Case No. 22-56090

In the United States Court of Appeals
for the Ninth Circuit

JUNIOR SPORTS MAGAZINES INC., et al.,
*Plaintiffs-Appellants*,

v.

ROB BONTA,
in his official capacity as Attorney General of the State of California,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:22-cv-04663-CAS-JC

**APPELLANTS' EXCERPTS OF RECORD
VOLUME III OF V**

C.D. Michel
Anna M. Barvir
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

Donald Kilmer
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Rd.
Caldwell, Idaho 83607
(408) 264-8489
don@dklawoffice.com

*Attorneys for Plaintiffs-Appellants*

December 19, 2022

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   KEVIN J. KELLY
    Deputy Attorney General
4   State Bar No. 337425
      300 S. Spring St., Ste. 9012
5     Los Angeles, CA 90013
      Telephone: (213) 266-6615
6     Fax: (916) 731-2124
      E-mail: Kevin.Kelly@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta,*
    *In his official capacity as Attorney*
8   *General of the State of California*

9                   IN THE UNITED STATES DISTRICT COURT

10                  FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12

13

14  **JUNIOR SPORTS MAGAZINES INC. ET AL.,**

15                                          **DEFENDANT'S OPPOSITION TO**
                                            **PLAINTIFFS' MOTION FOR**
16              **v.**                      **PRELIMINARY INJUNCTION**

17  **ROB BONTA, IN HIS OFFICIAL**          Date:         August 22, 2022
    **CAPACITY AS ATTORNEY**                Time:         10:00 a.m.
18  **GENERAL OF THE STATE OF**             Courtroom:    8D
    **CALIFORNIA ET AL.,**                  Judge:        Christina A. Snyder
19                                          Action Filed: July 8, 2022

20

21

22

23

24

25

26

27

28

---

0340

# TABLE OF CONTENTS

**Page**

Introduction.............................................................................................................. 1

Background.............................................................................................................. 2

    A.    The Challenged Statute............................................................... 2

    B.    California's Restrictions on the Ownership, Possession, and Use of Firearms by Minors. ......................................... 5

    C.    Plaintiffs' Allegations ................................................................ 6

Legal Standard ....................................................................................................... 7

Argument ................................................................................................................. 7

  I.    Plaintiffs Have Not Shown a Likelihood of Success on the Merits. .................................................................................................. 7

    A.    Contrary to Plaintiffs' contentions, AB 2571 is a regulation of commercial speech, not core political speech or association. .............................................................. 7

    B.    AB 2571 permissibly regulates commercial speech concerning unlawful activity. ................................................ 12

    C.    Even assuming AB 2571 regulates commercial speech that is protected by the First Amendment, it directly advances a substantial government interest and is no more restrictive than necessary to serve that interest. ................. 13

  II.    Plaintiffs Cannot Establish Irreparable Harm in the Absence of Injunctive Relief. .............................................................. 20

  III.    The Balance of Equities, Which Includes Analysis of the Public Interest, Tips Against an Injunction. ................................ 20

Conclusion ............................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v. Larose,*
   445 F. Supp. 3d 861 (S.D. Cal. 2020) ............................................................ 7

*Ariix, LLC v. NutriSearch Corp.,*
   985 F.3d 1107 (9th Cir. 2021) ....................................................................... 8

*Bd. of Trustees of State Univ. of N.Y. v. Fox,*
   492 U.S. 469 (1989) ..................................................................................... 17

*Bolger v. Youngs Drug Prods. Corp.,*
   463 U.S. 60 (1983) ......................................................................................... 8

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ......................................................................... 7

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
   447 U.S. 557 (1980) .......................................................................... 7, 12, 13

*City of Los Angeles v. Alameda Books, Inc.,*
   535 U.S. 425 (2002) ..................................................................................... 13

*City of Renton v. Playtime Theatres, Inc.,*
   475 U.S. 41 (1986) ................................................................................. 11, 13

*Coyote Publ'g Inc. v. Miller,*
   598 F.3d 592 (9th Cir. 2010) ....................................................................... 13

*Disbar Corp. v. Newsom,*
   508 F. Supp. 3d 747 (E.D. Cal. 2020) ........................................................... 7

*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014) ....................................................................... 7

*Edenfield v. Fane,*
   507 U.S. 761 (1993) ..................................................................................... 15

*Fla. Bar v. Went For It, Inc.,*
   515 U.S. 618 (1995) ............................................................................... 13, 15

ii

0342

**TABLE OF AUTHORITIES**
**(continued)**

Page

*FTC. v. Affordable Media,*
179 F.3d 1228 (9th Cir. 1999).................................................................20

*Fyock v. City of Sunnyvale,*
25 F. Supp. 3d 1267 (N.D. Cal. 2014), *aff'd sub nom. Fyock v.
Sunnyvale,* 779 F.3d 991 (9th Cir. 2015) ...........................................21

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States,*
527 U.S. 173 (1999) ..............................................................................17

*Hennessy-Waller v. Snyder,*
529 F. Supp. 3d 1031 (D. Ariz. 2021), *aff'd sub nom. Doe v.
Snyder,* 28 F.4th 103 (9th Cir. 2022).................................................22

*Hunt v. City of Los Angeles,*
638 F.3d 703 (9th Cir. 2011).............................................................7, 8

*Johnson v. Brown,*
567 F. Supp. 3d 1230 (D. Or. 2021)..............................................11, 20

*Nunez by Nunez v. City of San Diego,*
114 F.3d 935 (9th Cir. 1997).................................................................14

*OSU Student All. v. Ray,*
699 F.3d 1053 (9th Cir. 2012).................................................................19

*Plyler v. Doe,*
457 U.S. 202 (1982) ................................................................................19

*Progressive Democrats for Soc. Just. v. Bonta,*
No. 21-CV-03875-HSG, 2021 WL 6496784 (N.D. Cal. July 16,
2021)..........................................................................................................22

*In re R. M. J.,*
455 U.S. 191 (1982) ..............................................................................12

*Rupp v. Becerra,*
No. 817CV00746JLSJDE, 2018 WL 2138452 (C.D. Cal. May 9,
2018)..........................................................................................................21

iii

0343

**TABLE OF AUTHORITIES**
(continued)

Page

*Sable Commc'ns of California, Inc. v. F.C.C.,*
 492 U.S. 115 (1989) ...................................................... 14

*Tracy Rifle & Pistol LLC v. Harris*,
 118 F. Supp. 3d 1182 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401
 (9th Cir. 2016) ............................................................ 21

*Turner Broad. Sys., Inc. v. FCC*,
 520 U.S. 180 (1997) ...................................................... 13

*United States v. Edge Broad. Co.*,
 509 U.S. 418 (1993) ................................................. 13, 15

*Ventura Mobilehome Communities Owners Ass'n v. City of San
 Buenaventura*,
 371 F.3d 1046 (9th Cir. 2004) ............................................ 19

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1989) ...................................................... 10

*Wiese v. Becerra*,
 263 F.Supp.3d 986 ....................................................... 21

*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ........................................................ 7

*Zaitzeff v. City of Seattle*,
 No. C17-0184JLR, 2017 WL 2169941 (W.D. Wash. May 16, 2017) .............. 21

**Constitutions**

First Amendment ....................................................*passim*

Second Amendment ................................................. 1, 10, 11

Fourteenth Amendment .................................................... 6

**Statutes**

Cal. Bus. & Prof. Code § 22949.80 ....................................... 1

Cal. Bus. & Prof. Code § 22949.80(c)(4)(A) .............................. 10

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3    Cal. Bus. & Prof. Code § 22949.80(c)(6) ........................................ 8, 9, 10

4    Cal. Bus. & Prof. Code § 25664 ............................................................ 16

5
     Cal. Pen. Code § 16520 ........................................................................... 5
6

7    Cal. Pen. Code § 27505 ....................................................................... 5, 12

8    Cal. Pen. Code § 27510 ....................................................................... 5, 12

9    Cal. Pen. Code § 29610 ....................................................................... 5, 12

10   Cal. Pen. Code § 29615 ....................................................................... 5, 12

11   **Other Authorities**

12
13   Jason E. Goldstick, Ph.D. et al, *Current Causes of Death in Children
         and Adolescents in the United States*, 386 New Eng. J. Med. 1955,
14       1955 (2022)........................................................................................ 3

15   Matthew A. Lapierre, Ph.D. et al., *The Effect of Advertising on
         Children and Adolescents*, 140 PEDIATRICS S152 (2017) ..................... 3
16

17   Everytown Research & Policy, *#NotAnAccident Index*,
         https://everytownresearch.org/maps/notanaccident (last visited
18       August 8, 2022) ............................................................................... 14

19   Violence Policy Center, *Start Them Young* (2016) ..................................... 2

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction barring enforcement of California Business & Professions Code § 22949.80 ("AB 2571" or "§ 22949.80") in its entirety. Their motion is based on a misreading of the statute: it does not restrict core political speech about guns or conduct protected by the Second Amendment, but rather commercial speech concerning illegal activity – the sale of guns and other firearm-related products to minors. In an attempt to show that the statute sweeps well beyond that, Plaintiffs argue that California law broadly permits minors to use and possess firearms. To the contrary, California law generally prohibits minors from using or possessing guns and ammunition, with specified, narrow exceptions, and the law in all cases requires some form of adult supervision or permission. These restrictions are based on the obvious dangers posed by minors using guns, both to themselves and others.

Because AB 2571 is directed at regulating the advertising and marketing of guns to children, who are legally barred from purchasing them, it is constitutional. To the extent it regulates commercial speech about lawful activity, it satisfies the applicable *Central Hudson* test. AB 2571 directly advances a substantial government interest in protecting the safety and well-being of minors and society at large, and is no more restrictive than necessary to serve that interest.

For related reasons, Plaintiffs fail to demonstrate irreparable harm sufficient to obtain an injunction. The sweeping restrictions on speech they have read into AB 2571 cannot be squared with the operative text or the Legislature's expressly stated purposes. At the same time, enjoining AB 2571, a measure aimed at promoting public safety, would directly harm the public interest. That, coupled with the irreparable harm to the state that flows from any federal court order enjoining a duly enacted state law, precludes the relief Plaintiffs are seeking. Indeed, Plaintiffs seek an order barring *any* enforcement of the statute pending trial, yet they do not contend that it lacks *any* legitimate sweep, nor could they. By asking the court to

enjoin the statute in its entirety, Plaintiffs bear a particularly heavy burden here, and they fail to meet it. For these reasons and those discussed more fully below, this Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### A. The Challenged Statute

AB 2571, which went into effect as an urgency statute on June 30, 2022, is a reasonable legislative approach to an urgent nationwide crisis. Among other things, it restricts the marketing and advertising of firearm products to minors, attaches financial penalties for violations, and authorizes private enforcement.

AB 2571 is a product not only of years of professional research and scholarship on youth gun violence and the influence of advertising and marketing on children and adolescents, but also common sense. The legislative history of AB 2571, including academic literature and other materials considered by the Legislature, bear this out.[1] The author of AB 2571 quoted from and cited to a 2016 report entitled *Start Them Young* by the Violence Policy Center ("VPC"), a "national nonprofit educational organization that conducts research and public education on violence in America and provides information and analysis to policymakers, journalists, advocates, and the general public." *See* Request for Judicial Notice in Support of Plaintiffs' Motion for Preliminary Injunction ("Req. Jud. Nte."), Exhibit ("Exh.") 6, at 7. The VPC report included data from the Centers for Disease Control on firearm-related injuries and deaths among minors. *See* Violence Policy Center, *Start Them Young* (2016), annexed to the Declaration of Kevin J. Kelly ("Kelly Dec.") as Exh. A, at 40. According to the CDC, in 2014, the leading cause of death among minors ages 1 to 17 were unintentional injuries, with

---

[1] To the extent plaintiffs request that the Court take judicial notice of various related legislative materials, including various legislative analyses of AB 2571 and the bill itself (*see* Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Motion for Preliminary Injunction), Defendant does not oppose that request.

firearms accounting for 2% of all fatal unintentional injuries. *See id.* Guns also accounted for 40% of all suicides, and 59% of all homicides, in this age group. *See id.* The report further noted that toxic lead found in ammunition also poses a major health risk to both minors and adults. *See* id. at 42-43.

The Legislature also took note of the fact that since 2014, gun violence among children has only worsened. Indeed, AB 2571's author observed that gun violence is now the third leading cause of death for children and teens in California. *See* Req. Jud. Nte., Exh. 6, at 4. And the CDC recently reported that in 2020, for the first time, firearm-related injuries surpassed motor vehicle crashes as *the leading cause of death nationwide* among children and adolescents. *See* Req. Jud. Nte., Exh. 7, at 1; Jason E. Goldstick, Ph.D. et al, *Current Causes of Death in Children and Adolescents in the United States*, 386 New Eng. J. Med. 1955, 1955 (2022), annexed to the Kelly Dec. as Exh. B. Further, according to an analysis of FBI data, nearly half of all active shooting incidents at educational facilities in the United States from 2000 to 2019 were perpetrated by someone under the age of 18. *See* Req. Jud. Nte., Exh. 7, at 1.

AB 2571 also reflects the fact that "[f]or decades, researchers have recognized children as a vulnerable consumer group because of their budding developmental abilities." Matthew A. Lapierre, Ph.D. et al., *The Effect of Advertising on Children and Adolescents*, 140 PEDIATRICS S152, S153 (2017), annexed to the Kelly Dec. as Exh. C. For example, research has linked the marketing of certain products, including unhealthy food, alcohol, and tobacco, to an increased likelihood that adolescents will use these products. *See id*. Moreover, while "there have been calls to invest in the development of educational interventions to empower children by increasing their advertising knowledge," "research indicates that possessing advertising knowledge does not necessarily enable children to cope with advertising in a conscious and critical manner." *Id.* at S154.

It was with these concerns in mind that the Legislature enacted AB 2571. The Legislature found that California "has a compelling interest in ensuring that minors do not possess these dangerous weapons and in protecting its citizens, especially minors, from gun violence and from intimidation by persons brandishing these weapons." Req. Jud. Nte., Exh. 1, at 2. "The proliferation of firearms to and among minors poses a threat to the health, safety, and security of all residents of, and visitors to, this state." *Id.* at 1.

The Legislature further determined that "[t]hese weapons are especially dangerous in the hands of minors because current research and scientific evidence shows that minors are more impulsive, more likely to engage in risky and reckless behavior, unduly influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations." *Id.* at 1-2. Despite these risks, and the fact that "children are especially susceptible to marketing appeals, as well as more prone to impulsive, risky, thrill-seeking, and violent behavior than other age groups," "firearms manufacturers and retailers continue to market firearms to minors." *See id.* at 2.

Against this backdrop, AB 2571 prohibits members of the firearm industry, as defined, from advertising, marketing, or arranging for placement of an advertising or marketing communication concerning firearm-related products in a way that is designed, intended, or reasonably appears to be attractive to minors. *See* § 22949.80(a)(1). Courts are directed to look to the "totality of the circumstances" to determine whether the marketing or advertising is attractive to minors, and the statute provides a non-exclusive list of characteristics to assist courts in making that determination. *See id.* § 22949.80(2). Violators of the prohibition are subject to a maximum $25,000 penalty (*see id.* § 22949.80(e)(1)), and a person harmed by a violation may commence a civil action to recover damages (*see id.* § 22949.80(e)(3)). A court may also issue injunctive relief to prevent the harm

described in the statute and must award reasonable attorney's fees and costs to a prevailing plaintiff. *See id.* § 22949.80(e)(5).

**B. California's Restrictions on the Ownership, Possession, and Use of Firearms by Minors.**

AB 2571 restricts advertising and marketing in a narrow field that is already closely regulated. California law generally prohibits the sale, loan, or transfer of any firearm to a person under 21 years of age, with certain enumerated exceptions. *See* Cal. Pen. Code §§ 27505 & 27510. Furthermore, minors – those under the age of 18 – are generally prohibited from possessing a handgun, a semiautomatic centerfire rifle, and, as of July 1, 2023, any firearm. *See* Cal. Pen. Code § 29610.[2] There are very limited exceptions to these prohibitions. For example, the law allows a minor to possess or be loaned a firearm for certain limited purposes and under very specific circumstances. *See, e.g., id.* § 27505(b)(2) (permitting the loan of a firearm to a minor by the minor's parent or legal guardian for lawful recreational, agricultural, hunting, or artistic performance purposes, and for no longer than is reasonably necessary); *id.* § 29615 (permitting a minor to possess a firearm for lawful recreational, agricultural, hunting, or artistic performance purposes if accompanied by a parent or adult guardian and/or with the prior written consent of a parent or adult guardian and/or accompanied by a responsible adult). All of these permitted uses require the supervision and/or permission of a parent, legal guardian, and/or a responsible adult, depending on the purpose for which the item is used and, in some cases, the age of the minor. *See* Cal. Pen. Code §§ 27505 & 29615.

---

[2] For purposes of Cal. Pen. Code § 29610, a "firearm" is generally "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion," and includes "the frame or receiver of the weapon, including both a completed frame or receiver, or a firearm precursor part." *See* Cal. Pen. Code § 16520.

### C. Plaintiffs' Allegations

On July 8, 2022, Plaintiffs filed their Complaint. *See* ECF No. 1. The Complaint names eight individuals and entities as Plaintiffs and purports to allege a variety of constitutional claims, including violations of Plaintiffs' First Amendment rights to "political & ideological speech," "commercial speech," and "association & assembly," and their Fourteenth Amendment equal protection rights. *See* Complaint ¶¶ 107-141.

Plaintiffs allege that AB 2571 "imposes a content- and speaker-based restriction on protected speech that is viewpoint discriminatory, that serves no legitimate government interest (directly or indirectly), and that is both facially overbroad and far more extensive than necessary to achieve any purported interest." *Id.* ¶ 7. They further allege that it violates their "rights to assemble and associate" because "it directly prohibits advertising, marketing, or arranging for the placement of advertising or marketing promoting various firearm-related events and programs, where Plaintiffs peaceably and lawfully assemble and associate with each other and members of the public," and it "impermissibly restricts pro-gun (but not anti-gun) organizations from promoting membership in or financial support of their organizations in ways that might be deemed 'attractive to minors.'" *Id.* ¶ 9. They additionally allege that AB 2571 violates their equal protection rights "for many of the reasons [AB 2571] violates Plaintiffs' rights to engage in free speech[.]" *Id.* ¶ 10.

On July 20, 2022, Plaintiffs filed the instant motion. *See* ECF No. 12. Plaintiffs concurrently filed an ex parte motion to shorten the time for a hearing on the preliminary injunction motion, which Defendant opposed and the Court denied. *See* ECF Nos. 13, 14, & 15.

In their motion, Plaintiffs contend that, as a result of the passage of AB 2571, they and other "firearm industry members" have "immediately postponed or canceled youth shooting events and hunter's safety courses, scrubbed advertising

for such events from their websites, and terminated magazine subscriptions for minors living in California." Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction ("Plaintiffs' Memo") at 5. As a remedy, they seek an order barring enforcement of the statute in its entirety. *See id.* at 25.

<div align="center">

**LEGAL STANDARD**

</div>

Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Alvarez v. Larose*, 445 F. Supp. 3d 861, 865 (S.D. Cal. 2020) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "In cases where the movant seeks to alter the status quo," injunctive relief is "disfavored and a higher level of scrutiny must apply." *Disbar Corp. v. Newsom*, 508 F. Supp. 3d 747, 751 (E.D. Cal. 2020).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "When the government is a party, these last two factors," balance of the equities and public interest, "merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014); *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (same). Analysis of the first factor (*i.e.*, likelihood of success on the merits) is a "threshold inquiry," and thus if a movant fails to establish that factor, the court "need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).

<div align="center">

**ARGUMENT**

</div>

**I. PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.**

**A. Contrary to Plaintiffs' contentions, AB 2571 is a regulation of commercial speech, not core political speech or association.**

The Supreme Court has long distinguished between "commercial speech" – that is, "speech proposing a commercial transaction" – and other types of speech,

1   which may enjoy greater First Amendment protection. *See Cent. Hudson Gas &*
2   *Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562 (1980). Factors
3   to be considered in deciding whether speech constitutes "commercial speech"
4   include whether (1) the speech is an advertisement; (2) the speech refers to a
5   particular product; and (3) the speaker has an economic motivation. *See Hunt v.*
6   *City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger v. Youngs*
7   *Drug Prods. Corp.,* 463 U.S. 60, 66-68 (1983)). These factors are "not dispositive"
8   (*Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021)), and not all
9   of these factors "must necessarily be present in order for speech to be commercial"
10  (*Bolger*, 463 U.S. at 67 n.14).

11       Here, AB 2571 is properly understood as a regulation of commercial speech,
12  not core political speech, as Plaintiffs contend. It prohibits a "firearm industry
13  member" from *advertising, marketing, or arranging for placement of an*
14  *advertising or marketing communication* concerning any firearm-related product in
15  a manner that is designed, intended, or reasonably appears to be attractive to
16  minors. § 22949.80(a)(1). Thus, it regulates speech with an obvious economic or
17  commercial motivation. *See Hunt*, 638 F.3d at 715. The statute also defines
18  "marketing or advertising" with reference to commercial transactions, i.e., those
19  involving a proposed "exchange for monetary compensation." *See*
20  § 22949.80(c)(6). Thus, AB 2571 regulates speech constituting an "advertisement."
21  *See Hunt*, 638 F.3d at 715. AB 2571 also explicitly regulates advertising and
22  marketing in connection with a "particular product" (*see id.*), that is, "firearm-
23  related products" (*see* § 22949.80(c)(6)). Therefore, all of the hallmarks for
24  applying commercial speech doctrine are present here.

25       Plaintiffs argue incorrectly that AB 2571 regulates speech that "ranges from
26  purely political to commercial," because it applies to (1) magazines that include
27  images and articles depicting minors enjoying shooting sports and selling
28  advertising space for "firearm-related products;" (2) organizations that sell and give

-8-

away branded merchandise that promote their organization and messages; and (3) entities that advertise and market lawful recreational and competitive shooting events, educational programs, safety courses, and gun shows where youth are likely to attend and use firearm-related products. *See* Plaintiffs' Memo at 9-10. In support, they point to the law's language prohibiting advertising and marketing "concerning" a firearm-related product, as well as to the definition of "marketing or advertising," which includes commercial appeals to "use" a particular product. *See id.* at 3-4.

Plaintiffs read AB 2571 too broadly. The statute should be read holistically and in its entirety, and with a view to the dangers that the Legislature designed it to address. Plaintiffs largely ignore the statute's narrow definition of "firearm-related product," which encompasses only certain tangible products, described as "items" – firearms, their components, and accessories. § 22949.80(c)(5). Instead, Plaintiffs argue that, despite the fact that the law includes no express reference to the broad swath of educational, sporting and political activity they invoke, the statute's prohibition against marketing "concerning" certain tangible products encompasses anything and everything related to firearms in any way. This reading stretches AB 2571 too far and renders the narrow definition of "firearm-related products" superfluous.[3] Implicit in the terms "marketing or advertising" in relation to *any* specific product is an offer to engage in a *commercial* transaction for the *sale and purchase* of that product; AB 2571 does not purport to restrict communications of *any* kind about firearms or firearm-related activities. The title of the bill – "Marketing Firearms to Minors" – indicates what it regulates and how it should be interpreted and applied.

---

[3] Similarly, *commercial appeals* to "use" a particular product offered for sale necessarily includes the limiting definition of product, and thus do not include communications concerning educational or sporting events, much less political speech. *See* Cal. Bus. & Prof. Code § 22949.80(c)(6) (defining "marketing or advertising" as communications encouraging "purchase or use of a product or service," only "in exchange for monetary compensation").

The Legislature's express statements of purpose, which focus exclusively on marketing of tangible products – firearms and accessories – to minors, further support this common-sense reading. *See* Req. Jud. Nte., Exh. 1, at 1 (introductory paragraph stating intent to regulate "commercial speech" and "advertising"); *id.* ("This bill would prohibit a firearm industry member, as defined, from advertising or marketing any firearm-related product as defined, in a manner that is designed, intended, or reasonably appears to be attractive to minors."); *id.* at 2 ("It is the intent of the Legislature in enacting this act to further restrict the marketing and advertising of firearms to minors."). Nothing in the extensive legislative history evinces an intent to restrict promotion of educational, recreational, or competitive events, much less solicitation of membership in any organization or political speech of any kind.

Thus, fairly read, AB 2571 cannot be viewed as a content- or viewpoint-based restriction on core speech or on Plaintiffs' right to associate. The statute regulates commercial speech, and was not adopted to regulate speech "because of disagreement with the message it conveys." *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Rather, it was adopted to serve important government interests implicated by the marketing and advertising of firearms-related to products to children (that are discussed more fully below, *see infra* at I.(c)(1)).

Indeed, Plaintiffs are incorrect that the law prohibits them from, for example, "engaging in noncommercial speech soliciting memberships for youth and using branding merchandise." Plaintiffs' Memo at 12. As explained above, the only activity of Second Amendment rights organizations prohibited by AB 2571 is the advertising of firearms-related products to minors "in exchange for monetary compensation" – that is, if they proposed a commercial transaction for the product. *See* § 22949.80(c)(6).

Plaintiffs are similarly incorrect that the law targets those expressing a particular viewpoint and that they are targeted as a disfavored class. *See id.* at 12,

22. Indeed, if organizations such as Moms Demand Action for Gun Sense in America and Gun Free Kids (*see id.* at 12) engaged in the same prohibited "advertising or marketing" conduct for the purchase of firearms, they too would run afoul of the statute as a "firearm industry member" (*see* Cal. Bus. & Prof. Code § 22949.80(c)(4)(A) (defining "firearm industry member" as "[a] person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the . . . retail sale of firearm-related products")). Contrary to Plaintiffs' assertion, no individual, company or organization is exempt from the prohibition on marketing firearm-related products to children because, by doing so, they become a "firearm industry member" subject to the law. Accordingly, the law does not target any particular group or viewpoint, but rather specific prohibited conduct.

Plaintiffs' allegations about the personal feelings or motivations of individual government officials (*see, e.g.*, Plaintiffs' Memo at 1, 8-9, 12) do not change this result. In *Nordyke*, 644 F.3d at 792, the Ninth Circuit rejected the contention that a county ordinance prohibiting possession of firearms on county property was adopted "in order to prevent members of the 'gun culture' from expressing their views about firearms and the Second Amendment," finding that "the Ordinance's language suggests that gun violence, not gun culture, motivated its passage." *Id*. (citing statement in ordinance that "[p]rohibiting the possession of firearms on County property will promote the public health and safety by contributing to the reduction of gunshot fatalities and injuries in the County"). The Court declined to rely on comments made by an individual county supervisor, because "the feelings of one county official do not necessarily bear any relation to the aims and interests of the county legislature as a whole," and because "the Supreme Court has admonished litigants against attributing the motivations of legislators to legislatures." *Id.* (citing *United States v. O'Brien,* 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what

motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.")); *Johnson*, 491 U.S. 397; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986). The same reasoning applies here; the Court should disregard Plaintiffs' assertions regarding the purported motivations of individual government officials in adopting AB 2571.

### B. AB 2571 permissibly regulates commercial speech concerning unlawful activity.

As established above, AB 2571 – in light of both the operative language and the Legislature's express statements of purpose – regulates commercial speech. And for commercial speech to enjoy First Amendment protection, "it at least must concern lawful activity and not be misleading" (*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980)), which Plaintiffs acknowledge (*see* Plaintiffs' Memo at 16). "[W]hen the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions." *In re R. M. J.*, 455 U.S. 191, 203 (1982).

It is illegal in California to sell a firearm to a minor under any circumstances, and illegal to loan or transfer any firearm to a person under 21 years of age, subject to narrow exceptions. *See* Cal. Pen. Code §§ 27505, 27510, & 29615. California law also generally prohibits a minor from possessing a handgun, a semiautomatic centerfire rifle, and, as of July 1, 2023, any firearm. *See* Cal. Pen. Code § 29610. As Plaintiffs point out, there are exceptions to these prohibitions, but they are quite narrow and carefully circumscribed. Moreover, in each and every circumstance in which a minor is permitted to possess a gun, adult supervision or permission in some form is required for obvious safety reasons. Plaintiffs' assertion that these exceptions are "so broad that [they] nearly swallow the rule" (*see* Plaintiffs' Memo at 16) is plainly refuted by the statutory scheme itself. Therefore, AB 2571 regulates commercial speech respecting unlawful activity – the sale of guns to

minors. And, for the same reason, AB 2571 regulates advertising and marketing that is inherently misleading to the young viewers and readers it seeks to protect, a point that Plaintiffs appear to concede (although they seek to minimize its importance). *See* Plaintiffs' Memo at 11 (observing that "AB 2571 might technically ban misleading speech promoting the unlawful sale of firearms to minors[.]"). It is inherently misleading to advertise the sale of a product to an audience that is legally barred from purchasing the product being advertised.

### C. Even assuming AB 2571 regulates commercial speech that is protected by the First Amendment, it directly advances a substantial government interest and is no more restrictive than necessary to serve that interest.

Regulations of protected commercial speech are reviewed under a form of intermediate, not strict, scrutiny. *See Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 563-66 (1980); *Coyote Publ'g Inc. v. Miller*, 598 F.3d 592, 598-610 (9th Cir. 2010). If the commercial speech at issue concerns a lawful activity and is not misleading, then government regulation of the speech will be upheld so long as the government asserts a substantial interest, the regulation directly advances the government's asserted interest, and the regulation is no more restrictive than necessary to serve that interest. *See Central Hudson*, 447 U.S. at 566. When applying the intermediate scrutiny standard, courts give "substantial deference to the predictive judgments of [the legislature]." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (internal quotation marks and citation omitted); *see also United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993) ("Within the bounds of the general protection provided by the Constitution to commercial speech, we allow room for legislative judgments.").

Lawmakers "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *City of Renton*, 475 U.S. at 52 (internal quotation marks and citation omitted). In making such judgments, the legislature may rely on evidence "reasonably believed to be relevant to the problem" (*id.* at 51)

-13-

1    and such evidence need not be empirical (*see, e.g.*, *City of Los Angeles v. Alameda*

2    *Books, Inc.*, 535 U.S. 425, 439 (2002) (plurality opinion) (explaining that city did

3    not need empirical data to support its conclusion that adult-bookstore ordinance

4    would lower crime)). Indeed, "history, consensus, and simple common sense" can

5    suffice. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation

6    marks and citation omitted). To the extent that AB 2471 regulates truthful, lawful

7    commercial speech, it directly advances the State's asserted substantial interest and

8    is no more extensive than necessary to serve that interest, and it passes muster

9    under *Central Hudson*.

10          **1.    AB 2571 serves significant government interests in**
            **protecting minors and the general public from gun-related**
11          **injuries and deaths.**

12          As the Supreme Court has recognized, a state has "a compelling interest in

13   protecting the physical and psychological well-being of minors." *Sable Commc'ns*

14   *of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). Furthermore, "the

15   government may have a compelling interest in protecting minors from certain

16   things that it does not for adults." *Nunez by Nunez v. City of San Diego*, 114 F.3d

17   935, 945 (9th Cir. 1997). Consistent with these basic principles, AB 2571 declares

18   that the State has "a compelling interest in ensuring minors do not possess these

19   dangerous weapons [*i.e.*, firearms] and in protecting its citizens, especially minors,

20   from gun violence and from intimidation by persons brandishing these weapons."

21   *See* Req. Jud. Nte., Exh. 1, at 2. These are undeniably compelling interests.

22          The Legislature found that "the proliferation of firearms to and among minors

23   poses a threat to the health, safety, and security of all residents of, and visitors to,

24   this state." *See id.*, Exh. 1, at 1. This finding is borne out by the facts: "[i]n 2021

25   there were approximately 259 unintentional shootings by children, resulting in 104

26   deaths and 168 injuries." *See id.*, Exh. 6, at 9. Furthermore, to date, there have been

27   at least 169 unintentional shootings by children in 2022, resulting in 74 deaths and

28   104 injuries nationally. *See* Everytown Research & Policy, *#NotAnAccident Index*,

-14-

1   https://everytownresearch.org/maps/notanaccident (last visited August 8, 2022),

2   annexed to the Kelly Dec. as Exh. D. And in 2020, for the first time, firearms-

3   related injuries surpassed motor vehicle crashes as the leading cause of death

4   nationwide for children and adolescents. *See* Req. Jud. Nte., Exh. 7, at 1; Kelly

5   Dec., Exh. C, at 1955.

6         Plaintiffs try to cast doubt on the above interests as "genuine" and claim that

7   they are somehow "undercut by the State's laws expressly allowing minors to

8   possess firearms for lawful purposes." *See* Plaintiffs' Memo at 17-18. But, as

9   explained above, the prohibition on firearm possession by minors is the rule, not the

10  exception. The existing statutory framework reflects a policy concern that firearm

11  possession by minors – for any purpose, including the narrowly specified,

12  permissible uses set out in statute – presents inherent safety concerns. In any event,

13  as evidenced by the bill itself, the State's interest arises from safety concerns

14  regarding the *illegal* possession and use of firearms by minors. *See* Req. Jud. Nte.,

15  Exh. 1, at 2 ("In recognition of these facts, the Legislature has already prohibited

16  minors from possessing firearms, except in limited circumstances.").

17        The government interests explicitly stated by the Legislature in AB 2571

18  easily satisfy the "substantial state interest" prong of the analysis.

19        **2.    AB 2571 directly advances the State's significant
                government interests.**

20

21        In applying the third prong of the *Central Hudson* test, "a government body

22  seeking to sustain a restriction on commercial speech must demonstrate that the

23  harms it recites are real and that its restriction will in fact alleviate them to a

24  material degree." *Edenfield v. Fane*, 507 U.S. 761, 762 (1993). Nevertheless,

25  "empirical data [need not] come . . . accompanied by a surfeit of background

26  information," and such restrictions may be "based solely on history, consensus, and

27  'simple common sense.'" *Fla. Bar*, 515 U.S. at 628 (quotation marks omitted). Of

28  particular relevance here, the Supreme Court has long held that the government

-15-

may restrict advertising in order to dampen demand, and thereby advance a substantial government interest. *See, e.g.*, *Edge Broad.*, 509 U.S. at 434 ("If there is an immediate connection between advertising [for gambling] and demand, and the federal regulation decreases advertising, it stands to reason that the policy of decreasing demand for gambling is correspondingly advanced.").[4]

As described above, the Legislature found – and the factual record it relied on demonstrates – that the illegal possession of firearms by minors constitutes a serious health and safety risk to children and other residents of this state. Further, as the Legislature noted, studies have linked the influence of advertising to the use of certain products by youth. *See* Req. Jud. Nte., Exh. 3, at 12 ("Research on the effects of advertising has shown that they may be responsible for up to 30% of underage tobacco and alcohol use.") (citing John P. Pierce, Ph.D. et al., *Tobacco Industry Promotion of Cigarettes and Adolescent Smoking*, 279 J. OF AM. MED. ASS'N 511, 511-515 (1998)). Conversely, studies have shown that *restrictions* on advertising are associated with the *decreased* use of certain products by youth. *See id.* ("On the other hand, restrictions on alcohol advertising are associated with both (1) lower prevalence and frequency of adolescent alcohol consumption; and (2) older age of first alcohol use.") (citing Mallie J. Paschall, Ph.D. et al., *Alcohol Control Policies and Alcohol Consumption by Youth: A Multi-National Study*, 104 ADDICTION 1849-1855).

As the VPC found and as the Legislature recognized at the time of the bill's passage, firearm industry members have been directly advertising and marketing firearms to children. *See* Kelly Dec. Exh. A at 45; Req. Jud. Nte., Exh. 1, at 2 (observing that "firearms manufacturers and retailers continue to market firearms to

---

[4] The State has used a similar policy approach in regulating alcohol advertising aimed at minors. *See* Cal. Bus. & Prof. Code § 25664 (prohibiting "[t]he use, in any advertisement of alcoholic beverages, of any subject matter, language, or slogan addressed to and intended to encourage minors to drink the alcoholic beverages").

minors"). By restricting such advertising and marketing, and thereby reducing demand for firearm-related products among minors, AB 2571 is likely to reduce the unsafe use of firearms by minors. It will thus directly advance the State's goals of reducing gun violence perpetrated by and against minors and others, both intentional and unintentional.

Nevertheless, Plaintiffs argue that AB 2571 "builds on the deceptive claim that minors may not lawfully possess firearms in California, while ignoring the fact that the law bars even communications about expressly lawful recreational and training purposes." *See* Plaintiffs' Memo at 18. Again, this argument oversimplifies both AB 2571 and the background prohibition on possession of firearms by minors, which permits only narrow exceptions for specified uses, and even in those limited circumstances requires mandatory adult supervision and/or parent or legal guardian permission, depending on the circumstances and/or the age of the minor.

### 3. AB 2571 sweeps no further than necessary to serve the State's significant interests.

The fourth prong of the *Central Hudson* test "complements" the third prong by providing that a restriction on commercial speech must not be "more extensive than necessary to serve the interests that support it." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999). In analyzing this prong, the court must look for a fit between the government's ends and the means chosen to accomplish those ends that is reasonable, representing "not necessarily the single best disposition but one whose scope is in proportion to the interest served . . . ." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (quotation marks omitted). So long as a statute falls within those bounds, courts "leave it to governmental decisionmakers to judge what manner of regulation may best be employed." *Id.* In fact, the Supreme Court has written "of the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires," and of the virtue of providing "the Legislative and

-17-

Executive Branches needed leeway in a field (commercial speech) traditionally subject to government regulation . . . ." *Id.* at 481 (quotation marks omitted).

Here, as demonstrated above, AB 2571 regulates only a narrow category of commercial speech (that offering firearms, their components, and accessories for sale), and only by those "engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products" and entities or associations "formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership" of a firearm-related product and that advertises, endorses, or sponsors the products or the events where they are sold. *See* Req. Jud. Nte., Exh. 1, at 3. As the legislative materials reiterate, AB 2571 focuses on commercial speech "promulgated by a narrowly defined group of commercial speakers – the firearm industry – rather than on publishers, or even advertisers, in general." *Id.*, Exh. 5, at 3. Accordingly, it sweeps no further than necessary.

Plaintiffs argue that AB 2571 is overbroad because it "includes communications that are equally attractive to adults who have a right to obtain information about such products to make informed decisions for both themselves and their children." Plaintiffs' Memo at 20. In so arguing, they point to the Legislature's statement that the prohibition "applies whether the media is directed to children or a general audience. In other words, it applies to all marketing, regardless of the target audience." *See id.* (quoting Req. Jud. Nte., Exh. 2 at 6). Plaintiffs ignore that AB 2571 narrowly regulates advertising and marketing communications that are "designed, intended, or reasonably appear[] to be attractive to minors" as demonstrated by a variety of non-exclusive factors. *See* § 22949.80(a)(2). Indeed, these factors may include that they are "part of a marketing or advertising campaign designed with the intent to appeal to minors" (*id.* § 22949.80(a)(2)(D)) and/or "placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended

-18-

for a more general audience composed of adults" (*id.* § 22949.80(a)(2)(F)). And even so, an advertising or marketing communication is subject to the prohibition *only* if a court determines that they meet a "totality of the circumstances" test, a legal exercise that courts routinely perform in various other contexts.

      **4.**    **Plaintiffs are not likely to succeed on their Equal Protection claim because it is duplicative of their First Amendment claims, and because they have not alleged sufficient facts showing that they are part of a protected class of individuals.**

"The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). "But so too, the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Id.* (internal quotation marks and brackets omitted) (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)). Conclusory allegations that the government is treating plaintiffs differently from other similarly-situated individuals are insufficient to allege a valid Equal Protection claim. *See Ventura Mobilehome Communities Owners Ass'n v. City of San Buenaventura,* 371 F.3d 1046, 1055 (9th Cir. 2004) (conclusory allegations of Equal Protection violation, unaccompanied by allegations identifying others similarly situated or alleging how they are treated differently from plaintiff, are insufficient to withstand motion to dismiss).

Here, Plaintiffs allege in conclusory fashion that AB 2571 "targets only 'firearm industry members,'" a purportedly unpopular group, and that government officials adopted the law solely out of animus toward the Plaintiffs. *See* Plaintiffs' Memo at 22-23. This fails to identify any protected class. Indeed, Plaintiffs' claims are duplicative of and subsumed by their flawed First Amendment claim. Where, as here, the plaintiffs have failed to allege membership in a protected class, and speech is the only fundamental right underpinning the equal protection claim, the claim

"rise[s] and fall[s] with the First Amendment claims." *OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012).

## II. PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF.

Even if Plaintiffs had demonstrated a likelihood of success on the merits, they would still need to demonstrate that they would suffer irreparable harm if an injunction were not issued. It is true that, as Plaintiffs point out, a demonstration of even minimal loss of First Amendment freedoms constitutes "irreparable harm" for purposes of seeking injunctive relief. *See* Plaintiffs' Memo at 23 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). But as demonstrated above, Plaintiffs are not likely to succeed on the merits because AB 2571 does not unconstitutionally burden any of their constitutional rights. For the same reason, they cannot show they will suffer irreparable harm if their motion is denied.

## III. THE BALANCE OF EQUITIES, WHICH INCLUDES ANALYSIS OF THE PUBLIC INTEREST, TIPS AGAINST AN INJUNCTION.

Even if Plaintiffs could show that they would suffer irreparable harm in the absence of a preliminary injunction, the balance of the equities (which, where the defendant is a government official, includes analysis of the public interest) weighs against a preliminary injunction for numerous reasons. *See Johnson v. Brown*, 567 F. Supp. 3d 1230, 1266 (D. Or. 2021) (balancing equities even where Plaintiffs asserted that their "fundamental constitutional rights" were implicated). "[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *FTC. v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) (quoting *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir.1989)). First, the balance of the equities does not weigh in favor of the issuance of a preliminary injunction because AB 2571 promotes "a compelling interest in ensuring that minors do not possess these dangerous weapons [i.e., firearms] and in protecting its citizens, especially minors, from gun violence and from intimidation by persons brandishing these weapons." *See* Req. Jud. Nte.,

Exh. 1, at 2. Indeed, Plaintiffs seek an order barring *any* enforcement of the statute pending trial, yet they do not and cannot contend that it lacks *any* legitimate sweep. Although they are asking the court to enjoin AB 2571 on its face, Plaintiffs do not dispute that it bars at least some conduct harmful to the public's safety.

Moreover, the significance of the harm that could result from the improper issuance of an injunction would be substantial. "The costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave," and those costs would impact both "members of the public" and "the Government which is tasked with managing handgun violence." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016). The same cautions apply here.

Furthermore, the public interest would not be served by a preliminary injunction because "gun violence threatens the public at large." *See Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1283 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) (denying preliminary injunction where the public interest factor weighed against issuance of an injunction); *see also Wiese v. Becerra*, 263 F.Supp.3d 986, 994 (finding that the public interest is furthered "by preventing and minimizing the harm of gun violence"); *Rupp v. Becerra*, No. 817CV00746JLSJDE, 2018 WL 2138452, at *13 (C.D. Cal. May 9, 2018) ("[B]ecause the objective of the [challenged firearms law] is public safety, Plaintiffs fail to show that an injunction would be in the public interest."); *Zaitzeff v. City of Seattle*, No. C17-0184JLR, 2017 WL 2169941, at *3 (W.D. Wash. May 16, 2017) (denying motion for preliminary injunction based in part on a finding that a local ordinance banning certain uses of weapons, including nunchucks and fixed-blade knives, "serves a public safety interest").

Finally, the preliminary relief Plaintiffs seek here should also denied because they effectively seek to litigate the merits of the dispute without a motion for

summary judgment or trial. "[C]ourts generally disfavor preliminary injunctive relief that is identical to the ultimate relief sought in the case." *See Progressive Democrats for Soc. Just. v. Bonta*, No. 21-CV-03875-HSG, 2021 WL 6496784, at *11 (N.D. Cal. July 16, 2021) (holding that "it is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial") (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808–09 (9th Cir. 1963); *see also Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1046 (D. Ariz. 2021), *aff'd sub nom. Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022) (denying motion "because the preliminary injunctive relief sought is identical to the ultimate relief sought in the underlying complaint" and it would be "premature to grant such relief prior to discovery and summary judgment briefing"). The relief sought by Plaintiffs here is the same relief that Plaintiffs would obtain after summary judgment or a trial, weighing heavily against issuance of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' request for a preliminary injunction.

Dated: August 8, 2022

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General

*/s/ Kevin J. Kelly*
KEVIN J. KELLY
Deputy Attorney General
*Attorneys for Defendant Rob Bonta, in his Official Capacity as Attorney General of the State of California*

SA2022301332
65331219.docx

1  ROB BONTA
   Attorney General of California
2  MARK BECKINGTON
   Supervising Deputy Attorney General
3  KEVIN J. KELLY
   Deputy Attorney General
4  State Bar No. 337425
       300 S. Spring St., Ste. 9012
5      Los Angeles, CA 90013
       Telephone: (213) 266-6615
6      Fax: (916) 731-2124
       E-mail: Kevin.Kelly@doj.ca.gov
7  *Attorneys for Defendant Rob Bonta,*
   *In his official capacity as Attorney*
8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12

13

14 | **JUNIOR SPORTS MAGAZINES INC. ET AL.,** | **DECLARATION OF KEVIN J. KELLY IN SUPPORT OF DEFENDANT'S**
15 |  | **OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY**
16 |               **v.** | **INJUNCTION**

17 | **ROB BONTA, IN HIS OFFICIAL** | Date:          August 22, 2022
   | **CAPACITY AS ATTORNEY GENERAL** | Time:          10:00 a.m.
18 | **OF THE STATE OF CALIFORNIA ET AL.,** | Courtroom:     8D
   |  | Judge:         Christina A. Snyder
19 |  | Action Filed:  July 8, 2022

20

21

22

23

24

25

26

27

28

Kelly Decl. in Supp. of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (2:22-cv-04663-CAS (JCx))

0368

I, KEVIN J. KELLY, declare:

1.    I am a Deputy Attorney General with the California Department of Justice, Office of the Attorney General, and an attorney for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California ("defendant") in this matter. I am an attorney at law duly licensed to practice before all courts of the State of California and admitted to practice before the United States District Court for the Central District of California. I have personal knowledge of the facts set forth below and if called as a witness, I could and would competently testify to them.

2.    This declaration is made in support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction.

3.    **Exhibit A** is a true and correct copy of Violence Policy Center, *Start Them Young* (2016). The document is available on the Violence Policy Center's website at: https://vpc.org/studies/startthemyoung.pdf.

4.    **Exhibit B** is a true and correct copy of Jason E. Goldstick, Ph.D. et al, *Current Causes of Death in Children and Adolescents in the United States*, 386 NEW ENG. J. MED. 1955 (2022). A copy is available on the New England Journal of Medicine's website at https://www.nejm.org/doi/full/10.1056/NEJMc2201761.

5.    **Exhibit C** is a true and correct copy of Matthew A. Lapierre, Ph.D. et al., *The Effect of Advertising on Children and Adolescents*, 140 PEDIATRICS S152 (2017). A copy is available on the American Academy of Pediatrics' website at: https://publications.aap.org/pediatrics/article/140/Supplement_2/S152/34178/The-Effect-of-Advertising-on-Children.

6.    On or about August 8, 2022, I visited the official website of Everytown Research & Policy. From there, I viewed and saved a copy of #NotAnAccident Index, available at https://everytownresearch.org/maps/notanaccident. A true and correct copy is annexed hereto as **Exhibit D**.

0369

1   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

2   correct.

3   Executed on: August 8, 2022

4

5                                               /s/ Kevin J. Kelly
                                                KEVIN J. KELLY
6                                               Deputy Attorney General

7   SA2014119177
    FINAL JSM v Bonta - Kelly Dec.doc
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kelly Decl. in Supp. of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (2:22-cv-04663-CAS (JCx))

0370

# EXHIBIT A

FEBRUARY 2016



**Violence Policy Center**



# "Start Them Young"

## How the Firearms Industry and Gun Lobby Are Targeting Your Children

WWW.VPC.ORG

Exhibit A

0372

## ABOUT THE COVER

### The Title

"Start Them Young" is a section head of the 2012 National Shooting Sports Foundation (NSSF) publication *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*. NSSF is the official trade association for the firearms industry.

### The Photo

"A chilling photograph of a small boy, gnawing on a pistol clutched in his tiny hands, dressed in camouflage and with a grenade and ammunition belt in his lap, was recovered from the weapon-filled home of Sandy Hook school gunman Adam Lanza....A family friend said that Lanza and his older brother were taught to shoot almost as soon as they could hold a weapon by their mother Nancy, a gun fanatic. But a spokesman for Mrs. Lanza's ex-husband, Peter, last night denied that the child in the uncaptioned photograph was either son."

"Sandy Hook report reveals Lanza children's early exposure to guns," *The Telegraph*, December 28, 2013

## COPYRIGHT AND ACKNOWLEDGMENTS

Copyright © February 2016 Violence Policy Center

**Violence Policy Center**
1730 Rhode Island Ave., NW
Suite 1014
Washington, DC  20036

202-822-8200

The Violence Policy Center (VPC) is a national nonprofit educational organization that conducts research and public education on violence in America and provides information and analysis to policymakers, journalists, advocates, and the general public.

This publication was funded with the support of the Lisa & Douglas Goldman Fund.

Primary author for this study was Josh Sugarmann. Additional research and writing was provided by Marty Langley, Avery Palmer, Kristen Rand, and Jane Wiesenberg.

The VPC would like to express its sincere appreciation to Sue Roman for the photographs and companion video she contributed to the study. (see https://youtu.be/rjKXGN7hYcg for video)

An online version of this study is available at http://www.vpc.org/publications/start-them-young/.

For a complete list of VPC publications with document links, please visit http://www.vpc.org/publications.

**To learn more about the Violence Policy Center, or to make a tax-deductible contribution to help support our work, please visit www.vpc.org.**

## SELECT FIREARMS INDUSTRY AND GUN LOBBY QUOTES ON MARKETING GUNS TO CHILDREN FROM THE STUDY

**"If we don't improve at cultivating new hunters and shooters, the sport we love and industry we work in will eventually die away. That's a strong diagnosis, but a realistic one. Like many enthusiast sports in this busy, competitive world, people are leaving faster than new ones are coming in — and this is a recipe for industry-wide trouble down the road."**

"Shooting for a New Audience: Reaching New Demographics is Critical to Our Industry,"
*Shooting Sports Retailer*, May/June 2007 (page 5)

**"If you're a kid looking for your first rifle, this is the gun you need to tell your parents about."**

"Marlin's New Kid-Friendly Rifles," *NRA Family InSights,* January 2, 2014 (page 11)

**"I can't remember how old he was, exactly, when he shot his first firearm — I think he was probably 8 years old — but I know he was around 10 when he shot his first machine gun."**

"Children and Guns — An Iowa Fail," Jews for the Preservation of Firearms Ownership,
April 21, 2014 (page 13)

**"Lenin was famously quoted as saying 'Give me just one generation of youth, and I'll transform the whole world.' With this in mind, developing the next generation in the shooting sports isn't just a business decision: The survival of the firearms world depends on the political will of those who come after us, which is a direct result of their involvement in the shooting sports."**

"The Best Guns for Smaller Shooters," *Shooting Sports Retailer*, April 30, 2015 (page 17)

**"And of course, the problem with failing to recruit and grow is that numbers equate to political power. In an era when the private ownership and use of firearms, the right to 'keep and bear arms,' has come under increasing pressure, numbers and a young, vital membership are critical."**

"Is the Shooting Industry Getting it All Wrong?," *Shooting Sports Retailer*, July 31, 2015 (page 21)

"What market isn't tied to juniors? I really can't think of any. Military and law enforcement firearms have civilian versions which are applicable. The Concealed Carry Weapon (CCW) market has firearms which hold 10-rounds which is the limit for IDPA [International Defensive Pistol Association] competition. When the junior turns 21 they can get a CCW permit. What do they buy? It is usually a gun from a manufacturer they are familiar with."

"A Word from Your Editor," *Junior Shooters*, Spring 2012 (page 23)

"[W]e're talking about a tiny gun intended for the very youngest shooters — the ultimate first gun. 'We're targeting the six- to 12-year-old range....'  With the number of hunters declining, it's crucial to get kids introduced to the sport as early as possible. The HotShot [youth rifle] means that even the youngest shooters now have a gun sized just for them."

"Test Fire: Thompson/Center HotShot," *NRA Family*, January 2, 2014 (page 31)

"To help hunting and target shooting get a head start over other activities, stakeholders such as managers and manufacturers should target programs toward youth 12 years old and younger. This is the time that youth are being targeted with competing activities."

"It is important to consider more hunting and target shooting recruitment programs aimed at middle school level, or earlier."

*Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012 (page 34)

"[Y]outh ambassadors and others should focus on getting newcomers to take a first step into target shooting through any means, whether a BB or pellet gun, paintball gun, or archery bow. The point should be to get newcomers started shooting *something*, with the natural next step being a move toward actual firearms. Initial interest, however, should be embraced in whatever form it presents itself. "

*Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012 (page 35)

Exhibit A



# TABLE OF CONTENTS

Introduction ........................................................................................................................................ 1

Following the Tobacco Industry's Path: The Search for Replacement Shooters ....................3

Davey Crickett, Little Jake, and the Marlin Man ................................................................7

"Tactical Rifles" for Kids .............................................................................................. 12

Guns in a Rainbow of Colors ......................................................................................... 17

The "Fiscal and Political" Benefits of Marketing Guns to Children ....................................20

*Junior Shooters*: "For Kids By Kids" ............................................................................ 22

NRA "Junior Members" ................................................................................................ 30

National Shooting Sports Foundation: The Gun Industry's Tobacco Institute ..................... 32

The Industry Finds Its "'Reality' Video Game" in 3-Gun Competition ................................ 36

The Reality of Children and Guns .................................................................................40

Conclusion and Recommendations ................................................................................44

Endnotes ..................................................................................................................46

# INTRODUCTION

*"He was just a good kid. He was everybody's friend."*

On October 24, 2014, 14-year-old Jaylen Fryberg entered the cafeteria at Marysville-Pilchuck High School in Marysville, Washington, and shot five classmates, killing four, before turning the gun on himself. Unlike many school shooters before him, Fryberg had given little or no warning of his intentions. He was described as a popular "happy-go-lucky" kid who played sports and was recently elected as the freshman class' prince in the school's homecoming court.

But like many American children, he also had easy access to guns. He grew up with guns around the house, frequently went hunting with his father, and recently obtained a hunting rifle as a gift, which he called "probably the best [birthday] present ever, I just love my parents!!!" The semiautomatic 40-caliber Beretta handgun, which he used to commit the crime, was his father's. Friends said that the teen had recently been involved in a breakup with his girlfriend and had sent disturbing messages via social media the week before the shooting.[1]

★ ★ ★

*"It was insane how much he knew....He would say all the types of guns and could name anything."*

On June 10, 2014, Jared Padgett, a 15-year-old freshman at Reynolds High School in Troutdale, Oregon, opened fire with a Daniel Defense M4 AR-15-style semiautomatic assault rifle in the school's boys' locker room, killing a classmate. He then wounded a physical education teacher before eventually turning the gun on himself. In addition to the AR-15, Padgett carried nine ammunition magazines, including 30-round magazines, a .25 Colt pistol, and a knife. All the weapons came from his family's home.

Subsequent investigation found that Padgett showed an intense interest in guns. One classmate said that he had "showed off about the guns he had," saying that he had "bullets at home, bullets and guns." On Facebook, he "Liked" an M4 assault rifles page (the type of gun he used in the shooting), and a page called "We WILL NOT Be Disarmed." Friends and classmates recalled that he talked frequently about guns. Another peer added that "it was insane how much he knew" about firearms and that he "would say all the types of guns and could name anything." After the shooting, a close friend of Padgett's said he was not surprised to learn that Padgett was the shooter, saying that he knew "it was him all along."[2]

★ ★ ★

*He had plans to kill his family, set off bombs, and "kill as many students as he could."*

John David LaDue, a 17-year-old from Waseca, Minnesota, was arrested by police after he was seen entering a storage unit in a suspicious manner on April 29, 2014, and the witness became concerned and called police. It was soon alleged that LaDue had plans to kill his family, set off bombs, and kill "as many students as he could" at Waseca Junior/Senior High School, where he was an 11th-grade honor roll student. LaDue had bombs that he had completed, bomb-making materials, as well as gunpowder in the storage unit. Inside his home, police found three improvised explosives, 400 rounds of ammunition, and seven guns. LaDue had illegally purchased a 45 caliber Llama handgun and had also stolen firearms from his father.

Exhibit A

0378

LaDue had a longstanding fascination with guns and famous mass shootings. Speaking to police following his arrest, LaDue admitted that he idolized previous mass shooters, such as those responsible for the 1999 Columbine High School attack, and added that he had hoped to kill more people than the 26 children and educators murdered at Sandy Hook Elementary School in 2012. He "Liked" the pages for several assault weapon models on Facebook.

LaDue's parents seemed to approve of their son's obsession with guns. His father confessed that "I tried to indulge him in every way that I thought was harmless," allowing his son to keep guns in his room for deer hunting and for protecting the family when he was away on business. LaDue's father even wore a shirt with a National Rifle Association logo to his son's court hearing.[3]

This disturbing list continues on: youth who, immersed in the language, culture, and weaponry of today's militarized gun culture, lash out, using such easily accessed firepower to right their perceived wrongs in the most violent way possible. Incidents like the ones cited above occur with what seems like almost rapid-fire regularity in America today: Children, teens, and young adults with easy access to guns pick up their weapons and use them for a homicidal purpose. Even more often, depressed teenagers use the guns to commit suicide. Young children and teens also unintentionally fire the weapons, injuring themselves or others.

The tragic frequency of shootings involving children and teenagers is well documented and unfortunately now a regular part of our daily existence. Yet few realize that the firearms industry and the organizations that represent their interests, including the National Rifle Association,[4] have made it one of their top marketing priorities to promote the use of guns among America's children, as young as grade-school age. In doing so, the gun industry is following a trail once blazed by the tobacco industry in its efforts to entice children to smoke cigarettes.

Exhibit A

0379

# FOLLOWING THE TOBACCO INDUSTRY'S PATH: THE SEARCH FOR REPLACEMENT SHOOTERS

The gun industry has long understood that it faces a slow-motion demographic collapse. With the industry's customer base growing older, household gun ownership in America has steadily declined. As its primary market of white males ages and dies off, the firearms industry has set its sights on America's children. Much like the tobacco industry's search for replacement smokers, the gun industry is seeking replacement shooters to purchase its deadly products.

Firearms companies have teamed up with "corporate partners" like the National Rifle Association of America, the gun industry's trade association the National Shooting Sports Foundation (NSSF), and online publications

such as *Junior Shooters* in an industry-wide effort to market firearms to kids. They do this by promoting websites and magazines targeted at children, designing "kid-friendly" guns to appeal to the youth market, and even working to create the equivalent of "'reality' video" games to encourage gun use from an early age.

The industry's focus on recruiting children into the gun culture has been acknowledged since at least the 1990s:



*Junior Shooters,* Winter 2009

- A 1993 issue of NSSF's *SHOT Business* raises the question, "Kids can't buy guns, you say? Well, yes and no. It's true that most students from kindergarten through high school can't purchase firearms on their own. But it's also true that in many parts of the country, youngsters (from preteens on up) are shooting and hunting. Pop picks up the tab."[5]

- In answer to the question, "How old is old enough?" the NSSF pamphlet *When Your Youngster Wants a Gun...* (distributed by the organization up until 1994) responds: "Age is not the major yardstick. Some youngsters are ready to start at 10, others at 14. The only real measures are those of maturity and individual responsibility. Does your youngster follow directions well? Is he conscientious and reliable? Would you leave him alone in the house for two or three hours? Would you send him to the grocery store with a list and a $20 bill? If the answer to these questions or similar ones are `yes,' then the answer can also be `yes' when your child asks for his first gun."

Exhibit A

0380



**When your youngster wants a gun...**

far less likely to have an accident than youngsters who have had no such instruction. Unless you are personally competent to handle the instruction, an approved safety course should be prerequisite to your youngster's owning a gun.

## Why do youngsters want to shoot?

Quite simply, most youngsters are interested in shooting for the same reasons they want to play football, baseball or basketball. Shooting is a challenging, enjoyable sport with deep roots in American tradition.

Competitive shooting or informal target practice are exciting and rewarding sports which can be enjoyed 12 months a year, indoors or out, individually or as part of an organized team. Shooting helps develop a youngster's self-confidence, coordination, and personal discipline.

For many youngsters, the shooting sports are particularly appealing because they do not require superior physical prowess as do so many sports. A boy or girl lacking the physical requirements to make the varsity basketball team, for example, may find himself competing shoulder to shoulder in state or national shooting championships—perhaps even the Olympics.

## How old is old enough?

Age is not the major yardstick. Some youngsters are ready to start at 10, others at 14. The only real measures are those of maturity and individual responsibility. Does your youngster follow directions well? Is he conscientious and reliable? Would you leave him alone in the house for two or three hours? Would you send him to the grocery store with a list and a $20 bill? If the answer to these questions or similar ones are "yes," then the answer can also be "yes" when your child asks for his first gun.

NSSF pamphlet *When your youngster wants a gun...*

■ At the NRA's 1996 Annual Meeting in Dallas, Texas, then-President Marion Hammer introduced her 10-year-old grandson Michael, stating, "I know that when NRA reaches out and takes the hand of a child, we are touching America's future." Hammer also outlined the NRA's agenda to "invest" in America's youth, win their "hearts and minds," and ensure the organization's longevity: "I pledge to you to dedicate my term in office to

two demanding missions. One is building an NRA bridge to America's youth. The other is being fiscally far-sighted to provide for bold new programs that will teach America's children values to last a lifetime. It will be an old-fashioned wrestling match for the hearts and minds of our children, and we'd better engage our adversaries with no holds barred....If we do not successfully reach out to the next generation, then the freedom and liberty that we've lived for — and that many of our ancestors have died for — will not live beyond us."

■   A New England Firearms advertisement that appeared on the cover of the September/October 1998 issue of the gun industry publication *Shooting Sports Retailer* warned, "It's not `who your customers will be in five years.' It's `will there be any customers left.'" The cover shows a family shooting, with the parents slowly fading away as a child aims a long gun. Inside the magazine, a full-page ad from the company warns, "Building the next generation of customers takes work and commitment. But it must be done. The greatest threat to the firearms business may not be the anti-gunners. It is a future which lacks gun owners and users due to lack of interest. In effect, [the] greatest threat we face is the lack of a future customer base for the products which we all sell. Coming to grips with this challenge is not easy but it must be done."[6]

The warnings made in the 1990s are being echoed in the new millennium. In a 2007 "Retailing Intelligence Report" column titled "Shooting for a New Audience" (subtitled "Reaching New Demographics is Critical to Our Industry") in the gun industry trade publication *Shooting Sports Retailer*, industry marketing consultant Bruce Bear warned:

"If we don't improve at cultivating new hunters and shooters, the sport we love and industry we work in will eventually die away. That's a strong diagnosis, but a realistic one. Like many enthusiast sports in this busy, competitive world, people are leaving faster than new ones are coming in — and this is a recipe for industry-wide trouble down the road."

Urging that the gun industry "Reach Out to Young Guns," Bear warns, "It's absolutely critical for us to pass a love of shooting and hunting on to the next generation," and quotes a Dallas-area gun store owner: "Many baby boomers are getting older and getting out of hunting and shooting, and we need new people to replace them." Adds Bear, "Working with kids and their parents is not only good business, it is helping families discover the fun of sharing shooting sports together."[7]

The industry's concern is easily understood looking at the demographics regarding not only hunting, but household gun ownership overall. According to the General Social Survey (GSS)[8] conducted by the National Opinion Research Center (NORC) at the University of Chicago:

■   From 1977 to 2014, the percentage of American households that reported having any guns in the home dropped by 40 percent.

■   During this period household gun ownership hit its peak in 1977, when more than half (53.7 percent) of American households reported having any guns. By 2014, 32.4 percent of American households reported having any guns in the home, a drop of more than 20 percentage points.

■   In 2014, less than a third of American households reported having a gun in the home.

## TABLE ONE: HOUSEHOLD GUN OWNERSHIP IN THE UNITED STATES, 1973 TO 2014

| Year | Percent of Adults in Households with Guns | Year | Percent of Adults in Households with Guns | Year | Percent of Adults in Households with Guns | Year | Percent of Adults in Households with Guns |
|------|------|------|------|------|------|------|------|
| 1973 | 48.7 | 1985 | 47.9 | 1994 | 43.8 | 2008 | 35.9 |
| 1974 | 47.6 | 1987 | 48.5 | 1996 | 43.3 | 2010 | 32.1 |
| 1976 | 49.5 | 1988 | 43.1 | 1998 | 36.5 | 2012 | 34.4 |
| 1977 | 53.7 | 1989 | 48.7 | 2000 | 34.2 | 2014 | 32.4 |
| 1980 | 50.3 | 1990 | 45.4 | 2002 | 36.4 | | |
| 1982 | 48.6 | 1991 | 43.4 | 2004 | 37.0 | | |
| 1984 | 48.1 | 1993 | 45.4 | 2006 | 34.4 | | |

One of the "main reasons" cited by NORC for the decline in household firearms ownership is "the decrease in the popularity of hunting." In 1977, 31.6 percent of adults lived in a household where they, a spouse, or both were hunters (see Table Two). By 2014 this number had dropped by more than half, to 15.4 percent.[9]

## TABLE TWO: THE DECLINE IN HUNTING, 1977 TO 2014

| Year | Percent Households With Adult Hunters | Year | Percent Households With Adult Hunters | Year | Percent Households With Adult Hunters | Year | Percent Households With Adult Hunters |
|------|------|------|------|------|------|------|------|
| 1977 | 31.6 | 1988 | 22.2 | 1996 | 23.1 | 2008 | 17.6 |
| 1980 | 28.3 | 1989 | 23.4 | 1998 | 19.3 | 2010 | 18.2 |
| 1982 | 26.8 | 1990 | 24.3 | 2000 | 18.7 | 2012 | 19.7 |
| 1984 | 26.7 | 1991 | 23.0 | 2002 | 20.2 | 2014 | 15.4 |
| 1985 | 26.2 | 1993 | 21.0 | 2004 | 19.4 | | |
| 1987 | 25.5 | 1994 | 22.1 | 2006 | 17.2 | | |

According to a survey from a 2015 National Shooting Sports Foundation marketing study, 72 percent of gun owners began hunting between the ages of six to 15 years old. After age 15, the percentages drop precipitously: 12 percent began hunting from age 16 to 20; three percent began hunting from age 21 to 25; and only six percent began hunting over the age of 25 (seven percent began hunting at age five or less). Recognizing that hunting is the primary means by which youth are introduced to guns, the focus on children is no surprise.[10]

Exhibit A

0383

The gun industry's recognition that it relies on winning the "hearts and minds" of America's children has not changed since NRA President Marion Hammer's day. What has changed is the openness with which the industry and its lobbying partners carry out this mission, the lethality of the types of firearms they are promoting, and the sophistication of their marketing efforts to children. Bolt-action rifles are being supplanted by military-style assault rifles. Six-shot revolvers have given way to semiautomatic pistols. And just as before, a constant, underlying goal of this outreach effort is to ensure not just the financial well-being of the industry, but the political viability of the pro-gun movement.

While under federal law an individual must be 18 years old to purchase a rifle and 21 years old to purchase a handgun from a Federal Firearms License (FFL, the basic federal license required to deal in firearms) holder, federal law as regards possession is far more lax. Federal law is mute on long gun possession by those under the age of 18, and while federal law ostensibly prohibits handgun possession under the age of 18, there are numerous exceptions. State law on gun possession varies by jurisdiction.



**Savage 2015 catalog**

## DAVEY CRICKETT, LITTLE JAKE, AND THE MARLIN MAN

Many Americans would be surprised at the age at which some parents introduce their children to firearms. This was made clear in April 2013 when a two-year-old Kentucky girl was unintentionally shot and killed by her five-year-old brother with a 22 caliber rifle he had received as a birthday gift. The gun, a Crickett rifle manufactured by Keystone Sporting Arms, the self-proclaimed "leading rifle supplier in the youth market,"[11] is specially designed for children. On its webpage, a friendly cartoon character stepping into the Joe Camel role for the company, "Davey Crickett," holds a rifle and stands atop the company's slogan: "My First Rifle."[12] "Crickett Logo Wear" in the company's catalog includes an armed Davey Crickett Beanie Baby ("not for children under three years of age"[13]), a Davey Crickett "trading pin," and a "My First Rifle" dog tag. The company also has a promotional YouTube video for its child-sized weapons.[14]

Exhibit A

0384



**Various "Crickett Logo Wear" for children from Keystone Sporting Arms**

Exhibit A

0385

On the company's website, cartoon "story books" from Little Sportsman Inc. include *My First Rifle* as well as a series featuring a freckled-faced protagonist named "Little Jake" which includes the titles *Little Jake and the Three Bears* and *Little Jake On Safari.*

In *Little Jake and the Three Bears,* Little Jake decides he needs a bear rug for his bed to keep warm during the "long cold winter." He then gets on his ATV, visits his friend the game warden to get his "bear-hunting license," and then visits his "favorite sporting goods store" where his friend Jerry sells him the necessary "hunting supplies." Little Jake then waits for bear hunting season to begin, "getting very excited" and noting, "It was almost like waiting for Christmas." After coming across bears that were either "too small" or "too big" to keep him warm, he finds one that is "just right," and shoots it, noting that the bear "never felt a thing." The story ends with Little Jake in bed, covered by his bear rug, eating "tasty bear sausages."



In *Little Jake On Safari,* Little Jake, his dad, and their hunting party interrupt their hunt for buffalo in Africa to aid a local village where there "has been a big bull elephant destroying their crops...." Little Jake and the hunting party go to the village, where they look over a scene of bent corn and smashed watermelons. After it's explained to Little Jake that "These are not the cute, loveable animals you see in cartoons and at the circus" but "one of the smartest and most dangerous animals on earth," the hunting party eventually comes across the elephant, who charges. Little Jake aims "for the brain" and brings the elephant down with two shots from his elephant gun with a "Bang!" and a "Bam!" The local villagers come, and before they start "harvesting the huge animal," begin "singing and dancing around, happy that the elephant would never again destroy crops or hurt anymore [sic] people." In the end, the tribe's chief gives Little Jake the elephant's tusks as a gift "so that you will always remember the time you saved my village."



In a bizarre and brazenly transparent disclaimer, the publisher of the Little Jake series explains that even though Little Jake looks, talks, and acts "like a child":

---

"Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision. As this series evolves with new titles, readers will learn more about Little Jake, his background and family. Soon we will be introduced to Little Jane (Little Jake's younger sister) through her own book series."[15]

 

Pages from *Little Jake On Safari*

Despite the presumed acceptability, and even desirability, of the combination of children and guns presented on the Keystone website, across the country, sorrow at the tragedy of the Kentucky shooting was followed by shock and surprise that not only could a five-year-old legally possess his own gun, but that there was a significant faction of the gun industry geared toward this market.

A 2014 article from *NRA Family InSights* on guns for children under eight years of age offers a snapshot of just one gunmaker's efforts, Marlin, to target children, right down to the creation of a real-life "Marlin Man" by the company:

"There's been a lot of talk about getting kids interested in shooting. Now, we're finally seeing firearms manufacturers getting serious about it. Several companies are offering firearms sized just for kids. Marlin has taken a very bold step in that direction. They've done things right with their new XT line of .22 rifles. These rifles are not just sized for kids; they're completely designed for kids."

Exhibit A

"Marlin took a different approach than many companies, which just put a shorter barrel on a rifle and cut the stock off a bit. Marlin engaged in a lengthy research program using real kids as test subjects. They looked at every aspect of a rifle in an effort to determine what they could do to make it more kid-friendly."

"Their efforts paid off and in a big way. I got to see this first-hand at an event held at the Glade Springs Resort in West Virginia. Like many companies that launch a new firearm, Marlin invited several firearms journalists to come and see these new rifles. But this time, Marlin went a step further: They asked the writers to bring their kids."

"This made perfect sense, because what better way to evaluate rifles sized specifically for kids than to let kids shoot them? Before the event got underway, the kids spent the morning riding horses. And then, when they arrived at the range, they got to meet the Marlin Man and his horse in person. The Marlin Man is the mounted cowboy Marlin has used as a logo for many years. He was brought to life for the kids at this event and he stirred the cowboy in everyone present."

"The kids were turned loose on the range, which was staffed with Marlin employees and members of the West Virginia Division of Natural Resources. After two days of shooting thousands of rounds of .22 LR ammunition, the verdict was in: Marlin's XT 22 Youth rifles are winners. If you're a kid looking for your first rifle, this is the gun you need to tell your parents about."[16]





**Marlin 2016 catalog**





**Photos of very young children with high-powered firearms can be found on websites and social media such as Facebook**

## "TACTICAL" RIFLES FOR KIDS

From gun magazines, to websites, to social media, two things become clear. For some gun owners there is almost a race to the bottom to see how young a child can be to handle, and eventually possess, a gun. At the same time, there's not infrequently an inverse trend to see how powerful a gun the child can handle.

Writing for Jews for the Preservation of Firearms Ownership (JPFO) in 2014, JPFO writer contributor Nicki Kenyon explains:

> "When my son was 4 years old, we decided it was time to introduce him to gun safety. He couldn't quite tie his shoes yet, but we knew we had guns in the house, and we knew we needed to instill good habits early, because it was literally a matter of life and death. His father was a police officer, and I was active in gun rights, and made it a point to be armed as much as possible. I still do. It's a matter of life and death...."

Exhibit A

0389

"I can't remember how old he was, exactly, when he shot his first firearm — I think he was probably 8 years old — but I know he was around 10 when he shot his first machine gun. I remember when he was about 6 years old, I sent him to my bedroom to get some paperwork that was on his father's night stand. He called down to me and said, 'Mommy! Daddy's pistol is sitting on top of the paperwork. Do I have your permission to move it?' That's when I knew we taught him well...."

"My son was lucky. He was legally allowed to handle firearms in Virginia. We took him to the range. He shot a variety of firearms — rifles, pistols, machine guns and shot guns. He has had his own eye and hearing protection since he was in elementary school, and he received his first Mossberg Plinkster when he was approximately 9."[17]

And while Kenyon describes her child's climb up the ladder of firepower with equal doses of pride and rationalization, four months later the risks of putting a full-auto machine gun into the hands of a child was illustrated to the nation with horrific clarity. On August 25, 2014, 39-year-old firearms instructor Charles Vacca, a father of four, was shot and killed at the Last Stop gun range when he was teaching a nine-year-old on vacation with her family in Las Vegas how to shoot an UZI submachine gun. The girl lost control of the weapon as the result of the full-auto weapon's recoil. The gun climbed up out of her control and she unintentionally shot Vacca in the head. The girl then dropped the weapon and ran to her family, who huddled around her as she held her shoulder.[18]

In the comments section of an online article from the NRA's *American Hunter* magazine titled "Choosing Your Child's First Gun," readers detailed the ages at which they felt their own sons and daughters were ready for their first gun: five, six, seven, and older. One of the points raised in the article was the fact that the recoil from many guns can hurt child shooters. As a Virginia Beach gunsmith told the author, "The first thing you want to avoid is to not overgun your kid...You try to give an 8-year-old kid a .308 or some blowaway magnum and it's going to be too much. It will just make the child recoil shy and that's the worst thing you can do to a kid." The author added, "Not only will it hamper their ability to become accurate, but it may chase them away from the sport before they've even really had the chance to get into it, according to many experts. Every time they shoot, they'll be thinking, 'this gun is going to kick the heck out of me,' and if that thought is on their mind, they'll never be able to shoot accurately."[19]



**Photo from NRA's 2014 Great American Outdoor Show (Sue Roman)**

One reader did take issue with the author's reticence on recommending an AR-15 assault rifle as a first gun for an eight- or 10-year-old child, writing, "If you teach your child proper firearms basics an AR is the perfect way to go. I built my six year old son one and he loves it."[20]

Exhibit A

0390

For those who don't want to wait to put an assault rifle in their children's hands, but do have concerns about recoil and the weight of the weapon, a growing industry-wide trend toward 22 caliber assault rifles, often utilizing plastic resulting in lighter weight, has taken hold and is expanding. An additional frequently cited benefit is the relatively low cost of .22 ammunition, particularly for those who wish to train with the weapon.[21] As one author noted in *Shooting Sports Retailer* in discussing 22 caliber AR-style assault rifles: "these guns bring the coolness and fun of the tactical rifle to kids and less serious shooters..."[22] Throughout the industry, 22 caliber versions of higher-caliber assault rifles are increasingly common and frequently cited in the context of marketing guns to children:



*Junior Shooters*, Summer 2011

■ The product description for a .22 Bushmaster AR-15 model at the Gander Mountain Sports website states: "Designed for the indoor range and the youth shooter, this Carbon15 .22 LR Rimfire lightweight is sure to add new dimensions to your Bushmaster shooting pleasure. Operational controls are functionally and ergonomically identical to AR-15 type rifles...."[23]

■ "INTRODUCING THE NEW SIG522 Rifle" says a Sig Sauer ad for a new 22 caliber assault rifle that appeared in the Summer 2011 edition of *Junior Shooters*. [See later section *Junior Shooters*: "For Kids By Kids"] Under the headline "DOUBLE TAKE," the text reads, "It looks like the legendary SIG556, but look again. It's the SIG522 Rifle firing affordable .22LR. The new SIG522 has the look, feel, and action of the classic military-style SIG556 rifle...yet it costs much less, and fires affordable .22LR rounds. The full-size semi-auto SIG522 features a button rifled barrel with flash suppressor, light weight aluminum receiver with integral Picatinny rail, Swiss-style folding stock, and a 25-round magazine. To find out more about how to get the look, feel, action, and dependability of the SIG556, combined with .22LR caliber affordability, check out the new SIG522 at www.sigsauer.com — ***on the double!***"[Emphasis in original][24]

---

Exhibit A

■ An article in *Junior Shooters* exclaims, "One of the best dedicated AR-type .22 rifles to come out in the last couple of years is Smith & Wesson's M&P15-22. The M&P15-22 is built with high-strength polymer upper and lower receivers. This creates a reduced-weight rifle that retains the looks and operating features of the standard M&P rifle. Let me tell you, this rifle rocks!"[25]

■ A December 2013 review published on the website of Bill's Gun Shop & Range promises that the "Beretta ARX 160 in .22 LR is the company's fun version of their current military carbine that was designed in 2008. The military versions come chambered in 5.56x45mm NATO, 5.45x39mm Soviet, 6.8mm Remington SPC and 7.62x39mm Soviet. Along with the Italian Army it is also being fielded by Albania, Egypt, Kazakhstan, the Mexican Federal Police and Turkmenistan. The U.S. was in the process of evaluating it as a replacement for the M4 before the replacement process of [sic] cancelled." At the end of the glowing review, the shop concludes, "December is the perfect month for Bill's to offer this carbine as their Gun of the Month as plenty of kids (both young and old) will have a military replica .22 on their



December "Gun of the Month" from the website of Bill's Gun Shop and Range

Exhibit A

0392

Christmas list. The Beretta ARX 160 is a great choice and the holiday gives you the perfect excuse to buy one and act like it is a gift for your son or daughter. Just be sure to bring them to the range and let them shoot it every once in a while."[26] Surrounded by candy canes, a bow, and ribbon, the assault weapon is the gun dealer's "December Gun of the Month."

The appeal of the Beretta assault rifle to youth was made clear at the 2014 NRA-sponsored Great American Outdoor Show in Harrisburg, Pennsylvania. At the Beretta display at the show, a constant stream of young children, some alone, others accompanied by their parents, were drawn to the models of the gun, as well as other Beretta assault weapons, as these photographs of the Beretta display at the show illustrate.






**Photos from the Beretta display at the NRA's 2014 Great American Outdoor Show (Sue Roman)**

Exhibit A

0393





**Photo from NRA's 2014 Great American Outdoor Show (Sue Roman, VPC)**

## GUNS IN A RAINBOW OF COLORS

According to *Shooting Sports Retailer*, "More companies are offering pistols, rifles and shotguns built for smaller-framed shooters these days, with a dizzying array of models, colors and calibers to choose from. Making sure your customers get the best fit could help bring the next generation into the shooting sports."[27] The article, "The Best Guns for Smaller Shooters," warns:

> "Lenin was famously quoted as saying 'Give me just one generation of youth, and I'll transform the whole world.' With this in mind, developing the next generation in the shooting sports isn't just a business decision: The survival of the firearms world depends on the political will of those who come after us, which is a direct result of their involvement in the shooting sports."

> "So for reasons both fiscal and political, it's critical to provide products well-suited to young shooters. Although these guns have traditionally been called 'youth models,' when we started looking at the current offerings, we saw many called 'compact' versions instead. This implicitly points out that while we're using age as our primary qualifier, the features that make a gun well matched for young people also help the gun fit other shooters who are small of stature, such as females."[28]

Most common are pink guns for women and girls. At the online Sportsman's Outdoor Superstore, potential buyers can browse "Guns with Color," which includes pistols, revolvers, rifles (including numerous assault rifles),



**Photo from NRA's 2014 Great American Outdoor Show (VPC)**

and shotguns. Under pink pistols are weapons from Beretta, Browning, Cobra, Kel-Tec, SCCY, Ruger, Sig Sauer, Taurus, and Walther. Pink guns for females are a key marketing tool for girls:

■   "When 8-year-old Sara saw the gun, she knew she wanted to shoot it. Even though she'd never shot a gun before in her life and had never shown an interest in shooting, once she took a look at the 'Muddy Girl' from Henry Repeating Arms, she wanted to take her first shot."

"New in 2014, this Henry mini-bolt rifle, called the Muddy Girl, sports its namesake's camo pattern — a zany hot-pink-purple-and-black combination that belongs on more guns than just this little wonder. It makes a lifestyle statement for females that says, 'This gun is mine. Get your own…'"

"Sara, a 'girly-girl' who likes to cheerlead, left her pompoms behind, yet still coordinated her pink-and-black matching apparel for the photo shoot. Out on the range, her Aunt Marti — a pro-staffer for Mossy Oak and Moultrie Products…showed her how to shoulder the gun and how to weld her cheek to the curvy, synthetic stock…"

"'I like the color and the size of this gun,' said Sara. 'And I also like that it didn't kick me and it was easy to use…'"

"Its one-piece synthetic stock has been designed with just the right angle for little hands to grasp the gun firmly and still pull the trigger with confidence."[29]

■   Writing in *Junior Shooters* magazine, 12-year-old Casey Lutz is featured with a pink CZ bolt-action youth rifle. Says Lutz: "When my dad brought home the gun, a CZ 452 Scout, chambered in 22 long rifle, I was

---

Exhibit A

 

**Savage Arms youth rifles are featured at the NRA's 2014 Great American Outdoor Show (Sue Roman) and in** *NRA Family InSights*

excited to see that the gun was pink! My first thought was, 'Finally, a cool gun for a girl!' It's nice to see that companies like CZ make guns specifically for young women shooters. The second thing I noticed was the gun was small and compact and was designed to fit kids."[30]

A crayon-box of colors is offered for guns specifically targeted at youth, including the 22 caliber weapons through which they are most likely to be introduced to shooting.

■ Smith & Wesson offers a 22 caliber version of its M&P15 (M&P stands for Military & Police) AR-15 assault rifle in bright colors that include Pink Platinum, Purple Platinum, and Harvest Moon Orange.[31]

■ Savage Arms' youth rifle, the Rascal, presents the gun in child-friendly colors: red, yellow, orange, pink, and blue. In an ad for the youth rifle, the company promises that the firearms deliver "ONE SHOT, ONE THRILL!"

■ On its website, featuring assault rifles "built by Americans, for Americans," Black Forge Weapons offers "Youth Model" AR-15 assault rifles that come in orange, violet, green, blue, and red.[32]

 

**Twelve-year-old Casey,** *Junior Shooters,* **Summer 2011**     **Eight-year-old Sara,** *NRA Family InSights*

Exhibit A

0396





**Bright-colored .22 assault rifles featured on the Smith & Wesson website**

**"Youth Model" Black Forge AR-15-style assault rifles**

## THE "FISCAL AND POLITICAL" BENEFITS OF MARKETING GUNS TO CHILDREN

As noted by *Shooting Sports Retailer*, the impetus for marketing to children is both "fiscal and political."[33] In addition to the hoped-for financial benefits of marketing guns to youth, a corollary goal is to ensure that such an effort will help maintain a pro-gun base for political action.

Writing in the NRA's *America's 1st Freedom* magazine, Editor Mark Chesnut warns that "the future of our freedom — and our shooting and hunting heritage — lies in our children and grandchildren. Let's not get too busy or too focused on ourselves and our own activities to pass along to our kids the important things they need to know in order to be informed citizens and voters in the future."[34]

In a Spring 2012 editorial, *Junior Shooters* Editor-In-Chief Andy Fink chided those gun industry members who, when urged to target youth, respond, "Oh, that isn't my market?"[35] Noting that it's not just an issue of jobs, but of "gun rights," he warns:



**Junior Shooters, March 2011**

"It is thrilling to see so many people supporting juniors around the country. People are volunteering their time. Companies and organizations also provide time, energy, products, and money to ensure the shooting sports continue. However, we are not doing enough. All the companies involved in the shooting industry

Exhibit A

0397

need to realize our youth are the future of the shooting industry and thus each job within the industry is dependent upon juniors growing up with an appreciation for the sport we love. Each adult needs to help in some way by volunteering, or promoting youth shooting. This effort will also have a huge impact on retaining our gun rights, our hunting heritage, and wildlife conservation. We all need to do our part."[36]

Later that year, Fink revisited the issue:

"Each person who is introduced to the shooting sports and has a positive experience is another vote in favor of keeping our American heritage and freedom alive. They may not be old enough to vote now, but they will be in the future. And think about how many lives they will come in contact with that they can impact! Each of us affects others, and it is up to us how we make an impact on the future."[37]

Or, as a *Junior Shooters* promotional ad for itself in the magazine cheerfully explained under the headline "Junior Shooters: Making a Mark" — "This is not your everyday magazine. This is a magazine for kids and parents interested in preserving our 2nd Amendment rights. But not in a stuffy shirt, political way. We want to have fun. Join us."[38]

And in an article on the National Shooting Sports Foundation's 2015 gun industry summit, *Shooting Sports Retailer* stated:

"And of course, the problem with failing to recruit and grow is that numbers equate to political power. In an era when the private ownership and use of firearms, the right to 'keep and bear arms,' has come under increasing pressure, numbers and a young, vital membership are critical."[39]



*Junior Shooters*, Summer 2013



*Junior Shooters*, Summer 2012

Exhibit A

0398

## JUNIOR SHOOTERS: "FOR KIDS BY KIDS"

Perhaps the most honest and unvarnished look into the ongoing effort to create a youth gun culture can be found in *Junior Shooters*, available online and in print format.

Based in Boise, Idaho, the magazine "strives to be the first of its kind to promote juniors involved in all shooting disciplines…" and is "dedicated to juniors of all ages and their parents." The publication adds, "We care about kids and their parents and want you to have a place to go to find what is needed to get started in many different shooting venues."[40]



The home page for *Junior Shooters* features ads for assault rifle manufacturers Rock River Arms and Stag Arms

Exhibit A

0399

Visitors to the website are greeted by ads for AR-15 assault rifles. Clicking on the Rock River Arms ad for its LAR Coyote Carbine, the viewer is taken to a full description of the weapon on the company's website, and the ability to explore the full site. An ad for Stag Arms shows an AR-15 assault rifle and in a series of panels asks the questions "LEFT HANDED?" "RIGHT HANDED?" "WE'VE GOT YOU COVERED!" Clicking on the ad brings you to the company's website.[41]

Additional gun manufacturers listed as sponsors on the website are: companies that manufacture only assault weapons, such as Bushmaster (manufacturer of the AR-15 assault rifle used in the 2012 Sandy Hook Elementary School shooting in Newtown, Connecticut that left 20 students and six educators dead) as well as the aforementioned Rock River Arms and Stag Arms; companies that manufacture assault weapons and high-capacity pistols, such as FNHUSA, Remington, Sig Sauer, Smith & Wesson, and Sturm, Ruger & Company; and, companies that manufacture solely pistols, such as Glock.[42] Each issue of *Junior Shooters* contains an Advertiser's Index at the back of the magazine. Among the associations listed as sponsors of the publication is the gun industry trade association the National Shooting Sports Foundation (NSSF) and National Rifle Association Youth Programs.

Little known outside of pro-gun circles, the magazine frequently presents a blunt view of the financial and political benefits that recruitment of children offers the pro-gun movement.

In discussing the benefits of "junior shooters" to the gun industry and gun lobby, Editor-In-Chief Andy Fink explains, "Juniors start shooting, and become interested, in related sports at a young age, as young as six, seven, or eight" and can continue as a "junior" shooter until the age of 18 or 21, adding, "They may also have the build of a young youth or an adult."[43]

Fink makes the case that literally every firearms product can be marketed to "juniors," including concealed carry pistols (with the goal of the youth eventually obtaining a concealed carry permit when old enough) and assault rifles, writing:

"What market isn't tied to juniors? I really can't think of any. Military and law enforcement firearms have civilian versions which are applicable. The Concealed Carry Weapon (CCW) market has firearms which hold 10-rounds which is the limit for IDPA [International Defensive Pistol Association] competition.[44] When the junior turns 21 they can get a CCW permit. What do they buy? It is usually a gun from a manufacturer they are familiar with."[45]

Promising content "For Kids By Kids," articles in the magazine, with headlines such as "Why I Love Bushmaster AR-15s...You Should, Too"[46] commonly promote high-capacity semiautomatic pistols and assault rifles, often referred to by the industry-promoted euphemism "Modern Sporting Rifles" (MSR). At the same time, advertisements for assault weapons, high-capacity pistols, and firearm accessories are ubiquitous. Examples of the types of weapons and accessories promoted for children and youth in editorial content and advertisements are offered below.

■ A 2014 press release from gun manufacturer Mossberg included with online articles on the *Junior Shooters* website boasts that the company has "45 Firearms Developed Specifically for Smaller-Statured or Younger Shooters." The self-proclaimed "leader in the development and design of firearms for younger and small-statured shooters," the company touts its "recently-launched Mossberg 2014 Youth Catalog" and lists among its "industry-partners" the National Shooting Sports Foundation and the National Rifle Association.[47]

■ A profile of an AR-15 assault rifle upper receiver states that the "Adams Arms 14.5" Evo Ultralite Piston AR-15 upper is a great upper for a junior shooter; it's light, it's short, and it's accurate."[48]

"One advantage to having such a short, light upper is maneuverability and ease of use by younger, smaller shooters. At one local 3-Gun match [see the later section, *The Industry Finds Its "'Reality' Video Game" in 3-Gun Competition*], there was a long hallway with four doorways that you had to shoot through. The targets were set up so you had to move into the doorway. The short barrel really helped me move in and out of the doorways quickly. It was a real advantage."[49]

■ In a 2009 article that comes across more as a promotional piece, "The Mosquito: A Cool .22 With A Sting," Editor-in-Chief Andy Fink writes, "The .22 Mosquito is a real stinger." Spread across the top of the page is manufacturer Sig Sauer's logo. At the bottom is a picture of the pistol in pink, with the caption "The pink Mosquito — For the ladies!" Promising that the pistol's "slide is easy to operate even for youngsters," in the article Fink tests the gun, as do children ages 11, 12, 14, and 16. Fink reports, "Each of them liked the feel of the gun and operation. They had to get used to the first shot cocking the hammer being double-action with a heavy trigger pull of 12.1 pounds."[50]

Four years later, Fink revisited the gun, this time with three co-authors, two age 13 and one 18 years old:

"This pistol is sweet! It looks cool. It fits in your hand well, even the small hands of juniors and smaller women. It's a double/single-action semi-auto and is great for plinking and practice…[51] Sig Sauer's Mosquito has an ergonomic design to provide an enjoyable shooting experience. It is based on the design of the Sig Sauer P226 but is 10% smaller in size and chambered for the .22 long rifle cartridge."[52]

In the article, endorsements for the pistol are offered by two 13-year-old boys:

"Hayden Lierman (13): My .22 Mosquito pistol is the Desert Digital Camo model manufactured by Sig Sauer…The pistol looks cool and feels like a Beretta, which I think is awesome. It's a desert camouflage color."[53]

"Wyatt Irish (13): At first I thought that it was way too small to be



*Junior Shooters*, Summer 2009

Exhibit A

0401





*Junior Shooters*, Summer 2009      *Junior Shooters*, Summer 2010

reliable…However, one thing was for sure: I loved how the grip felt in my hand. For a person with small, bony-fingered, 13-year-old hands, the grip almost felt custom fit."[54]

■ In "Glocks are for Girls," the magazine reviews "a small, compact pistol" that is "generally used for conceal carry." The reviewer notes that "because of its small frame, I was able to shoot and operate it easily despite having small hands."[55]

■ Under "Kids' Gear" the magazine promotes online shooting sports accessories marketer Brownells (headed by NRA Board Member Pete Brownell) and features an assault rifle with a 100-round ammunition magazine:

"WOW! Do you need shooting accessories to go with your firearm? What about optics, mounting equipment, slings, magazines, cleaning materials, and parts? Brownells carries just about anything you can imagine… *Junior Shooters* has been working with Brownells since it started publication. We have found them to [sic] very supportive of promoting juniors and the shooting sports, and their customer service is excellent! We seriously recommend you check them out at www.brownells.com."[56]

■ "FIREFIELD SALUTES YOU, JUNIOR SHOOTERS!" is the headline atop a full-page ad from parts and accessories manufacturer Firefield. Below two males dressed in camo, one holding a shotgun and the other brandishing a pistol, the text reads:

Exhibit A



*Junior Shooters*, **Winter 2011**

Exhibit A

"We know that you are tomorrow's leaders of the industry, the ones who continue to value and support the outdoors through shooting. The one's [sic] who will continue to uphold the values of our country. The one's [sic] who will introduce the value of the great outdoors to the next generation and instill in them the love and respect that comes with being a shooter. Firefield isn't all about winning. We know the real victory lies in getting out there, smelling the fresh air and holding freedom in your hands. Let's keep that victory for the next junior shooters."

The ad ends with "Firefield — Victory Justifies Everything!"[57]



*Junior Shooters,* **March 2011**

In addition to the implicit advertising benefits *Junior Shooters'* articles "For Kids By Kids" offer the gun industry, the magazine regularly features full-page ads from gun companies, many featuring assault rifles and high-capacity pistols:

■ A full-page ad from Next Generation Arms for its X7 AR-15-style assault rifle states: "*The Gray Rifle* — an indistinct, shadowy weapon carried by an unseen, unstoppable foe." The ad continues: "Who is the X7 for? Visit us at www.nextgenerationarms.com and look at some of our featured users. They train many thousands a year in the tactical use of the AR-15. They protect and serve. They defend their homes and their homeland. The X7 continues our tradition of tactical performance and better-than-needed accuracy in a military grade small shoulder arm that works in all climates with little care."[58]



*Junior Shooters,* **Winter 2011**

■ An ad for a 22 caliber 1911 pistol has the headline "Make Dad Jealous" with a smiling young girl holding a target as the centerpiece. The text reads, "For less than $300, you can own an authentic 1911 reproduction in .22 LR and spend the day shooting and improving your skills — without emptying dad's wallet. Available through your local gun shop."[59]

Exhibit A

0404



PROVEN PERFORMANCE

**CONFIDENCE TO LIVE YOUR LIFE**

Shooting the best pistol means you can hone your skills and rise to any challenge. Backed by proven reliability, superior engineering and used by approximately 65% of law enforcement, **GLOCK** is a partner you can trust.

To learn more about the GLOCK Sport Shooting Foundation and other events, visit **GLOCK.COM/CONFIDENCE**

GLOCK®
PERFECTION

*Junior Shooters*, Spring 2013

Exhibit A

0405

■ A full-page ad for Glock pistols shows two black males, a youth and an adult, at an outdoor range, with the headline "Confidence to Live Your Life." The ad, in which the youth is holding an ammunition magazine in one hand and a round in the other, states, "Shooting the best pistol means you can hone your skills and rise to any challenge. Backed by proven reliability, superior engineering and used by approximately 65% of law enforcement, GLOCK is a partner you can trust."[60]

■ A full-page ad from Stag Arms features an AR-15-style assault rifle with a high-capacity ammunition magazine and promises that the gun is "Adaptable To Any Application."[61]

■ An ad for Rock River Arms' LAR Series of assault rifles (which come in Varmint and Predator models) states, "From varmints to vermin, predators to prey, RRA LAR-8 Series Rifles."[62]



*Junior Shooters*, Spring 2012



*Junior Shooters*, Spring 2013

■ A full-page ad for Sig Sauer's SP2022 pistol features the handgun, notes that it comes in 9mm, .357, and 40 caliber and adds, "No wonder it's becoming the standard choice among elite military and LE [law enforcement] forces worldwide."[63] A second full-page ad from the company for its "microcompact" P290RS concealed carry pistol states, "Get 9mm performance in a palm-sized, easy-to-carry polymer package." The tag line for the ad states, "Sig Sauer, when it counts."[64]

# NRA "JUNIOR MEMBERS"

Since 1981, and until recently, the National Rifle Association has published in print or online *NRA InSights* magazine for its Junior Members[65] under the age of 15 (although the online content is available to anyone).[66]

The industry's focus on youth as its financial savior is made clear in an ad for Marlin's XT rimfire rifle that appeared in the online version of the magazine. The headline of the ad reads, "FOR THE FUTURE OF OUR SPORT, IT'S THE MOST POWERFUL FIREARM ON EARTH." With a picture of a father and son together, the ad promises that the gun can "light a fire for the shooting sports or rekindle your own." Clicking on the ad leads the reader to the company's website and its full product line. Another online ad, for the Kel-Tec PMR-30 pistol, links to the company's website, where the first three images that greet the reader are adult shooters holding assault rifles.[67]

In January 2014, the NRA changed the title of *NRA InSights* to *NRA Family InSights* and switched to an online-only format for the magazine with accompanying website. In an editorial announcing the switch, the magazine promised, "In addition to the fun and informative content designed just for Junior members, we'll be including articles, photos, reviews and news for everyone in your family — parents, grandparents, and other family members."



*NRA InSights* online edition



*NRA InSights* online edition

In its "Industry Spotlight," the site features a profile of NRA Board Member Ronnie Barrett, inventor of the 50 caliber sniper rifle. Fifty caliber sniper rifles, used by U.S. troops around the world, can bring down commercial aircraft on takeoff and landing, pierce armor plating, and are accurate to more than a mile. They are banned in the state of California and the District of Columbia, but elsewhere they are as easy to purchase as a hunting

Exhibit A

0407

rifle under federal law. The promotional profile finishes with, "To read more about Ronnie Barrett and Barrett Firearms, go to www.barrett.net." By clicking on the link, the reader is taken to Barrett's website which features solely assault rifles and 50 caliber sniper rifles.[68]

Under "Kids," visitors are presented with two subsections: "Under 8" and "8 and Up." Both include a section titled "Guns."[69]

A review of the Thompson/Center HotShot rifle in the "Under 8" section states:

> "It's important to make a distinction here. With the HotShot, we're not talking about a slightly reduced-size rifle for teens who are not quite ready for a full-size gun. No, we're talking about a tiny gun intended for the very youngest shooters — the ultimate first gun. 'We're targeting the six- to 12-year-old range and feel that with the inclusion of the one-inch spacer in the box, there will be a longer period that the child can use the rifle, potentially out to 15 years old,' explains…[Craig Cushman, director of marketing for Thompson/Center]."

> "That's important. With the number of hunters declining, it's crucial to get kids introduced to the sport as early as possible."

> "The HotShot means that even the youngest shooters now have a gun sized just for them."[70]



*NRA Gun Guide* **App**

Also included in the website's "Under 8" section are "Awesome Apps," which include for $2.99 the *NRA Gun Guide* app. Text promoting the app asks:

> "Do you like the idea of being able to call up the specs of multiple firearms on a whim? Looking to win the next debate about calibers and models at the range? If so the 'NRA Gun Guide' app is exactly what you've been waiting for."

> "The 'NRA Gun Guide' is searchable by gun type, action type, manufacturer, price range and caliber/gauge, making it easy to find out vital info about the rifle in your local gun store or that pistol your buddy is trying to get you to buy at an inflated price."

> "With an easy-to-follow design, the 'NRA Gun Guide' is suitable for all levels of interest in firearms or experience with mobile apps. And, as new content is regularly added, it can only get better."[71]

When opened, the app promises "Hundreds of Guns Inside!" The "Semi-Auto Handguns" category of the app contains a wide range of pistols from major manufacturers (Beretta, Colt's Manufacturing, Glock, Heckler & Koch, Kel-Tec, Sig Sauer, Smith & Wesson, Sturm, Ruger & Company, and others) including numerous high-capacity firearms as well as guns recommended for concealed carry. The "Semi-Auto Rifles" category of the app is dominated by military-style assault rifles — AR-15s and others, including 50 caliber sniper rifles. Assault rifle manufacturers included in the category include Barrett, Beretta, Bushmaster, Colt's Manufacturing Co., DPMS, FNH-USA, Heckler & Koch, Rock River Arms, and others.

An article titled "My First .22 Pistol" offers reassurance to those wanting to introduce children to guns: "Fortunately for you, there are many people — neighbors, coaches, competitors, sales staff — who want to encourage youth shooters and turn them into lifelong firearms enthusiasts and Second Amendment advocates." The article notes that a young person's first pistol may come from brothers or sisters, or a "hand-me-down from someone you meet at the shooting range."[72 73]

The NRA has a wide range of additional programs focused on youth, some of which are named for their gun industry funders, such as the Brownells/NRA National Youth Shooting Sports Ambassador Program, Brownells/ NRA Day, and the Winchester/NRA Marksmanship Qualification Program. (In addition, the NRA has launched a concerted online effort with gun industry support to reach out to Millennials.)

## NATIONAL SHOOTING SPORTS FOUNDATION: THE GUN INDUSTRY'S TOBACCO INSTITUTE

While the National Rifle Association functions as the *unofficial* trade association for the firearms industry, the National Shooting Sports Foundation (NSSF) is its official trade association. In a grim irony, NSSF's headquarters is located in Newtown, Connecticut. The role played by the NSSF within the gun industry is not unlike that which was played by The Tobacco Institute for the tobacco industry. The NSSF offers a wide range of publications for its industry patrons, focusing primarily on marketing. At the same time, just as The Tobacco Institute denied a causal link between cigarettes and cancer, the NSSF continually works to minimize the hazards associated with exposure to firearms, especially by children.

For example, in December 2011, NSSF issued a press release that made the claim that hunting, as measured by injuries per number of participants, was actually safer than bowling, claiming a "percentage of injury per 100 participants" of only .05 percent compared to .06 percent for bowlers. Using NSSF's math, hunting was behind only camping and billiards in its low rate of injury. Other activities NSSF claimed hunting was safer than included golf and tennis. Left out of NSSF's equations were the



NSSF's *Millennials and The Shooting Sports: An In-Depth Exploration*

Exhibit A

severity of injuries for each category, that is, those injuries, if counted, that resulted in crippling disability or death (a distinction that might have benefited golf and tennis as compared to hunting, which included not only those injured by gunfire, but also from falling out of treestands).[74]  Soon after, in a focus group of 12- to 16-year-olds conducted for NSSF and another organization, a similar argument was made and countered:

> "A substantial number of individuals said that hunting and target shooting were rather dangerous activities due to the involvement of firearms. However, others insisted that hunting and shooting were no more dangerous than many mainstream sports; one person suggested that although the *rate* of injuries in hunting and target shooting is generally lower, any accidents that do occur are more likely to be fatal."[75]

In all of NSSF's publications the lethal risk from guns is rarely acknowledged, except as a marketing hurdle. When it is, gun death is consistently presented as being synonymous solely with unintentional shootings. Rarely are gun homicides — with youth as either perpetrators or victims — or suicides ever mentioned. Moreover, the risk of death from guns is, at best, only hinted at as illustrated by this "Message to Kids About Firearms Responsibility" from NSSF's *A Parent's Guide to Recreational Shooting for Youngsters*:

> "Not long ago, in another town, some kids found a firearm.  Maybe they were looking for it because of something they saw on television. Maybe one of them dared the other to find it. Maybe they just found a firearm that was left out by mistake. It doesn't matter why they found it. What matters is the firearm was loaded, and they played with it. Now they are very sorry they did. Don't let this happen to you."[76]

The passage is striking, but not unique, in its ability to place blame, whether it be on television, negligent parents, or the kids themselves, on virtually anyone except the industry.



**NSSF's *Understanding Activities that Compete with Hunting and Target Shooting***

NSSF issues a constant stream of publications, both to support, and defend, the firearms industry in the marketing of its products. Recent NSSF marketing publications (some publicly available, others limited to NSSF industry members) include titles such as: *Millennials and The Shooting Sports: An In-Depth Exploration* (2014); *Understanding Diversity in Hunting and Shooting Sports* (2013); *Understanding the Impact of Peer Influence on Youth*

*Participation in Hunting and Target Shooting* (2012); and, *Understanding Activities that Compete with Hunting and Target Shooting* (2012).

Among the "11 main points to consider" in the executive summary of the NSSF report *Understanding Activities that Compete with Hunting and Target Shooting* are "Electronic and indoor recreation are a threat to recruiting new hunters and target shooters," "Losing hunters and target shooters to competing activities is a subtle process," and, "Start them young."[77]

Discussing the "threat" posed by electronic and indoor recreation, the report presents findings "worth noting" from a 2010 study by the Kaiser Family Foundation: "It is estimated that today's youth 8 to 18 years old spend an average of 53 hours a week on electronic media entertainment," and, "Nearly three-quarters (71%) of youth have a television in their bedroom." NSSF suggests, "Rather than trying to stop youth from using electronic media, the hunting and target shooting industry should use those media to its advantage." "Tactical strategies" toward this end as cited in the report include:



NSSF's *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*

- ■ "The industry should use social media and web sites to raise interest and help youth find ways to hunt and target shoot."

- ■ "The industry should team with current online media firms to take advantage of their reach and their abilities to communicate with youth."

- ■ "Because youth are online to be entertained, messages that emphasize fun should be used in this setting."[78]

Under a section titled "Start Them Young," the report states, "There is a clear link between avidity and age of initiation in hunting...."[79] "Tactical strategies regarding initiation" detailed in the study include:

- ■ "To help hunting and target shooting get a head start over other activities, stakeholders such as managers and manufacturers should target programs toward youth 12 years old and younger. This is the time that youth are being targeted with competing activities."

- ■ "It is important to consider more hunting and target shooting recruitment programs aimed at middle school level, or earlier."

- ■ "Programs that have helped in hunting and target shooting recruitment should be implemented; for instance, it is important to implement more youth programs like *Families Afield*[80] and apprentice licenses."[81]

Exhibit A

0411

Recognizing that "not all youth can be born into the ideal environment for creating a lifelong hunter or shooter (i.e., as a male within a hunting or shooting family in a rural environment),"[82] the 2012 report *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting* urges that a "'Youth Hunter and Shooter Ambassador Program' be initiated to capitalize on the current population of youth hunters and shooters who can positively influence their fellow peers' attitudes toward the sports."[83] The report, sponsored by both NSSF and the Hunting Heritage Trust, explains how such "youth ambassadors" would be "performing a major service for the hunting and shooting sport communities"—

> "The more familiar youth are with individuals their own age who participate in hunting and shooting, the more likely they will be to support and actively participate in these activities. In this sense, youth hunters and shooters are the key to their fellow friends' and students' acceptance of these activities. Given this direct relationship, it is imperative that youth hunters and shooters recognize the weight and importance of their words and actions with regard to their peers' perceptions of hunting and target shooting..."

> "If non-hunting and non-shooting students talk with, befriend, and interact with youth who are actively involved in hunting and shooting, the positive aspects of these activities will increasingly be thought of as acceptable, appealing, and inviting recreational activities."[84]

The report also urged the use of social media, noting:

> "[T]alk and communication about hunting and shooting should be encouraged and promoted in as many ways as possible, especially through social media. One individual from the [youth] focus groups mentioned photos a hunting classmate had posted on Facebook — as with this individual, such photos tend to encourage questions, invite curiosity, increase interest, and place hunting and shooting activities in the foreground of the social atmosphere. Youth, in particular, are uniquely positioned to take advantage of the most prominent and effective means of social media and other communication tools — hunting and shooting sponsoring agencies and organizations should encourage this tendency wherever possible. In promoting the use of images, remember that pictures are often worth a thousand words: images promoting hunting and shooting should reinforce a positive atmosphere that emphasizes the environment, nature, the outdoors, nice weather, exercise, natural resources, wildlife, a social atmosphere among friends and peer groups, etc."[85]

The report also urged that "youth ambassadors and others should focus on getting newcomers to take a first step into target shooting through any means, whether a BB or pellet gun, paintball gun, or archery bow. The point should be to get newcomers started shooting *something*, with the natural next step being a move toward actual firearms. Initial interest, however, should be embraced in whatever form it presents itself. "[86]

Exhibit A

0412

## THE INDUSTRY FINDS ITS "'REALITY' VIDEO GAME" IN 3-GUN COMPETITION

In the competition for the recreation time of youth, video games are seen by the gun industry as both a threat to, and an opportunity for, marketing firearms to youth.



**Photo from the website of the Tri County Gun Club in Polo, Illinois, illustrating firearms and accessories needed for 3-Gun competition**

Bud Pidgeon, president of the U.S. Sportsmen's Alliance warns, "By the time kids are in fifth grade, or even before, they're already being pulled away by the allure of video games, organized sports or other activities."[87] And an article detailing NSSF's 2015 Shooting Sports Summit warned, "What those young people appear to be most interested in, at least superficially, is playing computer games, tapping on tiny keyboards and communicating with their friends through social media like Facebook, Twitter, Instagram and other websites."[88]

Yet while video games are seen as a competitor for the leisure time of children, the argument is frequently made, both inside and outside the industry, that first-person shooter games, and their use of easily identified real-world weapons, offer marketing opportunities.

According to Ralph Vaughn, who negotiates licensing deals with video game manufacturers on behalf of Barrett Firearms, manufacturer of 50 caliber anti-armor sniper rifles as well as assault rifles, "It is hard to qualify to what extent rifle sales have increased as a result of being in games...But video games expose our brand to a young audience who are considered possible future owners."[89]

In a column on the website *Gun Nuts Media*, author Caleb Giddings discusses the guns used in the latest edition of the video game series *Battlefield*. After discussing the video, he concludes:

> "There is a real point to all this digital nonsense though, and something that I saved for last. This game and games like it are absolutely how the next generation of gun owners are getting introduced to firearms. The incredible amounts of realism present in the depiction of firearms in game is a good thing. I guarantee that people will come into gun ranges and say 'I shot something just like that in *Battlefield*.' The immediate response of any employee of any range in the nation should be 'that's awesome! Want to try the real deal?'"[90]

Among the concurring statements in the comments section of the article[91] were:

- "I agree 100% that games like this can increase the number of 'gun people.' In the range I work in, It's very common to have younger people ask to see then rental guns, and can name many of them off (Beretta 92, AR, Glock, 1911, etc.) based on game experience. Then they get to try one for real and most of them are hooked! I don't know if it's what the game designers intended, but it works."

Exhibit A

0413

■ "Though gaming may be more realistic when it comes to firearms and operating, like you said, many people are being introduced to firearms through mediums like this. It is always great that video game devs would put a lot of attention to detail when it comes to subjects like this and seeing them play out IRL [In Real Life]…"

■ "The last generation of games have a big influence on the purchasing decisions of prospective gun owners of a certain age. I dare say that half of the PS90s sold are probably because of *Counter-Strike*, and I think it's responsible for some of the demand for Beretta Elites, as well."

As accessory manufacturer Firefield sums it up: "A majority of Firefield users grew up watching action-packed movies, TV shows and playing interactive video games that encompass tactical gear and military-style weapons platforms. Our optics and shooting accessories allow shooters to turn what they've seen on the screen into a reality."[92]

In 2007, Chris Dolnack, National Shooting Sports Foundation senior vice president, used the term "a 'reality' video game" to describe the organization's Scholastic Rifle Program (SRP) begun in 2003, telling *Junior Shooters* magazine, "We developed an action-packed reactive target format — a 'reality' video game — that is sure to be a hit with today's young shooter."[93] While the Scholastic Rifle Program apparently failed to fill that niche, another industry-promoted shooting event has: 3-Gun competition.



**Video from *The Truth About Guns* shows a 3-Gun participant ready to start the competition**

Writing at the website *The Truth About Guns*, Nick Leghorn promises, "3-gun is as close to a real-life first person shooter video game as you'll get without joining the military."[94] As described by Leghorn:

"3-gun gets its name from the fact that you use three different types of firearms over the course of the competition: a shotgun, a rifle, and a pistol. You score points by hitting designated targets, which include clay pigeons, cardboard silhouettes, steel targets of varying sizes, and anything else the Range Officer designates as a target….Competitors lose points for hitting 'no shoot' targets (hostages, friendlies, etc) or skipping targets/obstacles. Their score is augmented by the time it takes to complete the course of fire. The person with the combination of fastest time and best accuracy wins."[95]

In a video accompanying the article showing a shooter preparing for a 3-Gun match, a participant is asked, "How are you going to game this stage knowing nothing about it?" He replies, "I think it's kinda like [the video game] *Doom*, run through, keep upgrading weapons as you kill bad guys, right?"[96]

Such competitions frequently revolve around fantasy scenarios in which firepower is essential for the hero-shooter to emerge victorious. In its description of its 3-Gun Tactical Match, one gun club explains:

"This type of match has the shooter shooting centerfire rifle, centerfire pistol, and shotgun (.410 or larger) at paper 'bad guy,' steel plates, and similar targets. In any given scenario, the shooter moves through

an imaginary situation in which his life is placed in danger by the 'bad guys.' The scenario will vary from month to month, and will have a theme that practices real-life shooting and defensive skills. Examples of scenarios: exodus from a shopping mall overrun with terrorists, self defense at an ATM machine, Hollywood bank robbery, L.A. riots, home intruder, etc."[97]

In the video cited above, the "scenario" is spelled out for the 3-Gun participant as he's led hooded, his wrists tied together, into a faux prison cell and seated (see photo on previous page):

"Okay all you troopers are such badasses you decided you were going to go hunt pirates in Somalia… Something went wrong and you are now the prisoner of a Somali warlord who wants to do very bad things to you because you're an American…No one's coming to rescue you so you have to rescue yourself… During your last interrogation you noticed that the chair was rough on the sides. That might assist you in breaking your bonds should you be given the opportunity…At that point you should find yourself a gun. Cause we're Americans and we all like guns. Find one and start killing all the bad guys who are trying to do very bad things to you and your fellow Americans."[98]

In the pages of *Junior Shooters*, 3-Gun competitions are a mainstay, with child participants not only promoting the activity in its pages, but also lauding the gun companies that donate guns, ammunition, and other products: both for use in the activity and as prizes for the winners. As one article written by a 12- and 16-year-old states:

"Everything about 3-Gun is exactly the opposite of precision rifle. Precision to me is boring. All you do is stand there and shoot. With 3-Gun you get to 'get into it.' You get to run around (as long as you're safe), shoot 'big boy guns,' and go through obstacles shooting at the targets. Can it get any better? I think not. I felt like an FBI or a SWAT agent going in for a big bust. It was an awesome feeling."[99]

Writing in *Junior Shooters*, Corey Shaw, age 17, exulted:

"This summer I had the opportunity to shoot Fabrique Nationale Herstal (FNH) USA's SCAR. SCAR is an acronym for Special Combat Assault Rifle. And, oh, boy, is it SPECIAL!"

"Due to the fact that the SCAR is so light, you can fling it around from target to target; sometimes it feels more like you're shooting a .22 rather than a full-on combat rifle."[100 101]

In a *Junior Shooters* article titled, "Why I Love 3-Gun!," 12-year-old Jake Denno writes:

"Besides the three guns that have to be practiced with and brought to the match, many of the 3-Gun events will have special or stage weapons, as well…I have already been fortunate enough to be able to shoot a fully automatic UZI, an M-249 SAW and an M-203 grenade launcher. Some of the other special weapons in 3-Gun matches include MG-42 and M-60 machine guns, suppressed ARs and SCARs, but the one I really want to shoot is the Dillon Mini-Gun at the Larue Tactical match. Some events will also have manufacturers there who will have their pistols and shotguns as stage weapons. The only thing I do not like about stage and special weapons is that the score depends on how one shoots with an unfamiliar weapon. The triggers and sights are usually really different from what I shoot, and the guns don't always run well. At the Ironman [competition], the UZI just would not function properly, and it really threw me off my plan for that stage."[102]

---

Exhibit A



Summer 2012 *Junior Shooters* features 3-Gun competitors

Exhibit A

0416

Like the gun industry and gun lobby's ongoing campaign to attempt to rebrand assault rifles as "Modern Sporting Rifles," by labeling 3-Gun competitions a "sport," their hope is to not only engage young shooters, but also that the activity offers the necessary cover to maintain the sale and possession of weapons that were originally designed for military or law enforcement use, including assault weapons that should be banned for import under the "sporting purposes" test of the Gun Control Act of 1968.[103] As Michael Tenny, CEO of Cheaper Than Dirt!, an online vendor of guns, ammunition, and accessories that describes itself as "America's Ultimate Shooting Sports Discounter," told *Junior Shooters*, "We're always happy to be able to support the shooting sports in any way possible, and we're even more excited to help encourage new shooters by sponsoring the 3 Gun Nation Junior division...Faced with political pressure to ban the importation of the competition shotguns that have made 3-Gun into the sport it is today, I think it's critical that we as an industry pull together to support all of the shooting sports in any way we can."[104]

## THE REALITY OF CHILDREN AND GUNS

Much like the tobacco industry before it, the firearms industry — gun and accessory manufacturers, trade associations (both self-proclaimed, such as the NSSF, and *de facto*, such as the National Rifle Association) and related publications — consistently denies the risk associated with its products, especially in the marketing of guns to children. As noted earlier, their arguments, such as NSSF's assertion that hunting is safer than bowling, can at times be so divorced from reality that they cross the line from the absurd to the surreal.

Despite the rosy picture painted by the firearms industry, the combination of children and firearms poses risks that are widely recognized. These include death and injury, not just from unintentional shootings, virtually the sole category of firearm death acknowledged by the gun industry, but suicide and homicide. In addition, the exposure to lead that young shooters experience — either when firing a weapon or making their own ammunition, a practice commonly known as "hand loading" — can harm many different body organs and systems, including the brain, and exposure can lead to reduced intelligence as well as behavioral problems.

### YOUTH GUN DEATHS

In 2014, more than 1,300 children under the age of 18 died from firearms: 699 homicides, 532 suicides, 74 unintentional shootings,[105] and 19 from undetermined intent.  From 1999 to 2014, nearly 23,000 children under the age of 18 died from guns:  13,756 homicides, 6,903 suicides, 1,723 unintentional shootings, and 395 from undetermined intent.[106]

For the age group one to 17 in 2014, unintentional injury was the leading cause of death, the most common cause of unintentional death being motor vehicle-related deaths (49 percent) and drownings (18 percent). Firearms accounted for two percent of all fatal unintentional injuries. Malignant neoplasms (primarily cancers) were second. Suicide was the third leading cause of death. Guns accounted for 40 percent of these deaths, making firearms the second most popular method of suicide for this age group, behind suffocation. Homicide was the fourth leading cause of death for this age group, with firearms being used in 59 percent of all homicides.[107]

Exhibit A

0417

**TABLE THREE: FIREARM DEATHS IN THE UNITED STATES, LESS THAN 18 YEARS OF AGE, 1999 - 2014**[108]

| Year | Homicide | Suicide | Unintentional | Undetermined Intent | Total |
|------|----------|---------|---------------|---------------------|-------|
| 1999 | 1,001 | 558 | 158 | 50 | 1,767 |
| 2000 | 819 | 537 | 150 | 23 | 1,529 |
| 2001 | 835 | 451 | 125 | 16 | 1,427 |
| 2002 | 872 | 423 | 115 | 26 | 1,436 |
| 2003 | 805 | 377 | 102 | 25 | 1,309 |
| 2004 | 868 | 384 | 105 | 22 | 1,379 |
| 2005 | 921 | 412 | 127 | 25 | 1,485 |
| 2006 | 1,082 | 371 | 102 | 24 | 1,579 |
| 2007 | 1,038 | 325 | 112 | 36 | 1,511 |
| 2008 | 984 | 361 | 98 | 26 | 1,469 |
| 2009 | 887 | 401 | 83 | 16 | 1,387 |
| 2010 | 835 | 375 | 98 | 26 | 1,334 |
| 2011 | 730 | 448 | 102 | 23 | 1,303 |
| 2012 | 740 | 457 | 78 | 15 | 1,290 |
| 2013 | 640 | 491 | 94 | 23 | 1,248 |
| 2014 | 699 | 532 | 74 | 19 | 1,324 |
| **Total** | **13,756** | **6,903** | **1,723** | **395** | **22,777** |

A common myth is that children and teens living in rural areas do not suffer the effects of gun violence experienced by their contemporaries who live in urban environments, despite being exposed to guns at a young age. The fact is that guns kill rural youth at a rate equal to urban youth but in different circumstances. While more urban youth die from gun homicide, the difference is made up in rural areas through firearm suicide and unintentional deaths. A 2010 study in the *American Journal of Pediatrics* examined all pediatric firearm deaths up to age 19 from 1999 through 2006. The deaths were analyzed by rural-urban settings based on population size and proximity to metropolitan areas. The study concluded:

> "Children in the most-rural US counties had firearm mortality rates that were statistically indistinguishable from those for children in the most-urban counties. This finding reflects a greater homicide rate in urban counties counterbalanced by greater suicide and unintentional firearm death rates in rural counties."[109]

Parents also have significant ability to prevent youth suicide recognizing that adolescents who commit suicide most often use the family gun.[110] By removing guns from homes where children and teens live, especially depressed adolescents, parents will reduce likelihood of suicide and unintentional death for everyone in the household, but especially for teens.

While 85 percent of suicide attempts with guns are fatal, other means are less lethal: only one percent of cutting or piercing attempts are fatal, while only two percent of poisoning/overdose attempts result in death.[111] Moreover,

Exhibit A

0418

studies show that many teen suicide attempts are impulsive. Of teens who survived a suicide attempt, one quarter said they thought of suicide just five minutes before making the attempt. There is also little truth to the widely held belief that those who attempt to kill themselves are determined to succeed. In fact, 90 percent of near-lethal suicide attempts do not attempt to kill themselves again.[112]



"Loaded With Lead: Part 3," *Seattle Times*, October 20, 2014

## LEAD: THE SILENT HEALTH THREAT FROM FIREARMS

While the health and safety threats of gun violence can be measured in death and injury, there is another reason guns pose a grave threat to human health and particularly children's health: the toxic lead found in ammunition.

Lead is a highly toxic metal that is especially harmful to the developing brains of young children. It can harm many different body organs and systems, and exposure can lead to reduced intelligence and many behavioral problems. The federal Centers for Disease Control and Prevention (CDC) maintains there is *no* safe level of lead in the blood for children, and states, "Even low levels of lead in blood have been show to affect IQ, ability to pay attention, and academic achievement."[113] [114]

In recent decades, public health-based regulations have dramatically reduced the presence of lead in what were once common sources of exposure for children, such as lead-based paint and lead in gasoline. The major health threat that remains is lead from bullets. The Environmental Protection Agency (EPA) regulates lead in paint and gasoline but is prohibited from regulating the lead contained in cartridges and shells. The EPA has rejected a petition filed by 101 environmental organizations to regulate lead from spent bullets and shot citing a section of the Toxic Substances and Control Act (TSCA) that exempts cartridges and shells from the agency's reach. Both the NRA and the NSSF intervened in court to object to EPA regulation of lead in ammunition.[115] A 2013 consensus statement from scientists from across the nation warned: "Lead-based ammunition is likely the greatest, largely unregulated source of lead knowingly discharged into the environment in the United States."[116]

Exhibit A

0419

For both children and adults, the primary risk of exposure comes from shooting ranges, most notably indoor ranges. At the firing range, children can be exposed to lead through particles suspended in the air or even by eating contaminated food. Even when children do not go to the firing range themselves, they can be contaminated by clothing or accessories from adults returning from the range.[117] The CDC recommends that individuals "shower and change clothes after finishing a task that involves working with lead-based products, such as stained glass, making bullets, or using a firing range."[118]



This photo from the cover of a 1997 Browning firearms catalog ignores the threat lead poses to children

Yet despite the well-documented public health risk, shooting ranges remain a largely unregulated industry. A recent investigation in the *Seattle Times* revealed that shooting range owners routinely violate workplace safety laws, resulting in their employees as well as their children and adult customers being exposed to lead. The newspaper found that only 201 of the estimated 6,000 commercial gun ranges in the United States have been inspected within the past decade, but 86 percent of those which had been inspected violated at least one lead-related standard. Thousands more gun ranges are volunteer-led or members-only clubs with no employees, and these do not have to follow federal regulations at all.[119] Not surprisingly, while the NRA and its self-described gun industry "corporate partners" will at times pay lip service to the safety hazards posed by lead, their overriding focus remains actively encouraging children to visit shooting ranges. As a medical officer for the National Institute for Occupational Safety and Health told the *Seattle Times*, "Some firing ranges cater to children, they have birthday parties and special events." An NRA official, Susan Recce, told the newspaper, "The issue of lead problems for indoor ranges is extremely rare."[120]

The facts state otherwise. At a Vancouver, Washington shooting range, tests in 2010 found 20 youth and young adults on the Rifle and Pistol Club team had been overexposed to lead. "We weren't very cautious," one of the participants was quoted as saying. "We would get lead on our hands and eat finger food." Tests showed that the floor of the range had a lead level 993 times that allowed by a federal housing guideline.[121]

There is no cure or treatment for the effects of lead exposure, and the effects are chronic and irreversible. The only option is prevention. And yet, the response from all too many parents is to ignore the threat. In response to an online discussion thread titled "is 3 yrs old too young to help dad clean ar [AR-15 assault rifle]?," one commenter responded:

> "The whole lead, chemical paranoia is out of control IMO [in my opinion]. I grew up with lead paint, played with lead toy soldiers, dunked my hands in kerosene while cleaning car parts and used real MEK to degrease stuff. According to my doc I'm in good health aside from high cholesterol. Use common sense. Don't let your kid drink Hoppe's or Frog Lube. Don't let him stick his hands in his mouth...He's more likely to drown or get hurt at the playground than die for touching the bolt of a rifle once a week."[122]

Exhibit A

## CONCLUSION AND RECOMMENDATIONS

The efforts of the gun industry and gun lobby to put firearms in the hands of young children and teens are the exact opposite of what health experts advise. The American Academy of Pediatrics is emphatic in urging parents not to keep guns in homes with children. Their healthychildren.org website advises parents, "The best way to keep your children safe from injury or death from guns is to NEVER have a gun in the home." Specifically, the pediatricians' organization warns parents as follows:[123]

- Do not purchase a gun, especially a handgun.

- Remove all guns present in the home.

- Remember that young children simply do not understand how dangerous guns can be, despite parents' warnings.

- Find out if there are guns in the homes where your children play. If so, talk to the adults in the house about the dangers of guns to their families.

"For those who know of the dangers of guns but still keep a gun in the home," the site advises:

- Always keep the gun unloaded and locked up.

- Lock and store the bullets in a separate place.

- Make sure to hide the keys to the locked boxes.

As noted, one study found that adolescents who commit suicide most often use the family gun.[124] By removing guns from homes where children and teens live, especially depressed adolescents, parents will reduce likelihood of suicide and unintentional death for everyone in the household, but especially for teens.

A common argument is that giving children guns teaches them personal responsibility and other life skills. Typical is the language found on the website of National 4-H Shooting Sports, which promises "Skills for Life — Activity for a Lifetime." Sponsors of the program include: the National Shooting Sports Foundation; online accessories and ammo vendor MidwayUSA (headed by top NRA donor Larry Potterfield); the ammunition manufacturer Hornady (headed by NRA board member Steve Hornady); and, Hodgdon Powder (headed by one-time NRA board member Bob Hodgdon). In the "Just for Youth" section under the heading "Kids 'n' Guns," the site states:

> "4-H uses shooting sports to teach youth development. Our programs are valuable for helping young people develop self-confidence, personal discipline, responsibility, teamwork, self esteem and sportsmanship. The discipline and self-control required for responsible firearms use carries over into many other aspects of life."[125]

In the same section, the question is asked, "Isn't easy access to firearms one reason for the violent behavior we've seen in Columbine and other school shootings?" The response is as predictable as it is disingenuous: "No, access is not the issue. The safest location for a responsible gun owner to store a firearm is the secure environment of his or her home...Firearms should however, be stored so that they are inaccessible to unauthorized users."

Left unstated is the fact that with the creation of the youth gun culture envisioned by the firearms industry and the gun lobby, the children themselves in the home are all too often the *authorized* users.

---

Exhibit A

At the same time, the "skills" learned by youth at the foot of today's gun industry — with its embrace of heightened lethality and increased militarization, combined with the immaturity and limited judgment that define childhood — can be put into action with horrific results.

In addition to urging that homes with children be gun-free, the Violence Policy Center recommends the following:

■  Firearms are an adult product just like tobacco and alcohol and should be treated as such to protect the health and safety of children. Just as our society does not condone the use of alcohol or tobacco by minors even with adult supervision, we should prohibit the acquisition, possession, and use of firearms by children. Current federal law prohibits the transfer of handguns by Federal Firearms License (FFL) holders to anyone under the age of 21. Federal law also prohibits handgun possession by those under the age of 18 with a number of exceptions. Federally licensed dealers are also prohibited from selling long guns (shotguns and rifles) to those under the age of 18. These laws should be revised so that possession standards strictly match sales standards: 18 years old for long guns and 21 years old for handguns.

■  The Federal Trade Commission should investigate whether the firearms industry is inappropriately marketing firearms to children and also whether manufacturers are engaged in product placement of firearms in video games marketed to minors to determine whether such efforts violate applicable advertising standards.

■  Websites for gun manufacturers and vendors of related products (such as ammunition and ammunition magazines) should have the same age restrictions and criteria for access as those for tobacco and alcohol vendors.

■  Congress should repeal the section of the Toxic Substances Control Act prohibiting the Environmental Protection Agency from regulating lead in ammunition.

■  States should review their laws regarding firearm possession by children with the goal of having the age for legal possession at least match that for legal purchase from a Federal Firearms License holder.

■  An effective public education campaign should be developed and implemented to warn parents and youth about the dangers associated with the presence and use of firearms.

To put the gun industry and gun lobby's child-marketing efforts into perspective, imagine the public outcry if the alcohol industry announced a program targeting grade school children, promoting a line of "youth cocktails." Or if the tobacco industry urged parents to introduce their second and third grade-age children to the satisfaction and sophistication of smoking with "junior cigarettes." Or if it was revealed that these industries had a "strategic plan" targeting children to not only "start them young," but to create a cadre of "youth ambassadors," whose goal would be to convince their playmates via personal contact and social media to join them in these adult activities. Yet, the firearms industry and gun lobby are today aggressively pursuing just such a campaign targeting America's youth.

And while the firearms industry and gun lobby consistently work to present this marketing effort in terms of tradition and family, the real impetus lies in profit and political power. Most tragically, the effects of this campaign are all too often measured in unnecessary death and crippling injury.

Exhibit A

# ENDNOTES

1.   "Father of Marysville school shooter convicted of gun charges," *Seattle Times*, September 29, 2015 (http://www.seattletimes.com/seattle-news/crime/father-of-marysville-school-shooter-convicted-of-gun-charges/); "'Bang, Bang I'm Dead': Marysville Shooter Jaylen Fryberg's Ominous Texts – NBC News," *nbcnews.com*, November 20, 2014 (http://www.nbcnews.com/storyline/marysville-school-shooting/bang-bang-im-dead-marysville-shooter-jaylen-frybergs-ominous-texts-n252496); "Death Toll Rises to 5 in School Shooting," *Associated Press*, November 8, 2014 (http://www.nytimes.com/2014/11/09/us/death-toll-rises-to-5-in-school-shooting.html); "Second Washington school shooting victim dies after homecoming prince took aim at his friends, family," *Washington Post*, October 27, 2014 (http://www.washingtonpost.com/news/morning-mix/wp/2014/10/27/second-seattle-area-school-shooting-victim-dies-after-homecoming-prince-took-aim-at-his-friends-family/); "Marysville school shooting: What more could the community have done?," *Christian Science Monitor*, October 26, 2014 (http://www.csmonitor.com/USA/2014/1026/Marysville-school-shooting-What-more-could-the-community-have-done-video); "Tangled Portrait of a Student Emerges in Washington Shooting," *New York Times*, October 25, 2014 (http://www.nytimes.com/2014/10/26/us/contrasting-portraits-emerge-of-jaylen-ray-fryberg-shooter-at-washington-school.html?_r=0).

2.   "Troutdale police release parts of interviews with father, brother of Reynolds High shooter," *OregonLive*, April 6, 2015 (http://www.oregonlive.com/portland/index.ssf/2015/04/troutdale_police_release_31_pa.html); "NRA mouthpiece Wayne LaPierre quiet as Oregon high school shooter revealed to conceal AR-15 rifle in guitar case," *Daily News*, June 12, 2014 (http://www.nydailynews.com/news/national/school-shooter-portland-ore-ar-15-report-article-1.1825533); "Reynolds High School shooter Jared Padgett died of self-inflicted wound," *koin.com*, June 11, 2014 (http://koin.com/2014/06/11/reynolds-high-school-news-briefing-june-11-2014/); "Reynolds High shooter Jared Padgett 'showed off about guns,'" *koin.com*, June 11, 2014 (http://koin.com/2014/06/11/reynolds-high-shooter-jared-padgett-showed-off-about-guns/); "Oregon school shooting: Gunman Jared Michael Padgett known as serious student with interest in military," *The Oregonian*, June 11, 2014 (http://www.oregonlive.com/gresham/index.ssf/2014/06/oregon_school_shooting_gunman.html); "Jared Michael Padgett: Troutdale Shooting Suspect Argued With Classmates About Hitler," *Inquisitr*, June 11, 2014 (http://www.inquisitr.com/1294499/jared-michael-padgett-troutdale-shooting-suspect-argued-with-classmates-about-hitler/); "Jared Padgett Photos: Reynolds High School Gunman Jared Michael Padgett Facebook Pictures Out," *Epoch Times*, June 11, 2014 (http://www.theepochtimes.com/n3/728899-jared-padgett-photos-reynolds-high-school-gunman-jared-michael-padgett-facebook-pictures/).

3.   "Waseca teen accused in school shooting plot had been planning for months," *Star Tribune*, December 17, 2014 (http://www.startribune.com/local/257505631.html#qRWhjsAGA7Oj9pMX.97); "Recording released of Minnesota teen calmly telling police of plans to kill family and set off school massacre," *Daily Mail*, June 25, 2014 (http://www.dailymail.co.uk/news/article-2668478/Recording-released-Minnesota-teen-calmly-telling-police-plans-kill-family-set-school-massacre.html); "Teen details massacre plot, reveres Columbine killer," *USA Today*, June 25, 2014 (http://www.usatoday.com/story/news/nation/2014/06/25/teen-plot-bomb/11349075/); "Recording released of Minnesota teen calmly telling police of plans to kill family and set off school massacre," *Daily Mail*, June 25, 2014 (http://www.dailymail.co.uk/news/article-2668478/Recording-released-Minnesota-teen-calmly-telling-police-plans-kill-family-set-school-massacre.html); "UPDATED: Waseca teen pleads not guilty in mass shooting plot," *Waseca County News*, May 12, 2014 (http://www.southernminn.com/waseca_county_news/news/article_e3226229-92a4-5cec-8084-e1f88c297f11.html); "Police: Minnesota teen planned school massacre," *CNN*, May 2, 2014 (http://www.cnn.com/2014/05/01/justice/minnesota-attack-thwarted/).

Exhibit A

4.  See, for example, the 2013 Violence Policy Center study *Blood Money II: How Gun Industry Dollars Fund the NRA* (http://www.vpc.org/studies/bloodmoney2.pdf).

5.  NSSF *SHOT Business*, September/October 1993.

6.  *Shooting Sports Retailer*, September/October 1998.

7.  "Shooting for a New Audience," *Shooting Sports Retailer*, May/June 2007.

8.  General Social Survey (GSS) gun ownership data contained in this report is drawn from the NORC publication *General Social Survey Final Report: Trends in Gun Ownership in the United States, 1972-2014*, Tom W. Smith, Jaesok Son, NORC at the University of Chicago, March 2015. For a detailed history of gun ownership in the United States as reported by the GSS, see the May 2015 Violence Policy Center report *A Shrinking Minority: The Continuing Decline of Gun Ownership in America* (http://www.vpc.org/studies/ownership.pdf).

9.  Respondents were asked, "Do you (or does your [husband/wife]) go hunting?"

10. *NSSF Report: Incidence Rate of Hunting With Modern Sporting Rifles*, National Shooting Sports Foundation, 2015.

11. See http://www.chipmunkrifles.com/chipmunk_aboutus.php.

12. See http://www.crickett.com/.

13. Ironically, while the company's Beanie Baby must meet at least four types of federal safety standards — sharp edges and points, small parts, hazardous materials, and flammability — there are no federal safety standards for the domestic manufacture of firearms.  For more information, see http://www.vpc.org/regulating-the-gun-industry/regulate-firearms-like-other-consumer-products/.

14. "Watch an Ad for 'My First Rifle,' the Gun a 5-Year-Old Used to Shoot His 2-Year-Old Sister," *Slate*, May 3, 2013 (http://www.slate.com/blogs/crime/2013/05/03/crickett_keystone_sporting_arms_watch_an_ad_for_my_first_rifle_the_gun_a.html).

15. See http://www.littlesportsman.com/.

16. "Marlin's New Kid-Friendly Rifles," *NRA Family InSights*, January 2, 2014 (http://www.nrafamilyinsights.org/articles/marlins-new-kid-friendly-rifles).

17. "Children and Guns — An Iowa Fail," Jews for the Preservation of Firearms Ownership, April 21, 2014 (http://jpfo.org/alerts2014/alert20140421.htm).

18. "'We wish you peace': Children of weapons instructor killed in gun range accident make emotional video pledging forgiveness to nine-year-old girl who shot their father," *Daily Mail*, September 12, 2014 (http://www.dailymail.co.uk/news/article-2754358/We-wish-peace-Children-weapons-instructor-killed-gun-range-accident-make-emotional-video-pledging-forgiveness-nine-year-old-girl-shot-father.html#ixzz3U1IYxDJD).

19. "Choosing Your Child's First Gun," *American Hunter*, November 16, 2012.

20. "Choosing Your Child's First Gun," *American Hunter*, November 16, 2012.

21. As a 2010 article in the NRA's *American Rifleman* magazine noted: "The term 'tactical .22 rifle' is essentially an oxymoron. It's unlikely that a single military or police force on Earth uses .22 Long Rifle arms for small-scale combat operations, at least as primary guns. Nevertheless, this burgeoning class of firearms has taken hold in recent years in the civilian market. With origins dating back to the ever-modular Ruger 10/22, perhaps the most accessorized gun on the planet, up through today's AR-15 look-alikes, these guns have found a welcome place in the cabinets of varmint shooters, beginning marksmen, and of course those who like to shoot all day with inexpensive, readily available ammunition." "Tactical 22s: A New Class of Rifles," *American Rifleman*, November 19, 2010 (http://www.americanrifleman.org/articles/2010/11/19/tactical-22s-a-new-class-of-rifles/).

22. "Why AR-Styled Rifles Are so Popular," *Shooting Sports Retailer*, January 2014.

23. See http://www.gandermountain.com/modperl/product/details.cgi?i=781756, downloaded September 22, 2015.

24. Sig Sauer advertisement, *Junior Shooters*, Summer 2011.

25. "Rifles for Ruger Rimfire," *Junior Shooters*, March 2011 Special Edition.

26. See https://www.billsgs.com/the-average-joe-archive/214-december-gotm-beretta-arx-160.

27. "The Best Guns for Smaller Shooters," *Shooting Sports Retailer,* April 30, 2015 (http://www.shootingsportsretailer.com/2015/04/30/best-guns-smaller-shooters/).

28. "The Best Guns for Smaller Shooters," *Shooting Sports Retailer*, April 30, 2015 (http://www.shootingsportsretailer.com/2015/04/30/best-guns-smaller-shooters/).

29. "Henry Repeating Arms: Muddy Girl," *NRA Family*, February 21, 2014 (http://www.nrafamily.org/articles/2014/2/21/henry-repeating-arms-muddy-girl/).

30. "CZ 452 Scout Rifle," *Junior Shooters*, Summer 2011.

31. See http://www.smith-wesson.com/webapp/wcs/stores/servlet/ Category4_750001_750051_757786_-_757784_757784_image.

32. In May 2015, Black Forge Weapons was acquired by Invincible Arms of Ohio, see http://invinciblearms.com/news-and-announcements/invincible-arms-acquires-black-forge-weapons/.

33. "The Best Guns for Smaller Shooters," *Shooting Sports Retailer*, April 30, 2015 (http://www.shootingsportsretailer.com/2015/04/30/best-guns-smaller-shooters/).

34. "Letter from the Editor," *America's 1st Freedom*, December 2004.

35. "A Word from Your Editor," *Junior Shooters*, Spring 2012.

36. "A Word from Your Editor," *Junior Shooters*, Spring 2012.

37. "A Word from Your Editor," *Junior Shooters*, Winter 2012.

38. *Junior Shooters*, March 2011 Special Edition.

Exhibit A

39. "Is the Shooting Industry Getting it All Wrong?," *Shooting Sports Retailer*, July 31, 2015 (http://www.shootingsportsretailer.com/2015/07/31/shooting-industry-getting-wrong/).

40. See http://www.juniorshooters.net/aboutus/.

41. See http://www.juniorshooters.net, downloaded November 13, 2015.

42. See http://www.juniorshooters.net/aboutus/.

43. "A Word from Your Editor," *Junior Shooters*, Spring 2012.

44. Founded in 1996, "The International Defensive Pistol Association (IDPA) is the governing body of a shooting sport that simulates self-defense scenarios and real life encounters...One of the unique facets of this sport is that it is geared toward the new or average shooter, yet is fun, challenging and rewarding for the experienced shooter. The founders developed the sport so that practical gear and practical guns may be used competitively." On its website, IDPA poses the question, "WHY ANOTHER SHOOTING SPORT?," and answers: "Prior to the formation of IDPA, there was no place to compete and hone one's skill with equipment designed for & suitable for self-defense (http://www.idpa.com).

45. "A Word from Your Editor," *Junior Shooters*, Spring 2012.

46. "Why I Love Bushmaster AR-15s...You Should, Too," *Junior Shooters*, Summer 2012.

47. "45 Firearms Developed Specifically for Smaller-Statured or Younger Shooters," Mossberg press release, June 30, 2014 (http://www.juniorshooters.net/2014/07/06/mossbergs-youth-firearms-and-safety/).

48. "Adams Arms 14.5-inch Evo Ultralite Piston MSR Upper," *Junior Shooters*, Summer 2013.

49. "Adams Arms 14.5-inch Evo Ultralite Piston MSR Upper," *Junior Shooters*, Summer 2013.

50. "The Mosquito: A Cool .22 With A Sting," *Junior Shooter*s, Summer 2009.

51. "Sig Sauer's Mosquito," *Junior Shooters*, Summer 2013.

52. "Sig Sauer's Mosquito," *Junior Shooters*, Summer 2013.

53. "Sig Sauer's Mosquito," *Junior Shooters*, Summer 2013.

54. "Sig Sauer's Mosquito," *Junior Shooters*, Summer 2013.

55. "Glocks are for Girls," *Junior Shooters*, Summer 2009.

56. "Kids Gear!," *Junior Shooters*, Summer 2010.

57. *Junior Shooters*, Winter 2011.

58. *Junior Shooters*, March 2011.

59. *Junior Shooters*, Winter 2011.

60. *Junior Shooters*, Spring 2013.

61.  *Junior Shooters*, Spring 2013.

62.  *Junior Shooters*, Winter 2011.

63.  *Junior Shooters*, Spring 2012.

64.  *Junior Shooters*, Spring 2013.

65.  "NRA's Magazine for Juniors Goes Digital," *AccurateShooter.com*, September 28th, 2011 (http://bulletin.accurateshooter.com/2011/09/nras-magazine-for-juniors-goes-digital/).

66.  See https://membership.nrahq.org/forms/signup.asp.

67.  As of September 23, 2015.

68.  "Ronnie Barrett: High-Caliber Innovator," December 19, 2013 (http://www.nrafamily.org/articles/2013/12/19/ronnie-barrett-high-caliber-innovator/).

69.  See https://web.archive.org/web/20150221040356/http://www.nrafamilyinsights.org/Kids under "Kids."

70.  "Test Fire: Thompson/Center HotShot," *NRA Family*, January 2, 2014 (http://www.nrafamily.org/articles/2014/1/2/test-fire-thompsoncenter-hotshot/).

71.  Downloaded from http://www.nrafamilyinsights.org/Kids-Under-8-Awesome-Apps on November 13, 2014 and from https://web.archive.org/web/20141129150952/http://www.nrafamilyinsights.org/articles/nra-gun-guide-app on September 23, 2015.

72.  "My First .22 Pistol," *NRA Family*, August 8, 2014 (http://www.nrafamily.org/articles/2014/8/8/my-first-22-pistol/).

73.  On July 20, 2015, the online publication and website *NRA Family InSights* became the *NRA Family* website, "designed to cater to the unique needs of American families that own guns, with realistic how-to advice on topics such as safe firearm storage, introducing new shooters and hunters to the sports, outdoor family destinations and entertainment, personal protection tips, historical firearms and figures, gun and gear reviews, news for NRA families, Olympic shooting sports and more." According to Executive Director of NRA publications Doug Hamlin, "*NRA Family* was created to serve the millions of NRA families in America. Rather than addressing a specific sport or interest, we're adopting a holistic approach that includes the needs of mothers, fathers, kids and grandparents who are both eager to learn, and to pass their knowledge on to the next generation." "NRA Family's Brand-New Website," July 20, 2015 (http://www.nrafamily.org/articles/2015/7/20/nra-familys-brand-new-website/).

74.  "Hunting is Safer Than Golf and Most Other Activities (Not to Mention Football, Basketball and Soccer)," National Shooting Sports Foundation press release, December 5, 2011 (http://www.nssf.org/newsroom/releases/2011/120511.cfm?print=X).

75.  *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting: Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

76.  "A Parent's Guide to Recreational Shooting for Youngsters," National Shooting Sports Foundation, 2014.  Also included in the document is a pledge for children to sign which includes the promise that "I <u>will not</u> go snooping or allow my friends to go snooping for guns in the house."

Exhibit A

77. *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012.

78. *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012.

79. *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012.

80. Labeled "An Initiative for the Future of Hunting," *Families Afield* (http://www.familiesafield.org/), founded by NSSF, National Wild Turkey Federation, and the U.S. Sportsmen's Alliance, "is an education and outreach program to help states create hunting opportunities for youths, so that more families may enjoy America's greatest outdoor tradition together." The National Rifle Association and the Congressional Sportsmen's Foundation are also "coalition partners" in the program. According to NSSF, "Since its inception, 35 states have passed new laws aimed at removing barriers and making it easier for new people to get into the field and try hunting" (http://www.nssf.org/hunting/youth/). The bulk of the program's efforts have focused on reducing minimum age requirements for hunting by children and eliminating the need for more rigorous licensing and training for novice hunters. On the program's website under "Get Involved," NSSF warns "Hunter Numbers are Declining," stating, "For every 100 adult hunters today, only 69 youth hunters are coming up to take their place," while under the heading "Focus on Youth," the organization stresses that "Youngsters are Key."

81. *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012.

82. *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

83. *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

84. *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

85. *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

86. *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

87. "The Gun Industry's Deadly Addiction," *Rolling Stone*, February 28, 2013 (http://www.rollingstone.com/politics/news/the-gun-industrys-deadly-addiction-20130228#ixzz3bShTEHM4).

88. "Is the Shooting Industry Getting it All Wrong," *Shooting Sports Retailer*, July 31, 2015 (http://www.shootingsportsretailer.com/2015/07/31/shooting-industry-getting-wrong/).

89. "Shooters: How Video Games Fund Arms Manufacturers," *Eurogamer.net*, January 31, 2013

Exhibit A

0428

(http://www.eurogamer.net/articles/2013-02-01-shooters-how-video-games-fund-arms-manufacturers).

90. "The gun gamer's dilemma," *Gun Nuts Media*, March 25, 2015
    (http://www.gunnuts.net/2015/03/25/the-gun-gamers-dilemma/).

91. All typos or grammatical errors in original text.

92. Perhaps recognizing the risks that come with turning what shooters have "seen on the screen into a reality," under
    the heading "Our Products Are Not For the Unjust" on its website the company offers this disclaimer: "Let us make
    this plain — if you are a morally-deprived, violent individual who is interested in purchasing our products to do harm,
    please do not buy from us. Firefield products cater to independent, free-thinkers who strive to live a life of honor,
    purpose and meaning. Firefield works hard to embrace that spirit. Each product is built on a foundation of promoting
    self-reliance, love for our country and the importance of protecting our family. We understand that life is constantly
    moving, and our customers need the necessary tools to realize their full potential and complete each task with
    principle and integrity. By joining the Firefield Legion, you are part of an elite group that is responsible, ethical and
    edgy, and loves to keep it real in any situation" (http://www.fire-field.com/about.html).

93. "Always Shooting for More: National Shooting Sports Foundation builds ranks of young shooters, hunters," *Junior
    Shooters*, Volume 1, 2007.

94. "Competition Shooting 101: 3-Gun," *The Truth About Guns*, April 8, 2011
    (http://www.thetruthaboutguns.com/2011/04/foghorn/competition-shooting-101-3-gun/).

95. "Competition Shooting 101: 3-Gun," *The Truth About Guns*, April 8, 2011,
    (http://www.thetruthaboutguns.com/2011/04/foghorn/competition-shooting-101-3-gun/).

96. "Competition Shooting 101: 3-Gun," *The Truth About Guns*, April 8, 2011
    (http://www.thetruthaboutguns.com/2011/04/foghorn/competition-shooting-101-3-gun/).

97. "3-Gun Tactical Match," Cleburne County Shooting Club, Heber Springs, AR, downloaded September 24, 2015
    (http://www.ccscar.com/3gun.htm).

98. "Competition Shooting 101: 3-Gun," *The Truth About Guns*, April 8, 2011
    (http://www.thetruthaboutguns.com/2011/04/foghorn/competition-shooting-101-3-gun).

99. "So, You Think You Want to Try 3-Gun," *Junior Shooters*, Spring 2012.

100. "FNH Has All 4 Guns for 3-Gun!," *Junior Shooters*, Summer 2011.

101. According to FN's website, "Early 2004, United States Special Operations Command (USSOCOM) issued a
     solicitation for a family of Special Forces Combat Assault Rifles, the so-called SCAR, designed around two different
     calibers but featuring high commonality of parts and identical ergonomics. FN Herstal took part in the full and open
     competition and released prototypes of a brand new family of weapons within timeframe taking advantage of our
     long-standing firearms know-how" (http://www.fnherstal.com/primary-menu/products-capabilities/rifles/general/
     product/182/232/182/1/_/fn-scarR-l-std.html).

102. "Why I Love 3-Gun!," *Junior Shooters*, March 2011 Special Edition.

Exhibit A

0429

103. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) can fully exercise its existing statutory authority to exclude from importation all semiautomatic assault rifles as "non-sporting" weapons pursuant to 18 USC §925(d)(3) (a provision of the 1968 Gun Control Act) and also exclude the importation of assault weapon kits and parts sets. This policy was first implemented in 1989 by the George H.W. Bush administration in response to drug wars and mass shootings in the U.S. The Clinton administration strengthened the import rules in 1998 in response to efforts by the gun industry to evade the ban, but the policy was essentially abandoned by the George W. Bush administration with limited activity since.

104. "Junior Prizes in Place for 3 Gun Nation Tour," *Junior Shooters*, Special Edition, 2011.

105. In an in-depth investigation published in 2013, *The New York Times* reviewed hundreds of child firearm deaths and found that unintentional shootings occur roughly twice as often as federal records indicate because of idiosyncrasies in how such deaths are classified by authorities (for example, an unintentional shooting being classified as a homicide). According to the *Times*, "The undercount stems from the peculiarities by which medical examiners and coroners make their 'manner of death' rulings. These pronouncements, along with other information entered on death certificates, are the basis for the nation's mortality statistics, which are assembled by the National Center for Health Statistics, a division of the Centers for Disease Control and Prevention. Choosing among five options — homicide, accidental, suicide, natural or undetermined — most medical examiners and coroners simply call any death in which one person shoots another a homicide." "Children and Guns: The Hidden Toll," *The New York Times*, September 28, 2013 (http://www.nytimes.com/2013/09/29/us/children-and-guns-the-hidden-toll.html?pagewanted=all&_r=0).

106. Source, Centers for Disease Control and Prevention WISQARS database.

107. Source, Centers for Disease Control and Prevention WISQARS database, additional calculations by Violence Policy Center.

108. Source, Centers for Disease Control and Prevention WISQARS database.

109. Michael L. Nance, MD, Brendan G. Carr, MD, MS, Michael J. Kallan, MS, Charles C. Branas, PhD, and Douglas J. Wiebe, PhD, "Variation in Pediatric and Adolescent Firearm Mortality Rates in Rural and Urban US Counties," *Pediatrics*, Volume 125, Number 6, June 2010.

110. Renee M. Johnson, PhD, MPH, Catherine Barber, MPA, Deborah Azrael, PhD, David E. Clark, MD, and David Hemenway, PhD, "Who are the owners of firearms used in adolescent suicides?," *Suicide and Life-Threatening Behavior*, December 2010.

111. Harvard T.H. Chan School of Public Health, *Means Matter* (http://www.hsph.harvard.edu/means-matter/means-matter/case-fatality/).

112. Harvard T.H. Chan School of Public Health, *Means Matter* (http://www.hsph.harvard.edu/means-matter/).

113. Centers for Disease Control and Prevention, "What Do Parents Need to Know to Protect Their Children?" (http://www.cdc.gov/nceh/lead/acclpp/blood_lead_levels.htm).

114. Some recent evidence even suggests that there is a strong link between exposure to lead and criminal activity, see for example: Kevin Drum, "America's Real Criminal Element: Lead," *Mother Jones*, January/February 2013

Exhibit A

0430

(http://www.motherjones.com/environment/2013/01/lead-crime-link-gasoline); Jessica Wolpaw Reyes, "Environmental Policy as Social Policy? The Impact of Childhood Lead Exposure on Crime," National Bureau of Economic Research Working Papers, May 2007 (http://www.nber.org/papers/w13097); and, Rick Nevin, "Understanding international crime trends: The legacy of preschool lead exposure," *Environmental Research* 104 (2007) 315-336 (http://pic.plover.com/Nevin/Nevin2007.pdf).

115. *Trumpeter Swan Society v. Environmental Protection Agency*, 774 F.3d 1037 (D.C. Cir. 2014).

116. David C. Bellinger, PhD, MSc, et al, "Health Risks from Lead-Based Ammunition in the Environment — A Consensus Statement of Scientists," March 22, 2013 (http://escholarship.org/uc/item/6dq3h64x#page-1).

117. Violence Policy Center and Environmental Working Group, *Poisonous Pastime: The Health Risks of Shooting Ranges and Lead to Children, Families, and the Environment*, May 2001 (http://www.vpc.org/graphics/poison.pdf) and *Lead Pollution at Outdoor Firing Ranges*, Environmental Working Group, companion study to *Poisonous Pastime* (http://www.vpc.org/publications/lead-pollution-at-outdoor-firing-ranges/).

118. Centers for Disease Control and Prevention, "Prevention Tips" (http://www.cdc.gov/nceh/lead/tips.htm).

119. "Loaded With Lead: Part 1," *Seattle Times*, October 17, 2014 (http://projects.seattletimes.com/2014/loaded-with-lead/1/).

120. "Loaded With Lead: Part 1," *Seattle Times*, October 17, 2014 (http://projects.seattletimes.com/2014/loaded-with-lead/1/).

121. "Loaded With Lead: Part 3," *Seattle Times*, October 20, 2014 (http://projects.seattletimes.com/2014/loaded-with-lead/3/).

122. See http://www.m4carbine.net/showthread.php?157264-is-3-yrs-old-too-young-to-help-dad-clean-ar/page2.

123. See http://www.healthychildren.org/English/safety-prevention/all-around/Pages/Gun-Safety-Keeping-Children-Safe.aspx.

124. Renee M. Johnson, PhD, MPH, Catherine Barber, MPA, Deborah Azrael, PhD, David E. Clark, MD, and David Hemenway, PhD, "Who are the owners of firearms used in adolescent suicides?," *Suicide and Life-Threatening Behavior*, December 2010.

125. See http://w3.4-hshootingsports.org/Kids'N'Guns.php.

Exhibit A



**Violence Policy Center**

1730 Rhode Island Avenue, NW  Suite 1014

Washington, DC 20036

W W W . V P C . O R G

# EXHIBIT B

0433

CORRESPONDENCE

# Current Causes of Death in Children and Adolescents in the United States

**TO THE EDITOR:** The Centers for Disease Control and Prevention (CDC) recently released updated official mortality data that showed 45,222 firearm-related deaths in the United States in 2020 — a new peak.[1] Although previous analyses have shown increases in firearm-related mortality in recent years (2015 to 2019), as compared with the relatively stable rates from earlier years (1999 to 2014),[2,3] these new data show a sharp 13.5% increase in the crude rate of firearm-related death from 2019 to 2020.[1] This change was driven largely by firearm homicides, which saw a 33.4% increase in the crude rate from 2019 to 2020, whereas the crude rate of firearm suicides increased by 1.1%.[1] Given that firearm homicides

disproportionately affect younger people in the United States,[3] these data call for an update to the findings of Cunningham et al. regarding the leading causes of death among U.S. children and adolescents.[4]

The previous analysis, which examined data through 2016, showed that firearm-related injuries were second only to motor vehicle crashes (both traffic-related and nontraffic-related) as the leading cause of death among children and adolescents, defined as persons 1 to 19 years of age.[4] Since 2016, that gap has narrowed, and in 2020, firearm-related injuries became the leading cause of death in that age group (Fig. 1). From 2019 to 2020, the relative increase in the



**Figure 1.** Leading Causes of Death among Children and Adolescents in the United States, 1999 through 2020.
Children and adolescents are defined as persons 1 to 19 years of age.

The New England Journal of Medicine
Downloaded from nejm.org on August 7, 2022. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

rate of firearm-related deaths of all types (suicide, homicide, unintentional, and undetermined) among children and adolescents was 29.5% — more than twice as high as the relative increase in the general population. The increase was seen across most demographic characteristics and types of firearm-related death (Fig. S1 in the Supplementary Appendix, available with the full text of this letter at NEJM.org).

In addition, drug overdose and poisoning increased by 83.6% from 2019 to 2020 among children and adolescents, becoming the third leading cause of death in that age group. This change is largely explained by the 110.6% increase in unintentional poisonings from 2019 to 2020. The rates for other leading causes of death have remained relatively stable since the previous analysis, which suggests that changes in mortality trends among children and adolescents during the early Covid-19 pandemic were specific to firearm-related injuries and drug poisoning; Covid-19 itself resulted in 0.2 deaths per 100,000 children and adolescents in 2020.[1]

Although the new data are consistent with other evidence that firearm violence has increased during the Covid-19 pandemic,[5] the reasons for the increase are unclear, and it cannot be assumed that firearm-related mortality will later revert to prepandemic levels. Regardless, the increasing firearm-related mortality reflects a longer-term trend and shows that we continue to fail to protect our youth from a preventable cause of death. Generational investments are being made in the prevention of firearm violence, including new funding opportunities from the CDC and the National Institutes of Health, and funding for the prevention of community violence has been proposed in federal infrastructure legislation. This funding momentum must be maintained.

Jason E. Goldstick, Ph.D.
Rebecca M. Cunningham, M.D.
Patrick M. Carter, M.D.

University of Michigan
Ann Arbor, MI
jasoneg@umich.edu

Disclosure forms provided by the authors are available with the full text of this letter at NEJM.org.

This letter was published on April 20, 2022, at NEJM.org.

1. Centers for Disease Control and Prevention. CDC Wonder. 2021 (https://wonder.cdc.gov/).
2. Goldstick JE, Zeoli A, Mair C, Cunningham RM. US firearm-related mortality: national, state, and population trends, 1999-2017. Health Aff (Millwood) 2019;38:1646-52.
3. Goldstick JE, Carter PM, Cunningham RM. Current epidemiological trends in firearm mortality in the United States. JAMA Psychiatry 2021;78:241-2.
4. Cunningham RM, Walton MA, Carter PM. The major causes of death in children and adolescents in the United States. N Engl J Med 2018;379:2468-75.
5. Schleimer JP, McCort CD, Shev AB, et al. Firearm purchasing and firearm violence during the coronavirus pandemic in the United States: a cross-sectional study. Inj Epidemiol 2021;8:43.

DOI: 10.1056/NEJMc2201761

---

## SER-109 for Recurrent *Clostridioides difficile* Infection

**TO THE EDITOR:** In the ECOSPOR III (SER-109 versus Placebo in the Treatment of Adults with Recurrent *Clostridium difficile* Infection) trial by Feuerstadt et al. (Jan. 20 issue)[1] evaluating the efficacy of SER-109 for the prevention of recurrent *Clostridioides difficile* infection, 40% of the patients in the placebo group had a recurrence, a percentage that was lower than expected in this population with a history of more than three cases of *C. difficile* infection. In contrast, in the article by van Nood et al. that showed the benefits of fecal microbiota transplantation (FMT) in preventing recurrent *C. difficile* infection, 69% of the patients in the control vancomycin-treated group had a recurrence.[2] Similar rates of recurrence after multiple infections have also been reported in other clinical trials and observational studies, including the phase 2 trial of SER-109 involving patients 65 years of age or older.[3-5]

This discrepancy may be explained by a constitutive difference between the enrolled population in the trial by Feuerstadt et al. and those in other published studies. Additional information regarding coexisting conditions (such as the Charlson Comorbidity Index) and the interval between each episode of *C. difficile* infection before inclusion in the trial would allow a comparison of these results with previously pub-

The New England Journal of Medicine
Downloaded from nejm.org on August 7, 2022. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

0435

# EXHIBIT C

Exhibit C

0436

# The Effect of Advertising on Children and Adolescents

Matthew A. Lapierre, PhD,[a] Frances Fleming-Milici, PhD,[b] Esther Rozendaal, PhD,[c] Anna R. McAlister, PhD,[d,e] Jessica Castonguay, PhD[f]

abstract

In ~100 years, marketing to children went from a severely frowned upon practice to an integral part of growing up as companies came to realize that investing in marketing to children and adolescents provides excellent immediate and future dividends. Each year, enormous sums of money are spent to reach this valuable audience because children and adolescents spend billions on their own purchases, influence family decisions about what to buy, and promise a potential lifetime of brand loyalty. The channels to reach youth have grown, and marketers are increasingly using them, often blurring the distinction between entertainment and advertising. Because advertising to children and adolescents has become ubiquitous, researchers who study its influence raise significant concerns about the practice, especially as it relates to dietary behavior, family conflict, marketer tactics, and children's potential vulnerability as an audience. In this review by the Workgroup on Marketing and Advertising, we highlight the state of the research in this area and suggest that more research needs to be conducted on understanding the following: the effects of advertising exposure, how psychological development affects children's responses to marketing, the problems associated with advertising in newer media, and how researchers, parents, and practitioners might be able to mitigate the most deleterious advertising effects. We then present avenues of future research along with recommendations for key stakeholders.

[a]Department of Communication, University of Arizona, Tucson, Arizona; [b]Rudd Center for Food Policy and Obesity, University of Connecticut, Hartford, Connecticut; [c]Radboud University, Nijmegen, Netherlands; [d]Endicott College, Beverly, Massachusetts; [e]Michigan State University, East Lansing, Michigan; and [f]Temple University, Philadelphia, Pennsylvania

All authors conceptualized and organized the review, drafted the original manuscript, and approved the final manuscript as submitted.

The analysis, conclusions, and recommendations contained in each article are solely a product of the individual workgroup and are not the policy or opinions of, nor do they represent an endorsement by Children and Screens: Institute of Digital Media and Child Development or the American Academy of Pediatrics.

**DOI:** https://doi.org/10.1542/peds.2016-1758

Accepted for publication Apr 19, 2017

Address correspondence to Matthew A. Lapierre, PhD, Department of Communication, University of Arizona, P.O. Box 210025, Tucson, AZ 85721. E-mail: mlapierre@email.arizona.edu

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2017 by the American Academy of Pediatrics

**FINANCIAL DISCLOSURE:** The authors have indicated they have no financial relationships relevant to this article to disclose.

**FUNDING:** This special supplement, "Children, Adolescents, and Screens: What We Know and What We Need to Learn," was made possible through the financial support of Children and Screens: Institute of Digital Media and Child Development.

**POTENTIAL CONFLICT OF INTEREST:** The authors have indicated they have no potential conflicts of interest to disclose.

Exhibit C

**SUPPLEMENT ARTICLE**

**0437**

Downloaded from http://www.publications.aap.org/pediatrics/article-pdf/140/Supplement_2/S152/907743/peds_20161758v.pdf by guest

The average young person growing up in the United States sees anywhere from 13 000 to 30 000 advertisements on television each year.[1] However, these figures do not include the marketing content online, in print, at the movies, in video games, or at school. It is important to note that advertising and marketing can serve a useful purpose for children. Marketing may help socialize children as consumers, inform them about products, and help them carve out unique identities as they reach adulthood.[2] Yet, as scholars who study advertising and children have found, there are legitimate reasons to be concerned with how marketers approach young audiences.

Some of the most pressing concerns are as follows: whether young people represent a vulnerable audience in need of protection; how marketers are reaching children in online and social networking environments; what parents, practitioners, and policy makers can do to help children contend with these messages; and what the marketing industry can teach various stakeholders about encouraging protective behaviors in young people. Moreover, there are issues related to marketing and young people that can have serious implications, and they deserve careful research attention because there are both short- and long-term negative consequences connected with exposure to marketing messages for products that are not healthy for children[3–5] and the idealized images and messages within the advertising that youth see.[6,7] In the following pages, we discuss the current state of research in this area, offer suggestions for future research, and provide recommendations to key stakeholders regarding children, adolescents, and marketing.

## CURRENT STATE

### Influence of Marketing Communications on Children

The marketing of unhealthy products, including unhealthy food as well as alcohol and tobacco, is linked to various negative outcomes for youth. Research shows that food marketing increases children's immediate and future consumption, food brand preferences are influenced by product placements and advergames, and childhood obesity is related to viewing commercial television (not viewing DVDs or public television programming).[4]

Youth exposure to alcohol advertising also delivers unhealthy consequences. Alcohol advertising increases the likelihood that adolescents will start to use alcohol and increases consumption among adolescents who already drink alcohol.[3] This is particularly concerning because early alcohol use increases the risk of future alcohol dependence.[8]

Although tobacco marketing has been banned from television for more than 40 years, youth exposure to television advertising for electronic cigarettes (e-cigarettes) doubled from 2011 to 2013.[5] Contrary to the suggested positive aspects discussed by the manufacturers, research shows that e-cigarette use does not prevent and may increase conventional cigarette use among adolescents.[9]

Harm may also be caused by the overwhelming exposure to all types of marketing, and the images within this marketing, that children and adolescents experience. For example, a review of research found a consistent relationship between advertising exposure, materialism, and parent-child conflict.[6] Furthermore, a meta-analysis found that advertising and other media portrayals depicting the thin-ideal for women are related to a negative body image among women and girls.[7]

Therefore, there is concern not only for the negative effects associated with the marketing of unhealthy products (ie, food, alcohol, and tobacco) but also for the negative effects associated with the way marketing exposure in general may influence how youth view material possessions and themselves.

### Children's Consumer Development

For decades, researchers have recognized children as a vulnerable consumer group because of their budding developmental abilities. Relying on Piaget's theory of cognitive development, researchers in many studies have reported that until children are >7 years old, they do not have the ability to detect persuasive intent in advertising.[2]

Researchers in modern studies have moved beyond the age-stage theory of cognitive development and have found other variables that play a role in enhancing consumer competencies among young children. For example, research has shown that theory of mind (ie, the ability to think about the thoughts and feeling of others) predicts elementary school-aged children's ability to understand selling intent and the social symbolism of brands.[10,11] Similarly, preschool-aged children with developed theory of mind are better equipped to detect persuasive intent.[12] Furthermore, executive functioning (ie, the form of cognitive development that explains impulse control, planned behavior, and categorization skills) has been linked to children's ability to process brand messages.[11]

What remains unknown is how children move from basic consumer competencies to being critical thinkers capable of defending against persuasion. Children's readiness to learn from their social world renders them vulnerable until they develop skepticism.[13] The protracted development of executive functions (which continues into

Exhibit C

Downloaded from http://www.publications.aap.org/pediatrics/article-pdf/140/Supplement_2/S152/907743/peds_20161758v.pdf by guest

0438

adolescence) may explain why this skepticism is slow to emerge.[14] By late adolescence, children's ability to cope with advertising should surface.[13] However, even as adults, we may be capable of skepticism but still fail to use our critical-thinking skills at all times.[13] Hence, further research is needed to understand what (if any) individual differences characterize mindful child and adolescent consumers.

## Marketing to Children in New Media Environments

As marketing to children has moved to new media platforms, researchers have struggled to keep up with these changes. In the past, researchers could record a few hours of television to get a sense of how marketers were selling to children. However, monitoring new media is fraught with logistical issues because Web sites can be altered in a matter of hours and social networks can privately reach out to young people with commercial appeals.

What we do know about marketing appeals in newer media is that they are often qualitatively different from traditional advertisements. Instead of receiving messages passively, online advertisements engage children actively through advergaming platforms (ie, games featuring branded content) and/or through solicitation as brand ambassadors (eg, encouraging children to reach out to friends about a product).[15,16] These practices are particularly problematic because evidence shows that children have more difficulty understanding that they are being marketed to in these online settings.[17]

Research also shows that marketers reaching children in online settings are acting with little oversight and are often more aggressive with their marketing strategies. For example, although companies are legally forbidden from collecting data on children <13 years old

in the United States, evidence suggests that marketers do engage in this practice.[16] Moreover, content analyses of food product Web sites show that many companies feature food products that are substantially less beneficial to children.[18]

## Mitigating Advertising Effects

Because of the concerns regarding the appropriateness and possibly harmful consequences of advertising targeting youth, various initiatives have been taken to protect and empower them. On a policy level, advertising regulations have been implemented to restrict certain types of advertising targeted at children. However, many of these policies (such as those related to alcohol and food marketing) are self-regulated, and convincing evidence for the efficacy of these policies is still lacking.[19,20] Moreover, as noted above, the boundless and simultaneously subtle nature of the online media landscape makes it increasingly difficult to implement and control advertising policies.

In response to the difficulties related to advertising policies, there have been calls to invest in the development of educational interventions to empower children by increasing their advertising knowledge. However, research indicates that possessing advertising knowledge does not necessarily enable children to cope with advertising in a conscious and critical manner.[14] Because of the types of appeals used and children's growing cognitive abilities, young people may not be motivated or able to evaluate advertising and make well-informed consumer decisions.[14] Therefore, further investigation is needed to understand how best to use education interventions.

However, there is research that shows parents can play a key role in increasing their children's comprehension of advertising and counteract potentially

undesirable advertising effects by actively talking with their children about advertising.[21] Yet, in the contemporary media landscape, it has become increasingly difficult for parents to guide their children, particularly in online environments.[22] This makes it far more difficult for parents to recognize current advertising practices, which thereby restricts their ability to talk to their children about them.[23]

## Using Marketing Insights to Help Children

Despite frequent criticism, child-targeted marketing has the potential to encourage positive behaviors. The effectiveness of social marketing confirms that identical techniques used to sell commercial products can sell positive attitudes, ideas, and behaviors.[24] Still, whereas there is a vast research base looking at adults and persuasion, little is known regarding the theoretical foundations of persuasion as applied to youth or the potential to effectively market healthful commercial products to young audiences.

One reason is that few theoretical frameworks were developed with children in mind. For example, the Theory of Planned Behavior presents a concise way to assess and then target precursors to behavior. Although it has been used in research with youth ≥9 years old, these studies often suggest the need to adjust the model to explain children's behaviors.[25] In addition, it is unclear how this and other theoretical models apply to younger children.

Similarly, there is scant evidence regarding effective message design for young audiences. One example of this gulf in the research surrounds message framing. Some research suggests that adults typically respond best to gain-framed messages (ie, messages that highlight the advantages of performing a behavior), yet young children respond equally favorably to

Exhibit C

Downloaded from http://www.publications.aap.org/pediatrics/article-pdf/140/Supplement_2/S152/907743/peds_20161758v.pdf by guest

both gain- and loss-framed content (ie, messages that emphasize the negative repercussions of not taking action).[26] Furthermore, adolescents may respond differently to message framing because of developmental characteristics. For example, it is argued that adolescents are more influenced by loss-framed messages because these messages enhance cognitive dissonance in youth, yet adults are likely to experience this dissonance regardless of the message frame.[27]

Lastly, whereas social marketing has frequently been investigated from a public health perspective, little has been done to assess how commercial media messages can have a positive impact on children. Certain marketing tactics, such as the use of licensed characters, have been recognized as being particularly influential.[28] A recent review of research regarding the use of characters in child-targeted food marketing acknowledged that although particularly effective at promoting unhealthy foods, children's characters can encourage fruit and vegetable consumption as well.[29] In addition, children have been shown to find a vegetable dish more desirable when it is named attractively, although this has not been investigated in mediated contexts.[30] Nevertheless, to help children and families, researchers need a better understanding of how persuasive theories and message design apply to children to create effective messages for these audiences.

## FUTURE RESEARCH

Based on the current gaps in the research literature, we recommend the following:

- An interdisciplinary-focused content analysis dedicated to quantifying and tracking youth exposure to marketing messages across mobile and new media

platforms. By considering the challenges associated with tracking advertising on new media devices, such a study would include insights from ethnographers, computer scientists, behavioral scientists, and public health specialists;

- Longitudinal research exploring how youth process marketing messages across media platforms and across ages, with a particular focus on the following:

  o Understanding the link between persuasive-intent understanding and message perception and reception by using both direct and indirect measures that can reveal the processes through which children are persuaded by different forms of marketing messages;

  o Identifying developmental (eg, executive function and theory of mind abilities) and ecological factors (eg, socioeconomic status) that may moderate these effects; and

- Based on the results of the first 2 proposals, determining the most effective ways to enhance receptivity to healthy messages and increase protection against unhealthy marketing messages.

## RECOMMENDATIONS

### Clinicians and Providers

Educate parents about the subtle pervasiveness of marketing (particularly in new media settings) along with the negative effects of increased commercial exposure in children. Medical professionals should also strongly encourage parents to monitor their children's exposure to marketing communication.

### Policy Makers

By considering the challenges children face in negotiating an ever-changing and often confusing persuasion environment, increased

pressure should be applied to marketers to ensure that their practices are developmentally appropriate and transparent (eg, alcohol advertising).

### Educators

Those working directly with children and/or developing curricula for children should focus on interventions that increase children's advertising knowledge and help them engage critically with commercial messages in ways that are developmentally appropriate. Educators should also engage directly with young people to learn about the multitude of ways marketers target this audience.

## REFERENCES

1. Gantz W, Schwartz N, Angelini JR, Rideout V. Food for thought: television food advertising to children in the United States. 2007. Available at: https://kaiserfamilyfoundation.files.wordpress.com/2013/01/7618.pdf. Accessed September 30, 2015

2. John DR. Consumer socialization of children: a retrospective look at twenty-five years of research. *J Consum Res.* 1999;26(3):183–213

3. Anderson P, de Bruijn A, Angus K, Gordon R, Hastings G. Impact of alcohol advertising and media exposure on adolescent alcohol use: a systematic review of longitudinal studies. *Alcohol Alcohol.* 2009;44(3):229–243

4. Harris JL. Demonstrating the harmful effects of food advertising to children and adolescents. In: Jordan AB, Romer D, eds. *Media and the Well-Being of Children and Adolescents.* New York, NY: Oxford University Press; 2014:44–51

5. Duke JC, Lee YO, Kim AE, et al. Exposure to electronic cigarette television advertisements among youth and young adults. *Pediatrics.* 2014;134(1). Available at: www.pediatrics.org/cgi/content/full/134/1/e29

6. Buijzen M, Valkenburg PM. The effects of television advertising on materialism, parent–child conflict, and

Exhibit C

Downloaded from http://www.publications.aap.org/pediatrics/article-pdf/140/Supplement_2/S152/907743/peds_20161758v.pdf by guest

0440

unhappiness: a review of research. *J Appl Dev Psychol.* 2003;24(4):437–456

7. Grabe S, Ward LM, Hyde JS. The role of the media in body image concerns among women: a meta-analysis of experimental and correlational studies. *Psychol Bull.* 2008;134(3):460–476

8. Hingson RW, Heeren T, Winter MR. Age at drinking onset and alcohol dependence: age at onset, duration, and severity. *Arch Pediatr Adolesc Med.* 2006;160(7):739–746

9. Dutra LM, Glantz SA. Electronic cigarettes and conventional cigarette use among U.S. adolescents: a cross-sectional study. *JAMA Pediatr.* 2014;168(7):610–617

10. Lapierre MA. Development and persuasion understanding: predicting knowledge of persuasion/selling intent from children's theory of mind. *J Commun.* 2015;65(3):423–442

11. McAlister AR, Cornwell TB. Children's brand symbolism understanding: links to theory of mind and executive functioning. *Psychol Mark.* 2010;27(3):203–228

12. McAlister AR, Cornwell TB. Preschool children's persuasion knowledge: the contribution of theory of mind. *J Public Policy Mark.* 2009;28(2):175–185

13. Moses LJ, Baldwin DA. What can the study of cognitive development reveal about children's ability to appreciate and cope with advertising? *J Public Policy Mark.* 2005;24(2):186–201

14. Rozendaal E, Lapierre MA, van Reijmersdal EA, Buijzen M. Reconsidering advertising literacy as a defense against advertising effects. *Media Psychol.* 2011;14(4):333–354

15. Culp J, Bell RA, Cassady D. Characteristics of food industry web sites and "advergames" targeting children. *J Nutr Educ Behav.* 2010;42(3):197–201

16. Dahl S, Eagle L, Carlos B. Analyzing advergames: active diversions or actually deception. an exploratory study of online advergames content. *Young Consum.* 2009;10(1):46–59

17. Owen L, Lewis C, Auty S, Buijzen M. Is children's understanding of non-traditional advertising comparable to their understanding of television advertising? *J Public Policy Mark.* 2012;32(2):195–206

18. Harris JL, Speers SE, Schwartz MB, Brownell KD. US food company branded advergames on the Internet: children's exposure and effects on snack consumption. *J Child Media.* 2012;6(1):51–68

19. Harris JL, Sarda V, Schwartz MB, Brownell KD. Redefining "child-directed advertising" to reduce unhealthy television food advertising. *Am J Prev Med.* 2013;44(4):358–364

20. Jernigan DH, Ostroff J, Ross C. Alcohol advertising and youth: a measured approach. *J Public Health Policy.* 2005;26(3):312–325

21. Buijzen M. Reducing children's susceptibility to commercials: mechanisms of factual and evaluative advertising interventions. *Media Psychol.* 2007;9(2):411–430

22. Spiteri Cornish L. "Mum, can I play on the internet?": parents' understanding, perception and responses to online advertising designed for children. *Int J Advert.* 2014;33(3):437–473

23. Evans NJ, Carlson L, Grubbs Hoy M. Coddling our kids: can parenting style affect attitudes toward advergames? *J Advert.* 2013;42(2–3):228–240

24. Gordon R, McDermott L, Stead M, Angus K. The effectiveness of social marketing interventions for health improvement: what's the evidence? *Public Health.* 2006;120(12):1133–1139

25. Nigg CR, Paxton R. Conceptual perspectives used to understand youth physical activity and inactivity. In: Smith AL, Biddle SJH, eds. *Youth Physical Activity and Inactivity: Challenges and Solutions.* Champaign, IL: Human Kinetics; 2008:79–113

26. Bannon K, Schwartz MB. Impact of nutrition messages on children's food choice: pilot study. *Appetite.* 2006;46(2):124–129

27. Latimer AE, Krishnan-Sarin S, Cavallo DA, Duhig A, Salovey P, O'Malley SA. Targeted smoking cessation messages for adolescents. *J Adolesc Health.* 2012;50(1):47–53

28. McGinnis JM, Gootman J, Kraak VI; Institute of Medicine. *Food Marketing to Children and Youth: Threat or Opportunity?* Washington, DC: The National Academies Press; 2006

29. Kraak VI, Story M. Influence of food companies' brand mascots and entertainment companies' cartoon media characters on children's diet and health: a systematic review and research needs. *Obes Rev.* 2015;16(2):107–126

30. Wansink B, Just DR, Payne CR, Klinger MZ. Attractive names sustain increased vegetable intake in schools. *Prev Med.* 2012;55(4):330–332

Exhibit C

Downloaded from http://www.publications.aap.org/pediatrics/article-pdf/140/Supplement_2/S152/907743/peds_20161758v.pdf by guest

0441

# EXHIBIT D



# #NotAnAccident Index

In 2022 there were at least **169 unintentional shootings by children,** resulting in **74 deaths** and **104 injuries** nationally.

---

| 2022 |
|---|

| United States (169) |
|---|

CLICK TO FILTER

○ Death   ○ Injury
Clear filters

Data is up to date as of: July 26, 2022

**Reports**

[ Download Data ]

# Every year, hundreds of children in the US gain access to firearms and unintentionally shoot themselves or someone else. This is #NotAnAccident.

To better understand these shootings—and how they can be prevented—Everytown collects information from media reports about incidents in which a child under 18 unintentionally shoots themself or someone else. Details about each incident include ages of both shooters and victims, date, location, type of firearm, and other information.

Our 2021 report, "Preventable Tragedies: Findings from the #NotAnAccident Index," provides a deeper understanding of where, when, and how unintentional child shootings occur and the steps we can take to prevent them.

Moms Demand Action for Gun Sense in America launched the Be SMART campaign to raise awareness that secure gun storage—storing guns unloaded, locked, and separate from ammunition—can save children's lives.

See a case missing from our tracker? Please let us know.

**LEARN MORE ABOUT UNINTENTIONAL SHOOTINGS**

PREVENTABLE TRAGEDIES: FINDINGS FROM THE #NOTANACCIDENT INDEX

Report

# Be SMART

## We must make sure firearms are stored securely

The Be SMART framework is designed to help parents and adults normalize conversations about gun safety and take responsible actions that can prevent child gun deaths and injuries. Visit Be SMART for more information on preventing

Exhibit D

0444

unintentional shootings by children.

**LEARN MORE**

1  C.D. Michel-SBN 144258
   Anna M. Barvir-SBN 268728
2  Tiffany D. Cheuvront-SBN 317144
   MICHEL & ASSOCIATES, P.C.
3  180 East Ocean Blvd., Suite 200
   Long Beach, CA 90802
4  Telephone: (562) 216-4444
   Fax: (562) 216-4445
5  Email: cmichel@michellawyers.com

6  Attorneys for Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California
   Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting
7  Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA
   Foundation, and Gun Owners of California, Inc.
8
9  Donald Kilmer-SBN 179986
   Law Offices of Donald Kilmer, APC
10 14085 Silver Ridge Road
   Caldwell, Idaho 83607
11 Telephone: (408) 264-8489
   Email: Don@DKLawOffice.com

12 Attorney for Plaintiff Second Amendment Foundation

13          IN THE UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15 | JUNIOR SPORTS MAGAZINES        | CASE NO: 2:22-cv-04663-CAS (JCx)
   | INC., RAYMOND BROWN,
16 | CALIFORNIA YOUTH SHOOTING      | **REQUEST FOR JUDICIAL NOTICE IN
   | SPORTS ASSOCIATION, INC.,      | SUPPORT OF PLAINTIFFS' MOTION
17 | REDLANDS CALIFORNIA            | FOR PRELIMINARY INJUNCTION**
   | YOUTH CLAY SHOOTING
18 | SPORTS, INC., CALIFORNIA       | Hearing Date:   August 22, 2022
   | RIFLE & PISTOL ASSOCIATION,    | Hearing Time:   10:00 a.m.
19 | INCORPORATED, THE CRPA         | Courtroom:      8D
   | FOUNDATION, AND GUN            | Judge:          Christina A. Snyder
20 | OWNERS OF CALIFORNIA, INC.;
   | and SECOND AMENDMENT
21 | FOUNDATION,

22                 Plaintiffs,

23          v.

24 ROB BONTA, in his official capacity
   as Attorney General of the State of
25 California; and DOES 1-10,

26                 Defendant.

27

28

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

Under Federal Rule of Evidence 201, Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA Foundation, Gun Owners of California, Inc., and Second Amendment Foundation (collectively, "Plaintiffs") respectfully request that the Court take judicial notice of the following documents in support of Plaintiffs' motion for preliminary injunction:

1. **Assembly Bill 2571, 2021-2022 Reg. Sess. (Cal. 2022)**. A true and correct copy of this document is attached as **Exhibit 1**. Exhibit 1 is a public record of the California State Legislature that I accessed on or about July 6, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient.xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

2. **Assembly Privacy & Consumer Prot. Comm., Bill Analysis Re: AB 2571 (Bauer-Kahan) – As Amended April 7, 2022, 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 2**. Exhibit 2 is a public record of the California State Legislature that I accessed on or about July 6, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient.xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

3. **Assembly Judiciary Comm., Bill Analysis Re: AB 2571 (Bauer-Kahan) – As Amended April 7, 2022, 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 3**. Exhibit 3 is a public record of the California State Legislature that I accessed on or about July 6, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

1          **4.**      **Assembly Appropriations Comm., Bill Analysis Re: AB 2571**

2    **(Bauer-Kahan) – As Amended April 27, 2022, 2021-2022 Reg. Sess. (Cal.**

3    **2022).** A true and correct copy of this document is attached as **Exhibit 4**. Exhibit 4

4    is a public record of the California State Legislature that I accessed on or about July

5    6, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the

6    official California Legislative Information website, which publishes official legal

7    history and government documents saved in a fully searchable, image-based format.

8          **5.**      **Assembly, Assembly Floor Analysis Re: AB 2571 (Bauer-Kahan**

9    **and Gipson) – As Amended April 27, 2022, 2021-2022 Reg. Sess. (Cal. 2022).** A

10   true and correct copy of this document is attached as **Exhibit 5**. Exhibit 5 is a

11   public record of the California State Legislature that I accessed on or about July 6,

12   2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the

13   official California Legislative Information website, which publishes official legal

14   history and government documents saved in a fully searchable, image-based format.

15         **6.**      **Senate Judiciary Comm., Bill Analysis Re: AB 2571 (Bauer-**

16   **Kahan), 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this

17   document is attached as **Exhibit 6**. Exhibit 6 is a public record of the California

18   State Legislature that I accessed on or about July 6, 2022, from

19   https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

20   California Legislative Information website, which publishes official legal history

21   and government documents saved in a fully searchable, image-based format.

22         **7.**      **Senate Appropriations Comm. Bill Analysis Re: AB 2571 (Bauer-**

23   **Kahan), 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this

24   document is attached as **Exhibit 7**. Exhibit 7 is a public record of the California

25   State Legislature that I accessed on or about July 6, 2022, from

26   https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

27   California Legislative Information website, which publishes official legal history

28   and government documents saved in a fully searchable, image-based format.

8.    **Senate Rules Comm., Senate Floor Analysis Re: AB 2571 (Bauer-Kahan and Gipson), 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 8**. Exhibit 8 is a public record of the California State Legislature that I accessed on or about July 6, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

9.    **Assembly, Concurrence in Senate Amendments Re: AB 2571 (Bauer-Kahan and Gipson) – As Amended June 15, 2022.** A true and correct copy of this document is attached as **Exhibit 9**. Exhibit 9 is a public record of the California State Legislature that I accessed on or about July 6, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

A court shall take judicial notice of such a fact if requested by a party and supplied with the necessary information. Fed. R. Evid. 201(d). Judicial notice of Exhibits 1 through 9 is proper because the documents for which this request is made are "capable of accurate and ready determination by resort to sources who accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Indeed, "[a] trial court may presume that public records are authentic and trustworthy." *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999) (taking judicial notice of agency report).

What's more, "[l]egislative history is properly a subject of judicial notice." *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012); *Chaker v. Crogan*, 428 F.3d 1215, 1223 n.8 (9th Cir. 2005) (discussing legislative history of California statute). Further, "a federal court must take judicial notice of state statutes 'without plea or proof.'" *Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 323 (1st Cir. 2004) (citing *Lamar v. Micou*, 114 U.S. 218, 223 (1885)).

1      Here, the accuracy of all the public records subject to Plaintiffs' Request for

2  Judicial Notice, consisting of enacted legislation and legislative history, cannot

3  reasonably be questioned. Judicial notice of these records is therefore appropriate.

4

5   Dated:  July 19, 2022          **MICHEL & ASSOCIATES, P.C.**

6                                  *s/ Anna M. Barvir*
                                   Anna M. Barvir
7                                  Counsel for Plaintiffs Junior Sports
                                   Magazines, Inc., Raymond Brown, California
8                                  Youth Shooting Sports Association, Inc.,
                                   Redlands California Youth Clay Shooting
9                                  Sports, Inc., California Rifle & Pistol
                                   Association, Incorporated, The CRPA
10                                 Foundation, and Gun Owners of California,
                                   Inc.

11  Dated:  July 19, 2022          **LAW OFFICES OF DONALD KILMER, APC**

12                                 *s/ Donald Kilmer*
13                                 Donald Kilmer
                                   Counsel for Plaintiff Second Amendment
14                                 Foundation

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE

# EXHIBIT 1

STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

## Assembly Bill No. 2571

### CHAPTER 77

An act to add Chapter 39 (commencing with Section 22949.80) to Division 8 of the Business and Professions Code, relating to firearms, and declaring the urgency thereof, to take effect immediately.

[Approved by Governor June 30, 2022. Filed with Secretary of State June 30, 2022.]

LEGISLATIVE COUNSEL'S DIGEST

AB 2571, Bauer-Kahan. Firearms: advertising to minors.

Existing law generally regulates manufacturers and dealers of firearms. Under existing law, commercial speech or advertising is generally protected under the First Amendment to the Constitution of the United States. Existing laws and regulations, however, restrict the content and placement of advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors.

This bill would prohibit a firearm industry member, as defined, from advertising or marketing any firearm-related product, as defined, in a manner that is designed, intended, or reasonably appears to be attractive to minors. The bill would also prohibit a firearm industry member from using, disclosing, or compiling a minor's personal information if it is intended to market or advertise a firearm to that minor, as specified. The bill would impose a civil penalty of up to $25,000 for each violation of these provisions, and would authorize a person harmed by a violation to bring suit to recover any damages suffered, as specified. The bill would make each copy or republication of marketing or advertising prohibited by these provisions a separate violation. The bill would declare that its provisions are severable, as specified.

This bill would declare that it is to take effect immediately as an urgency statute.

*The people of the State of California do enact as follows:*

SECTION 1.  (a) The Legislature hereby finds and declares that the proliferation of firearms to and among minors poses a threat to the health, safety, and security of all residents of, and visitors to, this state. These weapons are especially dangerous in the hands of minors because current research and scientific evidence shows that minors are more impulsive, more likely to engage in risky and reckless behavior, unduly influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions

93

and decisions, and less able to control themselves in emotionally arousing situations. In recognition of these facts, the Legislature has already prohibited minors from possessing firearms, except in certain limited circumstances. Nonetheless, firearms manufacturers and retailers continue to market firearms to minors, often identifying particular weapons as starter guns, especially good for children. As reflected in numerous laws regulating marketing of dangerous products to minors, children are especially susceptible to marketing appeals, as well as more prone to impulsive, risky, thrill-seeking, and violent behavior than other age groups. Firearms marketing contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully. This state has a compelling interest in ensuring that minors do not possess these dangerous weapons and in protecting its citizens, especially minors, from gun violence and from intimidation by persons brandishing these weapons.

(b) It is the intent of the Legislature in enacting this act to further restrict the marketing and advertising of firearms to minors. Nothing in this chapter shall be construed to limit in any way the enforceability of existing law concerning firearms and marketing thereof.

SEC. 2. Chapter 39 (commencing with Section 22949.80) is added to Division 8 of the Business and Professions Code, to read:

### Chapter 39. Marketing Firearms to Minors

22949.80. (a) (1) A firearm industry member shall not advertise, market, or arrange for placement of an advertising or marketing communication concerning any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors.

(2) In determining whether marketing or advertising of a firearm-related product is attractive to minors, as described in paragraph (1), a court shall consider the totality of the circumstances, including, but not limited to, whether the marketing or advertising:

(A) Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.

(B) Offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals, that promotes a firearm industry member or firearm-related product.

(C) Offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors.

(D) Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

(E) Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

(F) Is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

(b) A firearm industry member publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, shall not knowingly use, disclose, compile, or allow a third party to use, disclose, or compile, the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

(c) As used in this chapter:

(1) "Ammunition" has the same meaning as provided in subdivision (b) of Section 16150 of the Penal Code.

(2) "Firearm" has the same meaning as provided in subdivisions (a) and (b) of Section 16520 of the Penal Code.

(3) "Firearm accessory" means an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with, a firearm which is designed, intended, or functions to alter or enhance the firing capabilities of a firearm, the lethality of the firearm, or a shooter's ability to hold, carry, or use a firearm.

(4) "Firearm industry member" means any of the following:

(A) A person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products.

(B) A person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products that does one of the following:

(i) Advertises firearm-related products.

(ii) Advertises events where firearm-related products are sold or used.

(iii) Endorses specific firearm-related products.

(iv) Sponsors or otherwise promotes events at which firearm-related products are sold or used.

(5) "Firearm-related product" means a firearm, ammunition, reloaded ammunition, a firearm precursor part, a firearm component, or a firearm accessory that meets any of the following conditions:

(A) The item is sold, made, or distributed in California.

(B) The item is intended to be sold or distributed in California.

(C) It is reasonably foreseeable that the item would be sold or possessed in California.

(D) Marketing or advertising for the item is directed to residents of California.

(6) "Marketing or advertising" means, in exchange for monetary compensation, to make a communication to one or more individuals, or to arrange for the dissemination to the public of a communication, about a product or service the primary purpose of which is to encourage recipients of the communication to purchase or use the product or service.

(7) "Minor" means a natural person under 18 years of age who resides in this state.

(d) This section shall not be construed to require or authorize a firearm industry member to collect or retain age information about users or subscribers of products or services offered.

(e) (1) Any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction.

(2) The court shall impose a civil penalty under paragraph (1) for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

(3) A person harmed by a violation of this section may commence a civil action to recover their actual damages.

(4) The court shall also order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the court deems necessary to prevent the harm described in this section.

(5) Upon a motion, a court shall award reasonable attorney's fees and costs, including expert witness fees and other litigation expenses, to a plaintiff who is a prevailing party in an action brought pursuant to this section.

(6) Each copy or republication of marketing or advertising prohibited by this section shall be deemed a separate violation.

(f) The provisions of this section are severable. If any portion, subdivision, paragraph, clause, sentence, phrase, word, or application of this section is for any reason held to be invalid by any court of competent jurisdiction, that decision shall not affect the validity of the remaining portions of this chapter. The Legislature hereby declares that it would have adopted this section and each and every portion, subdivision, paragraph, clause, sentence, phrase, word, and application not declared invalid or unconstitutional without regard to whether any other portion of this section or application thereof would be subsequently declared invalid.

SEC. 3. This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the California Constitution and shall go into immediate effect. The facts constituting the necessity are:

In order to protect public safety by prohibiting firearm advertising to minors as soon as possible, it is necessary that this act take effect immediately.

O

# EXHIBIT 2

Date of Hearing: April 19, 2022

ASSEMBLY COMMITTEE ON PRIVACY AND CONSUMER PROTECTION
Jesse Gabriel, Chair
AB 2571 (Bauer-Kahan) – As Amended April 7, 2022

**SUBJECT**: Firearms: advertising to minors

**SUMMARY**: This bill would prohibit the marketing or advertising of firearms to minors, as specified, would prohibit the use, disclosure, or compilation of a minor's personal information (PI) if there is actual knowledge that the PI is for the marketing or advertising a firearm, ammunition, or reloaded ammunition. Specifically, **this bill would**:

1) Prohibit a person, firm, corporation, partnership, or other organization publishing material directed to minors in any medium, including, but not limited to, print or broadcast media, internet-based media, or video games, from marketing or advertising in that material any firearm, ammunition, or reloaded ammunition, as specified.

2) Prohibit a person, firm, corporation, partnership, or other organization publishing a marketing or advertising communication, or arranging for placement of an advertising or marketing communication, from publishing or disseminating marketing or advertising for any firearm, ammunition, or reloaded ammunition that is attractive to minors.

3) Require a court to consider the following in determining whether marketing or advertising is attractive to minors:

   - Uses cartoon characters to promote firearms or firearms products.

   - Offers firearm brand name merchandise, such as hats, t-shirts, or stuffed animals, for minors.

   - Offers firearms or firearms accessories with colors or designs that are specifically designed to appeal to minors.

   - Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

4) Prohibit a person, firm, corporation, partnership, or other organization publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm, ammunition, or reloaded ammunition, as specified.

5) Provide that the bill shall not be construed to require a person, firm, corporation, partnership, or other organization to collect or retain age information about users or subscribers of products or services offered.

6) Create a civil penalty not to exceed $25,000 for each violation of the provisions above, brought by the Attorney General, by any district attorney, county counsel, or city attorney in any court of competent jurisdiction.

7) Define "internet-based media" to mean directed to minors means an internet website, online service, online application, or mobile application, or a portion thereof, that is created for the purpose of reaching an audience that is predominately comprised of minors, and is not intended for a more general audience comprised of adults. An internet website, online service, online application, or mobile application, or a portion thereof, shall not be deemed to be directed to minors solely because it refers to or links to an internet website, online service, online application, or mobile application directed to minors, as specified.

8) Define "marketing or advertising" to mean, in exchange for monetary compensation, to make a communication to one or more individuals, or to arrange for the dissemination to the public of a communication, about a product or service the primary purpose of which is to encourage recipients of the communication to purchase or use the product or service.

9) Provide various findings and declarations related to how the proliferation of firearms to and among minors poses a threat to the health, safety, and security of all residents of, and visitors to, the state.

**EXISTING LAW**:

1) Requires, pursuant to the federal Children's Online Privacy Protection Act (COPPA), that an operator of an internet website or online service directed to a child, as defined, or an operator of an internet website or online service that has actual knowledge that it is collecting personal information (PI) from a child to provide notice of what information is being collected and how that information is being used, and to give the parents of the child the opportunity to refuse to permit the operator's further collection of information from the child. (15 U.S.C. Sec. 6502.)

2) Prohibits, pursuant to the Privacy Rights for Minors in the Digital World, the operator of an internet website, online service, online application, or mobile application from:

- marketing or advertising a product or service to a minor, if the minor cannot legally purchase the product or participate in the service in the State of California; or,

- using, disclosing, or compiling, or knowingly allowing a third party to use, disclose, or compile, the PI of a minor for the purpose of marketing goods or services that minors cannot legally purchase or engage in in the State of California. (Bus. & Prof. Code Sec. 22580.)

3) Requires an operator of an internet website, online service, online application, or mobile application to do all of the following:

- permit a minor who is a user of the operator's internet website, service, or application to remove content or information submitted to or posted on the operator's website, service or application by the user;

- provide notice to a minor who is the user of the operator's internet website, service, or application that the minor may remove content or information submitted to or posted on the operator's website, service, or application by the user; and,

- provide notice to a minor who is the user of the operator's internet website, service, or application that the removal described above does not ensure complete or comprehensive removal of the content or information. (Bus. & Prof. Code Sec. 22581.)

4) Establishes the California Consumer Privacy Act of 2018 (CCPA) and provides various rights to consumers pursuant to the act. Subject to various general exemptions, a consumer has, among other things:

- the right to know what PI a business collects about consumers, as specified, including the categories of third parties with whom the business shares PI;

- the right to know what PI a business sells about consumers, as specified, including the categories of PI that the business sold about the consumer and the categories of third parties to whom the PI was sold, by category or categories of PI for each third party to whom the PI was sold;

- the right to access the specific pieces of information a business has collected about the consumer;

- the right to delete information that a business has collected from the consumer; and,

- the right to opt-out of the sale of the consumer's PI if over 16 years of age, and the right to opt-in if the consumer is a minor (as exercised by the parent if the minor is under 13, or as exercised by the minor if the minor is between ages 13 and 16); and,

- the right to equal service and price, despite exercising any of these rights. (Civ. Code Sec. 1798.100 et seq.)

5) Among other things, the California Privacy Rights Act (CPRA), enacted by Proposition 24 in 2020, creates a Privacy Protection Agency (PPA) in California, vested with full administrative power, authority, and jurisdiction to implement and enforce the CCPA. The agency shall be governed by a five-member board, with the chairperson and one member appointed by the Governor, and the three remaining members appointed by the Attorney General, the Senate Rules Committee, and the Speaker of the Assembly. (Civ. Code Sec. 1798.199.10.)

**FISCAL EFFECT**: Unknown

**COMMENTS**:

1) **Purpose of this bill**: This bill seeks to prohibit the marketing or advertising of firearms to minors. This bill is sponsored by Governor Gavin Newsom.

2) **Author's statement**: According to the Author:

> Existing law does not limit marketing of firearms to children outside of the internet. Some firearms manufacturers irresponsibly market weapons to children. For example, Wee 1 Tactical has begun marketing an AR-15 made specifically for children. They currently market the weapon, called a JR-15, with a cartoon skull-and-crossbones with a pacifier. See https://wee1tactical.com/. Under current law, the company would be able to market this weapon in California, as long as it does so off-line, e.g., in a magazine advertisement.

> This legislation would restrict the marketing and advertising of firearms to minors in all media. Specifically, this bill would prohibit a person or entity that publishes materials directed to minors in this state in any medium, or publishes advertising or marketing communications, from marketing or advertising firearms, ammunition, or reloaded ammunition to minors. Additionally, the bill would prohibit firearms marketing or advertising that is attractive to minors, regardless of whether the publication is directed to minors.

3) **Marketing and advertising of firearms to minors**: In 2016, the New York Times reported that the gun industry markets a variety of products specifically to minors and views children as a critically important group of future consumers:

> The report, called "Start Them Young" and issued [...] by the Violence Policy Center, lists a variety of firearms meant at least partly for children. It mentions the Crickett rifle, a gun made for children by the company Keystone Sporting Arms. Keystone's website and some of its merchandise bear the image of "Davey Crickett," a gun-wielding cartoon insect. The company sells Davey Crickett hats, dog tags and pins, as well as a Davey Crickett Beanie Baby, listed as "not for children under three years of age."

> Keystone's website also sells books featuring "Little Jake," a boy who uses his gun to bring down a bear and save an African village from a marauding elephant. The publisher of the books says Little Jake is actually older than he looks: "Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision."

> "Start Them Young" also cites the rise of .22-caliber versions of higher-caliber rifles, often produced with lightweight materials. According to an article in the trade magazine Shooting Sports Retailer, "these guns bring the coolness and fun of the tactical rifle to kids and less serious shooters." The website of the retailer Gander Mountain describes one such weapon thus: "Designed for the indoor range and the youth shooter, this Carbon15 .22 LR Rimfire lightweight is sure to add new dimensions to your Bushmaster shooting pleasure. Operational controls are functionally and ergonomically identical to AR-15 type rifles. (North, *Marketing Guns to Children,* The N.Y. Times (Feb. 19, 2016) found at < https://takingnote.blogs.nytimes.com/2016/02/19/marketing-guns-to-children/> as of Apr. 12, 2022.)

Modeled largely off the Privacy Rights for California Minors in a Digital World (hereinafter, "Minors in a Digital World"), which prohibits online marketing or advertising a product or

service to a minor if the minor cannot legally purchase the product or participate in the
service in California, this bill seeks to prohibit the advertising of firearms, ammunition, or
reloaded ammunition to minors in *all* mediums in this state. The bill would restrict
advertising and marketing in a number of ways, including prohibiting the advertising of
firearms in any medium directed to children, prohibiting the marketing or advertising of
firearms that is attractive to minors, and by limiting the collection, use, or disclosure of a
minor's PI for the purpose of marketing or advertising firearms.

In support, March for Our Lives writes:

> According to Everytown for Gun Safety, "Compared to other high-income countries,
> American children aged 5 to 14 are 21 times more likely to be killed with guns, and
> American adolescents and young adults aged 15 to 24 are 23 times more likely to be
> killed with guns." In a county where young people already face a high likelihood of
> facing harm or death due to firearms it is imperative that we do not allow gun
> manufacturers to continue the glorification of firearms.

4) **Minors in the Digital World creates limited restrictions with regard to minors' personal
   information and marketing**:  In an effort to further protect minors online, the Legislature
   subsequently passed SB 568 (Steinberg, Ch. 336, Stats. 2013), known as Privacy Rights for
   California Minors in the Digital World, which prohibits the operator of an internet website or
   other online service or mobile application from marketing or advertising a product or service
   to a minor if the minor cannot legally purchase the product or participate in the service in
   California (including firearms), or, compiling PI to market those products or services. This
   prohibition only applies to operators that have *actual* knowledge that a minor is using its
   online service or whose site service is directed to minor, rather than a general audience.

SB 568 was opposed by the Center for Democracy and Technology who took issue with the
bill's limitation that a website must be directed to minors for the provisions of the bill to
apply. SB 568, now codified beginning at Business and Professions Code Sec. 22580,
provides that a site or service is "directed to minors" if it is "created for the purpose of
reaching an audience that is *predominantly* composed of minors, and is not intended for a
more general audience comprised of adults."  (Emphasis added.)  The definition adds that a
site or service would not be deemed to be "directed at minors" merely because it contained
links to sites or services that were directed to minors.

Despite the protections put into place in Minors in a Digital World, we have since seen how
websites and social media companies collect and use the PI of residents in ways that most
people never anticipated, and have also seen how these businesses have been able to skirt the
intent of legislation designed to protect children through vague terms of service and
intentional disregard of the age of their audience.(*See* this Committee's Background Paper
from a March 29, 2022 entitled, *Protecting Kids Online: Challenges & Opportunities in a
Digital World* at p. 10.)

To this day, many social media companies and online marketplaces that are widely known to
be used broadly by children, have been able to avoid compliance with state and federal laws
designed to protect children by claiming that they have no actual knowledge of child users
under the age of 13. The Legislature recently sought to address this problem with the passage
of the CCPA, which, in part, provides that "a business that willfully disregards the

consumer's age shall be deemed to have had actual knowledge of the consumer's age." (Civ. Code Sec. 1798.120(c).)

By copying the language related to PI collection and disclosure from Minors in the Digital World and incorporating the "directed to minors" concept, this bill would seemingly allow businesses, manufacturers, and other organizations, so long as they could reasonably claim their medium was directed to a general audience, to: 1) advertise firearms to minors; and 2) collect and sell the information of minors for the purposes of advertising firearms to them. This does not appear to reflect the intent of the author or sponsor.

Accordingly, as this bill moves through the legislative process, the author may wish to consider amending the bill to better ensure that businesses, online and otherwise, are not required to have actual knowledge of an individual's age before these provisions of the bill apply, or otherwise market to general audiences to avoid this bill's restrictions against marketing firearms to children. Staff additionally notes that this bill does not define "directed to minors" but instead defines "internet-based media". Given that the "direct to minors" concept is used in relation to all material and not just material online, the author may wish to define the phrase so that it applies uniformly across all mediums the bill seeks to regulate.

5) **AB 2571 prohibits advertising of firearms that is attractive to minors**: In addition to prohibiting advertising of firearms in material "directed to children," as discussed above, this bill would additionally prohibit any "person, firm, corporation, partnership, or other organization publishing a marketing or advertising communication, or arranging for placement of an advertising or marketing communication, from publishing or disseminating marketing or advertising for any firearm, ammunition, or reloaded ammunition." Unlike the prohibition discussed in Comment 4, above, the prohibition on marketing of firearms that are "attractive to children" applies whether the media is directed to children or a general audience. In other words, it applies to all marketing, regardless of the target audience. Further, the prohibition applies to "marketing communications" and "arranging for advertising or marketing communications" which is appears to be broader than traditional media.

The bill requires that what will be deemed to be "attractive to minors" should be decided after a court considers the totality of the circumstances, including but not limited to whether the marketing or advertising:

- Uses cartoon characters to promote firearms or firearms products.

- Offers firearm brand name merchandise, such as hats, t-shirts, or stuffed animals, for minors.

- Offers firearms or firearms accessories with colors or designs that are specifically designed to appeal to minors.

- Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

Advertising, while often regulated to protect consumers, is a form of commercial speech protected by the First Amendment. Staff notes that this bill has been referred to the Assembly Judiciary Committee, where it will be analyzed if passed by this Committee.

First Amendment issues, including issues of commercial speech, typically fall within the jurisdiction of that committee. Similarly, this bill creates a civil penalty to be enforced by public prosecutors for violations of its provisions. Issues of liability and enforcement typically fall within the jurisdiction of that committee.

6) **Prior legislation**: AB 1545 (Wicks, 2021) would have enacted the Kids Internet Design and Safety (KIDS) Act and prohibited an operator of an online platform from incorporating certain features with respect to children's content without first obtaining parental consent.

   AB 1138 (Gallagher, 2019) sought to prohibit a person or business that conducts business in California, and that operates a social media website or application, from allowing a person under 16 years of age to create an account with the website or application unless the website or application obtains the consent of the person's parent or guardian before creating the account.

   AB 1665 (Chau, 2019) as introduced, would have prohibited a person or business that conducts business in California, that operates an internet website or application that seeks to use a minor's name, picture, or any information about the minor in connection with third party advertising, as specified, from doing so without obtaining prior parental consent.

   AB 375 (Chau, Ch. 55, Stats. 2018) enacted the California Consumer Privacy Protection Act (CCPA), which gives consumers certain rights regarding their PI, including: (1) the right to know what PI that is collected and sold about them; (2) the right to request the categories and specific pieces of PI the business collects about them; and (3) the right to opt-out of the sale of their PI, or opt-in in the case of minors under16 years of age.

   SB 568 (Steinberg, Ch. 336, Stats. 2013) *See* Comment 3.

7) **Double referral**: This bill was double referred to the Assembly Judiciary Committee.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

City of Mountain View
Everytown for Gun Safety Action Fund
March for Our Lives Action Fund
Moms Demand Action for Gun Sense in America
Students Demand Action for Gun Sense in America

**Opposition**

None on file

**Analysis Prepared by**:  Nichole Rocha / P. & C.P. / (916) 319-2200

# EXHIBIT 3

Date of Hearing: April 26, 2022

<div align="center">

ASSEMBLY COMMITTEE ON JUDICIARY
Mark Stone, Chair
AB 2571 (Bauer-Kahan) – As Amended April 7, 2022

As Proposed to be Amended

</div>

**SUBJECT**: FIREARMS: ADVERTISING TO MINORS

**KEY ISSUES**:

1) SHOULD STATE LAW PROHIBIT FIREARM INDUSTRY MEMBERS FROM MARKETING AND ADVERTISING FIREARMS AND FIREARM-RELATED PRODUCTS IN A MANNER THAT IS ATTRACTIVE TO MINORS?

2) SHOULD THE AG, CITY ATTORNEYS AND COUNTY COUNSELS, AND PERSONS HARMED BY THE ADVERTISING AND MARKETING OF FIREARMS AND FIREARM-RELATED PRODUCTS TO MINORS, BE ABLE TO BRING A CIVIL ACTION TO ENFORCE THIS PROHIBITION AND COLLECT CIVIL PENALTIES AND DAMAGES?

<div align="center">

**SYNOPSIS**

</div>

*The firearm industry has developed a number of advertising and marketing schemes to "start 'em young": entice children to be interested in possessing and using firearms that they cannot lawfully purchase and generally cannot possess through the use of gun-toting cartoon characters, children's books about boys and girls who commit heroic acts with guns, and gun-themed children's clothing, toys, and pins. Most concerning, gun makers are marketing child-sized guns, including assault-style rifles, and guns in colors or with designs specifically for children.*

*The bill in print restricts two different types of publications of advertising material promoting the sale of firearms, depending on the intended consumer of the publication. First, if the published material is "directed to minors," the publisher would be prohibited from marketing or advertising for sale any firearm, ammunition, or reloaded ammunition in that publication. Secondly, and far more broadly, any person who publishes a "marketing or advertising communication" or who "arranges for placement" of such a communication, would be prohibited from publishing or disseminating any material marketing or advertising for sale any firearm, ammunition, or reloaded ammunition that is attractive to minors. Given efficacy, vagueness, First Amendment, and federal preemption concerns related to these provisions, the author proposes to revise the bill to achieve its goals in a more effective and focused, but less problematic way.*

*As proposed to be amended, the bill would focus on the advertising, marketing, and placing of advertising and marketing by only firearm industry members (as defined by the bill), rather than on publishers, and would prohibit those industry members from engaging in specific acts. Specifically, a firearm industry member would be prohibited from advertising, marketing, or arranging for placement any advertising or marketing communication concerning a firearm-related product when the communication is designed, intended, or reasonably appears to make*

*the firearm-related product attractive to minors. As proposed to be amended, the bill also would allow a person harmed by a violation to commence a civil action to recover their actual damages for harms caused for the violation. This would appropriately provide compensation to a plaintiff in a case where they could demonstrate a causal link between the marketing or advertising of a particular firearm-related product by a particular firearm industry member and the resulting harm, such as a child misusing the firearm-related product and injuring themselves or others. Just as in a case brought by a public attorney, in a case brought by an injured party, the court would be required to order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the misconduct. Likewise, in both types of causes of action, upon a motion, a court would be required to award reasonable attorney's fees and costs, including expert witness fees and other litigation expenses, to a prevailing plaintiff.*

*The analysis discusses (1) why the bill raises potential First Amendment concerns in that it regulates commercial speech, but how it likely would be found constitutional; (2) how similar advertising restrictions are in place for products that minors cannot purchase; (3) why an exception to the federal law shielding gun dealers and manufacturers from civil liability actions brought in state or federal court for harm incurred due to the illegal use of non-defective products, the Protection of Lawful Commerce in Arms Act (PLCAA), would allow civil liability to be imposed under the bill; (4) why the bill does not infringe on the Second Amendment right to keep and bear arms; and (5) why the author may wish to consider the alternative or additional steps of making firearms designed for children illegal to sell in California.*

*The bill was previously approved by the Assembly Committee on Privacy and Consumer Protection (by a vote of 7-1). It is supported by a number of gun safety advocacy organizations and opposed by the National Rifle Association. The author's amendments are incorporated into the SUMMARY, below, and explained in the analysis.*

**SUMMARY**:  Prohibits firearm industry members from marketing or advertising firearm-related products to minors and authorizes public attorneys and injured plaintiffs to bring a civil action to enforce the prohibition, obtain injunctive relief, and seek either civil penalties, or, in some cases, damages for harms caused by a violation. Specifically, **this bill**:

1) On behalf of the Legislature, finds and declares that the proliferation of firearms to and among minors poses a threat to the health, safety, and security of all residents of, and visitors to, this state.

   a) These weapons are especially dangerous in the hands of minors because current research and scientific evidence shows that minors are more impulsive, more likely to engage in risky and reckless behavior, unduly influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations.

   b) In recognition of these facts, the Legislature has already prohibited minors from possessing firearms, except in certain limited circumstances.

   c) Nonetheless, firearms manufacturers and retailers continue to market firearms to minors, often identifying particular weapons as starter guns, especially good for children. As reflected in numerous laws regulating marketing of dangerous products to minors,

children are especially susceptible to marketing appeals, as well as more prone to impulsive, risky, thrill-seeking, and violent behavior than other age groups.

    d)   Firearms marketing contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully.

    e)   This state has a compelling interest in ensuring that minors do not possess these dangerous weapons and in protecting its citizens, especially minors, from gun violence and from intimidation by persons brandishing these weapons.

2) States that it is the intent of the Legislature in enacting this bill to further restrict the marketing and advertising of firearms to minors. Nothing in this bill will be construed to limit in any way the enforceability of existing law concerning firearms and marketing thereof.

3) Provides that a firearm industry member shall not advertise, market, or arrange for placement of an advertising or marketing communication concerning any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors.

4) Requires a court, in determining whether marketing or advertising of a firearm-related product is attractive to minors, to consider the totality of the circumstances, including, but not limited to, whether the marketing or advertising:

    a)   Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.

    b)   Offers brand name merchandise for minors, including but not limited to, hats, t-shirts or other clothing, toys, games, stuffed animals, that promotes a firearm industry member or firearm-related product.

    c)   Offers firearm-related products in sizes, colors or designs that are specifically designed to be used by, or appeal to, minors.

    d)   Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

    e)   Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

    f)   Is placed in a publication created for the purpose of reaching an audience that is predominately comprised of minors and not intended for a more general audience comprised of adults.

5) Prohibits a firearm industry member from publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, and from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

6) Defines the following for purposes of the bill:

    a) "Ammunition" has the same meaning as provided in subdivision (b) of Section 16150 of the Penal Code.

    b) "Firearm" has the same meaning as provided in subdivisions (a) and (b) of Section 16520 of the Penal Code.

    c) "Firearm accessory" means an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm which is designed, intended, or functions to alter or enhance the firing capabilities of a firearm, the lethality of the firearm, or a shooter's ability to hold, carry or use a firearm.

    d) "Firearm industry member" shall mean one of the following:

        i) A person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products.

        ii) A person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products that does one of the following:

            A) Advertises firearm-related products.

            B) Advertises events where firearm-related products are sold or used.

            C) Endorses specific firearm-related products.

            D) Sponsors or otherwise promotes events at which firearm-related products are sold or used.

    e) "Firearm-related product" means a firearm, ammunition, reloaded ammunition, a firearm precursor part, a firearm component, or a firearm accessory that meets any of the following conditions:

        i) The item is sold, made, or distributed in California.

        ii) The item is intended to be sold or distributed in California.

        iii) It is reasonably foreseeable that the item would be sold or possessed in California.

        iv) Marketing or advertising for the item is directed to residents of California.

    f) "Marketing or advertising" means, in exchange for monetary compensation, to make a communication to one or more individuals, or to arrange for the dissemination to the public of a communication, about a product or service the primary purpose of which is to encourage recipients of the communication to purchase or use the product or service.

    g) "Minor" means a natural person under 18 years of age who resides in this state.

h)  "Person" means a natural person, firm, corporation, partnership, or other organization.

7) Provides that the bill shall not be construed to require or authorize a firearm industry member to collect or retain age information about users or subscribers of products or services offered.

8) Provides that any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed $25,000 for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction.

9) Requires the court to impose a civil penalty for each violation of this bill. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to:

   a) The nature and seriousness of the misconduct,

   b) The number of violations,

   c) The persistence of the misconduct,

   d) The length of time over which the misconduct occurred,

   e) The willfulness of the defendant's misconduct, and

   f) The defendant's assets, liabilities, and net worth.

10) Allows a person harmed by a violation of the bill to commence a civil action to recover their actual damages.

11) Provides that the court shall also order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the court deems necessary to prevent the harm described in this bill.

12) Provides that upon a motion, a court shall award reasonable attorney's fees and costs, including expert witness fees and other litigation expenses, to a plaintiff who is a prevailing party in the action.

13) Deems each copy or republication of marketing or advertising prohibited by the bill to be a separate violation.

14) Makes the provisions of the bill severable.

   a) If any portion, subdivision, paragraph, clause, sentence, phrase, word, or application of this section is for any reason held to be invalid by any court of competent jurisdiction, that decision shall not affect the validity of the remaining portions of this chapter.

   b) The Legislature hereby declares that it would have adopted this provision and each and every portion, subdivision, paragraph, clause, sentence, phrase, word, and application not declared invalid or unconstitutional without regard to whether any other portion of this provision or application thereof would be subsequently declared invalid.

**EXISTING LAW**:

1) Makes everyone responsible, not only for the result of their willful acts, but also for an injury occasioned to another by their want of ordinary care of skill in the management of their property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury on themselves. (Civil Code Section 1714 (a).)

2) Prohibits, pursuant to the Privacy Rights for Minors in the Digital World, the operator of an internet website, online service, online application, or mobile application from:

   a) Marketing or advertising a product or service to a minor, if the minor cannot legally purchase the product or participate in the service in the State of California; or,

   b) Using, disclosing, or compiling, or knowingly allowing a third party to use, disclose, or compile, the personal information of a minor for the purpose of marketing goods or services that minors cannot legally purchase or engage in in the State of California. (Business & Professions Code Section 22580.)

3) Defines "ammunition" to include any bullet, cartridge, magazine, clip, speed loader, autoloader, ammunition feeding device, or projectile capable of being fired from a firearm with a deadly consequence. Specifies that "ammunition" does not include blanks. (Penal Code Section 16150 (b).)

4) Defines "firearm" as a device designed to be used as a weapon and from which is expelled, through a barrel, a projectile by the force of an explosion or other form of combustion. Specifies that "firearm" includes the frame or receiver of the weapon. (Penal Code Section 16520 (a)-(b).)

5) Defines "firearm precursor part" to mean a component of a firearm that is necessary to build or assemble a firearm and is either an unfinished handgun frame or an unfinished receiver, including both a single part receiver and a multiple part receiver. Requires the Department of Justice to provide written guidance and pictorial diagrams of each category of precursor parts. Exempts from this definition firearms parts that can only be used on antique firearms. Specifies that a firearm precursor part is not a firearm or the frame or receiver thereof. (Penal Code Section 16531.)

6) Prohibits, under the federal Protection of Lawful Commerce in Arms Act, a civil liability action from being brought in state or federal court by a person against a manufacturer or seller of a specified firearm or component part, or trade association, for relief resulting from the criminal or unlawful misuse of a firearm or component part by the person or a third party. Provides that specified actions are exempt from this prohibition, including an action in which the seller or manufacturer knowing violated a state or federal statute applicable to the sale or marketing of the product, and in which the violation was a proximate cause of the harm for which relief is sought. (15 U.S.C. Sec 7902.)

7) Requires, pursuant to the federal Children's Online Privacy Protection Act (COPPA), that an operator of an internet website or online service directed to a child, as defined, or an operator of an internet website or online service that has actual knowledge that it is collecting personal information (PI) from a child to provide notice of what information is being collected and how that information is being used, and to give the parents of the child the opportunity to

refuse to permit the operator's further collection of information from the child. (15 U.S.C. Sec. 6502.)

**FISCAL EFFECT**: As currently in print this bill is keyed fiscal.

**COMMENTS**: This bill seeks to prohibit firearm industry members from marketing or advertising firearm-related products to minors. It would also authorize public attorneys and injured plaintiffs to bring a civil action to enforce this prohibition, seek imposition of civil penalties, and, in some cases, obtain damages for harms caused by a violation. According to the author:

> Some firearms manufacturers irresponsibly market weapons to children. For example, Wee 1 Tactical has begun marketing an AR-15 made specifically for children. They currently market the weapon, called a JR-15, with a cartoon skull-and-crossbones with a pacifier. . . . Under current law, the company would be able to market this weapon in California, as long as it does so off-line, e.g., in a magazine advertisement.

> This legislation would restrict the marketing and advertising of firearms to minors in all media. Specifically, this bill would prohibit [a firearm industry member] . . . from marketing or advertising firearms, ammunition, or reloaded ammunition to minors.

The bill in print restricts two different types of publications from advertising material promoting the sale of firearms, depending on the intended consumer of the publication. First, if the published material is "***directed to minors***," the publisher would be prohibited from marketing or advertising for sale any firearm, ammunition, or reloaded ammunition in that publication. Secondly and far more broadly, any person who publishes a "marketing or advertising communication" or who "arranges for placement" of such a communication, would be prohibited from publishing or disseminating any material marketing or advertising for sale any firearm, ammunition, or reloaded ammunition that is ***attractive to minors***.

The California Broadcasters Association, the California News Publishers, and First Amendment Coalition raised concerns about the bill in print and its impacts beyond advertisers:

> While it might be constitutional to prohibit advertising the illegal sale of firearms to minors, the definition of "marketing or advertising" goes far beyond that. It covers any "communication" about a "product or service" made for "monetary compensation," the "primary purpose of which is to encourage recipients of the communication to purchase or use the product or service," even lawfully. The mere fact of "monetary compensation" for producing speech does not make the speech purely commercial. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983)).

> The bill would also prohibit any speech deemed to have the "primary purpose" of encouraging even lawful use of firearms. For example, the bill would likely prohibit a video promoting lawful use of firearms by minors for target shooting under parental supervision after gun safety training.

> In addition, the bill's broad sweep and draconian penalties would exert a chilling effect on protected speech such as movies, music, or video games, for fear that the government might deem that such speech has the "primary purpose" of "encouraging" firearm use. Even if such

speech were deemed to encourage unlawful firearm use, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002).

Given efficacy, vagueness, First Amendment, and federal preemption concerns related to these provisions, the author proposes to revise the bill to achieve its goals in a more effective and focused, but less problematic way. As proposed to be amended, the bill would focus on the advertising, marketing, and placing of advertising and marketing by only firearm industry members (as defined by the bill), rather than on publishers, and would prohibit those industry members from engaging in specific acts. It is unclear the extent to which the author's proposed amendment address the concerns raised by the Broadcasters, News Publishers, and First Amendment Coalition.

Under the bill, as it is proposed to be amended, a firearm industry member would be prohibited from advertising, marketing, or arranging for placement any advertising or marketing communication concerning a firearm-related product when the communication is designed, intended, or reasonably appears to make the firearm-related product attractive to minors. The bill then requires a court, in determining whether the marketing or advertising communication makes the firearm-related product attractive to minors, to consider "the totality of the circumstances," including but not limited to whether the marketing or advertising does any of the following:

(A) Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.

(B) Offers brand name merchandise for minors, including but not limited to, hats, t-shirts or other clothing, toys, games, stuffed animals, that promotes a firearm industry member or firearm-related product.

(C) Offers firearm-related products in sizes, colors or designs that are specifically designed to be used by, or appeal to, minors.

(D) Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

(E) Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

(F) Is placed in a publication created for the purpose of reaching an audience that is predominately comprised of minors and not intended for a more general audience comprised of adults.

***Remedies for Violations.*** The bill authorizes two types of civil actions to enforce compliance with its provisions. First the Attorney General or any district attorney, county counsel, or city attorney would be authorized to bring a civil action in any court of competent jurisdiction in the name of the people of the State, county, or city, as appropriate, to seek a civil penalty. Any person found in such an action to have violated any provision of the bill would be liable for a civil penalty not to exceed $25,000 for each violation. The bill specifies a number of factors that courts should rely upon in evaluating whether or not to impose the maximum $25,000 civil penalty: the nature and seriousness of the misconduct, the number of violations, the persistence

of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

As proposed to be amended, the bill also would allow a person harmed by a violation to commence a civil action to recover their actual damages for harms caused for the violation. This would appropriately provide compensation to a plaintiff in a case where they could demonstrate a causal link between the marketing or advertising of a particular firearm-related product by a particular firearm industry member and the resulting harm, such as a child misusing the firearm-related product and injuring themselves or others. Just as in a case brought by a public attorney, in a case brought by an injured party, the court would be required to order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the misconduct. Likewise, in both types of causes of action, upon a motion, a court would be required to award reasonable attorney's fees and costs, including expert witness fees and other litigation expenses, to a prevailing plaintiff. The bill also clarifies that each copy or republication of marketing or advertising prohibited by the bill would be deemed to be a separate violation.

In order to clarify that the bill is intended to be a state-specific measure, the bill defines a "firearm-related product" as a product (specifically a firearm, ammunition, reloaded ammunition, a firearm precursor part, a firearm component, or a firearm accessory) that meets any of the following conditions:

- The item is sold, made, or distributed in California.
- The item is intended to be sold or distributed in California.
- It is reasonably foreseeable that the item would be sold or possessed in California.
- Marketing or advertising for the item is directed to residents of California.

Finally, the bill includes two important privacy protections for personal information of minors. First, the bill prohibits a firearm industry member from publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, and from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product. Second, it clarifies that the bill shall not be construed to require or authorize a firearm industry member to collect or retain age information about users or subscribers of products or services offered. These provisions are within the jurisdiction and expertise of the Committee on Privacy & Consumer Protection which previously heard and approved the bill.

***Background – Firearm Industry Efforts to Market Firearms and Firearm Products to Minors.***
In 2016, the New York Times reported that the gun industry markets a variety of products specifically to minors and views children as a critically important group of future consumers:

> The report, called "Start Them Young" and issued [...] by the Violence Policy Center, lists a variety of firearms meant at least partly for children. It mentions the Crickett rifle, a gun made for children by the company Keystone Sporting Arms. Keystone's website and some of its merchandise bear the image of "Davey Crickett," a gun-wielding cartoon insect. The company sells Davey Crickett hats, dog tags and pins, as well as a Davey Crickett Beanie Baby, listed as "not for children under three years of age."

Keystone's website also sells books featuring "Little Jake," a boy who uses his gun to bring down a bear and save an African village from a marauding elephant. The publisher of the books says Little Jake is actually older than he looks: "Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision."

"Start Them Young" also cites the rise of .22-caliber versions of higher-caliber rifles, often produced with lightweight materials. According to an article in the trade magazine Shooting Sports Retailer, "these guns bring the coolness and fun of the tactical rifle to kids and less serious shooters." The website of the retailer Gander Mountain describes one such weapon thus: "Designed for the indoor range and the youth shooter, this Carbon15 .22 LR Rimfire lightweight is sure to add new dimensions to your Bushmaster shooting pleasure. Operational controls are functionally and ergonomically identical to AR-15 type rifles. (North, *Marketing Guns to Children,* The N.Y. Times (Feb. 19, 2016) found at < https://takingnote.blogs.nytimes.com/2016/02/19/marketing-guns-to-children/> as of Apr. 12, 2022.)

***The bill restricts some marketing and advertising of firearms, raising potential First Amendment Concerns.*** The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." (U.S. Const., amend. I.) While commercial speech is a type of content-based restriction, and content-based restrictions ordinarily receive strict scrutiny analysis under the First Amendment, the U.S. Supreme Court has held that the First Amendment accords commercial speech lesser protection than other constitutionally guaranteed expression. This is in part because, unlike other varieties of speech, speech proposing a commercial transaction occurs in an area traditionally subject to governmental regulation. (*Central Hudson Gas & Elec. Corp. v. Public Service Commission* (1980) 447 U.S. 557, 562-63.) Furthermore, a blanket prohibition against truthful, nonmisleading speech about a lawful product, which serves an end unrelated to consumer protection, must be reviewed with skepticism. A "state legislature does not have the broad discretion to suppress truthful, nonmisleading information for paternalistic purposes[.]" (*44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 510.) Ultimately, the First Amendment prohibits commercial speech against "unwarranted" governmental regulation. However, only truthful, non-misleading commercial speech is protected by the First Amendment.

The U.S. Supreme Court has articulated a four-prong test by which commercial speech regulations are evaluated for constitutionality. This test asks: (1) whether the expression concerns lawful activity and is not misleading; (2) whether the asserted governmental interest is substantial; (3) whether the regulation directly advances the governmental interest asserted; and (4) whether it is not more extensive than is necessary to achieve that interest. (*Central Hudson Gas & Elec. Corp., supra,* 447 U.S. at pp. 561-66.)

Here, on the **first prong**, the truthfulness and misleading nature of information in marketing materials in which firearm-related products are attractive to minors (thereby encouraging children to use firearms), is debatable. California law generally prohibits minors from possessing a handgun and most semi-automatic rifles (Penal Code Section 29610), as well as ammunition (Penal Code 30300 (a)). Exceptions to this prohibition include situations where a parent or legal guardian is present or has consented to the possession, or when minors are engaged in certain

recreational sports. (Penal Code Section 29615.) While it *may* technically be legal for a child to possess a firearm, lawful possession of a firearm by a minor is clearly the exception, rather than the rule under California law. Therefore, advertising and marketing materials that encourage minors to possess and use firearms may or may not concern a lawful activity and certainly could be misleading if it fails to make those points clear. Therefore, it is possible that a court could find that a particular marketing or advertising campaign was *not protected commercial speech* under First Amendment jurisprudence. (See *Central Hudson Gas & Elec. Corp., supra,* 447 U.S. at p. 566 [neither deceptive speech nor speech that proposes an illegal transaction is protected by the First Amendment].) The possibility and even likelihood that marketing or advertising of firearm-related products that makes those products attractive to children who, in most cases, cannot lawfully possess them, greatly strengthens the argument that the bill's restrictions on the marketing and advertising of firearm-related products would withstand constitutional scrutiny.

On the **second prong**, the important government interests of this bill are reflected in the bill's findings and declarations. California not only has a compelling interest in ensuring that minors do not possess these dangerous weapons, but also in protecting its citizens, including and especially minors, from gun violence. On the **third prong**, by restricting the marketing and advertising by the firearms industry of firearm-related products that are attractive to children, this bill would directly advance its stated governmental interests to limit the exposure of, and consumption by, minors to such advertising and marketing material, given the lethality (and general illegality for minors) of the products being advertised.

As with most commercial speech regulations, the ultimate determination of constitutionality may hinge upon the **fourth prong**. Recent Supreme Court jurisprudence suggests that while the regulation chosen does not have to be the least restrictive alterative, it must use a means that is substantially related to the desired objective. (*See e.g. Greater New Orleans Broadcasting Assn. v. U.S.* (1999) 527 U.S. 173 and *Thompson v. Western States Med. Center* (2002) 535 U.S. 357.)

In this case, the bill as proposed to be amended focuses on advertising and marketing materials that are promulgated by a narrowly defined group of commercial speakers—the firearm industry—rather than on publishers, or even advertisers, in general. Given that these are the only groups that generally engage in this type of commercial speech, the means used by the bill seem narrowly tailored to address the source of the harmful marketing and advertising content, rather than focused on its dissemination. Furthermore, the type of advertising and marketing at issue in this bill is not generally directed towards lawful purchasers of firearms (i.e. adults); rather, they are specifically designed to appeal to, and be directed at, children. Therefore, denying this form of advertising and marketing does not significantly impact a protected interest that firearm industry members have to furnish truthful information to would-be lawful purchasers who have a corresponding interest in receiving such information. (See *Discount Tobacco City & Lottery, Inc. v. United States* (6th Cir. 2012) 674 F.3d 509, 520.) Finally, with the findings incorporated into the bill—that firearms marketing and advertising contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully—-the bill seems substantially related to the achievement of its objective.

***Similar Restrictions on Advertising and Marketing of Contraband to Minors.*** Existing state law places limits on the advertising of other products that adults may lawfully purchase and use, but which minors may not, such as alcohol, marijuana, electronic cigarettes and vapes, and tobacco. Each year in the United States, companies spend billions of dollars advertising alcohol and tobacco products, while popular television shows and movies often depict smoking and

drinking in a positive light. Studies show that young people are often inclined to use drugs or alcohol themselves due to these influential depictions of substance use. Research on the effects of advertising has shown that they may be responsible for up to 30% of underage tobacco and alcohol use. (John P. Pierce, Won S. Choi, Elizabeth Gilpin (1998), Journal of the American Medical Association; 279 (7): pp. 511-515, available at: https://jamanetwork.com/journals/jama/fullarticle/187258.) On the other hand, restrictions on alcohol advertising are associated with both (1) lower prevalence and frequency of adolescent alcohol consumption; and (2) older age of first alcohol use. (Paschall, M. J., Grube, J. W., & Kypri, K. (2009). Alcohol control policies and alcohol consumption by youth: A multi-national study. *Addiction, 104*(11), 1849–1855, available at https://pubmed.ncbi.nlm.nih.gov/19832785/.)

*Alcohol.* California law imposes numerous restrictions on advertising of alcohol in a manner that appeals to persons who are underage. For example, coin banks, toys, balloons, magic tricks, miniature bottles or cans, confections, dolls, or other items that appeal to minors or underage drinkers may not be used in connection with the merchandising of beer. (Business & Professions Code Section 25600 (b)(2)(D).) The size of alcohol advertisements (relative to window size) and location is also restricted. For example, no more than 33 percent of the square footage of the windows and clear doors of an off-sale premises can bear advertising or signs of any sort. (Business & Professions Code Section 25612.5.)

*Tobacco.* In order to settle civil lawsuits filed by Attorneys General of more than 40 states and territories against several tobacco product manufacturers, America's largest tobacco manufacturers, including Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard, agreed to settle the litigation with the states on November 23, 1998 in the Master Settlement Agreement (MSA). (*The Master Settlement Agreement: An Overview* (2019) Public Law Center-Tobacco Control Legal Consortium.) In addition to imposing significant restrictions on tobacco advertising, as part of the settlement, the participating states released the participating manufacturers from liability for healthcare costs incurred by the states for smoking related illnesses. (*Ibid.*) Among other things, the MSA prohibited R.J. Reynolds from posting billboards or other signs advertising its Winston sponsorships at auto race tracks more than 90 days before and 10 days after a sponsored event at the site. The restriction, which the R.J. Reynolds argued amounted to a nearly year-long ban, was upheld. (*People of the State of California v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516.) The Attorney General also successfully enforced the MSA ban on cartoon characters in the case of R.J. Reynolds' Farm Rocks images. (*In re Tobacco Cases I* (2010) 186 Cal.App.4[th] 42; *In re Tobacco Cases I* (2011) 193 Cal.App.4th 1591.)

*Cannabis.* State law provides that any advertising or marketing placed in broadcast, cable, radio, print, and digital communications shall only be displayed where at least 71.6 percent of the audience is reasonably expected to be 21 years of age or older, as determined by reliable, up-to-date audience composition data. (Business & Professions Code Section 26131 (b).) Furthermore, any advertising or marketing involving direct, individualized communication or dialogue controlled by the licensee must utilize a method of age affirmation to verify that the recipient is 21 years of age or older before engaging in that communication or dialogue controlled by the licensee. (*Id.* at (c).)

**Immunity for gun manufacturers and dealers under PLCAA; and exceptions.** As a general rule, "[e]veryone is responsible, not only for the result of [their] willful acts, but also for an injury occasioned to another by [their] want of ordinary care of skill in the management of [their]

property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury [on themselves]." (Civil Code Section 1714 (a).) According to the California Supreme Court, Section 1714 embodies a fundamental principle of liability for failure to exercise such care, and that "it is clear that in the absence of statutory provision declaring an exception to the fundamental principle enunciated by Civil Code Section 1714, no such exception should be made unless clearly supported by public policy." (*Rowland v. Christian* (1968) 69 Cal. 2d 108, 112.)

Despite this principle of personal accountability for wrongdoing, as well as the state's numerous gun restrictions, the right to file a civil action against a gun manufacturer or dealer is hamstrung by a federal immunity statute titled the Protection of Lawful Commerce in Arms Act. (15 U.S.C. Sec 7902.) Signed by President George W. Bush in 2005, the Protection of Lawful Commerce in Arms Act (PLCAA) prohibits civil liability actions from being brought in state or federal court against gun dealers and manufacturers for harm incurred due to the illegal use of non-defective products. Importantly, the PLCAA specifies six exceptions to this prohibition:

1) An action brought against someone convicted of "knowingly transfer[ing] a firearm, knowing that such firearm will be used to commit a crime of violence" by someone harmed by such unlawful conduct;

2) An action brought against a seller for negligent entrustment or negligence;

3) An action in which a manufacturer or seller of a firearm, ammunition, or components parts *knowingly violated a state or federal statute applicable to the sale or marketing of the product,* and the violation was a proximate cause of the harm for which relief is sought;

4) An action for breach of contract or warranty in connection with the purchase of the product;

5) "An action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage;"

6) An action commenced by the Attorney General to enforce the Gun Control Act or the National Firearms Act.

The third exception, also known as the "predicate exception," has been the subject of considerable judicial scrutiny. Under this exception, a plaintiff may bring a suit if they successfully prove that a manufacturer or dealer knowingly violated an underlying statute "applicable to the sale or marketing" of a firearm or ammunition and this violation was the proximate cause of the harm. Two federal appellate rulings have adopted a narrow interpretation of the word "applicable," ruling that "applicable" statutes are those that specifically regulate the firearm industry. (See *City of New York v. Beretta USA Corp*. (2nd Cir. 2008) 524 F.3d 384 and *Ileto v. Glock, Inc.* (9th Cir. 2009) 565 F.3d 1126.) This interpretation has resulted in dismissal of a number of suits that argue "applicable" should be broadly defined to include state laws such as public nuisance statutes that address endangerment of health and safety.

However, some state courts have adopted a broader interpretation of the predicate exception. For example, in a suit filed by the parents of the Sandy Hook victims against Remington Arms, the manufacturer of the rifle used to kill 26 people (20 of whom were children between six and seven years old) at Sandy Hook Elementary School, the Connecticut Supreme Court ruled that the defendants, by marketing the illegal use of their products, violated the Connecticut Unfair Trade Practices Art (CUTPA). (*Soto v. Bushmaster Firearms Int'l, LLC.* (Conn. 2019) 202 A.3d 262.) The court noted that, because deceptive marketing is regulated by unfair trade practice laws, rather than firearms-specific statutes, CUTPA is an applicable statute as specified in the predicate exception. In February of 2022, the plaintiffs announced that they reached a settlement with the company for $73 million. The settlement allowed the plaintiffs to share internal company documents obtained during discovery that provide evidence of the company's unfair marketing practices promoting the illegal use of firearms.

***The bill appears to fall within an exception to PLCAA.*** As described above, the immunity provision of PLCAA generally shields gun manufacturers and dealers from liability in state or federal court for harm incurred due to the illegal use of non-defective products, except in limited cases. One exception reads as follows:

> An action in which a manufacturer or seller of a firearm, ammunition, or components parts "***knowingly violated a State or Federal statute applicable to the sale or marketing of the product***, and the violation was a proximate cause of the harm for which relief is sought;"

The new liability provisions created by the bill govern the sale or marketing of firearm-related products. Therefore, to the extent that those laws would apply to a manufacturer or seller of a firearm, ammunition, or components parts, it appears that any violations, at least to the extent that they were "knowing" and the proximate cause of the harm for which relief is sought by a plaintiff, would appear to fall within the exception above. Therefore, it appears that PLCAA would not preempt an action under the bill to hold a manufacturer or dealer civilly liable for a violation of the bill's provisions.

***The bill does not appear to raise Second Amendment concerns.*** The Second Amendment to the U.S. Constitution provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Prior to 2008, the right generally was understood by federal courts to be intertwined with military or militia use. (*See, e.g., Parker v. District of Columbia* (D. D.C. 2004) 311 F. Supp. 2d 103, pp. 104-05 [noting that the "vast majority of circuit courts . . . reject[ed] an individual right to bear arms separate and apart from Militia use"].) In *District of Columbia v. Heller*, the U.S. Supreme Court held that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, especially in one's home; and therefore the District of Columbia's functional ban on handgun possession in the home and its requirement that lawful firearms in the home be rendered inoperable were unconstitutional. (*District of Columbia v. Heller* (2008) 554 U.S. 570, 630-31.) Since *Heller,* the circuit courts largely have been applying a two-step inquiry to determine whether a particular law is constitutional. First, courts ask whether the challenged law burdens conduct protected by the Second Amendment. If it does not, the inquiry ends, as the law does not implicate the Second Amendment. But if the challenged law does burden conduct protected by the Second Amendment, courts next ask whether, under the applicable type of means-end scrutiny, the law is constitutional under that standard of review. (See Congressional Research Service, "*Post-Heller Second Amendment Jurisprudence,*" pp. 12-13 (March 25, 2019), available at https://sgp.fas.org/crs/misc/R44618.pdf.)

The Court in *Heller* observed that certain regulations restricting access to firearms were "longstanding" and "presumptively lawful," including restrictions on possessing and selling certain types of weapons, and conditions on the commercial sale of firearms. (*Heller, supra,* 554 U.S. 570, 626-27 and fn.26.) Given that the civil liability provisions of this bill apply only to firearm *industry* members (defined under the bill to mean "a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products") and are based upon longstanding and presumptively valid age restrictions in relation to the purchase and possession of firearms by children, the marketing and advertising restrictions in the bill likely do not implicate the Second Amendment. (*See United States v. Rene E.* (1ˢᵗ Cir. 2009) 583 F.3d 8, 15-16 [federal ban on juvenile possession of handguns fell within Heller's safe harbor for longstanding restrictions on firearm possession].) Rather, the bill imposes liability only on these persons and entities who fail to abide by marketing and advertising restrictions that are consistent with those longstanding and presumptively valid age-based restrictions in the course of doing business.

***Are there other ways to achieve the bill's goals that do not implicate the First Amendment?***
The author raises serious concerns about disturbing products – specifically child-sized firearms and other firearm-related products—that are designed, marketed, and advertised in a manner that is intended or reasonably does appeal to minors. What societal value is served by a child-sized assault-style rifle being available for purchase in the state, especially in comparison to the harm that potentially is caused by a child accessing that firearm? Shouldn't the state reduce the likelihood of serious harm that could be caused to a child or others caused by a child accessing the firearm, given a child may be particularly motivated to obtain it (without supervision) because of its size color, or marketing directed to children in an unsafe and unsupervised manner? Would California ever allow a child-sized car, powerful enough to be driven at freeway speeds, to be sold in the state? Given that minors have neither a legal right under state law to possess or purchase such firearms, nor a Second Amendment right protected by the U.S. Constitution to do so, should California simply prohibit the sale of such firearms?

The state could advance its interest to keep these attractive [to children] yet deadly products out of the stream of commerce without suppressing otherwise lawful speech by prohibiting the sale for all firearms, regardless of their characteristics, if they are designed, intended for use, or marketed to appeal to children as their primary users. (See *Pitt News v. Pappert* (3d Cir. 2004) 379 F.3d 96, 108 ["[T]he Commonwealth can seek to combat underage and abusive drinking by other means that are far more direct and that do not affect the First Amendment. The most direct way to combat underage and abusive drinking by college students is the enforcement of the alcoholic beverage control laws on college campuses."]; *Tracy Rifle & Pistol LLC v. Harris* (E.D. Cal. 2018) 339 F. Supp. 3d 1007, 1018 [finding a state law prohibiting the display of a handgun, an imitation handgun, or a placard advertising the sale of a handgun in a manner that is visible from the outside of a gun dealer's premises unconstitutional].) "California has several laws that, if enforced, further its substantial interest in reducing handgun suicide and crime without restricting speech.... [and] directly to deter the potential harmful consequences of handgun purchases without restricting speech." (*Pitt News, supra,* at p. 108.) *As the bill moves forward, the author may wish to consider whether it would be appropriate to also, or alternatively, prohibit the sale of such firearms in California.*

*ARGUMENTS IN SUPPORT*: Everytown for Gun Safety, Moms Demand Action for Gun Sense in America, and Students Demand Action for Gun Sense in America write the following in a joint letter of support:

> Current laws restrict the content and placement of advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors. This is done to prevent potentially harmful substances from getting in the hands of young people as well as preventing the glorification around them.

> Our research shows that, "compared to other high-income countries, American children aged 5 to 14 are 21 times more likely to be killed with guns, and American adolescents and young adults aged 15 to 24 are 23 times more likely to be killed with guns." In a county where young people already face a high likelihood of facing harm or death due to firearms it is imperative that we do not allow gun manufacturers to continue the glorification of firearms.

Regarding the comparison with restriction on advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors, the Brady Campaign and Brady California write, "While we certainly see the point of restricting ads around the previous products listed, unlike firearms none of these are a leading cause of death for children and teens."

*ARGUMENTS IN OPPOSITION*: National Rifle Association of America Institute for Legislative Action writes:

> [T]he restriction in AB 2571 fails to appreciate that minors can and do possess and use firearms for a variety of lawful purposes. The state interest asserted in AB 2571 is to combat the "proliferation of firearms to and among minors." The bill also notes, "[t]his state has a compelling interest in ensuring that minors do not possess these dangerous weapons." . . .

> The legislation's drafters justify their proposed regulation by citing restrictions on "advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors." As noted in the discussion of *Lorillard Tobacco Co. v. Reilly*, such measures must be the narrowest means of achieving an asserted state interest – which was not the case in *Lorillard* and is not the case with AB 2571.

> However, lawmakers should also understand that the restrictions cited as analogous to that in AB 2571 are of a fundamentally different character. Unlike restrictions on advertising for alcohol, cannabis, and tobacco, the underlying products and conduct that AB 2571 seeks to curb the advertisement of are protected under the U.S. Constitution. As such, lawmakers should be prepared for the courts to level more scrutiny upon restrictions on advertisements concerning Second Amendment protected products and conduct than those leveled at products that don't enjoy such protection.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Brady Campaign
Brady Campaign California
City of Mountain View
Everytown for Gun Safety Action Fund

March for Our Lives Action Fund
Moms Demand Action for Gun Sense in America
Students Demand Action for Gun Sense in America

**Opposition**

National Rifle Association - Institute for Legislative Action

**Concerns (with bill in print)**

California Broadcasters Association
California News Publishers Association
First Amendment Coalition

**Analysis Prepared by**:   Alison Merrilees / JUD. / (916) 319-2334

# EXHIBIT 4

AB 2571
Page 1

Date of Hearing:  May 11, 2022

ASSEMBLY COMMITTEE ON APPROPRIATIONS
Chris Holden, Chair
AB 2571 (Bauer-Kahan) – As Amended April 27, 2022

| | | | |
|---|---|---|---|
| Policy Committee: | Privacy and Consumer Protection | Vote: | 7 - 1 |
| | Judiciary | | 7 - 2 |

Urgency:  No          State Mandated Local Program:  No          Reimbursable:  No

**SUMMARY**:

This bill prohibits firearm industry members from marketing or advertising firearm-related products to minors and authorizes the Department of Justice (DOJ) or any city or county attorney and injured plaintiffs to bring a civil action to enforce the prohibition, obtain injunctive relief, and seek either civil penalties, or, in some cases, damages for harms caused by a violation.

**FISCAL EFFECT**:

1)  Cost pressures (Trial Court Trust Fund) in the mid-hundreds of thousands of dollars for trial courts to hear and adjudicate civil actions against a firearms industry member that markets or advertises to minors. If five cases are filed in civil court annually requiring seven to ten days or 56 to 80 hours of court time, at an average cost per hour of $1,000 in workload costs, the cost to the trial courts would be between $280,000 and $400,000 annually.  Although courts are not funded on the basis of workload, increased pressure on the Trial Court Trust Fund and staff workload may create a need for increased funding for courts from the General Fund (GF) to perform existing duties.

2)  Costs (GF) of $442,000 in fiscal year (FY) 2022-23, $776,000 in FYs 2023-24 and 2024-25 and $388,000 annually thereafter in additional legal staff for the DOJ to prosecute firearm industry members for unlawful advertisements to minors.

**COMMENTS**:

COMMENTS

1)  **Purpose.** According to the author:

> This legislation would restrict the marketing and advertising of firearms to minors in all media. Specifically, this bill would prohibit [a firearm industry member] . . . from marketing or advertising firearms, ammunition, or reloaded ammunition to minors.

2)  **Protection of Lawful Commerce in Arms Act (PLCAA).**  15 U.S.C. section 7902 generally prohibits filing any civil action, in either state or federal court, against a firearms manufacturer, distributor, dealer or importer of a firearm or ammunition. Section 7901 states its intent is to protect firearms manufacturers from liability caused by criminal misuse of

0483

firearms. Additionally, section 7901 expresses the intent of Congress to preempt state laws to the contrary. (15 U.S.C. § 7901 (b)(6) and (7); Ileto v. Glock, Inc. (9th Cir. 2009) 565 F.3d 1126, 1129 ("Congress clearly intended the PLCAA to preempt common-law claims such as general tort theories of liability.").) The PLCAA contains several exceptions including an action against a seller for negligent entrustment or negligence in general or an action where a manufacturer knowingly violates a state or federal law *applicable to the sale or marketing of a firearm*, and the violation was a proximate cause of the harm. Several federal courts have narrowly construed the phrase "state or federal law applicable to the sale or marketing of a firearm." City of New York v. Beretta U.S.A. Corp. (2d Cir. 2008) 524 F.3d 384, 399-400 held the meaning of the term "applicable" must be determined in the context of the statute and the PLCAA provides several examples of where in existing law an applicable statute might apply: (a) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record related to the lawfulness of the sale required to be kept under federal or state law; and (b) any case in which the manufacturer or seller transferred or sold a firearm or ammunition knowing, or having reasonable cause to believe, that the actual buyer of was prohibited from possessing or receiving a firearm or ammunition.

Plaintiffs in the Sandy Hook Elementary School shooting case recently settled a multi-million dollar lawsuit against Bushmaster Firearms wherein the Connecticut Supreme Court ruled Bushmaster Firearms International violated Connecticut's Unfair Trade Practices Act by engaging in deceptive advertising practices. The Connecticut Supreme Court found that state's Unfair Trade Practices Act fell within the definition of a state law "applicable to the sale or marketing of a firearm" and, for this reason, denied Bushmaster's attempt to dismiss the case. This case settled and will not be appealed.

The liability provisions in this bill govern the sale or marketing of firearm-related products. To the extent those laws apply to a manufacturer or seller of firearm, ammunition, or components parts, it appears that any violations, at least to the extent that they were "knowing" and the proximate cause of the harm for which relief is sought by a plaintiff, would appear to fall within the PLCAA exception. Therefore, it appears that PLCAA would not preempt an action under the bill to hold a manufacturer or dealer civilly liable for a violation of the bill's provisions.

3) **Argument in Support.** According to the Brady United Against Gun Violence:

> Current laws restrict the content and placement of advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors. This is done to prevent potentially harmful substances from getting in the hands of young people as well as preventing the glorification around them. While we certainly see the point of restricting ads around the previous products listed, unlike firearms none of these are a leading cause of death for children and teens.

4) **Argument in Opposition.** The National Rifle Association, Institute for Legislative Action:

> [The] restriction in AB 2571 fails to appreciate that minors can and do possess and use firearms for a variety of lawful purposes. The

state interest asserted in AB 2571 is to combat the "proliferation of firearms to and among minors." The bill also notes, "[t]his state has a compelling interest in ensuring that minors do not possess these dangerous weapons." The asserted interest is not necessarily to discourage illegal use of firearms by minors, but rather all use.

5) **Related Legislation.** AB 1594 (Ting) authorizes the DOJ, local governments and survivors of gun violence to file a civil action in a California court for damages against a gun manufacturer, importer or dealer that violates firearm industry standards of conduct, as specified.

**Analysis Prepared by**:   Kimberly Horiuchi / APPR. / (916) 319-2081

# EXHIBIT 5

ASSEMBLY THIRD READING
AB 2571 (Bauer-Kahan and Gipson)
As Amended  April 27, 2022
Majority vote

| MM |
|---|

Prohibits firearm industry members from marketing or advertising firearm-related products to minors and authorizes public attorneys and injured plaintiffs to bring a civil action to enforce the prohibition, obtain injunctive relief, and seek either civil penalties, or, in some cases, damages for harms caused by a violation.

M     r    r

1) Provides that a firearm industry member shall not advertise, market, or arrange for placement of an advertising or marketing communication concerning any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors.

2) Requires a court, in determining whether marketing or advertising of a firearm-related product is attractive to minors, to consider the totality of the circumstances, including, but not limited to, whether the marketing or advertising:

   a) Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.

   b) Offers brand name merchandise for minors, including but not limited to, hats, t-shirts or other clothing, toys, games, stuffed animals, that promotes a firearm industry member or firearm-related product.

   c) Offers firearm-related products in sizes, colors or designs that are specifically designed to be used by, or appeal to, minors.

   d) Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

   e) Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

   f) Is placed in a publication created for the purpose of reaching an audience that is predominately comprised of minors and not intended for a more general audience comprised of adults.

3) Prohibits a firearm industry member from publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, and from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

4) Provides that any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed $25,000 for each violation, which shall be assessed and recovered in a

civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction.

5) Allows a person harmed by a violation of the bill to commence a civil action to recover their

6) Provides that upon a motion, a court shall award reasonable attorney's fees and costs, including expert witness fees and other litigation expenses, to a plaintiff who is a prevailing

### MM

This bill prohibits a firearm industry member from advertising, marketing, or arranging for placement any advertising or marketing communication concerning a firearm-related product when the communication is designed, intended, or reasonably appears to make the firearm-related product attractive to minors. The bill then requires a court, in determining whether the marketing or advertising communication makes the firearm-related product attractive to minors, to consider "the totality of the circumstances," including but not limited to whether the marketing or advertising does any of the following:

1) Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.

2) Offers brand name merchandise for minors, including but not limited to, hats, t-shirts or other clothing, toys, games, stuffed animals, that promotes a firearm industry member or firearm-related product.

3) Offers firearm-related products in sizes, colors or designs that are specifically designed to be used by, or appeal to, minors.

4) Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

5) Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

6) Is placed in a publication created for the purpose of reaching an audience that is predominately comprised of minors and not intended for a more general audience comprised of adults.

*Remedies for violations.* This bill authorizes two types of civil actions to enforce compliance with its provisions. First the Attorney General or any district attorney, county counsel, or city attorney would be authorized to bring a civil action in any court of competent jurisdiction in the name of the people of the State, county, or city, as appropriate, to seek a civil penalty. Any person found in such an action to have violated any provision of the bill would be liable for a civil penalty not to exceed $25,000 for each violation. This bill specifies a number of factors that courts should rely upon in evaluating whether or not to impose the maximum $25,000 civil penalty: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

*The bill restricts some marketing and advertising of firearms, raising potential First Amendment concerns.* This bill focuses on advertising and marketing materials that are promulgated by a narrowly defined group of commercial speakers – the firearm industry – rather than on publishers, or even advertisers, in general. Given that these are the only groups that generally engage in this type of commercial speech, the means used by the bill seem narrowly tailored to address the source of the harmful marketing and advertising content, rather than focused on its dissemination. Furthermore, the type of advertising and marketing at issue in this bill is not generally directed towards lawful purchasers of firearms (i.e. adults); rather, they are specifically designed to appeal to, and be directed at, children. Therefore, denying this form of advertising and marketing does not significantly impact a protected interest that firearm industry members have to furnish truthful information to would-be lawful purchasers who have a corresponding interest in receiving such information. (See *Discount Tobacco City & Lottery, Inc. v. United States* (6th Cir. 2012) 674 F.3d 509, 520.) With the findings incorporated into this bill – that firearms marketing and advertising contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully – the bill seems substantially related to the achievement of its objective.

Some firearms manufacturers irresponsibly market weapons to children. For example, Wee 1 Tactical has begun marketing an AR-15 made specifically for children. They currently market the weapon, called a JR-15, with a cartoon skull-and-crossbones with a pacifier. . . . Under current law, the company would be able to market this weapon in California, as long as it does so off-line, e.g., in a magazine advertisement.

This legislation would restrict the marketing and advertising of firearms to minors in all media. Specifically, this bill would prohibit [a firearm industry member] . . . from marketing or advertising firearms, ammunition, or reloaded ammunition to minors.

According to the Brady United Against Gun Violence:

Current laws restrict the content and placement of advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors. This is done to prevent potentially harmful substances from getting in the hands of young people as well as preventing the glorification around them. While we certainly see the point of restricting ads around the previous products listed, unlike firearms none of these are a leading cause of death for children and teens.

The National Rifle Association, Institute for Legislative Action:

[The] restriction in AB 2571 fails to appreciate that minors can and do possess and use firearms for a variety of lawful purposes. The state interest asserted in AB 2571 is to combat the "proliferation of firearms to and among minors." The bill also notes, "[t]his state has a compelling interest in ensuring that minors do not possess these dangerous weapons." The asserted interest is not necessarily to discourage illegal use of firearms by minors, but rather all use.

MM

According to the Assembly Appropriations Committee:

1) Cost pressures (Trial Court Trust Fund) in the mid-hundreds of thousands of dollars for trial courts to hear and adjudicate civil actions against a firearms industry member that markets and advertises to minors. If five cases are filed in civil court annually requiring seven to ten days or 56 to 80 hours of court time, at an average cost per hour of $1,000 in workload costs, the cost to the trial courts would be between $280,000 and $400,000 annually. Although courts are not funded on the basis of workload, increased pressure on the Trial Court Trust Fund and staff workload may create a need for increased funding for courts from the General Fund (GF) to perform existing duties.

2) Costs (GF) of $442,000 in fiscal year (FY) 2022-23, $776,000 in FYs 2023-24 and 2024-25 and $388,000 annually thereafter in additional legal staff for the DOJ to prosecute firearm industry members for unlawful advertisements to minors.

M                                      M
   Gabriel, Bauer-Kahan, Bennett, Berman, Mike Fong, Irwin, Wilson
Kiley
                        Cunningham, Valladares, Wicks

M
   Stone, Kalra, Maienschein, Reyes, Robert Rivas, Friedman, Bloom
Davies, Kiley
                        Cunningham

M
   Holden, Bryan, Calderon, Carrillo, Mike Fong, Gabriel, Eduardo Garcia, Levine, Quirk,
Robert Rivas, Akilah Weber, Wilson
   Bigelow, Megan Dahle, Davies, Fong

VERSION: April 27, 2022

CONSULTANT:  Nichole Rocha / P. & C.P. / (916) 319-2200                FN: 0002582

# EXHIBIT 6

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2021-2022 Regular Session**

AB 2571 (Bauer-Kahan)
Version: April 27, 2022
Hearing Date: June 14, 2022
Fiscal: Yes
Urgency: No
CK

## SUBJECT

Firearms: advertising to minors

## DIGEST

This bill prohibits firearm industry members from advertising or marketing, as defined, firearm-related products to minors. The bill restricts the use of minors' personal information in connection with marketing or advertising firearm-related products to those minors.

## EXECUTIVE SUMMARY

In the United States, children are more likely to die from gun violence than in any other high-income country. In 2020, gun violence overtook car accidents to become the number one cause of death for U.S. children and adolescents.[1] In California, children are generally restricted from purchasing and possessing firearms and ammunition, except under specified circumstances. However, concerns have arisen that children are still being marketed to by the gun industry.

This bill prohibits firearm industry members from advertising or marketing, as defined, firearm-related products in a manner that is designed, intended, or reasonably appears to be attractive to minors. The determination of whether it is "attractive to minors" is based on a consideration of the totality of the circumstances, including whether the marketing or advertising used cartoon characters or offered brand name stuffed animals promoting the entity or firearm-related product. The bill also prohibits knowingly leveraging the personal information of a minor for the purpose of marketing or advertising to that minor any firearm-related product, as specified.

---

[1] Laurel Wamsley, *The U.S. is uniquely terrible at protecting children from gun violence* (May 28, 2022) NPR, https://www.npr.org/2022/05/28/1101307932/texas-shooting-uvalde-gun-violence-children-teenagers. All internet citations are current as of June 2, 2022.

AB 2571 (Bauer-Kahan)
Page 2 of 16

This bill is sponsored by Governor Gavin Newsom. It is supported by a variety of groups, including Everytown for Gun Safety and the County of San Diego. The bill is opposed by the National Rifle Association.

## PROPOSED CHANGES TO THE LAW

Existing federal law:

1) Provides, pursuant to the Second Amendment to the United States Constitution, that a well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed. (U.S. Const. Amend. 2.)

2) Prohibits a qualified civil liability action from being brought in any Federal or State court. (15 U.S.C. § 7902.) A "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines or penalties, or other relief resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. (15 U.S.C. § 7903.)

3) Establishes the federal Children's Online Privacy Protection Act (COPPA) to provide protections and regulations regarding the collection of personal information from children under the age of 13. (15 U.S.C. § 6501 et seq.)

Existing state law:

1) Requires a person be at least 18 years of age to be sold most firearms and at least 21 years of age to be sold a handgun, except as specified. (Pen. Code §§ 27505, 27510.)

2) Establishes the Privacy Rights for California Minors in the Digital World (PRCMDW), which prohibits an operator of an internet website, online service, online application, or mobile application ("operator") from the following:
   a) marketing or advertising specified products or services, such as firearms, cigarettes, and alcoholic beverages, on its internet website, online service, online application, or mobile application that is directed to minors;
   b) marketing or advertising such products or services to minors who the operator has actual knowledge are using its site, service, or application online and is a minor, if the marketing or advertising is specifically directed to that minor based upon the personal information of the minor; and

c) knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of a minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising such products or services to that minor, where the website, service, or application is directed to minors or there is actual knowledge that a minor is using the website, service, or application. (Bus. & Prof. Code § 22580.)

3) Requires, pursuant to the PRCMDW, certain operators to permit a minor user to remove the minor's content or information and to further inform the minor of this right and the process for exercising it. (Bus. & Prof. Code § 22581.)

4) Requires, pursuant to the Parent's Accountability and Child Protection Act, a person or business that conducts business in California, and that seeks to sell any product or service in or into California that is illegal under state law to sell to a minor, notwithstanding any general term or condition, take reasonable steps, as specified, to ensure that the purchaser is of legal age at the time of purchase or delivery, including, but not limited to, verifying the age of the purchaser. (Civ. Code § 1798.99.1(a)(1).)

5) Prohibits a business from selling or sharing the personal information of a consumer if the business has actual knowledge that the consumer is less than 16 years of age unless the consumer, in the case of consumers between 13 and 16 years of age, or the consumer's parent or guardian, in the case of consumers who are less than 13 years of age, has affirmatively authorized such sale or sharing. A business that willfully disregards the consumer's age shall be deemed to have had actual knowledge of the consumer's age. (Civ. Code § 1798.120.)

6) Defines "firearm" as a device designed to be used as a weapon from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion. (Pen. Code § 16520.) It defines "firearm precursor part" to mean a component of a firearm that is necessary to build or assemble a firearm and is either an unfinished receiver or an unfinished handgun frame. (Pen. Code § 16531.)

7) Defines "ammunition" to include any bullet, cartridge, magazine, clip, speed loader, autoloader, ammunition feeding device, or projectile capable of being fired from a firearm with a deadly consequence. (Pen. Code § 16150(b).)

8) Requires firearms dealers to obtain certain identifying information from firearms purchasers and forward that information, via electronic transfer, to the DOJ to perform a background check on the purchaser to determine whether they are prohibited from possessing a firearm. (Pen. Code §§ 28160-28220.)

AB 2571 (Bauer-Kahan)
Page 4 of 16

This bill:

1) Prohibits a firearm industry member from advertising, marketing, or arranging for placement of an advertising or marketing communication concerning any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors.

2) Defines "firearm industry member" to include any of the following:
   a) any person or entity engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products; or
   b) any person or entity formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products that endorses or advertises such products, or advertises, sponsors, or promotes events where they are sold or used.

3) Requires a court when determining whether marketing or advertising of a firearm-related product is attractive to minors to consider the totality of the circumstances, including, but not limited to, whether the marketing or advertising:
   a) uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products;
   b) offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals that promotes a firearm industry member or firearm-related product;
   c) offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors;
   d) is part of a marketing or advertising campaign designed with the intent to appeal to minors;
   e) uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products; or
   f) is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

4) Prohibits a firearm industry member publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

5) Provides that any person in violation is liable for a civil penalty not to exceed $25,000 for each violation, which shall be assessed and recovered in a civil action

AB 2571 (Bauer-Kahan)
Page 5 of 16

> brought in the name of the people of the State of California by the Attorney
> General or by any district attorney, county counsel, or city attorney in any court
> of competent jurisdiction. In assessing the amount of the civil penalty, the court
> shall consider any one or more of the relevant circumstances presented by any of
> the parties to the case, including, but not limited to, the nature and seriousness of
> the misconduct, the number of violations, the persistence of the misconduct, the
> length of time over which the misconduct occurred, the willfulness of the
> defendant's misconduct, and the defendant's assets, liabilities, and net worth.

6) Authorizes a person harmed by a violation to commence a civil action to recover
their actual damages.

7) Authorizes the court to order injunctive relief, including a permanent or
temporary injunction, restraining order, or other order against the person or
persons responsible for the conduct.

8) Entitles a prevailing plaintiff to reasonable attorney's fees and costs, including
expert witness fees and other litigation expenses.

9) Deems each copy or republication of prohibited marketing or advertising a
separate violation.

10) Defines "firearm-related product" as a firearm, ammunition, reloaded
ammunition, a firearm precursor part, a firearm component, or a firearm
accessory that has a specified connection to California.

## **COMMENTS**

1. Children and the epidemic of gun violence in the United States

Gun violence in the United States has surged in recent years. While most shooting
deaths involve handguns, there has been a dramatic rise in the use of assault weapons
in gun massacres with six or more deaths, owing to their ability to inflict greater
damage at a quicker rate.[2] Research shows that laws restricting assault weapons reduce
deaths; estimates find mass-shooting fatalities were 70 percent less likely during the
period when the federal ban was in effect.[3] Another rising scourge is the prevalence of
"ghost guns." In 2020, California accounted for 65 percent of all ghost guns seized by

---

[2] Emily Shapiro, *The type of gun used in most US homicides is not an AR-15* (October 26, 2021) ABC News,
https://abcnews.go.com/US/type-gun-us-homicides-ar-15/story?id=78689504. All internet citations are
current as of March 22, 2022.
[3] Charles DiMaggio, et al., *Changes in US mass shooting deaths associated with the 1994-2004 federal assault
weapons ban: Analysis of open-source data* (January 2019) The Journal of Trauma and Acute Care Surgery,
https://doi.org/10.1097/TA.0000000000002060.

the Bureau of Alcohol, Tobacco, Firearms and Explosives.[4] The weapons have been linked to 24 killings and dozens of other crimes in 2020 in Los Angeles alone. The problem of gun violence in our society is not going away. In 2020, over 45,000 Americans died from gun-related injuries in the United States. This is the most on record by far, a 43 percent increase from a decade prior.

As stated, gun violence has now become a leading cause of death of children in this country. This is a problem that is increasingly involving children from an early age:

> On May 24th an 18-year-old gunman, Salvador Ramos, walked into an elementary school in Uvalde, a town in south-west Texas, and shot dead at least 21 people, including 19 children. Mr Ramos was himself killed, reportedly by police. His motive remains unclear. It is the latest in a spate of mass shootings in America, and the toll is the biggest at a school since a gunman killed 26 people at Sandy Hook Elementary in Newtown, Connecticut, in 2012.

> In the decade since Sandy Hook there have been over 900 shootings on school grounds in America. After more than 60 years in which motor-vehicle crashes were the leading cause of death for young people, since 2017 guns have killed more Americans between the ages of one and 24. In 2020 more than 10,000 young Americans were killed by firearms, up from just under 7,000 two decades earlier. Pupils at almost all schools take part in active-shooter drills, learning to hide beneath their desks. Some drills use pellet guns and fake blood to simulate an attack.[5]

Not only are children increasingly the victims, but also the perpetrators of school shootings:

> In cases where the source of the gun could be determined, more than 85 percent of shooters brought them from their own homes or obtained them from friends or relatives, according to The Post's analysis.

> The ranks of school shooters include a 6-year-old boy, who killed a classmate after saying he didn't like her, and a 15-year-old girl, who did the same to a friend for rejecting her romantic overtures.

---

[4] Justin Ray, *'An instrument of death': The problem of ghost guns in California* (November 15, 2021) Los Angeles Times, https://www.latimes.com/california/newsletter/2021-11-15/ghost-guns-california-essential-california.
[5] *Guns are the things most likely to kill young people in America* (May 25, 2022) The Economist, https://www.economist.com/graphic-detail/2022/05/25/guns-are-the-things-most-likely-to-kill-young-people-in-america.

Seven in 10 of them, however, were under the age of 18, which means that — often because of an adult's negligence — dozens of children had access to deadly weapons.

**The median age of school shooters is 16.[6]**

This is borne out in other studies as well. According to an analysis of FBI data, in 29 of 62 active shooting incidents at educational facilities in the United States between 2000 and 2019, the offender was younger than 18, with an additional 10 shooters between 18 and 21 years old.[7] Another federally-run center database shows "at least 59 percent of the 2,275 school shootings researchers recorded since 1970 were committed by someone under 21 years old. The offender's age is unknown in another 18 percent of incidents."[8]

2.  Targeting children with firearm-related products

This bill is prompted by the incidence of marketing and advertising of firearm-related products to children, arguably seeking to attract future legal gun owners. A report from the Violence Policy Center (VPC) outlines the problem:

> The gun industry has long understood that it faces a slow-motion demographic collapse. With the industry's customer base growing older, household gun ownership in America has steadily declined. As its primary market of white males ages and dies off, the firearms industry has set its sights on America's children. Much like the tobacco industry's search for replacement smokers, the gun industry is seeking replacement shooters to purchase its deadly products. Firearms companies have teamed up with "corporate partners" like the National Rifle Association of America, the gun industry's trade association the National Shooting Sports Foundation (NSSF), and online publications such as Junior Shooters in an industry-wide effort to market firearms to kids. They do this by promoting websites and magazines targeted at children, designing "kid-friendly" guns to appeal to the youth market, and even working to create the equivalent of "'reality' video" games to encourage gun use from an early age.

---

[6] John Woodrow Cox, et al., *More than 311,000 students have experienced gun violence at school since Columbine* (May 27, 2022) Washington Post, https://www.washingtonpost.com/graphics/2018/local/school-shootings-database/.

[7] Mary Katherine Wildeman, *Data show most school shootings carried out by young adults, teens* (May 26, 2022) CT Insider, https://www.ctinsider.com/news/article/Data-show-most-school-shootings-carried-out-by-17199231.php.

[8] *Ibid.*

AB 2571 (Bauer-Kahan)
Page 8 of 16

The industry's focus on recruiting children into the gun culture has been acknowledged since at least the 1990s.[9]

One particularly acute example is a product marketed by WEE1 Tactical:

> A US gun manufacturer has unveiled a semi-automatic rifle for kids modeled on the AR-15, which has been used in a number of deadly mass shootings, sparking condemnation from gun safety groups.
>
> The gun dubbed the JR-15 is being marketed by maker WEE1 Tactical as "the first in a line of shooting platforms that will safely help adults introduce children to the shooting sports."
>
> The company's website says the rifle "also looks, feels, and operates just like Mom and Dad's gun."
>
> The JR-15 is only 31 inches (80 centimeters) long, weighs less than 2.5 pounds (one kilogram) and comes with magazines of five or 10 rounds of 22 caliber bullets. It was released in mid-January with a price tag of $389.
>
> The adult model, the AR-15, is the civilian version of a military-style weapon and has been used in multiple mass killings in the United States, including in schools.[10]

The marketing generally includes more compact models that are lighter to handle or firearms in various colors. A New York Times blog synthesizes the VPC report:

> The gun industry markets a variety of products explicitly to children, a new report shows, from armed stuffed animals to lighter versions of rifles. And some see kids as a vital group of future gun buyers who need to be brought into the fold at a young age.
>
> The report, called "Start Them Young" and issued on Thursday by the Violence Policy Center, lists a variety of firearms meant at least partly for children. It mentions the Crickett rifle, a gun made for children by the company Keystone Sporting Arms. Keystone's website and some of its merchandise bear the image of "Davey Crickett," a gun-wielding cartoon insect. The company sells Davey Crickett hats, dog tags and pins, as well as a Davey Crickett Beanie Baby, listed as "not for children under three years of age."

---

[9] Josh Sugarmann, "*Start Them Young" How the Firearms Industry and Gun Lobby Are Targeting Your Children* (February 2016) VPC, https://www.vpc.org/studies/startthemyoung.pdf.
[10] Agence France Presse, *US Gunmaker Unveils Semi-automatic Rifle Marketed To Kids* (February 18, 2022) Barron's, https://www.barrons.com/articles/top-gun-movie-business-51654023576.

Keystone's website also sells books featuring "Little Jake," a boy who uses his gun to bring down a bear and save an African village from a marauding elephant. The publisher of the books says Little Jake is actually older than he looks: "Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision."

"Start Them Young" also cites the rise of .22-caliber versions of higher-caliber rifles, often produced with lightweight materials. According to an article in the trade magazine Shooting Sports Retailer, "these guns bring the coolness and fun of the tactical rifle to kids and less serious shooters."[11]

According to the author:

In 2021 there were approximately 259 unintentional shootings by children, resulting in 104 deaths and 168 injuries. Weapons used by children have put other children at risk. 91% of the victims in these shootings by children were also under 18, often siblings of the children shooting. In California, gun violence is the third-leading cause of death for children and teens. This epidemic of deadly violence is fueled by an industry that encourages children to hold a gun as soon as they can walk.

Gun manufacturers view children as their next generation of advocates and customers, and target them with slick advertising – even children's books. The advertising for these weapons is shameless. Children in California are not allowed to buy or own a gun, yet they are advertised to across all forms of media with cartoons, video games, and social media.

AB 2571 will prohibit a person or entity from publishing materials that advertise or market firearms or weapons to anyone under the age of 18. This bill would allow the Attorney General, a District or County Attorney, or a County Counsel to bring a civil action against each violation up to $25,000.

Guns are not a toy. Guns are a tool of death. Taking away this tool of violent indoctrination from the gun industry is a vital step forward to protect California's children.

---

[11] Anna North, *Marketing Guns to Children* (February 19, 2022) The New York Times, https://takingnote.blogs.nytimes.com/2016/02/19/marketing-guns-to-children.

AB 2571 (Bauer-Kahan)
Page 10 of 16

3. <u>Prohibiting the marketing or advertising of such products to children</u>

This bill prohibits a firearm industry member from advertising or marketing any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors. Furthermore, the bill places limitations on how these entities can utilize the personal information of minors in this context. If they are publishing material directed to minors in California or have actual knowledge that a minor is using or receiving its material, they are prohibited from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

Violations of these provisions are subject to civil penalties of up to $25,000 for each violation in civil actions brought by the Attorney General or by any district attorney, county counsel, or city attorney. Each copy or republication of prohibited marketing or advertising is deemed a separate violation. Courts are provided specific factors to consider in setting the amount of the penalty including the nature, seriousness, and willfulness of the defendant's misconduct and the defendant's assets, liabilities, and net worth.

An individual harmed by a violation is also authorized to bring suit to recover their actual damages. This would require the individual to establish the causal connection between the violation and their damages.

In addition to the remedies above, the court can order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct. A prevailing plaintiff is entitled to reasonable attorney's fees and costs, including expert witness fees and other litigation expenses.

The bill also provides some direction to courts in determining whether marketing or advertising of a firearm-related product is attractive to minors. They are to consider the totality of the circumstances, including whether the marketing or advertising:

- uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products;
- offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals that promotes a firearm industry member or firearm-related product;
- offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors;
- is part of a marketing or advertising campaign designed with the intent to appeal to minors;

- uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products; or
- is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

### 4. Concerns raised with the bill

Some concerns have been raised about the bill's constitutionality, namely whether it violates the First Amendment. The prohibitions in this bill restrict the commercial speech of the firearm industry members, but the mere fact that it restricts speech does not mean that such a restriction would violate the First Amendment of the United States Constitution or Article I of the California Constitution.

Generally speaking, the First Amendment and Article I of the California Constitution, act to protect the freedom of expression of the citizens of California. Commercial speech, which is done on behalf of a company or individual for purpose of making a profit, is protected under the state and federal guarantees of free speech, but to a lesser degree than noncommercial speech.[12] A blanket prohibition against truthful, nonmisleading speech about a lawful product, which serves an end unrelated to consumer protection, must be reviewed with skepticism. A "state legislature does not have the broad discretion to suppress truthful, nonmisleading information for paternalistic purposes[.]" (*44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 510.) Ultimately, the First Amendment protects commercial speech against "unwarranted" governmental regulation.

In order to be upheld as a valid restriction on commercial speech, the proposed law must meet the following four-part test: (1) the speech must be about a lawful activity and cannot be false or misleading; (2) the government must have a substantial interest; (3) the law must directly advance the governmental interest asserted; and (4) the law must be no more extensive than necessary. (*Central Hudson Gas v. Public Service Commission* (1980) 447 U.S. 559.)

In this case, the proposed restriction is arguably about restricting the marketing of products to children that are not generally legally able to buy them. California law generally prohibits minors from possessing a handgun and most semi-automatic rifles, as well as ammunition. The possibility and even likelihood that marketing or advertising of firearm-related products that makes those products attractive to children who, in most cases, cannot lawfully possess them, greatly strengthens the argument that the bill's restrictions on the marketing and advertising of firearm-related products could withstand constitutional scrutiny. Even if the speech is lawful, the State of California arguably has a strong interest in taking steps to prevent firearms from being

---

[12] *See Gerawan Farming, Inc. v. Lyons* (2004) 33 Cal.4th 1, 22.

AB 2571 (Bauer-Kahan)
Page 12 of 16

sold to minors, and the proposed law advances that interest in a manner that does not cover products or advertisements directed to lawful purchasers. Based on the findings incorporated into the bill that firearms marketing and advertising contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully, the bill is arguably substantially related to the achievement of its objective. Although a determination regarding the First Amendment is ultimately for the courts, arguably the proposed restriction on marketing and advertising could survive such a challenge.

Similar laws already exist that restrict the advertising of other products to children. For instance, coin banks, toys, balloons, magic tricks, miniature bottles or cans, confections, dolls, or other items that appeal to minors or underage drinkers may not be used in connection with the merchandising of beer. (Bus. & Prof. Code § 25600.) Similarly, edible cannabis products cannot be designed to be appealing to children or easily confused with commercially sold candy or foods that do not contain cannabis. (Bus. & Prof. Code § 26130.)

Another particularly relevant example is the Privacy Rights for California Minors in the Digital World, which prohibits an operator of an internet website, online service, online application, or mobile application ("operator") from the following:

- marketing or advertising specified products or services such as firearms, cigarettes, and alcoholic beverages on its internet website, online service, online application, or mobile application that is directed to minors;
- marketing or advertising such products or services to minors who the operator has actual knowledge are using its site, service, or application online and is a minor, if the marketing or advertising is specifically directed to that minor based upon the personal information of the minor; and
- knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of a minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising such products or services to that minor, where the website, service, or application is directed to minors or there is actual knowledge that a minor is using the website, service, or application. (Bus. & Prof. Code § 22580.)

As can be seen, the language of this bill borrows from these existing statutes.

Writing in opposition, the National Rifle Association argues the bill will not withstand constitutional challenge:

> Even if one is to assume that AB 2571 meets the first three criteria of the test set forth in *Central Hudson*, the regulation fails the fourth part of the test. A minor may find a piece of advertising attractive for the same reasons as an adult. Adults and minors often use firearms for the same lawful purposes, prize the same characteristics in firearms, and therefore

would be attracted to the same advertising materials. As AB 2571 would target advertising valued by both minors and adults it would necessarily "impinge on the speaker's ability to propose a commercial transaction and the adult listener's opportunity to obtain information about products."

Moreover, the restriction in AB 2571 fails to appreciate that minors can and do possess and use firearms for a variety of lawful purposes. The state interest asserted in AB 2571 is to combat the "proliferation of firearms to and among minors." The bill also notes, "[t]his state has a compelling interest in ensuring that minors do not possess these dangerous weapons." The asserted interest is not necessarily to discourage illegal use of firearms by minors, but rather all use.

First, as minors are permitted by state law to use firearms for a variety of lawful purposes, it is dubious that the state's asserted interest in AB 2571 of preventing firearm use by minors is "substantial," as required by the second part of the *Central Hudson* test.

Second, if it is the drafters of AB 2571's goal to curb the illegal use of firearms by minors, a less suspect state interest, surely banning all advertising that may be attractive to minors, even that contemplating the use of firearms for lawful purposes, would be overbroad under part four of the *Central Hudson* test.

The legislation's drafters justify their proposed regulation by citing restrictions on "advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors." As noted in the discussion of *Lorillard Tobacco Co. v. Reilly*, such measures must be the narrowest means of achieving an asserted state interest – which was not the case in Lorillard and is not the case with AB 2571.

However, lawmakers should also understand that the restrictions cited as analogous to that in AB 2571 are of a fundamentally different character. Unlike restrictions on advertising for alcohol, cannabis, and tobacco, the underlying products and conduct that AB 2571 seeks to curb the advertisement of are protected under the U.S. Constitution. As such, lawmakers should be prepared for the courts to level more scrutiny upon restrictions on advertisements concerning Second Amendment protected products and conduct than those leveled at products that don't enjoy such protection.

One additional, potential legal barrier to the bill, is the federal Protection of Lawful Commerce in Arms Act (PLCAA). The PLCAA prohibits a qualified civil liability action from being brought in any federal or state court. (15 U.S.C. § 7902.) A "qualified civil

liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. (15 U.S.C. § 7903.) These statutes stand to preempt state laws that impose liability on manufacturers, sellers, and trade associations for the misuse of firearms by third parties.

However, there are exceptions to the PLCAA's preemptive effect. Specifically, the federal law explicitly does not preempt "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." (15 U.S.C. § 7903.) Given that liability attaches in this bill for the direct conduct of firearm industry members themselves, namely their advertising, marketing, or use of minors' personal information, and is not triggered solely by the misconduct of another party, the bill should arguably not be found to be preempted.

5. Stakeholder support

Brady California and the Brady Campaign to Prevent Gun Violence write in support of this measure:

> Current laws restrict the content and placement of advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors. This is done to prevent potentially harmful substances from getting in the hands of young people as well as preventing the glorification around them. While we certainly see the point of restricting ads around the previous products listed, unlike firearms none of these are a leading cause of death for children and teens.

Writing in support, the City of Mountain View argues the bill provides "another tool in the tool belt of municipalities to counter dangerous practices that jeopardize the health and wellness of our communities."

The County of San Diego writes in support of this bill, and gun legislation in general:

> The County of San Diego recognizes action must be taken to prevent unintentional shootings and reduce the risk of homicides and decrease access to guns used in crimes.

> State legislation that addresses gun violence will help hold the gun industry accountable through private lawsuits and by prohibiting the advertisement of certain categories of weapons. The County of San Diego

AB 2571 (Bauer-Kahan)
Page 15 of 16

supports these and other efforts that would allow for new oversight and accountability measures for the gun industry.

## SUPPORT

Governor Gavin Newsom (sponsor)
Brady California
Brady Campaign to Prevent Gun Violence
City of Mountain View
County of San Diego
Everytown for Gun Safety
March for Our Lives
Moms Demand Action for Gun Sense in America
Students Demand Action for Gun Sense in America

## OPPOSITION

National Rifle Association

## RELATED LEGISLATION

Pending Legislation:

SB 1327 (Hertzberg, 2022) establishes privately-enforced civil causes of action against any person who manufactures or causes to be manufactured, distributes, transports, or imports into the state, or causes to be distributed or transported or imported into the state, keeps for sale or offers or exposes for sale, or gives or lends any firearm lacking a required serial number, assault weapon, .50 BMG rifle, or firearm precursor part, as specified. This bill is currently in the Assembly Judiciary Committee.

AB 452 (Friedman, 2022) requires local educational agencies to inform parents, through a notice, of California's child access prevention laws and other firearm laws. This bill is currently in the Senate Appropriations Committee.

AB 1594 (Ting, 2022) establishes a firearm industry standard of conduct, which would require a firearm industry member, as defined, to, among other things, establish, implement, and enforce reasonable controls, as defined, and adhere to specified laws pertaining to unfair methods of competition, unfair or deceptive acts or practices, or false advertising. The bill also prohibits a firearm industry member from manufacturing, marketing, importing, offering for wholesale sale, or offering for retail sale a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California, as specified. This bill is currently in this Committee and will be heard on the same day as this bill.

AB 2571 (Bauer-Kahan)
Page 16 of 16

AB 1621 (Gipson, 2022), among other things, prohibits the sale, transfer, or possession of an unserialized firearm precursor part, except as specified, and explicitly prohibits the possession or transfer of a firearm without a serial number or mark of identification. This bill is currently in the Senate Public Safety Committee.

<u>Prior Legislation</u>: SB 568 (Steinberg, Ch. 336, Stats. 2013) established the Privacy Rights for California Minors in the Digital World.

### **PRIOR VOTES:**

Assembly Floor (Ayes 48, Noes 16)
Assembly Appropriations Committee (Ayes 12, Noes 4)
Assembly Judiciary Committee (Ayes 7, Noes 2)
Assembly Privacy and Consumer Protection Committee (Ayes 7, Noes 1)

**************

0507

# EXHIBIT 7

## SENATE COMMITTEE ON APPROPRIATIONS
### Senator Anthony Portantino, Chair
### 2021 - 2022  Regular  Session

**AB 2571 (Bauer-Kahan) - Firearms:  advertising to minors**

**Version:** June 15, 2022                    **Policy Vote:**
**Urgency:** Yes                                   **Mandate:** No
**Hearing Date:** June 16, 2022          **Consultant:** Matthew Fleming

**Bill Summary:**  AB 2571, an urgency measure, would prohibit firearm industry members from advertising or marketing firearm-related products to minors.

**Fiscal Impact:**

- <u>DOJ</u>:  The Department of Justice DOJ reports costs of $442,000 in Fiscal Year (FY) 2022-23, $776,000 in F 2023-24, $776,000 in FY 2024-25, $596,000 in FY 2025-26, and $388,000 annually thereafter (General Fund).

- <u>Courts</u>:  Unknown, potentially-significant workload cost pressures as the courts are required to adjudicate violations of this bill's provisions (Special Fund - Trial Court Trust Fund, General Fund).  See Staff Comments for additional detail.

**Background:**  In the United States, children are more likely to die from gun violence than in any other high-income country. In 2020, gun violence overtook car accidents to become the number one cause of death for U.S. children and adolescents.  In California, children are generally restricted from purchasing and possessing firearms and ammunition, except under specified circumstances.  Nonetheless, according to an analysis of FBI data, in 29 of 62 active shooting incidents at educational facilities in the United States between 2000 and 2019, the offender was younger than 18, with an additional 10 shooters between 18 and 21 years old.  Another federally-run center database shows at least 59 percent of the 2,275 school shootings researchers recorded since 1970 were committed by someone under 21 years old. The offender's age is unknown in another 18 percent of incidents.

There has been a variety of reporting on the subject of marketing firearms to children. Some examples of this practice include 1) the "Crickett rifle," a gun made for children by the company Keystone Sporting Arms. Keystone's website and some of its merchandise bear the image of "Davey Crickett," a gun-wielding cartoon insect;  2) the "JR-15," a child-size version of the AR-15, that is marketed to "look, feel, and operate just like Mom and Dad's gun;" and 3) a book series featuring "Little Jake," a boy who uses his gun to bring down a bear and save an African village from a marauding elephant. The publisher of the books says Little Jake is actually older than he looks: "Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision."  This bill seeks to prohibit firearm manufacturer and other industry members from targeting minors with advertisements for firearms and related products.

There has been nearly continuous litigation in the federal courts over California's firearms laws. Last year, a federal judge ruled that California's ban on the AR-15 assault rifle was unconstitutional. (*See Miller v. Bonta*, (S.D. Cal., June 4, 2021) 542 F. Supp. 3d 1009.) *Miller* was the third federal district court decision in recent years to find a California firearms regulation unconstitutional under the Second Amendment to the United States Constitution, joining *Rhode v. Becerra* (S.D. Cal., 2020) 445 F. Supp. 3d 902 (ammunition background checks), and *Duncan v. Becerra* (9th Cir. 2020) 970 F.3d 1133 (high-capacity magazines). *Duncan* was subsequently overturned by the Ninth Circuit Court of Appeals sitting *en banc*. (*Duncan v. Bonta* (9th Cir. 2021) 19 F.4th 1087). Because this firearms bill may be interpreted as a restriction on commercial speech, it is almost certain to face a constitutional challenge. (*See Nordyke v. Santa Clara County* (9th Cir. 2009) 110 F.3d 707, 710 (holding that "an offer to sell firearms or ammunition" is constitutionally protected commercial speech under the First Amendment to the United States Constitution.)

**Proposed Law:**

- Prohibits a firearm industry member from advertising, marketing, or arranging for placement of an advertising or marketing communication concerning any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors.

- Requires a court when determining whether marketing or advertising of a firearm-related product is attractive to minors to consider the totality of the circumstances, including criteria specified in the bill.

- Prohibits a firearm industry member publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

- Provides that any person in violation is liable for a civil penalty not to exceed $25,000 for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction. Specifies criteria the court must consider in setting the amount of the monetary penalty.

- Authorizes a person harmed by a violation to commence a civil action to recover their actual damages.

- Authorizes the court to order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct.

- Entitles a prevailing plaintiff to reasonable attorney's fees and costs, including expert witness fees and other litigation expenses.

- Deems each copy or republication of prohibited marketing or advertising a separate violation.

- Contains an urgency clause.

- Defines terms for purposes of the bill.

**Related Legislation:**

- SB 1327 (Hertzberg, 2022) establishes privately-enforced civil causes of action against any person who manufactures or causes to be manufactured, distributes, transports, or imports into the state, or causes to be distributed or transported or imported into the state, keeps for sale or offers or exposes for sale, or gives or lends any firearm lacking a required serial number, assault weapon, .50 BMG rifle, or firearm precursor part, as specified. SB 1327 is pending in the Assembly Judiciary Committee.

- AB 452 (Friedman, 2022) requires local educational agencies to inform parents, through a notice, of California's child access prevention laws and other firearm laws. AB 452 is pending in this committee.

- AB 1594 (Ting, 2022) establishes a firearm industry standard of conduct, which would require a firearm industry member, as defined, to, among other things, establish, implement, and enforce reasonable controls, as defined, and adhere to specified laws pertaining to unfair methods of competition, unfair or deceptive acts or practices, or false advertising. The bill also prohibits a firearm industry member from manufacturing, marketing, importing, offering for wholesale sale, or offering for retail sale a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California, as specified. AB 1594 is pending in this committee.

- AB 1621 (Gipson, 2022), among other things, prohibits the sale, transfer, or possession of an unserialized firearm precursor part, except as specified, and explicitly prohibits the possession or transfer of a firearm without a serial number or mark of identification. AB 1621 is pending in this committee.

**Staff Comments**:  Due to the likelihood that this bill could generate a constitutional challenge, the DOJ reported that its Governmental Law Section (GLS) require additional resources beginning in FY 2022-23 and concluding in FY 2025-26.  Specifically, GLS woul require 1.0 Deputy Attorney General and the legal complement of 1.0 Legal Secretary.  In addition, the Consumer Protection Section (CPS), within the Public Rights Division anticipates an increase in workload investigating potential violations of the law as well as increased litigation of civil enforcement actions in state or federal court upon the enactment of AB 2571. To address the additional workload, CPS will require additional resources consisting of 1.0 Deputy Attorney General and the legal complement of 1.0 Legal Secretary, beginning in FY 2022-23 and ongoing.

While the superior courts are not funded on a workload basis, an increase in workload could result in delayed court services and would put pressure on the General Fund to increase the amount appropriated to backfill for trial court operations.  The proposed

2022-2023 budget would appropriate $138.5 million from the General Fund to backfill continued reduction in fine and fee revenue for trial court operations.  Increased court workload results in additional pressure to increase the backfill amount appropriated from the General Fund for trial court operations.

**-- END --**

# EXHIBIT 8

SENATE RULES COMMITTEE                                    AB 2571
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

THIRD READING

---

Bill No:    AB 2571
Author:     Bauer-Kahan (D) and Gipson (D), et al.
Amended:    6/15/22 in Senate
Vote:       27 - Urgency

---

SENATE JUDICIARY COMMITTEE:  9-1, 6/14/22
AYES:  Umberg, Caballero, Durazo, Gonzalez, Hertzberg, Laird, Stern,
  Wieckowski, Wiener
NOES:  Jones
NO VOTE RECORDED:  Borgeas

SENATE APPROPRIATIONS COMMITTEE:  5-0, 6/16/22
AYES:  Portantino, Bradford, Kamlager, Laird, Wieckowski
NO VOTE RECORDED:  Bates, Jones

ASSEMBLY FLOOR:  48-16, 5/23/22 - See last page for vote

---

**SUBJECT:**  Firearms:  advertising to minors

**SOURCE:**   Governor Gavin Newsom

---

**DIGEST:**  This bill prohibits firearm industry members from advertising or
marketing, as defined, firearm-related products to minors. This bill restricts the use
of minors' personal information in connection with marketing or advertising
firearm-related products to those minors.

**ANALYSIS:**

Existing federal law:

1) Provides, pursuant to the Second Amendment to the United States Constitution,
   that a well regulated militia, being necessary to the security of a free state, the
   right of the people to keep and bear arms, shall not be infringed. (U.S. Const.
   Amend. 2.)

2) Prohibits a qualified civil liability action from being brought in any federal or state court. (15 U.S.C. § 7902.)

3) Establishes the federal Children's Online Privacy Protection Act (COPPA) to provide protections and regulations regarding the collection of personal information from children under the age of 13. (15 U.S.C. § 6501 et seq.)

Existing state law:

1) Requires a person be at least 18 years of age to be sold most firearms and at least 21 years of age to be sold a handgun, except as specified. (Pen. Code §§ 27505, 27510.)

2) Establishes the Privacy Rights for California Minors in the Digital World (PRCMDW), which prohibits an operator of an internet website, online service, online application, or mobile application ("operator") from specified acts. (Bus. & Prof. Code § 22580.)

3) Requires, pursuant to PRCMDW, certain operators to permit a minor user to remove the minor's content or information and to further inform the minor of this right and the process for exercising it. (Bus. & Prof. Code § 22581.)

4) Requires, pursuant to the Parent's Accountability and Child Protection Act, a person or business that conducts business in California, and that seeks to sell any product or service in or into California that is illegal under state law to sell to a minor to, notwithstanding any general term or condition, take reasonable steps, as specified, to ensure that the purchaser is of legal age at the time of purchase or delivery, including, but not limited to, verifying the age of the purchaser. (Civ. Code § 1798.99.1(a)(1).)

5) Prohibits a business from selling or sharing the personal information of a consumer if it has actual knowledge the consumer is less than 16 years of age unless the consumer has affirmatively authorized such sale or sharing. A business that willfully disregards the consumer's age shall be deemed to have had actual knowledge of the consumer's age. (Civ. Code § 1798.120.)

6) Defines "firearm" as a device designed to be used as a weapon from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion. It defines "firearm precursor part" to mean a component of a firearm that is necessary to build or assemble a firearm and is either an unfinished receiver or handgun frame. Defines "ammunition" to include any bullet, cartridge, magazine, clip, speed loader, autoloader, ammunition feeding

0515

device, or projectile capable of being fired from a firearm with a deadly consequence. (Pen. Code §§ 16150(b), 16520, 16531.)

7) Requires firearms dealers to obtain certain identifying information from purchasers and forward that information to the Department of Justice (DOJ) to perform a background check on the purchaser to determine whether they are prohibited from possessing a firearm. (Pen. Code §§ 28160-28220.)

This bill:

1) Prohibits a firearm industry member from advertising, marketing, or arranging for placement of advertising or marketing communications concerning any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors.

2) Defines "firearm industry member" to include any of the following:

   a) Any person or entity engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products; or

   b) Any person or entity formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products that endorses or advertises such products, or advertises, sponsors, or promotes events where they are sold or used.

3) Requires a court when determining whether marketing or advertising of a firearm-related product is attractive to minors to consider the totality of the circumstances, including whether the marketing or advertising:

   a) Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products;

   b) Offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals that promotes a firearm industry member or firearm-related product;

   c) Offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors;

   d) Is part of a marketing or advertising campaign designed with the intent to appeal to minors;

   e) Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products; or

f) Is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

4) Prohibits a member publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

5) Provides that any person in violation is liable for a civil penalty not to exceed $25,000 per violation in an action brought by the Attorney General or by any district attorney, county counsel, or city attorney. In assessing the amount of the civil penalty, the court shall consider relevant circumstances, including the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the misconduct, and the defendant's assets, liabilities, and net worth. Deems each copy or republication of prohibited marketing or advertising a separate violation.

6) Authorizes a person harmed to seek actual damages in a civil action.

7) Authorizes the court to order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct. Entitles a prevailing plaintiff to reasonable attorney's fees and costs, including expert witness fees and other litigation expenses.

8) Defines "firearm-related product" as a firearm, ammunition, reloaded ammunition, a firearm precursor part, a firearm component, or a firearm accessory that has a specified connection to California.

**Comments**

According to the author:

> In 2021 there were approximately 259 unintentional shootings by children, resulting in 104 deaths and 168 injuries. Weapons used by children have put other children at risk. 91% of the victims in these shootings by children were also under 18, often siblings of the children shooting. In California, gun violence is the third-leading cause of death for children and teens. This

epidemic of deadly violence is fueled by an industry that encourages children to hold a gun as soon as they can walk.

Gun manufacturers view children as their next generation of advocates and customers, and target them with slick advertising – even children's books. The advertising for these weapons is shameless. Children in California are not allowed to buy or own a gun, yet they are advertised to across all forms of media with cartoons, video games, and social media.

AB 2571 will prohibit a person or entity from publishing materials that advertise or market firearms or weapons to anyone under the age of 18. This bill would allow the Attorney General, a District or County Attorney, or a County Counsel to bring a civil action against each violation up to $25,000.

Guns are not a toy. Guns are a tool of death. Taking away this tool of violent indoctrination from the gun industry is a vital step forward to protect California's children.

*rohibiting the marketing or advertising of such products to children*

This bill prohibits a firearm industry member from advertising or marketing any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors. Furthermore, this bill places limitations on how these entities can utilize the personal information of minors in this context. If they are publishing material directed to minors in California or have actual knowledge that a minor is using or receiving its material, they are prohibited from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product. This bill also provides some direction to courts in determining whether marketing or advertising of a firearm-related product is attractive to minors. They are to consider the totality of the circumstances, including whether the marketing or advertising does certain specified things.

Violations of these provisions are subject to civil penalties in actions brought by public prosecutors, or actual damages in actions brought by injured persons.

*Legal obstacles*

The prohibitions in this bill restrict the commercial speech of the firearm industry members, but the mere fact that it restricts speech does not mean that such a restriction would violate the First Amendment of the United States Constitution or Article I of the California Constitution.

Generally speaking, the First Amendment and Article I, act to protect the freedom of expression of the citizens of California. Commercial speech, which is done on behalf of a company or individual for purpose of making a profit, is protected under the state and federal guarantees of free speech, but to a lesser degree than noncommercial speech.[1] Ultimately, the First Amendment protects commercial speech against "unwarranted" governmental regulation.

In order to be upheld as a valid restriction on commercial speech, the proposed law must meet the following four-part test: (1) the speech must be about a lawful activity and cannot be false or misleading; (2) the government must have a substantial interest; (3) the law must directly advance the governmental interest asserted; and (4) the law must be no more extensive than necessary. (*Central udson as v. ublic Service Commission* (1980) 447 U.S. 559.) Although a determination is ultimately for the courts, arguably the proposed restriction on marketing and advertising could survive such a First Amendment challenge.

Similar laws already exist that restrict the advertising of other products to children. For instance, coin banks, toys, balloons, magic tricks, miniature bottles or cans, confections, dolls, or other items that appeal to minors or underage drinkers may not be used in connection with the merchandising of beer. (Bus. & Prof. Code § 25600.) Similarly, edible cannabis products cannot be designed to be appealing to children or easily confused with commercially sold candy or foods that do not contain cannabis. (Bus. & Prof. Code § 26130.) Another particularly relevant example is PRCMDW, which prohibits an operator from specified conduct, such as marketing or advertising specified products or services such as firearms and alcoholic beverages on its website, online service or application that is directed to minors. It also prohibits operators from knowingly using the personal information of a minor with actual knowledge that the use is for the purpose of marketing or advertising such products or services to that minor, where the website, service, or application is directed to minors or there is actual knowledge that a minor is using the website, service, or application. (Bus. & Prof. Code § 22580.) As can be seen, the language of this bill borrows from these existing statutes.

One additional, potential legal barrier to the bill is the the federal Protection of Lawful Commerce in Arms Act (PLCAA), which prohibits a qualified civil liability action from being brought in any federal or state court. (15 U.S.C. § 7902.) A "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other

---

[1] *See era an Farming, Inc. v. Lyons* (2004) 33 Cal.4th 1, 22.

relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. (15 U.S.C. § 7903.) These statutes stand to preempt state laws that impose liability on manufacturers, sellers, and trade associations for the misuse of firearms by third parties.

However, there are exceptions to the PLCAA's preemptive effect. Specifically, the federal law explicitly does not preempt "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." (15 U.S.C. § 7903.)

(NOTE: For a more thorough discussion, see the Senate Judiciary Committee analysis.)

**FISCAL EFFECT:**   Appropriation:   No    Fiscal Com.:   Yes    Local:   No

According to the Senate Appropriations Committee:

- DOJ:  The DOJ reports costs of $442,000 in Fiscal Year (FY) 2022-23, $776,000 in F 2023-24, $776,000 in FY 2024-25, $596,000 in FY 2025-26, and $388,000 annually thereafter (General Fund).

- Courts:  Unknown, potentially-significant workload cost pressures as the courts are required to adjudicate violations of this bill's provisions (Special Fund - Trial Court Trust Fund, General Fund).

**SUPPORT:**  (Verified  6/20/22)

Governor Gavin Newsom (source)
Brady California
Brady Campaign to Prevent Gun Violence
California School Employees Association
City of Mountain View
County of San Diego
Everytown for Gun Safety
Friends Committee on Legislation of California
Giffords
March for Our Lives
Moms Demand Action for Gun Sense in America
National Association of Social Workers, California Chapter
Students Demand Action for Gun Sense in America

**OPPOSITION:** (Verified 6/20/22)

National Rifle Association

**ARGUMENTS IN SUPPORT:** The Brady Campaign to Prevent Gun Violence writes, "Current laws restrict the content and placement of advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors. This is done to prevent potentially harmful substances from getting in the hands of young people as well as preventing the glorification around them. While we certainly see the point of restricting ads around the previous products listed, unlike firearms none of these are a leading cause of death for children and teens."

**ARGUMENTS IN OPPOSITION:** The National Rifle Association argues, "Even if one is to assume that AB 2571 meets the first three criteria of the test set forth in *Central udson*, the regulation fails the fourth part of the test. A minor may find a piece of advertising attractive for the same reasons as an adult. Adults and minors often use firearms for the same lawful purposes, prize the same characteristics in firearms, and therefore would be attracted to the same advertising materials. As AB 2571 would target advertising valued by both minors and adults it would necessarily 'impinge on the speaker's ability to propose a commercial transaction and the adult listener's opportunity to obtain information about products.'"

ASSEMBLY FLOOR: 48-16, 5/23/22
AYES: Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bloom, Boerner
   Horvath, Bryan, Calderon, Carrillo, Cervantes, Daly, Mike Fong, Friedman,
   Gabriel, Cristina Garcia, Eduardo Garcia, Gipson, Haney, Holden, Irwin, Jones-
   Sawyer, Kalra, Lee, Levine, Low, Maienschein, McCarty, Medina, Mullin,
   Muratsuchi, Nazarian, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz
   Rivas, Robert Rivas, Rodriguez, Santiago, Stone, Ting, Villapudua, Ward,
   Akilah Weber, Wicks, Wood, Rendon
NOES: Bigelow, Cooley, Cunningham, Megan Dahle, Davies, Flora, Fong,
   Gallagher, Kiley, Lackey, Mathis, Patterson, Seyarto, Smith, Voepel, Waldron
NO VOTE RECORDED: Berman, Mia Bonta, Chen, Choi, Cooper, Gray,
   Grayson, Mayes, Nguyen, O'Donnell, Blanca Rubio, Salas, Valladares, Wilson

Prepared by:  Christian Kurpiewski / JUD. / (916) 651-4113
6/22/22 14:49:34

**\*\*\*\* END \*\*\*\***

# EXHIBIT 9

CONCURRENCE IN SENATE AMENDMENTS
AB 2571 (Bauer-Kahan and Gipson)
As Amended June 15, 2022
2/3 vote. Urgency

## SUMMARY

Prohibits firearm industry members from marketing or advertising firearm-related products to minors and authorizes public attorneys and injured plaintiffs to bring a civil action to enforce the prohibition, obtain injunctive relief, and seek either civil penalties, or, in some cases, damages for harms caused by a violation.

**Senate Amendments**
Declare that the act is an urgency statute necessary in order to protect public safety by prohibiting firearm advertising to minors as soon as possible, and shall go into immediate effect.

## COMMENTS

This bill prohibits a firearm industry member from advertising, marketing, or arranging for placement any advertising or marketing communication concerning a firearm-related product when the communication is designed, intended, or reasonably appears to make the firearm-related product attractive to minors. The bill then requires a court, in determining whether the marketing or advertising communication makes the firearm-related product attractive to minors, to consider "the totality of the circumstances," including but not limited to whether the marketing or advertising does any of the following:

1) Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.

2) Offers brand name merchandise for minors, including but not limited to, hats, t-shirts or other clothing, toys, games, stuffed animals, that promotes a firearm industry member or firearm-related product.

3) Offers firearm-related products in sizes, colors or designs that are specifically designed to be used by, or appeal to, minors.

4) Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

5) Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

6) Is placed in a publication created for the purpose of reaching an audience that is predominately comprised of minors and not intended for a more general audience comprised of adults.

*Remedies for violations.* The bill authorizes two types of civil actions to enforce compliance with its provisions. First, the Attorney General or any district attorney, county counsel, or city attorney would be authorized to bring a civil action in any court of competent jurisdiction in the name of the people of the State, county, or city, as appropriate, to seek a civil penalty. Any person found in such an action to have violated any provision of the bill would be liable for a

civil penalty not to exceed $25,000 for each violation. The bill specifies a number of factors that courts should rely upon in evaluating whether or not to impose the maximum $25,000 civil penalty: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth. Second, the bill authorizes a person harmed by a violation of any provision of the bill to commence a civil action to recover actual damages. In either case, the court would be required to order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the court deems necessary to prevent the harm, and to award reasonable attorney's fees and costs to a prevailing plaintiff.

*The bill restricts some marketing and advertising of firearms, raising potential First Amendment concerns.* This bill focuses on advertising and marketing materials that are promulgated by a narrowly defined group of commercial speakers – the firearm industry – rather than on publishers, or even advertisers, in general. Given that these are the only groups that generally engage in this type of commercial speech, the means used by the bill seem narrowly tailored to address the source of the harmful marketing and advertising content, rather than focused on its dissemination. Furthermore, the type of advertising and marketing at issue in this bill is not generally directed towards lawful purchasers of firearms (i.e. adults); rather, they are specifically designed to appeal to, and be directed at, children. Therefore, denying this form of advertising and marketing does not significantly impact a protected interest that firearm industry members have to furnish truthful information to would-be lawful purchasers who have a corresponding interest in receiving such information. (See *Discount Tobacco City & Lottery, Inc. v. United States* (6th Cir. 2012) 674 F.3d 509, 520.) With the findings incorporated into the bill – that firearms marketing and advertising contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully – the bill seems substantially related to the achievement of its objective.

**According to the Author**

Some firearms manufacturers irresponsibly market weapons to children. For example, Wee 1 Tactical has begun marketing an AR-15 made specifically for children. They currently market the weapon, called a JR-15, with a cartoon skull-and-crossbones with a pacifier. . . . Under current law, the company would be able to market this weapon in California, as long as it does so off-line, e.g., in a magazine advertisement.

This legislation would restrict the marketing and advertising of firearms to minors in all media. Specifically, this bill would prohibit [a firearm industry member] . . . from marketing or advertising firearms, ammunition, or reloaded ammunition to minors.

**Arguments in Support**

According to the Brady United Against Gun Violence:

Current laws restrict the content and placement of advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors. This is done to prevent potentially harmful substances from getting in the hands of young people as well as preventing the glorification around them. While we certainly see the point of restricting ads around the previous products listed, unlike firearms none of these are a leading cause of death for children and teens.

**Arguments in Opposition**
The National Rifle Association, Institute for Legislative Action:

> [The] restriction in AB 2571 fails to appreciate that minors can and do possess and use firearms for a variety of lawful purposes. The state interest asserted in AB 2571 is to combat the "proliferation of firearms to and among minors." The bill also notes, "[t]his state has a compelling interest in ensuring that minors do not possess these dangerous weapons." The asserted interest is not necessarily to discourage illegal use of firearms by minors, but rather all use.

## FISCAL COMMENTS

According to the Senate Appropriations Committee:

1) *Department of Justice (DOJ)*: The DOJ reports costs of $442,000 in Fiscal Year (FY) 2022-23, $775,000 in FY 2023-24, $776,000 in FY 2024-25, $596,000 in FY 2025-26, and $388,000 annually thereafter (General Fund).

2) *Courts*: Unknown, potentially-significant workload cost pressures as the courts are required to adjudicate violations of this bill's provisions (Special Fund – Trial Court Trust Fund, General Fund).

## VOTES:

**ASM PRIVACY AND CONSUMER PROTECTION:  7-1-3**
**YES:**  Gabriel, Bauer-Kahan, Bennett, Berman, Mike Fong, Irwin, Wilson
**NO:**  Kiley
**ABS, ABST OR NV:**  Cunningham, Valladares, Wicks

**ASM JUDICIARY:  7-2-1**
**YES:**  Stone, Kalra, Maienschein, Reyes, Robert Rivas, Friedman, Bloom
**NO:**  Davies, Kiley
**ABS, ABST OR NV:**  Cunningham

**ASM APPROPRIATIONS:  12-4-0**
**YES:**  Holden, Bryan, Calderon, Carrillo, Mike Fong, Gabriel, Eduardo Garcia, Levine, Quirk, Robert Rivas, Akilah Weber, Wilson
**NO:**  Bigelow, Megan Dahle, Davies, Fong

**ASSEMBLY FLOOR:  48-16-14**
**YES:**  Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bloom, Boerner Horvath, Bryan, Calderon, Carrillo, Cervantes, Daly, Mike Fong, Friedman, Gabriel, Cristina Garcia, Eduardo Garcia, Gipson, Haney, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Levine, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Nazarian, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Santiago, Stone, Ting, Villapudua, Ward, Akilah Weber, Wicks, Wood, Rendon
**NO:**  Bigelow, Cooley, Cunningham, Megan Dahle, Davies, Flora, Fong, Gallagher, Kiley, Lackey, Mathis, Patterson, Seyarto, Smith, Voepel, Waldron
**ABS, ABST OR NV:**  Berman, Mia Bonta, Chen, Choi, Cooper, Gray, Grayson, Mayes, Nguyen, O'Donnell, Blanca Rubio, Salas, Valladares, Wilson

**SENATE FLOOR: 27-7-6**
**YES:** Allen, Archuleta, Atkins, Becker, Bradford, Caballero, Cortese, Dodd, Durazo, Eggman, Hertzberg, Hueso, Kamlager, Leyva, Limón, McGuire, Min, Newman, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:** Dahle, Grove, Jones, Melendez, Nielsen, Ochoa Bogh, Wilk
**ABS, ABST OR NV:** Bates, Borgeas, Glazer, Gonzalez, Hurtado, Laird

## UPDATED

VERSION: June 15, 2022

CONSULTANT: Landon Klein / P. & C.P. / (916) 319-2200                    FN: 0003147

**CERTIFICATE OF SER  ICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Junior Sports Magazines, Inc., et al. v. Bonta*
Case No.:    2:22-cv-04663-CAS (JCx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**RE  UEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Kevin J. Kelly, Deputy Attorney General
kevin.kelly  doj.ca.gov
300 South Spring Street, Suite 9012
Los Angeles, CA 90013
    *Attorney for Defendant*

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 20, 2022.

_____
Laura Palmerin

CERTIFICATE OF SERVICE

0527

1   C.D. Michel-SBN 144258
    Anna M. Barvir-SBN 268728
2   Tiffany D. Cheuvront-SBN 317144
    MICHEL & ASSOCIATES, P.C.
3   180 East Ocean Blvd., Suite 200
    Long Beach, CA 90802
4   Telephone: (562) 216-4444
    Fax: (562) 216-4445
5   Email: cmichel@michellawyers.com

6   Attorneys for Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California
    Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting
7   Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA
    Foundation, and Gun Owners of California, Inc.
8
    Donald Kilmer-SBN 179986
9   Law Offices of Donald Kilmer, APC
    14085 Silver Ridge Road
10  Caldwell, Idaho 83607
    Telephone: (408) 264-8489
11  Email: Don@DKLawOffice.com

12  Attorney for Plaintiff Second Amendment Foundation

13              IN THE UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15  JUNIOR SPORTS MAGAZINES          CASE NO: 2:22-cv-04663-CAS (JCx)
    INC., RAYMOND BROWN,
16  CALIFORNIA YOUTH SHOOTING        **DECLARATION OF ANNA M. BARVIR**
    SPORTS ASSOCIATION, INC.,        **IN SUPPORT OF PLAINTIFFS'**
17  REDLANDS CALIFORNIA              **MOTION FOR PRELIMINARY**
    YOUTH CLAY SHOOTING              **INJUNCTION**
18  SPORTS, INC., CALIFORNIA
    RIFLE & PISTOL ASSOCIATION,      Hearing Date:    August 22, 2022
19  INCORPORATED, THE CRPA           Hearing Time:    10:00 a.m.
    FOUNDATION, AND GUN              Courtroom:       8D
20  OWNERS OF CALIFORNIA, INC.;      Judge:           Christina A. Snyder
    and SECOND AMENDMENT
21  FOUNDATION,

22              Plaintiffs,

23      v.

24  ROB BONTA, in his official capacity
    as Attorney General of the State of
25  California; and DOES 1-10,

26              Defendant.

27

28

## DECLARATION OF ANNA M. BARVIR

1.      I, Anna M. Barvir, am an attorney at the law firm Michel & Associates, P.C., attorneys of record for Plaintiffs in this action. I am licensed to practice law before the United States District Court for the Central District of California. I am also admitted to practice before the Eastern, Northern, and Southern Districts of California, as well as the courts of the state of California, the Supreme Court of the United States, and the D.C., Fourth, Ninth, and Tenth Circuit Courts of Appeals. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

2.      On July 18, 2022, I e-mailed Deputy Attorney General Kevin J. Kelly via email to inform him of Plaintiffs' intention to file a motion for preliminary injunction, as well as an ex parte application for an order shortening time to hear Plaintiffs' anticipated preliminary injunction motion. The Court has not yet ruled on Plaintiffs' ex parte application, and Mr. Kelly stated that his client would oppose Plaintiffs' it.

3.      On or about July 19, 2022, I visited the New York Times website and viewed and saved a copy of Anna North, *Marketing Guns to Children*, N.Y. Times (Feb. 19, 2016), *available at* https://archive.nytimes.com/takingnote.blogs.nytimes.com/2016/02/19/marketing-guns-to-children/. A true and correct copy is attached hereto as **Exhibit 28**.

4.      On or about July 19, 2022, I visited and viewed the official Twitter feed of Assemblymember Rebecca Bauer-Kahan, the author of Assembly Bill 2571. From there, I viewed and saved a copy of Press Release, *Assemblymember Bauer-Kahan's Legislation to Regulate Gun Advertisements Targeting Children Heads to the Governor* (June 30, 2022), *available at* https://twitter.com/BauerKahan/status/1542571180883730433. A true and correct copy is attached hereto as **Exhibit 29.**

5.      On or about July 19, 2022, I visited the official website of Assemblymember Rebecca Bauer-Kahan, the author of Assembly Bill 2571. From

there, I viewed and saved a copy of Press Release, *Assemblymember Bauer-Kahan Introduces Legislation to Regulate Manipulative Gun Advertisements Targeting Children* (Feb. 18, 2022), *available at* https://a16.asmdc.org/press-releases/20220218-assemblymember-bauer-kahan-introduces-legislation-regulate-manipulative-gun. A true and correct copy is attached hereto as **Exhibit 30.**

6.     On or about July 13, 2022, I visited and viewed the official Twitter feeds of Governor Gavin Newsom and Assemblymember Rebecca Bauer-Kahan. From there, I searched for "tweets" wherein they referenced Assembly Bill 2571 or AB 2571. I then saved a copy of each "tweet" search result. A true and correct copy of a collection relevant "tweets" from Governor Gavin Newsom and Assemblymember Rebecca Bauer-Kahan is attached hereto as **Exhibit 31.**

7.     On or about July 19, 2022, I visited https://wildlife.ca.gov/, the official website for the State of California, Department of Fish & Wildlife. From there, I navigated to the page for "California Hunter Education" and viewed and saved a copy of  State of California – Department of Fish & Wildlife DFW Form 1043: Student Consent. A true and correct copy is attached hereto as **Exhibit 32.**


I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on July 19, 2022

                                    *s/ Anna M. Barvir*
                                    Anna M. Barvir
                                    Declarant

DECLARATION OF ANNA M. BARVIR

0530

# EXHIBIT 28

**The New York Times**

The Opinion Pages

Taking Note
The Editorial Page Editor's Blog
# Marketing Guns to Children

**By Anna North**    February 19, 2016 10:05 am

The gun industry markets a variety of products explicitly to children, a new report shows, from armed stuffed animals to lighter versions of rifles. And some see kids as a vital group of future gun buyers who need to be brought into the fold at a young age.

The report, called "Start Them Young" and issued on Thursday by the Violence Policy Center, lists a variety of firearms meant at least partly for children. It mentions the Crickett rifle, a gun made for children by the company Keystone Sporting Arms. Keystone's website and some of its merchandise bear the image of "Davey Crickett," a gun-wielding cartoon insect. The company sells Davey Crickett hats, dog tags and pins, as well as a Davey Crickett Beanie Baby, listed as "not for children under three years of age."

Keystone's website also sells books featuring "Little Jake," a boy who uses his gun to bring down a bear and save an African village from a marauding elephant. The publisher of the books says Little Jake is actually older than he looks: "Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision."

"Start Them Young" also cites the rise of .22-caliber versions of higher-caliber rifles, often produced with lightweight materials. According to an article in the trade magazine Shooting Sports Retailer, "these guns bring the coolness and fun of the tactical rifle to kids and less serious shooters." The website of the retailer Gander Mountain describes one such weapon thus: "Designed for the indoor range and the youth shooter, this Carbon15 .22 LR Rimfire lightweight is sure to add new dimensions to your Bushmaster shooting pleasure. Operational controls are functionally and ergonomically identical to AR-15 type rifles."

The report makes the case that the gun industry and some gun-rights advocates see putting guns in the hands of children as a crucial recruitment move. In a 2012 report, the National Shooting Sports Foundation, the gun industry's trade association, explicitly recommended that gun manufacturers market to children: "To help hunting and target shooting get a head start over other activities, stakeholders such as managers and manufacturers should target programs toward youth 12 years old and younger. This is the time that youth are being targeted with competing activities." An online ad for a Marlin XT rifle features a father and son and boasts, "FOR THE FUTURE OF OUR SPORT, IT'S THE MOST POWERFUL FIREARM ON EARTH." And the editor-in-chief of the magazine Junior Shooters wrote in 2012:

Each person who is introduced to the shooting sports and has a positive experience is another vote in favor of keeping our American heritage and freedom alive. They may not be old enough to vote now, but they will be in the future. And think about how many lives they will come in contact with that they can impact!

In 2015, at least 282 people were accidentally shot by a child under 18, according to the group **Everytown for Gun Safety**. This year, the count is already up to 33.

And while weapons designed for children may be lighter, they are still deadly — "Start Them Young" notes that a five-year-old Kentucky boy accidentally killed his two-year-old sister with a Crickett rifle in April 2013. He had gotten the gun as a birthday present.

---

© 2017 The New York Times Company

California Notices

California Notices

# EXHIBIT 29



# Assemblymember Bauer-Kahan's Legislation to Regulate Gun Advertisements Targeting Children Heads to the Governor

*AB 2571 would prohibit the dangerous advertising of firearms to children and youth.*

For Immediate Release
June 30, 2022
Contact: Shawn Kumagai – Shawn.Kumagai@asm.ca.gov
925-244-1600 office

**Sacramento, CA** – Today, AB 2571 by Assemblymember Rebecca Bauer-Kahan (D-Orinda), which prohibits marketing firearms to children, passed the Assembly Floor on concurrence with a vote of 56 -14 This bill is part of Governor Newsom's priority package of gun control measures, which will go into effect immediately upon his signature.

"Guns are not toys-- they are deadly weapons," said Assemblymember Bauer-Kahan. "California has some of the strongest gun laws in the country and it is unconscionable that we still allow advertising weapons of war to our children. Our kids have a right to live long, happy lives, free of gun violence."

Gun manufacturers view children as their next generation of advocates, targeting them with everything from children's books about guns to special smaller weapons designed to make it easier for children to hold and shoot. The advertising for these weapons is completely shameless. Children in California are not allowed to buy or own a gun, yet guns are advertised specifically to children across all forms of media including cartoons, video games, and social media. Gun manufacturers use children's books, mascots, apparel, guns adorned in cartoons, and brightly colored logos to appeal specifically to children and youth.[1] Firearm companies have expanded to advertising on social media platforms in order to connect youth to their gun-selling websites. These platforms include YouTube, Twitter, social media influencers, and streaming services that children and youth disproportionately frequent.

AB 2571 would prohibit firearm manufacturers from continuing their malicious and manipulative marketing programs targeting children and youth. It would allow the California Attorney General or a district attorney, city attorney, or a county counsel in California to bring a civil action for a violation. Additionally, it would prohibit a firearm industry member from using, disclosing, or compiling a minor's personal information if that information is intended to be used for advertising or marketing to that minor.

Gun violence has been cited as the third leading cause of death for Californian children and youth between ages 1-17. In 2021 nationwide, there were approximately 259 unintentional shootings by children, resulting in 104 deaths and 168 injuries.[2] 91% of the victims in these shootings by children were also under 18, often siblings of the children who did the shooting. This violence is pervasive and the trend is rising. Action to keep weapons out of the hands of children is long overdue.

AB 2571 is joint authored by Asm. Mike Gipson (D-Los Angeles), and coauthored by Asm. Jesse Gabriel (D-Woodland Hills), Asm. Christina Garcia (D - Downey), Asm. Miguel Santiago (D-Los Angeles), and Asm. Phil Ting (D – San Francisco).

### 

[1] startthemyoung.pdf (vpc.org)
[2] https://www.npr.org/2021/08/31/1032725392/guns-death-children

# EXHIBIT 30

7/4/22, 6:38 PM    Assemblymember Bauer-Kahan Introduces Legislation to Regulate Manipulative Gun Advertisements Targeting Children | Assemblymember Rebecca Bauer-Kahan Representing …

Case 2:22-cv-04663-JLS-JDE Document 1-28 Filed 07/08/22 Page 1 of 3 Page ID #:276

# Assemblymember Bauer-Kahan Introduces Legislation to Regulate Manipulative Gun Advertisements Targeting Children

## AB 2571 restricts dangerous advertising of firearms to children and youth.

### FOR IMMEDIATE RELEASE:

*Friday, February 18, 2022*

Jordan Curley
Chief of Staff
916-319-2016
Jordan.curley@asm.ca.gov

**Sacramento, CA** – At a press conference today in San Diego, Assemblymember Rebecca Bauer-Kahan (D-Orinda), joined Governor Gavin Newsom, Attorney General Rob Bonta and others in announcing the introduction of AB 2571.  AB 2571 seeks to restrict the malicious and manipulative firearms marketing geared towards children and youth.  This bill comes at a time where California has experienced a collision of two major public health crises over the past years: COVID-19 and gun violence.

"California is a leader and one of the states with the strongest gun laws, it is remarkable that we still allow the marketing of weapons of war to our children" said

## Search form

[Search]

## Connect with us:

 

## Capitol Office

Sacramento, CA 95814
Phone: (916) 319-2016
Fax: (916) 319-2116

## District Office

12677 Alcosta Boulevard, Suite 395

Assemblymember Bauer-Kahan, "Your children, my three kids, have a right to live long, happy lives, free of gun violence."

San Ramon, CA 94583
Phone: (925) 244-1600

Gun violence has been cited as the third leading cause of death for Californian children and youth between ages 1-17.  Approximately 3 million children are directly exposed to gun violence each year- at home, at school, in their communities, and social media. Exposure to gun violence has resulted in children's injuries, emotional trauma, and death.

The gun industry has targeted a younger audience through children's books, mascots, apparel, and guns adorned in cartoons and brightly colored logos to appeal specifically to children and youth.[1] Firearm companies have expanded to advertising on social media platforms to connect youth to their gun selling websites. These platforms include YouTube, Twitter, social media influencers, and streaming services that children and youth disproportionately frequent.

The last time any attempts to regulate firearm marketing was in 2014 through the unsuccessful passage of the federal Children's Firearm Marketing Safety Act. Since then, gun violence by and affecting children has skyrocketed - in 2021 alone there were approximately 259 unintentional shootings by children, resulting in 104 deaths and 168 injuries.[2]

AB 2571 will limit the type of advertising and marketing geared towards children and youth.

"Gun manufacturers are responsible for the killings that result from their marketing of guns specifically to our children- the mass shooting at Sandy Hook Elementary being one of the most egregious examples of this. Gun

manufacturers target kids with everything from children's books about guns to special smaller weapons to make it easier for them to hold and shoot. The gun manufacturers are targeting our children to maximize profits, without any concern for the countless lives lost by children to gun violence" said Assemblymember Bauer-Kahan, "Taking away this tool of violent indoctrination from the gun industry is a vital step to ending the cycle of gun violence and protecting California's kids."

At the press conference, Governor Newsom noted, "I have no issue with guns or gun owners. I have serious issues with gun violence. I have serious issues with a company that thinks it's okay to market a JR-15 modeled after a weapon of war, an AR-15 that took the lives of 20 precious first graders and six adults at Sandy Hook, and to promote it with a skull and bone and a pacifier. How the hell do they think that's okay"? "Selling stickers, t-shirts, and hats marketing not a toy gun, but a JR-15, to start them early."

AB 2571 now awaits assignment to committee.

[1] startthemyoung.pdf (vpc.org)

[2] https://www.npr.org/2021/08/31/1032725392/guns-death-children

## Contact

**Capitol Office:** State Capitol
Sacramento, CA 95814
Tel: (916) 319-2016 | Fax: (916) 319-2116
**District Office:**
12677 Alcosta Boulevard, Suite 395
San Ramon, CA 94583

Tel: (925) 244-1600

Privacy and Conditions of Use | Accessibility | General Disclaimer | © 2022 California State Assembly Democratic Caucus

# EXHIBIT 31





Home

Explore

Notifications

Messages

Bookmarks

Lists

Profile

More

Tweet

← Tweet

**Asm Rebecca Bauer-Kahan**
@BauerKahan

Gun manufacturers are responsible for the killings that result from their marketing of guns specifically to our children. Taking away this tool of violent indoctrination from the gun industry is a vital step to ending the cycle of gun violence and protecting Ca's kids #ab2571

PRESS RELEASE

**Assemblymember Bauer-Kahan Introduces Legislation to Regulate Manipulative Gun Advertisements Targeting Children**

*AB 2571 restricts dangerous advertising of firearms to children and youth.*

**Sacramento, CA** — At a press conference today in San Diego, Assemblymember Rebecca Bauer-Kahan (D-Orinda), joined Governor Gavin Newsom, Attorney General Rob Bonta and others in announcing the introduction of AB 2571. AB 2571 seeks to restrict the malicious and manipulative firearms marketing geared towards children and youth. This bill comes at a time where California has experienced a collision of two major public health crises over the past years: COVID-19 and gun violence.

"California is a leader and one of the states with the strongest gun laws, it is remarkable that we still allow the marketing of weapons of war to our children" said Assemblymember Bauer-Kahan. "Your children, my three kids, have a right to live long, happy lives, free of gun violence."

Gun violence has been cited as the third leading cause of death for Californian children and youth between ages 1-17. Approximately 3 million children are directly exposed to gun violence each year- at home, at school, in their communities, and social media. Exposure to gun violence has resulted in children's injuries, emotional trauma, and death.

The gun industry has targeted a younger audience through children's books, mascots, apparel, and guns adorned in cartoons and brightly colored logos to appeal

The last time any attempts to regulate firearm marketing was in 2014 through the unsuccessful passage of the federal Children's Firearm Marketing Safety Act. Since then, gun violence by and affecting children has skyrocketed - in 2021 alone there were approximately 259 unintentional shootings by children, resulting in 104 deaths and 168 injuries.

AB 2571 will limit the type of advertising and marketing geared towards children and youth.

"Gun manufacturers are responsible for the killings that result from their marketing of guns specifically to our children- the mass shooting at Sandy Hook Elementary being one of the most egregious examples of this. Gun manufacturers target kids with everything from children's books about guns to special smaller weapons to make it easier for them to hold and shoot. The gun manufacturers are targeting our children to maximize profits, without any concern for the countless lives lost by children to gun violence" said Assemblymember Bauer-Kahan. "Taking away this tool of violent indoctrination from the gun industry is a vital step to ending the cycle of gun violence and protecting California's kids."

At the press conference, Governor Newsom noted, "I have no issue with guns or gun owners. I have serious issues with gun violence. I have serious issues with a company that thinks it's okay to market a JR-15 modeled after a weapon of war, an AR-15 that took the lives of 20 precious first graders and six adults at Sandy Hook, and to promote it with a skull and bone and a pacifier. How the hell do they think that's okay? Selling stickers, t-shirts, and hats marketing not a toy gun, but a JR-15, to start them early."

AB 2571 now awaits assignment to committee.

###

11:36 AM · Feb 18, 2022 · Twitter Web App

**35** Retweets **26** Quote Tweets **109** Likes

Tweet your reply Reply

**Cat Jones** @CatLucyJones · Feb 18
Rep ying to @BauerKahan
Thank you!
1

**Matt** @tweetingmatty · Feb 18
Rep ying to @BauerKahan
Can you show me an examp e of an advertisement?
1 11

**Jason Armstrong** @Jasonarm92 · Feb 18
That wou d be a no. Notice in the press re ease Ca ifornia simu taneous y has some of the toughest gun aws and spiking gun vio ence, proving yet again words on paper written by po iticians aren t the panacea to pp doing evi or reck ess things. Bauer-Kahan can t be this dumb.

**William** @Keshtath · Feb 18
Rep ying to @BauerKahan
Vio ent indoctrination...

A Tribute to the Original, Traditional, One-Hundred-Percent, Red-Blooded, Two-Fisted, All-American Christmas...

Search Twitter

**Relevant people**

**Asm Rebe...** Follow
@BauerKahan
Assemb ymember to the 16th District covering parts of Contra Costa and A ameda Counties.

**What's happening**

MLB · 1 hour ago
**Mets at Braves**
Trending with #LFGM, Char ie Morton

**#SolarOpposites**
New Season streaming on Hu u.
Promoted by So ar Opposites

Trending
**Perjury**
7,147 Tweets

Trending in United States
**Jayson Tatum**
A vira photo of a supposed Michae B. Jordan wax figure has some saying that it resemb es Ce tics star Jayson Tatum instead

Messages

reply    ♡ 1

**Tony Simon** @2nd4Everyone · Feb 18
Replying to @BauerKahan
Children can't purchase guns. Nice try though.

♡ 6

**Millz** @miz_unimited · Feb 18
Replying to @BauerKahan
How about you fix your socioeconomic problem that is the root cause. But what do I know I'm not a politician.

♡ 1

**Don Shift** @DonShift3 · Feb 18
Replying to @BauerKahan
Just cut to the chase and make guns illegal already, would you?

2    ♡ 1    ♡ 1

**Michael v19.3.7 (PCore: Voluntary...** @ion ... · Feb 18
guns are forever legal in the united states

1    ♡ 11

**Don Shift** @DonShift3 · Feb 18
I was being ironic because they're trying to outlaw them by the death of a thousand cuts instead of just getting to the point.

1    ♡ 5

**Michael v19.3.7 (PCore: Voluntary...** @ion ... · Feb 18
yaya i dig you

there's no room to be ironic here...they enjoy taking the guns ironically too

1    ♡ 2

















Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

Tweet

**Asm Rebecca Bauer-Kahan** @BauerKahan

One step closer to holding gun companies accountable for targeting our children. #AB2571 has passed the Assembly Judiciary Committee.

10:23 AM · Apr 26, 2022 · Twitter Web App

**51** Retweets **33** Quote Tweets **223** Likes

Tweet your reply Reply

**W@tt$** @dunk ergeist76 · Apr 26
Rep ying to @BauerKahan
When do we start ho ding Car companies accountab e for drunk drivers? Or Po iticians accountab e for their ack of fo owing The Constitution, and Bi of Rights? Heck, even enforcing the AOC who WONT pay dues.
8

**DW** @TheDrewWe ch · Apr 26
Rep ying to @BauerKahan
Hoo ywood g orifies why not go after them?
1 12

**W@tt$** @dunk ergeist76 · Apr 26
Go after Arno d and S y who s specifica y have said"Guns are bad"...but every one of their damn movies have guns..go figure.
4

**Robert Boojahideen** @Rob_Boojahideen · Apr 26
Rep ying to @BauerKahan
My favorite quote regarding unconstitutiona gun contro . "The Government isn t the one taking your rights away. Peop e in the Goverment are taking your rights away. Peop e who have names and addresses."
2

**Jimmy Meyer** @Gigantor68 · Apr 27
Rep ying to @BauerKahan and @gunpo icy
Awesome!! Can't wait to sue Chevy for my bad driving!!

**Pro Libertate** @Pro_Libertate · Apr 26
Rep ying to @BauerKahan and @gunpo icy
"To preserve iberty, it is essentia that the who e body of the peop e a ways possess arms, and be taught a ike, especia y when young, how to use them...."

Federa Farmer XV (Richard Henry Lee) January 25, 1788
1 3 13

Search Twitter

## Relevant people

**Asm Rebe...** @BauerKahan Follow
Assemb ymember to the 16th District covering parts of Contra Costa and A ameda Counties.

## What's happening

MLB · 1 hour ago
**Mets at Braves**
Trending with Char ie Morton

**#SolarOpposites**
New Season streaming on Hu u.
Promoted by So ar Opposites

Food · Trending
**Five Guys**
2,285 Tweets

Trending
**Perjury**
7,434 Tweets

The US ... · 1 hour ago
**Good Morning America's**

Messages

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

B Chapp 22 @cha mette123 · Apr 26
Amen Brother!!
2

Spicy McHaggis @MoeFugger76 · Apr 26
Rep ying to @BauerKahan
Why not focus your attention on the under ying causes of firearm deaths?
2 39

Dr. Mauser @Dr_Mauser · Apr 26
And if you don t want to focus on suicide, then your next best bet is to go after drug gangs and other crimina s.

This Tweet is from an account that no onger exists. Learn more

Show rep ies

BadProcessTweeter @SunnyShades561 · Apr 26
Rep ying to @BauerKahan and @gunpo icy
Ho d pe osi iab e for her district and stock purchases
1

Khyle @thisdudekhy e · Apr 26
Rep ying to @BauerKahan and @gunpo icy
Wi you ho d car manufacturers responsib e for peop e using them to cause accidents and ki ing peop e?
3

Beer For My Horses @ParkinJon · Apr 26
Rep ying to @BauerKahan and @gunpo icy
Wou dn't it be easier to simp y make it i ega to se a gun to a minor?? Oh, wait😂
47

Namronmada @ADAMNAMRON · Apr 26
Rep ying to @BauerKahan and @gunpo icy
How about ho d crimina s accountab e for their decisions

Boss Chonk, Hunter of Fascists an... @bos... · Apr 27
Rep ying to @BauerKahan
Gun companies are not "targeting our chi dren" with ads.

Silicon Strategies @si iconstrat · Apr 26
Rep ying to @BauerKahan and @gunpo icy
know a ton about marketing, and can attest that kids wou d not be a meaningfu audience for gun makers (aside from Daisy or junior hunters).

Hence, the bi is point ess.

Search Twitter

Terms of Service Privacy Po icy
Cookie Po icy Accessibi ity Ads info
More ··· © 2022 Twitter, nc.

Messages

Home

Explore

Notifications

Messages

Bookmarks

Lists

Profile

More

Tweet

← Tweet

**Asm Rebecca Bauer-Kahan**
@BauerKahan

#AB2571 to protect children from gun advertising has passed Senate Judiciary! Firearm companies shamelessly market to our youngest children, while accidental shootings by children skyrocket. This must end, and will end by AB 2571 banning these reckless advertisements.

3:36 PM · Jun 14, 2022 · Twitter Web App

**7** Retweets **1** Quote Tweet **17** Likes

Tweet your reply

Reply

**AmericanMitch** @american_mitch · Jun 14
Rep ying to @BauerKahan
Do you have examp es?

At a ?

m a constituent of yours and have questions.

1

**Xeisenberg-XRP** @Majestic_XRP · Jun 16
Rep ying to @BauerKahan
t's difficu t to take anyone serious when trying to egis ate something they know itt e about...

instagram.com
Nuance Bro (@nuancebro) • nstagram ree

## More Replies

**Superman Fan** @supermanfan19 · Ju 3
Rep ying to @BauerKahan
So... you re protecting chi dren from... the #1stAmendment? P ease exp ain your funding source for the costs of the awsuit in your future. #Ca TheLawyers

**B Chapp 22** @cha mette123 · Jun 14
Rep ying to @BauerKahan
B ah, b ah, b ah. have ived in Ca ifornia my who e ife. Never seen a gun advertised, ever! Like ever! You are a iar and you are gas ighting to your constituents!!

Search Twitter

## Relevant people

**Asm Rebe...**
@BauerKahan
Follow
Assemb ymember to the 16th District covering parts of Contra Costa and A ameda Counties.

## What's happening

MLB · 1 hour ago
**Mets at Braves**
Trending with Char ie Morton

**#SolarOpposites**
New Season streaming on Hu u.
Promoted by So ar Opposites

Entertainment · Trending
**#CoryMonteith**
2,022 Tweets

Trending
**Perjury**
7,267 Tweets

**Glamour** · 2 hours ago
**Sophia Bush on Why the**

Messages

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

Thread

**Asm Rebecca Bauer-Kahan** @BauerKahan

#AB2571 to end gun advertising to children has passed the Senate! Firearm companies are advertising shamelessly to our kids. Guns are the leading cause of death for children and we must end this dangerous marketing now.

9:34 PM · Jun 29, 2022 · Twitter Web App

**24** Retweets **1** Quote Tweet **109** Likes

Tweet your reply Reply

**Asm Rebecca Bauer-Kah...** @BauerKah... · Jun 29
Replying to @BauerKahan
@MomsDemand @bradybuzz @Everytown @GiffordsCourage @StudentsDemand
2 11

**Jen B** @jpen98 · Jun 30
Replying to @BauerKahan
Thank you @BauerKahan for your leadership on this issue! Together we can #EndGunViolence! #CALeg
2

**😷Emily A😷 Text READY to 6...** @EmilyAi... · Jun 29
Replying to @BauerKahan
Thank you @BauerKahan for your seemingly endless efforts to promote sensible gun violence prevention legislation. This @MomsDemand volunteer appreciates you 👊🙌👏
1 7

**Cat Jones** @CatLucyJones · Jun 29
Replying to @BauerKahan
Thank you Asm. RBK!
1 6

**Wendy Wheatcroft, MEd** ☮ @Wendy4SD · Jun 29
Replying to @BauerKahan and @ChinaKatSun
Thank you, sister!!!!
1 8

**Patricia Boe** @RestingBoeFace · Jun 29
Replying to @BauerKahan
👏👏👏
1 6

**Emily** @e_clan · Jun 29
Replying to @BauerKahan

Search Twitter

## Relevant people

**Asm Rebe...** @BauerKahan Follow
Assemblymember to the 16th District covering parts of Contra Costa and Alameda Counties.

## What's happening

MLB · 1 hour ago
**Mets at Braves**
Trending with Charlie Morton

**#SolarOpposites**
New Season streaming on Hulu.
Promoted by Solar Opposites

Trending
**Sean Hannity**
5,449 Tweets

Politics · Trending
**92% of Democrats**
People react to President Joe Biden's comment to a reporter during the White House Congressional Picnic on Tuesday that a 'poll showed that 92% of Democrats, if I ran, would vote for me'
15.7K Tweets

POPSUG... · Last night
**Lily James Looks Like a Totally Different Person With Blunt Fringe and Bleached Brows**

Show more

Terms of Service Privacy Policy Cookie Policy Accessibility Ads info More ··· © 2022 Twitter, Inc.

Messages

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

## Thread

**Asm Rebecca Bauer-Kahan** @BauerKahan

#AB2571 protecting our children from firearm advertising is heading to the governor! Kids are not allowed to buy these deadly weapons, they should not be marketed to. This bill will save young lives.

PRESS RELEASE

**Assemblymember Bauer-Kahan's Legislation to Regulate Gun Advertisements Targeting Children Heads to the Governor**

*AB 2571 would prohibit the dangerous advertising of firearms to children and youth*

For Immediate Release
June 30, 2022
Contact: Shawn Kumagai – ShawnKumagai@asm.ca.gov
925-244-1600 office

**Sacramento, CA** – Today, AB 2571 by Assemblymember Rebecca Bauer-Kahan (D-Orinda), which prohibits marketing firearms to children, passed the Assembly Floor on concurrence with a vote of 56-14. This bill is part of Governor Newsom's priority package of gun control measures, which will go into effect immediately upon his signature.

"Guns are not toys– they are deadly weapons," said Assemblymember Bauer-Kahan. "California has some of the strongest gun laws in the country and it is unconscionable that we still allow advertising weapons of war to our children. Our kids have a right to live long, happy lives, free of gun violence."

Gun manufacturers view children as their next generation of advocates, targeting them with everything from children's books about guns to special smaller weapons designed to make it easier for children to hold and shoot. The advertising for these weapons is completely shameless. Children in California are not allowed to buy or own a gun, yet guns are advertised specifically to children across all forms of media including cartoons, video games, and social media. Gun manufacturers use children's books, mascots, apparel, guns adorned in cartoons, and brightly colored [illegible]

[illegible] firearm industry member from using, disclosing, or compiling a minor's personal information if that information is intended to be used for advertising or marketing to that minor.

Gun violence has been cited as the third leading cause of death for Californian children and youth between ages 1-17. In 2021 nationwide, there were approximately 259 unintentional shootings by children, resulting in 104 deaths and 168 injuries.[2] 91% of the victims in these shootings by children were also under 18, often siblings of the children who did the shooting. This violence is pervasive and the trend is rising. Action to keep weapons out of the hands of children is long overdue.

AB 2571 is joint authored by Asm. Mike Gipson (D-Los Angeles), and coauthored by Asm. Jesse Gabriel (D-Woodland Hills), Asm. Christina Garcia (D - Downey), Asm. Miguel Santiago (D-Los Angeles), and Asm. Phil Ting (D – San Francisco).

###

[1] [illegible]
[2] https://www.npr.org/2021/08/31/1032725392/guns-death-children

11:10 AM · Jun 30, 2022 · Twitter Web App

**9** Retweets **1** Quote Tweet **35** Likes

Tweet your reply Reply

**Asm Rebecca Bauer-Kah...** @BauerKah... · Jun 30
Replying to @BauerKahan
@MomsDemand @bradybuzz
@Everytown
@GiffordsCourage
@StudentsDemand
1 6

**Christopher Duncan** @kida oha2767 · Ju 3
Rep ying to @BauerKahan
Great job Rebecca! Shame on Repub icans who either voted no or abstained.

**Krystal L** @Kitt937 · Jun 30
Rep ying to @BauerKahan
CA @momsdemand is so gratefu for your eadership on this @BauerKahan!
1 2 7

**Laura A.** @ aura adida · Jun 30
👏👏👏👏👏👏
2

**Laurie Wolfe** 🌻 ✌ @ auriejwo fe · Jun 30
Rep ying to @BauerKahan

Search Twitter

## Relevant people

**Asm Rebe...** @BauerKahan Follow
Assemb ymember to the 16th District covering parts of Contra Costa and A ameda Counties.

## What's happening

MLB · 1 hour ago
**Mets at Braves**
Trending with Char ie Morton

**#SolarOpposites**
New Season streaming on Hu u.
Promoted by So ar Opposites

Food · Trending
**Five Guys**
2,238 Tweets

Trending
**Sidney Powell**
47K Tweets

War in Ukraine · L VE
**Latest updates on the**

Messages

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

Thread

**Asm Rebecca Bauer-Kahan** @BauerKahan

Proud to have partnered with Governor Newsom to save young lives with #AB2571. Guns are not toys. There is no reason a child should have a gun so they should not see predatory ads for these weapons.

> **Gavin Newsom** @GavinNewsom · Ju 1
> Governor candidate, CA
> This is an AR-15. A weapon of war. The gun industry is open y marketing these to K DS. With cartoons and mini JR-15s.
>
> These don't be ong in the hands of our kids or on our streets.
>
> just signed 2 bi s that ban ghost guns and these sick marketing p oys.

8:29 AM · Ju 1, 2022 · Twitter Web App

**7** Retweets **1** Quote Tweet **40** Likes

Tweet your reply
Reply

**Asm Rebecca Bauer-Kahan** @BauerKahan · Ju 1
Rep ying to @BauerKahan
@MomsDemand

@bradybuzz

@Everytown

@GiffordsCourage

@StudentsDemand

1 9

**Patricia Boe** @RestingBoeFace · Ju 2
Rep ying to @BauerKahan
So gratefu for your eadership on gun sense egis ation!

1 3

Search Twitter

## Relevant people

**Asm Rebe...** @BauerKahan Follow
Assemb ymember to the 16th District covering parts of Contra Costa and A ameda Counties.

**Gavin New...** @GavinNewsom Follow
Governor candidate, CA
Husband to @JenSiebe Newsom and father. 40th Governor of Ca ifornia. Former Lt. Governor of Ca ifornia. Former San Francisco Mayor. Persona account.

## What's happening

MLB · 1 hour ago
**Mets at Braves**
Trending with Char ie Morton

**#SolarOpposites**
New Season streaming on Hu u.
Promoted by So ar Opposites

Messages

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

Tweet

**Gavin Newsom** @GavinNewsom
Governor candidate, CA

This is VILE.

A skull & crossbones with a pacifier on weapon of war.

Made to look "cute" to appeal to kids.

The manufacturer calls this a "JR-15."

Every NRA-backed politician should condemn this.

6:28 PM · Feb 16, 2022 · Twitter for iPhone

**1,638** Retweets **1,249** Quote Tweets **7,496** Likes

Tweet your reply Reply

**Firearms Policy Coalition** @gunpo icy · Feb 16
Rep ying to @GavinNewsom
You're a vi e tyrant. Leave peop e a one.
20 115 3,994

**Kevin Dalton** @KevinUncensored · Feb 16
Rep ying to @GavinNewsom
This is V LE
Focus on the peop e itera y dying on the sidewa ks of Ca ifornia instead of a perfect y ega .22 ca iber rif e you think is scary

Search Twitter

## Relevant people

**Gavin New...** Follow
@GavinNewsom
Governor candidate, CA

Husband to @JenSiebe Newsom and father. 40th Governor of Ca ifornia. Former Lt. Governor of Ca ifornia. Former San Francisco Mayor. Persona account.

## What's happening

MLB · 1 hour ago
**Mets at Braves**
Trending with #LFGM, Char ie Morton

**#SolarOpposites**
New Season streaming on Hu u.
Promoted by So ar Opposites

Trending
**Perjury**
7,229 Tweets

Trending in United States
**Jayson Tatum**

Messages

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More
Tweet

## Tweet

**Gavin Newsom** @GavinNewsom
Governor candidate, CA

This is an AR-15. A weapon of war. The gun industry is openly marketing these to KIDS. With cartoons and mini JR-15s.

These don't belong in the hands of our kids or on our streets.

I just signed 2 bills that ban ghost guns and these sick marketing ploys.

From **Office of the Governor of California**

7:07 AM · Ju 1, 2022 · Twitter for iPhone

**2,742** Retweets **1,480** Quote Tweets **15.9K** Likes

Tweet your reply
Reply

**Jeremy Knauff** @jeremyknauff · Ju 1
Rep ying to @GavinNewsom
🤣 My kid knows how to hand e a weapon better than you.

Search Twitter

### Relevant people

**Gavin New...** @GavinNewsom Follow
Governor candidate, CA
Husband to @JenSiebe Newsom and father. 40th Governor of Ca ifornia. Former Lt. Governor of Ca ifornia. Former San Francisco Mayor. Persona account.

### What's happening

MLB · 1 hour ago
**Mets at Braves**
Trending with #LFGM, Char ie Morton

**#SolarOpposites**
New Season streaming on Hu u.
Promoted by So ar Opposites

Po itics · Trending
**Jim Jordan**
141K Tweets

The US... · 2 hours ago
Good Morning America's

Messages

# EXHIBIT 32



State of California – Department of Fish and Wildlife
**STUDENT CONSENT**
DFW 1043 (NEW 01/05/17)



This form must be turned in before class begins in order to participate in the class.
Note to Instructor – This form shall be retained for a period of 3 years.

## 1)

Provide student name and review release information

STUDENT NAME: _____

I understand there is an inherent risk in the use of firearms. I hereby RELEASE the State of California, the Department of Fish and Wildlife and all other departments, agencies, commissions, boards, institutions, officials, employees and agents of the State, from any and all liability for any and all causes of actions which I [we] may hereafter have on account of any and all injuries to the participant's person or property, including death, arising out of or related in any way to the Participant's participation in the Department of Fish and Wildlife Hunter Education Course, whether such injury results from the negligence of the State of California, the Department of Fish and Wildlife or any other departments, agencies, commissions, boards, institutions, officials, employees and agents of the State. or from any other cause.

## 2)

Based on the student's age, complete Box A Or Box B

**A) Student is 17 years old or younger**

I, _____,
give my consent for my son/daughter, to participate in this hunter education course and give my express permission for my son/daughter to handle, manipulate and / or use firearms. **I have read this release and understand and agree to its terms.**

_____
Signature of parent or guardian

_____
Date (mm/dd/yy)

**B) Student is 18 years old or older**

**I have read this release and understand and agree to its terms.**

_____
Signature of student

_____
Date (mm/dd/yy)

## 3)

Mark appropriate box

Any person is allowed to participate in a Hunter Education course. However, certain individuals are restricted or prohibited from possessing firearms, ammunition, and/or dangerous weapons because of a court order, prior conviction, immigration status, or other reason.

☐ NOT RESTRICTED – the student named above is NOT restricted or prohibited from possessing firearms, ammunition, and/or dangerous weapons.

☐ RESTRICTED – the student named above is restricted or prohibited from possessing firearms, ammunition, and/or dangerous weapons. Speak with the instructor prior to the class.

## CERTIFICATE OF SER ICE
### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Junior Sports Magazines, Inc., et al. v. Bonta*
Case No.:    2:22-cv-04663-CAS (JCx)

IT IS HEREBY CERTIFIED THAT:

     I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

     I am not a party to the above-entitled action. I have caused service of:

**DECLARATION OF ANNA M BAR IR IN SUPPORT OF PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Kevin J. Kelly, Deputy Attorney General
kevin.kelly doj.ca.gov
300 South Spring Street, Suite 9012
Los Angeles, CA 90013
  *Attorney for Defendant*

     I declare under penalty of perjury that the foregoing is true and correct.

Executed July 20, 2022.

                  Laura Palmerin

0555

C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA Foundation, and Gun Owners of California, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNIOR SPORTS MAGAZINES INC., RAYMOND BROWN, CALIFORNIA YOUTH SHOOTING SPORTS ASSOCIATION, INC., REDLANDS CALIFORNIA YOUTH CLAY SHOOTING SPORTS, INC., CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, THE CRPA FOUNDATION, AND GUN OWNERS OF CALIFORNIA, INC.; and SECOND AMENDMENT FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10, <br><br> Defendant. | CASE NO: 2:22-cv-04663-CAS (JCx) <br><br> **DECLARATION OF JONATHAN L. COLEMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing Date: August 22, 2022 <br> Hearing Time: 10:00 a.m. <br> Courtroom: 8D <br> Judge: Christina A. Snyder |

# DECLARATION OF JON COLEMAN

1. I, Jonathan L. Coleman, am the Vice President of Plaintiff California Youth Shooting Sports Association, Inc. ("CYSSA"), a plaintiff in the above-entitled action and make this declaration of my own personal knowledge and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2. CYSSA is a non-profit athletic and educational organization incorporated under the laws of the state of California, with headquarters in Valley Springs, California.

3. CYSSA is committed to promoting and preserving the clay shooting sports among youth in California. To that end, CYSSA offers participation in its youth clay shooting program, the CYSSA Clay Target Program, a team-based youth development program for boys and girls, grades 12 and under. The Program allows youth to participate in supervised shotgun shooting sports programs taught by certified coaches and emphasizes safety and skill development in clay shooting.

4. Through this program, CYSSA regularly engages with minors through advertising, marketing, and other communications promoting youth competitive shooting events and practices where firearms, ammunition, and related products are lawfully possessed, handled, and used by youth.

5. Specifically, CYSSA holds State Trap Championships and "series shoots" at ranges across the state through a partnership with ranges and sponsors who give generously to help ensure that youth shooting sports thrive in California.

6. To promote participation and attendance at such events requires that CYSSA distribute printed and electronic communications concerning these events and programs. These communications might include images and/or written depictions of minors handling or using firearms and related products. These shooting events and programs also involve signage, discussions, branded merchandise, and other communications depicting minors enjoying or otherwise

DECLARATION OF JONATHAN L. COLEMAN
0557

1    encouraging minors to possess and use lawful firearms for lawful purposes. A true

2    and correct copy of a CYSSA advertisement for the 2022 U.S. Open Youth Clay

3    Shooting Championship, an example of the sort of event advertising CYSSA

4    engages in, is attached hereto as **Exhibit 10.**

5         7.    CYSSA's website provides youth shooters' "stats" and shooters'

6    standings, as well as a calendar of youth events, a gallery of images from various

7    youth shooting competitions where minors are depicted lawfully using firearms,

8    handbooks for competitive trap shooting, range and gun safety videos, links to

9    partner ranges, and more helpful resources for youth and parents engaged in the

10   shooting sports. A true and correct copy of the CYSSA website's "Home Page" is

11   attached hereto as **Exhibit 11.** A true and correct copy of the CYSSA Handbook,

12   available on the CYSSA website, is attached hereto as **Exhibit 12.**

13        8.    The passage of AB 2571 has caused great concern and confusion

14   among our youth shooters and parents, as well as our organization. Indeed, CYSSA

15   is unsure what can and cannot be communicated to our current and prospective

16   youth participants and their families as a result of AB 2571. We are thus curbing

17   the promotion of competitive and recreational shooting events on our website,

18   social media, and any communications to youth in California. We reasonably fear

19   that any attempt by the organization to engage in these activities exposes the

20   organization to substantial liability under AB 2571.

21        9.    But for the enactment and enforcement of AB 2571, we would be

22   preparing advertising, marketing, and other communications promoting

23   participation in the 2022 to 2023 season and events, encouraging new youth shooter

24   participation, registering youth for the new season, and posting general news and

25   information about participation in youth shooting sports. As it stands now, our

26   website is frozen in time.

27        10.   Teams and participants must be registered for sporting clay division by

28   September 1st of each year and for trap and skeet by February 1st of each year in

DECLARATION OF JONATHAN L. COLEMAN

0558

order to participate and gain the requirements necessary to be State Championship qualified. CYSSA is unable to share this vital information with youth currently because of AB 2571. Being unable to promote these programs and deadlines in youth shooting competition will likely have devastating effects on youth being eligible to compete.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on July 19, 2022.

*s/ Jonathan L. Coleman*
Jonathan L. Coleman
Declarant

# EXHIBIT 10

0560



YSSF YOUTH SHOOTING SPORTS FEDERATION

2022 U.S.OPEN

CLARK COUNTY SHOOTING COMPLEX

# U.S. OPEN YOUTH CLAY SHOOTING
## NATIONAL CHAMPIONSHIP

TOURNAMENT DATES
July 5 - 9 , 2022

11357 N. DECATUR BLVD
LAS VEGAS, NEVADA

**AWARDS CATEGORIES:**
INDIVIDUAL 1st-5th in JV/Varsity - 1st -3rd FOR ALL OTHER LEVELS
SQUADS FOR ALL DISCIPLINES BY AGE CATEGORY; TEAM; AND HIGH OVERALL.
YOUNG ADULT, VARSITY, JUNIOR VARSITY, INTERMEDIATE ADVANCED, INTERMEDIATE ENTRY & ROOKIES

July 5 : SKEET, FIRST 100 TARGETS
July 6 : SKEET, SECOND 100 TARGETS
July 7 : SPORTING CLAYS, 100 TARGETS
July 8 : TRAP, FIRST 100 TARGETS
July 9 : TRAP, SECOND 100 TARGETS AND AWARDS CEREMONY

THE U.S. OPEN YOUTH CLAY SHOOTING CHAMPIONSHIP INCLUDES THE DISCIPLINES OF SKEET, SPORTING CLAYS, AND TRAP FOR YOUNG ADULTS AND 12TH GRADE AND BELOW. THIS U.S. OPEN IS AN OPPORTUNITY FOR YOUTH SHOOTING TEAMS AND INDIVIDUALS TO COMPETE AT A NATIONALLY-ADVERTISED EVENT WITH COMPETITORS FROM AROUND THE COUNTRY. PARTICIPANTS WILL ENJOY COMPETING ON 28 COMBINATION TRAP/SKEET FIELDS, TWO SPORTING CLAY COURSES, AND A 5-STAND FIELD. ENJOY A SAFE, FUN, FAMILY ORIENTED, SHOOTING EVENT AND EXTEND YOUR STAY FOR A HOLIDAY IN BEAUTIFUL #VEGASSTRONG.

TOURNAMENT & HOTEL INFO: www/shootcyssa.com/usopen REGISTRATION/QUESTIONS: shootreports@shootcyssa.com

HOSTED BY THE YOUTH SHOOTING SPORTS FEDERATION | www.shootcyssa.com

# 2022 U.S. Open Registration Confirmation
## Youth Clay Shooting National Championship - HOSTED BY CYSSA / YSSF

Thank you for registering for the 11th annual 2022 U.S. Open National Youth Clay Shooting Championship!  We look forward to seeing you soon. This confirmation will provide important event information for you as you plan to travel to Las Vegas. Please read the information carefully.

1) **Tournament Location:**   Clark County Shooting Complex, 11357 N Decatur Blvd., Las Vegas, NV.
2) **Dates and times:**    Dates and times for the various activities, including athlete/team check-in and start time for the various shoot disciplines can be found at www.youthclayshooting.com and clicking on the tab labeled "Schedule".
3) **Firearms Policies:**    Firearms are no longer allowed on certain hotel properties. Clark County Range has arranged for a valet tag check in/out service for firearm storage in a secured location at Clark County Shooting Complex. If you would like to use the Clark County gun valet service, please read the following procedure:

1. Upon arriving in Las Vegas, proceed to the Clark County Shooting Complex Shotgun Center (main clubhouse). Purchase a firearm valet claim tag ($15 per case for the week) the customer service representative will escort you into the safe room to secure your firearm(s). Firearms must be in a case.

2. Attach one portion of the valet tag to your firearm case and retain the other half of the claim ticket as proof for checking your firearm in/out with the Clark County staff.

3. Storage Hours: The firearm valet service will be staffed and available for firearm check in/out the following dates/time:

Monday July 4th:        8am – 5:30pm
Tuesday July 5th:        6:45am – 5:30pm
Wednesday July 6th:    6:45am – 10:30pm
Thursday July 7th:       6:45am – 10:30pm
Friday July  8th:          6:45am – 5:30pm
Saturday July 9th:       6:45am – 5:30pm
Sunday July 10th:        6:45am -  5:00pm Final check-out

If your travel plans don't fall within the above times please contact the complex manager, Mr. Steve Carmichael at (702) 239-4446 for special Gun Valet arrangements.

4) **Team Registration:**    Head coach will check in with the shoot coordinator at the shotgun center
5) **Host Hotel:**    Sun Coast Hotel and Casino, 9090 Alta Dr., Las Vegas, NV 89145. www.suncoastcasino.com/groups. Click on Group Code and enter Reservation Group Code or call group reservations department at 866-636-7111 and use Reservation Group ID - **ACLAY22**.
6) **Shoot Fees:**    Shoot fees for the tournament are as follows:
   Skeet: $110 (200 targets) - Sporting Clays: $80 (100 targets) - Trap: $110 (200 targets)
7) **Practice Fees:**    Clark County Shooting Complex fees for practice rounds is as follows:  $4.75/25 for trap and skeet; .33 per target for Sporting Clays.

**Thank You for participating in the 2021 US Open**
**Stanley Chan 916-425-7080**
Revised 5/23/2022

# CALIFORNIA YOUTH SHOOTING SPORTS
## 2021-2022 SCHOLARSHIP APPLICATION

Name_____ Age_____

Physical Address_____
  Street & Number

Mailing Address_____

  _____
  City, State & Zip Code

Parent/Guardian Name_____

Home Telephone_____

E-Mail_____

  Choice of college, trade school or other institution to which you have been
  accepted:_____

  Additional institutions you have applied to:_____

  _____

  _____

  Your intended college major, career and/or vocation:_____

  _____

  Mail Scholarship Applications To:  CYSSA Scholarship
                                     4805 Verena Lane
                                     Sacramento, CA. 95835

  r          d          d          r  d
D  d     d

**Application Deadline:  MAY 1, 2022**

0563



| Email or phone | Password | Log In | Forgot Account? |

## California Youth Shooting Sports Association CYSSA

🔒 Private group · **2.2K members**

**Join group**

**About**     Discussion

### About this group

The CYSSA Clay Target Program is a team based YOUTH DEVELOPMENT PROGRAM for boys and girls, grades 12 and under, that provides it's participants... **See more**

🔒 **Private**
Only members can see who's in the group and what they post.

👁 **Visible**
Anyone can find this group.

📍 **California**

👥 **General**

🕐 **History**
Group created on June 19, 2016 See more

### Members · 2.2K

### Activity

💬 **1 new post today**
33 in the last month

👥 **2,212 total members**
No new members in the last week

👥 **Created 6 years ago**

0564

# CYSSA SCHOLARSHIP APPLICATION

*Application Deadline*
**May 1**

1. List HIGH SCHOOL ACTIVITIES (honors, awards, elected offices, leadership roles, organizations, programs or activities, etc) over the past three years. (Continue on back if necessary.)

_____
_____
_____
_____

2. Detail your PARTICIPATION in CYSSA.

_____
_____
_____
_____

3. List COMMUNITY ACTIVITIES (recognizing and meeting community needs, participation and innovative contributions to activities that may extend beyond your community, etc.) over the past three years.

_____
_____
_____
_____

4. WHAT ARE YOUR GOALS?

_____
_____
_____
_____

5. WHY ARE YOU APPLYING for this scholarship and how will it be used to realize your goals.

_____
_____
_____
_____

6. Provide any ADDITIONAL INFORMATION ABOUT YOURSELF that would assist the CYSSA Scholarship Committee with its decision.

_____
_____
_____
_____

7. Attach a COPY OF YOUR ACADEMIC PERFORMANCE—transcript with current classes—with this application.

8. Provide a SYNOPSIS OF YOUR CAREER GOALS(S). Detail how/why you have selected your chosen vocation. Include your planned academic preparations.

_____
_____
_____
_____

I understand this application information will remain confidential and is true and correct.

Signature_____Date_____

0565





# CYSSA®
California Youth Shooting
Sports Association

HOME   CALENDARS   DIRECTORY   **INFO**   REGISTRATION   COACH NEWS   LINKS TO RANGES   US OPEN   🔍

## GUIDES & INSTRUCTIONS

Home / Guides & Instructions

HERE IS A LIST OF PRINTABLE INSTRUCTIONAL GUIDES IN PDF FORMAT.

### GUIDES AND INSTRUCTIONS

CYSSA Handbook
CYSSA Handbook International Trap
10 Steps to Starting a Team
Head Coach Guidelines
CYSSA Shotgun Sport Director Duties
Team Registration Guide
Trap Series Shoot Guide
How to Use the Score Sheets for Trap
What is Trap
Starting a High School Shooting Club






REGISTER YOUR TEAM

PRE SQUAD FORMS



Congratulations
2022
CYSSA Scholarship Winners

Aiden Adams
Hunter Vandre
Alejo Peralton
Jordan Johnson
Michael Martinez

In remembrance of Phil Murphy
One of the founders of CYSSA

US OPEN LAS VEGAS, NEVADA



CYSSA HANDBOOKS



California Youth Shooting
Sports Association

2021
Official Handbook

California Youth Shooting
Sports Association

2021
International Trap
Official Handbook



Gallery

Copyright 2016 ShootCYSSA | All Rights Reserved | Powered by 2sclick.com



# CYSSA
California Youth Shooting
Sports Association

**HOME  CALENDARS  DIRECTORY  INFO  REGISTRATION  COACH NEWS  LINKS TO RANGES  US OPEN**

## HIGH FIVE DIVISIONS

Home / High Five Divisions

### CYSSA HIGH FIVE DIVISIONS FOR TRAP

**HIGH SCHOOL – DIVISION I** (1,800+ enrollment)
Antelope HS
Atwater HS
Clayton Valley Charter HS
Granite Bay HS
De La Salle HS
Del Oro HS
Roseville HS
Woodcreek HS

**HIGH SCHOOL – DIVISION II** (851-1,799)
Calaveras HS
Galt HS
Lincoln HS
Oakmont HS
River Valley HS
Sonora HS
St. Mary's HS
Summerville HS
Yuba City HS

**HIGH SCHOOL – DIVISION III** (up to 850)
Berean Christian HS
Bishop Manogue HS
Capital Christian HS
Colfax HS
Lassen HS
Mariposa HS
Marysville HS
North Tahoe HS
Sutter Union HS
Truckee HS

**OPEN GUN CLUB**
A&A Shooters
Angels Gun Club
Auburn Goldminers
Carson City Hot Shots
Comstock Claybusters
Coon Creek
Delta Valley
Diablo Valley Shotgun Sports
East Nicolaus Sportsman's Club
El Dorado Trap Team
Feather River Claybusters
Kingsbury Trap Club
Liberty Youth Shooters
Los Banos Tiger Trap Team
Martinez Gun Club
Outlaws
Sierra Valley Trap Team
Truckee Sport Shooters
Wilton Christian School Trap Team
Yolo Sportsman's Association Claybusters

**JUNIOR GUN CLUB**
*All of the Gun Club Teams plus*
Del Oro Jr. Trap Team
Depoali Middle School Rattlesnakes
Gold Country Shooters
Liberty Youth Shooting Team
Mother Lode Nuggets
Mariposa Youth
Truckee Sport Shooters
Woodcreek Area Youth Shooters

REGISTER YOUR TEAM
PRE SQUAD FORMS





Scholarship
Congratulations
2022
CYSSA Scholarship Winners
Aiden Adams
Hunter Vandre
Alejo Peralton
Jordan Johnson
Michael Martinez

In remembrance of Phil Murphy
One of the founders of CYSSA

**US OPEN LAS VEGAS, NEVADA**



**CYSSA HANDBOOKS**



California Youth Shooting
Sports Association

2021
Official Handbook



CYSSA
California Youth Shooting
Sports Association

2021
International Trap
Official Handbook



Gallery







Copyright 2016 ShootCYSSA | All Rights Reserved | Powered by 2slick.com

0568



# CYSSA ®
### California Youth Shooting
### Sports Association

HOME    CALENDARS    DIRECTORY    **INFO**    REGISTRATION    COACH NEWS    LINKS TO RANGES    US OPEN    🔍

## SCHOLARSHIP APPLICATION

Home / Scholarship Application

For CYSSA graduating seniors to apply, complete both forms and mail by USPS using the address located at the bottom of the "Applicant Information Form" Post marked on or before **MAY 1** or email to Jon Coleman jonc9119@comcast.net You Click on the forms below to download.

1. Applicant Information Form
2. CYSSA Scholarship Application





**REGISTER YOUR TEAM**

**PRE SQUAD FORMS**



Congratulations
2022
CYSSA Scholarship Winners

Aiden Adams
Hunter Vandre
Alejo Peralton
Jordan Johnson
Michael Martinez

In remembrance of Phil Murphy
One of the founders of CYSSA

**US OPEN LAS VEGAS, NEVADA**



**CYSSA HANDBOOKS**







Copyright 2016 ShootCYSSA | All Rights Reserved | Powered by 2zlick.com

0569









shootcyssa.com

The CRPA Foundation - CRPA | shootcyssa.com | shootcyssa.com | Officers, Board of Directors, Commit... | CYSSA Handbook – shootcyssa.com | Information – shootcyssa.com | High Five Divisions – shootcyssa.com

CYSSA®
California Youth Shooting Sports Association

HOME | CALENDARS | DIRECTORY | INFO | REGISTRATION | COACH NEWS | LINKS TO RANGES | US OPEN

- Guides & Instructions
- Gallery
- CYSSA Handbook
- CYSSA Handbook International Trap
- Team Codes
- Range and Gun Safety Video
- High Five Divisions
- Scholarship Application

## HIGH FIVE DIVISIONS

Home / High Five Divisions

REGISTER YOUR TEAM

PRE SQUAD FORMS

### CYSSA HIGH FIVE DIVISIONS FOR TRAP

**HIGH SCHOOL – DIVISION I** (1,800+ enrollment)
Antelope HS
Atwater HS
Clayton Valley Charter HS
Granite Bay HS
De La Salle HS
Del Oro HS
Roseville HS
Woodcreek HS

**HIGH SCHOOL – DIVISION II** (851-1,799)
Calaveras HS
Galt HS
Lincoln HS
Oakmont HS
River Valley HS
Sonora HS
St. Mary's HS
Summerville HS
Yuba City HS

**HIGH SCHOOL – DIVISION III** (up to 850)

US OPEN LAS VEGAS, NEVADA

shootcyssa.com

CYSSA®
California Youth Shooting Sports Association

HOME CALENDARS DIRECTORY INFO REGISTRATION COACH NEWS LINKS TO RANGES US OPEN

# INFORMATION

Home / Information

HERE IS A LIST OF PRINTABLE INSTRUCTIONAL GUIDES IN PDF FORMAT.

| DIRECTORY |
|---|
| Guides & Instructions |
| News |
| Gallery |
| CYSSA Handbook |
| Team Codes |

REGISTER YOUR TEAM

PRE SQUAD FORMS

US OPEN LAS VEGAS, NEVADA

CALIFORNIA WATERFOWL WHITE FLYER CALIFORNIA RIFLE & PISTOL ASSOCIATION FRIENDS OF NRA

shootcyssa.com

Information – shootcyssa.com | Scholarship Application – shootcyssa.com

CYSSA®
California Youth Shooting Sports Association

HOME | CALENDARS | DIRECTORY | INFO | REGISTRATION | COACH NEWS | LINKS TO RANGES | US OPEN

# SCHOLARSHIP APPLICATION

Home / Scholarship Application

For CYSSA graduating seniors to apply, complete both forms and mail by USPS using the address located at the bottom of the "Applicant Information Form" Post marked on or before **MAY 1** or email to Jon Coleman jonc9119@comcast.netYou Click on the forms below to download.

1. Applicant Information Form
2. CYSSA Scholarship Application

CALIFORNIA WATERFOWL | WHITE FLYER | CALIFORNIA RIFLE & PISTOL ASSOCIATION | FRIENDS OF NRA | NATIONAL RIFLE ASSOCIATION

REGISTER YOUR TEAM

PRE SQUAD FORMS

## US OPEN LAS VEGAS, NEVADA

# GALLERY

Home / Gallery



REGISTER YOUR TEAM

PRE SQUAD FORMS

*Scholarship*

**Congratulations**
2022
CYSSA Scholarship Winners

**Aiden Adams**
**Hunter Vandre**
**Alejo Peralton**
**Jordan Johnson**
**Michael Martinez**

In remembrance of Phil Murphy
-One of the founders of CYSSA -

**US OPEN LAS VEGAS, NEVADA**





Pages [ 1 ] [ 2 ] [ 3 ] [ 4 ] [ 5 ]



# HIGH FIVE DIVISIONS

Home / High Five Divisions

## CYSSA HIGH FIVE DIVISIONS FOR TRAP

**HIGH SCHOOL – DIVISION I** (1,800+ enrollment)
Antelope HS
Atwater HS
Clayton Valley Charter HS
Granite Bay HS
De La Salle HS
Del Oro HS
Roseville HS
Woodcreek HS

**HIGH SCHOOL – DIVISION II** (851-1,799)
Calaveras HS
Galt HS
Lincoln HS
Oakmont HS
River Valley HS
Sonora HS
St. Mary's HS
Summerville HS
Yuba City HS

**HIGH SCHOOL – DIVISION III** (up to 850)

**REGISTER YOUR TEAM**

**PRE SQUAD FORMS**

### Congratulations
2022
CYSSA Scholarship Winners

**Aiden Adams**
**Hunter Vandre**
**Alejo Peralton**
**Jordan Johnson**
**Michael Martinez**

In remembrance of Phil Murphy
–One of the founders of CYSSA –

**US OPEN LAS VEGAS, NEVADA**



**HIGH SCHOOL – DIVISION III** (up to 850)
Berean Christian HS
Bishop Manogue HS
Capital Christian HS
Colfax HS
Lassen HS
Mariposa HS
Marysville HS
North Tahoe HS
Sutter Union HS
Truckee HS

**OPEN GUN CLUB**
A&A Shooters
Angels Gun Club
Auburn Goldminers
Carson City Hot Shots
Comstock Claybusters
Coon Creek
Delta Valley
Diablo Valley Shotgun Sports
East Nicolaus Sportsman's Club
El Dorado Trap Team
Feather River Claybusters
Kingsburg Trap Club
Liberty Youth Shooters
Los Banos Tiger Trap Team
Martinez Gun Club
Outlaws
Sierra Valley Trap Team
Truckee Sport Shooters
Wilton Christian School Trap Team
Yolo Sportsman's Association Claybusters

**JUNIOR GUN CLUB**
*All of the Gun Club Teams plus*
Del Oro Jr. Trap Team
Depoali Middle School Rattlesnakes
Gold Country Shooters
Liberty Youth Shooting Team
Mother Lode Nuggets
Mariposa Youth
Truckee Sport Shooters
Woodcreek Area Youth Shooters

CYSSA HANDBOOKS





shootcyssa.com

Information – shootcyssa.com | EVENTS – shootcyssa.com

CYSSA®
California Youth Shooting Sports Association

HOME | CALENDARS | DIRECTORY | INFO | REGISTRATION | COACH NEWS | LINKS TO RANGES | US OPEN

# EVENTS

Home / EVENTS

REGISTER YOUR TEAM

PRE SQUAD FORMS

## US OPEN YOUTH CLAY SHOOTING CHAMPIONSHIPS
## TRAP, SKEET AND SPORTING CLAYS

July 5-9, 2022
Clark Co. Shooting Complex
Las Vegas, Nevada

(See below for Additional Details)

SHOOT-SUMMARY | HOTEL RATES AND DISCOUNTS CODE | SCHEDULE-OF-EVENTS | REGISTRATION INFORMATION

CALIFORNIA WATERFOWL | WHITE FLYER | CALIFORNIA RIFLE & PISTOL ASSOCIATION | FRIENDS OF NRA | NATIONAL RIFLE ASSOCIATION

US OPEN LAS VEGAS, NEVADA

shootcyssa.com

Information – shootcyssa.com | 2022-Flyer.jpg 4,336×5,611 pixels

2022 U.S.OPEN

CLARK COUNTY SHOOTING COMPLEX

# U.S. OPEN YOUTH CLAY SHOOTING NATIONAL CHAMPIONSHIP

TOURNAMENT DATES
July 5 - 9 , 2022

11357 N. DECATUR BLVD
LAS VEGAS, NEVADA

AWARDS CATEGORIES:
INDIVIDUAL 1st-5th in JV/Varsity - 1st-3rd FOR ALL OTHER LEVELS
SQUADS FOR ALL DISCIPLINES BY AGE CATEGORY; TEAM; AND HIGH OVERALL.
YOUNG ADULT, VARSITY, JUNIOR VARSITY, INTERMEDIATE ADVANCED, INTERMEDIATE ENTRY & ROOKIES

July 5 : SKEET, FIRST 100 TARGETS July 6 : SKEET, SECOND 100 TARGETS
July 7 : SPORTING CLAYS, 100 TARGETS July 8 : TRAP, FIRST 100 TARGETS
July 9 : TRAP, SECOND 100 TARGETS AND AWARDS CEREMONY

THE U.S. OPEN YOUTH CLAY SHOOTING CHAMPIONSHIP INCLUDES THE DISCIPLINES OF SKEET, SPORTING CLAYS, AND TRAP FOR YOUNG ADULTS AND 12TH GRADE AND BELOW. THIS U.S. OPEN IS AN OPPORTUNITY FOR YOUTH SHOOTING TEAMS AND INDIVIDUALS TO COMPETE AT A NATIONALLY-ADVERTISED EVENT WITH COMPETITORS FROM AROUND THE COUNTRY. PARTICIPANTS WILL ENJOY COMPETING ON 28 COMBINATION TRAP/SKEET FIELDS, TWO SPORTING CLAY COURSES, AND A 5-STAND FIELD. ENJOY A SAFE, FUN, FAMILY ORIENTED, SHOOTING EVENT AND EXTEND YOUR STAY FOR A HOLIDAY IN BEAUTIFUL #VEGASSTRONG.

TOURNAMENT & HOTEL INFO: www/shootcyssa.com/usopen REGISTRATION/QUESTIONS: shootreports@shootcyssa.com

HOSTED BY THE YOUTH SHOOTING SPORTS FEDERATION | www.shootcyssa.com







shootcyssa.com

Information – shootcyssa.com | 2022-Flyer.jpg 4,336×5,611 pixels

CYSSA®
California Youth Shooting Sports Association

HOME | CALENDARS | DIRECTORY | INFO | REGISTRATION | COACH NEWS | LINKS TO RANGES | US OPEN

- 2021-22
- 2020-21
- 2019-20
- 2018-19
- 2017-18
- 2016-17
- 2015-16
- 2014-15
- 2013-14

# INFORMATION

Home / Information

HERE I... NSTRUCTIONAL GUIDES IN PDF FORMAT.

## DIRECTORY

- Guides & Instructions
- News
- Gallery
- CYSSA Handbook
- Team Codes

REGISTER YOUR TEAM

PRE SQUAD FORMS

Scholarship

**Congratulations**
2022
CYSSA Scholarship Winners

Aiden Adams
Hunter Vandre
Alejo Peralton
Jordan Johnson
Michael Martinez

In remembrance of Phil Murphy
-One of the founders of CYSSA-

US OPEN LAS VEGAS, NEVADA

WHITE FLYER

CALIFORNIA

FRIENDS OF NRA

shootcyssa.com

Information – shootcyssa.com | 2022-Flyer.jpg 4,336×5,611 pixels

CYSSA®
California Youth Shooting Sports Association

HOME | CALENDARS | DIRECTORY | INFO | REGISTRATION | COACH NEWS | LINKS TO RANGES | US OPEN

- Guides & Instructions
- Gallery
- CYSSA Handbook
- CYSSA Handbook International Trap
- Team Codes
- Range and Gun Safety Video
- High Five Divisions
- Scholarship Application

# INFORMATION

Home / Information

HERE IS A LIST OF PRINTABLE INSTRUC… …RMAT.

## DIRECTO…

- Guides & Instructions
- News
- Gallery
- CYSSA Handbook
- Team Codes

REGISTER YOUR TEAM

PRE SQUAD FORMS

US OPEN LAS VEGAS, NEVADA

WHITE FLYER | CALIFORNIA | FRIENDS OF NRA

**NEW FOR 2022 ALL ATHLETES, HEAD COACHES, ASSISTANT COACHES , AND ADULT VOLUNTEERS  REGISTRATION WILL BE ONLINE:**

**1. TO REGISTER YOUR STUDENT ATHLETE:**
Click on the **"Registration link below"** . Select " 2021-2022 Youth Sessions" and complete the online registration.
*campscui.active.com/orgs/CaliforniaYouthShootingSportsAssociation?orglink=camps-registration*

**2. TO REGISTER YOUR COACHES AND VOLUNTEERS:**
Click on the **"Registration link below"** .  Select "2021-2022 Coaches and Volunteer Sessions" and complete the online registration. campscui.active.com/orgs/CaliforniaYouthShootingSportsAssociation?orglink=camps-registration
All Head Coaches, Assistant Coaches and Adult Volunteers working directly with the youth **must** submit to an on-line background check as provided by the CYSSA.
Each coach and adult volunteer must "Click" on this link to apply for the Background Check:
opportunities.averity.com/CalYouthSS.  The names of those who have completed the on-line application will be sent to the CYSSA Administrator. (Paperless and secure system.  Applicants can request a copy of the report)

*(Please do this as soon as possible so that we can update our records for the new season.)*
***3.  TO REGISTER YOUR TEAM OR UPDATE YOUR HEAD COACH:***
*Click on the " **Team Registration** " link " .*

*THIS YEARS DEADLINES FOR TEAM REGISTRATION, HEAD COACH CONTRACT, ASSISTANT COACH/ADULT VOLUNTEER REGISTRATION AND ON-LINE BACKGROUND CHECKS ARE: **Fall (Sporting Clays)  September 1 of this year, and  (Trap**
**and Shoot) February 1 of next year.***

**REGISTER YOUR TEAM**

**PRE SQUAD FORMS**



Congratulations
**2022
CYSSA Scholarship Winners**

**Aiden Adams
Hunter Vandre
Alejo Peralton
Jordan Johnson
Michael Martinez**

In remembrance of Phil Murphy
-One of the founders of CYSSA -

**US OPEN LAS VEGAS, NEVADA**



0581



Information – shootcyssa.com     2022-Flyer.jpg 4,336×5,611 pixels     Registration: Forms – shootcyssa.com

**HOME   CALENDARS   DIRECTORY   INFO   REGISTRATION   COACH NEWS   LINKS TO RANGES   US OPEN**



**NEW FOR 2022 ALL ATHLETES, HEAD COACHES, ASSISTANT COACHES , AND ADULT VOLUNTEERS  REGISTRATION WILL BE ONLINE:**

**1. TO REGISTER YOUR STUDENT ATHLETE:**
**Click on the " Registration link below"** . Select " 2021-2022 Youth Sessions" and complete the online registration.
*campscui.active.com/orgs/CaliforniaYouthShootingSportsAssociation?orglink=camps-registration*

**2. TO REGISTER YOUR COACHES AND VOLUNTEERS:**
Click on the **" Registration link below"** .  Select "2021-2022 Coaches and Volunteer Sessions" and complete the online registration. campscui.active.com/orgs/CaliforniaYouthShootingSportsAssociation?orglink=camps-registration
All Head Coaches, Assistant Coaches and Adult Volunteers working directly with the youth **must** submit to an on-line background check as provided by the CYSSA.
Each coach and adult volunteer must "Click" on this link to apply for the Background Check:
opportunities.averity.com/CalYouthSS.  The names of those who have completed the on-line application will be sent to the CYSSA Administrator. (Paperless and secure system.  Applicants can request a copy of the report)

*(Please do this as soon as possible so that we can update our records for the new season.)*
**3.  TO REGISTER YOUR TEAM OR UPDATE YOUR HEAD COACH:**
*Click on the "Team Registration" link "* .

*THIS YEARS DEADLINES FOR TEAM REGISTRATION, HEAD COACH CONTRACT, ASSISTANT COACH/ADULT VOLUNTEER REGISTRATION AND ON-LINE BACKGROUND CHECKS ARE: Fall (Sporting Clays)  September 1 of this year, and  (Trap and Skeet) February 1 of next year.*

on

*DEADLINE FOR ATHLETE REGISTRATIONS and FEES PAID IS  ANYTIME PRIOR TO AN ATHLETE'S PARTICIPATION IN THEIR FIRST CYSSA SANCITONED EVENT.*

**For Additional Registration Information Contact:**
Stanley Chan
boompole@aol.com
4805 Verena lane , Sacramento, CA. 95835

**THANK YOU...AND WELCOME TO THE CYSSA!**






**REGISTER YOUR TEAM**

**PRE SQUAD FORMS**



**US OPEN LAS VEGAS, NEVADA**



**CYSSA HANDBOOKS**





**TRAP CLUB LINKS**

AUBURN – http://www.auburntrapclub.net/

COON CREEK – cooncreektrap.com/location.html

KINGSBURG – www.kingsburggunclub.org/

SAC VALLEY – www.sacvalley.org/

SIERRA VALLEY – www.sierravalleygunclub-ca.com/

LOS BANOS – www.facebook.com/pages/Los-Banos-Sportsmens-Association/113227362033387

ANGEL'S CAMP – www.facebook.com/pages/Angels-Camp-Gun-Club/123264154398753

MARTINEZ – www.martinezgunclub.net/

YOLO – http://www.yolosportsmanassociation.com/

STOCKTON – stocktongunclub.com/

MOTHER LODE – www.motherlodegunclub.com/

NEWMAN – www.claytargetsonline.com/location/newman-swamp-rats-trapshooting-club/

CARSON CITY – www.capitolcitygunclub.org/

FALLON – www.shootnevada.com/fallon.html

**SPORTING CLAYS CLUB LINKS**

Raahague's – lincraahauges.com/

Birds Landing – www.birdslanding.net/

Quail Point – http://www.quailpoint.com/

Coon Creek – cooncreektrap.com/location.html

Camanche Hills – www.camhills.com/

Scholarship

**Congratulations**
2022
CYSSA Scholarship Winners

**Aiden Adams**
**Hunter Vandre**
**Alejo Peralton**
**Jordan Johnson**
**Michael Martinez**

In remembrance of Phil Murphy
-One of the founders of CYSSA -

**US OPEN LAS VEGAS, NEVADA**

**CYSSA HANDBOOKS**

0583



shootcyssa.com

# CYSSA
## California Youth Shooting Sports Association

HOME   CALENDARS   DIRECTORY   INFO   REGISTRATION   COACH NEWS   LINKS TO RANGES   US OPEN



Good morning,

We hate it when this happens, but we identified a miscalculation on the Varsity squad scores at the State Championship shoot. Saint Mary's edged out Granite Bay by four birds. We apologize for the confusion and stress that this has caused. We are already looking at ways to prevent this from happening. Again, we apologize for the error and ask for your forgiveness.

## 2022 senior state shoot
VARSITY SQUAD RESULTS

**AR — VAR SMH**  COACH: ANTHONY GOID   TEAM: SAINT MARY'S CATHOLIC   **948**

| | SHOOTER | CLUB | CAT. | SCORES | | |
|---|---|---|---|---|---|---|
| **2** | 1 SWANSON, DARIO | STM | VR | 96 | + 82 | = 178 |
| | 2 PERALTA, AJ | STM | VR | 99 | + 94 | = 193 |
| | 3 ALBERTI, SOPHIA | STM | VR | 98 | + 94 | = 192 |
| | 4 TRESS, LUKE | STM | VR | 97 | + 91 | = 188 |
| | 5 SCHULER, HUNTER | STM | VR | 99 | + 98 | = 197 |

**DD — GRIZZ 3**  COACH: RON DALE   TEAM: GRANITE BAY HIGH SCHOOL   **944**

| | SHOOTER | CLUB | CAT. | SCORES | | |
|---|---|---|---|---|---|---|
| **92** | 1 DICKSON, ETHAN | GBS | VR | 96 | + 93 | = 189 |
| | 2 HACKETT, BRENDEN | GBS | VR | 95 | + 96 | = 191 |
| | 3 PASCUAL, NICK | GBS | VR | 98 | + 96 | = 194 |
| | 4 AAKRE, MILO | GBS | VR | 92 | + 86 | = 178 |
| | 5 AVTLE, MICHAEL | GBS | VR | 93 | + 99 | = 192 |

**AB — DLS ONE**  COACH: JIM ABEDER   TEAM: DE LA SALLE TRAP TEAM   **932**

| | SHOOTER | CLUB | CAT. | SCORES | | |
|---|---|---|---|---|---|---|
| **83** | 1 LIGHTLE, JAKE | DLS | VR | 97 | + 98 | = 195 |
| | 2 MADRIGAL, LUKE | DLS | VR | 97 | + 96 | = 193 |
| | 3 KANGETER, MAXX | DLS | VR | 94 | + 94 | = 188 |
| | 4 OWEN, RUTT | DLS | VR | 91 | + 88 | = 179 |
| | 5 CASTILLO III, BENJAMIN | DLS | VR | 86 | + 91 | = 177 |

**A — EAGLE 3**  COACH: TOM HUGUENOT   TEAM: DEL ORO SPORTSMENS CLUB   **929**

| | SHOOTER | CLUB | CAT. | SCORES | | |
|---|---|---|---|---|---|---|
| **43** | 1 PAYNE, WYATT | DEL | VR | 97 | + 95 | = 192 |
| | 2 SNYDER, CAIDEN | DEL | VR | 96 | + 92 | = 188 |
| | 3 KILL, ROBERT | DEL | VR | 92 | + 87 | = 179 |

REGISTER YOUR TEAM

PRE SQUAD FORMS





Scholarship

**Congratulations**
2022
**CYSSA Scholarship Winners**

**Aiden Adams**
**Hunter Vandre**
**Alejo Peralton**
**Jordan Johnson**
**Michael Martinez**

In remembrance of Phil Murphy
-One of the founders of CYSSA -

## US OPEN LAS VEGAS, NEVADA







shootcyssa.com

HOME CALENDARS DIRECTORY INFO REGISTRATION COACH NEWS LINKS TO RANGES US OPEN

## 2021-22 CALENDAR OF EVENTS

2021-22 CALENDAR OF EVENTS

The CYSSA Clay Target Program is a team based YOUTH DEVELOPMENT PROGRAM for boys and girls, grades 12 and under, that provides it's participants with a positive, life enhancing experience. It is an opportunity for young people to participate in a supervised, shotgun shooting sports program taught by Certified Coaches that emphasizes gun safety and skill development in clay target shooting. The learning environment at team practices and at competitive events is designed to include the element of fun for all participants. Good sportsmanship, individual responsibility, self-discipline, positive academic progress and personal commitment are emphasized in the CYSSA program.

### DIVISIONS & CATEGORIES

YOUNG ADULT DIVISION (AGES 18-23)

---------------------------------------

SENIOR DIVISION (GRADES 9TH – 12TH)

| | |
|---|---|
| Junior Varsity | 1st year of participation in Senior Division |
| Varsity | 2nd, 3rd or 4th year of participation in Senior Division |

INTERMEDIATE DIVISION (GRADES 6TH – 8TH)

| | |
|---|---|
| Entry Level | 1st year of participation in Intermediate Division |
| Advanced | 2nd or 3rd year of participation in Intermediate Division |

ROOKIE DIVISION (GRADES 5 AND UNDER)

2021
Official Handbook

CYSSA
www.shootcyssa.com
California Youth Shooting Sports Association

2021
International Trap
Official Handbook

**ROOKIE DIVISION (GRADES 5 AND UNDER)**

Independent local teams are the core of the program. Teams may be formed from schools, gun clubs, neighborhoods, communities or be sponsored by other youth organizations such as 4-H, Boy and Girl Scouts, FFA, to name a few. The CYSSA administrative year starts Sept 1 and runs through August 31. While some teams have year long practices, most end their season with the State Championship.

## LOCAL AND STATE COMPETITION

Throughout the year, local clubs sponsor competitive events, "Series Shoots" in four clay target disciplines, trap, skeet, sporting clays and bunker. The format is 100 targets. Individual awards are given to the top three shooters in each Division and Category. The Series Shoots provide an opportunity for coaches, participants and parents to meet and build new friendships.

In mid-June the CYSSA hosts the 200 target State Trap Championships. It is a team, squad, and individual event for ALL registered CYSSA participants. Awards are presented to the top three squads and individuals in each Division and Category plus first and second place in the High Five Award (total of the best five scores from a team). State Championships also complete the season for skeet and sporting clays teams. Event dates, locations and programs are posted on the CALENDAR pages for each discipline.

For more information and rules regarding the program see the CYSSA Handbook (click here).





HOME    CALENDARS    DIRECTORY    INFO    REGISTRATION    COACH NEWS    LINKS N OPEN    NS OPEN



REGISTER YOUR TEAM

PRE SQUAD FORMS



US OPEN LAS VEGAS, NEVADA



CYSSA HANDBOOK3







## 2021-22 CALENDAR OF EVENTS

2021-22 CALENDAR OF EVENTS

The CYSSA Clay Target Program is a team based YOUTH DEVELOPMENT PROGRAM for boys and girls, grades 12 and under, that provides its participants with a positive, life enhancing experience. It is an opportunity for young people to participate in a supervised, shotgun shooting sports program taught by Certified Coaches that emphasizes gun safety and skill development in clay target shooting. The learning environment at team practices and at competitive events is designed to include the element of fun for all participants. Good sportsmanship, individual responsibility, self-discipline, positive academic progress and personal commitment are emphasized in the CYSSA program.

### DIVISIONS & CATEGORIES

**YOUNG ADULT DIVISION (AGES 18-23)**

--------------------------------------------------

**SENIOR DIVISION (GRADES 9TH — 12TH)**

| Junior Varsity | 1st year of participation in Senior Division |
|---|---|
| Varsity | 2nd, 3rd or 4th year of participation in Senior Division |

**INTERMEDIATE DIVISION (GRADES 6TH — 8TH)**

| Entry Level | 1st year of participation in Intermediate Division |
|---|---|
| Advanced | 2nd or 3rd year of participation in Intermediate Division |

**ROOKIE DIVISION (GRADES 5 AND UNDER)**

Independent local teams are the core of the program. Teams may be formed from schools, gun clubs, neighborhoods, communities or be sponsored by other youth organizations such as 4-H, Boy and Girl Scouts, FFA, to name a few. The CYSSA administrative year starts Sept 1 and runs through August 31. While some teams have year long practices, most end their season with the State Championship.

### LOCAL AND STATE COMPETITION

Throughout the year, local clubs sponsor competitive events, "Series Shoots" in four clay target disciplines, trap, skeet, sporting clays and bunker. The format is 100 targets. Individual awards are given to the top three shooters in each Division and Category. The Series Shoots provide an opportunity for coaches, participants and parents to meet and build new friendships.

In mid-June the CYSSA hosts the 200 target State Trap Championships. It is a team, squad, and individual event for ALL registered CYSSA participants. Awards are presented to the top five shooters and individuals in each Division and Category plus first and second place in the High Five Award (total of the best five scores from a team). State Championships also complete the season for each discipline. Event dates, locations and programs are posted on the CALENDAR pages for each discipline.

For more information and rules regarding the program see the CYSSA Handbook (click here).



# EXHIBIT 11



**California Youth Shooting Sports Association**



HOME    CALENDARS    DIRECTORY    INFO    REGISTRATION    COACH NEWS

LINKS TO RANGES    US OPEN    🔍



REGISTER
YOUR TEAM

Good morning.

We hate it when this happens, but we identified a miscalculation on the Varsity squad scores at the State Championship shoot. Saint Mary's edged out Granite Bay by four birds. We apologize for the confusion and stress that this has caused. We are already looking at ways to prevent this from happening. Again, we apologize for the error and ask for your forgiveness.

PRE SQUAD
FORMS

**2022 senior state shoot**
VARSITY SQUAD RESULTS

**AR — VAR SMH**                                    **948**
COACH: ANTHONY GIBO        TEAM: SAINT MARY'S CATHOLIC

| | SHOOTER | CLUB | CAT. | SCORES |
|---|---|---|---|---|
| 2 | 1 SWANSON, DARIO | STM | VR | 96 • 82 • 178 |
| | 2 PERALTA, AJ | STM | VR | 97 • 94 • 193 |
| | 3 ALBERTI, SOPHIA | STM | VR | 98 • 94 • 192 |
| | 4 TRESS, LUKE | STM | VR | 97 • 91 • 188 |
| | 5 SCHULER, HUNTER | STM | VR | 99 • 98 • 197 |

**DD — GRIZZ 3**                                    **944**
COACH: RON DALE        TEAM: GRANITE BAY HIGH SCHOOL

| | SHOOTER | CLUB | CAT. | SCORES |
|---|---|---|---|---|
| 92 | 1 DICKSON, ETHAN | GBS | VR | 96 • 93 • 189 |
| | 2 HACKETT, BRENDEN | GBS | VR | 95 • 96 • 191 |
| | 3 PASCUAL, NICK | GBS | VR | 98 • 96 • 194 |
| | 4 AAKRE, MEO | GBS | VR | 92 • 86 • 178 |
| | 5 ASTLE, MICHAEL | GBS | VR | 93 • 99 • 192 |

**AB — DLS ONE**                                    **932**
COACH: JIM ABERER        TEAM: DE LA SALLE TRAP TEAM

| | SHOOTER | CLUB | CAT. | SCORES |
|---|---|---|---|---|
| 83 | 1 LIGHTLE, JAKE | DLS | VR | 97 • 98 • 195 |
| | 2 MADRIGAL, LUKE | DLS | VR | 97 • 96 • 193 |
| | 3 KANGETER, MAXX | DLS | VR | 94 • 94 • 188 |
| | 4 OWEN, RUFF | DLS | VR | 91 • 88 • 179 |
| | 5 CASTILLO III, BENJAMIN | DLS | VR | 86 • 91 • 177 |

**A — EAGLE 3**                                    **929**
COACH: TOM HUGUENOT        TEAM: DEL ORO SPORTSMENS CLUB

| | SHOOTER | CLUB | CAT. | SCORES |
|---|---|---|---|---|
| 43 | 1 PAYNE, WYATT | DEL | VR | 97 • 95 • 192 |
| | 2 SNYDER, CAIDEN | DEL | VR | 96 • 92 • 188 |
| | 3 GILE, ROBERT | DEL | VR | 92 • 87 • 179 |
| | 4 PARKER, RILEY | DEL | VR | 98 • 91 • 189 |
| | 5 DERUNGS, SEAN | DEL | VR | 89 • 92 • 181 |

Date: 6/24/2013    Time: 11:05:36 AM    Page: 1

 

**US OPEN LAS VEGAS,
NEVADA**

0589



# 2021-22 CALENDAR OF EVENTS

2021-22 CALENDAR OF EVENTS

The CYSSA Clay Target Program is a team based YOUTH DEVELOPMENT PROGRAM for boys and girls, grades 12 and under, that provides it's participants with a positive, life enhancing experience. It is an opportunity for young people to participate in a supervised, shotgun shooting sports program taught by Certified Coaches that emphasizes gun safety and skill development in clay target shooting. The learning environment at team practices and at competitive events is designed to include the element of fun for all participants. Good sportsmanship, individual responsibility, self-discipline, positive academic progress and personal commitment are emphasized in the CYSSA program.

## CYSSA HANDBOOKS





### DIVISIONS & CATEGORIES

### YOUNG ADULT DIVISION (AGES 18-23)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### SENIOR DIVISION (GRADES 9TH – 12TH)

| Junior Varsity | 1st year of participation in Senior Div |
| Varsity | 2nd, 3rd or 4th year of participation in Seni |

### INTERMEDIATE DIVISION (GRADES 6TH – 8TH)

| Entry Level | 1st year of participation in Intermediate |



| Advanced | 2nd or 3rd year of participation in Interm Division |

### ROOKIE DIVISION (GRADES 5 AND UNDER)

Independent local teams are the core of the program. Teams may be formed from schools, gun clubs, neighborhoods, communities or be sponsored by other youth organizations such as 4-H, Boy and Girl Scouts, FFA, to name a few. The CYSSA administrative year starts Sept 1 and runs through August 31. While some teams have year long practices, most end their season with the State Championship.

## LOCAL AND STATE COMPETITION

Throughout the year, local clubs sponsor competitive events, "Series Shoots" in four clay target disciplines, trap, skeet, sporting clays and bunker. The format is 100 targets. Individual awards are given to the top three shooters in each Division and Category. The Series Shoots provide an opportunity for coaches, participants and parents to meet and build new friendships.

In mid-June the CYSSA hosts the 200 target State Trap Championships. It is a team, squad, and individual event for ALL registered CYSSA participants. Awards are presented to the top three squads and individuals in each Division and Category plus first and second place in the High Five Award (total of the best five scores from a team). State Championships also complete the season for skeet and sporting clays teams. Event dates, locations and programs are posted on the CALENDAR pages for each discipline.

For more information and rules regarding the program see the CYSSA Handbook (click here).



shooters pro shop

Copyright 2016 ShootCYSSA | All Rights Reserved | Powered by 2slick.com

# EXHIBIT 12



# California Youth Shooting Sports Association



# 2020 - 2021
# Official Handbook

California Youth Shooting Sports Association                    Rev. 2/15/2019

## California Youth Shooting Sports Association Handbook

## TABLE OF CONTENTS

### Section 1.0 – Introduction

1.1 The California Youth Shooting Sports Association .................................. 1
1.2 CYSSA President ............................................................................. 1
1.3 Purpose and Design of the CYSSA Program ........................................ 1
1.4 Sanctioned Shooting Disciplines and Seasons ......................................... 1

### Section 2.0 - General Requirements

2.1 Participant
    2.1.1 Student Status and Age Eligibility ................................. 2
    2.1.2 Academic Eligibility ..................................................... 2
    2.1.3 Competitive Divisions and Categories .......................... 2
2.2 Team
    2.2.1 Team Composition ...................................................... 2
    2.2.2 New Participants on a Team ......................................... 2
    2.2.3 Choosing a Team ......................................................... 3
    2.2.4 Application for Waiver ................................................. 3
    2.2.5 Home Gun Club or Shooting Facility ........................... 3
    2.2.6 Team Minimum Requirement ....................................... 4
    2.2.7 Bump-up Rule ............................................................. 4
    2.2.8 Team Registration, Deadlines, Requirements ............... 5
    2.2.9 Team Focus ................................................................. 5
    2.2.10 Regular Practices ........................................................ 5
    2.2.11 Team Funding ............................................................. 5
2.3 Coaches and Adult Volunteers ...................................................... 6
    2.3.1 Head Coach Requirements ........................................... 6
    2.3.2 Head Coach Responsibilities ........................................ 6
    2.3.3 Head Coach Registration ............................................. 6
    2.3.4 Team and Participant Registration ............................... 7
    2.3.5 Assistant Coaches, Adult Volunteers, Junior Trainers ............. 7

### Section 3.0 – Equipment

3.1 Shotguns… ................................................................................. 9
3.2 Shotshells .................................................................................... 9

### Section 4.0 – Safety Requirements

4.1 Personal Safety ........................................................................... 10
    4.1.1 Eyes and Ears Protection ............................................. 10
    4.1.2 Footwear .................................................................... 10
    4.1.3 Hats ........................................................................... 10
    4.1.4 Toe Pads .................................................................... 10
    4.1.5 NRA Rules of Gun Safety ........................................... 10
4.2 Range Safety ............................................................................... 10

0596

**California Youth Shooting Sports Association Handbook**

### Section 5.0 – Personal Conduct
5.1    Appropriate Dress ........................................................................ 11
5.1.1    Tops .......................................................................................... 11
5.1.2    Bottoms .................................................................................... 11
5.1.3    Clothing Adornments .............................................................. 11
5.2    Attitude/Conduct ..................................................................... 11

### Section 6.0 – Governance of the CYSSA Program
6.1    Disqualifications, Suspensions or Expulsions ........................... 12
6.2    Appeal Process .......................................................................... 12
6.2.1    Issue in Dispute ........................................................................ 12
6.2.2    Qualified Appellant ................................................................. 12
6.2.3    Head Coach Concurrence ......................................................... 12
6.2.4    Filing Procedure ....................................................................... 12

### Section 7.0 - Competitions
7.1    Series Shoot ............................................................................. 13
7.1.1    Description ................................................................................ 13
7.1.2    Course of Fire .......................................................................... 13
7.1.3    Awards ...................................................................................... 13
7.1.4    Team Assignments ................................................................... 13
7.2    State Championship .................................................................. 13
7.2.1    Description ................................................................................ 13
7.2.2    Course of Fire .......................................................................... 13
7.2.3    Awards ...................................................................................... 13
7.3    Non-CYSSA Teams or Individuals ........................................... 14
7.4    General Rules ........................................................................... 14
7.4.1    Scorers ..................................................................................... 14
7.4.2    Scorekeeping Rules ................................................................. 14
     7.4.2.1 Dead Targets .................................................................. 14
     7.4.2.2 Lost Targets ................................................................... 14
     7.4.2.3 No Targets ..................................................................... 15
     7.4.2.4 Failure to Fire ............................................................... 15
     7.4.2.5 Legal Trap Target .......................................................... 15
     7.4.2.6 Illegal Trap Target ........................................................ 15
     7.4.2.7 Legal Skeet Target ........................................................ 16
     7.4.2.8 Illegal Skeet Target ...................................................... 16
7.4.3    Ties .......................................................................................... 16
     7.4.3.1 Squad Ties ..................................................................... 16
     7.4.3.2 Individual Ties .............................................................. 16
7.4.4    Protests .................................................................................... 17
7.4.5    Disqualifications ...................................................................... 17
7.4.6    Coaches and Spectators ........................................................... 18
7.4.7    Participants .............................................................................. 18

0597

**California Youth Shooting Sports Association Handbook**

## 1.1 - INTRODUCTION

### 1.2 The CYSSA
The California Youth Shooting Sports Association (CYSSA), is a 501(c)(3) non-profit educational, athletic organization providing administrative support and direction to the CYSSA Clay Target Program in California. The CYSSA is governed by Officers and an Advisory Board.

### 1.3 CYSSA President
The CYSSA President is an unpaid position and is elected by a majority vote of the CYSSA Board to assist administrative personnel in the day-to-day operations of the CYSSA Clay Target Program. The President is the contact person for head coaches and the final arbiter of all decisions relating to the interpretation of the rules as set forth in this handbook. Decisions of the President are final, binding and not appealable. In emergency circumstances, the President may grant a waiver or allow a special exception to the rules. Such waivers or exceptions shall be made only when doing so is in the best interest of the CYSSA.

### 1.4 Purpose and Design of the CYSSA Program
The CYSSA Clay Target Program is a team based youth development program for school aged youths (grades 12 and under) which uses participation in the shooting sports to provide it's participants with a positive, life enhancing experience and is designed to instill in them a set of personal values or character traits that teaches fair play, individual responsibility, sportsmanship, self-discipline and personal commitment – qualities that will serve them well throughout their lives and will be instrumental in helping each participant reach their full potential.

CYSSA team activities are designed to incorporate two indispensable elements - SAFETY and FUN. CYSSA participants, led by trained and dedicated coaches, are taught the safe and responsible handling and use of firearms. The learning environment at team practices, and at competitive shoots, is designed to include the element of fun for all participants. Participants discover the joy of contributing to a shared team goal and the commitment that goes along with it. During this self-discovery process, team members develop proficiency in a sport that can be shared and enjoyed with family and friends for a lifetime.

Competition is clearly a part of the CYSSA sponsored shooting programs, but it is NOT the main emphasis of the program. The "Win at all Costs" philosophy has no place in this program. Striving to win while playing by the rules does. Participants are encouraged to set goals for improving their skills and contribute to the team. Honoring the game, exhibiting good sportsmanship and being a responsible team member are the primary values the CYSSA wishes to instill in its participants. It is the duty of everyone involved in the CYSSA – Coaches, Parents and Participants to familiarize themselves with the rules in this handbook and to uphold the high moral and ethical standards of personal conduct that participating in the shooting sports requires.

### 1.5 Sanctioned Shooting Disciplines and Seasons
The CYSSA offers opportunities for teams to participate in the Clay Target Program in the shooting sports of Trap, Skeet and Sporting Clays. The administrative year begins on September 1 and runs through August 31. While some Teams have a year-long practice schedule, many end their season with their State Championship.

0598

## California Youth Shooting Sports Association Handbook

## 2.1 - GENERAL REQUIREMENTS

## 2.2 Participant

### 2.2.1 Student Status and Age Eligibility

All school age youths in grades 12 and under with the physical, mental and emotional maturity to participate in a team shooting sport are eligible to participate. Participants must be students enrolled in a public or private accredited school or enrolled in a bona fide home school program. Eligibility ends with graduation from high school or once a student reaches his or her 20th birthday, whichever comes first. The CYSSA Board may grant a variance for the age requirement in view of special circumstances. High school participants graduating in the fall or spring semester of the current season are eligible to complete the entire season.

### 2.2.2 Academic Eligibility

All CYSSA Participants must make satisfactory academic progress and be deemed eligible to participate in extra-curricular activities as determined by school officials at their home school. A minimum 2.0 GPA is required for participation. The Head Coach has the option of establishing higher standards for his/her Team members.

### 2.2.3 Competitive Divisions and Categories

Divisions and Categories are designed to allow participants the opportunity of competing on a level playing field with one another. Grade level in school and years of participation – not age – within a division are the criteria used. Home schooled students 15 years of age or older must compete in the Senior Division. Determinations are as of September 1st. An athlete that participates in more than one CYSSA shooting discipline (trap, sporting clays, skeet, international trap) shall be classified by their most advanced classification in which they participate for any of the disciplines.

**Rookie Division (Grades 5 and under)**

**Intermediate Division (Grades 6 through 8)**
      Entry Level Category - 1st year of participation in the Intermediate Division
      Advanced Category – After one year of participation in the Intermediate Division

**Senior Division (Grades 9 through 12)**
      Junior Varsity Category - 1st year of participation in the Senior Division
      Varsity Category – After one year of participation in the Senior Division

## 2.3 Team

### 2.3.1 Team Composition

A team consists of one or more athletes and coaches from a gun club or high school that meet the requirements of this handbook. All participants must be members of a single Team that is registered with the CYSSA. A Team may choose to recruit its members from a sponsoring school or gun club. Participants may also be recruited from neighborhoods and communities and sponsored by youth organizations such as Church Groups, 4-H, Boy and Girl Scouts, FFA, etc.

### 2.3.2 New Participants on a Team

A participant may only register with one team for all disciplines (trap, skeet, sporting clays, international trap). Potential new members interested in shooting on an existing CYSSA Team

0599

**California Youth Shooting Sports Association Handbook**

must fill out the Consent and Waiver, Medical Consent and Sportsmanship Contract (See Section 2.3.4) prior to participating in any CYSSA activities, including practices. The athlete's registration forms must be on file with the CYSSA and fees paid prior to an athlete participating in any CYSSA sanctioned events.

New members may join a CYSSA Team at any time during a Team's CYSSA season. However, they must attend six team practice sessions in order to be eligible to shoot in the CYSSA State Championship (See Section 2.2.9). Series Shoots are not counted as practices, but all participants who have paid their fees and joined a registered Team are eligible to shoot at Series Shoots, without meeting the 6-team practice session requirement.

### 2.3.3 Choosing a Team

Scholastic Grades 5-8: The participant is required to shoot for one of the two gun club teams located closest to their residence. If the participant has been shooting for a different gun club Team that is not one of the two Teams closest to their residence prior to the shooting year, they may continue shooting for that Team.

Scholastic Grade 9-12 with a School-based CYSSA Team: If a participant attends a high school with a CYSSA Team, the participant is required to shoot for the high school team where they attend, or for one of the two gun club Teams located closest to their residence unless they were previously shooting for a gun club that has a CYSSA team. In the event they are shooting for a gun club with a CYSSA Team and they either begin attending a high school that has a CYSSA Team or the high school they are currently attending starts a CYSSA Team, they have the option of selecting which Team they wish to shoot for without filing for a waiver. Once they have made their selection to shoot for a Team, they are committed to shoot for that Team for the remainder of their CYSSA career unless they submit a waiver that is approved by CYSSA.

Scholastic Grade 9-12 without a School-based CYSSA Team: If a participant attends a high school with no CYSSA Team, they may apply to join the closest High School team, with approval from the head coach and school administration, through the waiver process described in Section 2.2.4, or, they may join one of the two gun club Teams located closest to their residence unless they were previously shooting for a gun club that has a CYSSA team. If there is no gun club Team near their school or residence, they may apply to join another Team through the waiver process described in Section 2.2.4. Once they have made their selection to shoot for a Team, they are committed to shoot for that Team for the remainder of their CYSSA career unless they submit a waiver that is approved by CYSSA.

A CYSSA participant may switch between the two closest gun club Teams one time with an approved waiver (See Section 2.2.4). Once the participant has made a change to the alternate closest team, they are committed to shoot for that Team for the remainder of their CYSSA career.

### 2.3.4 Application for Waiver

A participant may apply for a Waiver to the provisions of Section 2.2.3 by submitting a written request to the CYSSA President using the Waiver Application, a copy of which is included in this handbook. The CYSSA Board will review all Waiver requests and will notify the participant of the Board's decision. The Board's decision is final and not subject to appeal. A waiver is irrevocable and in effect for the remainder of the participants' CYSSA career. Once the participant

0600

**California Youth Shooting Sports Association Handbook**

has made a change to the alternate closest team, they are committed to shoot for that Team for the remainder of their CYSSA career.

**2.3.5 Gun Club or Shooting Facility**
Teams are to designate one gun club or shooting facility as its "Home" Gun Club or Shooting Facility of record at the time of registration with the CYSSA. A Team will be officially recognized at only one gun club or shooting facility per shooting discipline per CYSSA target year. This facility is the place where the team practices with its coaches on a regular basis.

Participants living near a state line may register at a Home Gun Club/Shooting Facility in a state other than their home state of residence so long as they meet the requirements as set forth in Sections 2.2.1, 2.2.2 and 2.2.3. A Participant may not be registered at more than one Home Gun Club/Shooting Facility per shooting discipline no matter where it is physically or legally located.

**2.3.6 Team Minimum Requirement**
The basic competitive unit of the CYSSA Clay Target Program is the Squad. A Team must consist of at least one registered squad. There is no upper limit to the number of individuals that can be registered with a Team. Teams may field as many squads as they can recruit members to fill them. A competitive squad is five (5) shooters in trap, except for Rookie squads at the State or National Tournament where a competitive squad may be reduced to three (3) as may be authorized from time to time by the CYSSA Board of Directors; and three (3) in skeet and sporting clays who are of the same Category and Division.

**2.3.7 mp-Up Rule**
A competitive squad is five (5) shooters in trap and three (3) in skeet and sporting clays who are of the same Category and Division. In a CYSSA sanctioned event where a Team is unable to field a full squad in a particular Division and Category, a lower Division and Category participant or participants may be elevated, or "bumped-up", to fill the higher squad vacancy for that event. The squad collectively then assumes the identity of the highest ranked Division and Category squad member for that event. Those individuals that were bumped-up remain eligible for individual awards in their original Division and Category. A high school team with an *officially affiliated* junior gun club program may bump up athletes from the junior gun club team to the high school team. Junior gun club teams and high school teams that are not affiliated may not bump up athletes between teams.

The main purpose of the bump-up rule is to give Teams the ability to field at least one competitive squad in a Division and Category where they would not otherwise be able to do so, as well as for teams that may have multiple squads in a Division or Category but one of those squads is not complete (less than 5 athletes in trap, 3 in skeet and sporting clays) due to an odd number of participants in that particular Division and Category. For example: If a trap team had only one Varsity squad with three shooters, the team may bump up a JV shooter and an Intermediate Advanced shooter to fill the squad of 5 athletes. The squad may then compete as a Varsity Squad for that event, however the shooters bumped-up will still compete for individual awards in the Junior Varsity and Intermediate Advanced categories. Teams may field multiple competitive squads including those that are comprised of five athletes from the same Division and Category and squads that are utilizing the bump-up rule if a squad has less than five athletes in a Category or Division. All competitive squads shall be eligible for relevant awards earned.

**California Youth Shooting Sports Association Handbook**

If a team has sufficient athletes to assemble a full squad (5 athletes in trap, 3 in skeet and sporting clays) in a Division or Category, it must do so before bumping up any lower Division or Category athlete to the upper level squad. For example, if a Trap team has four Varsity shooters, five JV shooters, and six IE shooters, it must squad the JV shooters on a full squad, five of the IE shooters on a squad, and then may bump up the remaining IE shooter to fill the Varsity squad vacancy.

A shooter may also compete on a Mixed Squad (a squad made up of members from different teams) or a Short Squad (one that is not full) and maintain their individual classification. Those Mixed or Short squads are not competitive squads but the individual shooters are eligible for individual awards in their respective Division and Category.

### 2.3.8 Team Registration Process and Deadline

Every Team seeking to participate in CYSSA must be registered with CYSSA prior to participating in any sanctioned event. Each registered Head Coach (See 2.3.2) is responsible for registering their Team with the CYSSA by going to the CYSSA website at www.shootcyssa.com and downloading and completing the Team Registration form. The form is to be completed and mailed to CYSSA Administrative Headquarters according to the following deadlines.

The deadline for Team and Head Coach Registration for existing/returning teams in trap, skeet, and international trap (bunker) is February 1st. The deadline for Team and Head Coach Registration for existing/returning teams in sporting clays is September 1st. Head Coaches wishing to register a new Team that has not previously been registered with CYSSA may contact the CYSSA Administrative Headquarters at any time to register a new team that is formed.

In addition to these deadlines, a team and any individual athlete thereof, that desires to participate in the CYSSA State Competition for the **trap discipline** must participate in a minimum of two (2) trap Series Shoots and meet the practice requirements in Section 2.2.10.

Further, a team and any individual athlete thereof, that desires to participate in the State Championships of one or more of the CYSSA disciplines of **skeet, sporting clays,** or **international trap (bunker)** must participate in a minimum of one (1) Series Shoot for each discipline they are participating in and meet the practice requirements in Section 2.2.10.

Only registered participants (forms on file and fees paid to CYSSA) may participate in Series Shoots and State Competitions. Any requested variance to Section 2.2.8 must be submitted to the CYSSA Board using the enclosed Waiver Request form submitted 30 days in advance of the shoot. Violations of this rule could result in the expulsion of a participant or a Team from CYSSA.

### 2.3.9 Team Focus

The intent of the CYSSA Clay Target Program is to provide participants with the opportunity to be a member of a TEAM. A Team is composed of a group of individuals who are committed to a common goal and who work together regularly to achieve that goal. Ultimately, to achieve this unity of purpose requires team members to spend time together in activities other than just shooting. Team members are expected and encouraged to practice on a regular basis with their coach(es) and to actively participate in team fund-raising efforts and community-service projects.

0602

**California Youth Shooting Sports Association Handbook**

### 2.3.10 egular Practices

Conducting regular practice is important for safe gun handling skill development for all athletes. Head Coaches are required to hold regular practices for their Team members with a minimum of six Team practice sessions, each on a separate day, with each Team member shooting a minimum of 25 targets at each practice session. Team members must attend six Team practice sessions in any of the CYSSA disciplines of trap, skeet, sporting clays or international trap (bunker) in order to be eligible to shoot in any CYSSA State Championship event. Practice sessions need not be in any specific discipline, however Series Shoots are not to be counted as practice sessions.

### 2.3.11 Team Funding

A Team is responsible for its own funding including practice, targets, travel, meals, ammunition, and shoot registration fees.

## 2.4 Coaches and Adult Volunteers

### 2.4.1 Head Coach Requirements

Every Team must have a Head Coach who is 21 years of age or older. The primary responsibility of the Head Coach is to ensure the SAFETY of participants. Head Coaches MUST emphasize safe handling and use of firearms in every facet of the CYSSA Program and must be willing to conduct Regular Practices as stipulated in Section 2.2.10 to reinforce safe gun handling skills.

### 2.4.2 Head Coach Responsibilities

The Head Coach is the primary point of contact between CYSSA and everyone involved with the Team unless he/she appoints an administrative person to assume this duty. The Head Coach is responsible for monitoring his/her participant's attendance at practices (Section 2.2.10) and checking for academic eligibility (Section 2.1.2). He/She also oversees the activities of the Assistant Coaches and Adult Volunteers.

For all CYSSA events (practices and competitions) the Team must be under the supervision of the Team's Head Coach. In the event the Head Coach cannot be present, he/she must designate an Assistant Coach who is registered with the team to provide supervision and leadership.

It is the Head Coach's responsibility to verify that the Division and Category information for each participant is correctly entered on all forms. The Head Coach or assigned Team Coordinator must have the Medical Consent form for each of his/her participants in his/her possession at all practices and CYSSA events.

All Head Coaches and Assistant Coaches must hold a current Shotgun Coach Certification credential. Credentials from the following Certified Coach training programs are accepted for one (1) year after which time they must take the USAS/NRA/CMP Shotgun Coach Certification class and be a Level 1 or higher Shotgun Coach.

- ☐ NSCA Level 1 or higher Instructor Certification
- ☐ NSSA Level 1 or higher Instructor Certification
- ☐ NRA/ATA Trap Coach Certification
- ☐ Team USA Shooting Coach Certification
- ☐ NRA Shotgun Instructor Certification
- ☐ 4-H Shooting Sports Shotgun Certification

**California Youth Shooting Sports Association Handbook**

☐ Boy Scouts Shotgun Instructor Certification

The Head Coach is responsible for registering with CYSSA and his/her Team and making sure participants are registered. He/she may appoint an administrative person to assume this task. (See Sections 2.3.3 and 2.3.4).

### 2.4.3 Head Coach Registration

The Head Coach must complete and submit the Head Coach Registration found on the CYSSA website (shootcyssa.com) by February 1st (trap, skeet, bunker) or September 1st (sporting clays) and mail with payment to the CYSSA Administrative Headquarters. The Head Coach and all assistant coaches and adult volunteers shall undergo a background check prior to having any interaction with athletes. To obtain a background check, see shootcyssa.com for a description of the process. The CYSSA Administrative Headquarters must receive a clear background check prior to a coach's interaction with any athlete or CYSSA event.

### 2.4.4 Team and Participant Registration

Team Registration is the responsibility of the Head Coach as stated in Section 2.2.8 above. Participant registration is the responsibility of the Head Coach and involves going to the CYSSA website, shootcyssa.com, each year to download the required forms, which include a Consent & Waiver, Medical Consent and Sportsmanship Contract. Each form must be copied and distributed to all potential participants and their parents or guardians to read, complete, sign, and return to the Head Coach. Head Coaches are responsible for collecting the completed forms and reviewing them to make sure they are filled out properly and the athlete is appropriately classified in the correct division before mailing the original Consent & Waiver and Sportsmanship Contracts with required payment to the CYSSA Headquarters. Head Coaches are to keep the Medical Consent forms with their Team records. The Head Coach or designated Team Coordinator must have Medical Consent Forms for each Team participant at all practices and CYSSA sanctioned events.

A Consent & Waiver and Sportsmanship Contract MUST be completed and on file with the CYSSA headquarters office **PRIOR TO** an athlete participating in any CYSSA activity, which includes but is not be limited to team practices, series shoots, or the state championship for any discipline. If the Head Coach fails to submit a Consent & Waiver, Sportsmanship Contract and required fees to the CYSSA headquarters for an athlete, that athlete will be deemed as not registered and therefore ineligible to participate in CYSSA. If an athlete who is not registered has participated in any CYSSA series shoot or state championship at the time when the failure to register is determined, any score for an event that the athlete has completed will be nullified and the athlete disqualified from future CYSSA events until the proper registration is completed. In such cases, the athlete's score will be changed to zero (0) and the awards redistributed accordingly among eligible participants, squads, teams, and High 5 or High 3 as appropriate. Additionally, Head Coaches who allow an athlete who is not registered to participate in a CYSSA series shoot or state championship will be assessed a penalty of $50 per unregistered athlete for every event that an unregistered athlete or athletes participate. Payment of the penalty will be due immediately upon discovery and is paid to CYSSA.

### 2.4.5 Assistant Coaches and Adult Volunteers

**2.3.5.1** All Assistant Coaches are required to hold a current Certification, be registered with the CYSSA and undergo background checks in the same manner as the Head Coach.

**California Youth Shooting Sports Association Handbook**

To register go to the CYSSA website, shootcyssa.com and download the proper forms. Complete and return with fee to the CYSSA Administrative Headquarters. Assistant Coaches and Adult Volunteers must be a minimum of 18 years old.

**2.3.5.2** The Assistant Coach's first and foremost responsibility is to ensure the safety of all participants and as such must emphasize the safe handling and use of firearms in every facet of the program. They are to assist the Head Coach with regular practice sessions and assist in performing the role of safety monitor at competitions and events.

**2.3.5.3** All Adult Volunteers directly involved with registered CYSSA Participants on a Team must be registered with the CYSSA and undergo background checks. No coaching certification is required. To register go to the CYSSA website and download the proper forms. Complete and return with fee to the CYSSA Headquarters. (Special circumstances apply to schools that already administer background checks to their employees).

**2.3.5.4**  Junior Trainers (ages 15 to 17), who have been recommended by a parent and their coach and have successfully completed a Shotgun Coach Certification credential from a training program as described in Section 2.3.2, can assist the head coach and assistant coaches in the training of other athletes. They must be working under the direct supervision of the head coach or an assistant coach.

**California Youth Shooting Sports Association Handbook**

## 3.0 - EQUIPMENT

### 3.1 Shotguns

**3.1.1** Any shotgun action type, 12 gauge or smaller, may be used as long as it is in a safe and workable condition and the participant is familiar with its operation. Shotguns used for all the disciplines, except for trap, must be able to shoot twice without requiring it to be reloaded.

**3.1.2** All participants using semi-automatic shotguns shall use a device capable of deflecting or suspending a fired shell hull so that it does not strike or interfere with fellow participants on the shooting line (e.g. shell catcher).

**3.1.3** Guns with exposed hammers, 'pistol' or tactical style grips/stocks, and release triggers are prohibited.

**3.1.4** Choke tubes or shotgun barrels may not be changed during any sub-event with the exception of chokes in sporting clays.

**3.1.5** Optics, assistive aiming devices, or shooting scopes are prohibited. A single neon colored front bead is permitted.

### 3.2 Shotshells

**3.2.1** Maximum loads for any gauge event may not exceed: Gauge 12 1 1/8 oz. lead. Gauge 20 7/8 oz. lead. Shot shells used in the trap, skeet and sporting clays disciplines must meet the following specifications:
- A maximum shot charge of 1 1/8 oz. cannot exceed a velocity of 1,290 ft/sec. or
- A maximum shot charge of 1 oz. cannot exceed a velocity of 1,325 ft/sec. or
- A maximum shot charge of 7/8 oz. cannot exceed a velocity of 1,350 ft/sec.

**3.2.2** All shot shell ammunition including reloads may generally be used, unless otherwise restricted by the shoot organizers. Reloads are not permitted at CYSSA State Championships, the YSSF US Open. Black powder, visual training loads, tracers or tracking devices are not permitted. Other shoot officials may also limit the ammunition to commercially manufactured shot shells. California Shooting Sports Association (CYSSA) assumes no responsibility in connection with the use of reloads or commercially manufactured ammunition.

**3.2.3** No lead shot smaller than US No. 9 (nominal diameter 0.080) or larger than US No. 7 ½ (nominal diameter 0.095) shall be used in any load. No steel shot.

**3.2.4** Shot shall be normal production spherical shot. Plated shot is permitted.

**3.2.5** Shot shells containing nickel, steel or copper coated shot, tracer loads/wads, or black powder are prohibited in all disciplines.

0606

## California Youth Shooting Sports Association Handbook

### 4.0 - SAFETY REQUIREMENTS

**4.1 Personal Safety**

**4.1.1 Eyes and Ears -** All CYSSA participants, coaches and anyone on the shooting field must wear appropriate ear (earplugs or muffs) and eye (shatterproof glasses) protection during practices and competitions. Participants MUST wear ear and eye protection when on the shooting line.

**4.1.2 Footwear** - All Participants must wear closed-toe and closed-heel footwear while on the shooting line. Wearing sandals, flip-flops, crocks, or any open-toed/heel footwear is prohibited.

**4.1.3 Hats –** Skeet and sporting clays participants must wear a hat with brim forward.

**4.1.4 Toe Pads** – The use of toe pads or resting the firearm barrel on any part of the foot is strictly prohibited. Barrel pads that are not attached to the participant's clothing or body are permissible.

**4.1.5 NRA Rules of Gun Safety** – Participants must always keep the gun pointed in a safe direction, always keep your finger off the trigger until ready to shoot, and always keep the gun unloaded and open until ready to use. Violation of the NRA safety rules may result in removal from a CYSSA sanctioned event.

**4.2 Range Safety**

**4.2.1** All participants must keep firearms unloaded with the actions open at all times except when it is their turn to shoot and they are on the firing line. When changing posts or stations during a sub-event each participant's firearm must be unloaded with the action open. All firearms must be unloaded, actions open, and barrels pointed straight up in the air or straight down at the ground while off the shooting line.

**4.2.2** A participant shooting **trap** may place a shotshell into the open action of their shotgun while the previous shooters are completing their shot, **so long as the action remains open**. No participant may close the action of their shotgun until the previous shooter has completed their shot (dismounted gun). For all shooting disciplines, at no time shall anyone load a shotshell into a firearm at any location other than on the firing line. Loading a firearm at a location other than the firing line, shooting station or box will result in immediate disqualification from the event.

**4.2.3** Every competitive event must have at least one Head or Assistant Coach on each shooting field during a sub-event to act as a safety monitor. The responsibility of the coach is to ensure the safety of that squad. He/she shall enforce all safety rules and maintain the rhythm of the shoot.

**4.2.4** Events are held "rain or shine" but may be canceled or postponed due to inclement weather if, in the opinion of range officials, the weather poses a safety risk, such as lighting.

0607

**California Youth Shooting Sports Association Handbook**

## 5.0 - PERSONAL CONDUCT

**5.1 Appropriate Dress**

Each registered CYSSA participant, coach and assistant coach represents their team and their team's sponsoring institution. Promoting a positive image is in the best interest of the CYSSA and everyone involved with the organization and shoot sports. Appropriate dress is key in making a good impression.

**5.1.1 Tops –** Items of clothing that expose any part of the torso are prohibited. Cutoff t-shirts, halter tops, muscle shirts or torn clothes are prohibited.

**5.1.2 Bottoms** – Short shorts and low riding shorts or pants revealing undergarments or buttocks are prohibited.

**5.1.3 Clothing Adornments** - Shirts, hats, pants and any other associated items with pictures, caricatures, profanity, designs, messages, writings or other embellishments with direct or indirect references to alcohol, tobacco, sex or sexual connotations, drugs, or gambling are prohibited. Appropriate and reasonable sponsorship recognition (e.g. athlete sponsor bibs) may be exempted from certain aspects of this requirement, subject to a review by the CYSSA Board.

**5.2 Attitude/Conduct**

**5.2.1** Using abusive or profane language or displaying unsportsmanlike conduct, including but not limited to arguing with anyone associated with conducting or coordinating a CYSSA event, unsafe handling/use of firearms, disrupting a competitor, or cheating by participants, coaches, adult volunteer or parents will not be tolerated and are grounds for athlete disqualification from an event or suspension and/or expulsion from CYSSA. Participants, adult volunteers, coaches, parents and spectators are prohibited from consuming alcoholic beverages or using drugs during CYSSA events. Participants are prohibited from using tobacco during CYSSA events. Any participant determined to be consuming alcohol or using drugs or tobacco during a CYSSA event is subject to disqualification from the event or suspension and/or expulsion from the program.

**5.2.2** All participants, coaches, parents and spectators are expected to conduct themselves in an exemplary manner at all times by displaying courtesy, consideration and good sportsmanship, win or lose to all team members, coaches, competitors and shoot officials.

**5.2.3** Breaches of the spirit as well as the letter of the CYSSA Rules constitute grounds for suspension and/or expulsion from the CYSSA program.

*Honor the Game and Treat Others with Respect.*

0608

**California Youth Shooting Sports Association Handbook**

## 6.1 - GOVERNANCE OF THE CYSSA PROGRAM

**6.2 Disqualifications, Suspensions or Expulsions**
All reasons for disqualifications, suspensions or expulsions shall be reviewed by the CYSSA Board. The CYSSA President upon decision of the Board may suspend or expel a participant or team from CYSSA or for other conduct, which, in his/her opinion, casts the CYSSA in disrepute or constitutes a disruption to the program, whether or not the activity occurs during a competitive event.

**6.3 Appeal Process**

**6.3.1 Issue in Dispute** - The issue in dispute must involve a violation of a CYSSA rule or policy.

**6.3.2  Qualified Appellant** - The injured or aggrieved party must be a registered CYSSA participant, coach, or adult volunteer.

**6.3.3 Head Coach Concurrence** - Appeals filed by a CYSSA participant must have the concurrence of the participant's Head Coach. The Head Coach and the participant must sign the letter to the CYSSA Board.

**6.3.4 Filing Procedure** - The appellant must submit a written appeal within 72 hours of the incident to the CYSSA President. The appeal must include the violation, the reason for the dispute, the date and specific location of the violation and the names of any witnesses to the violation. The written appeal may be sent by FAX, e-mail or by hard copy with the date submitted on it. The Board must review the appellant's letter before any final decision is announced.

**California Youth Shooting Sports Association Handbook**

## 7.1 - COMPETITIONS

**Definitions:**

**Sub-Event** – A Sub Event consists of 25 targets shot on any one field at one time for trap, skeet, and international trap (bunker), and 100 targets shot at one time in sporting clays.

**Competitive Event** – The total number of targets shot during the competition. For example, a trap competition (event) may be 100 targets consisting of four, twenty-five-target sub-events.

**Sanctioned Events** – Those events listed on the CYSSA Calendar. (shootcyssa.com)

**Event Coordinators** – Those persons designated to be in charge of an event.

## 7.2 Series Shoots

**7.2.1 Description** - A Series Shoot is a sanctioned event between two or more CYSSA teams.

**7.2.2 Course of Fire** – A Series Shoot in trap consists of four, 25 target sub-events. The course of fire for skeet, sporting clays, and bunker Series Shoots may vary and will be announced at the beginning of the event. For all sporting clays competitions, participants and teams shall **not** shoot a practice round on a sporting clay course after the targets are set for the competitive event.

**7.2.3 Series Shoot Awards** - Individual and squad awards are given in each Division & Category.

**7.2.4 Team Assignments** – Series shoots may be conducted concurrently at multiple shooting facilities. When multiple facilities are used CYSSA shall assign teams based on number of participants, number of fields at each facility, and a team's proximity to the shooting facilities.

## 7.3 State Championship

**7.3.1 Description** – The State Championship for trap, skeet, and sporting clays is the season finale held at one or more locations, which shall be determined annually by the CYSSA Board. It is a Team, squad, and individual sanctioned event for all CYSSA Participants.

**7.3.2 Course of Fire** –

**Trap** – The Senior and Intermediate Division trap competition shall be eight, 25 target sub-events for a total of 200 targets. Rookie Division participants may shoot less than 200 targets, as determined by CYSSA prior to the event.

**Skeet** – The Senior and Intermediate Division skeet competition shall be four, 25 target sub-events for a total of 100 targets. Rookie Division participants may shoot less than 100 targets, as determined by CYSSA prior to the event.

**Sporting Clays** – The Senior and Intermediate Division sporting clays competition shall be one, 100 target sub-event. Rookie Division participants may shoot less than 100 targets, as determined by CYSSA prior to the event. Sporting clays participants and teams shall not shoot a practice round on the state sporting clay course after the target presentations have been set for the State Championship event.

**7.3.3 Awards** - Team, squad and individual awards are given in each Division and Category.

0610

**California Youth Shooting Sports Association Handbook**

**7.4 Non-CYSSA Teams or Individuals** – CYSSA may invite teams or individuals not currently affiliated with CYSSA to participate in sanctioned events. This includes teams or individuals from states outside California. Every team and individual athlete wishing to participate must register with and meet the participation requirements of CYSSA as described in Section 2.2.8 and elsewhere in this handbook prior to participating in a CYSSA competitive event.

**7.5 General Rules**
    **7.5.1 Scorers**
        **7.5.1.1** Scorers must be familiar with the CYSSA rulebook and adequately trained to call targets and mark score sheets. The scorer will call out loud "No Target" or "No Bird" pursuant to Section 7.4.2.3, "Lost" for targets as stated in Section 7.4.2.2, and shall call out the score of each participant after each post, for example in trap, 4, 5, 3, 5, 2. An athletes who believes the scorer has made a tabulation error or incorrectly states a score when calling out the post score must address the scorer and discuss the discrepancy *before* the squad rotates to the next post and continues the round. Once a squad rotates to the next post and continues the round the prior post scores are deemed as final and not subject to dispute.

        **7.5.1.2** The official score is kept by the scorer on an official score sheet. It is the scorer's responsibility to record the score of each shot, tabulate the cumulative score for each participant and squad, and rule on shot appeals in each sub-event.

        **7.5.1.3** If the scorer rules a target dead or lost, the scorer shall promptly mark "X" or "/" for dead (hit) and "O" for lost (missed).

        **7.5.1.4** Any target shall be scored "lost" under the following circumstances:
            A. A target score box containing a mark other than a clear 'X' or 'O';
            B. A target score box that is left blank;
            C. A target score box which appears to contain both an 'X' and 'O' and does not include the word "dead" clearly printed beside it.

        **7.5.1.5** The scorer's decision on whether a target is dead or lost is final.

        **7.5.1.6** The scorer's score sheet shall be open to examination by the participants at the completion of a sub-event to ensure proper tabulation. Participants may examine their scores before the score sheets are sent to the next field or to the office for posting. Tabulation errors may be corrected anytime they are found. Totals are double-checked by the Event Coordinator or staff prior to posting. The score sheets of the event shall be official and shall solely govern all scores, standings, awards and records of the event.

    **7.5.2 Scorekeeping Rules**
        **7.5.2.1 Dead Targets** – A dead target is one that is fired upon and has a *visible piece* broken from it. Dust does **not** count and will be scored a lost target. An "X" is marked on the score sheet for a dead target.

        **7.5.2.2 Lost Targets** - A target shall be considered lost and an "O" marked on the score sheet when:
            A. A participant fires and fails to break the target by either missing or causing

**California Youth Shooting Sports Association Handbook**

only dust to fall from it without breaking any visible piece of the target;

B. A whole target appears promptly after a participant's recognizable command and the participant voluntarily does not fire (See Section 7.4.2.4);

C. A participant fires from in front of the firing line;

D. If a participant withdraws or is otherwise disqualified before or during a sub-event, the scorer shall rule all subsequent targets as lost and they shall be scored and reported accordingly.

**7.5.2.3 No Target –** The scorer shall rule, by calling out loud, "No Target" and allowing another target to be called for when:

A. An illegal target is thrown, (Sections 7.4.2.6 & 7.4.2.8);

B. A whole target appears on the call of the participant along with target debris;

C. A participant shoots out of turn;

D. Two participants fire at the same target;

E. The trap machine is activated without any call provided and the participant does not fire. If the participant fires, the result must be scored.

In the event that a scorer does not call "No Target" and any of the above situations occur, it is up to the participant to restrain from firing.

**7.5.2.4 Failure to Fire –** Participants will be allowed two Failures to Fire for gun or ammunition malfunctions during each sub-event. When the first or second allowable Failure to Fire in any sub-event occurs, the participant shall be allowed to call for and fire at another target and the result of the shot will be scored. Whenever a Failure to Fire occurs, the scorer shall mark "F1" or "F2" on the score sheet in the space where that target is scored along with the score for that target. After two failures to fire, subsequent failures to fire at called legal targets in the same sub-event shall be scored as lost.

**7.5.2.5 Legal Trap Target –** A legal trap target shall be deemed to have been thrown under the following circumstances:

A. Trap machines which throw targets at unknown angles shall be used.

B. Targets shall not measure more than 4 5/16" in diameter, 1 1/8" in height and shall weigh between 95 and 105 grams.

C. Unless specified by the Shoot Coordinator, orange targets are required.

D. Targets shall not be thrown less than 49 yards or more than 51 yards in calm conditions. Targets shall be between 8 feet and 10 feet above the ground when 10 yards from the trap field midpoint, in calm conditions.

E. The trap machine shall throw targets up to 17 degrees measured to the right of center and 17 degrees measured to the left of center, with a total arc between outside targets limits of 34 degrees.

F. Evaluation of legal target flight during a sub-event is in the sole discretion of the Shoot Coordinator and is not subject to review or protest.

**7.5.2.6 Illegal Trap Target -** An illegal target shall be deemed to have been thrown when the target is not within the prescribed angle or height limits as described in Section 7.4.2.5. If a contestant fires upon an illegal target, the result is not scored and the participant will be permitted to call for another target.

**California Youth Shooting Sports Association Handbook**

**7.5.2.7 Legal Skeet Target** - A legal skeet target is one that appears after the shooter's call and within a period not to exceed one (1) second, and which passes within a three-foot circle centered at a point fifteen (15) feet above the target-crossing point. The target-crossing point shall be measured from the level of Station 8. The target, in still air, must carry to a distance equivalent, on level ground, to 60 yards from the skeet house when passing through the center of the hoop, with an allowance tolerance of plus or minus two yards.

**7.5.2.8 Illegal Skeet Target** – An illegal skeet target occurs when:
  A. An unbroken target is thrown that does not conform to the definition of a legal target.
  B. Two targets are thrown simultaneously in singles. However, if by error or for mechanical reasons doubles are thrown and the shooter shoots and breaks or misses the correct target, it shall be scored as in singles. It shall be the shooter's prerogative to elect to shoot or withhold his/her shot when doubles are thrown in the calling of singles.
  C. The target thrown is broken. Under no circumstances shall the result of firing upon a broken target be scored.

**7.5.3 Ties** – If a tie occurs in any discipline, a shoot-off will be used to determine the winner.

During the duration of the California State imposed Corona Virus Pandemic, shoot-offs for all disciplines will be conducted as follows:

To determine the winner in a tie – the reverse run is the total number of targets broken counted in reverse order until an unbroken target is identified. The shooter with the highest number of broken targets, counting backwards is the winner. If this results in a tie, then the total number of targets broken in front order is then used until a broken target is identified. If this results in a tie, then a coin toss by the CYSSA discipline director is used to determine the winner.

If a shooter breaks 100 straight, then two rounds of 25 will be shot from the 27 yard line to "bank" targets in case another shooter also shoots 100 straight. The winner will be based on the highest number of targets broken. If there is a tie with less than 25 broken, reverse order of targets broken counted until an unbroken target is identified will be used. The second round of 25 "banked" targets will be used in case more than one shooter breaks 25 targets in the first "banked" round. If there is a tie with less than 25 targets broken, then reverse run, as described above, will be used. Subsequent ties with less than 24 targets broken will be based on front run targets described above. If a tie exists with 25 straight or reverse and front run, then a coin toss by the CYSSA discipline director will be used.

**7.5.3.1 Squad Ties** - Squads in trap shall shoot an additional sub-event to determine the winner. The squad with the greatest number of dead targets will be declared the winner. If there is still a tie after the first sub-event, squads shoot additional sub-events until the tie is broken. Squads in skeet shall shoot a full round of regulation skeet. Squads must be composed of the same athletes for the shoot-off and they must shoot in the same order. Ties between two or more squads in sporting clays shall result in all tied squads shooting additional sporting clays station(s) to determine the winner. The squad with

**California Youth Shooting Sports Association Handbook**

the greatest number of dead targets will be declared the winner. A squad qualifying for a shoot-off must shoot in the shoot-off or have its score from the main event entered as its final score. Only those squad members who qualified the squad for the shoot-off will be allowed to shoot in the shoot off and must shoot in their original positions on the field.

## 7.5.3.2 Individual Ties

**7.4.3.2.1 Trap -** Ties between two or more individual athletes in trap shall result in an additional sub-event from the 16-yard line to determine the winner. The individual with the greatest number of dead targets will be declared the winner. If there is still a tie among two or more athletes after the first sub-event, the remaining tied individuals shall shoot additional sub-events as follows:

The 2nd round tie breaker sub-event shall be shot from the 16 yard line.
The 3rd round tie breaker sub-event, if needed, shall be shot from the 20 yard line.
The 4th round tie breaker sub-event, if needed, shall be shot from the 23 yard line.
The 5th round tie breaker sub-event, if needed, shall be shot from the 25 yard line.
The 6th round tie breaker or greater, if needed, shall be shot from the 27 yard line.
Ties among trap squads will be handled in the same manner as described above.

**7.4.3.2.2 Skeet -** Ties between two or more athletes in skeet shall result in those athletes shooting doubles at stations 3,4,5 in a 'miss-and-out by station' manner. If both shooters only break one target at a station, regardless of the order, they remain tied and proceed to the next station. If there is still a tie among two or more athletes after the first shoot off, the remaining tied individuals shall shoot additional doubles at stations 3,4,5 in a miss-and-out manner until only the remaining athlete that has missed fewest targets on a station remains. Ties among squads will be handled in the same manner as described above.

**7.4.3.2.3 Sporting Clays -** Ties between two or more athletes in sporting clays shall result in those athletes shooting the course of fire at throwers 3, 4, and 5 at the facility '5-stand' to determine the winner. The individual with the greatest number of dead targets will be declared the winner. If there is still a tie among two or more athletes after the 5-stand shoot off, the remaining tied individuals shall shoot the 5-stand course of fire again to determine the winner.

Ties between two or more squads in sporting clays shall be determined using the course of fire at stations 3, 4, and 5 at the facility '5-stand' to determine the winner. One individual from each of the tied squads will occupy a single station and will shoot the course of fire at that station. After all individuals from the tied squads have completed shooting their station, the sum of the total of dead targets for all shooters from that squad will be added together for a complete shoot off score. The squad with the highest total of dead targets will be determined to be the winner.

If the facility does not have a 5-stand course, ties between two or more athletes or squads shall be determined using the existing course of fire at the sporting clay stations 7, 6, and 5. The individual or squad with the greatest number of dead targets will be declared the winner. If there is still a tie after the first shoot off, the remaining tied individuals or squads shall shoot the existing course of fire at stations 4, 3, and 2. The individual or squad with the greatest number of dead targets will be declared the winner.

**California Youth Shooting Sports Association Handbook**

For all disciplines, if any individual involved in a tie at the end of a sub-event forfeits their participation in a shoot-off, their score shall reflect a 'zero' for that shoot-off and awards shall be presented accordingly. If the individual who forfeit their shoot-off remains in contention for an award based on the outcome of the regular sub-event and the subsequent shoot-off, that individual shall still be eligible to receive the corresponding award.

### 7.4.4 Protests

**7.4.4.1** Only the participants of a squad in a sub-event may protest a shot scoring call made by the scorer. Participants may only protest to the scorer immediately following the protested shot. The scorer will pause the round to hear information related to the protest then make a decision on the disposition of that target at that time. The decision of the scorer is final and shall be reflected on the score sheet.

**7.4.4.2** Protests regarding tabulation errors of the total score may be made immediately after the close of the sub-event to which such scores relate, as described in Section 7.4.1.6. Protests may only be made by a participant who competed in the sub-event or the participant's coach.

**7.4.4.3** Score sheets may be reviewed and appeals made to the Event Coordinator for tabulation errors, not shot scoring. The Event Coordinator's decision is final.

### 7.4.5 Disqualifications

**7.4.5.1** Any registered CYSSA participant, coach, or registered adult volunteers may be disqualified at any time by the scorer or Event Coordinator whenever the following prohibited conduct is observed or brought to their attention:
  A. If a coach, participant, or adult volunteer disrupts the event;
  B. Fails to timely report for competition;
  C. Discharges a firearm at any place other than the regular firing line;
  D. Behaves in other than a sportsmanlike manner such as physical or verbal abuse, or threats of any type directed to any person;
  E. Interferes with the management of the event;
  F. Argues a protest after a final decision is made;
  G. Is under the influence of alcohol or drugs or any other conduct, which in the opinion of the CYSSA or Event Coordinator, disrupts the shoot.

**7.4.5.2** Disqualified individuals must immediately leave the competition field. All disqualifications are to be reported to the CYSSA President. The CYSSA President will give the report to the CYSSA Board for review and a decision shall be made as to whether or not the infraction warrants a suspension or expulsion from the program. (See Section 6.2 for the Appeal Process)

**California Youth Shooting Sports Association Handbook**

### 7.4.6 Coaches and Spectators

**7.4.6.1** Coaching during a sub-event in Trap and Skeet by Head Coaches, Assistant Coaches, adult volunteers or spectators is not permitted once a sub-event begins and will serve as the basis for disqualification of the squad or Team. Coaching is **only permitted** before and after sub-events and shall not cause any delay in the competition. In sporting clays sub-events, coaching may occur between shooting stations, during the "preview pair" or "show pair" targets thrown for all participants, and with an individual athlete while that athlete is in the shooting box – either before and after a shot - so long as the length of time to coach the athlete is not excess nor delay the overall shooting event.

**7.4.6.2** The Coaches, safety monitors or spectators are not to influence the score keeper's decisions during the sub-events, unless assistance is requested.

### 7.4.7 Participants

**7.4.7.1** Shot or target tracking, defined as tracing the flight of a target called for by another participant with the shotgun's barrel, is prohibited. Prior to a squad commencing a sub-event, the lead shooter may call for, and all squad members may track, one 'preview' target.

**7.4.7.2** A participant is *required* to fire at a legal target (Sections 7.4.2.5 & 7.4.2.7) when called for unless the target comes out broken, there is a gun or ammunition malfunction, it is an illegal target or the scorer calls "No Target".

**7.4.7.3** The participant has the right to request that the scorer call the lost targets louder if he/she is unable to hear the calls.

**7.4.7.4** Participants who, in the opinion of the scorer or Event Coordinator, engage in unsafe behavior or violate any safety rule may be disqualified from further participation.

**Registering with the CYSSA as an individual or coach constitutes acknowledgment and acceptance of these rules. All CYSSA activities shall be conducted in accordance with these rules.**

**California Youth Shooting Sports Association Handbook**

## <u>Waiver Request</u>

Date: _____

Participant Name: _____

Participant Address: _____

Participant Email: _____

Participant Phone:_____ (home)    _____(mobile)

Current Head Coach Name: _____

Current Head Coach Email: _____

Current Head Coach Phone:_____ (home)    _____(mobile)

Description of Waiver Request (please clearly and concisely describe your request and the applicable CYSSA rules you are requesting be waived):

Submit your written request to CYSSA President, Stanley Chan, at boompole@aol.com

**All waiver requests must be received in writing using this form.**

0617

**CERTIFICATE OF SER ICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Junior Sports Magazines, Inc., et al. v. Bonta*
Case No.:    2:22-cv-04663-CAS (JCx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**DECLARATION OF JONAT AN L COLEMAN IN SUPPORT OF PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Kevin J. Kelly, Deputy Attorney General
kevin.kelly doj.ca.gov
300 South Spring Street, Suite 9012
Los Angeles, CA 90013
    *Attorney for Defendant*

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 20, 2022.

_____
Laura Palmerin

CERTIFICATE OF SERVICE

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2022, an electronic PDF of

APPELLANTS' EXCERPTS OF RECORD, VOLUME III OF V was uploaded to

the Court's CM/ECF system, which will automatically generate and send by electronic

mail a Notice of Docket Activity to all registered attorneys participating in the case.

Such notice constitutes service on those registered attorneys.


Dated: December 19, 2022          Respectfully submitted,

                                  MICHEL & ASSOCIATES, P.C.

                                  s/ Anna M. Barvir
                                  Anna M. Barvir
                                  *Attorneys for Plaintiffs-Appellants*

0619