Case No. 22-56090

In the United States Court of Appeals
for the Ninth Circuit

JUNIOR SPORTS MAGAZINES INC., et al.,
*Plaintiffs-Appellants,*

v.

ROB BONTA,
in his official capacity as Attorney General of the State of California,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:22-cv-04663-CAS-JC

**APPELLANTS' EXCERPTS OF RECORD
VOLUME V OF V**

C.D. Michel
Anna M. Barvir
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

Donald Kilmer
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Rd.
Caldwell, Idaho 83607
(408) 264-8489
don@dklawoffice.com

*Attorneys for Plaintiffs-Appellants*

December 19, 2022

1  C.D. Michel-SBN 144258
   Anna M. Barvir-SBN 268728
2  Tiffany D. Cheuvront-SBN 317144
   MICHEL & ASSOCIATES, P.C.
3  180 East Ocean Blvd., Suite 200
   Long Beach, CA 90802
4  Telephone: (562) 216-4444
   Fax: (562) 216-4445
5  Email: cmichel@michellawyers.com

6  Attorneys for Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California
   Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting
7  Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA
   Foundation, and Gun Owners of California, Inc.
8
9  Donald Kilmer-SBN 179986
   Law Offices of Donald Kilmer, APC
10 14085 Silver Ridge Road
   Caldwell, Idaho 83607
11 Telephone: (408) 264-8489
   Email: Don@DKLawOffice.com

12 Attorney for Plaintiff Second Amendment Foundation

13              IN THE UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15 JUNIOR SPORTS MAGAZINES          CASE NO: 2:22-cv-04663
   INC., RAYMOND BROWN,
16 CALIFORNIA YOUTH SHOOTING        **DECLARATION OF RICHARD**
   SPORTS ASSOCIATION, INC.,        **MINNICH IN SUPPORT OF**
17 REDLANDS CALIFORNIA              **PLAINTIFFS' MOTION FOR**
   YOUTH CLAY SHOOTING              **PRELIMINARY INJUNCTION**
18 SPORTS, INC., CALIFORNIA
   RIFLE & PISTOL ASSOCIATION,      Hearing Date:    August 22, 2022
19 INCORPORATED, THE CRPA          Hearing Time:    10:00 a.m.
   FOUNDATION, AND GUN              Courtroom:       8D
20 OWNERS OF CALIFORNIA, INC.;      Judge:           Christina A. Snyder
   and SECOND AMENDMENT
21 FOUNDATION,

22              Plaintiffs,

23        v.

24 ROB BONTA, in his official capacity
   as Attorney General of the State of
25 California; and DOES 1-10,

26              Defendant.

27

28

                           1
              DECLARATION OF RICHARD MINNICH

0883

# DECLARATION OF RICHARD MINNICH

1.    I, Richard Minnich, am an officer and the Treasurer of Plaintiff California Rifle & Pistol Association, Incorporated (CRPA). I make this declaration of my own personal knowledge and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2.    CRPA is a non-profit membership organization incorporated under the laws of the state of California, with headquarters in Fullerton, California CRPA is incorporated in the state of California and headquartered in Fullerton, California.

3.    Founded in 1875, CRPA seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. CRPA works to preserve the constitutional and statutory rights of gun ownership, including the right to self-defense, the right to hunt, and the right to keep and bear arms. CRPA is also dedicated to promoting the shooting sports, providing education, training, and organized competition for adult and junior shooters. CRPA's members include law enforcement officers, prosecutors, professionals, firearm experts, parents, youth, and grandparents, and other members of the public.

4.    Through this lawsuit, CRPA represents not only its own interests as an organization formed for the express purpose of promoting and advocating for the lawful purchase, possession, and use of firearms and related products to disseminate information to like-minded individuals, but also the interests of its members, including youth under the age of 18 and their parents and firearms trainers, who support and promote the right to keep and bear arms for lawful purposes.

5.    CRPA is the state association for the National Rifle Association and as the state affiliate, one of the main charges is to conduct state-wide competitive shooting matches and name state champions in all disciplines of shooting sports.

6.    CRPA is also known for its reporting of current and political events in the state as they relate to Second Amendment issues, providing sound information and content to members, their top-notch training courses for new and experienced

2

DECLARATION OF RICHARD MINNICH

shooters, and hosting and sponsoring shooting events across the state for all ages.

7.     CRPA supports and sponsors junior teams who shoot and qualify for national competition by providing for travel costs, shooting jerseys, ammunition, and entry fees. CRPA would continue to sponsor and support youth shooting teams but for the passage of AB 2571, which prohibits CRPA from advertising, marketing, or arranging for the placement of any communication concerning firearms and related products that promote the use of such products—communications that are necessary to the sponsorship and support of junior shooting teams.

8.     CRPA operates a stellar training division where people of all ages are able to train in firearm safety and handling. We offer training courses in pistol, rifle, shotgun, protection of the home, and the state Hunter's Education course. Since the passage of AB2571, no one under the age of 18 may participate in these courses because they necessarily involve speech concerning firearms and related products, including recommendations about specific products and discussions and instruction promoting the possession and use of firearms. We have canceled at least one hunter's education course because most of the registered participants were under 18 years of age. Youth with a dream of hunting with their parents or grandparents may not be able to realize this dream because providers of hunter's education courses and basic firearm courses like CRPA are unable to provide the training lest they violate AB 2571 and risk hefty fines. But for the passage of AB 2571, CRPA would continue offering firearm safety, handling, and hunting courses to those under the age of 18 years.

9.     CRPA produces and distributes *The Firing Line*, an award-winning magazine for all its paid members and members of the general public. This magazine includes informative articles, political speech, advertising for products and services for gun owners, and celebrates the shooting sports. On a regular basis, a large portion of the magazine is devoted to the celebration of youth shooting

DECLARATION OF RICHARD MINNICH

teams and competitive shooting. A true and correct copy of *California Firing Line* (July/August 2022) is attached hereto as **Exhibit 22.**

10.     *California Firing Line* magazine also includes traditional advertisements for firearms and related products. To be clear, CRPA's traditional advertising of  such products is not designed or intended to encourage minors to unlawfully *buy* firearms themselves. Rather, they are intended for an audience of firearms-savvy minors who may want to ask their parents to lawfully purchase firearms and related products for the minor's lawful use.

11.     Produced six times per year, the production schedule of *California Firing Line* magazines is such that it is usually already in production and to the printer one-to-two months before it is mailed out to members. When AB 2571 passed and took effect immediately as an "urgency" statute, CRPA's July/August edition was already being sent out to the audience of regular readers. There is no way to stop the distribution, and this places CRPA at great risk of being in violation of AB2571. The inability to stop the distribution of a publication that was lawful on June 30, but not on July 1, has potentially grave consequences for a group like CRPA who did nothing wrong. Future magazines will have to be greatly modified at great cost to CRPA and to the readership. But for the enactment and enforcement of AB 2571, CRPA would continue to produce *California Firing Line* magazine and celebrate all facets of the gun culture, including youth in the shooting sports.

12.     CRPA also regularly plans, advertises, markets, promotes, sponsors, hosts, facilitates and/or participates in recreational events and shooting competitions specifically for youth or where youth are extremely likely to be in attendance and where youth lawfully use, handle, observe, or otherwise possess firearms, ammunition, and/or firearm parts. The programs regularly involve signage, flyers, discussions, branded merchandise and giveaways, and other communications depicting minors enjoying or otherwise encouraging minors to possess and use lawful firearms for lawful purposes, including hunting, recreational

and competitive shooting, and firearm safety programs. We also widely distribute printed and electronic communications promoting these events and programs. These communications regularly include images and/or depictions of minors handling or "using firearm-related products." An example of one such communication, an advertisement of the Youth Enhancement Program's Youth Expo (which was cancelled in light of the passage of AB 2571) is attached hereto as **Exhibit 23.**

13.    Just this last week, for example, CRPA sponsored a Youth Outdoor Adventure Day at Raahauge's Shooting Range. This is an annual event where thousands of kids attend and have the opportunity to kayak, fish, shoot archery, throw axes, climb rock walls, watch cowboy action shooting, participate in clay shooting, target shooting, and more. CRPA also hands out information on becoming a youth member of the organization and the Constitution. These types of events are essential to teaching kids about gun safety and responsibility under the watchful eye of trained safety officers. For many kids, this is the first experience they have with firearms.

14.    We also use CRPA-branded merchandise and giveaways (or "swag"), including but not limited to hats, t-shirts, stuffed animals, coloring and activity books, stickers, pins, and buttons, to promote the organization and solicit memberships and/or financial support, as well as to spread pro-gun messages and slogans. A true and correct copy of the CRPA website landing page for the CRPA Online Store is attached hereto as **Exhibit 24.** A true and correct copy of the CRPA website landing page for the CRPA Online Store, Patches, is attached hereto as **Exhibit 25.** A true and correct copy of the CRPA website landing page for the CRPA Online Store, Apparel, is attached hereto as **Exhibit 26.** A true and correct copy of the CRPA website landing page for the CRPA Online Store, Miscellaneous, is attached hereto as **Exhibit 27.**

15.    CRPA has a junior membership for youth under the age of 21 can join

5

DECLARATION OF RICHARD MINNICH

CRPA and receive information on their constitutional rights as gun owners in California. We have approximately 25 kids currently under this junior membership. Plans have been underway to develop content and information that youth would engage with more than standard member offerings. Plans to roll out the new CRPA Student Membership have been underway for several months with the roll out planned for September 2022. Time and resources have already gone into preparing materials for this membership. Students who are part of youth shooting teams have already signed on as ambassadors to help bring the content to their classmates and friends. If AB 2571 is allowed to stand, this would end the student membership, development of that content by youth for youth, and silence their voice. But for AB 2571 being signed into law, CRPA would continue with the promotion of the student membership and roll out this fall.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on July 19, 2022.

Richard Minnich
Declarant

DECLARATION OF RICHARD MINNICH

# EXHIBIT 22

ISSUE 1060, JUL/AUG 2022

# CALIFORNIA
# FIRING LINE

**OFFICIAL MAGAZINE OF THE CALIFORNIA RIFLE & PISTOL ASSOCIATION**

# SECOND AMENDMENT
# TRIUMPH

## SCOTUS VICTORY GIVES 2A REAL TEETH

**CRPA LAUNCHES 2A RECKONING CAMPAIGN**
TIME TO TAKE BACK OUR RIGHTS

**CALIFORNIA GOES SHALL ISSUE?**
CALIFORNIA AG PULLS "GOOD CAUSE" CONDITION

**REPORTS AND UPDATES**
LITIGATION, LEGISLATION, LOCAL ACTION, AND CRPA PROGRAMS

0890

# FRANKLIN® ARMORY

Our California roots are a founding part of our company, and although we have relocated, we always have and will continue to find ways to advocate for the 2A Community in The Golden State. The Franklin Armory® CA7®, CA11®, and CA12® are the *only* AR pistols on the California DOJ Roster of Certified Handguns.

## CA7® - 5.56 NATO
## CA11® - 300 BLK
## CA12® - 350 LGND

For more information on any of these models, please visit
www.franklinarmory.com/restricted-states/california
To purchase direct through a dealer, use the dealer directory at
www.franklinarmory.com/dealer-directory

*"Well done is better than well said."*
– Benjamin Franklin –

## JOIN THE TEAM

## SHOW YOUR LOVE





LIBERTY'S TEETH HAT


COFFEE TRAVEL MUG


CRPA MEDICAL KIT


HOME FIREARM SAFETY COURSE

GET YOURS AT CRPA.ORG/STORE

0891

ISSUE 1060

# JUL/AUG 2022



**CALIFORNIA COMPLIANCE DONE.**

COMPMAG

**COMPMAG FIXED MAGAZINE SOLUTIONS**

THE COMPMAG CONVERTS YOUR AR OR AK INTO A FIXED MAGAZINE RIFLE.

NO MODIFICATION TO YOUR FIREARM IS REQUIRED.

EASY TO INSTALL AND REMOVE.

NO NEED TO BREAK THE ACTION TO RELOAD.

LOADS EASILY THROUGH THE SIDE.

KEEP ALL OF YOUR FEATURES.

CALIFORNIA COMPLIANT.

MADE IN THE U.S.A.

**NOW AVAILABLE FOR AR-15, AR-10, AK-47**

**VISIT US AT:**

 COMPMAG.COM

 COMPMAG

 AR15COMPMAG

## LAW & POLITICS

**10** HOMICIDE FALLS IN PHILADELPHIA AFTER IT BECOMES MUCH EASIER TO GET A CARRY PERMIT
*KONSTADINOS T. MOROS*

**14** BIG WIN FOR 2A AT SCOTUS– NOW THE RECKONING BEGINS

**18** LEGAL ALERT FROM THE OFFICE OF THE ATTORNEY GENERAL

**22** GUN CONTROL THREATENS COURT PACKING AGAIN AS AMERICANS EMBRACE GUN RIGHTS
*LARRY KEANE / NSSF.ORG*

**24** NSSF RETAILER SURVEYS INDICATE 5.4 MILLION FIRST-TIME GUN BUYERS IN 2021
*NSSF.ORG*

**28** IS CDC COOKING THE BOOKS ON DEFENSIVE GUN USE STATISTICS?
*KONSTADINOS T. MOROS*

**30** WHAT IS THE CRPA?

**32** THE SUPREME COURT'S UPCOMING HISTORIC 2A DECISION & HOW IT MAY AFFECT THE RIGHT TO CARRY IN CALIFORNIA

## PROGRAM REPORTS

**36** LEGISLATIVE REPORT: NO SURPRISE... ONCE AGAIN, OUR REPRESENTATIVES ARE BREAKING ALL THE RULES! THE GUT AND AMEND RIDES AGAIN!
*ROY GRIFFITH*

**38** LITIGATION REPORT: RIGHT TO CARRY SHAKE-UP, AND MORE, EXPECTED WITH SCOTUS BRUEN RULING
*ALEX FRANK*

**46** LOCAL ADVOCACY REPORT: DO GUN LAWS REALLY WORK?
*TIFFANY D. CHEUVRONT*

**54** CRPA PROGRAMS UPDATE: SPOTLIGHT: BUSINESS AFFILIATES, FFL DEALERS AND CRPA OPPOSES LEGISLATION THAT SEEKS TO ADD DEALER REQUIREMENTS
*CRPA STAFF*

## GRASSROOTS ENGAGEMENT

**56** VOLUNTEER SPOTLIGHT: SPOTLIGHT ON JIM CAIRNS
*CHRISTINA GASTELO*

**58** CRPA VOLUNTEER REGISTRATION FORM / VOLUNTEERS ARE OUR MOST POWERFUL WEAPON!

**59** EVENTS & TRAINING

## CRPA SPORTS

**62** INTRODUCING THE ETNA POLICE DEPARTMENT PAL PROGRAM AND THE FIRST TEAM OF THE LEAGUE, THE ORLAND HIGH SCHOOL TRAP TEAM
*BYRAN DUNCAN*

**66** STUDENT SPOTLIGHT: ORLAND HIGH SCHOOL TRAP TEAM
*AUTUMN "OTTER" IRVIN*

**67** GOLDEN RULES OF GUN SAFETY

**70** ORLAND HIGH SCHOOL TRAP TEAM THRIVES: AN ATHLETE'S PERSPECTIVE
*SEAANNA ROSS*

## HUNTING & CONSERVATION

**72** ENSURING MODERN DAY HUNTING AND SHOOTING ACCESS IS CRITICAL FOR FUTURE GENERATIONS
*SALAM FATOHI / NSSF.ORG*

**74** HUNTERS' CODE OF ETHICS

**76** THE CORE PRINCIPLES OF NAM

**78** TRUE ORGANIC RECIPES— CITRUS MARINATED VENISON WITH RED WINE ONION JAM, GARLIC MASHED POTATOES, AND CRISPY PROSCIUTTO
*DAVID WITHERS*

**81** CRPA MEMBERSHIP LEVELS & BENEFITS / CRPA MEMBERSHIP APPLICATION

**82** CRPA BOOK CLUB

**ON THE COVER:** California gun owners celebrate the recent Supreme Court of the United States ruling in the New York State Rifle & Pistol Association, Inc. v. Bruen case that struck down limitations on carry outside the home. See story page 14.

ISSN 2689-0046 (print)
ISSN 2689-0062 (online)

*California Firing Line*, copyright ©2021 by the California Rifle & Pistol Association, Inc., is published bimonthly (6 times per year) in January, March, May, July, September and November by Chipotle Publishing, LLC on behalf of the California Rifle & Pistol Association, Inc.

**SUBSCRIPTION AND CRPA MEMBERSHIP INQUIRIES:** *California Firing Line* is sent to all CRPA members as a membership benefit. The magazine may also be purchased at the subscription rate of $35 per year or $8.95 for a single copy. Inquire at contact@crpa.org or (714) 992-2772.

**ADVERTISING INQUIRIES:** Contact us at CFL@chipotlepublishing.com / (702) 565-0746.

**ARTICLE SUBMISSIONS:** Articles and letters are welcome but should be germane to the topics of interest to the general readership of this publication. Submission of proposed articles and letters implies the right to edit and publish all or in part. Send article ideas, letters and editorial submissions to: **CFL@chipotlepublishing.com.** For a copy of the writer's guidelines, email **CFL@chipotlepublishing.com.**

**COPYRIGHT NOTICE:** The entire contents of this magazine are copyrighted and all rights are reserved. In accordance with Title 17 U.S.C. Section 107, any copyrighted work in this publication is distributed under Fair Use without profit or payment to those who have expressed a prior interest in receiving the included information for non-profit research and educational purposes only.
law.cornell.edu/uscode/text/17/107

**PERMISSION TO REPRODUCE:** No portion of the magazine may be reproduced in whole or in part without written consent. Send reprint permission requests to **CFL@chipotlepublishing.com** or call (702) 565-0746. Permission to reprint is typically granted upon request.

**DISCLAIMER:** Caution: All technical data in this publication may reflect the limited experience of individuals using specific tools, products, equipment and components under specific conditions and circumstances not necessarily herein reported, over which the California Rifle & Pistol Association, Inc. has no control. The data has not been tested or verified by the CRPA. The CRPA membership, its Board of Directors, Agents, Officers, Employees and Publisher accept no responsibility for the results obtained by persons using such data and disclaim all liability for any consequential injuries or damages.

Opinions expressed herein are those of the writers and are not to be construed as those of the Publisher nor as the official views of the CRPA or any of its agencies, unless otherwise made manifest by writers or spokespersons acting on behalf of the foregoing. Advertising of products and services herein does not imply endorsement or approval by the Publisher or the CRPA.

**POSTMASTER:** Send address changes to *California Firing Line* c/o California Rifle & Pistol Association, Inc., 271 E. Imperial Highway, Suite #620, Fullerton, CA 92835 or email the CRPA at **contact@crpa.org.** Periodicals postage paid at Fullerton, CA and additional mailing offices.



California Rifle & Pistol Association, Inc.
271 E. Imperial Highway, Suite 620
Fullerton, CA 92835
(714) 992-2772
**CRPA.org**

The California Rifle & Pistol Association, Inc. (CRPA) is a nonprofit association governed by an independent Board of Directors. CRPA's mission is to promote civilian marksmanship and qualifying state championship competitions; educate the public about firearms and the right to keep and bear arms; protect the right to choose to own a gun to hunt, for sport and to defend yourself and your family; and promote the shooting sports.



Issue 1060, Jul/Aug 2022
CaliforniaFiringLine.org

**PUBLISHER**  Megan Vukodinovich, Chipotle Publishing, LLC
**EXECUTIVE EDITOR**  Chuck Michel, CRPA President
**SENIOR EDITOR**  Rob Curtis, Chipotle Publishing, LLC
**GRAPHIC DESIGN**  Chipotle Publishing, LLC
**PRODUCTION COORDINATOR**  Rachel Hoefing, Chipotle Publishing, LLC
**ADVERTISING SALES**  Megan Vukodinovich & Jayne Wynes, Chipotle Publishing, LLC

**CONTRIBUTORS**

| | | |
|---|---|---|
| Don Barnes | Thomas E. Gift, MD | Elizabeth Smith |
| Mike Barranco | Roy Griffith | Guy Smith |
| Lloyd Billingsley | Steve Helsley | Craig Stowers |
| Sean Brady | Eric Johnson | Rick Travis |
| Chris Cheng | Sarah Keller | Paul Trouette |
| Tiffany D. Cheuvront | Donald Kilmer | Nick Villa |
| Jerry Clark | David Kopel | Ryan Watts |
| Matthew D. Cubeiro | William McLaughlin | Josh Wayner |
| Brian Fitzpatrick | Chuck Michel | Knox Williams |
| Alex Frank | Sam Paredes | Doris Wise |
| Christina Gastelo | Kevin Small | Robert B. Young, MD |
| Dan Gifford | Tarryn Small | |

*New contributors are welcome! Email CFL@chipotlepublishing.com for details.*

**WE'RE SOCIAL! FOLLOW & SHARE CRPA!**

   

**@crpaorg**     **@CRPA.org**     **CRPA TV**     **@CRPAnews**

## PRESIDENT'S MESSAGE

# WHEN IT COMES TO GUN CONTROL, CALIFORNIA IS THE BEST AT PASSING UNCONSTITUTIONAL LAWS THAT DO NOTHING

**BY CHUCK MICHEL**
CRPA PRESIDENT & GENERAL COUNSEL



After the horrific events of the past couple of weeks where deranged and evil people sought to do evil against the innocent, California Governor Gavin Newsom is taking advantage of tragedy to advance his anti-gun-owner agenda. He at it again, falsely promising that more laws that criminals ignore are going to stop evil and make us safer. Newsom refuses to deal with crime run rampant and mental health issues that are more prevalent after the past two years of government-imposed quarantine.

**GUNS SAVE LIVES.**
**GUN CONTROL FAILS.**

The Governor claims that more gun control works, but we know from the statistics that he is playing with the numbers. Lies, damn lies, and false statistics! California has the most and the strictest gun laws in the country. Yet last year California was home to 5 of the 27 mass shootings in the country. In 2019 California saw 2,945 people killed by gun violence and 1,586 of those killed were from suicide (gun control studies like to keep suicide and violent acts combined, but suicide should be noted separately for accuracy). In looking at these numbers, in 2019 fewer people died from "gun violence" than from suicide in the state. In 2020, firearm deaths were not even in the top ten leading causes of death in California. Meanwhile, armed citizens are stopping criminals with guns across the country.

Governor Newsom claims that in California the gun violence rates are lower because of all of the strict gun laws in the state. He demanded that legislators send more gun control legislation to his desk to sign in an obvious attempt to please his base and politicize an issue that no one is actually willing to address.

But an honest look at homicide data shows that homicides are on the rise in California not on the decline. Crimegrade.org reviews different types of crime rates for each state. **California currently has an "F" rating** meaning that "the rate of violent crime is higher than the average U.S. state. California is in the 21st percentile for safety, meaning 79% of states are safer and 21% of states are more dangerous."

So, gun control is not working as well as Governor Newsom claims.

**NOW FOR A RECKONING**

Our hopes have been fulfilled in the form of a new opinion from the Supreme Court of the United States in *New York State Rifle & Pistol Association v. Bruen*. We get lots of questions about what this opinion really does. I mean, we thought that *Heller* and *McDonald* would be the cases to give the Second Amendment back its teeth, right? Those cases are over a decade old and were instrumental in establishing specific rights and

# MEMBERS' VOICES

## Training Opportunities

I've been a member and contributor of CRPA for many years. I'm grateful for the services they provide, impressed by the successes they've had, and appreciate their leadership in defending gun rights in California and elsewhere. The magazine is great, very informative. But we're missing some opportunities.

The reason we even need an advocacy organization is because of a general public distrust of gun owners, and fear of the damage they sometimes inflict on society. No organization can eliminate psychotics, of course, but gun owners have a duty of competence to ourselves and our buddies in the foxholes with us. Effective use of firearms is challenging for everyone, both for the mechanical skills and the mental controls to make sure we do it right. Using a firearm is like a surgeon using a scalpel. It's not something that comes naturally, and it requires good training initially and continuing. We have a large community of firearms trainers, but their quality varies. We have very few standards, so competence varies. We have no way to know who is competent and who is not.

I'm concerned that CRPA seems to be starting to compete with the firearms training industry. The erratic quality and curriculum in the firearms training industry might make that seem necessary, but it is likely to be counterproductive. It will drive business away from the many trainers we rely on for coaching current owners and the increasing numbers of new gun owners. We need that industry to perform well. CRPA does not compete in firearms manufacturing, or ammo, or holsters, or any of the other products shooters need. CRPA does sneak into clothing and bags and such for marketing purposes, but not direct competition with important firearms industries. Except for training.

Available training is not all good quality. It's pretty much like any other education service – we can get a college degree from a premier school or a lesser one. The skills acquired can vary a lot. The curriculum varies between schools, and the quality of the instructors varies. CRPA might provide another beneficial service by helping to begin developing standards for firearms skills and training. NRA provides a number of certifications of firearms trainers. CRPA should work with them to develop a standard curriculum and sequence of training, from novices to advanced skills, and certification for instructors qualified to provide it. That way we can know which instructors are good, and that their training will provide necessary skills.

Every gun owner needs to know there are skills they need to have, and additional skills they can pursue, and where to find qualified instruction to help them accomplish it. A basic skills certification should provide a diploma recognized everywhere, just as a high school diploma does for academic training. More advanced skills should also provide standard diplomas that demonstrate additional accomplishments. We certainly don't want new infringements on firearms rights, but knowing who is capable of handling them effectively and who is not is a right everyone else should expect.

**—David Watson**

*Thank you for this analysis of general firearm training in California. CRPA has been providing quality training for decades in California, this is not a new or recent phenomenon. In fact, our trainers are some of the best in the state and our training facility, built in 2016 has hosted many groups in basic and advanced firearm training. For years, CRPA used the NRA curriculum that has been as a standard across the country. While we may still use some of these courses, CRPA has recognized, just like you did, it seems, that we need standardized curriculum that is focused on the California gun owner. Over the past year, CRPA has started to develop our own curriculum and we are rolling this out one course at a time as it is reviewed and prepared by trainers with decades of experience training in California with state specific issues. A certificate program is part of the CRPA vision so that you and others can have confidence in the training received, and to create a standard of excellence. CRPA's goal is to get as many people trained and confident in the shooting sports as possible while providing confidence to gun owners new and experienced alike. In fact, if trainers would like to offer CRPA courses as part of their curriculum, they should contact the training department at jclark@crpa.org for more information.*

### SHARE YOUR VOICE WITH CRPA

We want CRPA members' voices to be heard! If you have something you would like to bring to the attention of our *California Firing Line* Executive Editor, please email **CFL@chipotlepublishing.com** and be sure to specify that it is for Members' Voices (Letters to the Editor). We look forward to hearing from you!

*(PRESIDENT'S MESSAGE, CONT.)*

making the right to bear arms an individual right, not a collective one. But those cases were narrowly interpreted to those specific issues and how that right applies to the states, and the courts in several circuits like the Ninth Circuit have taken every opportunity to limit the Second Amendment with every chance they get. Those cases were not the end of the debate, just the end of the beginning.

*NYSRPA v. Bruen* clarifies many of the issues that *Heller* and *McDonald* did not. This new opinion means that Second Amendment cases will no longer be viewed under a lesser level of scrutiny than other fundamental rights. This is a GAME CHANGER. Now the government has a much heavier burden to prove their infringement is constitutional. I know you have heard a lot about this case and the eagerness with which those on both side of the debate were watching, but it really is that big.

The California Attorney General is already reacting to the *NYSRPA* ruling and its effect on concealed carry and the current "good cause" requirement in California. CRPA is launching public records requests to uncover their schemes, already watching for shenanigans and attempts by the sore losers to limit your rights in creative ways since they did not get the outcome they were hoping for out of the Supreme Court.

CRPA and our legal team are also preparing numerous additional lawsuits to file. We have a watch-dog group of all gun control lobby groups and the politicians they support. As a vindictive Newsom threatens more burdensome gun control laws that does not work, he will not get far without a challenge.

Please consider getting on board with CRPA now. This is the time to donate, join, up that membership to one of our enhanced life levels, and volunteer. We need new gun owners, current gun owners, and those who are not gun owners but believe that constitutional values apply to all.

Thank you for your continued support. We have had useless laws pushed down our throats for too long. It's time for a 2A Reckoning!

**Chuck**

## STATEMENT OF CRPA'S FINANCIAL PRACTICES

No other pro-2A association is more scrupulous about avoiding financial improprieties than CRPA and its sister, The CRPA Foundation. Donations and membership dues are closely monitored, budgeted, and reinvested into fighting for the rights of California gun owners. The CRPA has a Finance Committee that oversees bookkeeping and expenses, a fully informed Board of Directors, and accountants that scrutinize bookkeeping and expenses. CRPA also has a conflict of interest disclosure and review policy, a vendor fraud prevention policy, an expenses review and limitation policy and review process, and multiple other safeguards in place to make sure every donation is spent wisely and frugally. CRPA's volunteer President, Chuck Michel, is paid nothing for his many hours of work because he believes in the cause and donates all of that time. Any legal work for the CRPA or CRPA Foundation is done at significantly reduced, hourly, non-profit rates.

## CHOOSE THE CRPA FOUNDATION AS YOUR PREFERRED CHARITY ON AMAZONSMILE!

**1.** Go to **smile.amazon.com** and log in.
**2.** Select "CRPA Foundation" as your charity of choice.
**3.** Every eligible AmazonSmile purchase will result in a donation to CRPA Foundation.



BE SAFE. SHOOT STRAIGHT. *FIGHT BACK!*
CRPA.ORG
CALIFORNIA RIFLE & PISTOL ASSOCIATION FOUNDATION

## *HELP CRPA PICK JEFF BEZOS' POCKET!*

# HOMICIDE FALLS

## IN PHILADELPHIA AFTER IT BECOMES MUCH EASIER TO GET A CARRY PERMIT

BY KONSTADINOS T. MOROS



In the first few months of the pandemic, many people flocked to gun shops based on concerns that the economic and social upheaval caused by COVID-19 shutdowns would increase crime. Sadly, those fears ended up being justified, as there has been a well-documented surge in violent crime across the nation. According to the FBI, homicides in the United States increased by an astonishing 30% from 2019 to 2020, the largest single-year increase ever.[1] The FBI has yet to release information for 2021 yet, but we know from data in major cities that while the pace of increase has fortunately slowed, homicide nevertheless continued its rise in 2021.[2]

This surge was most pronounced in major cities. Los Angeles, for example, saw 350 people killed in homicides in 2020, a 36% increase from 2019.[3] In 2021, that grim figure rose to 397, an additional 13.5% jump from 2020's already-high total.[4] But it's not Los Angeles I'm interested in with this article, nor is it any of California's major cities, all of which dealt with surges in violent crime in the last couple of years. Instead, I'd like to take a look at Philadelphia, which presents us with an interesting case study of a city dealing with the same problems Los Angeles is, but

with a new pro-gun variable thrown in. To their credit, the Philadelphia police department keeps superb records of their crime data and makes that data public with weekly updates, making the city ideal for this sort of examination.

In 2020, as expected given the national surge, homicide in Philadelphia rose 35.5% from its 2019 level.[5] And similar to other cities like Los Angeles, the trend continued in 2021, albeit at a slower pace, with another 11.5% increase in homicide compared to 2020. But something else also happened part of the way

through 2021 in Philadelphia: it became far easier to get a carry permit. Thanks to a lawsuit suing the city for its shutdown of its gun permit unit (ostensibly due to the pandemic)[6], Philadelphia was forced to not only resume processing permits, but also to streamline the process of getting one. The fingerprinting requirement was removed, and the application could be completed entirely online.

What resulted was an unprecedented rise in the issuance of carry permits. As Philadelphia Magazine explains: "From 2017 through 2020, the number of license-to-carry ap-





**OUTDOOR SECURITY**
**THAT STARTS AT YOUR PERIMETER'S EDGE!**

- FAITH BASED PROPERTIES
- COMMUNITY PARKS & POOLS
- SCHOOL/BUSINESS CAMPUS
- COMMERCIAL BUILDINGS
- CONSTRUCTION SITES

- ASSOCIATIONS
- CUSTOM HOMES
- REAR EASEMENTS
- WAREHOUSES
- HIGH VALUE TARGETS

**24/7 VIDEO MONITORING**
With outdoor security that starts at your property's edge, NOT your window ledge, you change the course of events and control the element of surprise. Our outdoor security solutions create early boundaries of detection, giving you the best opportunity for protection.

**CONTACT US**
We'll review your security needs and design a solution.

Phone: (657) 444-7233
Website: www.PerimeterProtectionUSA.com
Email: Solutions@PerimeterProtectionUSA.com
CSLB License# 999578

SCAN ME



WE DON'T DO ALARMS WE DO ARRESTS

1. The Hill, *"Homicides up 30 percent in largest increase on record, FBI says"*, September 27, 2021.

2. Council for Criminal Justice, *"Homicides Continued to Increase in Major U.S. Cities in 2021, but at Slower Pace"*, January 26, 2022.

3. Crosstown, *"Murders in Los Angeles hit highest level in over a decade"*, January 7, 2021.

4. Crosstown, *"Los Angeles records 397 murders in 2021"*, January 10, 2022.

5. All of the data referring to Philadelphia's crime rates that is referenced in this article is sourced from the Philadelphia police department's "Crime Maps & Stats" page, which links to data for several previous years as well as the current 2022 weekly reports.

6. A copy of the complaint can be found at **firearmspolicy.org/philadelphia**



PEOPLE SHOT IN DEFENSIVE SHOOTINGS
PHILADELPHIA

Source: Gun Violence Archive, 6abc Analysis

(CREDIT)

plications in Philadelphia held about steady, ranging between 11,049 and 11,814 applications each year. But in 2021, 70,789 people applied for licenses to carry guns.[7] And according to the same article, over 90% of those applications were approved.

Perhaps unsurprisingly given the over six-fold increase in permit issuance, incidents of armed citizens defending themselves from criminals became much more common. A simple web search will reveal plenty of local news articles covering recent defensive uses of firearms in the city.[8] This increase is not merely anecdotal.

According to an ABC-affiliated local news article, **"In just the first three months of [2022], more people have been shot in defensive shootings than in each of the last three entire years.** If defensive shootings continue at the same rate through the rest of the year, Philadelphia is on track to have more than five times as many of these incidents as last year."[9]

In short, law-abiding Philadelphians are fed up with criminals terrorizing their community, and now that the city has been forced to make obtaining a carry permit a far more reasonable process, they are able to protect

themselves from those criminals much more effectively.

But does making carry permits so much easier to obtain have a dark side? Antigun advocates certainly always predict that relaxing carry laws will lead to "wild west" violence. And Philadelphia's antigun mayor has said that the city must "reinforce broadly that there are always options beyond carrying a gun, and that there are consequences if you nevertheless choose to carry that gun or—god forbid—use it."[10] So if their position is correct, then 2022, the first complete year in which the new carry permit

process will be in effect, should see another dramatic rise in homicides.

According to the Philadelphia police department's data, that just has not happened. Last year, by the end of March 2021, Philadelphia had seen 117 homicides. This year, in the same time frame, there have been 110. To be sure, that isn't a dramatic drop, representing a roughly 6% decrease. But at minimum, it's clear that predictions of the expansion of carry

rights leading to greater bloodshed have not come to pass. Over 60,000 more residents of the city have carry permits than did a year ago, and yet homicide is slightly down. We can't necessarily *credit* more citizens carrying for the homicide rate in the city finally falling, but it certainly has not made the problem worse, as the anti-gun side would have guessed it would.

However, there is some indication

that the increasing amount of people getting carry permits in 2021 did slow down the increase in the homicide rate. Recall that in 2021 Philadelphia saw "only" an 11.5% rise in homicide, after an astronomic 35.5% rise in 2020. But by the middle of 2021, that year still looked like a repeat of 2020. Specifically, by the end of June 2021 there had been a 31.1% increase in homicide over the same time period in 2020. In other words, the city was on track to nearly match 2020's pace of increase in the homicide rate. But then, the situation improved rapidly. By the end of September, the homicide rate was only 17.8% worse than its prior-year pace, and as stated, it fell further to only an 11.5% increase by the end of the year.

It could very well be that as more and more people got carry permits in 2021 and local news filled up with anecdotal examples of armed citizens successfully defending themselves against violent assault, criminals began to think twice. While a lot more data will be needed to confirm whether that is the case, the early signs have been encouraging. For those of us still in may-issue jurisdictions, such as here in California, hopefully the Supreme Court's upcoming decision in *New York State Rifle & Pistol Association Inc. v. Bruen* results in every law-abiding American being able to get a carry permit as easily as residents of Philadelphia now can. **CRPA**

**Konstadinos Moros** *practices general civil litigation with Michel & Associates. He received his bachelor's degree in political science from the University of California, San Diego in 2011. In 2014, he earned his Juris Doctorate from California Western School of Law and has been practicing law since 2015. He is an activist and advocate for maximizing our constitutional and natural rights, especially the right to keep and bear arms.*





# DEFEND FREEDOM
# FOREVER

Give the legacy of freedom and help protect our 2nd Amendment as part of your planned estate strategy!



Call 1 (800) 305-2772 or go to crpa.org/programs/crpa-donor-programs for more information.

---

7. Philadelphia Magazine, *"License-to-Carry Applications Have Skyrocketed In Philly — Even More Than You'd Think"*, March 16, 2022.

8. The Heritage Foundation's Defensive Gun Use Tracker also list several of these incidents, but not all of them. **datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us/**

9. 6abc, *"More victims fighting back against would-be robbers in Philadelphia, data shows"*, March 31, 2022.

10. City of Philadelphia, *"Mayor Kenney Issues Statement as Philadelphia Reaches 500 Homicides for the Year"*, November 24, 2021. **www.phila.gov**

# BIG WIN
# FOR 2A AT SCOTUS
## NOW THE RECKONING BEGINS

**I**n its first major Second Amendment decision since 2010, on June 23rd the Supreme Court of the United States confirmed that the right to bear arms extends outside the home, and applies to all law-abiding Americans, not just those who convince a local official that they have a unique special need to carry a gun.

The Court held 6-3 in *New York State Rifle & Pistol Association v. Bruen,* that a New York state law requiring applicants to prove they have a special need – like a stalker or a death threat – for a license to carry violates the Second and Fourteenth Amendments because it prevents law-abiding citizens wanting to carry simply to defend themselves or their families from exercising their right to bear arms.

Justice Clarence Thomas wrote the majority opinion for the Court, concluding that "the constitutional right to bear arms in public for self-defense is not a second-class right" and struck down New York state's licensing regime.

New York's law typically required applicants for concealed carry permits to prove they had a special need beyond a desire to be armed to defend themselves and their families. That highly subjective process deprived most citizens of a license and led to a corrupt system where some jurisdictions, like New York City, only issued permits to the wealthy and well-connected. That recently led to scandal and prosecutions.

So now so-called "may-issue" permitting procedures like New York's, that allow bureaucrats too much discretion to withhold a license, are unconstitutional.

California's similar system, which requires applicants to establish subjective "good cause" to get a license, has also been corrupted in practice. In the last decade, two-thirds of California counties thanks largely to the *Peruta* decision and subsequent lobbying and education by CRPA staff, have moved toward "shall-issue" systems, where self-defense is an accepted justification (good cause) for a license. But in those California counties that have not moved to shall-issue, often cronies and donors get a license, and ordinary folks don't. Most recently, Santa Clara County Sheriff Laurie Smith was indicted for issuing permits only to campaign donors, VIPs, and personal friends.

There is a CRPA lawsuit already in the 9th Circuit challenging Los Angeles County's requirement that applicants demonstrate a special need to establish good cause to get a license. California's existing system is likely to be struck down. Soon.

Sacramento politicians are already scrambling to rewrite the law in anticipation of that decision striking down California's good cause requirement.

Forty-three states are currently shall-issue, and that includes several that are politically similar to California, such as Oregon, Washington, Vermont, and others. The Supreme Court emphasized that such shall-issue listening systems are acceptable, holding that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 states' 'shall-issue' licensing regimes, under a license is required, but 'a general desire for self-defense is sufficient to obtain a [license].'"

Over the past decades, as those 43 states moved to shall-issue systems that accepted self-defense as an adequate justification, politicians repeatedly predicted that the shift would lead to "blood in the streets" and "wild west-style violence." California big government politicians including sore loser Governor Gavin Newsom were quick to breathlessly parrot those talking points in the wake of the New York ruling. But this isn't an academic discussion anymore. Increased violence simply hasn't been the result in the 43 states, nor in the two-thirds of California counties where licenses are much more readily available. In fact, violent crime typically goes down in those jurisdictions, as criminals are deterred from confronting victims who might shoot back.

Significantly, the *Bruen* decision also established a new standard of review for all Second Amendment cases going forward. As Justice Thomas explains for the Court, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

So, from now on, when a law affects Second Amendment rights, lower courts can only uphold that law if the government can establish it is consistent with the history and tradition of firearm regulations around the time of the adoption of the Second Amendment (1791) or the ratification of the 14th Amendment (1868). But even then, the majority cautions that, "when it comes to interpreting the Constitution, not all history is created equal... Historical evidence from long before either date may not illuminate the scope of the right..." Analogizing to history is allowed, within reason. For example, a background check before buying a gun is acceptable, because it is consistent with the historical tradition of preventing dangerous people from accessing weapons. But California's law that requires pistols to incorporate microstamping technology to stamp shell casings when fired, imposes a technology that hardly exists even now, and has no historical analog, and, therefore, is unlikely to pass constitutional muster. The microstamping requirement has stopped most modern pistols from being sold in the state, so infringement is blatant.

This new test for determining constitutionality is a hard reset for Second Amendment jurisprudence. CRPA already has a Second Amendment



0897

challenge to the "assault weapon" law, to the ammo background check requirement, and to the ban on standard capacity magazines that can hold over 10 rounds pending in the 9th Circuit. Our lawyers are working to brief those judges about the effect of the Supreme Court's ruling on these pending cases. In a nutshell, it should mean CRPA wins them all.

Since the Supreme Court last decided a Second Amendment case in 2010, biased lower courts seeking to uphold all manner of gun control laws have bent over backwards intellectually to create a highly subjective interest balancing test, under which a law that burdens Second Amendment rights will nonetheless be upheld if the interest of the government outweighs (in the judge's mind) that of the individual. Under that incorrect test, so long as a law didn't eliminate the right of people to have a handgun in their home, it was generally upheld — especially in the 9th Circuit.

Now the government must show there is historical grounding for their laws regulating guns and gun ownership. California's has over 800 byzantine gun laws that have failed to make us safer. But their complexity has made hundreds of accidental felons out of good people. Thanks to this ruling, courts cannot rely on fear-mongering and unsubstantiated statements made at a politician's press conference to justify a gun control law.

Now begins the reckoning as gun owners take back their freedoms and undo the damage done as politicians shoved useless gun control laws down our throats for the past decades. For now, at least, the Second Amendment, and the preexisting right to self-defense and to keep and bear arms for that purpose, have been vindicated. DONATE to CRPA so we can keep up the fight! **CRPA**

## Our lawyers are working to brief those judges about the effect of the Supreme Court's ruling on these pending cases. In a nutshell, it should mean CRPA wins them all.



**Prepare for the New Year:
Get California Gun Laws (9th ed.)**
Updated to Cover the New 2022 Laws
www.CalGunLawsBook.com

✴ How must a gun be possessed?
✴ When can you use deadly force?
✴ Where can you have a gun

✴ Which guns are banned?
✴ When can you have a gun?
✴ Who can possess a gun?

Do you know what California law requires gun owners to do in 2022? If you're not sure, as these laws change each year, you might become an accidental criminal. *California Gun Laws* explains all the relevant gun laws, including the new ones:

• Releasing gun purchasers' personal information to the government
• Adding new requirements for loaning firearms to minors and further restricting minors' possession of firearms
• Requiring the registration of newly-defined "assault weapons" to continue their lawful possession in California
• Restricting the sale of firearm precursor parts
• Changing the definition of "valid and unexpired hunting license"
• Changing the protocol when a firearm seller can't retake possession

**Get the Book on Amazon for $29.99**



IT'S JUST THE BEGINNING
CRPA.ORG
NYSRPA v. Bruen

# THE HOUR OF RECKONING IS UPON US

The CRPA legal team is engaged and fighting – more cases are coming!

You can tell them CRPA is coming ... and **FREEDOM** is coming with us!



**Please contribute to the CRPA 2ND Amendment Reckoning Campaign here**

**CRPA.ORG**



**CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL**

# TO: ALL CALIFORNIA DISTRICT ATTORNEYS, POLICE CHIEFS, SHERIFFS, COUNTY COUNSELS, AND CITY ATTORNEYS

## SUBJECT
U.S. SUPREME COURT'S DECISION IN *NEW YORK STATE RIFLE & PISTOL ASSOCIATION V. BRUEN*, NO. 20-843

## NO.
OAG-2022-02

## CONTACT FOR INFORMATION
CCWINFO@DOJ.CA.GOV

## DATE
JUNE 24, 2022

On June 23, 2022, the United States Supreme Court issued its decision in *New York State Rifle & Pistol Association v. Bruen*, No. 20-843 (*Bruen*).[1] In that case, the Court concluded that the State of New York's requirement that "proper cause" be demonstrated in order to obtain a permit to carry a concealed weapon in most public places violates the Second and Fourteenth Amendments. Although *Bruen* concerns a New York law, the *Bruen* majority specifically identifies California as one of six States that has an analogue to New York's "proper cause" standard. *Bruen*, slip op. 5-6. Accordingly, it is the Attorney General's view that the Court's decision renders California's "good cause" standard to secure a permit to carry a concealed weapon in most public places unconstitutional. Permitting agencies may no longer require a demonstration of "good cause" in order to obtain a concealed carry permit. However, local officials can and should continue to apply and enforce all other aspects of California law with respect to issuing public-carry licenses. In particular, the requirement that a public-carry license applicant provide proof of "good moral character" remains constitutional. Law enforcement agencies that issue licenses to carry firearms in public should consult with their own counsel, carefully review the decision in *Bruen*, take the following guidance into account,

and continue protecting public safety while complying with state law and the federal Constitution.

California law authorizes local law enforcement officials—sheriffs and chiefs of police—to issue licenses allowing license holders to "carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person." Cal. Pen. Code §§ 26150, 26155. In counties where the population is less than 200,000, local officials are also authorized to issue licenses permitting open carry in only that jurisdiction. *Id.* §§ 26150(b)(2); 26155(b)(2). These licenses, whether for concealed carry or open carry, exempt the holder from many generally applicable restrictions on the carrying of firearms in public. Local officials are only authorized to issue such licenses, however, upon proof that (1) "the applicant is of good moral character," (2) "[g]ood cause exists for issuance of the license," (3) the applicant is a resident of the relevant county or city (or has their principal place of business or employment in that county or city), and (4) the applicant has completed a course of training. *Id.* §§ 26150(a), 26155(a).

Although California law was not directly at issue in the *Bruen* decision, the decision makes clear that "good cause" requirements such as those in California Penal Code sections 26150(a)(2) and 26155(a) (2) are inconsistent with the Second and Fourteenth Amendments. Under the Supremacy Clause of the United States Constitution, state and local officials must comply with clearly established federal law.

In accordance with *Bruen*, the

Attorney General now considers the "good cause" requirements set forth in California Penal Code sections 26150(a)(2) and 26155(a)(2) to be unconstitutional and unenforceable. The immediate implications for law enforcement agencies that issue public-carry licenses ("issuing authorities") are as follows:

First, effective immediately, issuing authorities should no longer require proof of good cause for the issuance of a public-carry license. Issuing authorities may still inquire into an applicant's reasons for desiring a license to the extent those reasons are relevant to other lawful considerations, but denial of a license for lack of "good cause" now violates the Second and Fourteenth Amendments under the Supreme Court's decision in *Bruen*.

Second, issuing authorities should continue to apply and enforce all other aspects of California law with respect to public-carry licenses and the carrying of firearms in public. Issuing authorities are still required to take an applicant's fingerprints and to wait for the results of the background check that is run by the California Department of Justice (DOJ). Licenses "shall not be issued if the [DOJ] determines that the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm." Cal. Pen. Code § 26195(a). Moreover, because the Court's decision in *Bruen* does not affect the other statutory requirements governing public-carry licenses, issuing authorities must still require proof that (1) "the applicant is of good moral character," (2) the applicant is a resident

1 The decision is available at **https://www.supremecourt.gov/opinions/21pdf/20-843_7j80.pdf.**

0899

of the relevant county or city (or has their principal place of business or employment in that county or city), and (3) that the applicant has completed a course of training. *Id.* §§ 26150(a), 26155(a). Issuing authorities may also still require psychological testing. *Id.* § 26190(f).

*Bruen* recognizes that States may ensure that those carrying firearms in their jurisdiction are "law-abiding, responsible citizens.'" *Bruen*, slip op. p. 30 n.9; *see also id.* slip op. p. 2 (Kavanaugh, J., concurring) (States may "require a license applicant to undergo a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements"). Accordingly, in assessing whether an applicant has established "good moral character," issuing authorities should recognize that *Bruen* does not eliminate the duty or authority of local officials to protect the communities that they know best by ensuring that licenses are only issued to individuals who—by virtue of their character and temperament—can be trusted to abide by the law and otherwise ensure the safety of themselves and others. The investigation into whether an applicant satisfies the "good moral character" requirement should go beyond the determination of whether any "firearms prohibiting categories" apply, such as a mental health prohibition or prior felony conviction. Those categories, which may be found to apply during the DOJ-conducted background check (including the many categories pertaining to an applicant's criminal history), simply determine whether the applicant is even eligible to own or possess firearms under state and federal



► **Sacramento, CA - April 30, 2022:** Vertical view of the Office of the Attorney General of California, Department of Justice. (SHUTTERSTOCK)

law. When it comes to evaluating an applicant's moral character, however, the issue is not whether the applicant meets the minimum qualifications to own or possess firearms under other statutory criteria. "Good moral character" is a distinct question that requires an independent determination.

Existing public-carry policies of local law enforcement agencies across the state provide helpful examples of how to apply the "good moral character" requirement. The Sacramento County Sheriff's Office, for example, currently identifies several potential reasons why a public-carry license may be denied (or revoked), which include "[a] ny arrest in the last 5 years, re- gardless of the disposition" or "[a] ny conviction in the last 7 years."[2] It is reasonable to consider such factors in evaluating an applicant's proof of the requisite moral character to safely carry firearms in public. See, e.g., *Bruen*, slip op. p. 63 (referencing "law-abiding citizens"). Other jurisdictions list the personal characteristics one reasonably expects of candidates for a public-carry license who do not pose a danger to themselves or others. The Riverside County Sheriff's Department's policy, for example, currently provides as follows: "Legal judgments of good moral character can include consideration of honesty, trustworthiness, diligence, reliability, respect for the law, integrity, candor, discretion, observance of fiduciary



**FIREARMS AND SUICIDE PREVENTION**

Firearms retailers and range owners are in a unique position to help prevent suicide given their ongoing contact with the firearms-owning community. Suicide prevention training for those who influence a specific community can reduce the suicide risk for that community. Learn more at **afsp.org/firearms**.

duty, respect for the rights of others, absence of hatred and racism, fiscal stability, profession-specific criteria such as pledging to honor the constitution and uphold the law, and the absence of criminal conviction."[3]

As a starting point for purposes of investigating an applicant's moral character, many issuing authorities require personal references and/or reference letters. Investigators may personally interview applicants and use the opportunity to gain further insight into the applicant's character. And they may search publicly-available information, including social media accounts, in assessing the applicant's character. Finally, we note that it remains reasonable—and constitutional—to ask applicants why they are interested in carrying their firearms in public. Although applicants do not need to demonstrate good cause for the issuance of a license, an applicant's reasons for seeking a license may alert authorities to a need for psychological testing, be considered as part of the "good moral character" requirement, or provide information relevant to other statutory requirements. **CRPA**

2 Sacramento County Sheriff's Office, *CCW Application/Permit Denials/Revocations*, <https://www.sacsheriff.com/documents/ccw/REVO-DENIAL-REASONS.pdf> [last visited June 23, 2022].)

3 Riverside County Sheriff's Department, *Riverside County Sheriff's Department Standards Manual (DSM)*, <https://www.riversidesheriff.org/DocumentCenter/View/6791/Department-Standards-Manual-5222> [last visited June 23, 2022].

0900

# GUN CONTROL THREATENS COURT PACKING AGAIN AS AMERICANS EMBRACE GUN RIGHTS

**BY LARRY KEANE**

Originally published at **nssf.org/articles/gun-control-threatens-court-packing-again-as-americans-embrace-gun-rights/**

**T**he unauthorized leak of a draft abortion opinion from the U.S. Supreme Court has Democrats up in arms (again) about packing the U.S. Supreme Court. This isn't a new argument and one gun control advocates publicly pitched before.

Senators are openly calling for court-packing again and that's before the Supreme Court has rendered a final opinion on *New York State Rifle & Pistol Association v. Bruen* or finalized the opinion of the leaked abortion draft decision. Even before the nine justices heard arguments on the New York case challenging the states arbitrary and restrictive "may issue" concealed carry permit criteria, there were calls for court-packing.

U.S. Sen. Sheldon Whitehouse (D-R.I.) filed an amicus brief in *NYSRPA v. New York* supporting



(SHUTTERSTOCK)

restrictive gun control but took arguments beyond supporting the law with threats to upend the court's structure. That case was ultimately declared "moot" by the Supreme Court after New York City altered the law to avoid the Court striking down the law.

"Perhaps the Court can heal itself before the public demands it be 'restructured in order to reduce the influence of politics.' Particularly on the urgent issue of gun control, a nation desperately needs it to heal," Sen. Whitehouse wrote.

Senate Republican Leader Mitch McConnell (R-Ky.) led a 2019 letter excoriating court-packing threats and urged the justices to render opinions based on constitutional interpretations, not public opinion polls. The letter was signed by 53



ARE YOU PAYING ATTENTION?
STAY INFORMED WITH CRPATV
SUBSCRIBE NOW AT ▶ YOUTUBE.COM/CRPATV

Case 2:22-cv-04663-CAS-JC Document 12-1 Filed 07/25/22 Page 20 of 27 Page ID #:636

Republican senators.

"It's one thing for politicians to peddle these ideas in Tweets or on the stump," Sen. McConnell wrote. "But the Democrats' amicus brief demonstrates that their court-packing plans are more than mere pandering. They are a direct, immediate threat to the independence of the judiciary and the rights of all Americans."

It's a fool's errand to predict a Supreme Court ruling, but the justices' questions offered insight that they appeared to be wary of New York's subjective qualifications to obtain concealed carry permits. The decision will be the most significant on gun rights since the 2010 *McDonald* decision.

That's got gun control groups acting like spoiled school children. They're throwing fits. They too want to change the court's structure. Several of these groups joined together for a discussion on how to change the rules and rig the system against law-abiding Americans and their God-given right to self-defense.

### HIDING THE AGENDA

Igor Volsky, Executive Director of Guns Down America, Matt Post of March for Our Lives, Demand Justice's Tamara Brummer and U.S. Rep. Mondaire Jones (D-N.Y.) joined together for a closed-door discussion about their desire to pack the Supreme Court. They want more gun control-friendly justices that would legislate from the bench to restrict rights. The webinar was closed to the public, forcing any tuning in to register their personal information ahead of time. There is no public video of the discussion anywhere.

Brummer believes the Supreme Court has, "always been a political battleground, and now liberals need to push for more seats that will protect progressive policy advancements," like restrictive gun control. Matt Post exclaimed from the National Mall, "Their right to own an assault rifle does not outweigh our right to live." True assault rifles, or automatic weapons used by the military, have been severely restricted for civilian ownership since 1934 and haven't been commercially made or sold since 1986.

Volsky is an ardent gun control supporter. He's not only affiliated with Guns Down America but is also vice president of the far-left think tank Center for American Progress. He fired off a Twitter meltdown when U.S. District Court Judge Roger Benitez struck down California's 30-year-old ban on Modern Sporting Rifles (MSRs) in his ruling on



(SHUTTERSTOCK)

*Miller v. Bonta* last year.

Rep. Jones has never met a gun control proposal he didn't like. He so strongly supports court-packing that he's introduced legislation, along with fellow gun control Reps. Jerrold Nadler (D-N.Y.), Hank Johnson (D-Ga.) and Sen. Edward Markey (D-Mass.), to expand the court in order to pack it.

"To restore power to the people, we must expand the Supreme Court," Rep. Jones said. He must've forgotten the people elected the president who nominated justices on the current court, including the previous two Democratic presidents who filled vacancies. That doesn't include the Highest Court's newest justice, Judge Ketanji Brown Jack-

> **Democratic President Barack Obama famously stated, "Elections have consequences." The rules are the same for everyone and presidents get to nominate justices to fill vacancies on the Supreme Court when they arise.**

son, who was recently nominated by President Joe Biden and confirmed by the U.S. Senate and will be seated later this summer once Justice Stephen Breyer formally retires from the bench.

**VOTING AND BUYING**

These groups and elected officials aren't just ignoring their oath to defend the Constitution, they're ignoring their obligation to represent "We the People." More than 40 million firearms were purchased in 2020 and 2021, including more than 14 million by first-time buyers. The firearm buying boom has meant 33 months straight of 1 million or more guns purchased. This includes historic numbers of minorities and

more than 40 percent of first-time gun-buyers were women who feel "empowered" by taking up their Second Amendment rights.

Poll after poll shows Americans reject restrictions on their right to own a gun, including historic low levels of support for more gun control. It's why federal legislation, including Rep. Jones's court-packing gun control bill, has largely stalled and President Joe Biden is drawing the ire of gun control groups disappointed with his failure to accomplish more. It's why his first nominee for Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), David Chipman, failed to earn even the support of Democrats in the U.S. Senate and

had his nomination withdrawn.

Volsky's gun control court-packing expansion discussion demonstrated why their effort is a failing one. Preaching to the gun control choir won't do anything to make neighborhoods safer or stop criminals from committing their crimes.

Democratic President Barack Obama famously stated, "Elections have consequences." The rules are the same for everyone and presidents get to nominate justices to fill vacancies on the Supreme Court when they arise. Americans are embracing their Second Amendment rights by the millions and gun control groups are losing their argument. Because of that, they're now clamoring to change the rules. **CRPA**



**CALIFORNIA RIFLE AND PISTOL ASSOCIATION**

**COMING SEPTEMBER 2022**

New Membership Content Coming Soon
Student Offers just for YOU!

**As a Student Member**

As a CRPA member you defend your values, hobbies, and future in shooting sports. Gain access to resources that clarify common myths about firearm ownersip and exclusive content. Learn from other students from shooting sports community.

-Subscribe to our emails at www.crpa.org and stay up-to-date

**Carol Watson's Orange Coast Auctions**
**Antique & Modern Firearms**

**Saturday, July 23, 2022**





Impressive Antiques incl. a Lindsay M.1863 Rifle-Musket, Joslyn M.1864 Halfstock Rifle, and a Palmer SRC

Several Perazzis, incl. a MX8 Special SCO Grade Trap 2-Bbl Set, and a MX8 Special SCO Grade Skeet

Highly Collectible German Schuetzen Sporting/Target Rifles






**Orange Coast** AUCTIONS

Auction begins at 10am
Online bidding available via Proxibid.
Absentee and Phone Bids accepted.
California Bond #100166176

Fine Collection of Smith & Wesson Revolvers, incl. Registered Magnum Models

Desirable Pre-War U.S. Navy Contract Colt Model 1911-A1 Semi-Auto Pist.:

www.cwoauctions.com  info@cwoauctions.com  office: 714-213-8709

FEATURE NAME

# IS CDC <span style="color:red">COOKING THE BOOKS</span> ON DEFENSIVE GUN USE STATISTICS?

**BY KONSTADINOS T. MOROS**

**H**ow to define a defensive gun use DGU), and how to count when a DGU occurs, has been a contested gun policy debate for many **years.** If guns are used more often to defend a life than guns are misused by criminals to take one, then guns have social utility – in other words, guns are a net benefit to society. Guns save lives.

**WHAT IS A DGU?**

A DGU can be defined in different ways, but typically it means the use or presentation of a firearm for self-defense, defense of others or, in some cases, protecting property. Significantly, a gun does not have to be fired to be used defensively. In fact, in most DGUs the assailant is dissuaded and runs away after seeing the gun. Other times, the assailant is held at gunpoint until the authorities arrive.

**HOW MANY DGUS OCCUR?**

On the higher end of measured DGUs, you have Gary Kleck's famous survey from 1993. In that survey, Kleck asked 5000 adults if they, or their household members, had used a gun for self-defense in the past five years, even if it wasn't fired. Just over one percent of respondents said they did. In their National Self-Defense Survey, published in 1995, Kleck and his colleague Marc Gertz extrapolated that figure to the entire adult population of 200 million, concluding that Americans use guns for self-defense as often as 2.1 to 2.5 million times a year.

On the other end of the spectrum is the National Crime Victimization Survey (NCVS)—a national survey that is administered twice per year by the Bureau of Justice Statistics and that provides among the most-conservative estimates of DGUs. While NCVS results have varied over the years, their surveys indicate around 100,000 DGUs per year in the 1990s, and as few as 60,000 per year

more recently after crime fell. Those are still significant amounts, but an order of magnitude less than Kleck's results.

So, what explains the discrepancy? On the high side, it could be that people falsely report having had a DGU when they didn't. If that happens a lot, Kleck's results could be off.

But on the low end, the NCVS numbers are almost certainly a major underestimate. To begin with, instead of being random polling calls, they involve a government employee standing outside respondents' doors and asking them questions. A lot of people may not be eager to volunteer that they had a DGU for fear of legal trouble or merely identifying themselves as gun owners publicly. Significantly, the NCVS doesn't even ask about DGU specifically. Instead, respondents must first self-identify as having been a victim of a crime, and *only then* are they given

the opportunity to volunteer how they defended themselves, if at all. As the much-vaunted RAND Corporation writes in its overview of DGUs:

"As noted earlier, however, there are also good reasons to suspect that the NCVS underestimates the true number of DGUs. The NCVS provides an opportunity for respondents to describe DGUs only in the context of certain types of crimes. DGUs resulting from crimes not covered by the NCVS will likely be undercounted. DGUs may occur in the context of suspected crimes that respondents on the NCVS might not judge to qualify as events in which they were a victim of a crime, in which case those DGUs would be undercounted. At the time research on DGUs was being conducted, the NCVS did not explicitly ask crime victims whether they used a firearm to defend themselves.

Thus, some DGUs might go uncounted if respondents choose not to volunteer their use of a gun when asked whether they attempted to resist the perpetrator (Kleck, 1999)."[1]

Perhaps for emphasis, RAND repeats in its conclusion that while it considers Kleck's 2.5 million figure suspect, "the NCVS estimate of 116,000 DGU incidents per year almost certainly underestimates the true number."

Other surveys have also come up with figures ranging from 500,000 to two million per year.

**A CDC COVER-UP?**

The Centers for Disease Control and Prevention (CDC) ran its own survey in the late 1990s in a handful of states, and suspiciously it never published the results. The CDC data was discovered by Kleck a few years ago, and the response data was consistent



> **Archived version** of what the CDC's website used to say about Defensive Gun Uses. (web.archive.org)

1. **rand.org/research/gun-policy/analysis/essays/defensive-gun-use.html**

0904



# WHAT IS THE CRPA?

**T**he California Rifle & Pistol Association (CRPA), founded in 1875, is a nonprofit membership and donor-supported organization with tens of thousands of members throughout California. We need you!

CRPA's membership is comprised of a diverse cross-section of the general public including believers in the right to choose to own a gun to defend yourself and your family, competitive and recreational shooters, hunters, conservationists, gun safety experts, youth, women, police, prosecutors and defense attorneys, judges, firearm history and technology experts, coaches and trainers, families and loving parents.

CRPA works tirelessly and relentlessly to defend the civil and constitutional rights of individuals to choose to responsibly own and use firearms. Every dollar that CRPA receives from its members and donors stays and works in California to support your hunting and Second Amendment rights and the fight back against politicians, elitists and bureaucrats who would deprive individuals of those rights.

Through its Sacramento and local legal and political advocates, CRPA works in the state capital, in regulatory agencies and in city halls throughout California to promote laws that protect these rights and to oppose laws that infringe on these rights.

Through its legal team, CRPA fights in the courts to challenge unconstitutional and illegal gun bans and ill-conceived gun control laws and provides guidance to California gun owners regarding their legal rights and responsibilities.

CRPA works to preserve the traditional and historic role of the individual citizen to hunt and to conserve and preserve California's natural resources.

CRPA promotes the recreational shooting sports and hosts hundreds of "fun shoots" annually.

CRPA provides safety, education and skills training and makes gun safety information available.

CRPA organizes and sanctions competitive shooting matches for both adult and junior shooters, including Olympic training programs and state championships. CRPA sanctions state championship matches in many shooting disciplines. CRPA is proud to state that many CRPA competitors are among the best in the world.

with over one million DGUs per year.[2]

Perhaps because of all the differences as to the correct DGU number though, for years the CDC's website had said of defensive gun uses that "Estimates of defensive gun use vary depending on the questions asked, populations studied, timeframe, and other factors related to the design of studies. The CDC report *Priorities for Research to Reduce the Threat of Firearm-Related Violence* indicates a range of 60,000 to 2.5 million defensive gun uses each year."

Aside from CDC's somewhat dishonest omission of its own survey results, this phrasing was the right call. While we on the pro-gun rights side may complain that the NCVS numbers are wrong, and the anti-gun side would say the same about Kleck's figure, the CDC did what a government entity should do when the data is disputed – not take a side and instead just post the possible range.

Recently, however, the CDC edited this portion of the website about DGUs to instead say the following: "Estimates of defensive gun use vary depending on the questions asked, populations studied, timeframe, and other factors related to study design. Given the wide variability in estimates, additional research is necessary to understand defensive gun use prevalence, frequency, circumstances, and outcomes."

Given that there has been no new development in the field, there was no basis for the CDC to remove the reference to the frequency range of DGUs. Especially when its own unreleased survey indicated a result comfortably in the middle of that range.

So, what prompted the CDC to make this edit? We can find the answer in a prominent antigun publication created with Michael Bloomberg's seed money: The Trace. In a June 3, 2022 article by Jennifer Mascia, the Trace reports that "the edits followed months of lobbying by a group of researchers that included Mark Bryant, who leads Gun Violence Archive, and Devin Hughes, who runs GVPedia, a nonprofit gun violence research outfit (Hughes is a former Trace contributor)."

[2] researchgate.net/publication/344273747_What_Do_
CDC's_Surveys_Say_About_the_Prevalence_of_Defensive_
Gun_Use

## What is defensive gun use? How often does it occur?

Although definitions of defensive gun use vary, it is generally defined as the use of a firearm to protect and defend oneself, family, other people, and/or property against crime or victimization.

Estimates of defensive gun use vary depending on the questions asked, populations studied, timeframe, and other factors related to study design. Given the wide variability in estimates, additional research is necessary to understand defensive gun use prevalence, frequency, circumstances, and outcomes.

▶ **Current CDC website excerpt** on Defensive Gun Uses. (CDC.GOV)

If the Trace's reporting is correct, the CDC bent to the will of antigun activists and is now misinforming Americans about DGUs at their insistence.

**CONCLUSION**

This is another example of why CDC's funding to study gun crime should not be increased, as we have no way to trust that their "research"

would not be a sham meant to push the gun control agenda.

CRPA has already filed a Freedom of Information Act request to obtain all documents and communications related to the CDC's decision to edit their website as to DGUs. If a substantive response is received, a future article will report back with updates.

**CRPA**

**Konstadinos Moros** *practices general civil litigation with Michel & Associates. He received his bachelor's degree in political science from the University of California, San Diego in 2011. In 2014, he earned his Juris Doctorate from California Western School of Law and has been practicing law since 2015. He is an activist and advocate for maximizing our constitutional and natural rights, especially the right to keep and bear arms.*



**SCALCO FINANCIAL**
Tax Consulting & Wealth Management

**Work with a company that shares your values! Scalco Financial is a proud member of the CRPA.**

Our purpose at Scalco Financial is to help provide our clients with clarity and peace of mind concerning their tax and financial affairs. We offer independent skilled advice and services in the interrelated fields of income tax and wealth management.

**We offer comprehensive tax and investment solutions, including:**

Investment Planning — Tax Planning and Preparation — Insurance Planning — Estate Planning
Retirement Planning — Representation before the IRS, State, and other taxing authorities — Income Protection and Asset Preservation — Business Planning

**www.scalcofinancial.com | 562 430 3780 | 207 East Broadway, Unit 201, Long Beach, CA 90802**

Securities offered through Avantax Investment Services℠, Member FINRA, SIPC. Investment advisory services offered through Avantax Advisory

# THE SUPREME COURT'S UPCOMING HISTORIC 2A DECISION & HOW IT MAY AFFECT THE RIGHT TO CARRY IN CALIFORNIA

**T**he Supreme Court of the United States is preparing to issue a ruling in the landmark case of *New York State Rifle & Pistol Association Inc. v. Bruen*.[1] In that case, the Court will decide the issue of whether the state of New York's denial of the Petitioners' applications for concealed-carry licenses for self-defense violated the Second Amendment.

The following information has been prepared to help issuing authorities better understand the *Bruen* case and the potential impacts a Supreme Court decision can have on issuing authorities here in California. Following the release of the opinion from the Supreme Court, CRPA will also be hosting an online Q&A which will also be open to all California CCW issuing authorities.

### I. WHAT EXACTLY IS BEING CHALLENGED IN *BRUEN*

The New York law challenged in *Bruen* requires anyone who wants a license to carry a concealed handgun to show "proper cause" for the license. Courts in New York have defined "proper cause" to require applicants to show a special need to defend themselves, rather than simply wanting to protect themselves or their property. This requirement is substantially like California's "good cause" requirement for the issuance of a CCW.[2] Both California's and New York's requirement create a highly subjective determination that may violate the Second Amendment right to bear arms.

### II. HOW *BRUEN* COULD AFFECT CALIFORNIA LAWS REGARDING CCW ISSUANCE

All indications suggest the Supreme Court will rule for the Petitioners and strike down New York's requirement as unconstitutional. Should the Supreme Court do so, it will implicitly confirm that California equivalent "good cause" requirement is also unconstitutional. Regarding the issuance of licenses to carry concealed weapons, California law lists the requirements as follows:

*(a) When a person applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the sheriff of a county may issue a license to that person upon proof of all of the following:*

*(1) The applicant is of good moral character.*

***(2) Good cause exists for issuance of the license.***

*(3) The applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business.*

*(4) The applicant has completed a course of training as described in Section 26165.*[3]

While CRPA won't know for sure what the Court's exact ruling will be until it is published, at this time, we do not expect the ruling to affect anything beyond "good cause" or "proper cause" requirements. Thus, if the petitioners prevail, most of California's requirements will continue to stand except for the good cause requirement. Authorities may continue to require that the applicants be of good moral character, reside in the county of issuance, and complete a course of training. That said, CRPA will be on the lookout for any bad-faith applications of these requirements that intend to obstruct the Supreme Court's ruling.

### III. POTENTIAL IMPACTS OF *BRUEN* ON SHALL ISSUE VS. MAY ISSUE CARRY REGIMES

California is, like New York, one of the few remaining outlier states where so-called "may issue"[4] permitting regimes still exist. The overwhelming majority of states are now either "shall issue," where all law- abiding citizens who apply and take the required class (if any) are issued permits, or "constitutional carry," where all citizens[5] who can legally own a gun may carry it on their person openly or concealed.

Yet even within California, may issue policy is in the minority. Following a lawsuit brought by CRPA and other plaintiffs in 2016, the California Court of Appeals held that, because California's statutory scheme permits concealed carry only upon a showing of good cause and because open carry is also restricted, requiring "good cause" for a concealed carry license violates the Second Amendment. (*Peruta v. Cnty. of San Diego* (9th Cir. 2016) 824 F.3d 919, 924.)[6] Today, thanks in large



# TRUST

It's the foundation of the Attorney-Client relationship. You trust the lawyers at Michel & Associates to defend your Second Amendment rights. You can trust us to help with your other legal problems too.

Whether you've have been injured, been sued, need to file a lawsuit, need business advice, or have other legal issues, we can help. You can trust us to make sure your legal rights are protected.

Email or call us today for free consultation.

Proud to support CRPA with a portion of contingency fee recovery donated towards the fight to protect your right to keep and bear arms!

**C.D. "Chuck" Michel**
**Michel & Associates, Attorneys at Law**
cmichel@michellawyers.com • (562) 216-4444

4. The degree to which permits are issued under such regimes greatly varies. Some places (like Los Angeles County and San Diego County) currently issue to a few regular citizens but not to most. Others only issue to the famous and the well-connected, like San Francisco County. And Hawaii and New Jersey effectively issue to no one, with Hawaii having never issued a carry permit to a private citizen. (*Young v. Hawaii* (9th Cir. 2021) 992 F.3d 765, 859 [O'Scannlain, C.J., dissenting].)

5. Some constitutional carry states do set a minimum age requirement, limiting carry to people age 21 and older.

6. That appellate panel decision was overturned *en banc*, as all wins for Second Amendment rights are in the Ninth Circuit. But now, it may be vindicated with the *Bruen* decision. While the Supreme Court denied review to *Peruta* at the time, Justice Thomas wrote a scathing dissent from the denial of cert, concluding that "[t]he Court's decision to deny certiorari in this case reflects a distressing trend: the treatment of the Second Amendment as a disfavored right." (*Peruta v. California* (2017) 137 S.Ct. 1995, 1999 [Thomas J., dissenting from denial of certiorari].) Following *Bruen*, that "distressing trend" may finally now be coming to an end.

1. For a complete listing of case documents and additional case information, visit **supremecourt.gov**.

2. Pen. Code §§ 26150(a)(2), 26155(a)(2).

3. Pen. Code §§ 26150, 26155.

part to the tireless and ongoing work of CRPA staffers educating these authorities, a large majority of counties in California are effectively shall-issue, with their respective Sheriffs accepting a general desire for self-defense as sufficient good cause to issue a permit.

For instance, Tehama County Sheriff's Department states on its Concealed Weapons Permits website that "Sheriff-Coroner Dave Hencratt supports the right of law-abiding citizens to keep and bear arms. In this regard, all qualified residents of Tehama County are eligible to apply for a permit to carry concealed weapons."[7] The webpage then lists off four requirements for a permit including an age minimum of 21, the residency requirement, the mandatory safety course, and passing the background check. As another example, San Joaquin County Sheriff's Department expressly states on its website that "[p]ersonal protection or self-defense is sufficient to establish good cause" for the issuance of a permit.[8] As such, even if the *Bruen* decision goes as expected, counties like Tehama and San Joaquin probably won't have to change much as they are already likely to be in substantial compliance with the ruling.

In stark contrast, Alameda County's website states: "California is a 'May Issue' state; the decision to grant a CCW license is at the discretion of the County Sheriff or Police Chief. Having a CCW license is a privilege,

not an entitlement, and the Courts have ruled that a California CCW license is not guaranteed to all persons under the 2nd Amendment of the United States."[9] Alameda is likely to have to drastically change its policy and quickly edit out the misinformation on its website following *Bruen*. CRPA will make sure it does.

### IV. CONCLUSION

As discussed above, many counties already have policies in place that would comply with the likely ruling in *Bruen*. Counties that are may-issue (or effectively no-issue) will need to make the biggest changes to their policies if the petitioners in *Bruen* prevail.

CRPA is happy to offer its guidance and assistance on any questions permit issuing departments may have following the *Bruen* decision, whatever the ruling ends up being. Please do not hesitate to reach out to us with any questions or concerns. And as mentioned above, CRPA will be hosting a Q&A session open to all California issuing authorities follow-

ing the release of the decision in *Bruen*.

### FOR MORE INFORMATION

For more information, be sure to visit CRPA's website at **crpa.org/ countdown-to-hope-supreme-court-watch/** and **getmyccwnow. com**. And be sure to subscribe to CRPA email alerts to stay informed on the latest developments.

**Disclaimer:** This information has been prepared for general information purposes only. The information contained herein is not legal advice, should not to be acted on as such, may not be current, and is subject to change without notice. Michel & Associates, P.C., does not warrant or guarantee the accuracy, completeness, adequacy, or currency of the information contained herein. Users of this information do so at their own risk. This document does not create an attorney-client relationship. Individual facts and circumstances may alter the conclusion(s) drawn. For legal advice consult an attorney. **CRPA**

---

## HIGH CALIBER INJURY LAW

**Personal Injuries | Car Accidents | Motorcycle Accidents**



When you have been injured, you need to set your sights on getting better, and not let your guard down when facing insurance companies. Or the prospect of going to court to get what you deserve.

With 20 years experience and tens of millions of dollars in settlements and judgements by your side, you're ready ... with the law offices of Joseph Di Monda.* Call today for a no-fee, no-obligation review or your situation.

Law offices of **Joseph Di Monda, J.D., A.I.A.**
1721 Sepulveda Blvd, Manhattan Beach CA •562-912-7871

Proud to support CRPA with a portion of contingency for recovery donated towards the fight to protect your right to keep and bear arms!

*Past results are not a guarantee of future performance.*

7. tehamaso.org/administration/licenses-permits/concealed-weapons/

8. sjsheriff.org/concealed-weapon/permit/

9. alamedacountysheriff.org/services/ccw-request

ENGINEERED WITH ABSORBITS™ MOISTURE-WICKING TECHNOLOGY

## STOP RUST BEFORE IT STARTS

Don't miss out on your next hunt because of a rusty gun. Humidity and moisture can affect the performance of your gun, cause rust, and make cleaning difficult. Unlike any other gun cases, BONE-DRI cases are engineered with Absorbits™ moisture-removal technology to store and protect your firearms from rust after exposure to moisture. Tested, proven, and guaranteed for life, BONE-DRI cases suck moisture...other cases just suck.

ABSORBS MOISTURE    KEEPS SAFE & DRY    PREVENTS RUST

DUAL RIFLE CASE

SHOTGUN & RIFLE CASE

"BIG SHUUG" SHOTGUN SLEEVE

LEARN MORE AT
**BONE-DRI.COM**

0907

# LEGISLATIVE REPORT

## NO SURPRISE... ONCE AGAIN, OUR REPRESENTATIVES ARE BREAKING ALL THE RULES!

## THE GUT AND AMEND RIDES AGAIN!

I know in past legislative updates I have made statements like "your representatives have reached an all time low" and "once again they are breaking their own rules." Well, no surprise, Anti-gun anti-hunting champion Assembly Member Marc Levine has once again taken the prize and broke all the rules. As you will recall, Assembly Member Levine has run a bill the last three sessions in a row to unlawfully

**BY ROY GRIFFITH**
CRPA LEGISLATIVE LIAISON

tax gun owners. Even though the Assembly Democrats hold a supermajority, he has not even been able to get this bill off the Assembly floor! As you might recall we killed AB 1223 on the floor in the 2021 session only to watch him obtain an emergency exemption for it to live on to the 2022 session where he again failed to get the votes. Well, on a fair playing field that would be the end of it, at least for this year! However, we do not have a fair playing field and these liberal democrats do not even follow their own rules. Assembly Member Levine just took a clean energy bill, AB 1227, which would have required homes in California to have reflective roofing, and via the "Gut & Amend" process turned it into his failed bill AB 1223! Now mind you AB 1227 had already survived the assembly and public committee review process as an "Building Energy Efficiency Standards" bill! His action circumvented the review process of half the legislature, and to bypass the Assembly where Levine, on at least three occasions in three years, previously could not get the votes required to get the bill to the Senate, let alone the Governor! His action denies the people their right to be heard and the transparency they deserve. It is reprehensible to stoop so low as to use this backhanded, under-cover-of -darkness, tactic.

CRPA's very own Sean Fitzgerald, Founder and Principal of Vox Civic Communications, summed it up best by asking, "Assembly Member Levine, if this is such a great piece of legislation, that is going to save so many lives in California why do you have to stoop to such low tactics to get this bill to the Governor's desk?"

Now AB 1227 seeks to impose an excise tax in the amount of 10% of the sales price of a handgun and 11% of the sales price of a long gun, firearm precursor part, and ammunition to fund yet another slush fund the "Gun Violence Prevention, Healing, and Recovery Fund." This bill failed in the 2019 session as AB 18. At that time, the author stated the annual cost estimates from gun violence in the United States reach $229 billion. These costs are caused by *criminals*, not the individuals they seek to tax. The California Rifle and Pistol Association will always stand with law enforcement throughout California and put the safety of our communities and citizens first. However, we oppose taxing millions of law-abiding citizens for the actions of criminals who compose a fraction of a percent of the population who are not law-abiding. Firearms and ammunition sales already bring millions of dollars of sales tax into California's state budget each year. Many communities throughout California already collect more than 10% in sales tax alone. Additionally, an average of $40 million is made available for conservation and education efforts in California each year from an 11% federal excise tax imposed on the sale of sporting arms and ammunition (the Pitman Robertson Act). Furthermore, the proposed tax, which clearly impedes constitutionally protected activity, raises serious legal questions as to whether funds raised in this manner can be compiled in this newly created account.

Case law makes it clear that states may not impose a charge for the enjoyment of a right granted by the federal Constitution and a person cannot be compelled to purchase, through a fee or tax, the privilege freely granted by the Constitution. This type of tax scheme has been repeatedly struck down in multiple jurisdictions. A marriage license tax being used to fund shelters for victims of domestic violence was recently struck down on similar grounds. In that case, the court pointed that a statute cannot violate the Constitution no matter how desirable or beneficial the legislation may be.

Under the law, a state may only impose taxes in connection with the exercise of a constitutional right when those fees are designed to recoup the costs incurred in administering a regulatory regime to which the taxpayer is subjected. This tax neither recoups the costs of legitimate firearm regulation nor does it fund efforts to benefit firearms consumers generally. The money is being used instead to create the new "Gun Violence Prevention, Healing, and Recovery Fund." Again, we support crime prevention and victim support, but not funding it on the backs of law-abiding gun owners. It is therefore our view that these additional taxes are unjustified and unlawful.

I wish I could tell you AB 1227 was the only dumb idea still alive. The list of opposition bills below have passed their house of origin and are on the floor this week before being rubber stamped to head to the other side:

**SB 856: Dodd. Wild pigs: validations.**
**SB 915: Min. Firearms: state property.**
**SB 1327: Hertzberg. Firearms: private rights of action.**
**SB 1384: Min. Firearm Dealer requirements**
**AB:1594: Ting, Gipson, and Ward: Firearms: civil suits.**
**AB 1621 Firearms: Gipson: unserialized firearms.**
**AB 1769: Bennett. Firearms: prohibited places.**
**AB 2156: Wicks: Firearms: manufacturers.**
**AB 2552: McCarty: Firearms: gun shows and events.**

We are urging you to contact your representatives and demand they vote no on each and every one of these misguided bills. Thank you for being CRPA members and supporting us in the fight! For a complete list of the bills we face this session and sample language for your opposition letters refer to the Legislative Program Page at CRPA.org! God bless you all! CRPA

"Extreme taxation, excessive controls, oppressive government competition with business, frustrated minorities and forgotten Americans are not the products of free enterprise. They are the residue of centralized bureaucracy, of government by a self-anointed elite."

**Ronald Reagan**

0908

# LITIGATION REPORT

## RIGHT TO CARRY SHAKE-UP, AND MORE, EXPECTED WITH SCOTUS *BRUEN* RULING

BY ALEX FRANK

**A**ll eyes are on the Supreme Court of the United States right now. As of writing this article, the Supreme Court has not released its much-anticipated opinion in *New York State Rifle & Pistol Assn. v. Bruen*. That is likely to happen in June, and possibly July.

Predicting what the Supreme Court will do is hard, considering the secrecy of the court's operations. But it is no secret that the court is more conservative right now than at any time in recent history and appears poised to deliver a decidedly pro-Second Amendment decision. Given what observers can deduce from the court's 2022 term record, it appears that Justice Thomas is authoring the majority opinion.

**A ruling in *Bruen* would also allow other key CRPA supported cases stuck in the 9th Circuit Second Amendment litigation bottleneck – like CRPA's ammunition law challenge in *Rhode v. Bonta* and CRPA's "assault weapons" challenge in *Rupp v. Bonta* – to finally get back to business in a much more favorable legal environment.**



# YOUR GIVING AFFORDS US TO FUND ESSENTIAL PROGRAMS

Donations are made in the form of tax deductible gifts, appreciated stocks, wills, living trusts, donated real estate or firearms collections, and more. It all starts with your generous commitment and continued support!

**Download our estate planning guide at crpa.org/crpa-foundation**

# LEAVE A LEGACY
## FOR FUTURE GENERATIONS!

0909

This is great news. Justice Thomas has historically been the most clearly pro-Second Amendment jurist at the high court, by a long shot.

As exciting as the prospect of the Supreme Court reshaping the contours of the right to carry is, resolution of the *Bruen* case will likely trigger resolutions in several other important Second Amendment cases too. Once the court rules in *Bruen*, the ruling will likely trigger a "GVR" (grant, vacate, remand) in the CRPA supported *Duncan* case that is currently at the high court with a pending certiorari petition. The prediction is that the court will issue an opinion in *Bruen*, then grant the *Duncan* petition, vacate the 9th Circuit *en banc* panel's bad ruling, and remand it to the trial court for further proceedings consistent with the Supreme Court's *Bruen* ruling.

A ruling in *Bruen* would also allow other key CRPA supported cases stuck in the 9th Circuit Second Amendment litigation bottleneck – like CRPA's ammunition law challenge in *Rhode v. Bonta* and CRPA's "assault weapons" challenge in *Rupp v. Bonta* – to finally get back to business in a much more favorable legal environment.

CRPA does not expect that historically anti-gun jurisdictions will make total about-face changes in their approach to regulating public carry. It is likely that even in the face of an unmistakably clear language from the Supreme Court to accept self-defense as "good cause" for issuance of a carry permit, jurisdictions will impose barriers, burdens, and restrictions to make concealed carry difficult. CRPA will monitor those developments and challenge them where necessary.

Once the Supreme Court rules, it will likely trigger a deluge of permit applications. If you have been on the fence about applying, get that application in! **CRPA**

# CALIFORNIA AND 9TH CIRCUIT LITIGATION MATTERS

This report provides an overview of just some of the efforts being taken to protect the rights of California gun owners. Although litigation plays an extremely important role in the fight for the right to keep and bear arms, there are many other tremendous and equally important endeavors throughout California and across the nation.

Protecting the Second Amendment requires an enormous amount of resources and involvement in all levels of California's government, including all 58 counties, all 482 municipalities and all state and local agencies tasked with enforcing the myriad of complex and ever-expanding gun laws.

The digital version of this report, complete with links to relevant documents and additional information, can be found on CRPA's web page at **crpa.org.**

| ISSUE | CASE NAME | CASE STATUS | WHAT'S NEXT |
|---|---|---|---|
| CHALLENGE TO CALIFORNIA'S AMMUNITION SALES RESTRICTIONS | *Rhode v. Becerra* | The case was filed on April 26, 2018, in response to Proposition 63 and Senate Bill 1235's restrictions regarding the sale and transfer of ammunition in California. The lawsuit challenges these restrictions as a violation of the Second Amendment, Commerce Clause, and Equal Protection Clause of the United States Constitution, as well as a violation of the Firearm Owner's Protection Act. On April 23, 2020, the Honorable Roger Benitez granted Plaintiffs' request for a preliminary injunction. Consequently, the state was instantly legally barred from enforcing the ammunition laws at issue in this case. On April 24, 2020, Judge Benitez then denied the State's request to stay his injunction. The State applied to the Ninth Circuit later that day for a stay, which it granted, reinstating the status quo pending appeal of preliminary injunction. | This matter would likely have seen oral argument before the 9th Circuit sometime in the summer or early fall of 2021. However, due to the 9th Circuit's decision to rehear the *Duncan v. Becerra* matter en banc, this appeal was stayed on March 19, 2021 pending *Duncan's* resolution. On November 30, 2021, the 9th Circuit *en banc* panel reversed the *Duncan* wins. The *Duncan* plaintiffs petitioned the United States Supreme Court for certiorari on February 28, 2022. |

| ISSUE | CASE NAME | CASE STATUS | WHAT'S NEXT |
|---|---|---|---|
| CHALLENGE TO CA AND LOS ANGELES FIREARM CARRY RESTRICTIONS THAT PROHIBIT BOTH OPEN AND CONCEALED CARRY | *Flanagan v. Becerra* (Formerly *Flanagan v. Harris*) | The case was filed on August 17, 2016, as a direct response to *Peruta*. It seeks to force the court to decide whether it is willing to uphold a complete prohibition on the right of law-abiding citizens to carry a firearm for self-defense. The parties filed cross-motions for summary judgment. In May 2018, the court issued a decision granting Defendant's motion for summary judgment. | The 9th Circuit rejected the State's petition to have the case heard initially by an 11-judge *en banc* panel along with the *Young v. Hawaii* lawsuit. However, instead of allowing the case to proceed, the 9th Circuit stayed the case on July 30, 2019 pending the outcome of *Young v. Hawaii. Young* is currently at the Supreme Court, with a pending certiorari petition (filed May 11, 2021). |
| CHALLENGE TO UNDER 21 FIREARM PROHIBITION. | *Jones v. Bonta* | The 9th Circuit held oral argument on May 12, 2021. | On May 11, 2022, the 9th Circuit ruled that the district court erred in not granting plaintiffs' motion for preliminary injunction. The state has until July 25, 2022 to ask for an *en banc* hearing. |
| CHALLENGE TO CALIFORNIA'S "ASSAULT WEAPON" RESTRICTIONS | *Rupp v. Becerra* | The case was filed on April 24, 2017, in response to SB 880 and AB 1135. It challenges California's entire "assault weapon" ban as violating the Second Amendment and due process and takings clauses of the U.S. Constitution. Plaintiffs filed a preliminary injunction motion to prevent the State from requiring individuals to provide the date they acquired their firearms and the name and address of the person from whom they acquired them, as a condition of registration, but that motion was denied on May 9, 2018. On July 22, 2019, the court granted the State's motion for summary judgment, ending the case in the State's favor. Plaintiffs appealed to the 9th Circuit on August 27, 2019. Plaintiffs filed their opening appeal brief on January 27, 2020.  The state filed its brief May 26, 2020. Oral argument was heard on October 8, 2020, in Pasadena. The matter is now submitted, and resolution is pending. | Stayed pending the resolution of *NYSRPA*. |
| DOES HAWAII'S PERMIT SCHEME FOR GENERAL OPEN CARRY PROHIBITION VIOLATE THE SECOND AMENDMENT? | *Young v. Hawaii* | This case was on track for an *en banc* hearing but was stayed pending the outcome of *NYSRPA v. City of New York,* the gun case that the Supreme Court held mout in June of 2020. Shortly after that outcome, the Ninth Circuit rescheduled the *en banc* hearing for September 24, 2020. The 9th Circuit *en banc* panel reheard the case on September 24, 2020. On March 24, 2021, the *en banc* panel issued its ruling upholding the dismissal. | Mr. Young filed a petition for certiorari in the United States Supreme Court in May of 2021. Response is due June 24, 2021. |
| DOES CALIFORNIA'S FIREARM RIGHTS RESTORATION REGIME VIOLATE THE SECOND AMENDMENT? | *Linton v. Bonta* | On March 5, 2021, the Court administratively terminated the pending motion for summary judgment and stayed the case due to the 9th Circuit's announcement that *Duncan v. Becerra* would be reheard *en banc*. | The case will remain inactive pending the result of the *Duncan* re-hearing and Supreme Court Certiorari petition. |

0910

| ISSUE | CASE NAME | CASE STATUS | WHAT'S NEXT |
|---|---|---|---|
| **CHALLENGE TO CALIFORNIA'S BAN ON STANDARD-CAPACITY MAGAZINES** | *Duncan v. Becerra* | The case was filed in response to SB 1446 and Prop 63. It challenges California's ban on the acquisition and possession of magazines over ten rounds. On June 29, the district court granted plaintiffs' motion for a preliminary injunction, halting enforcement of the newly enacted possession ban while the case is litigated. The State immediately appealed the injunction order. In July 2018, the Ninth circuit upheld the injunction. The federal District Court, where Judge Benitez presides, granted Plaintiffs' summary judgment motion, which permanently enjoined Penal Code Sec. 32310 on March 29, 2019. This legalized the acquisition of standard-capacity magazines. However, the court entered a stay of the injunction, effective 5:00 p.m. on April 5, 2019. | The *Duncan* plaintiffs petitioned the United States Supreme Court for certiorari on February 28, 2022.<br><br>The court distributed it for conference for May 11, 2022. It will likely see a GVR once the court issues its *NYSRPA* ruling. |
| **CHALLENGES DOJ'S USE OF DROS SURPLUS TO FUND APPS AS AN ILLEGAL TAX.** | *Gentry v. Becerra*<br><br>(Formerly *Gentry v. Harris*) | Plaintiffs filed an amended complaint alleging that the DROS fee is an invalid tax. On August 9, 2017, the district court issued a ruling granting Plaintiffs' request to prohibit DOJ from using DROS fees to fund unrelated law enforcement efforts and requiring DOJ to perform its statutorily required review of the current $19 fee to determine whether it is "no more than necessary to fund" DOJ's costs for processing DROS transactions. Trial was held in January of 2019. The Court upheld the DROS fee as a legitimate regulatory fee. Plaintiffs argue that the Court's finding contradicts established law regarding regulatory fees. | The California Court of Appeals affirmed judgment in the State's favor on March 26, 2021. Plaintiffs are pursuing an attorneys fee award in trial court for the claims that were successful. |
| **CHALLENGE TO VENTURA COUNTY'S ACTIONS PREVENTING PEOPLE FROM BUYING GUNS AND AMMUNITION DURING THE COVID-19 SITUATION, AND TO FORCED CLOSURES OF FIREARM AND AMMUNITION RETAILERS AND SHOOTING RANGES UNDER THREAT OF PROSECUTION** | *McDougall v. County of Ventura* | The court granted Defendants' motion to dismiss on September 22, 2020. Plaintiffs appealed on November 19, 2020, and filed their brief in the 9th Circuit Court of Appeals on March 4, 2021. | The Ninth Circuit issued an opinion on January 20, 2022, reversing the district court's dismissal of the plaintiffs' action.<br><br>The 9th Circuit *en banc* hearing is set for June 22, 2022. |
| **DOES THE CITY OF MORGAN HILL'S 48-HOUR LOSS/THEFT REPORTING ORDINANCE FAIL DUE TO PROPOSITION 63 PREEMPTION?** | *Kirk v. City of Morgan Hill* | The trial court granted Morgan Hill's motion for summary judgment and denied Plaintiffs' motion for summary judgment on July 30, 2020. | The matter is fully briefed and parties are awaiting an oral argument date. |

| ISSUE | CASE NAME | CASE STATUS | WHAT'S NEXT |
|---|---|---|---|
| **CHALLENGE TO SANTA CLARA'S (AND OTHER BAY AREA COUNTIES) ACTIONS PREVENTING PEOPLE FROM BUYING GUNS AND AMMUNITION DURING THE COVID-19 SITUATION, AND TO FORCED CLOSURES OF FIREARM AND AMMUNITION RETAILERS AND SHOOTING RANGES UNDER THREAT OF PROSECUTION** | *Altman v. County of Santa Clara* | Plaintiffs filed their complaint on March 31, 2020, and a motion for temporary restraining order/preliminary injunction on April 10, 2020. The court denied the temporary restraining order and did not rule on the preliminary injunction. Plaintiffs' preliminary injunction was denied on June 3, 2020. By the time the court ruled on the motion, the only county remaining in the suit was Alameda County because the others permitted firearms stores to open as "essential businesses." | On March 8, 2022, the 9th Circuit ordered the case to be held in abeyance pending the issuance of the mandate in *McDougall v. County of Ventura*. |
| **CHALLENGE TO LOS ANGELES COUNTY'S ACTIONS PREVENTING PEOPLE FROM BUYING GUNS AND AMMUNITION DURING THE COVID-19 SITUATION, AND TO FORCED CLOSURES OF FIREARM AND AMMUNITION RETAILERS AND SHOOTING RANGES UNDER THREAT OF PROSECUTION** | *Martinez v. Villanueva* | Plaintiffs filed their complaint on March 27, 2020, and their request for both a temporary restraining order and preliminary injunction on March 30, 2020. On April 6, 2020, the court denied plaintiffs' temporary restraining order. On October 20, 2020, the court granted defendants' motion for judgment on the pleadings and dismissed the case with prejudice. | On March 14, the 9th Circuit stayed the case pending the outcome of *McDougall v. County of Ventura*. |
| **DOES HAWAII'S CONCEALED CARRY PERMIT REGIME VIOLATE THE 2ND AMENDMENT?** | *Livingston v. Ballard* | Hawaii attorney general moved to stay the case pending *Young*, which the court granted on June 10, 2019. The case is effectively stalled pending further development in *Young*. | This case will remain stayed pending the resolution of *Young*. |
| **CHALLENGE TO A CALIFORNIA ASSAULT WEAPONS STATUTE THAT PROHIBITS USING A LARGE CAPACITY MAGAZINE IN A RIFLE CONFIGURED WITH A "FIXED MAGAZINE"** | *Miller v. Bonta* | On June 4, 2021, Judge Benitez issued a decision and judgment declaring the statutes that constitute California's assault weapons prohibition unconstitutional. However, he simultaneously stayed his order for 30 days to allow the state to appeal. The state has appealed and obtained an indefinite stay of Judge Benitez's ruling pending resolution of the appeal. | The case will very likely remain stayed for a while as the appeal progresses. |
| **DOES CALIFORNIA'S UNSAFE HANDGUN ACT (I.E. THE ROSTER) VIOLATE THE SECOND AMENDMENT?** | *Renna v. Bonta* | The State's motion to dismiss was granted in part and denied in part on April 23, 2021. The court's ruling means that the plaintiffs' challenge to the roster itself is dead, but the other aspects of the challenge remain alive. | Parties continue to litigate the matter in the district court. |

| ISSUE | CASE NAME | CASE STATUS | WHAT'S NEXT |
|---|---|---|---|
| CHALLENGE TO WASHINGTON STATE'S UNDER 21 BAN | *Mitchell v. Atkins* | Briefing is underway in the 9th Circuit as of middle of 2021. | The case is stayed at the moment. |
| DID CALIFORNIA'S MANAGEMENT OF THE ONLINE SYSTEM FOR "ASSAULT WEAPON" REGISTRATION VIOLATE THE RIGHTS OF POTENTIAL REGISTRANTS? | *Sharp v. Bonta* | Plaintiffs reached a stipulated settlement and consent decree with the State on March 29, 2021. The State will allow a limited class of persons another chance to register "bullet-button" assault weapons, pursuant to the consent decree. | The new registration period lasted from January 13, 2022 at 9:00 AM and closed on April 12, 2022. |
| DOES A CALIFORNIA LAW THAT ALLOWS FIREARM PURCHASER INFORMATION TO BE DISCLOSED TO THIRD PARTIES VIOLATE PRIVACY LAWS AND THE SECOND AMENDMENT? | *Brandeis v. Bonta* | State court challenge to the same laws being challenged in the *Doe v. Bonta* matter. Filed January 28, 2022. | Plaintiffs filed for a preliminary injunction on March 3, 2022. |
| DOES A CALIFORNIA LAW THAT ALLOWS FIREARM PURCHASER INFORMATION TO BE DISCLOSED TO THIRD PARTIES VIOLATE PRIVACY LAWS AND THE SECOND AMENDMENT? | *Doe v. Bonta* | The federal court in San Diego denied Plaintiffs' request for a temporary injunction on January 20, 2022. | The case will proceed through litigation. |

# NATIONAL CASES WITH CALIFORNIA INTEREST

CRPA also litigates and assists in critical Second Amendment cases across the country that could set precedent for future challenges to California gun laws.

| ISSUE | CASE NAME | CASE STATUS | WHAT'S NEXT |
|---|---|---|---|
| DOES NEW YORK STATE'S PUBLIC CARRY LICENSING FRAMEWORK VIOLATE THE SECOND AMENDMENT? | *New York State Rifle & Pistol Association v. Bruen (formerly Corlett)* | The Supreme Court granted certiorari on April 26, 2021, framing the issue as "whether the State's denial of petitioners' applications for concealed-carry licenses for self-defense violated the Second Amendment." | The court heard oral argument on November 3, 2021. Expect an opinion in summer of 2022. |
| DID THE ATF EXCEED ITS AUTHORITY TO ORDER A BAN ON "BUMP" STOCKS? | *Aposhian v. Garland* | Petition for certiorari filed August 2, 2021. | The petition has been distributed for conference and rescheduled multiple times. |

| ISSUE | CASE NAME | CASE STATUS | WHAT'S NEXT |
|---|---|---|---|
| DOES A SEATTLE ORDINANCE THAT PROHIBITS THE PUBLIC CARRY OF SPECIFIC TYPES OF KNIVES VIOLATE THE SECOND AMENDMENT? | *Zaitzeff v. Seattle* | Petition for certiorari filed December 16, 2021. | Petition denied on February 22, 2022. |
| DOES NEW JERSEY'S BAN ON MAGAZINES OVER 10 ROUNDS VIOLATE THE SECOND AMENDMENT? | *Association of New Jersey Rifle & Pistol Clubs v. Grewal* | Petition for certiorari filed April 26, 2021. | The petition was distributed for conference last on September 27, 2021, with no activity since then. |
| DOES MARYLAND'S ASSAULT WEAPONS BAN VIOLATE THE SECOND AMENDMENT? | *Bianchi v. Frosh* | Petition for certiorari filed December 16, 2021. | Distributed for conference as of May 19, 2022. |
| THIS CASE CHALLENGES THE LAW THAT BARS INDIVIDUALS UNDER 21 YEARS OF AGE FROM BUYING HANDGUNS. | *Marshall v. BATFE* | Petition for certiorari filed February 17, 2022. | Petition denied on April 4, 2022. |
| CHALLENGE TO A MASSACHUSETTS LAW THAT BARS NON-VIOLENT MISDEMEANOR CONVICTS FROM PURCHASING HANDGUNS. | *Morin v. Lyver* | Certiorari petition filed December 13, 2022. | Response is due in March. The case will likely sit on the docket until something happens with *NYSRPA v. Bruen*. |
| THIS CASE INVOLVES THE SCOPE OF THE LAW ENFORCEMENT OFFICER'S SAFETY ACT. | *Rodrigues v. County of Hawaii* | Certiorari petition filed December 13, 2021. | Petition denied April 4, 2022. |
| ANOTHER BUMP STOCK BAN CASE. | *Gun Owners of America v. Garland* | Certiorari petition filed March 2, 2022. | The attorney general filed a response on May 24, 2022. |



**Alex Frank** *is a civil rights litigator at Michel & Associates, P.C., where he focuses on the Second Amendment and related constitutional issues.*

# LOCAL ADVOCACY
# DO GUN LAWS
# REALLY WORK?

**BY TIFFANY D. CHEUVRONT**

A renewed call for more gun control became the mantra of the current administration both in Washington and in Sacramento as this summer began with a barrage of gun violence across the country. But is more gun control what we need? Does it do anything to prevent future crimes or is it just more hoops to jump through for law-abiding citizens? How do we address issues like mental health, substance abuse, and criminal activity that are part of the conversation?

California has some of the strictest gun laws in the country and yet, last year California was home to five of the 27 mass shootings in the country. In 2019 California saw 2,945 people killed by gun violence and 1,586 of those killed were from suicide[1] (gun control studies like to keep suicide and violent acts combined, but suicide should be noted separately for accuracy). In looking at these numbers, in 2019 fewer people died from "gun violence" than from suicide in the state. In 2020, firearm deaths were not even in the top ten leading causes of death in California.[2]

In 2020 there were a total of 1.6 million background checks for firearm purchases in California—a 30% increase over 2019. Across the country there were more than 40 million background checks, up 40% from the previous year. In fact, according to the FBI National Instant Criminal Background Check system, only one state had less background checks than the previous year, yet gun control advocates call for more background checks to stop gun violence. We are doing more background checks than ever before.

In June, Governor Newsom called for more gun control to combat gun violence and noted that in California the gun violence rates were low because of all of the strict gun laws already in place in the state. He demanded that legislators send more gun control legislation to his desk to sign in an obvious attempt to please his base and politicize an issue that no one is actually willing to address. A closer examination of homicide data—focusing on the year of the assault causing the death, rather than the year it was reported to the FBI Uniform Crime Report—provides insights into who 2020 victims are, the means of death, and where homicides take place. In fact, homicides are on the rise in California not on the decline.

Gun homicides drive the rise. California saw 1,658 homicides in 2019; the number climbed to 2,161 in 2020—an increase of 503 homicides (or 30.3%). Of these deaths, gun homicides jumped by 460 in 2020 (or 40.6%). In other words, the increase in gun deaths account for 91% of the overall jump in homicides.[3]

Gun use was notable in other violent crimes as well. For example, aggravated assaults rose by 8.4%, and assaults with a firearm jumped by 39.2%, and although robberies decreased by 10%, the share of robberies involving a firearm rose from 23.9% of all robberies to 25%.[4] Most of the gun violence happened in the streets, which is something new for California, and flies in the face of gun control media that pushes the narrative about access to firearms in the home.

Crimegrade.org reviews different types of crime rates for each state. California currently has an "F" rating meaning that "the rate of violent crime is higher than the average U.S. state. California is in the 21st percentile for safety, meaning 79% of states are safer and 21% of states are more dangerous."[5]

The Public Policy Institute of California reported that California's major cities—Los Angeles, Oakland, San Diego, and San Francisco—show increases in property and violent crime and those numbers continue to grow.[6] The same group also notes that while the violent crime rate had a slight decrease in 2020 (probably due to pandemic lockdowns and not due to gun law enforcement), homicides (30% increase) and aggravated assaults (7.5% increase) both increased.

Even the largest gun control group in the country, Everytown for Gun Safety, is reporting that "in California the rate of gun deaths increased 10% from 2011 to 2020" and "gun homicides increased 31% compared to a 12% increase and 70% increase nationwide, respectively." "California has the 30th highest rate of gun homicides and gun assaults in the US. In California, 71% of all homicides involve a gun, compared to 76% nationwide."[7] So what is it Mr. Newsom? Is gun violence going down because of all of your gun control laws or not? It seems that the statistics from multiple groups seem to suggest that Mr. Newsom and his political cronies are just using the recent tragedies to push their agenda further and to politicize the issues instead of dealing with the real issues.

Recently, more than forty District Attorneys in California filed suit[8] to keep re-offenders in jail and stop the early releases of criminals from the passage of AB 109/Proposition 57, a bill that allows for early release of violent criminals because of jail over-crowding. Those inmates who were being granted early release included those with firearm violations,

> **California currently has an "F" rating meaning that "the rate of violent crime is higher than the average U.S. state. California is in the 21st percentile for safety, meaning 79% of states are safer and 21% of states are more dangerous.**

1. msn.com/en-us/news/crime/how-gun-violence-in-california-compares-to-other-states/ar-AALxaxF , citing Center for Disease Control Study
2. cdc.gov/nchs/pressroom/states/california/ca.htm
3. ppic.org/blog/gun-deaths-drive-californias-largest-ever-rise-in-homicides/
4. ppic.org/blog/gun-deaths-drive-californias-largest-ever-rise-in-homicides/
5. crimegrade.org/violent-crime-california/
6. ppic.org/publication/crime-trends-in-california/
7. everystat.org/wp-content/uploads/2019/10/Gun-Violence-in-California.pdf

0913

| Rank | State | Louisiana Firearm deaths per 100k people, 2019 | Total firearm deaths, 2019 | Background checks per 100k people, 2020 | 1-yr. change in background checks (%) |
|---|---|---|---|---|---|
| 1 | Mississippi | 23.7 | 705 | 12,326 | 53.9 |
| 2 | Alaska | 23.0 | 168 | 13,526 | 28.6 |
| 3 | Wyoming | 22.5 | 130 | 15,790 | 49.1 |
| 4 | Alabama | 21.8 | 1,071 | 22,138 | 57.3 |
| 5 | New Mexico | 21.8 | 457 | 9,836 | 31.5 |
| 6 | Louisiana | 21.5 | 999 | 9,261 | 52.5 |
| 7 | Missouri | 20.2 | 1,239 | 11,539 | 42.2 |
| 8 | South Carolina | 19.4 | 1,001 | 10,312 | 61.8 |
| 9 | Arkansas | 18.7 | 563 | 10,761 | 46.7 |
| 10 | Tennessee | 18.6 | 1,270 | 14,420 | 55.0 |
| 11 | Montana | 18.3 | 196 | 16,158 | 49.1 |
| 12 | Oklahoma | 18.2 | 719 | 11,885 | 30.6 |
| 13 | Georgia | 16.0 | 1,695 | 8,515 | 67.7 |
| 14 | West Virginia | 16.0 | 286 | 14,826 | 28.9 |
| 15 | Nevada | 15.7 | 483 | 7,121 | 70.9 |
| 16 | Arizona | 15.6 | 1,136 | 9,143 | 78.4 |
| 17 | Kentucky | 14.9 | 667 | 74,546 | -19.2 |
| 18 | Colorado | 14.4 | 832 | 11,817 | 44.9 |
| 19 | Indiana | 14.1 | 952 | 28,751 | 33.4 |
| 20 | Ohio | 13.5 | 1,578 | 8,356 | 53.0 |
| 21 | Idaho | 13.5 | 241 | 15,740 | 34.4 |
| 22 | Kansas | 13.4 | 390 | 8,567 | 49.4 |
| 23 | Florida | 13.4 | 2,872 | 8,903 | 59.9 |
| 24 | North Carolina | 13.3 | 1,397 | 8,489 | 67.9 |
| 25 | Oregon | 13.2 | 556 | 12,236 | 44.3 |
| 26 | Texas | 12.7 | 3,683 | 8,019 | 56.4 |
| 27 | Maryland | 12.5 | 753 | 5,005 | 103.3 |
| 28 | South Dakota | 12.3 | 109 | 13,050 | 35.1 |
| 29 | Michigan | 12.0 | 1,200 | 10,699 | 117.1 |
| 30 | Pennsylvania | 11.9 | 1,528 | 11,349 | 47.1 |
| 31 | Virginia | 11.9 | 1,014 | 9,648 | 60.6 |
| 32 | Utah | 11.9 | 380 | 37,953 | 47.8 |
| 33 | Maine | 11.7 | 157 | 10,203 | 51.3 |
| 34 | North Dakota | 11.7 | 89 | 11,215 | 41.5 |
| 35 | New Hampshire | 11.2 | 152 | 12,846 | 55.7 |
| 36 | Washington | 10.9 | 830 | 10,262 | 28.7 |
| 37 | Illinois | 10.7 | 1,362 | 58,832 | 50.6 |
| 38 | Wisconsin | 10.2 | 595 | 12,566 | 67.9 |
| 39 | Nebraska | 10.0 | 194 | 5,403 | 53.2 |
| 40 | Vermont | 9.5 | 59 | 9,289 | 61.7 |
| 41 | Delaware | 9.2 | 90 | 7,913 | 66.0 |
| 42 | Iowa | 8.9 | 282 | 8,577 | 48.0 |
| 43 | Minnesota | 8.2 | 463 | 16,994 | 40.5 |
| 44 | California | 7.5 | 2,945 | 4,052 | 29.1 |
| 45 | Connecticut | 5.1 | 183 | 6,149 | 26.8 |
| 46 | Rhode Island | 4.2 | 45 | 4,849 | 111.1 |
| 47 | New Jersey | 4.1 | 366 | 2,003 | 94.9 |
| 48 | New York | 4.1 | 794 | 2,611 | 42.9 |
| 49 | Hawaii | 3.9 | 55 | 1,420 | 58.7 |
| 50 | Massachusetts | 3.4 | 237 | 3,810 | 23.7 |

domestic violence, and even more violent histories. As an example of the failure of AB 109, in Lancaster County more than 300 inmates were released under partial supervision and 200 of those inmates have been re-arrested for new crimes. San Bernardino County has noted that there are high level gang members being released and in San Francisco, more than 300 inmates with violent pasts like sexual assault and weapons-related offenses have been released under this law.[9] Newsom continues to call for ending the Department of Juvenile Justice and State Prisons which is sure to lead to even more crime in the state. Newsom and gun control politicians pushing more laws are yet to address what affects citizens the most—being easy on criminals and threats to common people.

Mental illness is one of the few areas that people like to discuss when looking at violent acts against others, however the National Library of Medicine published and has been tracking cases of mental illness as it relates to violence for many years. Their studies have found that there is almost three times the amount of mental illness in arrested males than in the general population and most common are substance abuse disorders and personality disorders.[10] Law enforcement is also reporting a rise in mental health incidents across the country.[11] Overall, people with serious mental illness—which generally refers to

those with major depressive disorder, bipolar disorder, schizophrenia, and schizoaffective disorder—are somewhat more likely than members of the general public to commit acts of violence, research shows.[12] The study goes on to note that there is a link between mental illness and violence, but not every person with mental illness is violent. Mental illness coupled with substance abuse and lack of access to treatment are the biggest factors of mental health and violence. And, when someone with these issues lives in a neighborhood that is violent, unsafe, poor, and high crime, the

issues of mental health and violence collide.[13] For young people it is even more of an issue with an estimated 76% of youth with severe depression never receiving treatment.[14] There is no way to catch every mental health risk, but if access to services were more available, maybe some of the incidents we have seen over the past months would not have occurred.

If all of these statistics are readily available online, which they are, why would Newsom and his gun-control supporters move so forcibly to sign even more gun control into law knowing that it does not work? Why would

> ## So what is it Mr. Newsom? Is gun violence going down because of all of your gun control laws or not? It seems that the statistics from multiple groups seem to suggest that Mr. Newsom and his political cronies are just using the recent tragedies to push their agenda further and to politicize the issues instead of dealing with the real issues.

8. placer.ca.gov/7343/DA-File-Suit-Challenging-Early-Release-P

9. cjlf.org/releases/12-16.htm

10. ncbi.nlm.nih.gov/pmc/articles/PMC2686644/

11. bing.com/videos/search?q=mental+health+issues+and+violent+crime&docid=608038636413783103&mid=4C1F470A42D9E09519944C1F470A42D9E09519944&view=detail&FORM=VIRE

12. link.springer.com/article/10.1007/s00127-011-0356-x

13. apa.org/monitor/2021/04/ce-mental-illness

14. ui.asu.edu/content/mass-shootings-and-mental-health-what-can-be-done

0914



Overall Crime | Property Crime | **Violent Crime** | More

© CrimeGrade.org

**Crime Grades**



A+ | C | F

A+ (dark green) areas are safest

President Biden focus on pushing issues that have already been ruled unconstitutional by federal courts especially when videos of the President's own son are out there with illegal firearms? It's because they have an agenda. They have no idea how to get tough on crime without agitating their base of voters and they have no idea how to deal with mental health issues in the state. Politicians **know** that more gun control does not work but they are not willing to address the difficult issues that lay before them. They **know** that the only people who will follow the laws are the citizens who already are compliant and who are not the problem. Politicians would

rather "act" like they are doing something than deal with the real issues of criminals, gangs, drugs, and mental illness that plague many communities.

We must call out Newsom and his followers as the do-nothing politicians that they are. Call them out for increasing the dangers to regular citizens while making it more difficult for people to protect themselves and call them out for attempts to pass laws they **know** are unconstitutional. Call them out for promoting false narratives in press conferences that lead the average person to think that one more gun control measure will somehow stop those intent on hurting others.

It is time for the people of California to demand better from the Governor and elected officials and put the pressure on so they will address the real issues instead of placating their supporters and the gun control lobby paying for their campaigns. **CRPA**

**Tiffany D. Cheuvront**



*leads the local ordinance project for Michel & Associates, P.C. With over 19 years' experience in the non-profit and regulatory fields, she practices civil rights litigation and corporate governance law (five of those years working specifically in Second Amendment and CA policy). Tiffany has written and provided testimony on issues at the local, state and federal levels of government.*

# LOCAL ADVOCACY REPORT

**BY TIFFANY D. CHEUVRONT**

The **Local Advocacy Project** actively monitors all of California's 58 counties and 482 municipalities to support or oppose any proposed ordinance, law or policy likely to impact Second Amendment rights. Local efforts include developing and working with a network of professionals, citizens, local government officials and law enforcement professionals to effectively oppose local threats to California gun owners. These efforts also serve as the foundation for litigation efforts against municipalities that enact anti-gun-owner legislation.

| JURISDICTION & ISSUE | DESCRIPTION | LOP RESPONSE | STATUS |
|---|---|---|---|
| **VENTURA COUNTY FAIRGROUNDS** | For years, the Ventura County Fairgrounds has been debating over whether to hold gun shows or stop them at the requests of gun control activists. | The first week of January 2022 a group of gun control activists attempted to stop the gun shows again by attempting an emergency meeting and barely notifying anyone in the community. One of our members in the area got that notice and sent it to CRPA right away.<br><br>CRPA grassroots, chapters, and volunteers rushed to action and attended the online meeting. | After a very long meeting behind closed doors with legal counsel, the Ventura Fair Board reluctantly voted 4-3 to keep the gun shows in 2022.<br><br>Two bills were introduced to ban gun shows in Ventura and state-wide at the state level. These bills will change over the course of the legislative session, and we will be monitoring and offering testimony in opposition as well as having our legal team prepped. |
| **DEL MAR FAIRGROUNDS GUN SHOW ATTACKS CONTINUE** | For months the Del Mar gun show has been under siege from groups seeking to end the show. On September 11, 2018, the Del Mar Fair Board of Directors voted to institute an up to 1-year moratorium on gun shows beginning in 2019 while they "study the safety" of the gun show. | Additional legislation has been introduced at the state level that would prevent gun shows from occurring at the Del Mar Fairgrounds.<br><br>CRPA was a named plaintiff in a federal lawsuit against the fairgrounds in an effort to protect your right to come together with others in the gun culture and hold lawful and safe events on public property. More information on the lawsuit can be found at **michellawyers.com. Use the search box, entering "B & L Productions".** | For now, the federal courts have ordered that the gun shows may continue at the Del Mar Fairgrounds while the litigation progresses; the next gun shows will be in 2021.<br><br>Assemblyman Gloria sponsored a bill to prohibit the selling of firearms and ammunition at the Del Mar Fairgrounds (a sneaky way to try to stop gun shows again). CRPA is once again bringing litigation against this unconstitutional attempt at restricting your rights. More information will be available as the case proceeds. |
| **ORANGE COUNTY FAIRGROUNDS GUN SHOWS** | For months Senator Min has been trying to ban gun shows at all state facilities. Unable to get the support needed for this bill, Minn revised his SB 264 to only apply to gun shows at the Orange County Fairgrounds. | CRPA is also fighting SB 264 (Minn) that seeks to stop gun shows at Orange County Fairgrounds. We are prepared to fight this legislation as well, should it pass. Senator Minn has threatened legal action against the fair board if they attempt to approve any additional gun show contracts. CRPA has sent a letter outlining that Minn has no authority to threaten a sitting board. | CRPA is also fighting SB 264 (Minn) that seeks to stop gun shows at Orange County Fairgrounds. We are prepared to fight this legislation as well. Senator Minn has threatened legal action against the fair board if they attempt to approve any additional gun show contracts. CRPA has sent a letter outlining that Minn has no authority to threaten a sitting board. |
| **COUNTY OF SAN MATEO** | New Commissioners in the county are looking at hosting a public safety meeting with Giffords Law Center to discuss whether "Red Flag" laws are doing enough or if they should be expanded. | CRPA is monitoring this meeting and we encourage all those who can attend to plan on going and speaking out against these laws that are an overreach of government and a violation of due process for many. | More information will be coming as it is made available. |

0915

| JURISDICTION & ISSUE | DESCRIPTION | LOP RESPONSE | STATUS |
|---|---|---|---|
| **COW PALACE GUN SHOWS DALY CITY** | The California Legislature passed a bill in 2018 that would ban gun shows at the Cow Palace state venue as part of the concerted effort by opposition groups. This bill was vetoed by then Governor Brown. The pending legislation to stop gun shows and dismantle the Cow Palace authority was dropped; however, this came with the condition that the Cow Palace board would stop holding gun shows in the future. | CRPA drafted a prelitigation letter to the board of the Cow Palace to inform them of pending legal action should they persist with denying gun shows access to state property. CRPA will continue to monitor the situation. | The board voted in November to re-consider its stance against gun shows given the possible constitutional violations that have been outlined by the federal courts on this subject. As of September 2021, we are still waiting on a report from the Cow Palace board as to what they plan to do with gun shows. COVID-19 has delayed holding meetings on these issues. |
| **STATEWIDE PUBLIC RECORD REQUESTS** | CRPA regularly seeks and obtains public records in connection with any anti-gun efforts in California. Such efforts include proposed anti-gun ordinances, gun buyback programs and other anti-gun regulatory enforcement issues. | Responses to these requests often yield valuable results, such as which members of a local government entity are working with anti-gun groups, sources of funding and other important information. | Ongoing. CRPA attorneys monitor and review thousands of pages of public records requests each month. |
| **CITY OF SAN JOSE** | The Mayor for the City of San Jose wants to push mandatory insurance for all gun owners in the City as a way of paying for criminal violence that occurs in his City. | CRPA sent a letter previously on this same issue when the Mayor tried to make this a priority for the city in 2019. The Mayor has once again resurrected this issue and is trying to get mandatory insurance for gun owners or a mandatory fee to the City passed. The staff have been directed to come back with ordinance language in September. There is no new news on this issue as of the drafting of this alert. | CRPA has submitted public record requests and is preparing a lawsuit for filing should the city pass this ordinance. San Jose passed the ordinance even though there was 4 hours of testimony from the public against it. CRPA is preparing to sue as soon as the matter is ripe for the courts to consider. |
| **CITY OF WEST HOLLYWOOD** | The City of West Hollywood is attempting to pass a mandatory locked storage ordinance similar to others that are promoted by gun control advocacy groups. | CRPA alerted members in the area, and we are prepared to file legal action if the ordinance passes. If you are interested in being a named plaintiff in that legal action please contact us at **potentialplaintiffs@ michellawyers.com.** | Some of the public comments against the ordinance can be found on the City Council page and here: **https://wehotimes.com/gay-republicans-to-speak-out-against-wehos-safe-gun-storage-ordinance/** **https://weho.granicus.com/MetaViewer. php?view_id=22&clip_id=3610&meta_ id=202522** **https://weho.granicus.com/MetaViewer. php?view_id=22&clip_id=3610&meta_ id=202553** **https://weho.granicus.com/MetaViewer. php?view_id=22&clip_id=3610&meta_ id=202848** The City Council instructed the city attorney to draft the ordinance and bring it back to the Council at a later meeting. Make sure you follow CRPA on social media for all the latest news. |

| JURISDICTION & ISSUE | DESCRIPTION | LOP RESPONSE | STATUS |
|---|---|---|---|
| **CITY OF MONTE SERENO** | The City is attempting to pass a mandatory locked storage ordinance similar to others that are promoted by gun control advocacy groups. | CRPA alerted members in the area, and we are prepared to file legal action if the ordinance passes. CRPA legal team also drafted letters of opposition to the city council which was quoted by a council member that was opposed to the ordinance. | The ordinance passed the first reading even though the city attorney gave bad advice on the likelihood of having to defend legal action and admitted that there have been no firearm-related crimes in the city. We will continue to monitor this situation. |
| **CITY OF HERMOSA BEACH** | The City is attempting to pass a mandatory locked storage ordinance similar to others that are promoted by gun control advocacy groups. | CRPA alerted members in the area, and we are prepared to file legal action if the ordinance passes. CRPA legal team also drafted letters of opposition to the city council. | We are awaiting further action from the city at this time and will update our members when more information is available. |
| **GHOST GUN BANS** | Gun Control groups are busy pushing to try to get local jurisdictions to pass restrictions on the possession, sale, transfer, or manufacturing of "ghost guns" including precursor parts | San Diego, Los Angeles, and San Francisco have all passed the same basic ordinance in the last few weeks. The problem with these ordinances is that they address areas of concern that are controlled by the state AND there is no clear definition of what a precursor part is at the moment- these cities just made every piece of metal illegal to own and created criminals out of citizens with lawful products overnight. | CRPA is preparing for legal action on this issue. We will have more information shortly. We are waiting on official rulemaking from the state in order to address the issue to the fullest. Comments were also called for and submitted. |
| **CITY OF BEVERLY HILLS** | The City of Beverly Hills is discussing mandating training for all gun owners who live in the city and currently make FFLs in the city sign an assumption of liability for damages occurring due to their products | These ordinances violate civil rights and go against commercial manufacturing and product liability protections for those in the product chain who can only be held responsible if the product is damaged or they know that the person is planning on using the product outside of its intended purpose. | |
| **DOJ COE ISSUES** | It has come to our attention that there may be businesses and individuals that are having great difficulty getting their COE renewal from DOJ. | Not having a valid certificate of eligibility (COE) prevents firearms business owners from operating and completing purchases and individuals from receiving and handling ammunition for many programs. We are hearing reports that the DOJ is taking months to return approved COE applications. | If you are having trouble with this area, please send us a message at **contact@ crpa.org** so we can reach out to you and see if we can assist. |
| **CRPA COALITION WORK** | The CRPA has been working with other groups across the state for years to influence and advance pro-2A work in the state. We believe in leveraging our combined strength to get things done. | Coalitions are built from other non-profit groups with similar missions coming together. We work with local chapter leaders, elected officials and legislative teams to push support and protection of the Second Amendment. | Watch for joint letters from coalition groups to fight harmful legislation in the state and for work with other groups during this election cycle. To sign up for the Range Coalition, send an email to **ranges@crpa.org** |
| **CALL FOR PLAINTIFFS** | If you are a CRPA member, we need you! | When local ordinance issues do not go well, we have to fight for your rights in court. We need members just like you who are negatively affected by these unconstitutional laws to step up as named plaintiffs in the legal actions that may follow. | If you are interested in serving as a plaintiff in any of our upcoming litigation, please contact us at **potentialplaintiffs@ michellawyers.com.** |

# CRPA PROGRAMS UPDATE

## SPOTLIGHT: BUSINESS AFFILIATES, FFL DEALERS AND CRPA OPPOSES LEGISLATION THAT SEEKS TO ADD DEALER REQUIREMENTS

**I**f you are an FFL in California, you know how difficult business in this state can be! Numerous regulations over the years have forced many out of the state and others are discouraged with what you see coming in recent days.

CRPA has been and will continue to fight for your rights, just like those of the individual gun owners. We created the advance push back against Prop 63 (Gunmageddon) in 2016 and have three cases from that one piece of legislation that are pending in the Ninth Circuit right now. They are all on hold until the Supreme Court releases an opinion in the *NYSRPA v. Bruen* case, which is why that is such a big case for gun owners across the country! We are hopeful that, unlike *Heller* and *McDonald* that addressed very specific singular issues, that *NYSRPA* will address a broader scrutiny issue which will impact many of these issues we have been dealing with over the years in California.

Well, the new barrage of gun legislation lining up since June is telling. All of the suggestions that President Biden made, like limiting the age of purchasing a gun to 21 years old, and national registries are unconstitutional—federal courts have already ruled on those. California Governor Newsom is demanding that the legislators in Sacramento bring him more gun control laws to pass, even though the statistics do not bear out or support his statements on the "successes" of California gun laws.

A good example of this is SB 1384 by gun control advocate Senator Min who will do anything to try to stop gun sales in the state (he is already attempting to stop gun sales at all state property even though this was a complete failure last session and will cost the state hundreds of thousands of dollars in legal fees). SB 1384 would require FFLs to have a digital video surveillance system on their premises and would require FFLs to carry a general liability policy. FFL and employees would be required to complete annual training developed and testing administered by the DOJ. Not something that we want—More DOJ interaction that is less than stellar and impacts business dealings!

DOJ is already stating that they are overburdened with processing Certificate of Eligibility checks, background checks, Dealer Record of Sale documentation, current inspections, rights restoration requests for clearing bad dispositions off records, and ammunition checks. How can they possibly keep up with additional requirements that would require DOJ agents to conduct inspections of video surveillance, receive and review annual certifications for video surveillance systems, adopt regulations regarding placement of building security bollards outside of the licensing premises, conduct inspections of training records, develop and implement training, certification, and examinations for employees.

CRPA is appearing in Sacramento at hearings on this and other legislation and we have letters of opposition on file. These are important for establishing a record of opposition should this have to go to litigation down the road. We do know that Newsom is pushing for more gun control because it makes him look like he is doing something even though these provisions would do nothing to stop the mass shootings from June. CRPA will continue to fight against bad legislation in Sacramento and in the courts. You can keep up with all of the legislative updates by visiting **crpa.org/programs/legislative-advocacy/** frequently during legislative session.

Not a Business Affiliate Member? Email us at **contact@crpa.org** for more information. **CRPA**



▶ **Los Angeles, CA USA** - December 6, 2020: The front of a gun store. (SHUTTERSTOCK)

## SEE ALL OF CRPA'S PROGRAMS AT CRPA.ORG

| | | |
|---|---|---|
| **LEGISLATIVE ADVOCACY** | **SHOOTING PROGRAMS** | **2A LITIGATION PROGRAM** |
| **REGULATORY WATCH PROGRAM** | **RANGES & RETAILERS PROTECTION PROGRAMS** | **BUSINESS AFFILIATE PROGRAM** |
| **WOMEN'S PROGRAM** | **HUNTING & CONSERVATION** | **VOLUNTEERS & GRASSROOTS** |
| **FIREARM SAFETY PROGRAMS** | **LAW ENFORCEMENT INITIATIVE** | **CAMPAIGNS & ELECTIONS** |
| **HISTORICAL ARMS COLLECTING & EXHIBITIONS** | **LOCAL ADVOCACY & CRPA CHAPTERS** | **PUBLICATIONS** |

# SPOTLIGHT ON

# JIM CAIRNS

**J**im Cairns really learned about firearms during his time in the military.

He vividly recalls his first time shooting an M16 and describes it as incredible. However, that was not his very first experience shooting a firearm. When Jim was eight years old, the parents of a childhood friend invited him out to shoot with their family. That day he shot his very first shotgun and, although it knocked him down, he hung on and only became intrigued. Later, Jim's dad gifted him a Daisy Red Ryder BB Rifle.



**BY CHRISTINA GASTELO**
VOLUNTEER COORDINATOR

Eventually, he graduated to a .22 caliber rifle and would frequent the foothills in Fresno to go shooting. Jim has been a firearm enthusiast ever since and believes If you want to keep your freedoms, you must get in the fight! Jim has been a member and a volunteer for CRPA for nearly two years. He has volunteered his time at several youth events as a range safety officer and can also be found greeting attendees behind the CRPA membership booth.

Jim credits Ken, his best friend of 50 years, for providing inspiration and support for his involvement.



▶ **Cairns on the range** at "Take out Bin Laden Day," on August 17th, 2021 in Twin Falls Idaho. (KEN CRABTREE)



▶ **Cairns on the range** at "Take out Bin Laden Day," on August 17th, 2021 in Twin Falls Idaho. (KEN CRABTREE)

Ken, who lives in Idaho is an avid supporter of the Second Amendment and belongs to the Idaho Second Amendment Association. Jim does an annual trek to Idaho to visit Ken for their Annual "Remove Bin Laden" target day, and some kayaking down the Snake River.

Jim and his wife Griselda find a sense of accomplishment when volunteering. Together, they volunteer for the Rose Parade Float Committee. They help decorate Parade Floats for the annual Rose Parade in Pasadena, CA. They also volunteer for the "Zelstra Foundation", honoring first responders. They are avid music lovers, enjoy attending as many concerts as possible, and are members of Muse-ique and Pasadena Pops. They also golf together and go ocean cruising as



▶ **Cairns at the Lytle Creek Turkey Shoot and Open House** on Nov 20, 2021. (CHRISTINA GASTELO)

often as possible. CRPA is grateful to have Jim and we thank you for getting in the fight!

**Do you have an anecdote about this cause/organization that**

really moved you?

**Jim Cairns:** "Be safe. Shoot straight. Fight back." It couldn't be much clearer than that.

**When did you get involved with this organization?**

**JC:** I joined CRPA about a year-and-a-half ago. I was a current member of the NRA. However, after doing a little research, I discovered that the NRA wasn't very active in California. I did discover that CRPA was very actively involved in the Second Amendment, and that's very important to me.

**How do you believe others can get involved?**

**JC:** People need to become CRPA members. Once they do, it becomes much clearer about what's involved and what needs to be done to retain our freedoms.

**What do you hope the organization will achieve in the near future… and in the long term?**

**JC:** CRPA and its attorneys have an incredible track record at defeating anti-Second Amendment politicians. There are many more ridiculous anti-Second Amendment laws out there, but in the long run, I do believe that the CRPA will defeat them.

**What motivates you to stay involved?**

**JC:** "Just win, baby!" is what I keep reminding myself of. Turning back to tyranny and crooked politicians is plenty of motivation for me! **CRPA**

# VOLUNTEER REGISTRATION FORM

| First Name | Middle Initial |
| --- | --- |

**Last Name**

**Street Address**

**City, County, State, Zip Code**

**Cell Phone**

**Email Address**

**Date**

**Check your areas of interest. This is not an exclusive list. You can always change your mind.**

☐ Join a CRPA Chapter

☐ Visit Local Businesses to Promote Affiliate Program

☐ Work on Political Campaigns or Elections

☐ Assist with Youth/Women's Events / RSO

☐ Assist with Training Events / RSO

☐ Assist with Hunting Events

☐ Be a CRPA Membership Recruiter

☐ Liaison with Local Authorities and Council Members

☐ Teach Firearm Safety and Proficiency

☐ Promote CRPA/Pro-2A Messaging/PR Campaigns

☐ Other:

## THANK YOU!

Return to the **California Rifle & Pistol Association**
Attn: Volunteers Program

271 E. Imperial Highway, Suite #620, Fullerton, CA 92835

Phone: (714) 992–2772, ext. 8752   I   Email: volunteer@crpa.org

# VOLUNTEERS ARE CRPA'S MOST POWERFUL WEAPON!

CRPA is looking for men and women to join the fight for our rights as a CRPA volunteer or grassroots activist. You can feel good about being part of the solution, meet new friends, learn about guns and politics and get free CRPA swag! For more information, fill out and send in the volunteer form (page 56), email us at **volunteer@crpa.org** or call (714) 992–2772, ext. 8752.

Because of CRPA's tremendous growth, and with the support of our members and like-minded organizations, CRPA is expanding its involvement in local campaigns and elections and sponsoring and participating in more events. CRPA has made a substantial investment in grassroots/volunteer coordinating, local election messaging technologies and added staff to manage volunteers and events.

CRPA Chapters and affiliated groups maintain their independence, but work with CRPA and get access to: (1) real-time legislative information from our legislative advocates in the Capital; (2) CRPA/NRA campaign finance and PAC lawyers; (3) CRPA/NRA firearms lawyers who answer questions, fight for local FFLs and ranges in your area, oppose local gun control ordinances and file lawsuits; and (4) regular communication among coalition partners and other local groups to learn from each other and build a stronger network of activists. CRPA needs volunteers to work as Chapter Leaders; Government Liaisons (i.e., candidate development and local issues and ordinances coverage); Retail/Ranges Liaisons; Volunteers and Events Liaisons; and CCW Liaisons, among other things.

CRPA invites individuals as well as local 2A groups, clubs, ranges and FFLs to be a part of the effort in your county. Join us! **Volunteer for CRPA!**



▶ **Safety lecture** for BSA California Inland Empire Council Scout Adventure Day.

# EVENTS & TRAINING

## EVENTS

### JULY

**July 9-10**
**CODE OF THE WEST VALLEJO**
Solano County Fairgrounds
Vallejo, CA

**July 16**
**RAAHAUGES YOUTH DAY SPONSORED BY CRPA**
Mike Raahauge's Shooting Range
Eastvale, CA

**July 16-17**
**CROSSROADS OF THE WEST: ONTARIO GUN SHOW**
Ontario Convention Center
Ontario, CA

**LOCATION KEY**
■ NORTHERN CALIFORNIA
■ CENTRAL CALIFORNIA
■ SOUTHERN CALIFORNIA
■ OUT OF STATE

**July 23**
**YOUTH EXPO COMPTON HUNTING & FISHING CLUB**
Compton Hunting & Fishing Club
Compton, CA

**July 23-31**
**RAMONA JUNIOR FAIR**
431 Aqua Lane
Ramona, CA

## AUGUST

**August 2**
**NATIONAL NIGHT OUT**
National Event
Every City, CA

**August 10-14**
**SISKIYOU GOLDEN FAIR**
Siskiyou Golden Fairgrounds
Yreka, CA

**August 10-14**
**NEVADA COUNTY FAIR**
Nevada County Fairgrounds
Grass Valley, CA

**August 13-14**
**CROSSROADS OF THE WEST:
BAKERSFIELD GUN SHOW**
Kern County Fairgrounds
Bakersfield, CA

**August 25-28**
**MODOC DISTRICT FAIR**
Modoc District Fairgrounds
Cedarville, CA

**August 26-28**
**41ST RAMONA RODEO**
Fred Grand Arena
Ramona, CA

**August 27-28**
**CROSSROADS OF THE WEST:
VENTURA GUN SHOW**
Ventura County Fairgrounds
Ventura, CA

## CRPA TRAINING COURSES

■ Basic Rifle

■ Basic Pistol

■ Basic Shotgun

■ Home Firearms Safety

■ Basic Range Safety Officer

■ Personal Protection in the Home

■ Personal Protection Outside the Home

■ Metallic Cartridge Reloading

■ Hunters Education Traditional Course

■ Hunters Education Follow-up Course

■ Wild Game Cooking

■ Wild Game Field Dressing

■ First Aid/AED/CPR

■ Wilderness First Aid

■ Archery

■ Basic Backpacking

■ Leave No Trace

■ Emergency Preparedness

■ Photography

■ Basic Map and Compass

■ Trauma/ First Aid

# TRAINING VIDEOS & INFO ARE AT CRPA.ORG/ TRAINING- AND- EDUCATION



▶ **LA South Bay Gun Owners** (a CRPA chapter) – SCOTUS Party Thursday June 23rd. (DAVE RACE)

## TRAINING

### JULY

**July 9**
**RIFLE SHOOTING BASICS**
Fullerton, CA

**July 9**
**HUNTER EDUCATION**
Fullerton, CA

**July 16**
**PERSONAL PROTECTION IN THE HOME**
Fullerton, CA

**July 23**
**SHOTGUN SHOOTING BASICS**
Fullerton, CA

**July 30**
**CHIEF RANGE SAFETY OFFICER**
Fullerton, CA

### AUGUST

**August 6**
**HUNTER EDUCATION**
Fullerton, CA

**Aug 13**
**PISTOL SHOOTING BASICS**
Fullerton, CA

**August 20**
**RIFLE SHOOTING BASICS**
Fullerton, CA

**August 27**
**HUNTER EDUCATION**
Fullerton, CA

### SEPTEMBER

**September 10**
**PISTOL SHOOTING BASICS**
Fullerton, CA

**September 10**
**HUNTER EDUCATION**
Fullerton, CA

**September 17**
**SHOTGUN SHOOTING BASICS**
Fullerton, CA

**September 24**
**RANGE SAFETY OFFICER**
Fullerton, CA



▶ **The five new shooters** to the Etna trap team shoot under the watchful eye of head coach Tony Stalker and coach Brandon Buell (in uniform), both are Etna police officers in the PAL (Police Activity League) program. (BYRAN DUNCAN)

# INTRODUCING THE ETNA POLICE DEPARTMENT PAL PROGRAM AND THE FIRST TEAM OF THE LEAGUE, THE ORLAND HIGH SCHOOL TRAP TEAM



▶ **After shooting**, Jacob Baxman *(foreground)* and other YHS Trap Team members performing maintenance at the Yreka Clay Birds clubhouse. (BYRAN DUNCAN)

**BY BYRAN DUNCAN**

**T**he Yreka High School Trap Team is practicing and improving, although the perfect score of 25 out of 25 is being elusive this season. Both senior Ty Libby and junior Peyton Zanotto, have been able to shoot 25, but not back-to-back, for the next level of 50 out of 50. One bird is all it takes to miss the next level. On the other side of the coin, freshman Bella Verry, the athlete who had no gun experience and was lucky to hit one bird out of 50, has improved. She handles her shotgun safely and scores are on the rise, with a solid 15 or better out of 25. The team is truly coming together, which includes many off the range activities, such as assisting at the Mother's Day Craft Show and Championship Chainsaw Carving held at the Siskiyou Golden Fair Grounds, at the Siskiyou County NRA Dinner in Montague, and the Rocky Mountain Elks Dinner in Yreka.

As the team prepares for the first in-person competition of this season, the Redding Invitational, sponsored by our friendly rival, Foothill High School, we are taking a moment to introduce some of the teams we shoot alongside and against. The



▶ **Mike Lewis points out** the highest bidder, while seventh-grader Bret Keele hold up the chainsaw-carved feather. Bret is looking forward to joining his brother on the YHS Trap Team. His brother, Briley, is standing behind him with Kale Nixon, as they discuss moving the next heavy auction item into place with a dolly. (BYRAN DUNCAN)

CRPA works with and supports the Civilian Marksmanship Program (CMP), a national organization created by federal law that provides citizens around the country with firearm training and learning opportunities, similar to the operations of CRPA.

The CMP's highest priority is serving youth through gun safety education and marksmanship events that encourage personal growth and life skill development. CRPA whole-heartedly joins in and supports these efforts.

CMP has also developed excellent match procedures at competitive and recreational shooting events that are being incorporated into CRPA's own event and match management processes. Individuals can keep informed about CMP affiliated matches by visiting the CMP's Competition Tracker page at *http://ct.thecmp.org*.

The CMP also sells select vintage military rifles to qualified U.S. citizens at a great price, along with competitive equipment and memorabilia! You can learn more about getting started on your own marksmanship journey through the CMP at *http://thecmp.org/get-started/*.

**Visit us online at www.TheCMP.org**



▶ **Etna's graduating seniors,** Michael Medvar-Berry *(left)* and Colby Bridwell *(right)*, from the trap team take a moment for a photo opportunity with a proud mom at the Yreka Clay Birds' portion of the Dodge Shooting Range. (BYRAN DUNCAN)

distinction of against and alongside is based upon the team size. We are all in the same conference (California) and are then further classified by team size, rather than school size, thus shooting against teams of similar size and alongside larger and smaller teams.

The first team to introduce is a fellow Siskiyou County Team that we shoot alongside. The Etna High School Trap Team doubled their number of athletes from four to nine this year. Interestingly, the Etna team is sponsored by the Etna Police Department's "Police Activity League" programs, referred to as PAL. The small Etna Police Department covers the city of Etna and the town of Fort Jones, some 12 miles apart, and assists other agencies in the entire ranching area of Scott Valley with four full-time officers and two volunteer reserves, a part-time detective and two part-time community service officers. The math equates to nine PAL volunteers involved in all 10 Etna school sports, except baseball. The trap team started about the same time the Yreka team began. The team is in their fourth year and per head coach Officer Tony Stalker, "getting better every year." We share the same range and club house provided by the Yreka Clay Birds, sometimes shooting together. The range is just a few miles away from Yreka High School, but the Etna team drives about 30 miles one-way to practice every week. Per graduating senior Colby Bridwell, his younger brother Chace, a seventh-grader and already a trap shooter, is looking forward to replacing him soon. The team's range safety officer, Officer Josh Short, is also a hunting safety course instructor.

The next team is one we shoot against. The Orland High School Trap Team began in the spring of 2017, being the first school registered in the league, and was one of only two schools in California participating in the California High School Target League. The other school was in Orange County. The State Championships, now held in person in Kingsburg, was a virtual shoot due to the several hundreds of mile distance between the two teams. Anna Canon, the head coach and a CRPA member, wears numerous hats, to include Agriculture Instructor, FFA Advisor and California High School Target League State Director. As there is no trap range near them, the team has been rather resourceful. They received permission from a local farmer to use a field for practice, mounted their trap machine on a trailer, dug a hole and parked the machine and trailer in the hole, when being used, powering the machine with a small generator. Five years later, they are still shooting in the farmer's field and the 27 athletes of the team are just as enthusiastic as ever.

The Yreka High School Trap Team is looking forward to shooting against this great team at the Riverside Invitational and the State Championships. In future articles, we will introduce some of the other amazing teams, athletes, coaches, and supporters.

## STUDENT SPOTLIGHT:

# ORLAND HIGH SCHOOL TRAP TEAM

**BY AUTUMN "OTTER" IRVIN**

I grew up in a gun-friendly family and, occasionally, we would shoot shotguns, rifles, and handguns but I never really went hunting or shot consistently. In my freshmen year, I found out that Orland High School had a trap and sporting clay team. I wanted to give it a shot and I signed up. I went out to my first practice not knowing what to expect, shooting a 20-gauge Winchester and hitting one clay out of 25. I had no knowledge about my gun or how to properly use it. I was very doubtful and didn't think this

 

▶ **LEFT:** Autumn Irvin at Clear Creek Sports Club in Corning, shooting sporting clays. **RIGHT:** Autumn Irvin at Birds Landing Hunting Preserve, shooting sporting clays. (ERIC KNIGHT)



▶ **Bruce Chapman,** Autumn Irvin, and Anna Canon at the Navy Seal Foundation. (ERIC KNIGHT)

was going to be my sport. But, that didn't stop me from going out there to have fun and improve my shooting.

My coaches, Anna Canon and Bruce Chapman, saw something in me and wanted to make me better so they let me use a 12-gauge BT99 Browning single shot over-under. For a while, I didn't want to use a 12-gauge shotgun, so everybody would say I'm using the "little girl gun." Once I moved on from the 20-gauge I started to improve. Once my sophomore year came around, I wanted to get serious in the world of shooting.

The more I was on that line, the more I realized it wasn't just physically moving your gun to hit that clay, it's also a mental game. I learned that there are so many little things you must do to focus. When I'm on the line, I keep my head down so I'm not so focused on the other shooters. I count how many shots go off around me, peeking my head up until it's my turn to shoot. While my head is down, I close my eyes and think of the word "black." I think black because when I close my eyes that's all I see, noth-

## VEHICLE DONATION PROGRAM

    

Donate your car, truck, RV or Boat to the CRPA Foundation to support our ongoing commitment to inform and educate all Californians and California gun owners of their constitutional rights. We'll make it easy for you to donate with your free scheduled pick-up, and you may even qualify for a tax deduction!  Visit us online at **crpa-foundation.careasy.org/home.html.**

### WE ACCEPT ALL TYPES OF VEHICLES:

 CARS
 MOTORCYCLES
 BOATS
TRUCKS
TRAILERS
AND MORE!

### HOW IT WORKS

1 Call us at **833-200-CRPA** or **833-200-2772.**

2 We will tow your vehicle at no cost to you!

3 Get a tax deductible receipt and help your cause.

## GOLDEN RULES OF GUN SAFETY

**1.** **ALWAYS** treat all guns as if they are loaded.

**2.** **ALWAYS** keep the gun pointed in a safe direction.

**3.** **ALWAYS** keep your finger off the trigger until you are ready to shoot.

**4.** **ALWAYS** keep the gun unloaded until ready to use.

**5.** **ALWAYS** know your target, its surroundings, and beyond.

**6.** **ALWAYS** know how to properly operate your gun.

**7.** **ALWAYS** be sure the gun is safe to operate.

**8.** **ALWAYS** use only the correct ammunition for your gun.

**9.** **ALWAYS** wear eye and ear protection.

**10.** **NEVER** use alcohol or over-the-counter, prescription, or other drugs before or while participating in shooting sports.



For more information and training, please contact the California Rifle & Pistol Association: (800) 305-2772 | **CRPA.org**

ing but black. That word helps me to keep my focus then, when it's my turn, I have nothing else on my mind other than breaking the clay.

During the spring season, I started to place All-Around Shooter and Top Female Shooter. My name was being heard up and down California by other shooting teams, coaches, newspaper articles, and many other followers in the shooting world. People knew me as "Otter." I was given this name by my coach Bruce because he said Autumn was too hard to remember and an otter is a spunky animal and I'm spunky. Towards the end of the season, many trap teams across the state wanted to have a practice state shoot in Redding. At this shoot, I met many amazing coaches and had the opportunity to compete against many great shooters.

During the shoot, I tied with another sophomore, Peyton Zanotto, which forced us into a shoot off. It was nerve-racking, having five other teams watch you. Whoever was the first person to miss a clay was the loser and that was me. I lost the shoot-off. I never thought that I would end up having a shoot-off with another female shooter, but it was a great experience. I was hoping to see how she was going to shoot in Kingsburg at the state tournament and, even though I haven't fully met her, I'd like to shoot with her for more competition.

The California State High School Clay Target League State Tournament in Kingsburg was one of my bigger achievements before I qualified to compete at the national championships. I placed as California's Top Female Trap shooter with a 20.4 average. I was qualified in the second tier for the national championships which is held each year in

## I've created the best bonds with so many of my teammates that push me every day to do my best and, most of all, we push each other.

# JOIN & SUPPORT
# CRPA'S RANGE COALITION

**CRPA's Range Coalition members are businesses, clubs, private and public ranges throughout California.** Range Coalition members are united to protect range operations and expand opportunities for public participation in the shooting sports so that all Californians have convenient access to ranges and to marksmanship, self-defense, hunting, safety and other training.

The CRPA Range Coalition advocates for ranges in Sacramento and locally to protect ranges and ensure that any proposed legislation or regulatory policies promote proven and sound best management practices and recognize the value of access to ranges and training programs. Through webinars and Information Bulletins, CRPA provides critical information to coalition members and range operators about environmental, safety, insurance, corporate, legal, operational and other important issues of interest.

California's ranges are encouraged to learn more about CRPA's Range Coalition by emailing CRPA at ranges@crpa.org.

## JOIN ▪ LEARN ▪ TEACH ▪ THRIVE



▶ **The Orland HS Trap Team** at the 2021 Nationals in Macon, Michigan. (ERIC KNIGHT)



▶ **Trio of top scores** are shown by Orland High School Trap Team athletes (left to right) Austin Baylor, Autumn Irvin, and Jermy Crandle. (ERIC KNIGHT)

Mason Michigan. Many of my teammates also qualified to participate. As a sophomore in high school, this was one of the best experiences I've ever had in my life.

More than 2,000 shooters participated from all over the United States and there were over a mile of 40 trap ranges on which we were able to shoot. One of my best memories in Michigan was in my last round of the individual competition. I shot my first 25 on a national level. The best feeling was hearing my parents, coaches, teammates, and their families cheering me on from behind the line.

Everyone on my team has improved so much and has grown to love the sport just as much as I do. Not only do I love this sport because I get to shoot guns, but in the last year, this team has formed a bond that I could never imagine that any sport could have. I can't thank my coaches enough for helping me improve and become who I am today.

This team is one big family. All of the Trap Moms are always supplying us with snacks and drinks. On weekends the Trap Dads are BBQing or something of that nature. I've created the best bonds with so many of my teammates that push me every day to do my best and, most of all, we push each other. If it wasn't for this sport, I don't know who I would be close friends with today. I am the oldest of all of them and I see so many of them becoming amazing shooters as a team and individually, and I want to push them to do their best every time we get on that line.

It amazes me how far this small-town high school shooting team has come from shooting in a local field to traveling across the nation to compete on a more competitive level. This spring season, I am now a junior and have many goals for myself and the team. Not only has this sport inspired me to become a good trap shooter, but it inspired me to focus, learn accuracy, be a leader, supporter, and most of all, to build friendships. I know for a fact that in the future trap will always be a part of me and hope to continue a more competitive level after high school.

Case 2:22-cv-04663-SVW-JC Document 12-1 Filed 07/25/22 Page 44 of 47 Page ID #:659

# ORLAND HIGH SCHOOL TRAP TEAM THRIVES:
## AN ATHLETE'S PERSPECTIVE

**BY SEAANNA ROSS**

**O**ut in a farmer's field, Chuck and Jana Sanford grant us a place to practice our marksmanship. About five years ago, after getting permission to shoot, we took a tractor and dug out a hole. That's where we placed the machine with the help of Clear Creek Sports Club, who provided us with a machine to use. That year, the team had 16 young men and women practicing their 2nd Amendment rights... which was exactly where Bruce and Anna's motivation came from, to teach kids a life-long skill; a skill they were passionate for.

Both being members of the California Rifle & Pistol Association, Bruce and Anna persisted in finding ways to make the sport better and safer for the kids who participate. In these few years they have managed to watch the team grow to 27 members, as well as having 13 shooting in sporting clays. As the team grew, there were bound to be problems that came up. Expenses for ammo and clays as well as kids who don't have access to equipment. Now we can provide the ammunition, eye and ear protection, shell bags, and guns needed for the athletes, which is all provided by the NRA Foundation and their friends. We also get a discount on purchasing clays at the Clear Creek Sports Club and Bird's Landing. With the help of these organizations,

 

▶ **LEFT:** SeaAnna Ross and Amanda Pozzi, a seventh-grader, enjoy a snack break at the range. **RIGHT:** SeaAnna Ross of the Orland High School Trap Team at the Orland's High School range. (ANNA CANON)

we have witnessed participation grow each year and our athletes improve.

Our friends here help us in many ways, yet there is still a lot of underlying support to get the athletes involved. Corey and Scotty Blethroad are also coaches on the team and help with a lot of our appointments. Brenda and Kaylee Thompson are our scorekeepers, they usually have a bag of candy and hand out a piece to the athletes for some motivation to hit the clays. Kaylee and her husband, Kellon, also push the button for the machine. With this group of supporters, plus parents, the team members have enjoyed success. I have improved a lot since I started shooting



▶ **Cheyenne Petersen zeros in** on a flying clay, which can be seen a few feet above the right corner of the CRPA banner. (ANNA CANON)

for the team. Austin Baylor is probably the most improved shooter currently in both trap and sporting clays. Lauren Lazzaretto is only a sophomore, but she has been competing on the team as a child since it formed in 2017! Not only are these astounding athletes doing well in the sport, but their peers Jeremy Crandall Jr., Hailey Blethroad, and Austin Baylor are

some of the top shooters for trap in the second week of competition. Jeremy Crandall Jr., Anthony Travis, and Autumn Irvin are also the top shooters for sporting clays. This is only their third week of competition. With these excellent shooters, and the passion and support of all the coaches and friends, the team is thriving more and more every single year.

"Through the motto of 'safety, fun, and marksmanship,' shooting sports teach a valuable skill to the youth involved. Everyone gets to participate, as there are no benchwarmers. The knowledge of this skill can lead to a life-long pursuit, creating future supporters of the 2nd Amendment so that our rights can be maintained," said Anna Canon, head coach.

 

# KEEP CALIFORNIA HUNTING ALIVE!
• GET YOUR HUNTING LICENSE
• TAKE HUNTERS EDUCATION COURCES
• PRESERVE YOUR RIGHTS TO KEEP AND BEAR ARMS

CRPA works to preserve the traditional and historic role of the individual citizen to hunt, conserve, and preserve California's resources. In addition, CRPA works relentlessly in California to defend your constitutional right to keep and bear arms.

Become a member today to help promote and support the fight for the Second Amendment and hunting conservation.

**VISIT CRPA!**
Memberships, Courses, License, & More

www.crpa.org ● (714) 992-2772
271 E Imperial Hwy, Suite 620, Fullerton, CA 92835

**HUNTERS ARE THE TRUE CONSERVATIONISTS!**

# ENSURING MODERN DAY HUNTING AND SHOOTING ACCESS IS CRITICAL FOR FUTURE GENERATIONS



**BY SALAM FATOHI**

*Originally published at nssf.org/articles/ensuring-modern-day-hunting-and-shooting-access-is-critical-for-future-generations/*

**H**unting and recreational shooting sports are staples of American pastimes. Often, finding the time to get outdoors is a significant hurdle. For some, free access to places to safely hunt and shoot is the real obstacle. In a 2012 partnership between Responsive Management and NSSF, a baseline report was conducted to understand this critical issue.

With support from an Association

of Fish and Wildlife Agencies (AFWA) Multistate Conservation Grant, the report, "Assessing the Quality and Availability of Hunting and Shooting Access in the United States," was produced. It provides information on sentiment around access to hunting and recreational shooting sports.

**RESULTS ARE IN**

The latest report had three key focal points: analyzing the current availability of public and private areas to hunt and shoot recreationally, determining how hunters and shooters rate access, and examining how the perception of access has changed over the past decade.

The continental United States has a plethora of hunting options for outdoorsmen and women. According to the hunters surveyed, white-tailed deer (79 percent) is the most

sought-after game species, with wild turkey in second place (40 percent). All other species ranked 28 percent or less.

At ranges, recreational shooters primarily shot handguns. Unsurprisingly, the survey found hunters and shooters who live in urban and suburban areas need to travel the furthest and have the least access to land to enjoy their recreational activity.

**HEADING AFIELD**

Hunting respondents reported that 56 percent chose to hunt almost exclusively on private land, 25 percent mostly hunt on public land and 19 percent hunt on both property types equally. A clear majority of hunters, 59 percent, relayed that they hunt private land that they do not own but have permission to hunt. Conversely, 41 percent of hunters said they

use private land enrolled in walk-in access programs. These programs offer access to landowner-approved easements to hunt or access public land. These trends make sense when recognizing the topmost factor for hunters is choosing an area that is not crowded by other sportsmen. Nearly all hunters, 92 percent, reported overcrowding to be either very important or somewhat important.

**DO YOU HAVE THE TIME?**

Time and a place to hunt, 24 percent and 21 percent respectively, were top reasons given why hunters do not go afield. Almost a third of hunters reported that a combination of less land to hunt due to private land ownership, housing developments, land use changes or previously accessible private land had been sold and marked "no hunting" were



(SHUTTERSTOCK)

significant hurdles for them when deciding whether to get outdoors. Of the 19 states surveyed, respondents reported about half with a favorable outlook on hunting access and management of land overall. Ratings of access to land for hunting decreased, with excellent or good responses decreasing to 47 percent in 2021 from 56 percent in 2010.

A majority of recreational shooters, 57 percent, shoot mostly on private

land while 21 percent shoot almost exclusively on public land. Like their hunting counterparts, recreational shooters who utilize private land are typically not the actual landowner but choose their areas to shoot

# HUNTERS' CODE OF
# ETHICS

- Follow the rules of firearm and hunting safety. Insist that fellow hunters do the same.

- Respect the environment and wildlife. Study the ecosystem. Tread lightly. Leave no trash behind.

- Do not waste game or fish. Make full use of any animal taken. Take only what you will use, even if it is under the legal limit.

- Use only fair and humane methods of taking wildlife. Develop your hunting and shooting skills as necessary to ensure clean, sportsmanlike kills.

- Know your fitness, skill and equipment limitations. Hunt within those limits.

- Obey all hunting regulations. Hunt with the appropriate license and tags only in allowed areas during designated times and seasons. Obey bag and possession limits. Use only legal hunting methods and equipment. Report game law violations immediately.

- Ask landowner for permission to hunt and respect the land. Close any gates you open. Say thank you.

- Be considerate of non-hunters' sensibilities. Strive to leave them with positive images of hunting and hunters.

- Don't flaunt your kill. Be as discreet as possible. Treat game carcasses in an inoffensive manner, particularly during transport.

- Generally conduct yourself in a sportsmanlike manner. Hunt according to "fair chase." Require the same of your hunting partners.

- Support NAM wildlife conservation programs and urge policymakers to support strong NAM-based conservation initiatives.

- Teach others the skills, techniques, rules and ethics of hunting. Pass these ethical hunting practices along to younger hunters.

**HUNTERS ARE THE TRUE CONSERVATIONISTS!**

# CRPA IS A FOUNDING MEMBER OF THE CALIFORNIA HUNTING & CONSERVATION COALITION

California Hunting and Conservation Coalition (Coalition) members include all the major hunting and natural resource conservation groups in California. Coalition members are united to ensure a strong future for wildlife conservation by protecting and expanding hunting and fishing opportunities throughout California and supporting wildlife management decisions based on the North American Model of Wildlife Conservation.

The Coalition works to make sure these decisions are based on the best available science and sound management strategies.

The Coalition's primary goal is to ensure that wildlife populations thrive in perpetuity and that our traditional hunting and fishing heritage will be guaranteed for all Californians, for generations to come.

Coalition efforts are badly needed in these times of great challenges to our hunting heritage but also in times of great opportunities.

**HUNTERS ARE THE TRUE CONSERVATIONISTS!**

CALIFORNIA HUNTING & CONSERVATION COALITION

OFFICIAL MAGAZINE OF THE CALIFORNIA RIFLE & P

based on ease of access and a lack of other shooters or land users.

**WHAT'S IN YOUR WALLET?**

Not the least surprising, cost – rather than time or other obligations – was reported by all recreational shooters as a top factor affecting their enjoyment of the sport. Almost half, 43 percent, of recreational shooters noted that access constraints were a topmost concern. Both hunters and recreational shooters rely heavily on friends, family and word-of-mouth to source information on where to enjoy their recreational shooting activity of choice.

About a third of hunters and a quarter of recreational shooters used their state wildlife agency's website or the U.S. Fish and Wildlife Service's (USFWS) website for helpful resources on land access. Awareness of these resources can increase both access and utilization of land for hunters and shooters alike. Hunters and recreational shooters who learn of access to land where they can enjoy the outdoors will lead to more people adopting stewardship of the land. Increasing awareness of where outdoorsmen and women can go

not only creates more participation but also fuels both the economy of conservation through licensing and Pittman-Robertson funds and the tertiary dollars spent to enhance the outdoor experience.

Increasing awareness of resources is a top recommendation regarding both hunter and sport shooter feedback. That is why NSSF's Lets Go Hunting and Lets Go Shooting campaigns are both great resources for all who are interested in America's greatest pastime to find more information about opportunities and greater access to get outdoors. **CRPA**

## CORE PRINCIPLES OF
## THE NORTH AMERICAN MODEL OF WILDLIFE CONSERVATION

**P**roper ecological stewardship and natural resource management through hunting, trapping and strategic depredation efforts are critical components of maintaining ecological balance.
Hunters and anglers provide the vast majority of funding for natural resource conservation efforts through license fees and federal excise taxes paid.

The traditional science-based and experience-proven North American Model (NAM) of Wildlife Conservation approach to natural resource management has been used to successfully maintain balanced population levels of diverse wildlife species for many decades. Consistent with NAM, hunters and anglers obey conservation regulations, adopt safe practices and adhere to a code of ethics.

Animal rights extremist groups that oppose hunting (see **humanewatch.org** and **huntfortruth.org**) advocate abandoning the NAM in favor of an unbalanced and unscientific approach to species management that would deliberately make hunting unsustainable. These groups promote a model that would encourage predator species populations to explode. These unchecked predator populations would decimate game species and endanger suburban neighborhoods.

Through education, mentorship and example, CRPA supports and promotes the NAM. CRPA opposes the ongoing duplicitous efforts of animal rights extremist groups and fights the unscientific and unbalanced approach they advocate at the Capital, the California Fish and Game Commission and in the courtrooms!

- Wildlife belongs to the people and is held in the public trust. It is managed in trust for the people by government agencies.
- It is illegal to sell the meat of any wild animal in North America.
- Laws developed by people and enforced by government agencies ensure the proper use and conservation of wildlife resources.
- Every law-abiding citizen has the right and privilege to hunt and fish and should have the opportunity.
- Humans can legally kill certain wildlife for legitimate purposes under strict guidelines for food and fur, in self-defense or property protection. Laws are in place to restrict casual killing, killing for commercial purposes, wasting of game and mistreating wildlife.
- Because wildlife and fish freely migrate across boundaries between states, provinces and countries, they are considered an international resource.
- The best science available will be used as a basis for informed decision-making on wildlife management.

## HUNTERS ARE THE TRUE CONSERVATIONISTS!



We are happy to announce the
**California Rifle and Pistol Association's NEW RangeCon22 coming near you!**

**CRPA Heard You and Responded to the Needs of our Range Coalition Members!**

We understand the demands of time and travel for many ranges that would put a strain on attending a state-wide conference, especially coming off the last two tough years. CRPA wants as many people as possible to participate in RangeCon22 which is why WE ARE BRINGING IT TO YOUR AREA!

Great content for range operators and board members, training opportunities for range staff, great value, less time and travel!

**1 Day Conference or Training
Choose Your Location – Choose Conference or Training**

**TUES AUG 16th**
**SLO Sportsmen's Association**
San Luis Obispo, California

**WED AUG 31st**
**Yolo Sportsmen's Association**
Davis, California

**THUR SEPT 15th**
**5 Dogs Range**
Bakersfield, California

**TUES SEPT 20th**
**Mike Raahauge Shooting Enterprises**
Corona, California

**CRPA is bringing the first range conference to the state in decades. The purpose is to:**

- Inform you of the newest environmental & recycling issues.
- Educating you on legislative, regulatory, and other vital legal issues.
- Introduce you to competition hosting opportunities.
- Helping you build grassroots support that both grow and protect your business.
- Networking emerging technologies that will improve all aspects of your range.
- Focusing on marketing and insurance.
- Opportunities for new range development and existing range expansion.
- New training opportunities designed for California ranges.

SCAN WITH PHONE

**SIGN UP HERE**
Space is limited and filling fast.

**ALL THIS FOR JUST $45**

**RSO Class: $125
CRSO Class: $225**

Go to https://crpa.org/crpa-rangecon-2022/ and sign up under events

0928

Case 2:22-cv-00365-JC/Document 12-3 Filed 07/25/22; Page 42 of 45 Page ID #:663

# CITRUS MARINATED VENISON

## WITH RED WINE ONION JAM, GARLIC MASHED POTATOES, AND CRISPY PROSCIUTTO

BY DAVID WITHERS

### INGREDIENTS
*(SERVES 4)*

**VENISON**
1 ½ lb. Venison Back Straps

**MARINADE**
4 oz. Red Wine
2 cloves Crushed Garlic
1 Shallot, finely sliced
3 sprigs Thyme
1 Orange, juiced & zest

**BONE BROTH REDUCTION**
16 oz. Beef Bone Broth
1 Celery Stick
1 Shallot, sliced
1 Carrot, sliced
2 sprigs Thyme

**RED WINE ONION JAM**
½ lb. Red Onions, sliced
3 oz. Red Wine
½ tbsp Red Wine Vinegar
1 tbsp Brown Sugar

**GARLIC MASHED POTATOES AND CRISPY PROSCIUTTO**
1 lb. Russet Potatoes, peeled & quartered
2 cloves Garlic, peeled
4 tbsp Butter
4 oz. Half-and-half
4 slices Prosciutto

**BRUSSELS SPROUTS LEAVES AND CARROTS**
1 Shallot, finely sliced
1 lb. Brussels Sprouts Leaves
2 oz. Chicken Broth
12  Baby carrots, peeled & blanched for 2 minutes
1 Rosemary stalk



TRUE ORGANIC RECIPES

## METHOD

### VENISON & MARINADE

In a bowl, mix marinade ingredients. Add venison. Cover and refrigerate for 4 hours. Preheat oven to 375°. Remove venison from marinade, pat dry with paper towel. Place on a plate and season with salt and pepper. In a sauté pan, add a little olive oil. When pan is smoking hot, seer venison on all sides. If pan is oven safe, place in the oven for approximately 10 minutes or until internal temperature reaches 125°. Remove and let rest for 5 minutes.

### BONE BROTH REDUCTION

In a pot, add bone broth and vegetables. Bring to a boil. Reduce heat and reduce to approximately 4 oz. Strain through a fine strainer and set aside.

### RED WINE ONION JAM

In a pan, add a little olive oil and place on medium heat. When hot, add onions, salt and pepper and cook for approximately 2 minutes. Add the remaining ingredients and cook until it reaches a jam-like consistency. This can be done days before.

### GARLIC MASHED POTATOES

In a pot, add potatoes and garlic. Cover with water. Sprinkle with salt. Bring to a boil. Cook until potatoes are soft. Drain potatoes. In the same pot, add butter and half-and-half and bring to a boil. Meanwhile, in a bowl, put the potatoes and garlic through a ricer or potato masher then slowly add butter mixture until desired consistency. This can be kept warm by placing the bowl over a pot with hot water in it.

### CRISPY PROSCIUTTO

Preheat oven to 375°. Place prosciutto on a baking sheet lined with parchment paper. Cook for 8 minutes or until crispy. This can be done 1 hour before.

### BRUSSELS SPROUTS LEAVES AND CARROTS

In a sauté pan, add a little olive oil. Add shallots and cook on a medium heat for 1 minute. Add brussels sprouts, mix well. Add broth, salt and pepper. Cook until tender. In another pan, add a little olive oil. Sautee carrots and rosemary until golden.

### ASSEMBLY

Slice venison into four portions. Spoon onion jam, mashed potatoes, brussels sprouts, and carrots onto the plate. Garnish with crispy prosciutto and drizzle with bone broth reduction. **CRPA**

**THE LODGE** The Cattlemen's Winery

Try our award winning Wines!

The Lodge Winery & Olive Oil Co. is pleased to announce our partnership with the California Rifle and Pistol Association. A substantial donation is given to the CRPA with the purchase of any product from our website when you enter their partner code during checkout.

Partner Code: **CRPA**

Not available in stores. We ship direct to your door.

TheLodgeWinery.com

## CRPA MEMBERSHIP LEVELS & BENEFITS

*ALL NEW* CRPA members of every level receive these benefits:
- Subscription to CRPA's *California Firing Line* magazine
- CRPA membership card with Know Your Rights notice
- CRPA decal or sticker
- Legislative & litigation updates and information bulletins
- Exclusive access to timely and informative webinars, podcasts and other resources

Upgraded members receive *additional* benefits as listed below. To sign up for membership, please visit crpa.org.

■ **1-Year General Membership:** $55 / Year

■ **5-Year General Membership:** $225 ($5 savings a year on annual membership)

■ **2A Sustaining Membership:** $17.91 / month

**CRPA LIFE MEMBERSHIPS\***
- Life Member Hat
- Life Member Velcro Patch
- CRPA Life Member Decal or Sticker
- Pocket Constitution
- CRPA Challenge Coin
- A copy of the current year edition of *California Gun Laws: A Guide to State and Federal Regulations* by CRPA's President and General Counsel Chuck Michel

***\*Active military and veterans get a 10% discount on all Annual, 5-Year, & Life Memberships. Use Code USVET at checkout.***

■ **Life Member:** $1000

■ **Senior Life Member (65 and older):** $550

**ENHANCED LIFE MEMBERSHIPS**
CRPA's Enhanced Life Members are 2A supporters, hunters and shooters committed to the CRPA's mission and success. In addition to ALL the above-listed member benefits, CRPA Enhanced Life Members also receive:

■ **Defender Life Member:** $1000 upgrade for CRPA Life Members
- CRPA Defender Life Member Hat
- CRPA Defender Life Member Lapel Pin
- CRPA Custom-Engraved Defender Life Member Buck Knife
- Annually updated copy of *California Gun Laws: A Guide to State and Federal Firearm Regulations* by CRPA's President and General Counsel Chuck Michel
- Defender Life Member Certificate
- Invitations to Exclusive VIP Events, Briefings and Tours
- Personal Recognition from CRPA President

■ **Activist Life Member (Silver/Patron):** $1500 upgrade for CRPA Defender Life Members
- Activist Life Member Embroidered Patch
- Activist Life Member Outerwear / Jacket
- Activist Life Member Hat
- Activist Life Member Lapel Pin
- CRPA Custom Engraved Life Membership Buck Knife
- Annually updated copy of *California Gun Laws: A State and Federal Firearm Regulations* by CRPA's President and General Counsel Chuck Michel
- Activist Life Member Certificate
- Invitations to Exclusive VIP Events, Briefings and Tours
- Personal Recognition from CRPA President

■ **Patriot Life Member (Gold/Benefactor):** $1500 upgrade for CRPA Activist Life Members
- Custom Engraved Pistol (For First 50 Members)
- CRPA Patriot Life Member Hat
- CRPA Patriot Life Member Lapel Pin
- CRPA Custom Engraved Life Member Buck Knife
- Annually updated copy of *California Gun Laws: A Guide to State and Federal Firearm Regulations* by CRPA's President and General Counsel Chuck Michel
- CRPA Patriot Life Member Challenge Coin
- Special Patriot Life Member Recognition Wall Plaque
- Patriot Life Member Certificate
- Invitations to Exclusive VIP Events, Briefings and Tours
- Personal Recognition from CRPA President
- Custom logo jacket

# CRPA MEMBERSHIP APPLICATION

Name

DOB

Street Address

City, County, State, Zip Code

Phone

Email Address

| Membership Options | Price |
|---|---|
| ☐ 1-Year Member | $55 |
| ☐ 5-Year Member | $225 |
| ☐ 2A Sustaining Member | $17.91/month |
| ☐ Life Member | $1000 |
| *Veterans take 10% off Annual, 5-year, Life | |
| ☐ Senior Life Member | $550 |
| ☐ Defender Life Member | $1000 + Life |
| ☐ Activist Life Member | $1500 + Defender |
| ☐ Patriot Life Member | $1500 + Activist |

Check next to membership of choice

☐ Auto-Renewal        Total Due $

Check #

Card #

Exp Date MM/YY

Email Address

*25% of CRPA membership dues are used for lobbying and political activities.

**California Rifle & Pistol Association**
271 E. Imperial Highway, Suite #620, Fullerton, CA 92835
Phone: (800)-305-2772  I  Email: membership@crpa.org

# GUN TRUTHS:
## HOW GUN LAWS FAIL

Gun Truths has compiled research and empirical evidence from multiple credible and high-quality independent sources to show how gun bans and gun control laws fail to reduce violent crime or make us any safer. We have assembled peer-reviewed studies, research, and information from government databases acquired through the hard work of individuals who simply seek the truth. These researchers have assessed the data and presented the most salient findings to let readers form their own objective opinion about gun control. The matter-of-fact presentation of facts and data in this book, free of manipulative gimmicks or emotional pleas, seeks to cut through the misconceptions created by the gun-control lobby.

Gun Truths debunks common myths about firearms, self-defense, and gun ownership. It serves as a reference guide for journalists, politicians, law enforcement, and anyone interested in learning about the topics inflaming the debate on gun control. We believe that this debate will become more open, honest, and efficient if both sides are more informed. Gun Truths is divided into chapters based on gun control topics and categories. Each chapter lists common myths surrounding firearms and the individ-



uals who possess them. Each myth is followed by several facts and sources that show the objective truth based on unbiased, well-researched data. This should make it relatively easy to find the information you need to form an educated opinion about firearm policy. So, when you hear a politician, celebrity, or pundit repeat a sound bite about gun control, you can quickly find that myth in this book and decide the truth for yourself. **CRPA**

# CALIFORNIA GUN LAWS

## A GUIDE TO STATE AND FEDERAL FIREARM REGULATIONS

BY C.D. MICHEL & MATTHEW D. CUBEIRO



*California Gun Laws: A Guide to State and Federal Firearm Regulations* is said to be the bible and definitive source for information on the subject. This tremendous resource is jam-packed with thousands of hours of legal research, all of which has been transcribed into a format that is easy to read and comprehend. Chock-full of legal and practical insights drawn from decades of experience, this book is a must-have for any California gun owner.

The 2021 8th Edition will answer all of your questions regarding current state and federal firearm laws, including who can legally possess a firearm, where and when you can possess it, how to acquire a firearm in California, which firearms are prohibited and how to lawfully carry a firearm in public.

The 8th Edition also covers new and important legislative and regulatory changes to state and federal firearm laws following the release of the 7th Edition. Such changes include **Senate Bill No. 118,** which classifies certain firearms not otherwise meeting the legal definition of a rifle, pistol or shotgun as "assault weapons," and **DOJ's** "emer-

gency" **Dealer Record of Sale (DROS) fee regulations** establishing a $31.19 fee for all firearm transactions in California. Other bills signed by the governor are addressed, including:

■ **Assembly Bill No. 2847,** which modifies California's microstamping requirements for handguns to be listed on California's roster of handguns certified for sale in the state and adds a provision deleting handguns from the existing roster as newer handguns equipped with microstamping are added.

■ **Assembly Bill No. 2699,** which adds several state law enforcement agencies to the list of those exempt from California's roster requirement, while also placing additional requirements on certain officers who acquire handguns pursuant to these exceptions.

■ **Assembly Bill No. 2362,** which imposes civil penalties in addition to existing criminal penalties on California-licensed firearm dealers who breach any prohibition or requirement, subjecting their license to forfeiture.

And more! Now available at **CRPA.org/store.** **CRPA**

---

### AMERICA, GUNS, AND FREEDOM

BY MIGUEL A. FARIA, JR., M.D.



*America, Guns, and Freedom* outlines why the Second Amendment and armed self-defense are still needed in modern society, while debunking arguments that the U.S. should follow the path of European social democracies by enforcing draconian gun control.

### FIRST THEY CAME FOR THE GUN OWNERS: The Campaign to Disarm You and Take Your Freedoms

BY MARK W. SMITH

Bestselling author and attorney Mark W. Smith exposes the all-encompassing nature of the anti-gun lobby's attack on the right to keep and bear arms that empowers government to control other important aspects of our lives.

### SHOOT TO WIN

BY CHRIS CHENG



Chris Cheng is a self-taught amateur who beat 17 competitors in HISTORY's "Top Shot: Season 4." Cheng's book *Shoot to Win* focuses on the fundamentals of pistol, rifle and shotgun shooting.

### GUNS AND CONTROL: A Nonpartisan Guide To Understanding Mass Public Shootings, Gun Accidents, Crime, Public Carry, Suicides, Defensive Use, and More

BY GUY SMITH

20 years of gun policy research distilled for the 2020 election cycle. This is a guide for your undecided friends, family and a solid briefing book for Second Amendment supporters.

### GUN CONTROL IN THE THIRD REICH: Disarming The Jews and "Enemies of the State"

BY STEPHEN P. HALBROOK

*Gun Control in the Third Reich* presents the definitive history of how the Nazi regime used gun control to disarm and repress its enemies and consolidate power. "Outstanding book!"—America's 1st Freedom.

### THE GUN BOOK SERIES

BY SILVIO CALABI, STEVE HELSLEY& ROGER SANGER

 

Three experts tackle the social misconceptions surrounding firearms in a non-political series of easy-to-read books that explores the realities of firearms. The first book, *The Gun Book for Boys,* is geared toward boys aged 12-16, followed by *The Gun Book for Parents* and *The Gun Book for Girls* (all ages). The series guides those who are interested in guns and shooting, but who have little to no firearms training.



### #DUPED: How the Anti-gun Lobby Exploits the Parkland School Shooting--and How Gun Owners Can Fight Back

BY MARK W. SMITH

Mark W. Smith reveals how young people like the Parkland students are exploited for political gain to short-circuit any legitimate debate depriving law-abiding Americans of their right to bear arms.

0931

# THE WORLD'S BEST CASES
## MANUFACTURED WITH PRIDE IN
# CALIFORNIA



SKB Cases is family owned and operated in Orange, California, and has been since it was founded in 1977. All SKB cases are meticulously engineered and built to provide the best protection and functionality for everyone from outdoor enthusiasts and competition shooters, to law enforcement and military personnel. We're so confident our cases are the best, each one is backed by an **Unconditional Lifetime Warranty**.

Visit **www.skbcases.com** to see our full lineup of products.

OFFICIAL CASE OF

0932

# EXHIBIT 23



# Youth Enhancement Program's

# YOUTH EXPO

## COMPTON HUNTING & FISHING CLUB

### 1625 Sportsman Drive, Compton, CA 90221

## Hosted By CHFC Foundation

# Saturday, July 23rd, 2022

## 10:00 AM - 3:00 PM

### **Activities For All Ages**

- Inflatable BB Ranges
- Outdoor Archery
- Birds Of Prey - CHC
- First Aid Basic
- Rubber Band Shooting Gallery
- Quail Call Making - Boy Scouts
- SCI Sensory Trailer
- Laserlyte Gallery
- Snow Cones & Popcorn
- U.S. Forest Service
- California Rifle & Pistol Association
- Tomahawk Throwing

- NSSF Child Safety Literature
- Face Painting
- NRA Eddie The Eagle Station
- California Waterfowl
- CA Fish & Wildlife
- Casting Practice Pools
- Wheel Spin - Event Card Entry
- California Waterfowl
- Turner's Outdoorsman
- Reptile Encounter

Youth must pre-register for this free event at http://www.chfcfoundation.org , download waiver and bring the signed waiver to the event.

# Sponsors & Exhibitors






















0934

# EXHIBIT 24



# Online Store

Select a Catalog



Support the fight to preserve the Second Amendment in California with every purchase made.

Keywords:

**SEARCH**

## CRPA

[View All](#)









**2022 Weekly Gun Giveaway Calendar**

Type: Promo

Price: $100.00

**California Gun Laws 9th Edition**

Type: Publication

Price: $29.95

**Fierce About Freedom hat**

Type: Headwear

Price: $25.00

**CRPA Firing Line (multiple issues available)**

Type: Publication

Price: $8.95



**Gun Safe Sticker - Notice to Police**

Type: Sticker

Price: $1.99



**CRPA University Hoodie**

Type: Apparel

Price: $30.00



**LEOSA Active Cards**

Type: Publication

Price: $3.99



**Stars & Stripes Lapel Pin**

Type: Miscellaneous

Price: $5.00

## Book Club

View All



**The Right To Bear Arms**

Type: Publication

Price: $29.95



**California Gun Laws 9th Edition**

Type: Publication

Price: $29.95



**Shoot To Win: Tips, Tactics and Techniques to Help you Shoot**

Type: Publication

Price: $24.99



**#Duped**

Type: Publication

Price: $12.99



**Protect Yourself From Violence**

Type: Publication

Price: $13.99



**Shall Not Be Infringed**

Type: Publication

Price: $22.99

Out of Stock Notice



**CRPA Firing Line (multiple issues available)**

Type: Publication

Price: $8.95

## Events & Education

**View All**



**Pistol Postal Challenge**

Type: Event

Price: $20.00



**Rimfire Postal Challenge**

Type: Event

Price: $20.00



**Shotgun Postal Challenge**

Type: Event

Price: $20.00



**Virtual CRPA Home Firearms Safety Course**

Type: Education

Price: $25.00

## Pro Shop

**View All**

0938

   

**Vanquest CRPA Medical Kit**

Type: First Aid/Medical

Price: $155.00

**AMK Sportsman Series Whitetail Medical Kit**

Type: First Aid/Medical

Price: $49.99

**AMK Sportsman 200**

Type: First Aid/Medical

Price: $39.99

**SWAT-T Multifunctional Tourniquet**

Type: First Aid/Medical

Price: $17.95



 

**Gerber Ultimate Bear Grylls Knife and Fire Starter**

Type: Knife/Tool

Price: $70.95

**CRKT 2630 DU HOC**

Type: Knife/Tool

Price: $135.00

# Apparel

**View All**



**CRPA University Hoodie**

Type: Apparel

Price: $30.00



**Blue CRPA Polo Shirt**

Type: Apparel

Price: $30.00



**CRPA Shooting Team Adult T-Shirt**

Type: Apparel

Price: $25.00



**Fierce About Freedom hat**

Type: Headwear

Price: $25.00



**Hunter Orange CRPA Hat**

Type: Headwear

Price: $24.99



**Classic CRPA Logo Hat**

Type: Headwear

Price: $25.00



**CRPA Beanie**

Type: Headwear

Price: $15.00

## Patches

**View All**

Case 2:22-cv-04663-CAS-JC Document 12-2 Filed 07/25/22 Page 59 of 67 Page ID #:675



**Vanquest Med CROSS Glow-In-The-Dark Patch**
Type: Patch
Price: $6.99



**Vanquest MED Glow-In-The-Dark Patch**
Type: Patch
Price: $7.99



**Vanquest US Flag (Left Star) - Glow-In-The-Dark Patch**
Type: Patch
Price: $5.99
Out of Stock Notice



**Vanquest Mohl-Air Hook and Loop Adapter**
Type: Tactical Gear/Accessory
Price: $10.99

# Drinkware

**View All**



**Red Fierce About Freedom Travel Mug**
Type: Drinkware
Price: $22.00



**Blue CRPA Tumbler**
Type: Drinkware
Price: $25.00

# Miscellaneous

**View All**

   

**CRPA Bumper Sticker**

Type: Sticker

Price: $2.99

**"Don't Tread on Me" Mousepad**

Type: Miscellaneous

Price: $14.95

**Sticker: Fierce About Freedom**

Type: Sticker

Price: $1.99

**2022 Weekly Gun Giveaway Calendar**

Type: Promo

Price: $100.00

## Last Chance

**View All**



**145th Anniversary Patch**

Type: Patch

Price: $6.00

    

Neon CRM by **Neon One**



**California Rifle & Pistol Association Headquarters & Training Center**

271 E. Imperial Highway,

Suite 620

Fullerton, California 92835

P: (714) 992-2772

800-305-2772

E: contact@crpa.org

8am to 4:30pm, Monday to Friday

## DONATE NOW

## SUBSCRIBE

**Support Your Second Amendment Rights**

The California Rifle & Pistol Association, founded in 1875, provides training in the safe, responsible, and enjoyable use of firearms; sanctions competitive shooting state championships; and fights for the constitutional right to keep and bear arms for those who choose to own a gun in California for sport, hunting, or self-defense.

**E-news Subscription**

Follow the latest news, events and activities of the California Rifle & Pistol Association by signing up for our e-news! All subscribers will receive exclusive alerts and invitations to events through out California.

## CRPA VOLUNTEERS

**Volunteer**

Looking for a way for you and your family to get engaged in protecting the Second Amendment? We have all kinds of opportunities for serving and learning more about what we do.

California Rifle & Pistol Association © 1875-2022

Home     Join CRPA     Donate     Join NRA

# EXHIBIT 25





# Online Store

Apparel ▾

Support the fight to preserve the Second Amendment in California with every purchase made.

Keywords:

[                    ]

**SEARCH**

Apparel



**CRPA University Hoodie**

**Type:** Apparel

Price: $30.00



**CRPA Sports Adult Baseball Tee**

**Type:** Apparel

Price: $25.00



**Guns Save Lives Women's Tee**

**Type:** Apparel

Price: $20.00



**Sheepdog Adult T-Shirt**

**Type:** Apparel

Price: $18.00









### Blue CRPA Polo Shirt

**Type:** Apparel

Price: $30.00

### Hold the Line Adult T-Shirt

**Type:** Apparel

Price: $20.00

### CRPA Shooting Team Adult T-Shirt

**Type:** Apparel

Price: $25.00

### I'd Rather Be Hunting Adult T-Shirt

**Type:** Apparel

Price: $15.00



### Fierce About Freedom hat

**Type:** Headwear

Price: $25.00



### Hunter Orange CRPA Hat

**Type:** Headwear

Price: $24.99



### Classic CRPA Logo Hat

**Type:** Headwear

Price: $25.00



### CRPA Beanie

**Type:** Headwear

Price: $15.00



### CRPA Camo Hat

**Type:** Headwear

Price: $24.00



### CRPA RSO STARTER PACKAGE

**Type:** Instructor/RSO Gear

Price: $40.00  $35.00

**SALE!**

$5.00 off

Neon CRM by **Neon One**

0947



271 E. Imperial Highway,

Suite 620

**California Rifle & Pistol Association Headquarters & Training Center** Fullerton, California 92835

P: (714) 992-2772

800-305-2772

E: contact@crpa.org

8am to 4:30pm, Monday to Friday

## DONATE NOW

**Support Your Second Amendment Rights**

The California Rifle & Pistol Association, founded in 1875, provides training in the safe, responsible, and enjoyable use of firearms; sanctions competitive shooting state championships; and fights for the constitutional right to keep and bear arms for those who choose to own a gun in California for sport, hunting, or self-defense.

## SUBSCRIBE

**E-news Subscription**

Follow the latest news, events and activities of the California Rifle & Pistol Association by signing up for our e-news! All subscribers will receive exclusive alerts and invitations to events through out California.

## CRPA VOLUNTEERS

**Volunteer**

Looking for a way for you and your family to get engaged in protecting the Second Amendment? We have all kinds of opportunities for serving and learning more about what we do.

# California Rifle & Pistol Association © 1875-2022

Home    Join CRPA    Donate    Join NRA

0949

# EXHIBIT 26





# Online Store



Support the fight to preserve the Second Amendment in California with every purchase made.

Keywords:

SEARCH

Patches









**CRPA Women's Hat**

**Type:** Headwear

Price: $20.00

**Liberty's Teeth CRPA Hat**

**Type:** Headwear

Price: $25.99

**Limited Edition Victory Patch**

**Type:** Patch

Price: $25.00

**2A Defender Patch**

**Type:** Patch

Price: $4.00









**Vanquest Med CROSS Glow-In-The-Dark Patch**

**Vanquest MED Glow-In-The-Dark Patch**

**Vanquest US Flag (Left Star) - Glow-In-The-Dark Patch**

**Fierce About Freedom hat**

**Type:** Headwear

**Type:** Patch

Price: $6.99

**Type:** Patch

Price: $7.99

**Type:** Patch

Price: $5.99

Out of Stock

Price: $25.00







**Vanquest Mohl-Air Hook and Loop Adapter**

**Type:** Tactical Gear/Accessory

Price: $10.99

**145th Anniversary Patch**

**Type:** Patch

Price: $6.00

**CRPA RSO STARTER PACKAGE**

**Type:** Instructor/RSO Gear

Price: $40.00  $35.00

SALE!

$5.00 off

Neon CRM by **Neon One**



271 E. Imperial Highway,

Suite 620

**California Rifle & Pistol Association Headquarters & Training Center** Fullerton, California 92835

P: (714) 992-2772

800-305-2772

E: contact@crpa.org

8am to 4:30pm, Monday to Friday

**DONATE NOW**

**SUBSCRIBE**

**Support Your Second Amendment Rights**

The California Rifle & Pistol Association, founded in 1875, provides training in the safe, responsible, and enjoyable use of firearms; sanctions competitive shooting state championships; and fights for the constitutional right to keep and bear arms for those who choose to own a gun in California for sport, hunting, or self-defense.

**E-news Subscription**

Follow the latest news, events and activities of the California Rifle & Pistol Association by signing up for our e-news! All subscribers will receive exclusive alerts and invitations to events through out California.

**CRPA VOLUNTEERS**

**Volunteer**

Looking for a way for you and your family to get engaged in protecting the Second Amendment? We have all kinds of opportunities for serving and learning more about what we do.

0953

California Rifle & Pistol Association © 1875-2022

Home    Join CRPA    Donate    Join NRA

# EXHIBIT 27



# Online Store

Miscellaneous ▾



Support the fight to preserve the Second Amendment in California with every purchase made.

Keywords:

**SEARCH**

Miscellaneous



**CRPA Bumper Sticker**

**Type:** Sticker

Price: $2.99



**Sticker: 2A Defender**

**Type:** Sticker

Price: $1.99



**Collectible 2A Shot Glasses**

**Type:** Drinkware

Price: $7.00



**"Don't Tread on Me" Mousepad**

**Type:** Miscellaneous

Price: $14.95



**Sticker: Fierce About Freedom**



**2022 Weekly Gun Giveaway**

**CRPA RSO STARTER**

**Type:** Sticker

Price: $1.99

**Calendar**

**Type:** Promo

Price: $100.00

**PACKAGE**

**Type:** Instructor/RSO Gear

Price: $40.00  $35.00



$5.00 off

Neon CRM by **Neon One**

---

BE SAFE. SHOOT STRAIGHT. *FIGHT BACK!*

**CRPA** .ORG

CALIFORNIA RIFLE & PISTOL ASSOCIATION

**California Rifle & Pistol Association Headquarters & Training Center**

271 E. Imperial Highway,
Suite 620
Fullerton, California 92835

P: (714) 992-2772
800-305-2772
E: contact@crpa.org

8am to 4:30pm, Monday to Friday

**DONATE NOW**

**SUBSCRIBE**

**Support Your Second Amendment Rights**

The California Rifle & Pistol Association, founded in 1875, provides training in the safe, responsible, and enjoyable use of firearms; sanctions competitive shooting state championships; and fights for the constitutional right to keep

**E-news Subscription**

Follow the latest news, events and activities of the California Rifle & Pistol Association by signing up for our e-news! All subscribers will receive exclusive alerts and invitations to events through out California.

0957

and bear arms for those who choose to own a gun in
California for sport, hunting, or self-defense.

## CRPA VOLUNTEERS

**Volunteer**

Looking for a way for you and your family to get engaged in protecting the Second Amendment? We have all kinds of
opportunities for serving and learning more about what we do.

California Rifle & Pistol Association © 1875-2022

Home      Join CRPA      Donate      Join NRA

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Junior Sports Magazines, Inc., et al. v. Bonta*
Case No.:    2:22-cv-04663-CAS (JCx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**DECLARATION OF RICHARD MINNICH IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Kevin J. Kelly, Deputy Attorney General
kevin.kelly@doj.ca.gov
300 South Spring Street, Suite 9012
Los Angeles, CA 90013
   *Attorney for Defendant*

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 20, 2022.

_____
Laura Palmerin

0959

1  C.D. Michel-SBN 144258
   Anna M. Barvir-SBN 268728
2  Tiffany D. Cheuvront-SBN 317144
   MICHEL & ASSOCIATES, P.C.
3  180 East Ocean Blvd., Suite 200
   Long Beach, CA 90802
4  Telephone: (562) 216-4444
   Fax: (562) 216-4445
5  Email: cmichel@michellawyers.com

6  Attorneys for Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California
   Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting
7  Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA
   Foundation, and Gun Owners of California, Inc.
8
   Donald Kilmer-SBN 179986
9  Law Offices of Donald Kilmer, APC
   14085 Silver Ridge Road
10 Caldwell, Idaho 83607
   Telephone: (408) 264-8489
11 Email: Don@DKLawOffice.com

12 Attorney for Plaintiff Second Amendment Foundation

13            IN THE UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15 JUNIOR SPORTS MAGAZINES          CASE NO: 2:22-cv-04663-CAS (JCx)
   INC., RAYMOND BROWN,
16 CALIFORNIA YOUTH SHOOTING        **DECLARATION OF ALLISON**
   SPORTS ASSOCIATION, INC.,        **RANGEL IN SUPPORT OF**
17 REDLANDS CALIFORNIA              **PLAINTIFFS' MOTION FOR**
   YOUTH CLAY SHOOTING              **PRELIMINARY INJUNCTION**
18 SPORTS, INC., CALIFORNIA
   RIFLE & PISTOL ASSOCIATION,      Hearing Date:    August 22, 2022
19 INCORPORATED, THE CRPA           Hearing Time:    10:00 a.m.
   FOUNDATION, AND GUN              Courtroom:       8D
20 OWNERS OF CALIFORNIA, INC.;      Judge:           Christina A. Snyder
   and SECOND AMENDMENT
21 FOUNDATION,

22            Plaintiffs,

23      v.

24 ROB BONTA, in his official capacity
   as Attorney General of the State of
25 California; and DOES 1-10,

26            Defendant.

27

28

                          1
              DECLARATION OF ALLISON RANGEL

0960

## DECLARATION OF ALLISON RANGEL

1.    I, Allison Rangel, am the President of Redlands California Youth Clay Shooting Sports, Inc. ("RCYCSS"), a plaintiff in the above-entitled action. I make this declaration of my own personal knowledge and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2.    RCYCSS is a 501(c)(3) nonprofit organization incorporated under the laws of the state of California and headquartered in Redlands, California.

3.    RCYCSS is committed to growing clay shooting sports among the youth within the Southern California region. To that end, RCYCSS offers participation in youth clay shooting program, the Redlands Clay Crushers Junior Trap Team, which consists of youth shooters in ages ranging from 10 to 18 years old.

4.    The mission of the Redlands Clay Crushers Junior Trap Team is to allow youth shooters the opportunity to safely and responsibly participate in clay shooting sports, including American Trap, Skeet, International Skeet, Olympic Bunker, and Sporting Clays. RCYCSS and the Redlands Clay Crushers Junior Trap Team consistently focus on firearm safety in a fun, yet skill-based environment. One of their principal goals is to strengthen connections within families and communities through a lifelong love of recreational shooting sports.

5.    Through this program, RCYCSS regularly engages with minors through advertising, marketing, and other communications promoting youth competitive shooting events and practices where firearms, ammunition, and related products are lawfully possessed, handled, and used by youth.

6.    To promote participation and attendance at such events requires that RCYCSS distribute printed and electronic communications concerning these events and programs. These communications might include images and/or written depictions of minors handling or using firearms and related products. These shooting events and programs also involve signage, discussions, branded

2

DECLARATION OF ALLISON RANGEL

1      merchandise, and other communications depicting minors enjoying or otherwise
2      encouraging minors to possess and use lawful firearms for lawful purposes.

3          7.      RCYCSS communicates with its current and prospective youth
4      participants and their parents through its website and on social media. These
5      mediums serve to introduce coaching staff, advertise practice schedules and
6      registration deadlines, provide links to important shooting resources, and promote
7      participation in youth shooting teams generally.

8          8.      RCYCSS also provides recommendations on which firearm and
9      related products are most suitable its young shooters' competitive and recreational
10      shooting needs.

11          9.      The passage of AB 2571 has caused great concern and confusion
12      among our youth shooters and parents, as well as our organization. Indeed,
13      RCYCSS is unsure what can and cannot be communicated to our current and
14      prospective youth participants and their families as a result of AB 2571. We are
15      thus curbing the promotion of events on our website, social media, and any
16      communications to youth in California. We reasonably fear that any attempt by the
17      organization to engage in these activities exposes the organization to substantial
18      liability under AB 2571.

19          10.      But for the enactment and enforcement of AB 2571, we would
20      currently be promoting our various upcoming youth shooting events to minors in
21      the program, encouraging new youth shooter participation, registering youth for the
22      new season, and posting general news and information about participation in youth
23      shooting sports.

24          11.      RCYCSS can no longer provide information on these events to youth,
25      and this will greatly limit the participation and the ability of youth to compete. But
26      for the implementation of AB 2571 RCYCSS would continue to share competitive
27      shooting opportunities and resources with youth in California.

28

1     I declare under penalty of perjury that the foregoing is true and correct.

2   Executed within the United States on July 19, 2022.

3

4

5   Allison Rangel

6   Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

DECLARATION OF ALLISON RANGEL

## CERTIFICATE OF SERVICE
### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Junior Sports Magazines, Inc., et al. v. Bonta*
Case No.:    2:22-cv-04663-CAS (JCx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**DECLARATION OF ALLISON RAN EL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Kevin J. Kelly, Deputy Attorney General
kevin.kelly@doj.ca.gov
300 South Spring Street, Suite 9012
Los Angeles, CA 90013
    *Attorney for Defendant*

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 20, 2022.

Laura Palmerin

CERTIFICATE OF SERVICE

0964

C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA Foundation, and Gun Owners of California, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

JUNIOR SPORTS MAGAZINES INC., RAYMOND BROWN, CALIFORNIA YOUTH SHOOTING SPORTS ASSOCIATION, INC., REDLANDS CALIFORNIA YOUTH CLAY SHOOTING SPORTS, INC., CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, THE CRPA FOUNDATION, AND GUN OWNERS OF CALIFORNIA, INC.; and SECOND AMENDMENT FOUNDATION,

Plaintiffs,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,

Defendant.

CASE NO: 2:22-cv-04663-CAS (JCx)

**DECLARATION OF SAM PAREDES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date:     August 22, 2022
Hearing Time:     10:00 a.m.
Courtroom:        8D
Judge:            Christina A. Snyder

1

DECLARATION OF SAM PAREDES

# DECLARATION OF SAM PAREDES

1.     I, Sam Paredes, am the Executive Director of Gun Owners of California, Inc. ("GOC"), a plaintiff in the above-entitled action. I make this declaration of my own personal knowledge and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2.     GOC is recognized as a 501(c)(4) non-profit mutual benefit corporation under the Internal Revenue Code and a recognized non-profit membership corporation under the state of California. GOC is incorporated in the state of California and is currently headquartered in El Dorado Hills, California.

3.     GOC is dedicated to the preservation and restoration of the Second Amendment in California. It was formed for the express purpose of promoting, encouraging, and advocating for the purchase, use, and ownership of firearms and related products. GOC opposes legislation that it deems harmful to the right to keep and bear arms, while fighting to protect the Second Amendment rights of all Californians at the capitol, in the courts, and through elections. GOC strongly believes that the rights enshrined in the Second Amendment guarantees those enshrined by the First Amendment.

4.     In service of its mission, GOC annually supports youth shooting teams by raising contributing financial resources to their programs and has sponsored individual talented young shooters through their careers as juniors looking to earn scholarships at major universities. Through this work, Plaintiff GOC regularly engages with minors through advertisements, sponsorships, and other communications promoting events where "firearm-related products" are used.

5.     GOC also engages in pure political speech concerning the exercise of the constitutional right to own, possess, and use firearms for lawful purposes, including speech about firearm use and safety, hunting, and the shooting sports.

6.     The passage of AB 2571 has caused great concern within our organization. Indeed, the enactment and enforcement of AB 2571 restricts GOC's

1   ability to engage in speech concerning firearms and related products (including the

2   promotion of its youth scholarship programs for young competitive shooters)

3   directly with minors or in ways that are designed, intended, or reasonably appear to

4   be attractive to minors. This means that GOC must halt or drastically limit the

5   distribution of advertisements, mentions, recruitment information, and other content

6   so that those under 18 years of age are not likely to receive it. Otherwise, I

7   reasonably believe that the organization will be subject to substantial liability under

8   AB 2571 for engaging in such activities.

9       7.    The passage of AB 2571 has also caused great confusion within the

10   organization over what speech is allowed or not allowed under the law. This

11   confusion chills the speech of GOC and its thousands of members across the state

12   because we are unsure what can be said without fear of violating the law and being

13   subject to substantial liability.

14       8.    But for the enactment and enforcement of AB 2571, GOC would

15   continue to engage in speech concerning firearms and related products, including

16   the promotion of its youth scholarship programs for young competitive shooters, as

17   well as its political speech about the rights to keep and bear arms for lawful

18   purposes, including hunting and the shooting sports.

19

20      I declare under penalty of perjury that the foregoing is true and correct.

21   Executed within the United States on July 19, 2022.

22

23

24                                 Sam Paredes

25                                 Declarant

26

27

28

3

DECLARATION OF SAM PAREDES

# CERTIFICATE OF SERVICE
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Junior Sports Magazines, Inc., et al. v. Bonta*
Case No.:      2:22-cv-04663-CAS (JCx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**DECLARATION OF SAM PAREDES IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Kevin J. Kelly, Deputy Attorney General
kevin.kelly@doj.ca.gov
300 South Spring Street, Suite 9012
Los Angeles, CA 90013
  *Attorney for Defendant*

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 20, 2022.

Laura Palmerin

0968

1  C.D. Michel-SBN 144258
   Anna M. Barvir-SBN 268728
2  Tiffany D. Cheuvront-SBN 317144
   MICHEL & ASSOCIATES, P.C.
3  180 East Ocean Blvd., Suite 200
   Long Beach, CA 90802
4  Telephone: (562) 216-4444
   Fax: (562) 216-4445
5  Email: cmichel@michellawyers.com

6  Attorneys for Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California
   Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting
7  Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA
   Foundation, and Gun Owners of California, Inc.
8
9  Donald Kilmer-SBN 179986
   Law Offices of Donald Kilmer, APC
10 14085 Silver Ridge Road
   Caldwell, Idaho 83607
11 Telephone: (408) 264-8489
   Email: Don@DKLawOffice.com

12 Attorney for Plaintiff Second Amendment Foundation

13            IN THE UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15 JUNIOR SPORTS MAGAZINES        CASE NO: 2:22-cv-04663-CAS (JCx)
   INC., RAYMOND BROWN,
16 CALIFORNIA YOUTH SHOOTING      **DECLARATION OF ANNA CANON IN**
   SPORTS ASSOCIATION, INC.,      **SUPPORT OF PLAINTIFFS' MOTION**
17 REDLANDS CALIFORNIA            **FOR PRELIMINARY INJUNCTION**
   YOUTH CLAY SHOOTING
18 SPORTS, INC., CALIFORNIA       Hearing Date:   August 22, 2022
   RIFLE & PISTOL ASSOCIATION,    Hearing Time:   10:00 a.m.
19 INCORPORATED, THE CRPA         Courtroom:      8D
   FOUNDATION, AND GUN            Judge:          Christina A. Snyder
20 OWNERS OF CALIFORNIA, INC.;
   and SECOND AMENDMENT
21 FOUNDATION,

22              Plaintiffs,

23         v.

24 ROB BONTA, in his official capacity
   as Attorney General of the State of
25 California; and DOES 1-10,

26              Defendant.

27

28

                            1

0969

# DECLARATION OF ANNA CANON

1. I, Anna Canon, make this declaration of my own personal knowledge and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2. I am not a party to this litigation, but support Plaintiffs' Motion for Preliminary Injunction and ask this Court to grant the requested relief because of the direct impact that enactment and enforcement of Assembly Bill 2571 has on my work with youth shooting programs.

3. I am currently employed as the Head Coach of the Orland High School Clay Target Team and the State Director of the California State High School Clay Target League.

4. In 2014, I began looking for activities for students that were not in contact sports and discovered sporting clays. I grew up hunting and shooting with firearms and wanted to share that experience with my children. Drawing upon my ability to teach at the high school level, my experience in firearms and hunting, and a desire to share my respect for and support of the constitutional rights we all have to the next generation, I began a youth sporting clay team at Orland High School in Orland, California.

5. I was drawn to the shooting sports because of the ability of all to participate. Currently, we have a student with spina bifida participating on the Orland High School Clay Target Team. The shooting sports provide him with the ability to compete at the high school level just like his brothers and friends.

6. That first year, the team included five students including my sons who had already completed the state course on hunter's safety from the California Department of Fish and Game. But my small starter team grew and eventually joined the California Youth Shooting Sports Association (CYSSA), competing against youth their own ages at numerous ranges in northern and central California.

7. In about 2018, I worked with the USA High School Clay Target

0970

1    League to form the California State High School Clay Target League. We had 36

2    students join that first year from two different schools. Currently, we have 354

3    youth athletes in three disciplines with two seasons shooting trap, sporting clays,

4    and skeet.

5    8.    AB 2571 is, however, making it impossible for the California High

6    School Clay Target League to continue its mission to promote the shooting sports

7    amongst California high schoolers. In fact, the law prompted the organization to

8    halt the promotion of events and recruitment of youth to participate in the next

9    season because such communications necessarily involve the promotion of the use

10   of firearms and related products directly to teens.

11   9.    I can no longer promote the work of the California State High School

12   Clay Target League, our student successes, solicit sponsorships that would promote

13   firearm-related products to youth in the program, or adequately train the team. I

14   reasonably fear that any attempt by the organization to engage in these activities

15   exposes the organization to substantial liability under AB 2571.

16   10.    The entire California State High School Clay Target League is "down"

17   until this Court issues an injunction enjoining the enforcement of the law so that we

18   may resume our work with youth or until we can determine whether there is any

19   way at all to continue our important work notwithstanding the enforcement of AB

20   2571, something that appears highly unlikely.

21   11.    Because of the importance of safety, all of my youth shooters are

22   required to attend California's Hunter's Safety courses, which equip them with the

23   knowledge necessary as a hunter for their entire lives. AB 2571 is, however,

24   extinguishing many vital opportunities for my youth shooters to take these courses.

25   Indeed, many course have been canceled because the trainers and facilities that host

26   these events fear that they cannot train anyone under the age of 18 years.

27   12.    AB 2571 is damaging youth shooting sports for many California

28   students who have used participation in the shooting sports as an instrument to

3

DECLARATION OF ANNA CANON

1  improve their grades, as a break from dealing with tough issues of being a kid, and

2  as a steppingstone to go on to college shooting teams.

3        I declare under penalty of perjury that the foregoing is true and correct.

4  Executed within the United States on July 18, 2022.

5

6                        Anna Canon

7                        Declarant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ANNA CANON

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Junior Sports Magazines, Inc., et al. v. Bonta*
Case No.:    2:22-cv-04663-CAS (JCx)

IT IS HEREBY CERTIFIED THAT:

     I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

     I am not a party to the above-entitled action. I have caused service of:

**DECLARATION OF ANNA CANON IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Kevin J. Kelly, Deputy Attorney General
kevin.kelly@doj.ca.gov
300 South Spring Street, Suite 9012
Los Angeles, CA 90013
   *Attorney for Defendant*

     I declare under penalty of perjury that the foregoing is true and correct.

Executed July 20, 2022.

Laura Palmerin

0973

C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA Foundation, and Gun Owners of California, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNIOR SPORTS MAGAZINES INC., RAYMOND BROWN, CALIFORNIA YOUTH SHOOTING SPORTS ASSOCIATION, INC., REDLANDS CALIFORNIA YOUTH CLAY SHOOTING SPORTS, INC., CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, THE CRPA FOUNDATION, AND GUN OWNERS OF CALIFORNIA, INC.; and SECOND AMENDMENT FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10, <br><br> Defendant. | CASE NO: 2:22-cv-04663-CAS (JCx) <br><br> **DECLARATION OF JAY FITZGERALD IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing Date: August 22, 2022 <br> Hearing Time: 10:00 a.m. <br> Courtroom: 8D <br> Judge: Christina A. Snyder |

0974

## DECLARATION OF JAY FITZGERALD

1.     I, Jay Fitzgerald, make this declaration of my own personal knowledge and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2.     I am not a party to this litigation, but support Plaintiffs' Motion for Preliminary Injunction and ask this Court to grant the requested relief because of the direct impact that enactment and enforcement of Assembly Bill 2571 has on my me and my daughter and our enjoyment of the shooting sports.

3.     I am the father of a junior youth competitive shooter who is a four-time Skeet All American, a three-time Junior World Champion, and a four-time California State Lady Champ in shooting. She is also a minor under the age of 18, residing in California.

4.     Since the passage of AB 2571, because my daughter is a minor living in California, she has been cut off from some of the national youth shooting groups.

5.     For instance, she can no longer receive emails from National Shooting Sports Association, a leading organization in her chosen area of sport, that would otherwise alert her to events and registration information for upcoming competitions.

6.     My daughter is unable to contact USA Shooting, and they are unable to reach out to my daughter, because of her age and the reasonable fear that if they do advertise, market, or otherwise communicate with her (and other minors in California) the organization will expose itself to substantial civil liability under AB 2571.

7.     My daughter has also been unable to log into sites to see future tournaments and standings of the shooters as they compete.

8.     All publications have stopped coming to my daughter, and coaches are cancelling training clinics that she would usually attend. We are unsure if we fly our daughter out of state to train whether the coaches would be in violation of the

2

DECLARATION OF JAY FITZGERALD

law because our daughter is a resident of California.

        9.     Communications that we had with recruiting colleges have stopped because they are unable to communicate with youth in California regarding their shooting teams and opportunities because of her age and the reasonable fear that if they do advertise, market, or otherwise communicate with her (and other minors in California) they will expose themselves to substantial civil liability under AB 2571.

        10.    AB 2571 effectively destroys my daughter's training, opportunities to compete at the Olympic and World levels and has shut down her communications with national groups and recruiters.

        I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on July 19, 2022.

_____
Jay Fitzgerald
Declarant

DECLARATION OF JAY FITZGERALD

0976

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Junior Sports Magazines, Inc., et al. v. Bonta*
Case No.:    2:22-cv-04663-CAS (JCx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**DECLARATION OF JAY FIT    ERALD IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Kevin J. Kelly, Deputy Attorney General
kevin.kelly@doj.ca.gov
300 South Spring Street, Suite 9012
Los Angeles, CA 90013
   *Attorney for Defendant*

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 20, 2022.

_____
Laura Palmerin

CERTIFICATE OF SERVICE

0977

C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California
Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting
Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA
Foundation, and Gun Owners of California, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNIOR SPORTS MAGAZINES INC., RAYMOND BROWN, CALIFORNIA YOUTH SHOOTING SPORTS ASSOCIATION, INC., REDLANDS CALIFORNIA YOUTH CLAY SHOOTING SPORTS, INC., CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, THE CRPA FOUNDATION, AND GUN OWNERS OF CALIFORNIA, INC.; and SECOND AMENDMENT FOUNDATION, | CASE NO: **COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF** **(1) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH];** **(2) VIOLATION OF 42 U.S.C. § 1983 [COMMERCIAL SPEECH];** **(3) VIOLATION OF 42 U.S.C. § 1983 [RIGHT TO ASSOCIATION];** |
| Plaintiffs, | **(4) VIOLATION OF 42 U.S.C. § 1983 [EQUAL PROTECTION]** |
| v. | **FRCP 5.1(a) NOTICE OF UNCONSTITUTIONALITY OF STATE STATUTE** |
| ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10, | |
| Defendant. | |

1

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

Plaintiffs Junior Sports Magazines Inc., Raymond Brown, California Youth Shooting Sports Association, Inc., Redlands California Youth Clay Shooting Sports, Inc., California Rifle & Pistol Association, Incorporated, The CRPA Foundation, and Gun Owners of California, Inc., and the Second Amendment Foundation (collectively, "Plaintiffs"), by and through their respective attorneys, bring this Complaint for Declaratory and Injunctive Relief against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## JURISDICTION AND VENUE

1. The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress

2. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

3. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## INTRODUCTION

4. Plaintiffs bring this suit to challenge the constitutionality of California Business & Professions Code section 22949.80, which makes it unlawful for any "firearm industry member" to "advertise, market, or arrange for placement of an advertising or marketing communication concerning any firearm-related product in

a manner that is designed, intended, or reasonably appears to be attractive to minors." Cal. Bus. & Prof. Code § 22949.80(a)(1).

5. The First Amendment fully protects pure political, ideological, and educational speech. Content- and viewpoint-based restrictions on such speech are especially repugnant to the People's right to free speech. Indeed, "above all else, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972); *see also* The Constitution thus "demands that content-based restrictions on speech be presumed invalid . . . and that the Government bear the burden of showing their constitutionality." *Ashcroft v. Am. Civil Libs. Union*, 535 U.S. 564, 573 (2002).

6. The First Amendment also protects non-misleading commercial speech promoting lawful products or services. That protection is at its highest when the products or services are themselves independently protected by other fundamental rights. And the sale of firearms, ammunition, and firearm parts and accessories is not only legal, but also constitutionally protected by the Second Amendment.

7. Section 22949.80 imposes a content- and speaker-based restriction on protected speech that is viewpoint discriminatory, that serves no legitimate government interest (directly or indirectly), and that is both facially overbroad and far more extensive than necessary to achieve any purported interest. It thus violates Plaintiffs' free speech and commercial speech rights.

8. The First Amendment also protects the right to peaceably assemble and associate. The right to assemble often merges with the right to free expression. For "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1959). "Governmental action which may have the effect of curtailing the freedom to associate is subject to the *closest* scrutiny." *Id.* at 461-62 (emphasis added).

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

0980

9. Section 22949.80 effectively curtails the rights to assemble and associate because it directly prohibits advertising, marketing, or arranging for the placement of advertising or marketing promoting various firearm-related events and programs, where Plaintiffs peaceably and lawfully assemble and associate with each other and members of the public. It also impermissibly restricts pro-gun (but not anti-gun) organizations from promoting membership in or financial support of their organizations in ways that might be deemed "attractive to minors."

10. Finally, for many of the reasons section 22949.80 violates Plaintiffs' right to engage in free speech, it also violates their right to equal protection under the law.

11. What's more, AB 2571 (codified as § 22949.80), clearly violates well-established free speech precedents of the U.S. Supreme Court, making the law frivolous on its face. This may very well have the effect of forcing the California Attorney General's office to defend this statute by making legal contentions that are not warranted by existing law, or even abandoning the defense and enforcement of this statute altogether. *See generally*, *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947 (9th Cir. 2009).

12. Because section 22949.80 violates rights protected by the First and Fourteenth Amendments, Plaintiffs seek equitable relief declaring the law invalid and enjoining its enforcement by Defendants, their employees, agents, successors in office, and all District Attorneys, County Counsel, and City Attorneys holding office in the state of California, as well as their successors in office.

## PARTIES

### [Plaintiffs]

13. Plaintiff JUNIOR SPORTS MAGAZINES, INC. ("Junior Sports Magazines") is a for-profit company incorporated under the laws of the state of Idaho. Plaintiff Junior Sports Magazines is the publisher of the online and print magazine *Junior Shooters*, a publication dedicated to promoting youth of all

involved in all shooting disciplines with readership throughout California. *Junior Shooters* answers questions young and beginner shooters have about firearm safety, guns and gear, protective gear, and more. The magazine also provides information on how to get started in the shooting sports, shooting events, youth shooting organizations and clubs, as well as scholarships available to youth shooters.

14.     Plaintiff RAYMOND BROWN is a resident of Yucaipa, California. Plaintiff Brown is a Level 3 Sporting Clays Instructor—one of only three such instructors in California and the only one located in Southern California. He regularly trains youth in the shooting sports and those participating in high school shooting trap teams. His work includes promoting his courses to youth in the shooting sports and speaking to the youth he trains about firearms and safety.

15.     Plaintiff CALIFORNIA YOUTH SHOOTING SPORTS ASSOCIATION, INC. ("CYSSA") is a non-profit organization incorporated under the laws of the state of California, with headquarters in Valley Springs, California. Plaintiffs CYSSA is committed to promoting and preserving the clay shooting sports among youth in California. To that end, Plaintiff CYSSA offers participation in its youth clay shooting program, the CYSSA Clay Target Program, a team-based youth development program for boys and girls, grades 12 and under, that provides its participants with a positive, life-enhancing experience. It is an opportunity for young people to participate in a supervised, shotgun-shooting sports program taught by certified coaches that emphasizes firearm safety and skill development in clay target shooting. Good sportsmanship, individual responsibility, self-discipline, positive academic progress, and personal commitment are emphasized in the CYSSA program. Plaintiff CYSSA, in partnership with other local clubs, sponsor youth competitive events, like its "Series Shoots" and the State Trap Championships.

16.     Plaintiff REDLANDS CALIFORNIA YOUTH CLAY SHOOTING SPORTS, INC. ("RCYCSS") is a 501(c)(3) non-profit organization incorporated

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

under the laws of the state of California, with headquarters in Redlands, California. Plaintiff RCYCSS is committed to growing clay shooting sports among the youth within the Southern California region. To that end, Plaintiff RCYCSS offers participation in its youth clay shooting program, the Redlands Clay Crushers Junior Trap Team, which consists of youth shooters ranging from age 10-18. The group's mission is to allow youth shooters the opportunity to safely and responsibly participate in clay shooting sports, including American Trap, Skeet, International Skeet, Olympic Bunker, and Sporting Clays. Plaintiff RCYCSS and the Redlands Clay Crushers Junior Trap Team consistently focus on firearm safety in a fun, yet skill-based environment. One of its principal goals is to strengthen connections within families and communities through lifelong recreational shooting sports activities.

17.     Plaintiff CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED ("CRPA") is a non-profit membership organization incorporated under the laws of the state of California, with headquarters in Fullerton, California. Among its other activities, Plaintiff CRPA works to preserve and protect the constitutional and statutory rights of gun ownership, including the right to self-defense and the right to keep and bear arms. Plaintiff CRPA accomplishes this through its educational offerings, publications (including magazines, like "The Firing Line"), member-engagement events, and legislative advocacy and initiatives. Through this lawsuit, Plaintiff CRPA represents not only its own interests as a "firearm industry member" to disseminate information to like-minded individuals, but also the interests of its members, including youth under the age of 18 and their parents and firearms trainers, who support and promote the right to keep and bear arms for lawful purposes.

18.     Plaintiff THE CRPA FOUNDATION ("CRPAF") is a 501(c)(3) non-profit organization incorporated under the laws of the state of California, with headquarters in Fullerton, California. Since 2004, Plaintiff CRPAF has raised funds

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

0983

to benefit eligible programs supportive of advancing its mission and ensuring the
continued fight to protect the Second Amendment rights of all law-abiding citizens
in California who to choose to own a gun for sport, hunting, and personal
protection. Grants from CRPAF benefit a variety of constituencies throughout
California, including youth, women, gun collectors, hunters, target shooters, law
enforcement, adaptive shooters, and those who choose to own a gun to defend
themselves and their families. Plaintiff CRPAF is dedicated to fostering youth
leadership skills through bolstering programs that engage kids, teenagers, and
young adults in wildlife conservation, hunting heritage and traditions, and
competitive and recreational shooting sports. Through its Youth Scholarship
Program, Plaintiff CRPAF supports collegiate bound students that believe in the
preservation of the Second Amendment and conservation of wildlife in California.

19. Plaintiff GUN OWNERS OF CALIFORNIA, INC. ("GOC") is a non-
profit organization incorporated under the laws of the state of California, with
headquarters in El Dorado Hills, California. GOC is dedicated to the restoration of
the Second Amendment in California. To that end, GOC annually supports youth
shooting teams by raising contributing financial resources to their programs and has
sponsored individual talented young shooters through their careers as juniors
looking to earn scholarships at major universities.

20. Plaintiff SECOND AMENDMENT FOUNDATION ("SAF") is a
501(c)(3) non-profit membership organization incorporated under the laws of the
state of Washington. Plaintiff SAF has over 650,000 members and supporters
nationwide, include thousands of members in California. Founded in 1974, Plaintiff
SAF is dedicated to promoting a better understanding of the country's
constitutional heritage to privately own and possess firearms. To that end, Plaintiff
SAF carries on many educational and legal action programs designed to better
inform the public about the gun control debate. It has been a pioneer in innovative
defense of the right to keep and bear arms through its publications, public education

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

programs, legal action, and events like the annual Gun Rights Policy Conference. It is critical to the success of SAF that its promotional material, publications, and messages about the "right to keep and bear arms" be permitted to reach a broad public audience, including minors and young adults. Restrictions on speech "concerning firearm-related products" interfere with that effort. Through this lawsuit, Plaintiff SAF represents not only its own interests as a "firearm industry member" to disseminate information to like-minded individuals, but also the interests of its members, including youth under the age of 18 and their parents and firearms trainers, who support and promote the right to keep and bear arms for lawful purposes.

**[Defendants]**

21.     Defendant ROB BONTA is the Attorney General of the State of California. He is the "chief law officer" of the state, and it his duty to "see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. 5, § 1. Defendant Bonta has "direct supervision over every district attorney" within the State. *Id.* If, at any point a district attorney of the State fails to enforce adequately "any law of the State," he must "prosecute any violations of the law." *Id.* Defendant Bonta is also expressly responsible for enforcing section 22949. Cal. Bus. & Prof. Code § 22949.80(e)(1) (any person who violates this section "is liable for a civil penalty … which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction.") Defendant Bonta maintains an office for service in Los Angeles, California, and is sued in his official capacity.

22.     The true names and capacities of Defendants named as DOEs 1 through 10, inclusive, are individual, corporate, associate or otherwise, and are unknown to Plaintiffs. They are, however, believed to be responsible in some way for Plaintiffs' injuries as alleged herein. Each Doe Defendant is, and at all times

mentioned here was, a partner, agent, principal, co-conspirator, or are otherwise vicariously or directly responsible for the acts or omissions of the other defendants or themselves. They are each sued individually and/or in their official capacity and are joined as party defendants. Plaintiffs thus sue each Doe Defendant under rules 15 and 21 of the Federal Rules of Civil Procedure. Plaintiffs are informed and believed that the Doe Defendants are all California residents. Plaintiffs will amend this complaint to show such true names and capacities of Doe Defendants when they have been ascertained.[1]

## FACTUAL ALLEGATIONS

### [The First Amendment Rights to Free Speech, Association, & Assembly]

23. The First Amendment provides, in part, that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I. It is incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

24. Political and ideological speech—including speech concerning "politics, nationalism, religion, or other matters of opinion"—has long been considered the core of the First Amendment. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

25. The First Amendment does not tolerate the suppression of speech based on what some may label an unpopular viewpoint of the speaker. *John J. Hurley and S. Boston Allied War Vets. Council v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995). Indeed, "*above all else*, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95

---

[1] Section 22949.80(e)(1) authorizes, not only the Attorney General, but also all District Attorneys, County Counsel, and City Attorneys to initiate a civil action alleging a violation of the challenged law. To Plaintiffs' knowledge no such actor has yet filed such an action, but Plaintiffs will immediately amend or move to amend this complaint to show the true names and capacities of such actors should they do so.

0986

1    (emphasis added); *see also Ashcroft*, 535 U.S. at 573.

2       26.    A content-based restriction that implicates political or ideological

3    speech must generally survive "strict scrutiny," where the government must show

4    that the law is narrowly tailored to achieve a compelling government interest. *See*

5    *Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see also Lorillard Tobacco Co. v.*

6    *Reilly*, 533 U.S. 525 (2001) (holding that tobacco marketing restrictions – even

7    those purposed to protecting minors -- must be the narrowest means of achieving an

8    asserted state interest); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011)

9    (overturing California law banning sale or rental of "violent video games" to

10   minors); *see also Tracy Rifle & Pistol LLC v. Harris*, 339 F. Supp. 3d 1007, 1018

11   (E.D. Cal. 2018) (holding that a California law prohibiting the display of a

12   handgun, an imitation handgun, or a placard advertising the sale of a handgun in a

13   manner that is visible from the outside of a gun dealer's premises is

14   unconstitutional).

15      27.    Even purely commercial speech—speech that "does no more than

16   propose a commercial transaction" or relates solely to the economic interests of the

17   speaker and audience—receives First Amendment protection if it is not misleading

18   and concerns a lawful activity. *Cent. Hudson Gas & Elec. Corp. v. Public Serv.*

19   *Comm'n*, 447 U.S. 557 (1980).

20      28.    "An offer to sell firearms or ammunition" is constitutionally protected

21   commercial speech. *Nordyke v. Santa Clara*, 110 F.3d 707, 710 (9th Cir. 2009).

22      29.    Government restrictions on protected commercial speech are

23   constitutional *only* if they directly advance a substantial government interest and are

24   not broader than necessary to serve that interest. *Cent. Hudson*, 447 U.S. 557.[2]

25   _____

26   [2] Though this is currently the controlling test for so-called "commercial
     speech," modern case law is trending toward extending *full* First Amendment
     protection to all speech, including "commercial speech." *See Sorrell v. IMS Health,*
27   *Inc.*, 564 U.S. 552 (moving toward providing commercial speech the same level of
     heightened protection long accorded to political speech); *see also 44 Liquormart,*
28   *Inc. v. Rhode Island*, 517 U.S. 484, 523 (1996) (Thomas, J., concurring in part and
     concurring in judgment) ("I do not see a philosophical or historical basis for

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

0987

30.     The First Amendment protects not only the right of free speech, but also "the right of the people peaceably to assemble." U.S. Const., amend. I. The right to assemble often merges with the right to free expression. For "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Patterson*, 357 U.S. 449, 462 (1958). "Governmental action which may have the effect of curtailing the freedom to associate is subject to the *closest* scrutiny." *Id.* at 461-62.

**[The Fourteenth Amendment Right to Equal Protection Under the Law]**

31.     The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

32.     Singling out speakers because of the content of their speech also violates their fundamental rights under the Equal Protection Clause. U.S. Const. amend. XIV.

33.     If unequal treatment occurs in the context of exercising a fundamental right, or the government is motivated by animus toward a disfavored group, courts apply heighted scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see also Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985); *Romer v. Evans*, 517 U.S. 620 (1996). Indeed, "[b]ecause the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest." *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 666 (1990), *rev'd on other grounds*, *Citzs. United v. Fed. Elec. Comm'n*, 558 U.S. 310, 130 S. Ct. 876 (2010).

---

asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech. Indeed, some historical materials suggest to the contrary.").

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

**[California Laws Regarding Minors and Firearms]**

34.     California law restricts the possession, use, and acquisition of firearms by minors. *See* Cal. Penal Code §§ 29610-29750.

35.     While California's restrictions on firearm possession by minors may appear broad, they are greatly tempered by a non-exhaustive list of statutory exceptions authorizing a variety of lawful uses, as well as the constitutional right to keep and bear arms for lawful purposes, including the core lawful purpose of self-defense.

36.     Indeed, California Penal Code section 29750 makes clear that it was *not* the Legislature's intent "to expand or narrow the application of the then-existing statutory and judicial authority as to the rights of minors to be loaned or to possess live ammunition or a firearm for the purpose of self-defense or the defense of others." The law is quite clear that minors do indeed possess a right to possess and use firearms for self-defense and defense of others and that the laws are not meant to restrict or prohibit that right.

37.     That said, current California law purports to otherwise prohibit minors from possessing handguns and semiautomatic centerfire rifles (and beginning July 1, 2023, any type of firearm). Cal. Penal Code § 29610. Minors also cannot possess live ammunition. *Id.* § 29650.

38.     But the exceptions to these restrictions are numerous and non-exhaustive. Common to all of the exceptions is that the minor be engaged in, or be in direct transit to or from, "a lawful, recreational sport" which includes, "*but is not limited to*, competitive shooting, or agricultural, ranching, or hunting activity or hunting education, or a motion picture, television, or video production, or entertainment or theatrical event, the nature of which involves the use of a firearm." Cal. Penal Code § 29615 (exceptions for possession of firearms); *id.* § 29655 (exceptions for possession of live ammo).

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

0989

39. Some of the exceptions to California's restrictions on firearm possession by minors do not even require the presence of a parent or legal guardian. This can include situations where the minor only has the express written permission of their parent or legal guardian to possess a firearm. *See, e.g.*, Cal. Penal Code § 29615(c)-(e).

40. California also prohibits any "person, corporation, or firm" from selling, loaning, or transferring a firearm to a minor, or selling a handgun to an individual under 21 years of age, *except in certain circumstances*. Cal. Penal Code § 27505.

41. As applied to laws restricting the "loan" of a firearm to a minor, the applicable exceptions first look to the relationship of the person to the minor (i.e., whether they are the parent/legal guardian or someone else) and the type of firearm being loaned (e.g., whether it is a semiautomatic centerfire rifle, handgun, some other type of firearm). *See* Cal. Penal Code § 27505(b)(2)-(5). Notably, here again, the law makes clear the minor need not always be accompanied by a parent, legal guardian, or responsible adult. And all of the exceptions use the same "lawful, recreational sport" language as above.

### [California's Assembly Bill 2571 (Bauer-Kahan)]

42. Assembly member Rebecca Bauer-Kahan introduced AB 2571 on or about February 18, 2022. Assem. Bill 2571, 2021-2022 Reg. Sess. (Cal. 2022) (attached hereto as **Exhibit A**). The source of the bill was Governor Gavin Newsom. Sen. Rules Comm., Bill Analysis Re: AB 2571 (Bauer-Kahan), 2021-2022 Reg. Sess., at 1 (Cal. 2022).

43. AB 2571 passed both houses of the California Legislature and was presented to Governor Gavin Newsom at or around 2:30 p.m. on June 30, 2022.

44. Governor Newsom approved AB 2571 the very same day.

45. Because AB 2571 was passed as an "urgency statute necessary for the immediate preservation of the public peace, health, or safety," AB 2571 took effect

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

immediately upon Governor Newsom's approval on June 30, 2022. Ex. A.

46. AB 2571, which added section 22949.80 to the California Business & Professions Code,[3] makes it unlawful for any "firearm industry member" to "advertise, market, or arrange for placement of an advertising or marketing communication concerning any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors." Cal. Bus. & Prof. Code § 22949.80(a)(1).

47. AB 2571 defines "minor" as a "natural person under 18 years of age who resides in" California. *Id.* § 22949.80(c)(7).

48. Though the phrase "reasonably appears to be attractive to minors" is extraordinarily vague and open to broad interpretation based on one's subjective opinion, AB 2571 provides some guidance for the courts "[i]n determining whether marketing or advertising concerning a "firearm-related product" is attractive to minors. *Id.* § 22949.80(a)(2).

49. Specifically, under AB 2571, "a court shall consider the totality of the circumstances." This includes, *but is not limited to*, considering whether the marketing or advertising:

(A) Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.

(B) Offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals, that promotes a firearm industry member or firearm-related product.

(C) Offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors.

(D) Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

(E) Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

---

[3] Throughout this complaint, Plaintiffs refer to the challenged law, California Business & Professions Code section 22949.80, as "AB 2571."

0991

(F) Is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

*Id.* § 22949.80(a)(2).

50. AB 2571 defines "firearm industry members" in two ways:

(A) A person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products.

(B) A person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products that does one of the following:

(i) Advertises firearm-related products.

(ii) Advertises events where firearm-related products are sold or used.

(iii) Endorses specific firearm-related products.

(iv) Sponsors or otherwise promotes events at which firearm-related products are sold or used.

*Id.* § 22949.80(c)(4).

51. AB 2571 thus does not bar members of the (politically popular) book, movie, television, and video game industries from "advertising, marketing, or arranging for the placement of an advertising or marketing communication concerning any firearm-related product" even though the author of AB 2571 expressly identifies the "slick advertising" of such products in children's books, cartoons, and video games as sources of "shameless" advertising of "weapons" to children. Sen. Judiciary Comm., Bill Analysis Re: AB 2571 (Bauer-Kahan), 2021-2022 Reg. Sess., at 9 (Cal. 2022) (attached hereto as **Exhibit B**).

52. AB 2571 does, however, apply to (politically unpopular) organizations formed to promote and preserve the Second Amendment rights to keep and bear arms, organizations that offer competitive and recreational shooting programs, businesses that offer shooting skills courses and/or firearm-safety training, and gun

0992

1  show promoters, as well as firearms manufacturers and retailers. Cal. Bus. & Prof.

2  Code § 22949.80(c)(4).

3       53.    AB 2571 defines "firearm-related product" as any "firearm,

4  ammunition, reloaded ammunition, a firearm precursor part, a firearm component,

5  or a firearm accessory that meets any of the following conditions":

6          (A)  The item is sold, made, or distributed in California.

7          (B)  The item is intended to be sold or distributed in
                California.

8
           (C)  It is reasonably foreseeable that the item would be
9               sold or possessed in California.

10         (D)  Marketing or advertising for the item is directed to
                residents of California.

11 *Id.* § 22949.80(c)(5).

12      54.    Under AB 2571, "marketing or advertising" means "in exchange for

13 monetary compensation, to make a communication to one or more individuals, or to

14 arrange for the dissemination to the public of a communication, about a *product or*

15 *service the primary purpose of which is to encourage recipients of the*

16 *communication to purchase or use the product or service*." *Id.* § 22949.80(c)(6)

17 (emphasis added).

18      55.    AB 2571 is thus not limited to advertising or marketing

19 communications that propose an economic transaction like the purchase or sale of

20 "firearm-related products," including firearms, ammunition, reloaded ammunition,

21 firearm precursor parts, firearm components, or firearm accessories.

22      56.    Rather, it applies to *any communication*, made in exchange for

23 monetary compensation, "*concerning* a firearm-related product" that is "designed,

24 intended or reasonably [appears] to be attractive to youth" if the communication is

25 made by a "firearm industry member" for the purpose of encouraging "recipients of

26 the communication to purchase or *use* the product or *service*." *Id.* § 22949.80(a)(1),

27 (c)(6) (emphases added).

28      57.    AB 2571 thus restricts honest and lawful commercial speech

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

0993

promoting lawful activities and services, including, but not limited to, traditional advertisements for youth shooting competitions, youth recreational shooting and outdoors events, firearm- and hunter-safety courses, shooting skills courses, and youth organization shooting programs.

58. AB 2571 also bans a broad category of pure speech, including, *but not limited to:*

    a. All (or nearly all) aspects of youth hunting and shooting magazines and the websites, social media, and other communications promoting those magazines;

    b. Articles, cartoons (including political cartoons), and photographs promoting or depicting the use of "firearm-related products" by minors in magazines intended for a broader audience including adults;

    c. Videos, cartoons, coloring books, posters, social media posts, and youth education campaigns by gun rights organizations and/or firearms trainers encouraging youth to take up lawful recreational or competitive shooting activities or teaching about firearm safety;

    d. Branded merchandise, giveaways, or "swag"— including, but not limited to, t-shirts, hats, other clothing, stickers, pins, buttons, toys, games, and stuffed animals—by a "firearm industry member" that promotes a "firearm industry member," *including nonprofit Second Amendment organizations*, or contains pro-gun slogans and political messages;

    e. Any communication made by a "firearm industry member" "in exchange for monetary compensation" that encourages the recipient of the communication to exercise their Second Amendment rights to purchase or use firearms or other firearms-related products generally, like coaching or speaking with youth about taking firearms training or getting involved with a youth shooting team;

    f. Youth firearm- and hunter-safety courses and youth shooting skills courses, as well as recommendations or endorsements by firearms trainers concerning the most appropriate firearms, ammunition, and accessories for young and beginner shooters; and

    g. Signage, flyers, posters, discussions, branded merchandise and giveaways, and/or other communications generally depicting minors enjoying

17

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

or otherwise encouraging minors to enjoy their Second Amendment right to possess and use lawful firearms for lawful purposes at youth recreational and competitive shooting events, as well as communications promoting such events;

h. Use of Daisy® BB guns, like the famous Daisy® Red Ryder, and the Daisy® inflatable BB Gun Range and similar products by gun-rights organizations at events to introduce youth to firearms—usually for the very first time—in a safe and controlled environment in order to encourage youth to take up the shooting sports and/or become youth members of the sponsoring organization; and

i. Communications soliciting funds for scholarships and grants for youth shooters and youth shooting teams.

59. Any person who violates AB 2571 "shall be liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction." *Id.* § 22949.80(e)(1).

60. AB 2571 mandates that courts "shall impose a civil penalty … for each violation" of the law, instructing courts to consider any number of relevant circumstances when assessing the appropriate fine, including, but not limited to:

the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

*Id.* § 22949.80(e)(2).

61. AB 2571 also mandates that courts "shall also order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the court deems necessary to prevent the harm described in this section. *Id.* § 22949.80(e)(4).

62. AB 2571 also authorizes any "person harmed by a violation of this section" to "commence a civil action to recover their actual damages." *Id.* §

22949.80(e)(3).

63.     AB 2571 also includes a fee-shifting provision, mandating that, upon a motion, courts "shall award reasonable attorney's fees and costs, including expert witness fees and other litigation expenses, to a plaintiff who is a prevailing party in an action brought pursuant to" AB 2571. *Id.* § 22949.80(e)(5).

64.     AB 2571 does not, however, authorize an award of attorney's fees and costs, including expert witness fees and other litigation expenses, to a defendant who is a prevailing party in an action brought pursuant to AB 2571—even if such an action is frivolous or without merit. *Id.*

## [The Impact of AB 2571 on Plaintiffs' Protected Conduct]

65.     Plaintiffs regularly "advertise, market, or arrange for placement of an advertising or marketing communication concerning … firearm-related product[s] in a manner that is designed, intended, or [might] reasonably appear[] to be attractive to minors."

66.     Specifically, all Plaintiffs engage in the planning, advertising, marketing, promoting, sponsoring, hosting, and/or facilitating of lawful events, competitions, trainings, educational programs, safety courses, and/or gun shows, specifically for youth or where youth are extremely likely to be in attendance and where youth lawfully use, handle, observe, and/or otherwise possess firearms, ammunition, and/or firearm parts.

67.     These programs regularly involve signage, flyers, discussions, branded merchandise and giveaways, and/or other communications depicting minors enjoying or otherwise encouraging minors to enjoy their Second Amendment right to possess and use lawful firearms for lawful purposes, including hunting, recreational and competitive shooting, and firearm safety programs.

68.     Plaintiffs also widely distribute printed and electronic communications promoting these events and programs. These communications regularly include images and/or depictions of minors handling or "using firearm-related products."

0996

69.     These programs also sometimes include vendors or exhibitors, like Plaintiffs CRPA and SAF, who set up a booth or table to, among other things, promote membership or financial support of their organization; sell or distribute branded merchandise or merchandise with pro-gun slogans and other political messages; disseminate books, pamphlets, coloring books, flyers, and other communications promoting the use of firearms and related products generally, the Second Amendment, firearm safety, and participating in recreational or competitive shooting programs; or sell or advertise for sale firearms and related products and services.

70.     Plaintiff Junior Sports Magazines, the publisher of the online and print magazine *Junior Shooters*, publishes and distributes "a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults." *Junior Shooters* regularly includes and, but for the enforcement of AB 2571, would continue to include articles and images or depictions of the use of "firearm-related products" by minors, as well as recommendations and endorsements of specific "firearm-related products" appropriate for young and beginner recreational and competitive shooters. AB 2571 prohibits this otherwise protected speech.

71.     Plaintiff Junior Sports Magazine's publications also include communications and articles promoting its partners' and advertisers' youth shooting competitions, youth recreational shooting and outdoors events, youth shooting organizations and clubs, firearm-safety courses, and shooting skills courses. AB 2571 prohibits this otherwise protected speech.

72.     Plaintiff Junior Sports Magazine's publications also include traditional advertisements for "firearm-related products." AB 2571 prohibits this otherwise protected commercial speech.

73.     To be clear, Plaintiff Junior Sports Magazine's traditional advertising of "firearm-related products" is not designed or intended to encourage minors to

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

unlawfully buy firearms themselves. Rather, Plaintiffs' communications might "reasonably appear[] to be attractive to minors" because they are attractive to everyone—including adults—and/or they are intended for an audience of minors who may want to ask their parents to lawfully purchase "firearm-related products" for the minor's lawful use.

74.     Plaintiff Brown, as a firearms trainer, regularly engage in the planning, advertising, marketing, and facilitation of shooting-skills courses and firearm-safety courses specifically for youth or where youth are extremely likely to be in attendance and where youth lawfully use, handle, observe, and/or otherwise possess firearms, ammunition, and/or firearm parts.

75.     Plaintiff Brown's training programs regularly involve communications depicting minors enjoying or otherwise encouraging minors to enjoy their Second Amendment right to possess and use lawful firearms for lawful purposes, including hunting, recreational and competitive shooting, and firearm safety programs. AB 2571 prohibits this otherwise protected speech.

76.     Plaintiff Brown's firearm training programs might also include recommendations on which "firearm-related products" are most suitable for young and/or beginner shooters in terms of ease of use, safety features, size, and/or type of use. AB 2571 prohibits this otherwise protected speech.

77.     Plaintiffs CYSSA, RCYCCS, CRPA, and CRPA Foundation regularly engage in the planning, advertising, marketing, promoting, sponsoring, hosting, and/or facilitating of youth recreational events and shooting competitions specifically for youth or where youth are extremely likely to be in attendance and where youth lawfully use, handle, observe, and/or otherwise possess firearms, ammunition, and/or firearm parts.

78.     Plaintiffs CYSSA, RCYCCS, CRPA, and CRPAF's youth programs regularly involve signage, flyers, discussions, branded merchandise and giveaways, and/or other communications depicting minors enjoying or otherwise encouraging

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

minors to enjoy their Second Amendment right to possess and use lawful firearms for lawful purposes, including hunting, recreational and competitive shooting, and firearm safety programs. AB 2571 prohibits this otherwise protected speech.

79.     These Plaintiffs also widely distribute printed and electronic communications promoting these events and programs. These communications regularly include images and/or depictions of minors handling or "using firearm-related products." AB 2571 prohibits this otherwise protected speech.

80.     These programs also sometimes include vendors or exhibitors, like Plaintiffs CRPA, who set up a booth or table to, among other things, promote membership or financial support of their organization; sell or distribute branded merchandise or merchandise with pro-gun slogans and other political messages; disseminate books, pamphlets, coloring and activity books, flyers, and other communications promoting the use of firearms and related products generally, the Second Amendment, firearm safety, and participating in recreational or competitive shooting programs; sell or advertise for sale firearms and related products and services. AB 2571 prohibits this otherwise protected speech.

81.     Plaintiff CYSSA, a non-profit organization "formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products," offers participation in its youth clay shooting program, the CYSSA Clay Target Program, a team-based youth development program for boys and girls, grades 12 and under.

82.     Through this program, Plaintiff CYSSA regularly engages with minors through advertising, marketing, and other communications promoting youth competitive shooting events and practices where "firearm-related products" are used and providing recommendations on which "firearm-related products" are most suitable its young shooters' competitive and recreational shooting needs. AB 2571 prohibits this otherwise protected speech.

83.     Plaintiff CYSSA also widely distributes printed and electronic

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF
0999

communications promoting its youth competitive events and practices. These communications regularly include images and/or depictions of minors handling or "using firearm-related products." AB 2571 prohibits this otherwise protected speech.

84. Plaintiff RCYCSS, a non-profit organization "formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products," fields its own youth shooting team, the Redlands Clay Crushers Junior Trap Team, which consists of youth shooters ranging from age 10-18.

85. Through this program, Plaintiff RCYCSS regularly engages with minors through advertising, marketing, and other communications promoting youth competitive shooting events and practices events where "firearm-related products" are used and providing recommendations on which "firearm-related products" are most suitable its young shooters' competitive and recreational shooting needs. AB 2571 prohibits this otherwise protected speech.

86. Plaintiff RCYCSS also widely distributes printed and electronic communications promoting its youth competitive events and practices. These communications regularly include images and/or depictions of minors handling or "using firearm-related products." AB 2571 prohibits this otherwise protected speech.

87. Plaintiff CRPA, a non-profit member organization "formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products," not only promotes, sponsors, and hosts firearms programs for youth like those described above, it is also rolling out paid memberships for youth and uses CRPA-branded merchandise and giveaways (or "swag"), including but not limited to hats, t-shirts, stuffed animals, coloring and activity books, stickers, pins, and buttons, to promote the organization and solicit memberships and/or financial support, as well as to spread pro-gun messages and

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

1000

slogans. AB 2571 prohibits this otherwise protected speech.

88.     AB 2571 *does not*, however, prohibit anti-gun organizations not "formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products," like Moms Demand Action for Gun Sense in America, Gun Free Kids, and Everytown for Gun Safety, from offering and soliciting youth memberships or using branded merchandise, like hats, t-shirts, stuffed animals, coloring and activity books, stickers, pins, and buttons, bearing anti-gun messages and slogans—or even images of *unlawful* firearms—to spread their political messages, promote their organizations, or solicit memberships and/or financial support.

89.     Plaintiff CRPA also publishes and distributes various publications, including magazines, that have included and, but for the enforcement of AB 2571, would continue to include cartoons (including political cartoons), as well as articles and images or depictions of the use of "firearm-related products" by minors. AB 2571 prohibits this otherwise protected speech.

90.     Plaintiff CRPA's publications also include advertisements promoting CRPA's and CRPA partners' youth shooting competitions, youth recreational shooting and outdoors events, firearm- and hunter-safety courses, and shooting skills courses. AB 2571 prohibits this otherwise protected speech.

91.     Plaintiff CRPA's publications also include traditional advertisements for "firearm-related products." AB 2571 prohibits this otherwise protected commercial speech.

92.     To be clear, Plaintiff CRPA's traditional advertising of "firearm-related products" is not designed or intended to encourage minors to unlawfully *buy* firearms themselves. Rather, Plaintiffs' communications might "reasonably appear[] to be attractive to minors" because they are attractive to *everyone*— including adults—and/or they are intended for an audience of minors who may want to ask their parents to lawfully purchase "firearm-related products" for the

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

1001

1    minor's lawful use.

2        93.    Plaintiff CRPAF, a 501(c)(3) non-profit organization "formed for the

3    express purpose of promoting, encouraging, or advocating for the purchase, use, or

4    ownership of firearm-related products," not only promotes, sponsors, and hosts

5    firearms programs for youth like those described above, it also solicits funds for

6    and provides scholarships and grants for individual youth shooters and youth

7    shooting teams, publishes brochures and articles about youth shooting teams, and

8    (in response to countless requests from CRPA and CRPAF supporters for such

9    content) is launching an activity book about the shooting sports for children. AB

10    2571 prohibits this otherwise protected speech.

11        94.    Plaintiff GOC, a non-profit member organization "formed for the

12    express purpose of promoting, encouraging, or advocating for the purchase, use, or

13    ownership of firearm-related products," regularly supports youth shooting teams

14    and individual talented young shooters through sponsorships and other support.

15    Through this work, Plaintiff GOC regularly engages with minors through

16    advertisements, sponsorships, and other communications promoting events where

17    "firearm-related products" are used. AB 2571 prohibits this otherwise protected

18    speech.

19        95.    Plaintiff SAF, a non-profit member organization "formed for the

20    express purpose of promoting, encouraging, or advocating for the purchase, use, or

21    ownership of firearm-related products," sponsors and supports an initiative called

22    2AGaming, an outreach program with the goal of growing the Second Amendment

23    Community. 2AGaming functions by reaching out to people who play video games,

24    especially people who play games that focus on guns. This outreach necessarily

25    includes minors and young adults who play such games. Part of the purpose of

26    2AGaming is to persuade gamers, whose experience with firearms may—at first—

27    be limited to a digital experience, to seek out friends and shooting clubs to obtain

28    the necessary training and make that first trip to a range for a live fire experience.

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF
1002

Plaintiff SAF hopes to educate the younger generation on safety and where their gun rights come from; and also seek to shift the political culture in the United States from one that demonizes and fears guns, to an attitude of respect and protection for our nation's Second Amendment heritage.[4]

96. Plaintiff SAF also produces SAF-branded merchandise or "swag" that it distributes to promote itself, to increase paid memberships, encourage participation in shooting sports, and spread its Second Amendment message. The ban on merchandizing codified in AB 2571 would include a ban on SAF branded t-shirts, hats, other clothing, toys, games, pins, stickers, buttons, etc. that "promote" a "firearm industry member."

97. As a result of the adoption and immediate enforcement of AB 2571, Plaintiffs have already begun to curtail these activities, as well as all manner of speech that could arguably fall under AB 2571's ban on speech—fearing the draconian penalties that attach to each incident of marketing barred by AB 2571, including fines up to $25,000 *per copy or reproduction of the communication* and an award of actual damages and attorney's fees and costs to any prevailing plaintiff who brings an action alleging a violation of AB 2571.

98. AB 2571 thus has the practical effect of wiping out a vital outlet for the free exchange of ideas related to the lawful possession and use of lawful "firearm-related products" and for the promotion and preservation of the "gun culture" in California through the passing down of pro-gun attitudes and traditions to future generations.

99. Both on its face and as evidenced by the legislative history of AB 2571, this appears be the very purpose and intent of the law.

100. Indeed, the Senate Judiciary Committee's June 10, 2022, Bill Analysis

---

[4] Information about 2AGaming can be found at https://www.saf.org/gaming/. The program has received favorable press coverage at https://www.breitbart.com/politics/2020/01/30/2nd-amendment-gaming-spreading-gun-rights-message-via-video-games/.

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

1003

of AB 2571, quotes heavily from the Violence Policy Center's ("VPC") 2016

report, *Start Them Young*, which disparagingly "outlines the *problem*" of the "gun

industry's" attempts to "attract future legal gun owners" thusly:

> The gun industry has long understood that it faces a slow-motion demographic collapse. With the industry's customer base growing older, household gun ownership in America has steadily declined. As its primary market of white males ages and dies off, the firearms industry has set its sights on America's children. Much like the tobacco industry's search for replacement smokers, the gun industry is seeking replacement shooters to purchase its deadly products. Firearms companies have teamed up with "corporate partners" like the National Rifle Association of America, the gun industry's trade association the National Shooting Sports Foundation (NSSF), and online publications such as Junior Shooters in an industry-wide effort to market firearms to kids. They do this by promoting websites and magazines targeted at children, designing "kid-friendly" guns to appeal to the youth market, and even working to create the equivalent of "'reality' video" games to encourage gun use from an early age.
>
> **The industry's focus on recruiting children into the gun culture has been acknowledged since at least the 1990s.**

Ex. B at 7-8 (quoting Josh Sugarman, Violence Policy Center, *"Start Them Young"*

*How the Firearms Industry and Gun Lobby Are Targeting Your Children* (Feb.

2016), *available at* https://www.vpc.org/studies/startthemyoung.pdf (attached

hereto as **Exhibit C**)) (emphasis added).

      101.   The Senate Judiciary Committee's analysis continues, quoting a New

York Times article lauding the VPC report:

> The gun industry markets a variety of products explicitly to children, a new report shows, from armed stuffed animals to lighter versions of rifles. *And some see kids as a vital group of future gun buyers who need to be brought into the fold at a young age.*
>
> The report, called "Start Them Young" and issued on Thursday by the Violence Policy Center, lists a variety of firearms meant at least partly for children. It mentions the Crickett rifle, a gun made for children by the company Keystone Sporting Arms. Keystone's website and some of its merchandise bear the image of "Davey Crickett," a gun-wielding cartoon insect. The company sells Davey

Crickett hats, dog tags and pins, as well as a Davey Crickett Beanie Baby, listed as "not for children under three years of age."

Keystone's website also sells books featuring "Little Jake," a boy who uses his gun to bring down a bear and save an African village from a marauding elephant. The publisher of the books says Little Jake is actually older than he looks: "Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision."

Ex. B at 8-9 (quoting Anna North, *Marketing Guns to Children*, N.Y. Times (Feb. 19, 2022), *available at* https://archive.nytimes.com/takingnote.blogs.nytimes.com/2016/02/19/marketing-guns-to-children/ (attached hereto as **Exhibit D**)) (emphasis added).

102.    The New York Times article explains that "the [VPC] report makes the case that the gun industry and some gun-rights advocates see putting guns in the hands of children as a crucial recruitment move." It goes on to quote the editor-in-chief of Plaintiff Junior Sports Magazines' *Junior Shooters*, who wrote in 2012, that:

Each person who is introduced to the shooting sports and has a positive experience *is another vote in favor of keeping our American heritage and freedom alive*. They may not be old enough to vote now, but they will be in the future. And think about how many lives they will come in contact with that they can impact!

Ex. D (emphasis added). It is thus clear that the Legislature understood the importance of engaging youth in the shooting sports for the preservation of the "gun culture" and, in fact, intended AB 2571 to serve as a barrier to that constitutionally protected conduct.

103.    Further evidencing the intent of AB 2571 are the bill's author's own words:

This epidemic of deadly violence is fueled by an industry that *encourages children to hold a gun as soon as they can walk*.

28

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

1005

> Gun manufacturers view children as their next generation of **advocates** and customers, and target them with slick advertising – even children's books. The advertising for these weapons is shameless. Children in California are not allowed to buy or own a gun, yet they are advertised to across all forms of media with cartoons, video games, and social media.
>
> ….
>
> Guns are not a toy. Guns are a tool of death. Taking away this **tool of violent indoctrination** from the gun industry is a vital step forward to protect California's children.

Ex. B at 9 (emphases added).

104.   Setting aside the obvious hyperbole and the animus evident from the author's words, it is clear that the intent of AB 2571 was not simply to keep unlawful firearms out of the hands of minors and to prevent unlawful use of firearms, but to prevent "firearm industry members," which by the very terms of AB 2571 include pro-Second Amendment organizations and youth shooting programs, from "indoctrinating" youth to become "advocates" for the Second Amendment and "gun culture" in America.

105.   Then, on July 1, 2022, after signing AB 2571 into law, Governor Newsom recorded and posted to his official Twitter feed a message to "the members of the United States Supreme Court" and to "right-wing Republicans across this country," rhetorically asking them:

> *Do you have no common decency*, respect, or even common understanding that kids should not have one of these [referring to a semi-automatic rifle in his hands]? This is an AR-15. This is a weapon of war. A weapon of mass destruction. But you're out there promoting and allowing marketing of these weapons of war to our kids. Supporting and celebrating gun manufacturers who put up advertisements like the ones you see behind me. These are cartoon skulls will pacifiers in them. His and her pacifiers. Cartoon skulls of children with pacifiers. *That is what the right wing is marketing and promoting* at behest of the gun industry in this country. The good news, if there's any, is that this ends at least today in California. I just signed a bill, so the gun industry *and those that are backing this industry* can no longer market to our children. *The idea that we even have to do this is ridiculous.* This law, by the way, goes into effect

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

immediately. Because *decent human beings, people with common sense, know that we should not be allowing this kind of disgusting marketing to go on another day.*

Rosalio Ahumada, *Gavin Newsom Signs New Gun Safety Laws Targeting Illegal Weapons, Marketing to Kids*, Sac. Bee (July 1, 2022), *available at* https://www.sacbee.com/news/local/crime/article263108183.html (the entire video of Governor Newsom's remarks is available on the Sacramento Bee website, as well as the official Twitter page of the Office of the Governor of California).

106.   In his recorded statement, Governor Newsom reproduced and displayed advertising from WEE1 Tactical of their JR-15, *id.*—the very advertising that seemingly sparked California's concern over firearm marketing that has been prevalent in America for generations, *see* Ex. B at 8. But because Governor Newsom is not a "firearm industry member" whose primary purpose is to encourage his audience to "purchase or use the product," but rather to disparage those whose viewpoints do not align with his and those who *would* use the product, Governor Newsom is free to reproduce and display the very same images WEE1 Tactical is now barred from distributing.

### FIRST CAUSE OF ACTION
#### Violation of Right to Free Speech Under U.S. Const., amend. I
#### Political & Ideological Speech
#### 42 U.S.C. § 1983
(By All Plaintiffs Against All Defendants)

107.   Plaintiffs incorporate by reference paragraphs 1 through 106 of this complaint as though fully set forth herein in their entirety.

108.   Defendants, acting under color of state law, are enforcing AB 2571, which deprives Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

109.   On its face and as applied, AB 2571 is an unconstitutional abridgement of Plaintiffs' right to free speech under the First Amendment because it casts such a wide net that it directly prohibits Plaintiffs' pure speech related to the lawful possession and use of lawful firearms without any compelling governmental

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

1     interest.

2          110.   On its face and as evidenced by the legislative history of AB 2571, it is

3     clear that the law's purpose and intention is to thwart the promotion and

4     preservation of the "gun culture" in California through the passing down of pro-gun

5     attitudes and traditions to future generations. AB 2571 is thus a "presumptively

6     unlawful" content-based and viewpoint-discriminatory restriction of speech.

7          111.   On its face, AB 2571 does not apply to similar or opposing speech

8     made by businesses, organizations, or people who are not considered "firearm

9     industry members." AB 2571 is thus a "presumptively unlawful" content-,

10    viewpoint-, and speaker-based restriction on speech.

11         112.   Defendants have no compelling (or even legitimate) governmental

12    interest in banning Plaintiffs' pure speech concerning "firearm-related products."

13    Indeed, the State's purported interests in "ensuring that minors do not possess these

14    dangerous weapons" and "protecting its citizens … from gun violence" are betrayed

15    by the fact that California does not directly ban the possession of many "firearm-

16    related products" by minors for lawful purposes under a broad range of

17    circumstances.

18         113.   Further, AB 2571 is neither narrowly tailored to nor the least

19    restrictive means of achieving the state's dubious interests. Indeed, it sweeps up *all*

20    communications "*concerning* firearm-related products" made by "firearm industry

21    members" "in exchange for monetary compensation" that are "designed, intended,

22    or reasonably appear[] to be attractive minors"—even communications concerning

23    lawful (and constitutionally protected) products and services and communications

24    that are equally attractive to adults who have a right to obtain information about

25    such products and services.

26         114.   AB 2571 is unconstitutionally overbroad because, in an effort to

27    restrict commercial advertising promoting the sale of "firearm-related products" to

28    minors, the law seriously and deliberately burdens a vast amount of speech that

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF
1008

does not constitute such a communication and is fully protected by the First Amendment.

115.   Even if AB 2571 was not written with the intention of barring events, competitions, firearm safety programs, or shooting skills courses for youth (and the advertising, marketing, and other communications necessarily attendant to these programs) or to prevent firearms-related organizations from soliciting members through marketing to and providing memberships for minors, that is its effect. Indeed, AB 2571 is so hopelessly vague and confusing that Plaintiffs have already begun to curtail all manner of speech that could arguably fall under AB 2571's overly broad ban. This "chilling" of speech also offends the First Amendment.

116.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to free speech, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

## SECOND CAUSE OF ACTION
### Violation of Right to Commercial Speech Under U.S. Const., amend. I
### 42 U.S.C. § 1983
(By All Plaintiffs Against All Defendants)

117.   Plaintiffs incorporate by reference paragraphs 1 through 116 of this complaint as though fully set forth herein in their entirety.

118.   Defendants, acting under color of state law, are enforcing AB 2571, which deprives Plaintiffs of commercial speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

119.   On its face and as applied, AB 2571 is an unconstitutional abridgement of Plaintiffs' right to free speech under the First Amendment because it casts such a wide net that it directly prohibits Plaintiffs' protected commercial speech without any substantial governmental interest and is far more extensive than necessary to serve any purported governmental interest.

32

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

120. AB 2571 ensnares *all* advertising, marketing, and placement of advertising or marketing concerning "firearm-related products" by "firearm industry members" that might be deemed "attractive" to minors—even those that propose the sale of lawful firearms for lawful purposes. It does not merely target commercial speech regarding unlawful activity or products.

121. Defendants have no substantial (or even legitimate) governmental interest in banning non-misleading commercial speech concerning the lawful sale, possession, and use of "firearm-related products." Indeed, the State's purported interests in "ensuring that minors do not possess these dangerous weapons" and "protecting its citizens … from gun violence" are betrayed by the fact that California does not ban the possession of many "firearm-related products" by minors for lawful purposes under a broad range of circumstances.

122. Even if the state's purported interests were substantial, neither interest is directly served by the ban.

123. Even if the state's purported interests were substantial, AB 2571 is far more extensive than necessary to achieve the state's interests. Indeed, it sweeps up *all* communications concerning "firearm-related products" made by "firearm industry members" "in exchange for monetary compensation" that are "designed, intended, or reasonably appear[] to be attractive minors"—even communications concerning lawful (and constitutionally protected) products and services and communications that are equally attractive to adults who have a right to obtain information about such products and services.

124. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to free speech, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF 1010

### THIRD CAUSE OF ACTION
### Violation of Rights to Association & Assembly Under U.S. Const., amend. I
### 42 U.S.C. § 1983
(By All Plaintiffs Against All Defendants)

125. Plaintiffs incorporate by reference paragraphs 1 through 124 of this complaint as though fully set forth herein in their entirety.

126. Defendants, acting under color of state law, are enforcing AB 2571, which deprives Plaintiffs of free association and assembly rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

127. On its face and as applied, AB 2571 is an unconstitutional abridgement of Plaintiffs' rights to free association and assembly under the First Amendment because it casts such a wide net that it directly prohibits all Plaintiffs from advertising, marketing, or arranging for the placement of advertising or marketing concerning their various firearm-related programs, where Plaintiffs peacefully and lawfully assemble and associate with each other and members of the public, including youth.

128. On its face and as applied, AB 2571 is an unconstitutional abridgement of Plaintiff CRPA's rights to free association and assembly under the First Amendment because it casts such a wide net that it directly prohibits Plaintiff CRPA from advertising, marketing, or arranging for the placement of advertising or marketing concerning its youth memberships. It also bars Plaintiff CRPA from distributing CRPA-branded merchandise and giveaways to promote the membership in and financial support of the organization.

129. Defendants have no compelling (or even legitimate) interest in prohibiting "firearm industry members," like the Plaintiffs, from advertising, marketing, or arranging for the placement of any advertising or marketing communication concerning their firearm-related youth programming and services and the "firearm-related products" used, sold, endorsed, recommended, or advertised at such events—effectively putting an end to such events and, by

34

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

1011

extension, the rights of Plaintiffs to associate and assemble at them.

130. Defendants have no compelling (or even legitimate) governmental interest in prohibiting Plaintiff CRPA, a "firearm industry member," from advertising, marketing, or arranging for the placement of any advertising or marketing communication concerning its youth memberships and from distributing CRPA-branded merchandise to promote the membership in and financial support of the organization.

131. Even if AB 2571 served some sufficient government purpose, it is neither narrowly tailored nor the least restrictive means to serve that end.

132. As a direct and proximate result of Defendants' conduct, all Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to free association and assembly, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

### FOURTH CAUSE OF ACTION
**Violation of the Right to Equal Protection Under U.S. Const., amend. XIV**
**42 U.S.C. § 1983**

(By All Plaintiffs Against All Defendants)

133. Plaintiffs incorporate by reference paragraphs 1 through 132 of this complaint as if fully set forth herein in their entirety.

134. Defendants, acting under color of state law, are enforcing AB 2571, which deprives Plaintiffs of right to equal protection under the law secured by the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

135. On its face and as applied, AB 2571 is an unconstitutional abridgement of Plaintiffs' right to equal protection under the law guaranteed by the Fourteenth Amendment because it is a viewpoint-discriminatory and/or animus-based restriction on Plaintiffs' protected political and ideological speech that serves no compelling governmental interest.

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

136.   On its face and as evidenced by the legislative history of AB 2571, it is clear that the law's purpose and intention is to thwart the promotion and preservation of the "gun culture" in California through the passing down of pro-gun attitudes and traditions to future generations.

137.   On its face, AB 2571 does not apply to similar or opposing speech made by businesses, organizations, or people who are not considered "firearm industry members."

138.   Defendants have no compelling (or even legitimate) governmental interest in banning Plaintiffs' pure speech concerning "firearm-related products." Indeed, the State's purported interests in "ensuring that minors do not possess these dangerous weapons" and "protecting its citizens … from gun violence" are betrayed by the fact that California does not directly ban the possession of many "firearm-related products" by minors for lawful purposes under a broad range of circumstances.

139.   Nor is there any legitimate interest in singling out politically disfavored "firearm industry members" under AB 2571's ban on protected speech—while leaving members of other industries, like the popular entertainment and video game industries, as well as anti-gun organizations free to engage in similar or identical speech. Rather, AB 2571 is steeped in and motivated by animus for "gun culture" and those who participate in it.

140.   Further, AB 2571 is not narrowly tailored to achieving the state's dubious interests.

141.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to equal protection under the law, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

1013

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

1.     A declaration that AB 2571, codified at California Business & Professions Code section 22949.80, violates the Plaintiffs' free speech rights under the First Amendment to the United States Constitution, on its face and as applied to the Plaintiffs;

2.     A declaration that AB 2571, codified at California Business & Professions Code section 22949.80, violates the Plaintiffs' commercial speech rights under the First Amendment to the United States Constitution, on its face and as applied the Plaintiffs;

3.     A declaration that AB 2571, codified at California Business & Professions Code section 22949.80, violates the rights of assembly and association of the Plaintiffs under the First Amendment to the United States Constitution, on its face and as applied to the Plaintiffs;

4.     A declaration that AB 893, codified at California Business & Professions Code section 22949.80, violates the rights of the Plaintiffs to equal protection under the law per the Fourteenth Amendment to the United States Constitution, on its face and as applied to the Plaintiffs;

5.     A preliminary and permanent injunction prohibiting all Defendants, their employees, agents, successors in office, and all District Attorneys, County Counsel, and City Attorneys holding office in the state of California, as well as their successors in office, from enforcing AB 2571, codified at Business & Professions Code section 22949.80;

6.     An award of costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988 or other applicable state or federal law; and

/ / /

/ / /

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

1014

1      7.      Any such other relief the Court deems just and equitable.

2

3    Dated:  July 8, 2022                **MICHEL & ASSOCIATES, P.C.**

4                                        *s/ Anna M. Barvir*
                                         _____
5                                        Anna M. Barvir
                                         Counsel for Plaintiffs Attorneys for Plaintiffs
6                                        Junior Sports Magazines, Inc., Raymond
                                         Brown, California Youth Shooting Sports
7                                        Association, Inc., Redlands California Youth
                                         Clay Shooting Sports, Inc., California Rifle &
8                                        Pistol Association, Incorporated, The CRPA
                                         Foundation, and Gun Owners of California,
9                                        Inc.

10   Dated:  July 8, 2022                **LAW OFFICES OF DONALD KILMER, APC**

11                                       *s/ Donald Kilmer*
                                         _____
12                                       Donald Kilmer
                                         Counsel for Plaintiff Second Amendment
13                                       Foundation

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY RELIEF & INJUNCTIVE RELIEF

# EXHIBIT A



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

# Assembly Bill No. 2571

## CHAPTER 77

An act to add Chapter 39 (commencing with Section 22949.80) to Division 8 of the Business and Professions Code, relating to firearms, and declaring the urgency thereof, to take effect immediately.

[Approved by Governor June 30, 2022. Filed with Secretary of State June 30, 2022.]

### LEGISLATIVE COUNSEL'S DIGEST

AB 2571, Bauer-Kahan. Firearms: advertising to minors.

Existing law generally regulates manufacturers and dealers of firearms. Under existing law, commercial speech or advertising is generally protected under the First Amendment to the Constitution of the United States. Existing laws and regulations, however, restrict the content and placement of advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors.

This bill would prohibit a firearm industry member, as defined, from advertising or marketing any firearm-related product, as defined, in a manner that is designed, intended, or reasonably appears to be attractive to minors. The bill would also prohibit a firearm industry member from using, disclosing, or compiling a minor's personal information if it is intended to market or advertise a firearm to that minor, as specified. The bill would impose a civil penalty of up to $25,000 for each violation of these provisions, and would authorize a person harmed by a violation to bring suit to recover any damages suffered, as specified. The bill would make each copy or republication of marketing or advertising prohibited by these provisions a separate violation. The bill would declare that its provisions are severable, as specified.

This bill would declare that it is to take effect immediately as an urgency statute.

*The people of the State of California do enact as follows:*

SECTION 1. (a) The Legislature hereby finds and declares that the proliferation of firearms to and among minors poses a threat to the health, safety, and security of all residents of, and visitors to, this state. These weapons are especially dangerous in the hands of minors because current research and scientific evidence shows that minors are more impulsive, more likely to engage in risky and reckless behavior, unduly influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions

93

and decisions, and less able to control themselves in emotionally arousing situations. In recognition of these facts, the Legislature has already prohibited minors from possessing firearms, except in certain limited circumstances. Nonetheless, firearms manufacturers and retailers continue to market firearms to minors, often identifying particular weapons as starter guns, especially good for children. As reflected in numerous laws regulating marketing of dangerous products to minors, children are especially susceptible to marketing appeals, as well as more prone to impulsive, risky, thrill-seeking, and violent behavior than other age groups. Firearms marketing contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully. This state has a compelling interest in ensuring that minors do not possess these dangerous weapons and in protecting its citizens, especially minors, from gun violence and from intimidation by persons brandishing these weapons.

(b)  It is the intent of the Legislature in enacting this act to further restrict the marketing and advertising of firearms to minors. Nothing in this chapter shall be construed to limit in any way the enforceability of existing law concerning firearms and marketing thereof.

SEC. 2.  Chapter 39 (commencing with Section 22949.80) is added to Division 8 of the Business and Professions Code, to read:

### Chapter 39.  Marketing Firearms to Minors

22949.80.  (a)  (1)  A firearm industry member shall not advertise, market, or arrange for placement of an advertising or marketing communication concerning any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors.

(2)  In determining whether marketing or advertising of a firearm-related product is attractive to minors, as described in paragraph (1), a court shall consider the totality of the circumstances, including, but not limited to, whether the marketing or advertising:

(A)  Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.

(B)  Offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals, that promotes a firearm industry member or firearm-related product.

(C)  Offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors.

(D)  Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

(E)  Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

(F)  Is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

(b) A firearm industry member publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, shall not knowingly use, disclose, compile, or allow a third party to use, disclose, or compile, the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

(c) As used in this chapter:

(1) "Ammunition" has the same meaning as provided in subdivision (b) of Section 16150 of the Penal Code.

(2) "Firearm" has the same meaning as provided in subdivisions (a) and (b) of Section 16520 of the Penal Code.

(3) "Firearm accessory" means an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with, a firearm which is designed, intended, or functions to alter or enhance the firing capabilities of a firearm, the lethality of the firearm, or a shooter's ability to hold, carry, or use a firearm.

(4) "Firearm industry member" means any of the following:

(A) A person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products.

(B) A person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products that does one of the following:

(i) Advertises firearm-related products.

(ii) Advertises events where firearm-related products are sold or used.

(iii) Endorses specific firearm-related products.

(iv) Sponsors or otherwise promotes events at which firearm-related products are sold or used.

(5) "Firearm-related product" means a firearm, ammunition, reloaded ammunition, a firearm precursor part, a firearm component, or a firearm accessory that meets any of the following conditions:

(A) The item is sold, made, or distributed in California.

(B) The item is intended to be sold or distributed in California.

(C) It is reasonably foreseeable that the item would be sold or possessed in California.

(D) Marketing or advertising for the item is directed to residents of California.

(6) "Marketing or advertising" means, in exchange for monetary compensation, to make a communication to one or more individuals, or to arrange for the dissemination to the public of a communication, about a product or service the primary purpose of which is to encourage recipients of the communication to purchase or use the product or service.

(7) "Minor" means a natural person under 18 years of age who resides in this state.

Case 2:22-cv-04663-DC Document 11-2 Filed 07/08/22 Page 65 of 45 Page ID #:843

(d)  This section shall not be construed to require or authorize a firearm industry member to collect or retain age information about users or subscribers of products or services offered.

(e)  (1)  Any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction.

(2)  The court shall impose a civil penalty under paragraph (1) for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

(3)  A person harmed by a violation of this section may commence a civil action to recover their actual damages.

(4)  The court shall also order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the court deems necessary to prevent the harm described in this section.

(5)  Upon a motion, a court shall award reasonable attorney's fees and costs, including expert witness fees and other litigation expenses, to a plaintiff who is a prevailing party in an action brought pursuant to this section.

(6)  Each copy or republication of marketing or advertising prohibited by this section shall be deemed a separate violation.

(f)  The provisions of this section are severable. If any portion, subdivision, paragraph, clause, sentence, phrase, word, or application of this section is for any reason held to be invalid by any court of competent jurisdiction, that decision shall not affect the validity of the remaining portions of this chapter. The Legislature hereby declares that it would have adopted this section and each and every portion, subdivision, paragraph, clause, sentence, phrase, word, and application not declared invalid or unconstitutional without regard to whether any other portion of this section or application thereof would be subsequently declared invalid.

SEC. 3.  This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the California Constitution and shall go into immediate effect. The facts constituting the necessity are:

In order to protect public safety by prohibiting firearm advertising to minors as soon as possible, it is necessary that this act take effect immediately.

O

1020

# EXHIBIT B

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2021-2022 Regular Session**

AB 2571 (Bauer-Kahan)
Version: April 27, 2022
Hearing Date: June 14, 2022
Fiscal: Yes
Urgency: No
CK

## SUBJECT

Firearms:  advertising to minors

## DIGEST

This bill prohibits firearm industry members from advertising or marketing, as defined, firearm-related products to minors. The bill restricts the use of minors' personal information in connection with marketing or advertising firearm-related products to those minors.

## EXECUTIVE SUMMARY

In the United States, children are more likely to die from gun violence than in any other high-income country. In 2020, gun violence overtook car accidents to become the number one cause of death for U.S. children and adolescents.[1] In California, children are generally restricted from purchasing and possessing firearms and ammunition, except under specified circumstances. However, concerns have arisen that children are still being marketed to by the gun industry.

This bill prohibits firearm industry members from advertising or marketing, as defined, firearm-related products in a manner that is designed, intended, or reasonably appears to be attractive to minors. The determination of whether it is "attractive to minors" is based on a consideration of the totality of the circumstances, including whether the marketing or advertising used cartoon characters or offered brand name stuffed animals promoting the entity or firearm-related product. The bill also prohibits knowingly leveraging the personal information of a minor for the purpose of marketing or advertising to that minor any firearm-related product, as specified.

---

[1] Laurel Wamsley, *The U.S. is uniquely terrible at protecting children from gun violence* (May 28, 2022) NPR, https://www.npr.org/2022/05/28/1101307932/texas-shooting-uvalde-gun-violence-children-teenagers. All internet citations are current as of June 2, 2022.

AB 2571 (Bauer-Kahan)
Page 2 of 16

This bill is sponsored by Governor Gavin Newsom. It is supported by a variety of groups, including Everytown for Gun Safety and the County of San Diego. The bill is opposed by the National Rifle Association.

## PROPOSED CHANGES TO THE LAW

Existing federal law:

1) Provides, pursuant to the Second Amendment to the United States Constitution, that a well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed. (U.S. Const. Amend. 2.)

2) Prohibits a qualified civil liability action from being brought in any Federal or State court. (15 U.S.C. § 7902.) A "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines or penalties, or other relief resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. (15 U.S.C. § 7903.)

3) Establishes the federal Children's Online Privacy Protection Act (COPPA) to provide protections and regulations regarding the collection of personal information from children under the age of 13. (15 U.S.C. § 6501 et seq.)

Existing state law:

1) Requires a person be at least 18 years of age to be sold most firearms and at least 21 years of age to be sold a handgun, except as specified. (Pen. Code §§ 27505, 27510.)

2) Establishes the Privacy Rights for California Minors in the Digital World (PRCMDW), which prohibits an operator of an internet website, online service, online application, or mobile application ("operator") from the following:
   a) marketing or advertising specified products or services, such as firearms, cigarettes, and alcoholic beverages, on its internet website, online service, online application, or mobile application that is directed to minors;
   b) marketing or advertising such products or services to minors who the operator has actual knowledge are using its site, service, or application online and is a minor, if the marketing or advertising is specifically directed to that minor based upon the personal information of the minor; and

c) knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of a minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising such products or services to that minor, where the website, service, or application is directed to minors or there is actual knowledge that a minor is using the website, service, or application. (Bus. & Prof. Code § 22580.)

3) Requires, pursuant to the PRCMDW, certain operators to permit a minor user to remove the minor's content or information and to further inform the minor of this right and the process for exercising it. (Bus. & Prof. Code § 22581.)

4) Requires, pursuant to the Parent's Accountability and Child Protection Act, a person or business that conducts business in California, and that seeks to sell any product or service in or into California that is illegal under state law to sell to a minor, notwithstanding any general term or condition, take reasonable steps, as specified, to ensure that the purchaser is of legal age at the time of purchase or delivery, including, but not limited to, verifying the age of the purchaser. (Civ. Code § 1798.99.1(a)(1).)

5) Prohibits a business from selling or sharing the personal information of a consumer if the business has actual knowledge that the consumer is less than 16 years of age unless the consumer, in the case of consumers between 13 and 16 years of age, or the consumer's parent or guardian, in the case of consumers who are less than 13 years of age, has affirmatively authorized such sale or sharing. A business that willfully disregards the consumer's age shall be deemed to have had actual knowledge of the consumer's age. (Civ. Code § 1798.120.)

6) Defines "firearm" as a device designed to be used as a weapon from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion. (Pen. Code § 16520.) It defines "firearm precursor part" to mean a component of a firearm that is necessary to build or assemble a firearm and is either an unfinished receiver or an unfinished handgun frame. (Pen. Code § 16531.)

7) Defines "ammunition" to include any bullet, cartridge, magazine, clip, speed loader, autoloader, ammunition feeding device, or projectile capable of being fired from a firearm with a deadly consequence. (Pen. Code § 16150(b).)

8) Requires firearms dealers to obtain certain identifying information from firearms purchasers and forward that information, via electronic transfer, to the DOJ to perform a background check on the purchaser to determine whether they are prohibited from possessing a firearm. (Pen. Code §§ 28160-28220.)

This bill:

1) Prohibits a firearm industry member from advertising, marketing, or arranging for placement of an advertising or marketing communication concerning any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors.

2) Defines "firearm industry member" to include any of the following:
   a) any person or entity engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products; or
   b) any person or entity formed for the express purpose of promoting, encouraging, or advocating for the purchase, use, or ownership of firearm-related products that endorses or advertises such products, or advertises, sponsors, or promotes events where they are sold or used.

3) Requires a court when determining whether marketing or advertising of a firearm-related product is attractive to minors to consider the totality of the circumstances, including, but not limited to, whether the marketing or advertising:
   a) uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products;
   b) offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals that promotes a firearm industry member or firearm-related product;
   c) offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors;
   d) is part of a marketing or advertising campaign designed with the intent to appeal to minors;
   e) uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products; or
   f) is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

4) Prohibits a firearm industry member publishing material directed to minors in this state or who has actual knowledge that a minor in this state is using or receiving its material, from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

5) Provides that any person in violation is liable for a civil penalty not to exceed $25,000 for each violation, which shall be assessed and recovered in a civil action

brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

6) Authorizes a person harmed by a violation to commence a civil action to recover their actual damages.

7) Authorizes the court to order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct.

8) Entitles a prevailing plaintiff to reasonable attorney's fees and costs, including expert witness fees and other litigation expenses.

9) Deems each copy or republication of prohibited marketing or advertising a separate violation.

10) Defines "firearm-related product" as a firearm, ammunition, reloaded ammunition, a firearm precursor part, a firearm component, or a firearm accessory that has a specified connection to California.

## COMMENTS

1. Children and the epidemic of gun violence in the United States

Gun violence in the United States has surged in recent years. While most shooting deaths involve handguns, there has been a dramatic rise in the use of assault weapons in gun massacres with six or more deaths, owing to their ability to inflict greater damage at a quicker rate.[2] Research shows that laws restricting assault weapons reduce deaths; estimates find mass-shooting fatalities were 70 percent less likely during the period when the federal ban was in effect.[3] Another rising scourge is the prevalence of "ghost guns." In 2020, California accounted for 65 percent of all ghost guns seized by

---

[2] Emily Shapiro, *The type of gun used in most US homicides is not an AR-15* (October 26, 2021) ABC News, https://abcnews.go.com/US/type-gun-us-homicides-ar-15/story?id=78689504. All internet citations are current as of March 22, 2022.

[3] Charles DiMaggio, et al., *Changes in US mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data* (January 2019) The Journal of Trauma and Acute Care Surgery, https://doi.org/10.1097/TA.0000000000002060.

the Bureau of Alcohol, Tobacco, Firearms and Explosives.[4] The weapons have been linked to 24 killings and dozens of other crimes in 2020 in Los Angeles alone. The problem of gun violence in our society is not going away. In 2020, over 45,000 Americans died from gun-related injuries in the United States. This is the most on record by far, a 43 percent increase from a decade prior.

As stated, gun violence has now become a leading cause of death of children in this country. This is a problem that is increasingly involving children from an early age:

> On May 24th an 18-year-old gunman, Salvador Ramos, walked into an elementary school in Uvalde, a town in south-west Texas, and shot dead at least 21 people, including 19 children. Mr Ramos was himself killed, reportedly by police. His motive remains unclear. It is the latest in a spate of mass shootings in America, and the toll is the biggest at a school since a gunman killed 26 people at Sandy Hook Elementary in Newtown, Connecticut, in 2012.

> In the decade since Sandy Hook there have been over 900 shootings on school grounds in America. After more than 60 years in which motor-vehicle crashes were the leading cause of death for young people, since 2017 guns have killed more Americans between the ages of one and 24. In 2020 more than 10,000 young Americans were killed by firearms, up from just under 7,000 two decades earlier. Pupils at almost all schools take part in active-shooter drills, learning to hide beneath their desks. Some drills use pellet guns and fake blood to simulate an attack.[5]

Not only are children increasingly the victims, but also the perpetrators of school shootings:

> In cases where the source of the gun could be determined, more than 85 percent of shooters brought them from their own homes or obtained them from friends or relatives, according to The Post's analysis.

> The ranks of school shooters include a 6-year-old boy, who killed a classmate after saying he didn't like her, and a 15-year-old girl, who did the same to a friend for rejecting her romantic overtures.

---

[4] Justin Ray, *'An instrument of death': The problem of ghost guns in California* (November 15, 2021) Los Angeles Times, https://www.latimes.com/california/newsletter/2021-11-15/ghost-guns-california-essential-california.

[5] *Guns are the things most likely to kill young people in America* (May 25, 2022) The Economist, https://www.economist.com/graphic-detail/2022/05/25/guns-are-the-things-most-likely-to-kill-young-people-in-america.

> Seven in 10 of them, however, were under the age of 18, which means that — often because of an adult's negligence — dozens of children had access to deadly weapons.

**The median age of school shooters is 16.[6]**

This is borne out in other studies as well. According to an analysis of FBI data, in 29 of 62 active shooting incidents at educational facilities in the United States between 2000 and 2019, the offender was younger than 18, with an additional 10 shooters between 18 and 21 years old.[7] Another federally-run center database shows "at least 59 percent of the 2,275 school shootings researchers recorded since 1970 were committed by someone under 21 years old. The offender's age is unknown in another 18 percent of incidents."[8]

2. Targeting children with firearm-related products

This bill is prompted by the incidence of marketing and advertising of firearm-related products to children, arguably seeking to attract future legal gun owners. A report from the Violence Policy Center (VPC) outlines the problem:

> The gun industry has long understood that it faces a slow-motion demographic collapse. With the industry's customer base growing older, household gun ownership in America has steadily declined. As its primary market of white males ages and dies off, the firearms industry has set its sights on America's children. Much like the tobacco industry's search for replacement smokers, the gun industry is seeking replacement shooters to purchase its deadly products. Firearms companies have teamed up with "corporate partners" like the National Rifle Association of America, the gun industry's trade association the National Shooting Sports Foundation (NSSF), and online publications such as Junior Shooters in an industry-wide effort to market firearms to kids. They do this by promoting websites and magazines targeted at children, designing "kid-friendly" guns to appeal to the youth market, and even working to create the equivalent of "'reality' video" games to encourage gun use from an early age.

---

[6] John Woodrow Cox, et al., *More than 311,000 students have experienced gun violence at school since Columbine* (May 27, 2022) Washington Post, https://www.washingtonpost.com/graphics/2018/local/school-shootings-database/.
[7] Mary Katherine Wildeman, *Data show most school shootings carried out by young adults, teens* (May 26, 2022) CT Insider, https://www.ctinsider.com/news/article/Data-show-most-school-shootings-carried-out-by-17199231.php.
[8] *Ibid.*

AB 2571 (Bauer-Kahan)
Page 8 of 16

The industry's focus on recruiting children into the gun culture has been acknowledged since at least the 1990s.[9]

One particularly acute example is a product marketed by WEE1 Tactical:

A US gun manufacturer has unveiled a semi-automatic rifle for kids modeled on the AR-15, which has been used in a number of deadly mass shootings, sparking condemnation from gun safety groups.

The gun dubbed the JR-15 is being marketed by maker WEE1 Tactical as "the first in a line of shooting platforms that will safely help adults introduce children to the shooting sports."

The company's website says the rifle "also looks, feels, and operates just like Mom and Dad's gun."

The JR-15 is only 31 inches (80 centimeters) long, weighs less than 2.5 pounds (one kilogram) and comes with magazines of five or 10 rounds of 22 caliber bullets. It was released in mid-January with a price tag of $389.

The adult model, the AR-15, is the civilian version of a military-style weapon and has been used in multiple mass killings in the United States, including in schools.[10]

The marketing generally includes more compact models that are lighter to handle or firearms in various colors. A New York Times blog synthesizes the VPC report:

The gun industry markets a variety of products explicitly to children, a new report shows, from armed stuffed animals to lighter versions of rifles. And some see kids as a vital group of future gun buyers who need to be brought into the fold at a young age.

The report, called "Start Them Young" and issued on Thursday by the Violence Policy Center, lists a variety of firearms meant at least partly for children. It mentions the Crickett rifle, a gun made for children by the company Keystone Sporting Arms. Keystone's website and some of its merchandise bear the image of "Davey Crickett," a gun-wielding cartoon insect. The company sells Davey Crickett hats, dog tags and pins, as well as a Davey Crickett Beanie Baby, listed as "not for children under three years of age."

---

[9] Josh Sugarmann, "*Start Them Young" How the Firearms Industry and Gun Lobby Are Targeting Your Children* (February 2016) VPC, https://www.vpc.org/studies/startthemyoung.pdf.
[10] Agence France Presse, *US Gunmaker Unveils Semi-automatic Rifle Marketed To Kids* (February 18, 2022) Barron's, https://www.barrons.com/articles/top-gun-movie-business-51654023576.

Keystone's website also sells books featuring "Little Jake," a boy who uses his gun to bring down a bear and save an African village from a marauding elephant. The publisher of the books says Little Jake is actually older than he looks: "Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision."

"Start Them Young" also cites the rise of .22-caliber versions of higher-caliber rifles, often produced with lightweight materials. According to an article in the trade magazine Shooting Sports Retailer, "these guns bring the coolness and fun of the tactical rifle to kids and less serious shooters."[11]

According to the author:

In 2021 there were approximately 259 unintentional shootings by children, resulting in 104 deaths and 168 injuries. Weapons used by children have put other children at risk. 91% of the victims in these shootings by children were also under 18, often siblings of the children shooting. In California, gun violence is the third-leading cause of death for children and teens. This epidemic of deadly violence is fueled by an industry that encourages children to hold a gun as soon as they can walk.

Gun manufacturers view children as their next generation of advocates and customers, and target them with slick advertising – even children's books. The advertising for these weapons is shameless. Children in California are not allowed to buy or own a gun, yet they are advertised to across all forms of media with cartoons, video games, and social media.

AB 2571 will prohibit a person or entity from publishing materials that advertise or market firearms or weapons to anyone under the age of 18. This bill would allow the Attorney General, a District or County Attorney, or a County Counsel to bring a civil action against each violation up to $25,000.

Guns are not a toy. Guns are a tool of death. Taking away this tool of violent indoctrination from the gun industry is a vital step forward to protect California's children.

---

[11] Anna North, *Marketing Guns to Children* (February 19, 2022) The New York Times, https://takingnote.blogs.nytimes.com/2016/02/19/marketing-guns-to-children.

   3. <u>Prohibiting the marketing or advertising of such products to children</u>

This bill prohibits a firearm industry member from advertising or marketing any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors. Furthermore, the bill places limitations on how these entities can utilize the personal information of minors in this context. If they are publishing material directed to minors in California or have actual knowledge that a minor is using or receiving its material, they are prohibited from knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of that minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising to that minor any firearm-related product.

Violations of these provisions are subject to civil penalties of up to $25,000 for each violation in civil actions brought by the Attorney General or by any district attorney, county counsel, or city attorney. Each copy or republication of prohibited marketing or advertising is deemed a separate violation. Courts are provided specific factors to consider in setting the amount of the penalty including the nature, seriousness, and willfulness of the defendant's misconduct and the defendant's assets, liabilities, and net worth.

An individual harmed by a violation is also authorized to bring suit to recover their actual damages. This would require the individual to establish the causal connection between the violation and their damages.

In addition to the remedies above, the court can order injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct. A prevailing plaintiff is entitled to reasonable attorney's fees and costs, including expert witness fees and other litigation expenses.

The bill also provides some direction to courts in determining whether marketing or advertising of a firearm-related product is attractive to minors. They are to consider the totality of the circumstances, including whether the marketing or advertising:

- uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products;
- offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals that promotes a firearm industry member or firearm-related product;
- offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors;
- is part of a marketing or advertising campaign designed with the intent to appeal to minors;

- uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products; or
- is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

4. <u>Concerns raised with the bill</u>

Some concerns have been raised about the bill's constitutionality, namely whether it violates the First Amendment. The prohibitions in this bill restrict the commercial speech of the firearm industry members, but the mere fact that it restricts speech does not mean that such a restriction would violate the First Amendment of the United States Constitution or Article I of the California Constitution.

Generally speaking, the First Amendment and Article I of the California Constitution, act to protect the freedom of expression of the citizens of California. Commercial speech, which is done on behalf of a company or individual for purpose of making a profit, is protected under the state and federal guarantees of free speech, but to a lesser degree than noncommercial speech.[12] A blanket prohibition against truthful, nonmisleading speech about a lawful product, which serves an end unrelated to consumer protection, must be reviewed with skepticism. A "state legislature does not have the broad discretion to suppress truthful, nonmisleading information for paternalistic purposes[.]" (*44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 510.) Ultimately, the First Amendment protects commercial speech against "unwarranted" governmental regulation.

In order to be upheld as a valid restriction on commercial speech, the proposed law must meet the following four-part test: (1) the speech must be about a lawful activity and cannot be false or misleading; (2) the government must have a substantial interest; (3) the law must directly advance the governmental interest asserted; and (4) the law must be no more extensive than necessary. (*Central Hudson Gas v. Public Service Commission* (1980) 447 U.S. 559.)

In this case, the proposed restriction is arguably about restricting the marketing of products to children that are not generally legally able to buy them. California law generally prohibits minors from possessing a handgun and most semi-automatic rifles, as well as ammunition. The possibility and even likelihood that marketing or advertising of firearm-related products that makes those products attractive to children who, in most cases, cannot lawfully possess them, greatly strengthens the argument that the bill's restrictions on the marketing and advertising of firearm-related products could withstand constitutional scrutiny. Even if the speech is lawful, the State of California arguably has a strong interest in taking steps to prevent firearms from being

---

[12] *See Gerawan Farming, Inc. v. Lyons* (2004) 33 Cal.4th 1, 22.

sold to minors, and the proposed law advances that interest in a manner that does not cover products or advertisements directed to lawful purchasers. Based on the findings incorporated into the bill that firearms marketing and advertising contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully, the bill is arguably substantially related to the achievement of its objective. Although a determination regarding the First Amendment is ultimately for the courts, arguably the proposed restriction on marketing and advertising could survive such a challenge.

Similar laws already exist that restrict the advertising of other products to children. For instance, coin banks, toys, balloons, magic tricks, miniature bottles or cans, confections, dolls, or other items that appeal to minors or underage drinkers may not be used in connection with the merchandising of beer. (Bus. & Prof. Code § 25600.) Similarly, edible cannabis products cannot be designed to be appealing to children or easily confused with commercially sold candy or foods that do not contain cannabis. (Bus. & Prof. Code § 26130.)

Another particularly relevant example is the Privacy Rights for California Minors in the Digital World, which prohibits an operator of an internet website, online service, online application, or mobile application ("operator") from the following:

- marketing or advertising specified products or services such as firearms, cigarettes, and alcoholic beverages on its internet website, online service, online application, or mobile application that is directed to minors;
- marketing or advertising such products or services to minors who the operator has actual knowledge are using its site, service, or application online and is a minor, if the marketing or advertising is specifically directed to that minor based upon the personal information of the minor; and
- knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of a minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising such products or services to that minor, where the website, service, or application is directed to minors or there is actual knowledge that a minor is using the website, service, or application. (Bus. & Prof. Code § 22580.)

As can be seen, the language of this bill borrows from these existing statutes.

Writing in opposition, the National Rifle Association argues the bill will not withstand constitutional challenge:

> Even if one is to assume that AB 2571 meets the first three criteria of the test set forth in *Central Hudson*, the regulation fails the fourth part of the test. A minor may find a piece of advertising attractive for the same reasons as an adult. Adults and minors often use firearms for the same lawful purposes, prize the same characteristics in firearms, and therefore

would be attracted to the same advertising materials. As AB 2571 would target advertising valued by both minors and adults it would necessarily "impinge on the speaker's ability to propose a commercial transaction and the adult listener's opportunity to obtain information about products."

Moreover, the restriction in AB 2571 fails to appreciate that minors can and do possess and use firearms for a variety of lawful purposes. The state interest asserted in AB 2571 is to combat the "proliferation of firearms to and among minors." The bill also notes, "[t]his state has a compelling interest in ensuring that minors do not possess these dangerous weapons." The asserted interest is not necessarily to discourage illegal use of firearms by minors, but rather all use.

First, as minors are permitted by state law to use firearms for a variety of lawful purposes, it is dubious that the state's asserted interest in AB 2571 of preventing firearm use by minors is "substantial," as required by the second part of the *Central Hudson* test.

Second, if it is the drafters of AB 2571's goal to curb the illegal use of firearms by minors, a less suspect state interest, surely banning all advertising that may be attractive to minors, even that contemplating the use of firearms for lawful purposes, would be overbroad under part four of the *Central Hudson* test.

The legislation's drafters justify their proposed regulation by citing restrictions on "advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors." As noted in the discussion of *Lorillard Tobacco Co. v. Reilly*, such measures must be the narrowest means of achieving an asserted state interest – which was not the case in Lorillard and is not the case with AB 2571.

However, lawmakers should also understand that the restrictions cited as analogous to that in AB 2571 are of a fundamentally different character. Unlike restrictions on advertising for alcohol, cannabis, and tobacco, the underlying products and conduct that AB 2571 seeks to curb the advertisement of are protected under the U.S. Constitution. As such, lawmakers should be prepared for the courts to level more scrutiny upon restrictions on advertisements concerning Second Amendment protected products and conduct than those leveled at products that don't enjoy such protection.

One additional, potential legal barrier to the bill, is the federal Protection of Lawful Commerce in Arms Act (PLCAA). The PLCAA prohibits a qualified civil liability action from being brought in any federal or state court. (15 U.S.C. § 7902.) A "qualified civil

liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. (15 U.S.C. § 7903.) These statutes stand to preempt state laws that impose liability on manufacturers, sellers, and trade associations for the misuse of firearms by third parties.

However, there are exceptions to the PLCAA's preemptive effect. Specifically, the federal law explicitly does not preempt "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." (15 U.S.C. § 7903.) Given that liability attaches in this bill for the direct conduct of firearm industry members themselves, namely their advertising, marketing, or use of minors' personal information, and is not triggered solely by the misconduct of another party, the bill should arguably not be found to be preempted.

5. <u>Stakeholder support</u>

Brady California and the Brady Campaign to Prevent Gun Violence write in support of this measure:

> Current laws restrict the content and placement of advertising and promotional marketing of alcohol, cannabis, and tobacco to protect minors. This is done to prevent potentially harmful substances from getting in the hands of young people as well as preventing the glorification around them. While we certainly see the point of restricting ads around the previous products listed, unlike firearms none of these are a leading cause of death for children and teens.

Writing in support, the City of Mountain View argues the bill provides "another tool in the tool belt of municipalities to counter dangerous practices that jeopardize the health and wellness of our communities."

The County of San Diego writes in support of this bill, and gun legislation in general:

> The County of San Diego recognizes action must be taken to prevent unintentional shootings and reduce the risk of homicides and decrease access to guns used in crimes.

> State legislation that addresses gun violence will help hold the gun industry accountable through private lawsuits and by prohibiting the advertisement of certain categories of weapons. The County of San Diego

AB 2571 (Bauer-Kahan)
Page 15 of 16

supports these and other efforts that would allow for new oversight and accountability measures for the gun industry.

## SUPPORT

Governor Gavin Newsom (sponsor)
Brady California
Brady Campaign to Prevent Gun Violence
City of Mountain View
County of San Diego
Everytown for Gun Safety
March for Our Lives
Moms Demand Action for Gun Sense in America
Students Demand Action for Gun Sense in America

## OPPOSITION

National Rifle Association

## RELATED LEGISLATION

Pending Legislation:

SB 1327 (Hertzberg, 2022) establishes privately-enforced civil causes of action against any person who manufactures or causes to be manufactured, distributes, transports, or imports into the state, or causes to be distributed or transported or imported into the state, keeps for sale or offers or exposes for sale, or gives or lends any firearm lacking a required serial number, assault weapon, .50 BMG rifle, or firearm precursor part, as specified. This bill is currently in the Assembly Judiciary Committee.

AB 452 (Friedman, 2022) requires local educational agencies to inform parents, through a notice, of California's child access prevention laws and other firearm laws. This bill is currently in the Senate Appropriations Committee.

AB 1594 (Ting, 2022) establishes a firearm industry standard of conduct, which would require a firearm industry member, as defined, to, among other things, establish, implement, and enforce reasonable controls, as defined, and adhere to specified laws pertaining to unfair methods of competition, unfair or deceptive acts or practices, or false advertising. The bill also prohibits a firearm industry member from manufacturing, marketing, importing, offering for wholesale sale, or offering for retail sale a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in California, as specified. This bill is currently in this Committee and will be heard on the same day as this bill.

AB 2571 (Bauer-Kahan)
Page 16 of 16

AB 1621 (Gipson, 2022), among other things, prohibits the sale, transfer, or possession of an unserialized firearm precursor part, except as specified, and explicitly prohibits the possession or transfer of a firearm without a serial number or mark of identification. This bill is currently in the Senate Public Safety Committee.

Prior Legislation: SB 568 (Steinberg, Ch. 336, Stats. 2013) established the Privacy Rights for California Minors in the Digital World.

## **PRIOR VOTES:**

Assembly Floor (Ayes 48, Noes 16)
Assembly Appropriations Committee (Ayes 12, Noes 4)
Assembly Judiciary Committee (Ayes 7, Noes 2)
Assembly Privacy and Consumer Protection Committee (Ayes 7, Noes 1)

**************

# EXHIBIT C

FEBRUARY 2016



**Violence Policy Center**



# "Start Them Young"

How the Firearms Industry and Gun
Lobby Are Targeting Your Children

WWW.VPC.ORG

## ABOUT THE COVER

### The Title

"Start Them Young" is a section head of the 2012 National Shooting Sports Foundation (NSSF) publication *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*. NSSF is the official trade association for the firearms industry.

### The Photo

"A chilling photograph of a small boy, gnawing on a pistol clutched in his tiny hands, dressed in camouflage and with a grenade and ammunition belt in his lap, was recovered from the weapon-filled home of Sandy Hook school gunman Adam Lanza....A family friend said that Lanza and his older brother were taught to shoot almost as soon as they could hold a weapon by their mother Nancy, a gun fanatic. But a spokesman for Mrs. Lanza's ex-husband, Peter, last night denied that the child in the uncaptioned photograph was either son."

"Sandy Hook report reveals Lanza children's early exposure to guns," *The Telegraph*, December 28, 2013

## COPYRIGHT AND ACKNOWLEDGMENTS

Copyright © February 2016 Violence Policy Center

**Violence Policy Center**
1730 Rhode Island Ave., NW
Suite 1014
Washington, DC  20036

202-822-8200

The Violence Policy Center (VPC) is a national nonprofit educational organization that conducts research and public education on violence in America and provides information and analysis to policymakers, journalists, advocates, and the general public.

This publication was funded with the support of the Lisa & Douglas Goldman Fund.

Primary author for this study was Josh Sugarmann. Additional research and writing was provided by Marty Langley, Avery Palmer, Kristen Rand, and Jane Wiesenberg.

The VPC would like to express its sincere appreciation to Sue Roman for the photographs and companion video she contributed to the study. (see https://youtu.be/rjKXGN7hYcg for video)

An online version of this study is available at http://www.vpc.org/publications/start-them-young/.

For a complete list of VPC publications with document links, please visit http://www.vpc.org/publications.

**To learn more about the Violence Policy Center, or to make a tax-deductible contribution to help support our work, please visit www.vpc.org.**

## SELECT FIREARMS INDUSTRY AND GUN LOBBY QUOTES ON MARKETING GUNS TO CHILDREN FROM THE STUDY

**"If we don't improve at cultivating new hunters and shooters, the sport we love and industry we work in will eventually die away. That's a strong diagnosis, but a realistic one. Like many enthusiast sports in this busy, competitive world, people are leaving faster than new ones are coming in — and this is a recipe for industry-wide trouble down the road."**

"Shooting for a New Audience: Reaching New Demographics is Critical to Our Industry," *Shooting Sports Retailer*, May/June 2007 (page 5)

**"If you're a kid looking for your first rifle, this is the gun you need to tell your parents about."**

"Marlin's New Kid-Friendly Rifles," *NRA Family InSights*, January 2, 2014 (page 11)

**"I can't remember how old he was, exactly, when he shot his first firearm — I think he was probably 8 years old — but I know he was around 10 when he shot his first machine gun."**

"Children and Guns — An Iowa Fail," Jews for the Preservation of Firearms Ownership, April 21, 2014 (page 13)

**"Lenin was famously quoted as saying 'Give me just one generation of youth, and I'll transform the whole world.' With this in mind, developing the next generation in the shooting sports isn't just a business decision: The survival of the firearms world depends on the political will of those who come after us, which is a direct result of their involvement in the shooting sports."**

"The Best Guns for Smaller Shooters," *Shooting Sports Retailer*, April 30, 2015 (page 17)

**"And of course, the problem with failing to recruit and grow is that numbers equate to political power. In an era when the private ownership and use of firearms, the right to 'keep and bear arms,' has come under increasing pressure, numbers and a young, vital membership are critical."**

"Is the Shooting Industry Getting it All Wrong?," *Shooting Sports Retailer*, July 31, 2015 (page 21)

"What market isn't tied to juniors? I really can't think of any. Military and law enforcement firearms have civilian versions which are applicable. The Concealed Carry Weapon (CCW) market has firearms which hold 10-rounds which is the limit for IDPA [International Defensive Pistol Association] competition. When the junior turns 21 they can get a CCW permit. What do they buy? It is usually a gun from a manufacturer they are familiar with."

"A Word from Your Editor," *Junior Shooters*, Spring 2012 (page 23)

"[W]e're talking about a tiny gun intended for the very youngest shooters — the ultimate first gun. 'We're targeting the six- to 12-year-old range....' With the number of hunters declining, it's crucial to get kids introduced to the sport as early as possible. The HotShot [youth rifle] means that even the youngest shooters now have a gun sized just for them."

"Test Fire: Thompson/Center HotShot," *NRA Family*, January 2, 2014 (page 31)

"To help hunting and target shooting get a head start over other activities, stakeholders such as managers and manufacturers should target programs toward youth 12 years old and younger. This is the time that youth are being targeted with competing activities."

"It is important to consider more hunting and target shooting recruitment programs aimed at middle school level, or earlier."

*Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012 (page 34)

"[Y]outh ambassadors and others should focus on getting newcomers to take a first step into target shooting through any means, whether a BB or pellet gun, paintball gun, or archery bow. The point should be to get newcomers started shooting *something*, with the natural next step being a move toward actual firearms. Initial interest, however, should be embraced in whatever form it presents itself. "

*Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012 (page 35)

1043

# TABLE OF CONTENTS

Introduction ................................................................................................................................ 1

Following the Tobacco Industry's Path: The Search for Replacement Shooters ........................ 3

Davey Crickett, Little Jake, and the Marlin Man ........................................................................ 7

"Tactical Rifles" for Kids ............................................................................................................ 12

Guns in a Rainbow of Colors .................................................................................................... 17

The "Fiscal and Political" Benefits of Marketing Guns to Children .......................................... 20

*Junior Shooters*: "For Kids By Kids" ....................................................................................... 22

NRA "Junior Members" .............................................................................................................. 30

National Shooting Sports Foundation: The Gun Industry's Tobacco Institute ......................... 32

The Industry Finds Its "'Reality' Video Game" in 3-Gun Competition ..................................... 36

The Reality of Children and Guns ............................................................................................ 40

Conclusion and Recommendations ........................................................................................... 44

Endnotes .................................................................................................................................... 46

## INTRODUCTION

*"He was just a good kid. He was everybody's friend."*

On October 24, 2014, 14-year-old Jaylen Fryberg entered the cafeteria at Marysville-Pilchuck High School in Marysville, Washington, and shot five classmates, killing four, before turning the gun on himself. Unlike many school shooters before him, Fryberg had given little or no warning of his intentions. He was described as a popular "happy-go-lucky" kid who played sports and was recently elected as the freshman class' prince in the school's homecoming court.

But like many American children, he also had easy access to guns. He grew up with guns around the house, frequently went hunting with his father, and recently obtained a hunting rifle as a gift, which he called "probably the best [birthday] present ever, I just love my parents!!!" The semiautomatic 40-caliber Beretta handgun, which he used to commit the crime, was his father's. Friends said that the teen had recently been involved in a breakup with his girlfriend and had sent disturbing messages via social media the week before the shooting.[1]

★ ★ ★

*"It was insane how much he knew....He would say all the types of guns and could name anything."*

On June 10, 2014, Jared Padgett, a 15-year-old freshman at Reynolds High School in Troutdale, Oregon, opened fire with a Daniel Defense M4 AR-15-style semiautomatic assault rifle in the school's boys' locker room, killing a classmate. He then wounded a physical education teacher before eventually turning the gun on himself. In addition to the AR-15, Padgett carried nine ammunition magazines, including 30-round magazines, a .25 Colt pistol, and a knife. All the weapons came from his family's home.

Subsequent investigation found that Padgett showed an intense interest in guns. One classmate said that he had "showed off about the guns he had," saying that he had "bullets at home, bullets and guns." On Facebook, he "Liked" an M4 assault rifles page (the type of gun he used in the shooting), and a page called "We WILL NOT Be Disarmed." Friends and classmates recalled that he talked frequently about guns. Another peer added that "it was insane how much he knew" about firearms and that he "would say all the types of guns and could name anything." After the shooting, a close friend of Padgett's said he was not surprised to learn that Padgett was the shooter, saying that he knew "it was him all along."[2]

★ ★ ★

*He had plans to kill his family, set off bombs, and "kill as many students as he could."*

John David LaDue, a 17-year-old from Waseca, Minnesota, was arrested by police after he was seen entering a storage unit in a suspicious manner on April 29, 2014, and the witness became concerned and called police. It was soon alleged that LaDue had plans to kill his family, set off bombs, and kill "as many students as he could" at Waseca Junior/Senior High School, where he was an 11th-grade honor roll student. LaDue had bombs that he had completed, bomb-making materials, as well as gunpowder in the storage unit. Inside his home, police found three improvised explosives, 400 rounds of ammunition, and seven guns. LaDue had illegally purchased a 45 caliber Llama handgun and had also stolen firearms from his father.

LaDue had a longstanding fascination with guns and famous mass shootings. Speaking to police following his arrest, LaDue admitted that he idolized previous mass shooters, such as those responsible for the 1999 Columbine High School attack, and added that he had hoped to kill more people than the 26 children and educators murdered at Sandy Hook Elementary School in 2012. He "Liked" the pages for several assault weapon models on Facebook.

LaDue's parents seemed to approve of their son's obsession with guns. His father confessed that "I tried to indulge him in every way that I thought was harmless," allowing his son to keep guns in his room for deer hunting and for protecting the family when he was away on business. LaDue's father even wore a shirt with a National Rifle Association logo to his son's court hearing.[3]

This disturbing list continues on: youth who, immersed in the language, culture, and weaponry of today's militarized gun culture, lash out, using such easily accessed firepower to right their perceived wrongs in the most violent way possible. Incidents like the ones cited above occur with what seems like almost rapid-fire regularity in America today: Children, teens, and young adults with easy access to guns pick up their weapons and use them for a homicidal purpose. Even more often, depressed teenagers use the guns to commit suicide. Young children and teens also unintentionally fire the weapons, injuring themselves or others.

The tragic frequency of shootings involving children and teenagers is well documented and unfortunately now a regular part of our daily existence. Yet few realize that the firearms industry and the organizations that represent their interests, including the National Rifle Association,[4] have made it one of their top marketing priorities to promote the use of guns among America's children, as young as grade-school age. In doing so, the gun industry is following a trail once blazed by the tobacco industry in its efforts to entice children to smoke cigarettes.

## FOLLOWING THE TOBACCO INDUSTRY'S PATH: THE SEARCH FOR REPLACEMENT SHOOTERS

The gun industry has long understood that it faces a slow-motion demographic collapse. With the industry's customer base growing older, household gun ownership in America has steadily declined. As its primary market of white males ages and dies off, the firearms industry has set its sights on America's children. Much like the tobacco industry's search for replacement smokers, the gun industry is seeking replacement shooters to purchase its deadly products.

Firearms companies have teamed up with "corporate partners" like the National Rifle Association of America, the gun industry's trade association the National Shooting Sports Foundation (NSSF), and online publications such as *Junior Shooters* in an industry-wide effort to market firearms to kids. They do this by promoting websites and magazines targeted at children, designing "kid-friendly" guns to appeal to the youth market, and even working to create the equivalent of "'reality' video" games to encourage gun use from an early age.



*Junior Shooters*, Winter 2009

The industry's focus on recruiting children into the gun culture has been acknowledged since at least the 1990s:

■ A 1993 issue of NSSF's *SHOT Business* raises the question, "Kids can't buy guns, you say? Well, yes and no. It's true that most students from kindergarten through high school can't purchase firearms on their own. But it's also true that in many parts of the country, youngsters (from preteens on up) are shooting and hunting. Pop picks up the tab."[5]

■ In answer to the question, "How old is old enough?" the NSSF pamphlet *When Your Youngster Wants a Gun...* (distributed by the organization up until 1994) responds: "Age is not the major yardstick. Some youngsters are ready to start at 10, others at 14. The only real measures are those of maturity and individual responsibility. Does your youngster follow directions well? Is he conscientious and reliable? Would you leave him alone in the house for two or three hours? Would you send him to the grocery store with a list and a $20 bill? If the answer to these questions or similar ones are `yes,' then the answer can also be `yes' when your child asks for his first gun."



**NSSF pamphlet *When your youngster wants a gun...***

■ At the NRA's 1996 Annual Meeting in Dallas, Texas, then-President Marion Hammer introduced her 10-year-old grandson Michael, stating, "I know that when NRA reaches out and takes the hand of a child, we are touching America's future." Hammer also outlined the NRA's agenda to "invest" in America's youth, win their "hearts and minds," and ensure the organization's longevity: "I pledge to you to dedicate my term in office to

two demanding missions. One is building an NRA bridge to America's youth. The other is being fiscally far-sighted to provide for bold new programs that will teach America's children values to last a lifetime. It will be an old-fashioned wrestling match for the hearts and minds of our children, and we'd better engage our adversaries with no holds barred....If we do not successfully reach out to the next generation, then the freedom and liberty that we've lived for — and that many of our ancestors have died for — will not live beyond us."

- A New England Firearms advertisement that appeared on the cover of the September/October 1998 issue of the gun industry publication *Shooting Sports Retailer* warned, "It's not `who your customers will be in five years.' It's `will there be any customers left.'" The cover shows a family shooting, with the parents slowly fading away as a child aims a long gun. Inside the magazine, a full-page ad from the company warns, "Building the next generation of customers takes work and commitment. But it must be done. The greatest threat to the firearms business may not be the anti-gunners. It is a future which lacks gun owners and users due to lack of interest. In effect, [the] greatest threat we face is the lack of a future customer base for the products which we all sell. Coming to grips with this challenge is not easy but it must be done."[6]

The warnings made in the 1990s are being echoed in the new millennium. In a 2007 "Retailing Intelligence Report" column titled "Shooting for a New Audience" (subtitled "Reaching New Demographics is Critical to Our Industry") in the gun industry trade publication *Shooting Sports Retailer*, industry marketing consultant Bruce Bear warned:

"If we don't improve at cultivating new hunters and shooters, the sport we love and industry we work in will eventually die away. That's a strong diagnosis, but a realistic one. Like many enthusiast sports in this busy, competitive world, people are leaving faster than new ones are coming in — and this is a recipe for industry-wide trouble down the road."

Urging that the gun industry "Reach Out to Young Guns," Bear warns, "It's absolutely critical for us to pass a love of shooting and hunting on to the next generation," and quotes a Dallas-area gun store owner: "Many baby boomers are getting older and getting out of hunting and shooting, and we need new people to replace them." Adds Bear, "Working with kids and their parents is not only good business, it is helping families discover the fun of sharing shooting sports together."[7]

The industry's concern is easily understood looking at the demographics regarding not only hunting, but household gun ownership overall. According to the General Social Survey (GSS)[8] conducted by the National Opinion Research Center (NORC) at the University of Chicago:

- From 1977 to 2014, the percentage of American households that reported having any guns in the home dropped by 40 percent.

- During this period household gun ownership hit its peak in 1977, when more than half (53.7 percent) of American households reported having any guns. By 2014, 32.4 percent of American households reported having any guns in the home, a drop of more than 20 percentage points.

- In 2014, less than a third of American households reported having a gun in the home.

1049

## TABLE ONE: HOUSEHOLD GUN OWNERSHIP IN THE UNITED STATES, 1973 TO 2014

| Year | Percent of Adults in Households with Guns | Year | Percent of Adults in Households with Guns | Year | Percent of Adults in Households with Guns | Year | Percent of Adults in Households with Guns |
|---|---|---|---|---|---|---|---|
| 1973 | 48.7 | 1985 | 47.9 | 1994 | 43.8 | 2008 | 35.9 |
| 1974 | 47.6 | 1987 | 48.5 | 1996 | 43.3 | 2010 | 32.1 |
| 1976 | 49.5 | 1988 | 43.1 | 1998 | 36.5 | 2012 | 34.4 |
| 1977 | 53.7 | 1989 | 48.7 | 2000 | 34.2 | 2014 | 32.4 |
| 1980 | 50.3 | 1990 | 45.4 | 2002 | 36.4 | | |
| 1982 | 48.6 | 1991 | 43.4 | 2004 | 37.0 | | |
| 1984 | 48.1 | 1993 | 45.4 | 2006 | 34.4 | | |

One of the "main reasons" cited by NORC for the decline in household firearms ownership is "the decrease in the popularity of hunting." In 1977, 31.6 percent of adults lived in a household where they, a spouse, or both were hunters (see Table Two). By 2014 this number had dropped by more than half, to 15.4 percent.[9]

## TABLE TWO: THE DECLINE IN HUNTING, 1977 TO 2014

| Year | Percent Households With Adult Hunters | Year | Percent Households With Adult Hunters | Year | Percent Households With Adult Hunters | Year | Percent Households With Adult Hunters |
|---|---|---|---|---|---|---|---|
| 1977 | 31.6 | 1988 | 22.2 | 1996 | 23.1 | 2008 | 17.6 |
| 1980 | 28.3 | 1989 | 23.4 | 1998 | 19.3 | 2010 | 18.2 |
| 1982 | 26.8 | 1990 | 24.3 | 2000 | 18.7 | 2012 | 19.7 |
| 1984 | 26.7 | 1991 | 23.0 | 2002 | 20.2 | 2014 | 15.4 |
| 1985 | 26.2 | 1993 | 21.0 | 2004 | 19.4 | | |
| 1987 | 25.5 | 1994 | 22.1 | 2006 | 17.2 | | |

According to a survey from a 2015 National Shooting Sports Foundation marketing study, 72 percent of gun owners began hunting between the ages of six to 15 years old. After age 15, the percentages drop precipitously: 12 percent began hunting from age 16 to 20; three percent began hunting from age 21 to 25; and only six percent began hunting over the age of 25 (seven percent began hunting at age five or less). Recognizing that hunting is the primary means by which youth are introduced to guns, the focus on children is no surprise.[10]

The gun industry's recognition that it relies on winning the "hearts and minds" of America's children has not changed since NRA President Marion Hammer's day. What has changed is the openness with which the industry and its lobbying partners carry out this mission, the lethality of the types of firearms they are promoting, and the sophistication of their marketing efforts to children. Bolt-action rifles are being supplanted by military-style assault rifles. Six-shot revolvers have given way to semiautomatic pistols. And just as before, a constant, underlying goal of this outreach effort is to ensure not just the financial well-being of the industry, but the political viability of the pro-gun movement.

While under federal law an individual must be 18 years old to purchase a rifle and 21 years old to purchase a handgun from a Federal Firearms License (FFL, the basic federal license required to deal in firearms) holder, federal law as regards possession is far more lax. Federal law is mute on long gun possession by those under the age of 18, and while federal law ostensibly prohibits handgun possession under the age of 18, there are numerous exceptions. State law on gun possession varies by jurisdiction.



**Savage 2015 catalog**

## DAVEY CRICKETT, LITTLE JAKE, AND THE MARLIN MAN

Many Americans would be surprised at the age at which some parents introduce their children to firearms. This was made clear in April 2013 when a two-year-old Kentucky girl was unintentionally shot and killed by her five-year-old brother with a 22 caliber rifle he had received as a birthday gift. The gun, a Crickett rifle manufactured by Keystone Sporting Arms, the self-proclaimed "leading rifle supplier in the youth market,"[11] is specially designed for children. On its webpage, a friendly cartoon character stepping into the Joe Camel role for the company, "Davey Crickett," holds a rifle and stands atop the company's slogan: "My First Rifle."[12] "Crickett Logo Wear" in the company's catalog includes an armed Davey Crickett Beanie Baby ("not for children under three years of age"[13]), a Davey Crickett "trading pin," and a "My First Rifle" dog tag. The company also has a promotional YouTube video for its child-sized weapons.[14]



**Various "Crickett Logo Wear" for children from Keystone Sporting Arms**

On the company's website, cartoon "story books" from Little Sportsman Inc. include *My First Rifle* as well as a series featuring a freckled-faced protagonist named "Little Jake" which includes the titles *Little Jake and the Three Bears* and *Little Jake On Safari*.

In *Little Jake and the Three Bears*, Little Jake decides he needs a bear rug for his bed to keep warm during the "long cold winter." He then gets on his ATV, visits his friend the game warden to get his "bear-hunting license," and then visits his "favorite sporting goods store" where his friend Jerry sells him the necessary "hunting supplies." Little Jake then waits for bear hunting season to begin, "getting very excited" and noting, "It was almost like waiting for Christmas." After coming across bears that were either "too small" or "too big" to keep him warm, he finds one that is "just right," and shoots it, noting that the bear "never felt a thing." The story ends with Little Jake in bed, covered by his bear rug, eating "tasty bear sausages."



In *Little Jake On Safari*, Little Jake, his dad, and their hunting party interrupt their hunt for buffalo in Africa to aid a local village where there "has been a big bull elephant destroying their crops…." Little Jake and the hunting party go to the village, where they look over a scene of bent corn and smashed watermelons. After it's explained to Little Jake that "These are not the cute, loveable animals you see in cartoons and at the circus" but "one of the smartest and most dangerous animals on earth," the hunting party eventually comes across the elephant, who charges. Little Jake aims "for the brain" and brings the elephant down with two shots from his elephant gun with a "Bang!" and a "Bam!" The local villagers come, and before they start "harvesting the huge animal," begin "singing and dancing around, happy that the elephant would never again destroy crops or hurt anymore [sic] people." In the end, the tribe's chief gives Little Jake the elephant's tusks as a gift "so that you will always remember the time you saved my village."



In a bizarre and brazenly transparent disclaimer, the publisher of the Little Jake series explains that even though Little Jake looks, talks, and acts "like a child":

"Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision. As this series evolves with new titles, readers will learn more about Little Jake, his background and family. Soon we will be introduced to Little Jane (Little Jake's younger sister) through her own book series."[15]



**Pages from** *Little Jake On Safari*

Despite the presumed acceptability, and even desirability, of the combination of children and guns presented on the Keystone website, across the country, sorrow at the tragedy of the Kentucky shooting was followed by shock and surprise that not only could a five-year-old legally possess his own gun, but that there was a significant faction of the gun industry geared toward this market.

A 2014 article from *NRA Family InSights* on guns for children under eight years of age offers a snapshot of just one gunmaker's efforts, Marlin, to target children, right down to the creation of a real-life "Marlin Man" by the company:

"There's been a lot of talk about getting kids interested in shooting. Now, we're finally seeing firearms manufacturers getting serious about it. Several companies are offering firearms sized just for kids. Marlin has taken a very bold step in that direction. They've done things right with their new XT line of .22 rifles. These rifles are not just sized for kids; they're completely designed for kids."

1054

"Marlin took a different approach than many companies, which just put a shorter barrel on a rifle and cut the stock off a bit. Marlin engaged in a lengthy research program using real kids as test subjects. They looked at every aspect of a rifle in an effort to determine what they could do to make it more kid-friendly."

"Their efforts paid off and in a big way. I got to see this first-hand at an event held at the Glade Springs Resort in West Virginia. Like many companies that launch a new firearm, Marlin invited several firearms journalists to come and see these new rifles. But this time, Marlin went a step further: They asked the writers to bring their kids."

"This made perfect sense, because what better way to evaluate rifles sized specifically for kids than to let kids shoot them? Before the event got underway, the kids spent the morning riding horses. And then, when they arrived at the range, they got to meet the Marlin Man and his horse in person. The Marlin Man is the mounted cowboy Marlin has used as a logo for many years. He was brought to life for the kids at this event and he stirred the cowboy in everyone present."

"The kids were turned loose on the range, which was staffed with Marlin employees and members of the West Virginia Division of Natural Resources. After two days of shooting thousands of rounds of .22 LR ammunition, the verdict was in: Marlin's XT 22 Youth rifles are winners. If you're a kid looking for your first rifle, this is the gun you need to tell your parents about."[16]





**Marlin 2016 catalog**





**Photos of very young children with high-powered firearms can be found on websites and social media such as Facebook**

## "TACTICAL" RIFLES FOR KIDS

From gun magazines, to websites, to social media, two things become clear. For some gun owners there is almost a race to the bottom to see how young a child can be to handle, and eventually possess, a gun. At the same time, there's not infrequently an inverse trend to see how powerful a gun the child can handle.

Writing for Jews for the Preservation of Firearms Ownership (JPFO) in 2014, JPFO writer contributor Nicki Kenyon explains:

> "When my son was 4 years old, we decided it was time to introduce him to gun safety. He couldn't quite tie his shoes yet, but we knew we had guns in the house, and we knew we needed to instill good habits early, because it was literally a matter of life and death. His father was a police officer, and I was active in gun rights, and made it a point to be armed as much as possible. I still do. It's a matter of life and death...."

"I can't remember how old he was, exactly, when he shot his first firearm — I think he was probably 8 years old — but I know he was around 10 when he shot his first machine gun. I remember when he was about 6 years old, I sent him to my bedroom to get some paperwork that was on his father's night stand. He called down to me and said, 'Mommy! Daddy's pistol is sitting on top of the paperwork. Do I have your permission to move it?' That's when I knew we taught him well...."

"My son was lucky. He was legally allowed to handle firearms in Virginia. We took him to the range. He shot a variety of firearms — rifles, pistols, machine guns and shot guns. He has had his own eye and hearing protection since he was in elementary school, and he received his first Mossberg Plinkster when he was approximately 9."[17]

And while Kenyon describes her child's climb up the ladder of firepower with equal doses of pride and rationalization, four months later the risks of putting a full-auto machine gun into the hands of a child was illustrated to the nation with horrific clarity. On August 25, 2014, 39-year-old firearms instructor Charles Vacca, a father of four, was shot and killed at the Last Stop gun range when he was teaching a nine-year-old on vacation with her family in Las Vegas how to shoot an UZI submachine gun. The girl lost control of the weapon as the result of the full-auto weapon's recoil. The gun climbed up out of her control and she unintentionally shot Vacca in the head. The girl then dropped the weapon and ran to her family, who huddled around her as she held her shoulder.[18]

In the comments section of an online article from the NRA's *American Hunter* magazine titled "Choosing Your Child's First Gun," readers detailed the ages at which they felt their own sons and daughters were ready for their first gun: five, six, seven, and older. One of the points raised in the article was the fact that the recoil from many guns can hurt child shooters. As a Virginia Beach gunsmith told the author, "The first thing you want to avoid is to not overgun your kid...You try to give an 8-year-old kid a .308 or some blowaway magnum and it's going to be too much. It will just make the child recoil shy and that's the worst thing you can do to a kid." The author added, "Not only will it hamper their ability to become accurate, but it may chase them away from the sport before they've even really had the chance to get into it, according to many experts. Every time they shoot, they'll be thinking, 'this gun is going to kick the heck out of me,' and if that thought is on their mind, they'll never be able to shoot accurately."[19]

One reader did take issue with the author's reticence on recommending an AR-15 assault rifle as a first gun for an eight- or 10-year-old child, writing, "If you teach your child proper firearms basics an AR is the perfect way to go. I built my six year old son one and he loves it."[20]



**Photo from NRA's 2014 Great American Outdoor Show (Sue Roman)**

For those who don't want to wait to put an assault rifle in their children's hands, but do have concerns about recoil and the weight of the weapon, a growing industry-wide trend toward 22 caliber assault rifles, often utilizing plastic resulting in lighter weight, has taken hold and is expanding. An additional frequently cited benefit is the relatively low cost of .22 ammunition, particularly for those who wish to train with the weapon.[21] As one author noted in *Shooting Sports Retailer* in discussing 22 caliber AR-style assault rifles: "these guns bring the coolness and fun of the tactical rifle to kids and less serious shooters..."[22] Throughout the industry, 22 caliber versions of higher-caliber assault rifles are increasingly common and frequently cited in the context of marketing guns to children:



*Junior Shooters*, **Summer 2011**

- The product description for a .22 Bushmaster AR-15 model at the Gander Mountain Sports website states: "Designed for the indoor range and the youth shooter, this Carbon15 .22 LR Rimfire lightweight is sure to add new dimensions to your Bushmaster shooting pleasure. Operational controls are functionally and ergonomically identical to AR-15 type rifles...."[23]

- "INTRODUCING THE NEW SIG522 Rifle" says a Sig Sauer ad for a new 22 caliber assault rifle that appeared in the Summer 2011 edition of *Junior Shooters*. [See later section *Junior Shooters*: "For Kids By Kids"] Under the headline "DOUBLE TAKE," the text reads, "It looks like the legendary SIG556, but look again. It's the SIG522 Rifle firing affordable .22LR. The new SIG522 has the look, feel, and action of the classic military-style SIG556 rifle...yet it costs much less, and fires affordable .22LR rounds. The full-size semi-auto SIG522 features a button rifled barrel with flash suppressor, light weight aluminum receiver with integral Picatinny rail, Swiss-style folding stock, and a 25-round magazine. To find out more about how to get the look, feel, action, and dependability of the SIG556, combined with .22LR caliber affordability, check out the new SIG522 at www.sigsauer.com — **on the double!**"[Emphasis in original][24]

---

■ An article in *Junior Shooters* exclaims, "One of the best dedicated AR-type .22 rifles to come out in the last couple of years is Smith & Wesson's M&P15-22. The M&P15-22 is built with high-strength polymer upper and lower receivers. This creates a reduced-weight rifle that retains the looks and operating features of the standard M&P rifle. Let me tell you, this rifle rocks!"[25]

■ A December 2013 review published on the website of Bill's Gun Shop & Range promises that the "Beretta ARX 160 in .22 LR is the company's fun version of their current military carbine that was designed in 2008. The military versions come chambered in 5.56x45mm NATO, 5.45x39mm Soviet, 6.8mm Remington SPC and 7.62x39mm Soviet. Along with the Italian Army it is also being fielded by Albania, Egypt, Kazakhstan, the Mexican Federal Police and Turkmenistan. The U.S. was in the process of evaluating it as a replacement for the M4 before the replacement process of [sic] cancelled." At the end of the glowing review, the shop concludes, "December is the perfect month for Bill's to offer this carbine as their Gun of the Month as plenty of kids (both young and old) will have a military replica .22 on their



**December "Gun of the Month" from the website of Bill's Gun Shop and Range**

Christmas list. The Beretta ARX 160 is a great choice and the holiday gives you the perfect excuse to buy one and act like it is a gift for your son or daughter. Just be sure to bring them to the range and let them shoot it every once in a while."[26] Surrounded by candy canes, a bow, and ribbon, the assault weapon is the gun dealer's "December Gun of the Month."

The appeal of the Beretta assault rifle to youth was made clear at the 2014 NRA-sponsored Great American Outdoor Show in Harrisburg, Pennsylvania. At the Beretta display at the show, a constant stream of young children, some alone, others accompanied by their parents, were drawn to the models of the gun, as well as other Beretta assault weapons, as these photographs of the Beretta display at the show illustrate.






**Photos from the Beretta display at the NRA's 2014 Great American Outdoor Show (Sue Roman)**





**Photo from NRA's 2014 Great American Outdoor Show (Sue Roman, VPC)**

## GUNS IN A RAINBOW OF COLORS

According to *Shooting Sports Retailer*, "More companies are offering pistols, rifles and shotguns built for smaller-framed shooters these days, with a dizzying array of models, colors and calibers to choose from. Making sure your customers get the best fit could help bring the next generation into the shooting sports."[27] The article, "The Best Guns for Smaller Shooters," warns:

> "Lenin was famously quoted as saying 'Give me just one generation of youth, and I'll transform the whole world.' With this in mind, developing the next generation in the shooting sports isn't just a business decision: The survival of the firearms world depends on the political will of those who come after us, which is a direct result of their involvement in the shooting sports."

> "So for reasons both fiscal and political, it's critical to provide products well-suited to young shooters. Although these guns have traditionally been called 'youth models,' when we started looking at the current offerings, we saw many called 'compact' versions instead. This implicitly points out that while we're using age as our primary qualifier, the features that make a gun well matched for young people also help the gun fit other shooters who are small of stature, such as females."[28]

Most common are pink guns for women and girls. At the online Sportsman's Outdoor Superstore, potential buyers can browse "Guns with Color," which includes pistols, revolvers, rifles (including numerous assault rifles),

---



**Photo from NRA's 2014 Great American Outdoor Show (VPC)**

and shotguns. Under pink pistols are weapons from Beretta, Browning, Cobra, Kel-Tec, SCCY, Ruger, Sig Sauer, Taurus, and Walther. Pink guns for females are a key marketing tool for girls:

■  "When 8-year-old Sara saw the gun, she knew she wanted to shoot it. Even though she'd never shot a gun before in her life and had never shown an interest in shooting, once she took a look at the 'Muddy Girl' from Henry Repeating Arms, she wanted to take her first shot."

"New in 2014, this Henry mini-bolt rifle, called the Muddy Girl, sports its namesake's camo pattern — a zany hot-pink-purple-and-black combination that belongs on more guns than just this little wonder. It makes a lifestyle statement for females that says, 'This gun is mine. Get your own...'"

"Sara, a 'girly-girl' who likes to cheerlead, left her pompoms behind, yet still coordinated her pink-and-black matching apparel for the photo shoot. Out on the range, her Aunt Marti — a pro-staffer for Mossy Oak and Moultrie Products...showed her how to shoulder the gun and how to weld her cheek to the curvy, synthetic stock..."

"'I like the color and the size of this gun,' said Sara. 'And I also like that it didn't kick me and it was easy to use...'"

"Its one-piece synthetic stock has been designed with just the right angle for little hands to grasp the gun firmly and still pull the trigger with confidence."[29]

■  Writing in *Junior Shooters* magazine, 12-year-old Casey Lutz is featured with a pink CZ bolt-action youth rifle. Says Lutz: "When my dad brought home the gun, a CZ 452 Scout, chambered in 22 long rifle, I was

 

**Savage Arms youth rifles are featured at the NRA's 2014 Great American Outdoor Show (Sue Roman) and in *NRA Family InSights***

excited to see that the gun was pink! My first thought was, 'Finally, a cool gun for a girl!' It's nice to see that companies like CZ make guns specifically for young women shooters. The second thing I noticed was the gun was small and compact and was designed to fit kids."[30]

A crayon-box of colors is offered for guns specifically targeted at youth, including the 22 caliber weapons through which they are most likely to be introduced to shooting.

■ Smith & Wesson offers a 22 caliber version of its M&P15 (M&P stands for Military & Police) AR-15 assault rifle in bright colors that include Pink Platinum, Purple Platinum, and Harvest Moon Orange.[31]

■ Savage Arms' youth rifle, the Rascal, presents the gun in child-friendly colors: red, yellow, orange, pink, and blue. In an ad for the youth rifle, the company promises that the firearms deliver "ONE SHOT, ONE THRILL!"

■ On its website, featuring assault rifles "built by Americans, for Americans," Black Forge Weapons offers "Youth Model" AR-15 assault rifles that come in orange, violet, green, blue, and red.[32]

 

**Twelve-year-old Casey, *Junior Shooters*, Summer 2011**     **Eight-year-old Sara, *NRA Family InSights***



**Bright-colored .22 assault rifles featured on the Smith & Wesson website**



**"Youth Model" Black Forge AR-15-style assault rifles**

## THE "FISCAL AND POLITICAL" BENEFITS OF MARKETING GUNS TO CHILDREN

As noted by *Shooting Sports Retailer*, the impetus for marketing to children is both "fiscal and political."[33] In addition to the hoped-for financial benefits of marketing guns to youth, a corollary goal is to ensure that such an effort will help maintain a pro-gun base for political action.

Writing in the NRA's *America's 1st Freedom* magazine, Editor Mark Chesnut warns that "the future of our freedom — and our shooting and hunting heritage — lies in our children and grandchildren. Let's not get too busy or too focused on ourselves and our own activities to pass along to our kids the important things they need to know in order to be informed citizens and voters in the future."[34]

In a Spring 2012 editorial, *Junior Shooters* Editor-In-Chief Andy Fink chided those gun industry members who, when urged to target youth, respond, "Oh, that isn't my market?"[35] Noting that it's not just an issue of jobs, but of "gun rights," he warns:



*Junior Shooters*, **March 2011**

"It is thrilling to see so many people supporting juniors around the country. People are volunteering their time. Companies and organizations also provide time, energy, products, and money to ensure the shooting sports continue. However, we are not doing enough. All the companies involved in the shooting industry

1064

need to realize our youth are the future of the shooting industry and thus each job within the industry is dependent upon juniors growing up with an appreciation for the sport we love. Each adult needs to help in some way by volunteering, or promoting youth shooting. This effort will also have a huge impact on retaining our gun rights, our hunting heritage, and wildlife conservation. We all need to do our part."[36]

Later that year, Fink revisited the issue:

"Each person who is introduced to the shooting sports and has a positive experience is another vote in favor of keeping our American heritage and freedom alive. They may not be old enough to vote now, but they will be in the future. And think about how many lives they will come in contact with that they can impact! Each of us affects others, and it is up to us how we make an impact on the future."[37]

Or, as a *Junior Shooters* promotional ad for itself in the magazine cheerfully explained under the headline "Junior Shooters: Making a Mark" — "This is not your everyday magazine. This is a magazine for kids and parents interested in preserving our 2nd Amendment rights. But not in a stuffy shirt, political way. We want to have fun. Join us."[38]

And in an article on the National Shooting Sports Foundation's 2015 gun industry summit, *Shooting Sports Retailer* stated:

"And of course, the problem with failing to recruit and grow is that numbers equate to political power. In an era when the private ownership and use of firearms, the right to 'keep and bear arms,' has come under increasing pressure, numbers and a young, vital membership are critical."[39]



*Junior Shooters*, Summer 2013



*Junior Shooters*, Summer 2012

## JUNIOR SHOOTERS: "FOR KIDS BY KIDS"

Perhaps the most honest and unvarnished look into the ongoing effort to create a youth gun culture can be found in *Junior Shooters*, available online and in print format.

Based in Boise, Idaho, the magazine "strives to be the first of its kind to promote juniors involved in all shooting disciplines…" and is "dedicated to juniors of all ages and their parents." The publication adds, "We care about kids and their parents and want you to have a place to go to find what is needed to get started in many different shooting venues."[40]



The home page for *Junior Shooters* features ads for assault rifle manufacturers Rock River Arms and Stag Arms

Visitors to the website are greeted by ads for AR-15 assault rifles. Clicking on the Rock River Arms ad for its LAR Coyote Carbine, the viewer is taken to a full description of the weapon on the company's website, and the ability to explore the full site. An ad for Stag Arms shows an AR-15 assault rifle and in a series of panels asks the questions "LEFT HANDED?" "RIGHT HANDED?" "WE'VE GOT YOU COVERED!" Clicking on the ad brings you to the company's website.[41]

Additional gun manufacturers listed as sponsors on the website are: companies that manufacture only assault weapons, such as Bushmaster (manufacturer of the AR-15 assault rifle used in the 2012 Sandy Hook Elementary School shooting in Newtown, Connecticut that left 20 students and six educators dead) as well as the aforementioned Rock River Arms and Stag Arms; companies that manufacture assault weapons and high-capacity pistols, such as FNHUSA, Remington, Sig Sauer, Smith & Wesson, and Sturm, Ruger & Company; and, companies that manufacture solely pistols, such as Glock.[42] Each issue of *Junior Shooters* contains an Advertiser's Index at the back of the magazine. Among the associations listed as sponsors of the publication is the gun industry trade association the National Shooting Sports Foundation (NSSF) and National Rifle Association Youth Programs.

Little known outside of pro-gun circles, the magazine frequently presents a blunt view of the financial and political benefits that recruitment of children offers the pro-gun movement.

In discussing the benefits of "junior shooters" to the gun industry and gun lobby, Editor-In-Chief Andy Fink explains, "Juniors start shooting, and become interested, in related sports at a young age, as young as six, seven, or eight" and can continue as a "junior" shooter until the age of 18 or 21, adding, "They may also have the build of a young youth or an adult."[43]

Fink makes the case that literally every firearms product can be marketed to "juniors," including concealed carry pistols (with the goal of the youth eventually obtaining a concealed carry permit when old enough) and assault rifles, writing:

> "What market isn't tied to juniors? I really can't think of any. Military and law enforcement firearms have civilian versions which are applicable. The Concealed Carry Weapon (CCW) market has firearms which hold 10-rounds which is the limit for IDPA [International Defensive Pistol Association] competition.[44] When the junior turns 21 they can get a CCW permit. What do they buy? It is usually a gun from a manufacturer they are familiar with."[45]

Promising content "For Kids By Kids," articles in the magazine, with headlines such as "Why I Love Bushmaster AR-15s...You Should, Too"[46] commonly promote high-capacity semiautomatic pistols and assault rifles, often referred to by the industry-promoted euphemism "Modern Sporting Rifles" (MSR). At the same time, advertisements for assault weapons, high-capacity pistols, and firearm accessories are ubiquitous. Examples of the types of weapons and accessories promoted for children and youth in editorial content and advertisements are offered below.

- A 2014 press release from gun manufacturer Mossberg included with online articles on the *Junior Shooters* website boasts that the company has "45 Firearms Developed Specifically for Smaller-Statured or Younger Shooters." The self-proclaimed "leader in the development and design of firearms for younger and small-statured shooters," the company touts its "recently-launched Mossberg 2014 Youth Catalog" and lists among its "industry-partners" the National Shooting Sports Foundation and the National Rifle Association.[47]

■ A profile of an AR-15 assault rifle upper receiver states that the "Adams Arms 14.5" Evo Ultralite Piston AR-15 upper is a great upper for a junior shooter; it's light, it's short, and it's accurate."[48]

"One advantage to having such a short, light upper is maneuverability and ease of use by younger, smaller shooters. At one local 3-Gun match [see the later section, *The Industry Finds Its "'Reality' Video Game" in 3-Gun Competition*], there was a long hallway with four doorways that you had to shoot through. The targets were set up so you had to move into the doorway. The short barrel really helped me move in and out of the doorways quickly. It was a real advantage."[49]

■ In a 2009 article that comes across more as a promotional piece, "The Mosquito: A Cool .22 With A Sting," Editor-in-Chief Andy Fink writes, "The .22 Mosquito is a real stinger." Spread across the top of the page is manufacturer Sig Sauer's logo. At the bottom is a picture of the pistol in pink, with the caption "The pink Mosquito — For the ladies!" Promising that the pistol's "slide is easy to operate even for youngsters," in the article Fink tests the gun, as do children ages 11, 12, 14, and 16. Fink reports, "Each of them liked the feel of the gun and operation. They had to get used to the first shot cocking the hammer being double-action with a heavy trigger pull of 12.1 pounds."[50]

Four years later, Fink revisited the gun, this time with three co-authors, two age 13 and one 18 years old:

"This pistol is sweet! It looks cool. It fits in your hand well, even the small hands of juniors and smaller women. It's a double/single-action semi-auto and is great for plinking and practice...[51] Sig Sauer's Mosquito has an ergonomic design to provide an enjoyable shooting experience. It is based on the design of the Sig Sauer P226 but is 10% smaller in size and chambered for the .22 long rifle cartridge."[52]

In the article, endorsements for the pistol are offered by two 13-year-old boys:

"Hayden Lierman (13): My .22 Mosquito pistol is the Desert Digital Camo model manufactured by Sig Sauer...The pistol looks cool and feels like a Beretta, which I think is awesome. It's a desert camouflage color."[53]

"Wyatt Irish (13): At first I thought that it was way too small to be



*Junior Shooters*, Summer 2009





*Junior Shooters*, Summer 2009        *Junior Shooters*, Summer 2010

reliable…However, one thing was for sure: I loved how the grip felt in my hand. For a person with small, bony-fingered, 13-year-old hands, the grip almost felt custom fit."[54]

■ In "Glocks are for Girls," the magazine reviews "a small, compact pistol" that is "generally used for conceal carry." The reviewer notes that "because of its small frame, I was able to shoot and operate it easily despite having small hands."[55]

■ Under "Kids' Gear" the magazine promotes online shooting sports accessories marketer Brownells (headed by NRA Board Member Pete Brownell) and features an assault rifle with a 100-round ammunition magazine:

"WOW! Do you need shooting accessories to go with your firearm? What about optics, mounting equipment, slings, magazines, cleaning materials, and parts? Brownells carries just about anything you can imagine… *Junior Shooters* has been working with Brownells since it started publication. We have found them to [sic] very supportive of promoting juniors and the shooting sports, and their customer service is excellent! We seriously recommend you check them out at www.brownells.com."[56]

■ "FIREFIELD SALUTES YOU, JUNIOR SHOOTERS!" is the headline atop a full-page ad from parts and accessories manufacturer Firefield. Below two males dressed in camo, one holding a shotgun and the other brandishing a pistol, the text reads:



*Junior Shooters*, **Winter 2011**

"We know that you are tomorrow's leaders of the industry, the ones who continue to value and support the outdoors through shooting. The one's [sic] who will continue to uphold the values of our country. The one's [sic] who will introduce the value of the great outdoors to the next generation and instill in them the love and respect that comes with being a shooter. Firefield isn't all about winning. We know the real victory lies in getting out there, smelling the fresh air and holding freedom in your hands. Let's keep that victory for the next junior shooters."

The ad ends with "Firefield — Victory Justifies Everything!"[57]



*Junior Shooters,* **March 2011**

In addition to the implicit advertising benefits *Junior Shooters'* articles "For Kids By Kids" offer the gun industry, the magazine regularly features full-page ads from gun companies, many featuring assault rifles and high-capacity pistols:

■   A full-page ad from Next Generation Arms for its X7 AR-15-style assault rifle states: "*The Gray Rifle* — an indistinct, shadowy weapon carried by an unseen, unstoppable foe." The ad continues: "Who is the X7 for? Visit us at www.nextgenerationarms.com and look at some of our featured users. They train many thousands a year in the tactical use of the AR-15. They protect and serve. They defend their homes and their homeland. The X7 continues our tradition of tactical performance and better-than-needed accuracy in a military grade small shoulder arm that works in all climates with little care."[58]



*Junior Shooters,* **Winter 2011**

■   An ad for a 22 caliber 1911 pistol has the headline "Make Dad Jealous" with a smiling young girl holding a target as the centerpiece. The text reads, "For less than $300, you can own an authentic 1911 reproduction in .22 LR and spend the day shooting and improving your skills — without emptying dad's wallet. Available through your local gun shop."[59]



PROVEN PERFORMANCE
CONFIDENCE TO LIVE YOUR LIFE

Shooting the best pistol means you can hone your skills and rise to any challenge. Backed by proven reliability, superior engineering and used by approximately 65% of law enforcement, **GLOCK** is a partner you can trust.

To learn more about the GLOCK Sport Shooting Foundation and other events, visit **GLOCK.COM/CONFIDENCE**

GLOCK®
PERFECTION

*Junior Shooters*, Spring 2013

- A full-page ad for Glock pistols shows two black males, a youth and an adult, at an outdoor range, with the headline "Confidence to Live Your Life." The ad, in which the youth is holding an ammunition magazine in one hand and a round in the other, states, "Shooting the best pistol means you can hone your skills and rise to any challenge. Backed by proven reliability, superior engineering and used by approximately 65% of law enforcement, GLOCK is a partner you can trust."[60]

- A full-page ad from Stag Arms features an AR-15-style assault rifle with a high-capacity ammunition magazine and promises that the gun is "Adaptable To Any Application."[61]

- An ad for Rock River Arms' LAR Series of assault rifles (which come in Varmint and Predator models) states, "From varmints to vermin, predators to prey, RRA LAR-8 Series Rifles."[62]



*Junior Shooters*, Spring 2012



*Junior Shooters*, Spring 2013

- A full-page ad for Sig Sauer's SP2022 pistol features the handgun, notes that it comes in 9mm, .357, and 40 caliber and adds, "No wonder it's becoming the standard choice among elite military and LE [law enforcement] forces worldwide."[63] A second full-page ad from the company for its "microcompact" P290RS concealed carry pistol states, "Get 9mm performance in a palm-sized, easy-to-carry polymer package." The tag line for the ad states, "Sig Sauer, when it counts."[64]

# NRA "JUNIOR MEMBERS"

Since 1981, and until recently, the National Rifle Association has published in print or online *NRA InSights* magazine for its Junior Members[65] under the age of 15 (although the online content is available to anyone).[66]

The industry's focus on youth as its financial savior is made clear in an ad for Marlin's XT rimfire rifle that appeared in the online version of the magazine. The headline of the ad reads, "FOR THE FUTURE OF OUR SPORT, IT'S THE MOST POWERFUL FIREARM ON EARTH." With a picture of a father and son together, the ad promises that the gun can "light a fire for the shooting sports or rekindle your own." Clicking on the ad leads the reader to the company's website and its full product line. Another online ad, for the Kel-Tec PMR-30 pistol, links to the company's website, where the first three images that greet the reader are adult shooters holding assault rifles.[67]

In January 2014, the NRA changed the title of *NRA InSights* to *NRA Family InSights* and switched to an online-only format for the magazine with accompanying website. In an editorial announcing the switch, the magazine promised, "In addition to the fun and informative content designed just for Junior members, we'll be including articles, photos, reviews and news for everyone in your family — parents, grandparents, and other family members."



***NRA InSights* online edition**



***NRA InSights* online edition**

In its "Industry Spotlight," the site features a profile of NRA Board Member Ronnie Barrett, inventor of the 50 caliber sniper rifle. Fifty caliber sniper rifles, used by U.S. troops around the world, can bring down commercial aircraft on takeoff and landing, pierce armor plating, and are accurate to more than a mile. They are banned in the state of California and the District of Columbia, but elsewhere they are as easy to purchase as a hunting

rifle under federal law. The promotional profile finishes with, "To read more about Ronnie Barrett and Barrett Firearms, go to www.barrett.net." By clicking on the link, the reader is taken to Barrett's website which features solely assault rifles and 50 caliber sniper rifles.[68]

Under "Kids," visitors are presented with two subsections: "Under 8" and "8 and Up." Both include a section titled "Guns."[69]

A review of the Thompson/Center HotShot rifle in the "Under 8" section states:

> "It's important to make a distinction here. With the HotShot, we're not talking about a slightly reduced-size rifle for teens who are not quite ready for a full-size gun. No, we're talking about a tiny gun intended for the very youngest shooters — the ultimate first gun. 'We're targeting the six- to 12-year-old range and feel that with the inclusion of the one-inch spacer in the box, there will be a longer period that the child can use the rifle, potentially out to 15 years old,' explains…[Craig Cushman, director of marketing for Thompson/Center]."

> "That's important. With the number of hunters declining, it's crucial to get kids introduced to the sport as early as possible."



> "The HotShot means that even the youngest shooters now have a gun sized just for them."[70]

Also included in the website's "Under 8" section are "Awesome Apps," which include for $2.99 the *NRA Gun Guide* app. Text promoting the app asks:

> "Do you like the idea of being able to call up the specs of multiple firearms on a whim? Looking to win the next debate about calibers and models at the range? If so the 'NRA Gun Guide' app is exactly what you've been waiting for."

> "The 'NRA Gun Guide' is searchable by gun type, action type, manufacturer, price range and caliber/gauge, making it easy to find out vital info about the rifle in your local gun store or that pistol your buddy is trying to get you to buy at an inflated price."

*NRA Gun Guide* **App**

> "With an easy-to-follow design, the 'NRA Gun Guide' is suitable for all levels of interest in firearms or experience with mobile apps. And, as new content is regularly added, it can only get better."[71]

When opened, the app promises "Hundreds of Guns Inside!" The "Semi-Auto Handguns" category of the app contains a wide range of pistols from major manufacturers (Beretta, Colt's Manufacturing, Glock, Heckler & Koch, Kel-Tec, Sig Sauer, Smith & Wesson, Sturm, Ruger & Company, and others) including numerous high-capacity firearms as well as guns recommended for concealed carry.  The "Semi-Auto Rifles" category of the app is dominated by military-style assault rifles — AR-15s and others, including 50 caliber sniper rifles.  Assault rifle manufacturers included in the category include Barrett, Beretta, Bushmaster, Colt's Manufacturing Co., DPMS, FNH-USA, Heckler & Koch, Rock River Arms, and others.

An article titled "My First .22 Pistol" offers reassurance to those wanting to introduce children to guns: "Fortunately for you, there are many people — neighbors, coaches, competitors, sales staff — who want to encourage youth shooters and turn them into lifelong firearms enthusiasts and Second Amendment advocates." The article notes that a young person's first pistol may come from brothers or sisters, or a "hand-me-down from someone you meet at the shooting range."[72][73]

The NRA has a wide range of additional programs focused on youth, some of which are named for their gun industry funders, such as the Brownells/NRA National Youth Shooting Sports Ambassador Program, Brownells/NRA Day, and the Winchester/NRA Marksmanship Qualification Program.  (In addition, the NRA has launched a concerted online effort with gun industry support to reach out to Millennials.)

## NATIONAL SHOOTING SPORTS FOUNDATION: THE GUN INDUSTRY'S TOBACCO INSTITUTE

While the National Rifle Association functions as the *unofficial* trade association for the firearms industry, the National Shooting Sports Foundation (NSSF) is its official trade association. In a grim irony, NSSF's headquarters is located in Newtown, Connecticut. The role played by the NSSF within the gun industry is not unlike that which was played by The Tobacco Institute for the tobacco industry. The NSSF offers a wide range of publications for its industry patrons, focusing primarily on marketing. At the same time, just as The Tobacco Institute denied a causal link between cigarettes and cancer, the NSSF continually works to minimize the hazards associated with exposure to firearms, especially by children.

For example, in December 2011, NSSF issued a press release that made the claim that hunting, as measured by injuries per number of participants, was actually safer than bowling, claiming a "percentage of injury per 100 participants" of only .05 percent compared to .06 percent for bowlers. Using NSSF's math, hunting was behind only camping and billiards in its low rate of injury. Other activities NSSF claimed hunting was safer than included golf and tennis. Left out of NSSF's equations were the



NSSF's *Millennials and The Shooting Sports:  An In-Depth Exploration*

severity of injuries for each category, that is, those injuries, if counted, that resulted in crippling disability or death (a distinction that might have benefited golf and tennis as compared to hunting, which included not only those injured by gunfire, but also from falling out of treestands).[74]  Soon after, in a focus group of 12- to 16-year-olds conducted for NSSF and another organization, a similar argument was made and countered:

> "A substantial number of individuals said that hunting and target shooting were rather dangerous activities due to the involvement of firearms. However, others insisted that hunting and shooting were no more dangerous than many mainstream sports; one person suggested that although the *rate* of injuries in hunting and target shooting is generally lower, any accidents that do occur are more likely to be fatal."[75]

In all of NSSF's publications the lethal risk from guns is rarely acknowledged, except as a marketing hurdle. When it is, gun death is consistently presented as being synonymous solely with unintentional shootings. Rarely are gun homicides — with youth as either perpetrators or victims — or suicides ever mentioned. Moreover, the risk of death from guns is, at best, only hinted at as illustrated by this "Message to Kids About Firearms Responsibility" from NSSF's *A Parent's Guide to Recreational Shooting for Youngsters*:

> "Not long ago, in another town, some kids found a firearm.  Maybe they were looking for it because of something they saw on television. Maybe one of them dared the other to find it. Maybe they just found a firearm that was left out by mistake. It doesn't matter why they found it. What matters is the firearm was loaded, and they played with it. Now they are very sorry they did. Don't let this happen to you."[76]

The passage is striking, but not unique, in its ability to place blame, whether it be on television, negligent parents, or the kids themselves, on virtually anyone except the industry.



**NSSF's *Understanding Activities that Compete with Hunting and Target Shooting***

NSSF issues a constant stream of publications, both to support, and defend, the firearms industry in the marketing of its products. Recent NSSF marketing publications (some publicly available, others limited to NSSF industry members) include titles such as: *Millennials and The Shooting Sports: An In-Depth Exploration* (2014); *Understanding Diversity in Hunting and Shooting Sports* (2013); *Understanding the Impact of Peer Influence on Youth*

*Participation in Hunting and Target Shooting* (2012); and, *Understanding Activities that Compete with Hunting and Target Shooting* (2012).

Among the "11 main points to consider" in the executive summary of the NSSF report *Understanding Activities that Compete with Hunting and Target Shooting* are "Electronic and indoor recreation are a threat to recruiting new hunters and target shooters," "Losing hunters and target shooters to competing activities is a subtle process," and, "Start them young."[77]

Discussing the "threat" posed by electronic and indoor recreation, the report presents findings "worth noting" from a 2010 study by the Kaiser Family Foundation: "It is estimated that today's youth 8 to 18 years old spend an average of 53 hours a week on electronic media entertainment," and, "Nearly three-quarters (71%) of youth have a television in their bedroom." NSSF suggests, "Rather than trying to stop youth from using electronic media, the hunting and target shooting industry should use those media to its advantage." "Tactical strategies" toward this end as cited in the report include:



**NSSF's** *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*

- "The industry should use social media and web sites to raise interest and help youth find ways to hunt and target shoot."

- "The industry should team with current online media firms to take advantage of their reach and their abilities to communicate with youth."

- "Because youth are online to be entertained, messages that emphasize fun should be used in this setting."[78]

Under a section titled "Start Them Young," the report states, "There is a clear link between avidity and age of initiation in hunting...."[79] "Tactical strategies regarding initiation" detailed in the study include:

- "To help hunting and target shooting get a head start over other activities, stakeholders such as managers and manufacturers should target programs toward youth 12 years old and younger. This is the time that youth are being targeted with competing activities."

- "It is important to consider more hunting and target shooting recruitment programs aimed at middle school level, or earlier."

- "Programs that have helped in hunting and target shooting recruitment should be implemented; for instance, it is important to implement more youth programs like *Families Afield*[80] and apprentice licenses."[81]

1078

Recognizing that "not all youth can be born into the ideal environment for creating a lifelong hunter or shooter (i.e., as a male within a hunting or shooting family in a rural environment),"[82] the 2012 report *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting* urges that a "'Youth Hunter and Shooter Ambassador Program' be initiated to capitalize on the current population of youth hunters and shooters who can positively influence their fellow peers' attitudes toward the sports."[83] The report, sponsored by both NSSF and the Hunting Heritage Trust, explains how such "youth ambassadors" would be "performing a major service for the hunting and shooting sport communities"—

> "The more familiar youth are with individuals their own age who participate in hunting and shooting, the more likely they will be to support and actively participate in these activities. In this sense, youth hunters and shooters are the key to their fellow friends' and students' acceptance of these activities. Given this direct relationship, it is imperative that youth hunters and shooters recognize the weight and importance of their words and actions with regard to their peers' perceptions of hunting and target shooting…"

> "If non-hunting and non-shooting students talk with, befriend, and interact with youth who are actively involved in hunting and shooting, the positive aspects of these activities will increasingly be thought of as acceptable, appealing, and inviting recreational activities."[84]

The report also urged the use of social media, noting:

> "[T]alk and communication about hunting and shooting should be encouraged and promoted in as many ways as possible, especially through social media. One individual from the [youth] focus groups mentioned photos a hunting classmate had posted on Facebook — as with this individual, such photos tend to encourage questions, invite curiosity, increase interest, and place hunting and shooting activities in the foreground of the social atmosphere. Youth, in particular, are uniquely positioned to take advantage of the most prominent and effective means of social media and other communication tools — hunting and shooting sponsoring agencies and organizations should encourage this tendency wherever possible. In promoting the use of images, remember that pictures are often worth a thousand words: images promoting hunting and shooting should reinforce a positive atmosphere that emphasizes the environment, nature, the outdoors, nice weather, exercise, natural resources, wildlife, a social atmosphere among friends and peer groups, etc."[85]

The report also urged that "youth ambassadors and others should focus on getting newcomers to take a first step into target shooting through any means, whether a BB or pellet gun, paintball gun, or archery bow. The point should be to get newcomers started shooting *something*, with the natural next step being a move toward actual firearms. Initial interest, however, should be embraced in whatever form it presents itself. "[86]

## THE INDUSTRY FINDS ITS "'REALITY' VIDEO GAME" IN 3-GUN COMPETITION

In the competition for the recreation time of youth, video games are seen by the gun industry as both a threat to, and an opportunity for, marketing firearms to youth.

Bud Pidgeon, president of the U.S. Sportsmen's Alliance warns, "By the time kids are in fifth grade, or even before, they're already being pulled away by the allure of video games, organized sports or other activities."[87] And an article detailing NSSF's 2015 Shooting Sports Summit warned, "What those young people appear to be most interested in, at least superficially, is playing computer games, tapping on tiny keyboards and communicating with their friends through social media like Facebook, Twitter, Instagram and other websites."[88]


**Photo from the website of the Tri County Gun Club in Polo, Illinois, illustrating firearms and accessories needed for 3-Gun competition**

Yet while video games are seen as a competitor for the leisure time of children, the argument is frequently made, both inside and outside the industry, that first-person shooter games, and their use of easily identified real-world weapons, offer marketing opportunities.

According to Ralph Vaughn, who negotiates licensing deals with video game manufacturers on behalf of Barrett Firearms, manufacturer of 50 caliber anti-armor sniper rifles as well as assault rifles, "It is hard to qualify to what extent rifle sales have increased as a result of being in games...But video games expose our brand to a young audience who are considered possible future owners."[89]

In a column on the website *Gun Nuts Media*, author Caleb Giddings discusses the guns used in the latest edition of the video game series *Battlefield*. After discussing the video, he concludes:

> "There is a real point to all this digital nonsense though, and something that I saved for last. This game and games like it are absolutely how the next generation of gun owners are getting introduced to firearms. The incredible amounts of realism present in the depiction of firearms in game is a good thing. I guarantee that people will come into gun ranges and say 'I shot something just like that in *Battlefield*.' The immediate response of any employee of any range in the nation should be 'that's awesome! Want to try the real deal?'"[90]

Among the concurring statements in the comments section of the article[91] were:

■ "I agree 100% that games like this can increase the number of 'gun people.' In the range I work in, It's very common to have younger people ask to see then rental guns, and can name many of them off (Beretta 92, AR, Glock, 1911, etc.) based on game experience. Then they get to try one for real and most of them are hooked! I don't know if it's what the game designers intended, but it works."

- ◼ "Though gaming may be more realistic when it comes to firearms and operating, like you said, many people are being introduced to firearms through mediums like this. It is always great that video game devs would put a lot of attention to detail when it comes to subjects like this and seeing them play out IRL [In Real Life]..."

- ◼ "The last generation of games have a big influence on the purchasing decisions of prospective gun owners of a certain age. I dare say that half of the PS90s sold are probably because of *Counter-Strike*, and I think it's responsible for some of the demand for Beretta Elites, as well."

As accessory manufacturer Firefield sums it up: "A majority of Firefield users grew up watching action-packed movies, TV shows and playing interactive video games that encompass tactical gear and military-style weapons platforms. Our optics and shooting accessories allow shooters to turn what they've seen on the screen into a reality."[92]

In 2007, Chris Dolnack, National Shooting Sports Foundation senior vice president, used the term "a 'reality' video game" to describe the organization's Scholastic Rifle Program (SRP) begun in 2003, telling *Junior Shooters* magazine, "We developed an action-packed reactive target format — a 'reality' video game — that is sure to be a hit with today's young shooter."[93] While the Scholastic Rifle Program apparently failed to fill that niche, another industry-promoted shooting event has: 3-Gun competition.



**Video from *The Truth About Guns* shows a 3-Gun participant ready to start the competition**

Writing at the website *The Truth About Guns*, Nick Leghorn promises, "3-gun is as close to a real-life first person shooter video game as you'll get without joining the military."[94] As described by Leghorn:

> "3-gun gets its name from the fact that you use three different types of firearms over the course of the competition: a shotgun, a rifle, and a pistol. You score points by hitting designated targets, which include clay pigeons, cardboard silhouettes, steel targets of varying sizes, and anything else the Range Officer designates as a target....Competitors lose points for hitting 'no shoot' targets (hostages, friendlies, etc) or skipping targets/obstacles. Their score is augmented by the time it takes to complete the course of fire. The person with the combination of fastest time and best accuracy wins."[95]

In a video accompanying the article showing a shooter preparing for a 3-Gun match, a participant is asked, "How are you going to game this stage knowing nothing about it?" He replies, "I think it's kinda like [the video game] *Doom*, run through, keep upgrading weapons as you kill bad guys, right?"[96]

Such competitions frequently revolve around fantasy scenarios in which firepower is essential for the hero-shooter to emerge victorious. In its description of its 3-Gun Tactical Match, one gun club explains:

> "This type of match has the shooter shooting centerfire rifle, centerfire pistol, and shotgun (.410 or larger) at paper 'bad guy,' steel plates, and similar targets. In any given scenario, the shooter moves through

an imaginary situation in which his life is placed in danger by the 'bad guys.' The scenario will vary from month to month, and will have a theme that practices real-life shooting and defensive skills. Examples of scenarios: exodus from a shopping mall overrun with terrorists, self defense at an ATM machine, Hollywood bank robbery, L.A. riots, home intruder, etc."[97]

In the video cited above, the "scenario" is spelled out for the 3-Gun participant as he's led hooded, his wrists tied together, into a faux prison cell and seated (see photo on previous page):

"Okay all you troopers are such badasses you decided you were going to go hunt pirates in Somalia… Something went wrong and you are now the prisoner of a Somali warlord who wants to do very bad things to you because you're an American…No one's coming to rescue you so you have to rescue yourself… During your last interrogation you noticed that the chair was rough on the sides. That might assist you in breaking your bonds should you be given the opportunity…At that point you should find yourself a gun. Cause we're Americans and we all like guns. Find one and start killing all the bad guys who are trying to do very bad things to you and your fellow Americans."[98]

In the pages of *Junior Shooters*, 3-Gun competitions are a mainstay, with child participants not only promoting the activity in its pages, but also lauding the gun companies that donate guns, ammunition, and other products: both for use in the activity and as prizes for the winners. As one article written by a 12- and 16-year-old states:

"Everything about 3-Gun is exactly the opposite of precision rifle. Precision to me is boring. All you do is stand there and shoot. With 3-Gun you get to 'get into it.' You get to run around (as long as you're safe), shoot 'big boy guns,' and go through obstacles shooting at the targets. Can it get any better? I think not. I felt like an FBI or a SWAT agent going in for a big bust. It was an awesome feeling."[99]

Writing in *Junior Shooters*, Corey Shaw, age 17, exulted:

"This summer I had the opportunity to shoot Fabrique Nationale Herstal (FNH) USA's SCAR. SCAR is an acronym for Special Combat Assault Rifle. And, oh, boy, is it SPECIAL!"

"Due to the fact that the SCAR is so light, you can fling it around from target to target; sometimes it feels more like you're shooting a .22 rather than a full-on combat rifle."[100][101]

In a *Junior Shooters* article titled, "Why I Love 3-Gun!," 12-year-old Jake Denno writes:

"Besides the three guns that have to be practiced with and brought to the match, many of the 3-Gun events will have special or stage weapons, as well…I have already been fortunate enough to be able to shoot a fully automatic UZI, an M-249 SAW and an M-203 grenade launcher. Some of the other special weapons in 3-Gun matches include MG-42 and M-60 machine guns, suppressed ARs and SCARs, but the one I really want to shoot is the Dillon Mini-Gun at the Larue Tactical match. Some events will also have manufacturers there who will have their pistols and shotguns as stage weapons. The only thing I do not like about stage and special weapons is that the score depends on how one shoots with an unfamiliar weapon. The triggers and sights are usually really different from what I shoot, and the guns don't always run well. At the Ironman [competition], the UZI just would not function properly, and it really threw me off my plan for that stage."[102]



Summer 2012 *Junior Shooters* features 3-Gun competitors

Like the gun industry and gun lobby's ongoing campaign to attempt to rebrand assault rifles as "Modern Sporting Rifles," by labeling 3-Gun competitions a "sport," their hope is to not only engage young shooters, but also that the activity offers the necessary cover to maintain the sale and possession of weapons that were originally designed for military or law enforcement use, including assault weapons that should be banned for import under the "sporting purposes" test of the Gun Control Act of 1968.[103] As Michael Tenny, CEO of Cheaper Than Dirt!, an online vendor of guns, ammunition, and accessories that describes itself as "America's Ultimate Shooting Sports Discounter," told *Junior Shooters*, "We're always happy to be able to support the shooting sports in any way possible, and we're even more excited to help encourage new shooters by sponsoring the 3 Gun Nation Junior division…Faced with political pressure to ban the importation of the competition shotguns that have made 3-Gun into the sport it is today, I think it's critical that we as an industry pull together to support all of the shooting sports in any way we can."[104]

## THE REALITY OF CHILDREN AND GUNS

Much like the tobacco industry before it, the firearms industry — gun and accessory manufacturers, trade associations (both self-proclaimed, such as the NSSF, and *de facto*, such as the National Rifle Association) and related publications — consistently denies the risk associated with its products, especially in the marketing of guns to children. As noted earlier, their arguments, such as NSSF's assertion that hunting is safer than bowling, can at times be so divorced from reality that they cross the line from the absurd to the surreal.

Despite the rosy picture painted by the firearms industry, the combination of children and firearms poses risks that are widely recognized. These include death and injury, not just from unintentional shootings, virtually the sole category of firearm death acknowledged by the gun industry, but suicide and homicide. In addition, the exposure to lead that young shooters experience — either when firing a weapon or making their own ammunition, a practice commonly known as "hand loading" — can harm many different body organs and systems, including the brain, and exposure can lead to reduced intelligence as well as behavioral problems.

### YOUTH GUN DEATHS

In 2014, more than 1,300 children under the age of 18 died from firearms: 699 homicides, 532 suicides, 74 unintentional shootings,[105] and 19 from undetermined intent.  From 1999 to 2014, nearly 23,000 children under the age of 18 died from guns:  13,756 homicides, 6,903 suicides, 1,723 unintentional shootings, and 395 from undetermined intent.[106]

For the age group one to 17 in 2014, unintentional injury was the leading cause of death, the most common cause of unintentional death being motor vehicle-related deaths (49 percent) and drownings (18 percent). Firearms accounted for two percent of all fatal unintentional injuries. Malignant neoplasms (primarily cancers) were second. Suicide was the third leading cause of death. Guns accounted for 40 percent of these deaths, making firearms the second most popular method of suicide for this age group, behind suffocation. Homicide was the fourth leading cause of death for this age group, with firearms being used in 59 percent of all homicides.[107]

**TABLE THREE: FIREARM DEATHS IN THE UNITED STATES, LESS THAN 18 YEARS OF AGE, 1999 - 2014**[108]

| Year | Homicide | Suicide | Unintentional | Undetermined Intent | Total |
|---|---|---|---|---|---|
| 1999 | 1,001 | 558 | 158 | 50 | 1,767 |
| 2000 | 819 | 537 | 150 | 23 | 1,529 |
| 2001 | 835 | 451 | 125 | 16 | 1,427 |
| 2002 | 872 | 423 | 115 | 26 | 1,436 |
| 2003 | 805 | 377 | 102 | 25 | 1,309 |
| 2004 | 868 | 384 | 105 | 22 | 1,379 |
| 2005 | 921 | 412 | 127 | 25 | 1,485 |
| 2006 | 1,082 | 371 | 102 | 24 | 1,579 |
| 2007 | 1,038 | 325 | 112 | 36 | 1,511 |
| 2008 | 984 | 361 | 98 | 26 | 1,469 |
| 2009 | 887 | 401 | 83 | 16 | 1,387 |
| 2010 | 835 | 375 | 98 | 26 | 1,334 |
| 2011 | 730 | 448 | 102 | 23 | 1,303 |
| 2012 | 740 | 457 | 78 | 15 | 1,290 |
| 2013 | 640 | 491 | 94 | 23 | 1,248 |
| 2014 | 699 | 532 | 74 | 19 | 1,324 |
| **Total** | **13,756** | **6,903** | **1,723** | **395** | **22,777** |

A common myth is that children and teens living in rural areas do not suffer the effects of gun violence experienced by their contemporaries who live in urban environments, despite being exposed to guns at a young age. The fact is that guns kill rural youth at a rate equal to urban youth but in different circumstances. While more urban youth die from gun homicide, the difference is made up in rural areas through firearm suicide and unintentional deaths. A 2010 study in the *American Journal of Pediatrics* examined all pediatric firearm deaths up to age 19 from 1999 through 2006. The deaths were analyzed by rural-urban settings based on population size and proximity to metropolitan areas. The study concluded:

> "Children in the most-rural US counties had firearm mortality rates that were statistically indistinguishable from those for children in the most-urban counties. This finding reflects a greater homicide rate in urban counties counterbalanced by greater suicide and unintentional firearm death rates in rural counties."[109]

Parents also have significant ability to prevent youth suicide recognizing that adolescents who commit suicide most often use the family gun.[110] By removing guns from homes where children and teens live, especially depressed adolescents, parents will reduce likelihood of suicide and unintentional death for everyone in the household, but especially for teens.

While 85 percent of suicide attempts with guns are fatal, other means are less lethal: only one percent of cutting or piercing attempts are fatal, while only two percent of poisoning/overdose attempts result in death.[111] Moreover,

studies show that many teen suicide attempts are impulsive. Of teens who survived a suicide attempt, one quarter said they thought of suicide just five minutes before making the attempt. There is also little truth to the widely held belief that those who attempt to kill themselves are determined to succeed. In fact, 90 percent of near-lethal suicide attempts do not attempt to kill themselves again.[112]



"Loaded With Lead: Part 3," *Seattle Times*, October 20, 2014

## LEAD: THE SILENT HEALTH THREAT FROM FIREARMS

While the health and safety threats of gun violence can be measured in death and injury, there is another reason guns pose a grave threat to human health and particularly children's health: the toxic lead found in ammunition.

Lead is a highly toxic metal that is especially harmful to the developing brains of young children. It can harm many different body organs and systems, and exposure can lead to reduced intelligence and many behavioral problems. The federal Centers for Disease Control and Prevention (CDC) maintains there is *no* safe level of lead in the blood for children, and states, "Even low levels of lead in blood have been show to affect IQ, ability to pay attention, and academic achievement."[113][114]

In recent decades, public health-based regulations have dramatically reduced the presence of lead in what were once common sources of exposure for children, such as lead-based paint and lead in gasoline. The major health threat that remains is lead from bullets. The Environmental Protection Agency (EPA) regulates lead in paint and gasoline but is prohibited from regulating the lead contained in cartridges and shells. The EPA has rejected a petition filed by 101 environmental organizations to regulate lead from spent bullets and shot citing a section of the Toxic Substances and Control Act (TSCA) that exempts cartridges and shells from the agency's reach. Both the NRA and the NSSF intervened in court to object to EPA regulation of lead in ammunition.[115] A 2013 consensus statement from scientists from across the nation warned: "Lead-based ammunition is likely the greatest, largely unregulated source of lead knowingly discharged into the environment in the United States."[116]

For both children and adults, the primary risk of exposure comes from shooting ranges, most notably indoor ranges. At the firing range, children can be exposed to lead through particles suspended in the air or even by eating contaminated food. Even when children do not go to the firing range themselves, they can be contaminated by clothing or accessories from adults returning from the range.[117] The CDC recommends that individuals "shower and change clothes after finishing a task that involves working with lead-based products, such as stained glass, making bullets, or using a firing range."[118]



This photo from the cover of a 1997 Browning firearms catalog ignores the threat lead poses to children

Yet despite the well-documented public health risk, shooting ranges remain a largely unregulated industry. A recent investigation in the *Seattle Times* revealed that shooting range owners routinely violate workplace safety laws, resulting in their employees as well as their children and adult customers being exposed to lead. The newspaper found that only 201 of the estimated 6,000 commercial gun ranges in the United States have been inspected within the past decade, but 86 percent of those which had been inspected violated at least one lead-related standard. Thousands more gun ranges are volunteer-led or members-only clubs with no employees, and these do not have to follow federal regulations at all.[119] Not surprisingly, while the NRA and its self-described gun industry "corporate partners" will at times pay lip service to the safety hazards posed by lead, their overriding focus remains actively encouraging children to visit shooting ranges. As a medical officer for the National Institute for Occupational Safety and Health told the *Seattle Times*, "Some firing ranges cater to children, they have birthday parties and special events." An NRA official, Susan Recce, told the newspaper, "The issue of lead problems for indoor ranges is extremely rare."[120]

The facts state otherwise. At a Vancouver, Washington shooting range, tests in 2010 found 20 youth and young adults on the Rifle and Pistol Club team had been overexposed to lead. "We weren't very cautious," one of the participants was quoted as saying. "We would get lead on our hands and eat finger food." Tests showed that the floor of the range had a lead level 993 times that allowed by a federal housing guideline.[121]

There is no cure or treatment for the effects of lead exposure, and the effects are chronic and irreversible. The only option is prevention. And yet, the response from all too many parents is to ignore the threat. In response to an online discussion thread titled "is 3 yrs old too young to help dad clean ar [AR-15 assault rifle]?," one commenter responded:

> "The whole lead, chemical paranoia is out of control IMO [in my opinion]. I grew up with lead paint, played with lead toy soldiers, dunked my hands in kerosene while cleaning car parts and used real MEK to degrease stuff. According to my doc I'm in good health aside from high cholesterol. Use common sense. Don't let your kid drink Hoppe's or Frog Lube. Don't let him stick his hands in his mouth…He's more likely to drown or get hurt at the playground than die for touching the bolt of a rifle once a week."[122]

## CONCLUSION AND RECOMMENDATIONS

The efforts of the gun industry and gun lobby to put firearms in the hands of young children and teens are the exact opposite of what health experts advise. The American Academy of Pediatrics is emphatic in urging parents not to keep guns in homes with children. Their healthychildren.org website advises parents, "The best way to keep your children safe from injury or death from guns is to NEVER have a gun in the home." Specifically, the pediatricians' organization warns parents as follows:[123]

- Do not purchase a gun, especially a handgun.

- Remove all guns present in the home.

- Remember that young children simply do not understand how dangerous guns can be, despite parents' warnings.

- Find out if there are guns in the homes where your children play. If so, talk to the adults in the house about the dangers of guns to their families.

"For those who know of the dangers of guns but still keep a gun in the home," the site advises:

- Always keep the gun unloaded and locked up.

- Lock and store the bullets in a separate place.

- Make sure to hide the keys to the locked boxes.

As noted, one study found that adolescents who commit suicide most often use the family gun.[124] By removing guns from homes where children and teens live, especially depressed adolescents, parents will reduce likelihood of suicide and unintentional death for everyone in the household, but especially for teens.

A common argument is that giving children guns teaches them personal responsibility and other life skills. Typical is the language found on the website of National 4-H Shooting Sports, which promises "Skills for Life — Activity for a Lifetime." Sponsors of the program include: the National Shooting Sports Foundation; online accessories and ammo vendor MidwayUSA (headed by top NRA donor Larry Potterfield); the ammunition manufacturer Hornady (headed by NRA board member Steve Hornady); and, Hodgdon Powder (headed by one-time NRA board member Bob Hodgdon). In the "Just for Youth" section under the heading "Kids 'n' Guns," the site states:

> "4-H uses shooting sports to teach youth development. Our programs are valuable for helping young people develop self-confidence, personal discipline, responsibility, teamwork, self esteem and sportsmanship. The discipline and self-control required for responsible firearms use carries over into many other aspects of life."[125]

In the same section, the question is asked, "Isn't easy access to firearms one reason for the violent behavior we've seen in Columbine and other school shootings?" The response is as predictable as it is disingenuous: "No, access is not the issue. The safest location for a responsible gun owner to store a firearm is the secure environment of his or her home...Firearms should however, be stored so that they are inaccessible to unauthorized users."

Left unstated is the fact that with the creation of the youth gun culture envisioned by the firearms industry and the gun lobby, the children themselves in the home are all too often the *authorized* users.

At the same time, the "skills" learned by youth at the foot of today's gun industry — with its embrace of heightened lethality and increased militarization, combined with the immaturity and limited judgment that define childhood — can be put into action with horrific results.

In addition to urging that homes with children be gun-free, the Violence Policy Center recommends the following:

■ Firearms are an adult product just like tobacco and alcohol and should be treated as such to protect the health and safety of children. Just as our society does not condone the use of alcohol or tobacco by minors even with adult supervision, we should prohibit the acquisition, possession, and use of firearms by children. Current federal law prohibits the transfer of handguns by Federal Firearms License (FFL) holders to anyone under the age of 21. Federal law also prohibits handgun possession by those under the age of 18 with a number of exceptions. Federally licensed dealers are also prohibited from selling long guns (shotguns and rifles) to those under the age of 18. These laws should be revised so that possession standards strictly match sales standards: 18 years old for long guns and 21 years old for handguns.

■ The Federal Trade Commission should investigate whether the firearms industry is inappropriately marketing firearms to children and also whether manufacturers are engaged in product placement of firearms in video games marketed to minors to determine whether such efforts violate applicable advertising standards.

■ Websites for gun manufacturers and vendors of related products (such as ammunition and ammunition magazines) should have the same age restrictions and criteria for access as those for tobacco and alcohol vendors.

■ Congress should repeal the section of the Toxic Substances Control Act prohibiting the Environmental Protection Agency from regulating lead in ammunition.

■ States should review their laws regarding firearm possession by children with the goal of having the age for legal possession at least match that for legal purchase from a Federal Firearms License holder.

■ An effective public education campaign should be developed and implemented to warn parents and youth about the dangers associated with the presence and use of firearms.

To put the gun industry and gun lobby's child-marketing efforts into perspective, imagine the public outcry if the alcohol industry announced a program targeting grade school children, promoting a line of "youth cocktails." Or if the tobacco industry urged parents to introduce their second and third grade-age children to the satisfaction and sophistication of smoking with "junior cigarettes." Or if it was revealed that these industries had a "strategic plan" targeting children to not only "start them young," but to create a cadre of "youth ambassadors," whose goal would be to convince their playmates via personal contact and social media to join them in these adult activities. Yet, the firearms industry and gun lobby are today aggressively pursuing just such a campaign targeting America's youth.

And while the firearms industry and gun lobby consistently work to present this marketing effort in terms of tradition and family, the real impetus lies in profit and political power. Most tragically, the effects of this campaign are all too often measured in unnecessary death and crippling injury.

# ENDNOTES

1. "Father of Marysville school shooter convicted of gun charges," *Seattle Times*, September 29, 2015 (http://www.seattletimes.com/seattle-news/crime/father-of-marysville-school-shooter-convicted-of-gun-charges/); "'Bang, Bang I'm Dead': Marysville Shooter Jaylen Fryberg's Ominous Texts – NBC News," *nbcnews.com*, November 20, 2014 (http://www.nbcnews.com/storyline/marysville-school-shooting/bang-bang-im-dead-marysville-shooter-jaylen-frybergs-ominous-texts-n252496); "Death Toll Rises to 5 in School Shooting," *Associated Press*, November 8, 2014 (http://www.nytimes.com/2014/11/09/us/death-toll-rises-to-5-in-school-shooting.html); "Second Washington school shooting victim dies after homecoming prince took aim at his friends, family," *Washington Post*, October 27, 2014 (http://www.washingtonpost.com/news/morning-mix/wp/2014/10/27/second-seattle-area-school-shooting-victim-dies-after-homecoming-prince-took-aim-at-his-friends-family/); "Marysville school shooting: What more could the community have done?," *Christian Science Monitor*, October 26, 2014 (http://www.csmonitor.com/USA/2014/1026/Marysville-school-shooting-What-more-could-the-community-have-done-video); "Tangled Portrait of a Student Emerges in Washington Shooting," *New York Times*, October 25, 2014 (http://www.nytimes.com/2014/10/26/us/contrasting-portraits-emerge-of-jaylen-ray-fryberg-shooter-at-washington-school.html?_r=0).

2. "Troutdale police release parts of interviews with father, brother of Reynolds High shooter," *OregonLive*, April 6, 2015 (http://www.oregonlive.com/portland/index.ssf/2015/04/troutdale_police_release_31_pa.html); "NRA mouthpiece Wayne LaPierre quiet as Oregon high school shooter revealed to conceal AR-15 rifle in guitar case," *Daily News*, June 12, 2014 (http://www.nydailynews.com/news/national/school-shooter-portland-ore-ar-15-report-article-1.1825533); "Reynolds High School shooter Jared Padgett died of self-inflicted wound," *koin.com*, June 11, 2014 (http://koin.com/2014/06/11/reynolds-high-school-news-briefing-june-11-2014/); "Reynolds High shooter Jared Padgett 'showed off about guns,'" *koin.com*, June 11, 2014 (http://koin.com/2014/06/11/reynolds-high-shooter-jared-padgett-showed-off-about-guns/); "Oregon school shooting: Gunman Jared Michael Padgett known as serious student with interest in military," *The Oregonian*, June 11, 2014 (http://www.oregonlive.com/gresham/index.ssf/2014/06/oregon_school_shooting_gunman.html); "Jared Michael Padgett: Troutdale Shooting Suspect Argued With Classmates About Hitler," *Inquisitr*, June 11, 2014 (http://www.inquisitr.com/1294499/jared-michael-padgett-troutdale-shooting-suspect-argued-with-classmates-about-hitler/); "Jared Padgett Photos: Reynolds High School Gunman Jared Michael Padgett Facebook Pictures Out," *Epoch Times*, June 11, 2014 (http://www.theepochtimes.com/n3/728899-jared-padgett-photos-reynolds-high-school-gunman-jared-michael-padgett-facebook-pictures/).

3. "Waseca teen accused in school shooting plot had been planning for months," *Star Tribune*, December 17, 2014 (http://www.startribune.com/local/257505631.html#qRWhjsAGA7Oj9pMX.97); "Recording released of Minnesota teen calmly telling police of plans to kill family and set off school massacre," *Daily Mail*, June 25, 2014 (http://www.dailymail.co.uk/news/article-2668478/Recording-released-Minnesota-teen-calmly-telling-police-plans-kill-family-set-school-massacre.html); "Teen details massacre plot, reveres Columbine killer," *USA Today*, June 25, 2014 (http://www.usatoday.com/story/news/nation/2014/06/25/teen-plot-bomb/11349075/); "Recording released of Minnesota teen calmly telling police of plans to kill family and set off school massacre," *Daily Mail*, June 25, 2014 (http://www.dailymail.co.uk/news/article-2668478/Recording-released-Minnesota-teen-calmly-telling-police-plans-kill-family-set-school-massacre.html); "UPDATED: Waseca teen pleads not guilty in mass shooting plot," *Waseca County News*, May 12, 2014 (http://www.southernminn.com/waseca_county_news/news/article_e3226229-92a4-5cec-8084-e1f88c297f11.html); "Police: Minnesota teen planned school massacre," *CNN*, May 2, 2014 (http://www.cnn.com/2014/05/01/justice/minnesota-attack-thwarted/).

1090

4. See, for example, the 2013 Violence Policy Center study *Blood Money II: How Gun Industry Dollars Fund the NRA* (http://www.vpc.org/studies/bloodmoney2.pdf).

5. NSSF *SHOT Business*, September/October 1993.

6. *Shooting Sports Retailer*, September/October 1998.

7. "Shooting for a New Audience," *Shooting Sports Retailer*, May/June 2007.

8. General Social Survey (GSS) gun ownership data contained in this report is drawn from the NORC publication *General Social Survey Final Report: Trends in Gun Ownership in the United States, 1972-2014*, Tom W. Smith, Jaesok Son, NORC at the University of Chicago, March 2015. For a detailed history of gun ownership in the United States as reported by the GSS, see the May 2015 Violence Policy Center report *A Shrinking Minority: The Continuing Decline of Gun Ownership in America* (http://www.vpc.org/studies/ownership.pdf).

9. Respondents were asked, "Do you (or does your [husband/wife]) go hunting?"

10. *NSSF Report: Incidence Rate of Hunting With Modern Sporting Rifles*, National Shooting Sports Foundation, 2015.

11. See http://www.chipmunkrifles.com/chipmunk_aboutus.php.

12. See http://www.crickett.com/.

13. Ironically, while the company's Beanie Baby must meet at least four types of federal safety standards — sharp edges and points, small parts, hazardous materials, and flammability — there are no federal safety standards for the domestic manufacture of firearms.  For more information, see http://www.vpc.org/regulating-the-gun-industry/regulate-firearms-like-other-consumer-products/.

14. "Watch an Ad for 'My First Rifle,' the Gun a 5-Year-Old Used to Shoot His 2-Year-Old Sister," *Slate*, May 3, 2013 (http://www.slate.com/blogs/crime/2013/05/03/crickett_keystone_sporting_arms_watch_an_ad_for_my_first_rifle_the_gun_a.html).

15. See http://www.littlesportsman.com/.

16. "Marlin's New Kid-Friendly Rifles," *NRA Family InSights*, January 2, 2014 (http://www.nrafamilyinsights.org/articles/marlins-new-kid-friendly-rifles).

17. "Children and Guns — An Iowa Fail," Jews for the Preservation of Firearms Ownership, April 21, 2014 (http://jpfo.org/alerts2014/alert20140421.htm).

18. "'We wish you peace': Children of weapons instructor killed in gun range accident make emotional video pledging forgiveness to nine-year-old girl who shot their father," *Daily Mail*, September 12, 2014 (http://www.dailymail.co.uk/news/article-2754358/We-wish-peace-Children-weapons-instructor-killed-gun-range-accident-make-emotional-video-pledging-forgiveness-nine-year-old-girl-shot-father.html#ixzz3U1IYxDJD).

19. "Choosing Your Child's First Gun," *American Hunter*, November 16, 2012.

20. "Choosing Your Child's First Gun," *American Hunter*, November 16, 2012.

1091

21.  As a 2010 article in the NRA's *American Rifleman* magazine noted: "The term 'tactical .22 rifle' is essentially an oxymoron. It's unlikely that a single military or police force on Earth uses .22 Long Rifle arms for small-scale combat operations, at least as primary guns. Nevertheless, this burgeoning class of firearms has taken hold in recent years in the civilian market. With origins dating back to the ever-modular Ruger 10/22, perhaps the most accessorized gun on the planet, up through today's AR-15 look-alikes, these guns have found a welcome place in the cabinets of varmint shooters, beginning marksmen, and of course those who like to shoot all day with inexpensive, readily available ammunition." "Tactical 22s: A New Class of Rifles," *American Rifleman*, November 19, 2010 (http://www.americanrifleman.org/articles/2010/11/19/tactical-22s-a-new-class-of-rifles/).

22.  "Why AR-Styled Rifles Are so Popular," *Shooting Sports Retailer*, January 2014.

23.  See http://www.gandermountain.com/modperl/product/details.cgi?i=781756, downloaded September 22, 2015.

24.  Sig Sauer advertisement, *Junior Shooters*, Summer 2011.

25.  "Rifles for Ruger Rimfire," *Junior Shooters*, March 2011 Special Edition.

26.  See https://www.billsgs.com/the-average-joe-archive/214-december-gotm-beretta-arx-160.

27.  "The Best Guns for Smaller Shooters," *Shooting Sports Retailer,* April 30, 2015 (http://www.shootingsportsretailer.com/2015/04/30/best-guns-smaller-shooters/).

28.  "The Best Guns for Smaller Shooters," *Shooting Sports Retailer*, April 30, 2015 (http://www.shootingsportsretailer.com/2015/04/30/best-guns-smaller-shooters/).

29.  "Henry Repeating Arms: Muddy Girl," *NRA Family*, February 21, 2014 (http://www.nrafamily.org/articles/2014/2/21/henry-repeating-arms-muddy-girl/).

30.  "CZ 452 Scout Rifle," *Junior Shooters*, Summer 2011.

31.  See http://www.smith-wesson.com/webapp/wcs/stores/servlet/ Category4_750001_750051_757786_-_757784_757784_image.

32.  In May 2015, Black Forge Weapons was acquired by Invincible Arms of Ohio, see http://invinciblearms.com/news-and-announcements/invincible-arms-acquires-black-forge-weapons/.

33.  "The Best Guns for Smaller Shooters," *Shooting Sports Retailer*, April 30, 2015 (http://www.shootingsportsretailer.com/2015/04/30/best-guns-smaller-shooters/).

34.  "Letter from the Editor," *America's 1st Freedom*, December 2004.

35.  "A Word from Your Editor," *Junior Shooters*, Spring 2012.

36.  "A Word from Your Editor," *Junior Shooters*, Spring 2012.

37.  "A Word from Your Editor," *Junior Shooters*, Winter 2012.

*38.*  *Junior Shooters*, March 2011 Special Edition.

39. "Is the Shooting Industry Getting it All Wrong?," *Shooting Sports Retailer*, July 31, 2015 (http://www.shootingsportsretailer.com/2015/07/31/shooting-industry-getting-wrong/).

40. See http://www.juniorshooters.net/aboutus/.

41. See http://www.juniorshooters.net, downloaded November 13, 2015.

42. See http://www.juniorshooters.net/aboutus/.

43. "A Word from Your Editor," *Junior Shooters*, Spring 2012.

44. Founded in 1996, "The International Defensive Pistol Association (IDPA) is the governing body of a shooting sport that simulates self-defense scenarios and real life encounters...One of the unique facets of this sport is that it is geared toward the new or average shooter, yet is fun, challenging and rewarding for the experienced shooter. The founders developed the sport so that practical gear and practical guns may be used competitively."  On its website, IDPA poses the question, "WHY ANOTHER SHOOTING SPORT?," and answers: "Prior to the formation of IDPA, there was no place to compete and hone one's skill with equipment designed for & suitable for self-defense (http://www.idpa.com).

45. "A Word from Your Editor," *Junior Shooters*, Spring 2012.

46. "Why I Love Bushmaster AR-15s...You Should, Too," *Junior Shooters*, Summer 2012.

47. "45 Firearms Developed Specifically for Smaller-Statured or Younger Shooters," Mossberg press release, June 30, 2014 (http://www.juniorshooters.net/2014/07/06/mossbergs-youth-firearms-and-safety/).

48. "Adams Arms 14.5-inch Evo Ultralite Piston MSR Upper," *Junior Shooters*, Summer 2013.

49. "Adams Arms 14.5-inch Evo Ultralite Piston MSR Upper," *Junior Shooters*, Summer 2013.

50. "The Mosquito: A Cool .22 With A Sting," *Junior Shooter*s, Summer 2009.

51. "Sig Sauer's Mosquito," *Junior Shooters*, Summer 2013.

52. "Sig Sauer's Mosquito," *Junior Shooters*, Summer 2013.

53. "Sig Sauer's Mosquito," *Junior Shooters*, Summer 2013.

54. "Sig Sauer's Mosquito," *Junior Shooters*, Summer 2013.

55. "Glocks are for Girls," *Junior Shooters*, Summer 2009.

56. "Kids Gear!," *Junior Shooters*, Summer 2010.

57. *Junior Shooters*, Winter 2011.

58. *Junior Shooters*, March 2011.

59. *Junior Shooters*, Winter 2011.

60. *Junior Shooters*, Spring 2013.

1093

61. *Junior Shooters*, Spring 2013.

62. *Junior Shooters*, Winter 2011.

63. *Junior Shooters*, Spring 2012.

64. *Junior Shooters*, Spring 2013.

65. "NRA's Magazine for Juniors Goes Digital," *AccurateShooter.com*, September 28th, 2011 (http://bulletin.accurateshooter.com/2011/09/nras-magazine-for-juniors-goes-digital/).

66. See https://membership.nrahq.org/forms/signup.asp.

67. As of September 23, 2015.

68. "Ronnie Barrett: High-Caliber Innovator," December 19, 2013 (http://www.nrafamily.org/articles/2013/12/19/ronnie-barrett-high-caliber-innovator/).

69. See https://web.archive.org/web/20150221040356/http://www.nrafamilyinsights.org/Kids under "Kids."

70. "Test Fire: Thompson/Center HotShot," *NRA Family*, January 2, 2014 (http://www.nrafamily.org/articles/2014/1/2/test-fire-thompsoncenter-hotshot/).

71. Downloaded from http://www.nrafamilyinsights.org/Kids-Under-8-Awesome-Apps on November 13, 2014 and from https://web.archive.org/web/20141129150952/http://www.nrafamilyinsights.org/articles/nra-gun-guide-app on September 23, 2015.

72. "My First .22 Pistol," *NRA Family*, August 8, 2014 (http://www.nrafamily.org/articles/2014/8/8/my-first-22-pistol/).

73. On July 20, 2015, the online publication and website *NRA Family InSights* became the *NRA Family* website, "designed to cater to the unique needs of American families that own guns, with realistic how-to advice on topics such as safe firearm storage, introducing new shooters and hunters to the sports, outdoor family destinations and entertainment, personal protection tips, historical firearms and figures, gun and gear reviews, news for NRA families, Olympic shooting sports and more." According to Executive Director of NRA publications Doug Hamlin, "*NRA Family* was created to serve the millions of NRA families in America. Rather than addressing a specific sport or interest, we're adopting a holistic approach that includes the needs of mothers, fathers, kids and grandparents who are both eager to learn, and to pass their knowledge on to the next generation." "NRA Family's Brand-New Website," July 20, 2015 (http://www.nrafamily.org/articles/2015/7/20/nra-familys-brand-new-website/).

74. "Hunting is Safer Than Golf and Most Other Activities (Not to Mention Football, Basketball and Soccer)," National Shooting Sports Foundation press release, December 5, 2011 (http://www.nssf.org/newsroom/releases/2011/120511.cfm?print=X).

75. *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting: Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

76. "A Parent's Guide to Recreational Shooting for Youngsters," National Shooting Sports Foundation, 2014.  Also included in the document is a pledge for children to sign which includes the promise that "I will not go snooping or allow my friends to go snooping for guns in the house."

1094

77.  *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012.

78.  *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012.

79.  *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012.

80.  Labeled "An Initiative for the Future of Hunting," *Families Afield* (http://www.familiesafield.org/), founded by NSSF, National Wild Turkey Federation, and the U.S. Sportsmen's Alliance, "is an education and outreach program to help states create hunting opportunities for youths, so that more families may enjoy America's greatest outdoor tradition together." The National Rifle Association and the Congressional Sportsmen's Foundation are also "coalition partners" in the program. According to NSSF, "Since its inception, 35 states have passed new laws aimed at removing barriers and making it easier for new people to get into the field and try hunting" (http://www.nssf.org/hunting/youth/). The bulk of the program's efforts have focused on reducing minimum age requirements for hunting by children and eliminating the need for more rigorous licensing and training for novice hunters. On the program's website under "Get Involved," NSSF warns "Hunter Numbers are Declining," stating, "For every 100 adult hunters today, only 69 youth hunters are coming up to take their place," while under the heading "Focus on Youth," the organization stresses that "Youngsters are Key."

81.  *Understanding Activities that Compete with Hunting and Target Shooting, 2011 Comprehensive Consumer Study, Executive Summary*, National Shooting Sports Foundation, 2012.

82.   *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

83.  *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

84.  *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

85.  *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

86.  *Understanding the Impact of Peer Influence on Youth Participation in Hunting and Target Shooting, Executive Summary*, Hunting Heritage Trust and National Shooting Sports Foundation, 2012.

87.  "The Gun Industry's Deadly Addiction," *Rolling Stone*, February 28, 2013 (http://www.rollingstone.com/politics/news/the-gun-industrys-deadly-addiction-20130228#ixzz3bShTEHM4).

88.  "Is the Shooting Industry Getting it All Wrong," *Shooting Sports Retailer*, July 31, 2015 (http://www.shootingsportsretailer.com/2015/07/31/shooting-industry-getting-wrong/).

89.  "Shooters: How Video Games Fund Arms Manufacturers," *Eurogamer.net*, January 31, 2013

(http://www.eurogamer.net/articles/2013-02-01-shooters-how-video-games-fund-arms-manufacturers).

90.  "The gun gamer's dilemma," *Gun Nuts Media*, March 25, 2015
     (http://www.gunnuts.net/2015/03/25/the-gun-gamers-dilemma/).

91.  All typos or grammatical errors in original text.

92.  Perhaps recognizing the risks that come with turning what shooters have "seen on the screen into a reality," under
     the heading "Our Products Are Not For the Unjust" on its website the company offers this disclaimer: "Let us make
     this plain — if you are a morally-deprived, violent individual who is interested in purchasing our products to do harm,
     please do not buy from us. Firefield products cater to independent, free-thinkers who strive to live a life of honor,
     purpose and meaning. Firefield works hard to embrace that spirit. Each product is built on a foundation of promoting
     self-reliance, love for our country and the importance of protecting our family. We understand that life is constantly
     moving, and our customers need the necessary tools to realize their full potential and complete each task with
     principle and integrity. By joining the Firefield Legion, you are part of an elite group that is responsible, ethical and
     edgy, and loves to keep it real in any situation" (http://www.fire-field.com/about.html).

93.  "Always Shooting for More: National Shooting Sports Foundation builds ranks of young shooters, hunters," *Junior
     Shooters*, Volume 1, 2007.

94.  "Competition Shooting 101: 3-Gun," *The Truth About Guns*, April 8, 2011
     (http://www.thetruthaboutguns.com/2011/04/foghorn/competition-shooting-101-3-gun/).

95.  "Competition Shooting 101: 3-Gun," *The Truth About Guns*, April 8, 2011,
     (http://www.thetruthaboutguns.com/2011/04/foghorn/competition-shooting-101-3-gun/).

96.  "Competition Shooting 101: 3-Gun," *The Truth About Guns*, April 8, 2011
     (http://www.thetruthaboutguns.com/2011/04/foghorn/competition-shooting-101-3-gun/).

97.  "3-Gun Tactical Match," Cleburne County Shooting Club, Heber Springs, AR, downloaded September 24, 2015
     (http://www.ccscar.com/3gun.htm).

98.  "Competition Shooting 101: 3-Gun," *The Truth About Guns*, April 8, 2011
     (http://www.thetruthaboutguns.com/2011/04/foghorn/competition-shooting-101-3-gun).

99.  "So, You Think You Want to Try 3-Gun," *Junior Shooters*, Spring 2012.

100. "FNH Has All 4 Guns for 3-Gun!," *Junior Shooters*, Summer 2011.

101. According to FN's website, "Early 2004, United States Special Operations Command (USSOCOM) issued a
     solicitation for a family of Special Forces Combat Assault Rifles, the so-called SCAR, designed around two different
     calibers but featuring high commonality of parts and identical ergonomics.  FN Herstal took part in the full and open
     competition and released prototypes of a brand new family of weapons within timeframe taking advantage of our
     long-standing firearms know-how" (http://www.fnherstal.com/primary-menu/products-capabilities/rifles/general/
     product/182/232/182/1/_/fn-scarR-l-std.html).

102. "Why I Love 3-Gun!," *Junior Shooters*, March 2011 Special Edition.

103. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) can fully exercise its existing statutory authority to exclude from importation all semiautomatic assault rifles as "non-sporting" weapons pursuant to 18 USC §925(d)(3) (a provision of the 1968 Gun Control Act) and also exclude the importation of assault weapon kits and parts sets. This policy was first implemented in 1989 by the George H.W. Bush administration in response to drug wars and mass shootings in the U.S. The Clinton administration strengthened the import rules in 1998 in response to efforts by the gun industry to evade the ban, but the policy was essentially abandoned by the George W. Bush administration with limited activity since.

104. "Junior Prizes in Place for 3 Gun Nation Tour," *Junior Shooters*, Special Edition, 2011.

105. In an in-depth investigation published in 2013, *The New York Times* reviewed hundreds of child firearm deaths and found that unintentional shootings occur roughly twice as often as federal records indicate because of idiosyncrasies in how such deaths are classified by authorities (for example, an unintentional shooting being classified as a homicide). According to the *Times*, "The undercount stems from the peculiarities by which medical examiners and coroners make their 'manner of death' rulings. These pronouncements, along with other information entered on death certificates, are the basis for the nation's mortality statistics, which are assembled by the National Center for Health Statistics, a division of the Centers for Disease Control and Prevention. Choosing among five options — homicide, accidental, suicide, natural or undetermined — most medical examiners and coroners simply call any death in which one person shoots another a homicide." "Children and Guns: The Hidden Toll," *The New York Times*, September 28, 2013 (http://www.nytimes.com/2013/09/29/us/children-and-guns-the-hidden-toll.html?pagewanted=all&_r=0).

106. Source, Centers for Disease Control and Prevention WISQARS database.

107. Source, Centers for Disease Control and Prevention WISQARS database, additional calculations by Violence Policy Center.

108. Source, Centers for Disease Control and Prevention WISQARS database.

109. Michael L. Nance, MD, Brendan G. Carr, MD, MS, Michael J. Kallan, MS, Charles C. Branas, PhD, and Douglas J. Wiebe, PhD, "Variation in Pediatric and Adolescent Firearm Mortality Rates in Rural and Urban US Counties," *Pediatrics*, Volume 125, Number 6, June 2010.

110. Renee M. Johnson, PhD, MPH, Catherine Barber, MPA, Deborah Azrael, PhD, David E. Clark, MD, and David Hemenway, PhD, "Who are the owners of firearms used in adolescent suicides?," *Suicide and Life-Threatening Behavior*, December 2010.

111. Harvard T.H. Chan School of Public Health, *Means Matter* (http://www.hsph.harvard.edu/means-matter/means-matter/case-fatality/).

112. Harvard T.H. Chan School of Public Health, *Means Matter* (http://www.hsph.harvard.edu/means-matter/).

113. Centers for Disease Control and Prevention, "What Do Parents Need to Know to Protect Their Children?" (http://www.cdc.gov/nceh/lead/acclpp/blood_lead_levels.htm).

114. Some recent evidence even suggests that there is a strong link between exposure to lead and criminal activity, see for example: Kevin Drum, "America's Real Criminal Element: Lead," *Mother Jones*, January/February 2013

(http://www.motherjones.com/environment/2013/01/lead-crime-link-gasoline); Jessica Wolpaw Reyes, "Environmental Policy as Social Policy? The Impact of Childhood Lead Exposure on Crime," National Bureau of Economic Research Working Papers, May 2007 (http://www.nber.org/papers/w13097); and, Rick Nevin, "Understanding international crime trends: The legacy of preschool lead exposure," *Environmental Research* 104 (2007) 315-336 (http://pic.plover.com/Nevin/Nevin2007.pdf).

115. *Trumpeter Swan Society v. Environmental Protection Agency*, 774 F.3d 1037 (D.C. Cir. 2014).

116. David C. Bellinger, PhD, MSc, et al, "Health Risks from Lead-Based Ammunition in the Environment — A Consensus Statement of Scientists," March 22, 2013 (http://escholarship.org/uc/item/6dq3h64x#page-1).

117. Violence Policy Center and Environmental Working Group, *Poisonous Pastime: The Health Risks of Shooting Ranges and Lead to Children, Families, and the Environment*, May 2001 (http://www.vpc.org/graphics/poison.pdf) and *Lead Pollution at Outdoor Firing Ranges*, Environmental Working Group, companion study to *Poisonous Pastime* (http://www.vpc.org/publications/lead-pollution-at-outdoor-firing-ranges/).

118. Centers for Disease Control and Prevention, "Prevention Tips" (http://www.cdc.gov/nceh/lead/tips.htm).

119. "Loaded With Lead: Part 1," *Seattle Times*, October 17, 2014 (http://projects.seattletimes.com/2014/loaded-with-lead/1/).

120. "Loaded With Lead: Part 1," *Seattle Times*, October 17, 2014 (http://projects.seattletimes.com/2014/loaded-with-lead/1/).

121. "Loaded With Lead: Part 3," *Seattle Times*, October 20, 2014 (http://projects.seattletimes.com/2014/loaded-with-lead/3/).

122. See http://www.m4carbine.net/showthread.php?157264-is-3-yrs-old-too-young-to-help-dad-clean-ar/page2.

123. See http://www.healthychildren.org/English/safety-prevention/all-around/Pages/Gun-Safety-Keeping-Children-Safe.aspx.

124. Renee M. Johnson, PhD, MPH, Catherine Barber, MPA, Deborah Azrael, PhD, David E. Clark, MD, and David Hemenway, PhD, "Who are the owners of firearms used in adolescent suicides?," *Suicide and Life-Threatening Behavior*, December 2010.

125. See http://w3.4-hshootingsports.org/Kids'N'Guns.php.

 **Violence Policy Center**

1730 Rhode Island Avenue, NW  Suite 1014

Washington, DC 20036

W W W . V P C . O R G

# EXHIBIT D

The New York Times

The Opinion Pages

## Taking Note
## The Editorial Page Editor's Blog
# Marketing Guns to Children

**By Anna North**    February 19, 2016 10:05 am

The gun industry markets a variety of products explicitly to children, a new report shows, from armed stuffed animals to lighter versions of rifles. And some see kids as a vital group of future gun buyers who need to be brought into the fold at a young age.

The report, called **"Start Them Young"** and issued on Thursday by the Violence Policy Center, lists a variety of firearms meant at least partly for children. It mentions the Crickett rifle, a gun made for children by the company Keystone Sporting Arms. Keystone's website and some of its merchandise bear the image of "Davey Crickett," a gun-wielding cartoon insect. The company sells Davey Crickett hats, dog tags and pins, as well as a Davey Crickett Beanie Baby, listed as "not for children under three years of age."

Keystone's website also sells books featuring "Little Jake," a boy who uses his gun to bring down a bear and save an African village from a marauding elephant. The publisher of the books says Little Jake is actually older than he looks: "Little Jake is a fictional character in his late teens. While small in stature so that young children may relate to him, Little Jake is old enough to hunt and fish safely on his own without adult supervision."

"Start Them Young" also cites the rise of .22-caliber versions of higher-caliber rifles, often produced with lightweight materials. According to an article in the trade magazine Shooting Sports Retailer, "these guns bring the coolness and fun of the tactical rifle to kids and less serious shooters." The website of the retailer Gander Mountain describes one such weapon thus: "Designed for the indoor range and the youth shooter, this Carbon15 .22 LR Rimfire lightweight is sure to add new dimensions to your Bushmaster shooting pleasure. Operational controls are functionally and ergonomically identical to AR-15 type rifles."

The report makes the case that the gun industry and some gun-rights advocates see putting guns in the hands of children as a crucial recruitment move. In a 2012 report, the National Shooting Sports Foundation, the gun industry's trade association, explicitly recommended that gun manufacturers market to children: "To help hunting and target shooting get a head start over other activities, stakeholders such as managers and manufacturers should target programs toward youth 12 years old and younger. This is the time that youth are being targeted with competing activities." An online ad for a Marlin XT rifle features a father and son and boasts, "FOR THE FUTURE OF OUR SPORT, IT'S THE MOST POWERFUL FIREARM ON EARTH." And the editor-in-chief of the magazine Junior Shooters wrote in 2012:

Each person who is introduced to the shooting sports and has a positive experience is another vote in favor of keeping our American heritage and freedom alive. They may not be old enough to vote now, but they will be in the future. And think about how many lives they will come in contact with that they can impact!

In 2015, at least 282 people were accidentally shot by a child under 18, according to the group Everytown for Gun Safety. This year, the count is already up to 33.

And while weapons designed for children may be lighter, they are still deadly — "Start Them Young" notes that a five-year-old Kentucky boy accidentally killed his two-year-old sister with a Crickett rifle in April 2013. He had gotten the gun as a birthday present.

© 2017 The New York Times Company

California Notices

California Notices

## *2:22cv4663, Junior Sports Magazines Inc. Et Al V. Rob Bonta Et Al*

US District Court Docket

United States District Court, California Central

(Western Division - Los Angeles)

**This case was retrieved on 12/19/2022**

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 07/08/2022 | COMPLAINT with filing fee previously paid ($402 paid on 07/08/2022, receipt number ACACDC-33596259), filed by Plaintiffs The CRPA Foundation, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Raymond Brown, Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., California Rifle & Pistol Association, Incorporated. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Attorney Anna M Barvir added to party Raymond Brown(pty:pla), Attorney Anna M Barvir added to party California Rifle & Pistol Association, Incorporated(pty:pla), Attorney Anna M Barvir added to party California Youth Shooting Sports Association, Inc.(pty:pla), Attorney Anna M Barvir added to party Gun Owners of California, Inc.(pty:pla), Attorney Anna M Barvir added to party Junior Sports Magazines Inc.(pty:pla), Attorney Anna M Barvir added to party Redlands California Youth Clay Shooting Sports, Inc.(pty:pla), Attorney Anna M Barvir added to party The CRPA Foundation(pty:pla))(Barvir, Anna) (Entered: 07/08/2022) | |
| 2 | 07/08/2022 | CIVIL COVER SHEET filed by Plaintiffs Raymond Brown, California Rifle & Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. (Barvir, Anna) (Entered: 07/08/2022) | |
| 3 | 07/08/2022 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening),,,, 1 filed by Plaintiffs Raymond Brown, California Rifle & Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. (Barvir, Anna) (Entered: 07/08/2022) | |
| 4 | 07/08/2022 | NOTICE of Interested Parties filed by Plaintiffs Raymond Brown, California Rifle & Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation, (Barvir, Anna) (Entered: 07/08/2022) | |
| 5 | 07/08/2022 | NOTICE OF ASSIGNMENT to District Judge Christina A. Snyder and Magistrate Judge Jacqueline Chooljian. (et) (Entered: 07/08/2022) | |
| 6 | 07/08/2022 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (et) (Entered: 07/08/2022) | |
| 7 | 07/08/2022 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (et) (Entered: 07/08/2022) | |

1103

2:22cv4663, Junior Sports Magazines Inc. Et Al V. Rob Bonta Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 8 | 07/08/2022 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Rob Bonta. (et) (Entered: 07/08/2022) | |
| 9 | 07/12/2022 | NOTICE of Appearance filed by attorney Kevin James Kelly on behalf of Defendant Rob Bonta (Attorney Kevin James Kelly added to party Rob Bonta(pty:dft))(Kelly, Kevin) (Entered: 07/12/2022) | |
| 10 | 07/12/2022 | PROOF OF SERVICE Executed by Plaintiff The CRPA Foundation, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Raymond Brown, Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., California Rifle and Pistol Association, Incorporated, upon Defendant Rob Bonta served on 7/11/2022, answer due 8/1/2022. Service of the Summons and Complaint were executed upon Officer Silkwood, Person Authorized to Accept Service on behalf of Rob Bonta, Attorney General for the State of California in compliance with Federal Rules of Civil Procedure by personal service.Original Summons NOT returned.  (Barvir, Anna) (Entered: 07/12/2022) | |
| 11 | 07/19/2022 | NOTICE TO COUNSEL upon filing of the complaint by Judge Christina A. Snyder. (rba) (Entered: 07/19/2022) | |
| 12 | 07/20/2022 | NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80  filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. Motion set for hearing on 8/22/2022 at 10:00 AM before Judge Christina A. Snyder. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Request for Judicial Notice, # 3 Declaration of Anna M. Barvir, # 4 Declaration of Jonathan L. Coleman, # 5 Declaration of Andy Fink, # 6 Exhibit 17 to 20 for Declaration of Andy Fink, # 7 Declaration of Steve Gomez, # 8 Declaration of Alan Gottlieb, # 9 Declaration of Richard Minnich, # 10 Declaration of Allison Rangel, # 11 Declaration of Sam Paredes, # 12 Declaration of Anna Canon, # 13 Declaration of Jay Fitzgerald, # 14 Proposed Order) (Barvir, Anna) (Entered: 07/20/2022) | |
| 13 | 07/20/2022 | EX PARTE APPLICATION to Shorten Time for Hearing on re NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80  12 to August 8, 2022  filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Declaration of Anna M. Barvir, # 3 Proposed Order) (Barvir, Anna) (Entered: 07/20/2022) | |
| 14 | 07/21/2022 | OPPOSITION to EX PARTE APPLICATION to Shorten Time for Hearing on re NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80 12 to August 8, 2022  13  filed by Defendant Rob Bonta. (Attachments: # 1 Proposed Order)(Kelly, Kevin) (Entered: 07/21/2022) | |
| 15 | 07/22/2022 | ORDER DENYING PLAINTIFFS' EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR HEARING ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION by Judge Christina A. Snyder: IT IS HEREBY ORDERED that Plaintiffs' Application 13 is denied. IT IS FURTHER ORDERED that all papers in | |

2:22cv4663, Junior Sports Magazines Inc. Et Al V. Rob Bonta Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | opposition to Plaintiffs' motion for preliminary injunction must be filed and served by 8/8/2022. Any reply must be filed and served by 8/15/2022. The hearing on Plaintiffs' Motion for a Preliminary Injunction 12 shall take place on 8/22/2022 at 10:00 AM. (gk) (Entered: 07/22/2022) | |
| 16 | 07/28/2022 | STIPULATION for Extension of Time to File Answer to 30 days after Court's ruling on motion for preliminary injunction re Complaint (Attorney Civil Case Opening),,,, 1 filed by Defendant Rob Bonta Rob Bonta. (Attachments: # 1 Proposed Order)(Kelly, Kevin) (Entered: 07/28/2022) | |
| 17 | 07/29/2022 | ORDER EXTENDING DEADLINE FOR DEFENDANT TO RESPOND TO COMPLAINT by Judge Christina A. Snyder: Upon Stipulation 16 , IT IS HEREBY ORDERED that the deadline for Defendant Rob Bonta to answer, move, or otherwise respond to the Complaint is extended until 30 days after the Court rules on Plaintiffs' pending motion for a preliminary injunction. (gk) (Entered: 08/01/2022) | |
| 18 | 08/08/2022 | SCHEDULING NOTICE (IN CHAMBERS) AND SETTING HEARING BY ZOOM by Judge Christina A. Snyder. The 8/22/2022 hearing on the NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80 12 at 10:00 AM will be held by Zoom before Judge Christina A. Snyder. Zoom Webinar Information can be found on the Court's website, under Judge Snyder's Procedures.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (cj) TEXT ONLY ENTRY (Entered: 08/08/2022) | |
| 19 | 08/08/2022 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80 12 filed by Defendant Rob Bonta. (Kelly, Kevin) (Entered: 08/08/2022) | |
| 20 | 08/08/2022 | DECLARATION of Kevin J. Kelly in support of Defendant's opposition to Plaintiffs' motion for preliminary injunction NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80 12 filed by Defendant Rob Bonta. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Kelly, Kevin) (Entered: 08/08/2022) | |
| 21 | 08/15/2022 | REPLY in support of NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80 12 filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. (Barvir, Anna) (Entered: 08/15/2022) | |
| 22 | 08/18/2022 | Notice of Errata re: Plaintiffs' Reply to Defendant's Opposition to Motion for Preliminary Injunction filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation.  (Barvir, Anna) (Entered: 08/18/2022) | |
| 23 | 08/18/2022 | EX PARTE APPLICATION for Leave to file Supplemental or Sur-Reply Brief in Support of Plaintiffs Motion for Preliminary Injunction  filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, | |

2:22cv4663, Junior Sports Magazines Inc. Et Al V. Rob Bonta Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Inc., The CRPA Foundation. (Attachments: # 1 Proposed Order) (Barvir, Anna) (Entered: 08/18/2022) | |
| 24 | 08/19/2022 | MINUTE (IN CHAMBERS) PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION 12 ; PLAINTIFFS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL OR SUR-REPLY BRIEF 23 by Judge Christina A. Snyder. The Court hereby sets a status conference for September 12, 2022 at 11:00 AM, for the purpose of discussing a new hearing date for plaintiffs' motion for preliminary injunction. Additionally, plaintiffs are granted leave to file the supplemental brief, dkt 23. (iv) (Entered: 08/19/2022) | |
| 25 | 08/19/2022 | FOR COURT USE ONLY: STATISTICAL CORRECTION Granting 23 re: Order 24 . (iv) (Entered: 08/19/2022) | |
| 26 | 08/19/2022 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80 12 filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. (Barvir, Anna) (Entered: 08/19/2022) | |
| 27 | 09/02/2022 | SCHEDULING NOTICE (IN CHAMBERS) AND SETTING HEARING BY ZOOM by Judge Christina A. Snyder, re: Minutes 24 . The 9/12/2022 Status Conference at 11:00 AM will be held by Zoom before Judge Christina A. Snyder. Zoom Webinar Information can be found on the Court's website, under Judge Snyder's Procedures. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (cj) TEXT ONLY ENTRY (Entered: 09/02/2022) | |
| 28 | 09/09/2022 | STATUS REPORT Regarding the Potential Adoption of Legislative Amendments to AB 2571 filed by Defendant Rob Bonta. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Kelly, Kevin) (Entered: 09/09/2022) | |
| 29 | 09/12/2022 | MINUTES OF ZOOM STATUS CONFERENCE RE: CASE AND TO RESET MOTION HEARING before Judge Christina A. Snyder: Hearing held by Zoom. The Court orders supplemental briefing and resets the hearing on plaintiffs Motion for Preliminary Injunction 12 , as follows: Plaintiffs' Supplemental Brief shall be filed on or before 9/28/2022; Defendants Supplemental Brief shall be filed on or before 10/7/2022; and Hearing is reset on 10/17/2022 at 10:00 AM., by Zoom. Zoom Webinar Information can be found on the Courts Website, under Judge Snyders Procedures. Court Reporter: Laura Elias. (jp) (Entered: 09/21/2022) | |
| 30 | 09/28/2022 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80 12 filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. (Attachments: # 1 Request for Judicial Notice, # 2 Declaration of Andy Fink, # 3 Declaration of Richard Minnich, # 4 Declaration of Jonathan Coleman, # 5 Declaration of Alan Gottlieb, # 6 Declaration of Sam Paredes, # 7 Declaration of Steve Gomez)(Barvir, Anna) (Entered: 09/28/2022) | |
| 31 | 09/28/2022 | DECLARATION of Raymond Brown in support of NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80 12 | |

2:22cv4663, Junior Sports Magazines Inc. Et Al V. Rob Bonta Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. (Barvir, Anna) (Entered: 09/28/2022) | |
| 32 | 10/07/2022 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendant from enforcing Bus. & Prof. Code Sec. 22949.80  12 in Further Support of Opposition to Plaintiffs' Motion for Preliminary Injunction filed by Defendant Rob Bonta. (Kelly, Kevin) (Entered: 10/07/2022) | |
| 33 | 10/17/2022 | MINUTES OF ZOOM HEARING RE: PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION (Filed 07/20/22) 12 held before Judge Christina A. Snyder. Hearing held by Zoom and counsel are present. Tentative Order provided. The Court confers with counsel and counsel argue, as stated on the record. The Court takes the matter under submission and the motion will stand submitted. The Court will issue a final order. Court Reporter: Marea Woolrich. (rolm) (Entered: 10/20/2022) | |
| 34 | 10/24/2022 | TRANSCRIPT ORDER as to Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., Second Amendment Foundation, The CRPA Foundation for Court Reporter. Court will contact Laura Palmerin at lpalmerin@michellawyers.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Barvir, Anna) (Entered: 10/24/2022) | |
| 35 | 10/24/2022 | (IN CHAMBERS) PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION 12 by Judge Christina A. Snyder. In accordance with the foregoing, the Court DENIES plaintiffs' motion for a preliminary injunction. IT IS SO ORDERED. (rolm) (Entered: 10/24/2022) | |
| 36 | 10/27/2022 | TRANSCRIPT ORDER as to Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation for Court Reporter. Court will contact Laura Palmerin at lpalmerin@michellawyers.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Barvir, Anna) (Entered: 10/27/2022) | |
| 37 | 11/21/2022 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. Appeal of Order on Motion for Preliminary Injunction 35 . (Appeal Fee - $505 Fee Paid, Receipt No. ACACDC-34355965.) (Barvir, Anna) (Entered: 11/21/2022) | |
| 38 | 11/21/2022 | Joint STIPULATION to Stay Case pending Appeal filed by Plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., The CRPA Foundation. (Attachments: # 1 Proposed Order)(Barvir, Anna) (Entered: 11/21/2022) | |
| 39 | 11/22/2022 | ORDER GRANTING STAY OF PROCEEDINGS PENDING | |

2:22cv4663, Junior Sports Magazines Inc. Et Al V. Rob Bonta Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | APPEAL AND EXTENDING DEADLINE FOR DEFENDANT TO RESPOND TO COMPLAINT by Judge Christina A. Snyder: Upon Stipulation 38 , IT IS HEREBY ORDERED further proceedings in this matter, including discovery, pretrial motions, and trial, are stayed until further order of this Court, pending resolution of Plaintiffs' appeal of this Court's interlocutory order denying Plaintiffs' motion for preliminary injunction. IT IS FURTHER ORDERED that Plaintiffs' counsel shall file with this Court a copy of the Ninth Circuit's decision in Plaintiffs' interlocutory appeal in this matter within ten days of its issuance. IT IS FURTHER ORDERED that the deadline for Defendant Rob Bonta to answer, move, or otherwise respond to the Complaint is extended until 30 days after the Ninth Circuit issues a decision in Plaintiffs' interlocutory appeal. (gk) (Entered: 11/23/2022) | |
| 40 | 11/22/2022 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 22-56090 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 37 as to plaintiffs Raymond Brown, California Rifle and Pistol Association, Incorporated, California Youth Shooting Sports Association, Inc., Gun Owners of California, Inc., Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., Second Amendment Foundation, The CRPA Foundation. (mat) (Entered: 11/23/2022) | |
| 41 | 11/22/2022 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 37 filed by Junior Sports Magazines Inc., Redlands California Youth Clay Shooting Sports, Inc., California Rifle and Pistol Association, Incorporated, Raymond Brown, Gun Owners of California, Inc., California Youth Shooting Sports Association, Inc., The CRPA Foundation. CCA # 22-56090. The appeal filed November 21, 2022 is a preliminary injunction appeal.Accordingly, Ninth Circuit Rule 3-3 shall apply. Failure to file timely the opening brief shall result in the automatic dismissal of this appeal by the (9TH CCA) Clerk for failure to prosecute. [See document for all details.] (mat) (Entered: 11/23/2022) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2022, an electronic PDF of

APPELLANTS' EXCERPTS OF RECORD VOLUME V OF V was uploaded to the

Court's CM/ECF system, which will automatically generate and send by electronic

mail a Notice of Docket Activity to all registered attorneys participating in the case.

Such notice constitutes service on those registered attorneys.


Dated: December 19, 2022        Respectfully submitted,

                                    MICHEL & ASSOCIATES, P.C.

                                    s/ Anna M. Barvir
                                    Anna M. Barvir
                                    *Attorneys for Plaintiffs-Appellants*