## No. 22-56090

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# NINTH CIRCUIT

JUNIOR SPORTS MAGAZINES, INC., ET AL.,

*Plaintiffs-Appellants,*

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA AND DOES 1 – 10,

*Defendants-Appellees.*

On Appeal from the
United States District Court for the Central District of California
No. 2:22-cv-04663-CAS-JC
The Honorable Christina A. Snyder

## BRIEF OF *AMICUS CURIAE* THE SECOND AMENDMENT LAW CENTER, JEWS FOR THE PRESERVATION OF FIREARM OWNERSHIP, AND CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS IN SUPPORT OF PLAINTIFFS-APPELLANTS

Marc J. Randazza
RANDAZZA LEGAL GROUP, PLLC
4974 S. Rainbow Blvd., Suite 100
Las Vegas, Nevada 89118
Tel.: 702-420-2001
ecf@randazza.com

Jay M. Wolman
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
Tel.: 702-420-2001
ecf@randazza.com

## CORPORATE DISCLOSURE STATEMENT OF
## THE SECOND AMENDMENT LAW CENTER

Pursuant to Federal Rule of Appellate Procedure 26.1, The Second Amendment Law Center ("2ALC") hereby provides the following information:

2ALC is a nonprofit corporation organized under § 501(c)(3) of the Internal Revenue Code, which does not have any shareholder(s) or subsidiary(ies).

Date: December 27, 2022.            RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
    Marc J. Randazza

## CORPORATE DISCLOSURE STATEMENT OF JEWS
## FOR THE PRESERVATION OF FIREARM OWNERSHIP

Pursuant to Federal Rule of Appellate Procedure 26.1, Jews for the Preservation of Firearm Ownership ("JPFO") hereby provides the following information:

JPFO is a non-profit tax-exempt 501(c)(3) educational civil-rights organization, which does not have any shareholder(s) or subsidiary(ies).

Date: December 27, 2022.          RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
          Marc J. Randazza

## CORPORATE DISCLOSURE STATEMENT OF CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS

Pursuant to Federal Rule of Appellate Procedure 26.1, Citizens' Committee for the Right to Keep and Bear Arms ("CCRKBA") hereby provides the following information:

CCRKBA is a nonprofit organization incorporated in Washington, which does not have any shareholder(s) or subsidiary(ies).

Date: December 27, 2022.      RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT OF THE SECOND AMENDMENT LAW CENTER ..................................................................I

CORPORATE DISCLOSURE STATEMENT OF JEWS FOR THE PRESERVATION OF FIREARM OWNERSHIP .................................... II

CORPORATE DISCLOSURE STATEMENT OF CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS ..........III

TABLE OF CONTENTS .......................................................... IV

TABLE OF AUTHORITIES ......................................................V

STATEMENT OF THE IDENTITY OF THE AMICUS CURIAE AND ITS INTEREST IN THE CASE ................................................. 1

FRAP 29(A)(4)(E) STATEMENT ............................................. 3

ARGUMENT ............................................................................ 4

   1.  SPEECH NECESSARY FOR THE LAWFUL EXERCISE OF CONSTITUTIONAL RIGHTS CANNOT BE RESTRAINED............................................... 5

   2.  THE CALIFORNIA LAW IS UNCONSTITUTIONAL .................................. 9

      2.1   The Restrictions on Non-Commercial Speech are Unconstitutional.................................................................. 13

      2.2   The Restrictions on Commercial Speech are Unconstitutional.................................................................. 18

   3.  CONCLUSION ................................... 24

CERTIFICATE OF COMPLIANCE ........................................ 25

CERTIFICATE OF SERVICE ................................................ 26

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002) .................................................................. 10

*Ben-Shalom v. Marsh*,
  881 F.2d 454 (7th Cir. 1989) ................................................. 10

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983) ........................................................... 15, 16

*Brown v. Entm't Merchants Ass'n*,
  564 U.S. 786 (2011) ................................................................... 7

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980) .................................... 19, 20, 21, 23, 24

*Clark v. Martinez*,
  543 U.S. 371 (2005) ................................................................ 14

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
  657 F.3d 936 (9th Cir. 2011) ................................................ 14

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988) ................................................................ 14

*Erznoznik v. Jacksonville*,
  422 U.S. 205 (1975) ................................................................... 7

*First Resort, Inc. v. Herrera*,
  860 F.3d 1263 (9th Cir. 2017) .............................................. 17

*Frisby v. Schultz*,
  487 U.S. 474 (1988) ................................................................ 18

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) .................................................... 10

*Junior Sports Magazines Inc. v. Bonta*,
No. 2:22-cv-04663-CAS (JCx), 2022 U.S. Dist.
LEXIS 193730 (C.D. Cal. Oct. 24, 2022) ............... 13, 14, 15, 20, 21, 22

*Kennedy v. Bremerton Sch. Dist.*,
142 S. Ct. 2407 (2022) ........................................................................ 17

*Lakewood v. Plain Dealer Pub. Co.*,
486 U.S. 750 (1988) ............................................................................ 14

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) ............................................................................ 22

*Martinez v. City of Fresno*,
No. 1:22-cv-00307-DAD-SAB, 2022 U.S. Dist.
LEXIS 92907 (E.D. Cal. May 24, 2022) ............................................. 21

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .............................................................................. 5

*Merrill v. Navegar, Inc.*,
26 Cal. 4th 465 (2001) ........................................................................ 22

*Newsom v. Albermarle*,
354 F.3d 249 (4th Cir. 2003) ................................................................ 7

*People v. Belous*,
458 P.2d 194 (Cal. 1969) ...................................................................... 5

*Planned Parenthood of Cent. Missouri v. Danforth*,
428 U.S. 52 (1976) ................................................................................ 7

*Prison Legal News v. Ryan*,
39 F.4th 1121 (9th Cir. 2022) ............................................................. 15

*Reno v. ACLU*,
521 U.S. 844 (1997) ...................................................................... 15, 19

*Schowengerdt v. United States*,
944 F.2d 483 (9th Cir. 1991) .............................................................. 10

vi

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ................................................................ 7

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994) .............................................................. 17

*United States v. Isnadin*,
  742 F.3d 1278 (11th Cir. 2014) ............................................ 12

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) .............................................................. 18

## STATUTES

Cal. Bus. & Prof. Code § 22949.80 .............................. 10, 11, 15

Cal. Gov't Code § 84504 ............................................................ 16

Cal. Pen. Code § 261 .................................................................. 4

## OTHER AUTHORITIES

Barry Stentiford, *THE AMERICAN HOME GUARD* 149 (2002) ........ 8, 9

California Assembly Bill 160 ..................................................... 4

California Assembly Bill 2571 ........................................ passim

David Kopel & Joseph Greenlee, The Second Amendment Rights of
  Young Adults, 43 S. ILL. U. L.J. 495 (2019) .......................... 6

Ida B. Wells, *Southern Horrors, N.Y. AGE,* June 25, 1892 .................... 8

Ida B. Wells, *THE LIGHT OF TRUTH: WRITINGS OF AN ANTI-
LYNCHING CRUSADER* 84 (Mia Bay ed., 2014) ................................ 8

J. Story, Commentaries on the Constitution of the United States 607,
  §1897 (2d ed., 1851) ................................................................ 5

St. George Tucker, ed., Blackstone's Commentaries, with Notes of
Reference to the Constitution and Laws 300 (1803) ............................ 5

*STATE PAPERS AND ADDRESSES OF GOVERNOR HERBERT R.
O'CONOR* 618 (1947) ............................................................... 9

## CONSTITUTIONAL PROVISIONS

Cal. Const. Art. I .......................................................................... 5

U.S. Const. amend. II .............................................................. 6, 7

## STATEMENT OF THE IDENTITY OF THE AMICUS CURIAE AND ITS INTEREST IN THE CASE

The Second Amendment Law Center ("2ALC") is a nonprofit corporation organized under § 501(c)(3) of the Internal Revenue Code. 2ALC is dedicated to promoting and defending the individual rights to keep and bear arms for hunting, sport, self-defense, and other lawful purposes envisioned by the Founding Fathers. The purpose of 2ALC is to defend these rights in courts across the country. 2ALC also seeks to educate the public about the social utility of private firearms ownership and to provide accurate and truthful historical, criminological, and technical information about firearms to policy makers, judges, attorneys, police, and the public.

Jews for the Preservation of Firearm Ownership ("JPFO") is a non-profit tax-exempt 501(c)(3) educational civil-rights organization, not a lobby. JPFO was founded by Jews in 1989, initially aimed at educating the Jewish community about the historical evils that Jews have suffered when they have been disarmed. JPFO has always welcomed people of all religious beliefs who share a common goal of opposing and reversing victim-disarmament policies while advancing liberty for all. It was the brainchild of Aaron Zelman (1946 - 2010), a leading national civil-rights

1

activist. JPFO's products and programs reach out to as many segments of the American people as possible, using bold tactics without compromise on fundamental principles.

Citizens' Committee for the Right to Keep and Bear Arms ("CCRKBA") is a nonprofit organization incorporated in Washington and with its principal place of business in that state. CCRKBA was formed in 1972 and is dedicated to protecting firearms rights. CCRKBA educates grass root activists, the public, legislators, and the media about the Second Amendment. Their programs are designed to help all Americans understand the importance of the Second Amendment and its role in keeping Americans free. CCRKBA has a nationwide membership and has members throughout California.

*Amici* are interested in this case due to their concerns for the unconstitutional speech restrictions under AB 2571 that may affect them, their members, and their constituents.

*Amici* 2ALC, JPFO, and CCRKBA's authority to file this brief is based on the consent of all parties to this appeal, as provided for in FRAP 29(a)(2).

2

## FRAP 29(a)(4)(E) STATEMENT

This brief was authored by Randazza Legal Group, PLLC as counsel to The Second Amendment Law Center ("2ALC"), Jews for the Preservation of Firearm Ownership ("JPFO"), and Citizens' Committee for the Right to Keep and Bear Arms ("CCRKBA"). No attorney for any party authored this brief, in whole or in part. No party or counsel for any party contributed money that was intended to fund preparing or submitting this brief. No person, other than 2ALC, JPFO, CCRKBA, and Randazza Legal Group, PLLC contributed money that was intended to fund the preparation and submission of this brief.

## ARGUMENT

This is not a case about selling guns to minors. This is a case about whether a state can restrict speech about lawful (and even Constitutionally-protected) activity. Whatever the Court says California is allowed to do here will apply in full force to other Constitutionally-permissible speech.

It is illegal under Cal. Pen. Code § 261.5(b) for adolescents to have sex. However, it is nevertheless commonplace, as evidenced by the 4,184 births among adolescent females ages 15-17 in 2018 (down from 17,008 in 2008).[1] It was found that "contraceptive use is one of the most important proximate determinants of fertility."[2] Yet, it would take only a few quick edits, primarily using a "find and replace" function of a word processor, to convert California's Assembly Bill 2571 (originally and as-amended by Assembly Bill 160) (collectively "AB 2571") into a law that would not only prohibits condom manufacturers and pharmaceutical companies from advertising directly to minors, but one that also would

---

[1] <https://www.cdph.ca.gov/Programs/CFH/DMCAH/surveillance/CDPH%20Document%20Library/Adolescents/Adolescent-Births-in-CA-2018.pdf> at p. 9.

[2] *Id.* at 21.

prohibits gynecologists and family planning groups from making recommendations to their patients. And, by that same token, although the California Constitution protects the right to abortion, *People v. Belous,* 458 P.2d 194 (Cal. 1969) and Cal. Const. Art. I, § 1, an AB 2571 variant could be used to preclude the lawful dissemination of information by abortion providers to minors (as abortions typically result from sexual intercourse). Such a law would not be tolerated by this Court under the First Amendment, and neither can AB 2571 survive constitutional scrutiny.

### 1. Speech Necessary for the Lawful Exercise of Constitutional Rights Cannot Be Restrained

The Supreme Court has refused to treat the right to arms as "a second-class right," *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010), a refusal supported by early commentators' description of the right as the "true palladium of liberty" and the "palladium of the liberties of a republic." St. George Tucker, ed., Blackstone's Commentaries, with Notes of Reference to the Constitution and Laws 300 (1803); J. Story, Commentaries on the Constitution of the United States 607, §1897 (2d ed., 1851). The statute here at issue indeed treats not merely the right to

arms, but speech about the right to bear arms as a second, if not third, class right.

Hundreds of statutes throughout the colonial and founding eras required young adults, of majority, to own firearms and edged weapons. *See* David Kopel & Joseph Greenlee, The Second Amendment Rights of Young Adults, 43 S. ILL. U. L.J. 495, 533–89 (2019) (covering the 13 original states and colonies, Vermont, and Plymouth Colony). The Second Amendment became the law of the land after being ratified by eleven states. At the time of ratification, every ratifying state required ownership of firearms. *Id.* at 537–38 (New Jersey), 542–43 (Maryland), 547–48 (North Carolina), 550 (South Carolina), 554–55 (New Hampshire), 557–58 (Delaware), 562–63 (Pennsylvania), 567 (New York), 569 (Rhode Island), 573 (Vermont), 583 (Virginia). So did the other states. *Id.* at 585 (Massachusetts), 587 (Georgia), 589 (Connecticut).[3] Most statutes requiring firearm ownership were militia statutes. Hundreds of militia statutes enacted prior to the Second Amendment's

---

[3] Connecticut, Georgia, and Massachusetts ratified the entire Bill of Rights—including the Second Amendment—in 1939, to make a statement when dictators like Hitler, Mussolini, Franco, Stalin, and Tojo were wantonly murdering disarmed victims.

ratification *required* these young adults to own arms. *See id.* at 536–89 (identifying over 200 statutes). Only in 1738–1757 Virginia, when militia duty started at 21, was a minimum militia age over 18.

"Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52, 74 (1976); *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect"); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 794 (2011) (*quoting Erznoznik v. Jacksonville*, 422 U.S. 205, 212–13 (1975)) ("[M]inors are entitled to a significant measure of First Amendment protection"). *See also Newsom v. Albermarle*, 354 F.3d 249 (4th Cir. 2003) (high school cannot punish a student for wearing a NRA Shooting Sports Camp shirt).

The exercise of the fundamental right to arms necessitates speech about the exercise of that right. The leading journalist exposing racial lynching was Ida B. Wells. She penned an iconic article that was

reprinted as a nationally circulated pamphlet, Southern Horrors. After

noting cases where lynch mobs had been defeated by armed African-

Americans, Wells continued:

> The lesson this teaches and which every AfroAmerican should
> ponder well is that a Winchester rifle should have a place of
> honor in every black home, and it should be used for the
> protection which the law refuses to give. When the white man
> who is always the aggressor knows he runs as great a risk
> biting the dust every time his Afro-American victim does, he
> will have greater respect for AfroAmerican life. The more the
> Afro-American yields and cringes and begs, the more he has
> to do so, the more he is insulted, outraged, lynched.

Ida B. Wells, *Southern Horrors, N.Y. AGE,* June 25, 1892, reprinted in

Ida B. Wells, *THE LIGHT OF TRUTH: WRITINGS OF AN ANTI-*

*LYNCHING CRUSADER* 84 (Mia Bay ed., 2014).

An armed citizenry is not merely the province of the Revolution or

late-1800s fights against lynch mobs. After Pearl Harbor, Hawaii relied

heavily on volunteer civilians, and "created a more extensive militia

system than any other state or territory." Barry Stentiford, *THE*

*AMERICAN HOME GUARD* 149 (2002). The volunteers were

responsible for "breach defense, watching strategic and vulnerable points

such as hilltops, runways, and crossroads, traffic control, providing

guides and scouts for the army, and, if all else failed, implementation of

8

scorched earth in the path of invaders." *Id*. Maryland's governor called forth volunteer citizens "to furnish immediately, local protection against parachute troops, saboteurs, or organized raiding parties." *STATE PAPERS AND ADDRESSES OF GOVERNOR HERBERT R. O'CONOR* 618 (1947).

Today, if *amici* repeat the words of Ms. Wells to high school students, they violate AB 2571 for endorsing the Winchester rifle. Similarly, if they endorse civilian ownership of arms, should the need for volunteers to again stand ready to defend their state, as in the aftermath of Pearl Harbor, they violate AB 2571. California cannot constitutionally prohibit teaching the lessons of history to those who may need such lessons.

### 2. The California Law is Unconstitutional

As argued by Appellants, AB 2571 is a content-based and viewpoint-based statute that restricts both commercial and non-commercial speech. The government seeks to restrict speech on a particular viewpoint—the benefits of the purchase of firearms. It is an idea the California legislature appears to find abhorrent, but it cannot impose its will on the people. "First Amendment freedoms are most in

danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). *See also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 579 (1995) ("The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis"). The First Amendment protects speech favoring and endorsing particular conduct, even where the conduct at issue is not permitted. *See Schowengerdt v. United States,* 944 F.2d 483, 489 (9th Cir. 1991) (distinguishing between the speech and conduct); *Ben-Shalom v. Marsh,* 881 F.2d 454, 462 (7th Cir. 1989) (same).

As amended, AB 2571 not only restricts manufacturers and retailers of firearms, Cal. Bus. & Prof. Code § 22949.80(c)(4)(A), but it also restricts individuals and organizations that encourage or advocate for the "purchase, use, or ownership of firearm-related products" who

10

advertise firearm-related products or endorse specific firearm-related products, Cal. Bus. & Prof. Code § 22949.80(c)(4)(B). This is a dangerous statute that unduly restricts promotion of safe handling and storage by manufacturers and sellers of trigger locks and gun safes.

Covered individuals, organizations, and entities are prohibited, if paid, to encourage the purchase of a firearm-related product, is such is "designed, intended, or reasonably appears to be attractive to minors." Cal. Bus. & Prof. Code § 22949.80(a)(1) & (c)(6). Under these restrictions, Appellant Junior Sports Magazines, Inc., cannot publish a magazine that advertises firearms or ammunition.

Other appellants cannot endorse products as part of training or coaching, even if they are not paid for the specific endorsement. That is, by its terms, AB 2571 prohibits answering the question of a minor, who is paying to lawfully take a class, as to what products are recommended. Tennis and golf students routinely are advised by their trainers and coaches what equipment is best. But, if a self-defense coach is asked about methods of protection, they can promote specific knives (and other deadly weapons), but they cannot make a recommendation as to the best firearm to keep on one's person or in one's home.

There is no restriction on the contrary viewpoint. Paid spokespersons for the tactical knife industry can tell someone 17 years and 364 days old: "Buy XYZ knife—available on xyzknife.com; it's much safer than buying ABC firearm,"" but those restricted by AB 2571 cannot (truthfully) say "Actually, ABC firearm is safer because [valid reasons]".[4] And, they especially cannot mention the prospect of lawfully purchasing ABC firearm the very next day, when it is legal for them to do so.

AB 2571 also restricts who can promote firearms purchases. As noted by Appellants, AB 2571 does not apply to most members of the entertainment industry. Thus, a movie studio can make a film that is attractive to minors that promotes the purchase of a brand of firearms, but a competitor brand cannot produce its own film. The entertainment industry has produced major films like *Ford v Ferrari* and *Tucker: The Man and His Dream* about icons of the auto industry, both of which had involvement of those affiliated with their namesakes. Should a movie or TV studio wish to make a biopic of Samuel Colt, AB 2571 could serve to prohibit that studio from obtaining any assistance from Colt's

---

[4] "It has been said the first rule of modern warfare is, 'Don't bring a knife to a gun fight.'" *United States v. Isnadin*, 742 F.3d 1278, 1284 (11th Cir. 2014).

Manufacturing Company, as even an R-rating means it can be marketed to 17-year-olds.

And, the text of AB 2571 also means that a firearms manufacturer can never merge with or acquire a member of the entertainment industry. This may seem less pressing, but one cannot discount the value of the free publicity Remington Arms received as a result of five seasons, across 94 episodes, of *Remington Steele*. In fact, the Walt Disney company[5] may be prohibited from sales of or streaming of *Remington Steele*: Disney may be deemed a member of the firearms industry since a costume of Woody from *Toy Story* sold by Disney likely includes holsters—a "firearm accessory" under AB 2571 (and the marketing of that costume to minors is similarly prohibited).

### 2.1 The Restrictions on Non-Commercial Speech are Unconstitutional

The District Court determined that "the statute constitutes a restriction only on commercial speech." *Junior Sports Magazines Inc. v. Bonta*, No. 2:22-cv-04663-CAS (JCx), 2022 U.S. Dist. LEXIS 193730, at

---

[5] *Amici* are of the understanding that both the producer (MTM Enterprises) and distributor (20th Century Fox Television) of *Remington Steele* are now owned by Disney.

*36 (C.D. Cal. Oct. 24, 2022). Notably, it "recognize[d] that interpreting AB 2571 as restricting non-commercial, political speech and discriminating based on content and viewpoint would subject the statute to strict scrutiny and potentially raise serious constitutional questions." *Id.* at *36 n.4. In doing so, the District Court construed the statute to avoid such problems, taking the government at its word that it would only be enforced as to commercial speech. *Id.* A court "cannot simply 'presume[] the [government] will act in good faith and adhere to standards absent from the ordinance's face.'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 946-47 (9th Cir. 2011) (*quoting Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 770 (1988)). But, the District Court did so under the guise of the canon of constitutional avoidance, under which, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). That canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Clark v. Martinez*, 543 U.S.

371, 385 (2005). This means the text of the statute must be found to have "ambiguity". *Prison Legal News v. Ryan*, 39 F.4th 1121, 1131 (9th Cir. 2022); *see also Reno v. ACLU*, 521 U.S. 844, 884 (1997) ("In considering a facial challenge, this Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction.") (citation omitted). There is no ambiguity—under ordinary textual analysis AB 2571 covers both commercial and non-commercial speech. And, the statute is not readily susceptible to such a limitation.

*Amici* agree there are "serious constitutional questions," applying the statute to non-commercial speech. The problem is that, as described above, the statute, as written, covers a host of non-commercial statements. The District Court relied on *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-68 (1983), to find that the regulated speech was 1) an advertisement; 2) referring to a particular product; and 3) arose from an economic motivation. *Junior Sports Magazines, supra* at *36-37. The speech covered does not simply include advertisements — "marketing or advertising" is defined more broadly than the common meaning of those terms to include any statement encouraging recipients to engage in a commercial transaction. Cal. Bus. & Prof. Code § 22949.80(c)(6). This

15

includes coaches paid by rifle-team students who then make a recommendation as to what firearms the students should have. Although it covers references to a particular product, it also absurdly covers statements where the speaker says "buy X, Y, or Z—they're all great"— statements about more than just a particular product. Similarly, coaches do not necessarily have an economic motivation in recommending particular product(s), even though their students are paying them for the recommendation. This is just one instance of speech that is covered by AB 2571, but does not meet the *Bolger* test.

Most egregiously, it would bar political speech to potential voters. Laws can be changed and, especially in California, with its referendum and initiative systems, proponents of ballot measures must be able to speak to their constituents. The process takes months, and many eligible voters on election day are under 18 prior to that date. AB 2571 would prohibit a firearms industry from campaigning for particular ballot measures that could result purchases of covered items, especially where other California law, Cal. Gov't Code § 84504, requires disclosure of who paid for a particular campaign advertisement. And, as described above,

it would limit *amici* from promoting firearms purchases, using the words of civil rights icon Ida B. Wells or of the post-Pearl Harbor governors.

As the District Court chose, improperly, to avoid the construction that includes non-commercial speech, the Court could remand for such consideration. But, there is no need. On its face, the statute fails strict scrutiny. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994) ("Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."); *accord First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017) (recognizing that viewpoint discrimination is subject to strict scrutiny). Thus, the government must have shown "its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022). AB 2571 neither serves a compelling interest nor is narrowly tailored.

The legislative history and the government's arguments below indicate that the purpose of the statute was to prevent minors from learning about firearms by restricting the information that could be conveyed to them. 3-ER-361 & 475. This may, at first blush, appear to

17

be a compelling interest, but it is not. The Court should not confuse the interest in reducing violence with the interest at issue here, just as the Court would not confuse an interest in reducing teen pregnancy with an interest in precluding access to pornography.

Even if the interest were in reducing gun violence, AB 2571 is not narrowly tailored to that interest. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). AB 2571 eliminates far more than gun violence. AB 2571 is not a restriction on gun ownership by minors. It is not a restriction on gun sales to minors. It is not a restriction on gun use by minors. AB 2571 does, however, broadly prohibit educational and political speech related to the lawful use of firearms by minors as well as their lawful use upon reaching the age of majority. AB 2571 "significantly restrict[s] a substantial quantity of speech that does not create" gun violence. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 n.7 (1989). Thus, AB 2571 fails strict scrutiny.

## 2.2 The Restrictions on Commercial Speech are Unconstitutional

Even if AB 2571 could be viewed as only restricting commercial speech, it remains unconstitutional. "For commercial speech to come

within [the First Amendment], it at least must concern lawful activity and not be misleading." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Here, there is nothing unlawful about advertising and marketing that may be attractive to minors, even though it is directed to adults. Neither is this a law that restricts merely misleading information—it prohibits all covered communications, whether true or false.

And, importantly, it restricts speech intended for adults under the guise of protecting minors. Just as when the Supreme Court struck down part of the Communications Decency Act, the same logic applies here: "In order to deny minors access to potentially harmful speech, the [statute] effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another. That burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno v. ACLU*, 521 U.S. 844, 874 (1997).

Merely because minors might not be able to own or possess certain items does not make marketing that is attractive to them unlawful. Amusement parks publish marketing and advertising that is attractive

to minors, but it is the parents who make the decision whether to buy plane tickets and fly across the country to visit those parks. Ronald McDonald may appeal to children, but it is the parents who choose to go to the drive-thru. Smokey the Bear may convey his message to children, but few youths are left to their own devices in the forest. There is, therefore, nothing inherently unlawful about communicating information to minors that they may then relay to their parents and, thereby, affect the decisions of those parents. A PSA of "Kids, when your dad goes hunting, make sure he wears a bright orange vest" could be prohibited under AB 2571, but, like speech about other safety measures like trigger locks and gun safes, it is speech that should be encouraged, without a hint of unlawful active or misleading content.

Moreover, it restricts speech regarding firearms that that minors may lawfully possess. And, it restricts speech regarding firearms that the minors may lawfully own upon reaching the age of majority—perhaps even the very next day. Even the District Court agreed, stating "AB 2571 regulates speech that is not inherently misleading and that does not concern unlawful activity." *Junior Sports Magazines, supra* at *43.

20

Thus, the speech restricted by AB 2571 comes within the protections of the First Amendment, and falls outside what *Central Hudson* authorizes.

Under the next prong of *Central Hudson,* the government interest must be substantial. 477 U.S. at 566. The District Court determined that "[p]rotecting minors and the public broadly from gun violence is a substantial government interest." *Junior Sports Magazines, supra* at \*47. However, if the government can satisfy that prong with a broad platitude, it renders that prong effectively meaningless. The purported interest "is at best vague and at worst completely undefined." *Martinez v. City of Fresno*, No. 1:22-cv-00307-DAD-SAB, 2022 U.S. Dist. LEXIS 92907, at \*23-24 (E.D. Cal. May 24, 2022) (finding an ordinance to "protect the health and safety of the public and city employees while an abatement is in progress" not to sufficiently articulate a substantial government interest). Nearly any policy could be attempted to be justified by invoking the interest of "protecting people from harm."" Here, like in *Martinez*, the government has not articulated the specific harm the broad restrictions of AB 2571 are supposed to serve; *amici* are not even aware of the legislature considering a single actual advertisement that directly resulted in any injury.

21

Next, under *Central Hudson,* the law must "directly advance[] the government interest asserted." 477 U.S. at 566. AB 2571 does not. Here, the District Court looked to *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 558-62 (2001), for comparison, but it failed to see the differences. *Junior Sports Magazines, supra* at *54-55. The District Court noted the detailed studies in *Lorillard* and other cases to justify the restrictions, wherein there were direct connections between advertising and the government interest. *Id.* at *54-60. But, in its analysis, the District Court merely recited that a) gun violence exists; and b) some marketing may be attractive to minors, without any direct connection between the two. *Id.* at * 66-69. The links between gun "advertisements and carnage amount to little more than guesswork." *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 490 (2001) (affirming summary judgment in the absence of evidence that the gun advertising at issue caused the assailant to commit a crime). Speculation is not a substitute for fact.

Moreover, the advancement of the interest by the law is, at best, indirect. It does not restrain the encouragement of gun violence, only a possible precursor step of encouraging the lawful purchase of firearms and firearm accessories. As noted by Appellants, the legislature

bemoaned the speech of the entertainment industry that promoted gun violence (Appellants' brief at 4-5, citing 3-ER-500), but knowing it could not even attempt to constitutionally (or politically) take on Marvel's Stark Industries or the music of NWA, the legislators went after the less-politically favored class of the firearms industry. AB 2571 will not reduce gun violence any more than a ban on condom ads would reduce teen pregnancy. To the contrary, it reduces the opportunity for minors to learn about safe handling and proper use of firearms.

Finally, under *Central Hudson,* the law must "not [be] more extensive than is necessary to serve that [government] interest." 477 U.S. at 566. AB 2571 is over-extensive. A literal reading of the statute would prohibit licensing and selling tickets to a high school production of *Annie Get Your Gun.* It would prohibit employment recruiters from marketing post-graduation jobs to high school seniors in the security industry, if any of the recruiting materials incidentally showed images of armed individuals. It prohibits the swaths of speech articulated above. None of the prohibited speech, such as recommendations by coaches, or the speech advanced by Appellants—advertisements and sponsorships directed at the lawful use of firearms by minors—is the kind of speech

23

that results in gun violence. No one will suddenly commit gun violence because they saw a manufacturer's name at a tournament. Instead, a wide swath of speech unrelated to whether a minor will suddenly go out and illegally buy a gun (let alone then use that gun to illegally harm someone) will be restricted. Thus, AB 2571 fails the *Central Hudson* test.

### 3.    Conclusion

AB 2571 is anathema to the First Amendment. It fails to serve its intended purpose; all it does is restrain speech that is protected under the Constitution. The Court should reverse the order below and declare the statute unconstitutional.

Date: December 27, 2022.          RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza
4974 S. Rainbow Blvd., Suite 100
Las Vegas, Nevada 89118
Tel.: 702-420-2001
ecf@randazza.com

Jay M. Wolman
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
Tel.: 702-420-2001
ecf@randazza.com

*Attorneys for Amicus Curiae,*
2ALC, JPFO, and CCRKBA

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3) because this brief contains 4,634 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: December 27, 2022.          RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza

25

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: December 27, 2022.                RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza